**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN, | ) ) ) ) | |
| Petitioner, | ) ) | Case No. 21-cv-8330 |
| v. | ) ) | |
| WHITE OAK GLOBAL ADVISORS, LLC, | ) ) | |
| Respondent. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**RESPONDENT WHITE OAK GLOBAL ADVISORS, LLC'S PETITION TO VACATE,**
**IN PART, AN ARBITRATION AWARD AND IN OPPOSITION TO PETITIONER'S**
**PETITION TO CONFIRM ARBITRATION AWARD**

SIDLEY AUSTIN LLP
James Heyworth
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

and

Thomas K. Cauley, Jr. (*pro hac vice*
application forthcoming)
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Respondent White*
*Oak Global Advisors, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

SUMMARY OF ARGUMENT ..................................................................................................5

JURISDICTION AND VENUE ................................................................................................9

FACTUAL BACKGROUND ...................................................................................................10

    A.    The Parties ........................................................................................................10

    B.    The Plan Knowingly Invested With White Oak to Access Its Direct
Lending Strategy in Illiquid Loans through the Pinnacle and Summit
Funds. ................................................................................................................10

    C.    White Oak Terminated the IMA and, Consistent with the IMA, Offered to
Make an In-Kind Distribution, which the Plan Refused to Accept. ...................12

    D.    White Oak Earned a Reasonable Management Fee Under the IMA. ...................12

    E.    White Oak Never Received Any Performance Fees. ...........................................14

PROCEDURAL HISTORY .......................................................................................................14

    A.    The Plan's Arbitration Demand. ...........................................................................14

    B.    The Arbitration Hearing and Partial Award ........................................................15

    C.    After the Partial Award Was Issued, White Oak Made Numerous
Evidentiary and Legal Submissions to the Arbitrator. .......................................16

    D.    The Award .............................................................................................................19

STANDARD OF REVIEW .......................................................................................................22

ARGUMENT .............................................................................................................................23

I.    The Plan's Petition Seeking Management Fees, Attorneys' Fees, Costs,
Prejudgment Interest and Declaratory Relief Should Be Denied. ....................................23

    A.    The Award Did Not Grant the Plan Management Fees. ......................................23

    B.    The Award Did Not Find Any Breaches of Fiduciary Duty or Enter Any
Declaratory Relief. ..............................................................................................24

II.    The Award's Order Granting Attorneys' Fees and Costs to the Plan Should Be
Vacated. ...............................................................................................................................25

i

A.     The Plan Did Not Prevail on Its ERISA Claims. ....................................26

     i.     The Plan Did Not Have Success on the Merits Because the Arbitrator Rejected the Plan's Request for a $120 Million Money Judgment and Awarded No Damages to the Plan.....................................26

     ii.     The Plan Did Not Have Success on the Merits Because the Arbitrator Adopted White Oak's Position that the Plan is Solely Entitled to an In-Kind Distribution. ...........................................28

B.     The Plan Wholly Failed to Show That Its Attorneys' Fees Were Reasonable. ......................................................................................29

     i.     The Plan did not achieve any success on the merits. ...............................30

     ii.     The Plan improperly delayed providing its invoices, and the invoices it eventually provided were too heavily redacted to allow White Oak to assess the reasonableness of the Plan's requested fees. ......................................................................................30

     iii.     The Plan's invoices demonstrate a severe lack of billing judgment.........31

     iv.     The Plan did not establish the reasonableness of its counsel's sky-high billing rates. ...............................................................32

C.     Expert Fees Are Not Recoverable as a Matter of Law. ...........................32

III.     To the Extent that the Award Purports to Grant Prejudgment Interest, the Award Should Be Vacated.................................................................................33

CONCLUSION.................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council Inc.*,
  No. 13 Civ. 2608 (JGK), 2014 WL 840965 (S.D.N.Y. Mar. 4, 2014) ...................................29

*Adler v. Raynor*,
  DLC, 2011 WL 5024412 (S.D.N.Y. Oct. 20, 2011) .............................................................26

*Alpaca Shop Franchise Co. v. Roxburgh*,
  No. 3:05CV1203 (SRU), 2010 WL 2976918 (D. Conn. July 22, 2010) ...............................25

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  860 F. Supp. 2d 251 (S.D.N.Y. 2012) ....................................................................................18

*Bd. of Tr.'s of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
  No. 09 CIV. 6273 RMB AJP, 2013 WL 1189681 (S.D.N.Y. Mar. 21, 2013) ........................28

*Brightman v. 1199/seiu Health Care Emps. Pension Fund*,
  No. 18-CV-4932 (LJL), 2021 WL 809373 (S.D.N.Y. Mar. 2, 2021) .....................................27

*Curtis v. Alcoa, Inc.*,
  No. 3:06-CV-448-PLR-CCS, 2014 WL 2895468 (E.D. Tenn. June 26, 2014) ......................27

*Doscher v. Sea Port Grp. Secs., LLC*,
  832 F.3d 372 (2d Cir. 2016) ...................................................................................................10

*Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*,
  898 F. Supp. 2d 883 (D. Md. 2012), *aff'd* 541 F. App'x 322 (4th Cir. 2013) ..................27, 28

*Feltzin v. Union Mall LLC*,
  393 F. Supp. 3d 204 (E.D.N.Y. 2019) ....................................................................................30

*Florasynth, Inc. v. Pickholz*,
  750 F.2d 171 (2d Cir. 1984) .............................................................................................22, 25

*In re Fraidin*,
  34 F. App'x 932 (4th Cir. 2002) .............................................................................................31

*Garlock v. Nelson*,
  No. 96-CV-1096 (FJS), 1998 WL 315089 (N.D.N.Y. June 9, 1998) .....................................33

*Great Am. Ins. Co. v. Wexler Ins. Agency, Inc.*,
  No. CV979397MMMBQRX, 2000 WL 36732271 (C.D. Cal. Apr. 19, 2000) ......................34

*Hardt v. Reliance Standard Life Ins. Co.*,
  560 U.S. 242 (2010)....................................................................................26, 27

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
  137 F. Supp. 2d 351 (S.D.N.Y. 2001), *vacated on other grounds*, 302 F.3d 18
  (2d Cir. 2002)..........................................................................................32

*U.S. ex rel. Karlin v. Noble Jewelry Holdings Ltd.*,
  No. 08 Civ. 7826(JGK)(KNF), 2012 WL 1228199 (S.D.N.Y. Apr. 9, 2012) ........................30

*Klimbach v. Spherion Corp.*,
  467 F. Supp. 2d 323 (W.D.N.Y. 2006) ..................................................................30

*Levy v. Young Adult Inst., Inc.*,
  No. 13-CV-2861 (JPO), 2019 WL 1434271 (S.D.N.Y. Mar. 30, 2019),
  *reconsideration denied*, No. 13-CV-2861 (JPO), 2019 WL 3454613 (S.D.N.Y.
  July 30, 2019)..........................................................................................32

*Lowen v. Tower Asset Mgmt., Inc.*,
  829 F.2d 1209 (2d Cir. 1987)..........................................................................17

*Lunday v. City of Albany*,
  42 F.3d 131 (2d Cir. 1994)............................................................................31

*N.Y. Dist. Council of Carpenters Pension Fund v. Savasta*,
  No. 99 CV 11362(GBD), 2005 WL 22872 (S.D.N.Y. Jan. 4, 2005)........................................17

*NDrive, Navigation Sys. S.A. v. LG Elecs. Inc.*,
  2018 WL 8983479 (S.D.N.Y. Nov. 8, 2018)................................................................22

*Olivares v. Brentwood Indus.*,
  No. 4:13-CV-04107, 2015 WL 13658070 (W.D. Ark. Apr. 13, 2015) ....................................34

*Pino v. Locascio*,
  101 F.3d 235 (2d Cir. 1996)............................................................................30

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
  497 F.3d 133 (2d Cir. 2007)............................................................................29

*Randolph v. Dimension Films*,
  634 F. Supp. 2d 779 (S.D. Tex. 2009) ..................................................................31

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*,
  157 F.3d 174 (2d Cir. 1998)............................................................................22

*Sacerdote v. N.Y. Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018)....................................................................18

*Staats v. Procter & Gamble Long Term Disability Allowance Plan*,
  No. CIV.A. 11-1320, 2012 WL 3705000 (W.D. Pa. Aug. 27, 2012) ....................................28

*Tr. for the Mason Tenders Dist. Council Welfare Fund, Pension Fund, Annuity
  Fund & Training Program Fund v. Odessy Constr. Corp.*,
  No. 1:14–cv–1560–GHW, 2014 WL 3844619 (S.D.N.Y. Aug. 1, 2014) .............................25

*Travel Leaders Grp., LLC v. Corley*,
  No. 19-cv-1595 (GBD) (JLC), 2019 WL 6647319 (S.D.N.Y. Dec. 5, 2019)........................32

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009)................................................................................................................9

*Weiss v. Sallie Mae, Inc.*,
  939 F.3d 105 (2d Cir. 2019)................................................................................................22

## Statutes

9 U.S.C. § 10(a) ...................................................................................................................10

28 U.S.C. § 1821 .................................................................................................................32

29 U.S.C. § 1109(a) ......................................................................................................18, 27

Employee Retirement Income Security Act of 1974 ............................................. *passim*

## PRELIMINARY STATEMENT

On August 4, 2021, the Arbitrator issued her final award (the "Award") in an arbitration that The Trustees of the New York State Nurses Association Pension Plan (the "Plan") brought against White Oak Global Advisors, LLC ("White Oak") in connection with the Plan's investments with White Oak, which is an investment manager.  White Oak requests that the Court vacate the Award in part, and deny the Plan's petition to confirm the Award (the "Petition").

Mischaracterizing the Award, the Petition claims that the Arbitrator awarded the Plan "the return of the net asset value ("NAV") of the Plan's assets, disgorgement of profits and fees, and the removal of White Oak as investment manager…" (Dkt. 1, Pet. at ¶ 19.)  In truth, the Award denied all of the relief and damages that the Plan sought, awarding the Plan *no damages whatsoever*.  Instead, the Award ordered the Plan to accept the in-kind distribution of the Plan's pro-rata ownership interests in its investments with White Oak, which White Oak had been attempting to make to the Plan for three years.  White Oak already has made the in-kind distribution to the Plan that the Award calls for, and the Plan has accepted that in-kind distribution.  Surprisingly, the Petition fails to even mention this in-kind distribution.

In addition, the Petition claims that the Arbitrator awarded the Plan $9,493,641.05 in management fees.  The Award does no such thing.  The Award does not award the Plan *any* damages or order the disgorgement of *any* amount.  The Petition also seeks a declaratory judgment that White Oak breached its fiduciary duties to the Plan.  But again, that finding is nowhere contained in the Award and the Award expressly denies all claims not granted in the Award.  The Petition should be denied.

Despite adopting White Oak's position that the Plan must accept an in-kind distribution and denying the Plan any money damages, the Award states that the Plan is to be awarded

attorneys' fees, which are not specified in the Award, and the Award refers to "interest."  The portions of the Award that granted the Plan attorneys' fees and "interest" – to the extent "interest" refers to prejudgment interest – should be vacated, because White Oak prevailed at the arbitration.

The Petition mischaracterizes the Arbitrator's Award, including in the following ways:

- The Petition incorrectly contends that the Award left the Partial Final Award that the Arbitrator issued on November 30, 2020 (the "Partial Award") unchanged, and argues that the Plan is entitled to relief contemplated by the Partial Award.  In fact, the Arbitrator expressly explained that the Award "modified" the Partial Award based on new evidence and legal arguments White Oak presented after the Partial Award was issued.  Based on this new evidence and legal arguments White Oak presented, the Award does not grant the Plan any of the relief the Plan requested, and did not award the Plan any money damages whatsoever.  The Award also declined to order White Oak to disgorge any fees it earned for managing the Plan's investment with White Oak.  Rather, the Arbitrator ordered the Plan to accept the in-kind distribution that White Oak had been attempting to make to the Plan for three years, stating that White Oak should not be "penalized" for the Plan's continued refusals over three years to accept the in-kind distribution that White Oak had repeatedly offered the Plan.

- The Plan states that the Arbitrator ordered White Oak to "disgorge all [Plan] assets," the total value of which the Plan argues is $96,213,778.83.  However, the Petition never mentions that White Oak already "disgorged" all Plan assets White Oak held when White Oak made an in-kind distribution to the Plan by the date set forth in the Award, which the Plan accepted.

- The Plan falsely argues that the Arbitrator awarded the Plan over $9 million in management fees, when in fact the Award *denied* the Plan's request that White Oak refund any fees, including all fees that White Oak earned for managing the Plan's investment with White Oak.

As the Arbitrator explained in the Award, her findings in the Partial Award were "partial" because "all evidence had not been presented concerning several areas." (Ex. A at 8.)[1] Based on the new evidence submitted after the Partial Award, which included testimony from two White Oak experts, and additional legal briefing from White Oak, which the Arbitrator stated in the Award "clarified questions presented, especially around the applicability of statutory construction," *id.*, the Arbitrator modified her Partial Award in the Award.

The evidence and law that White Oak presented to the Arbitrator after the Partial Award – that the Arbitrator accepted in her Award – clearly established that the Plan was not entitled to recover any damages from White Oak, let alone the $120 million of damages that the Plan argued the Arbitrator should award pursuant to the Partial Award. Instead, White Oak showed, and the Arbitrator agreed in the Award, that the Plan was solely entitled to an in-kind distribution (not the all-cash payment the Plan had sought). The Award correctly found that White Oak had "unsuccessfully attempted in writing" to make the in-kind distribution to the Plan since September 2018, and that White Oak should not be "penalized" because the Plan refused to accept the in-kind distribution. The Award ordered the Plan to accept the in-kind distribution by September 3, 2021, which White Oak in fact made on that date, and which the Plan accepted.

Based on the extensive legal authority that White Oak provided to the Arbitrator after the Partial Award holding that management fees cannot be disgorged as ill-gotten profits because

---

[1] All exhibits cited herein are attached to the Declaration of Thomas K. Cauley, Jr. filed herewith.

they constitute reimbursement for services provided, the Arbitrator also adopted White Oak's argument that the over $9 million in fees White Oak received for managing the business of the funds could not be disgorged as ill-gotten profits.  The Arbitrator found that those fees, which the Arbitrator called "performance fees" instead of "management fees," "constitute *reimbursement for managing* the business and affairs of [the White Oak funds in which the Plan invested], *rather than profits of White Oak*."[2]  (*Id.* at 10.) (emphasis added).  White Oak never collected any "performance fees," as the Plan full well knows.  Removing any doubt that the Arbitrator was denying the Plan's request for disgorgement of management fees and denying all other claims by the Plan, the Award concludes by stating that "all claims not expressly granted herein are DENIED," *id.* at 11, which would include the Plan's request for a more than $9 million refund of management fees, to the extent it was not previously denied in the Award.

The Plan also seeks a declaration that White Oak breached its fiduciary duties to the Plan. But the Award nowhere contains any declaratory judgment or other finding that White Oak breached its fiduciary duties.  To the contrary, the Award expressly denies all claims not expressly granted in the Award, which would include the Plan's claim that White Oak breached its fiduciary duties, and the Award awarded the Plan *zero* damages.

White Oak seeks to vacate the Award's award of  an unspecified amount of attorneys' fees, costs and interest.  The award of attorneys' fees and costs was plainly improper because the Plan did not obtain any of the substantive relief it requested in the arbitration.  The Award also calls upon White Oak to make an unspecified amount of "interest disgorgement" to the Plan.  To

---

[2] The Plan's own expert testified that the management fees White Oak earned are used to pay for the overhead associated with "managing the business and affairs" of White Oak's funds, such as White Oak employee salaries, employee benefits and office rent.  (Ex. R, Simon Aff. at ¶ 12.)  Thus, the Arbitrator's Award allowing White Oak to retain the fees it earned for "managing the business and affairs" of its investment funds is taken directly from the Plan's expert's testimony describing management fees and clearly refers to management fees.

the extent the reference to "interest disgorgement" refers to prejudgment interest, such an award is clearly improper, because the Plan did not prevail at the arbitration and was not awarded any damages upon which prejudgment interest can be calculated.  Because White Oak, not the Plan, prevailed in the arbitration, the Arbitrator manifestly disregarded the law in purporting to award the Plan attorneys' fees and costs, and to the extent the Arbitrator awarded the Plan prejudgment interest.  Those portions of the Award should be vacated.

## SUMMARY OF ARGUMENT

After an arbitration hearing in December 2019, the Arbitrator issued the Partial Award on November 30, 2020.  The Partial Award rejected the Plan's claim that White Oak improperly invested the Plan in illiquid assets, as well as the Plan's claim that White Oak breached the Most Favored Nations ("MFN") provision in the parties investment management agreement ("IMA").  However, the Arbitrator preliminarily found in the Partial Award that White Oak purportedly committed three technical violations of the Employee Retirement Income Security Act of 1974 ("ERISA"): (1) including a never-invoked provision in the investment funds' documents allowing White Oak to provide early-withdrawing investors with an interest bearing note (instead of an in-kind distribution), (2) including never-invoked indemnification provisions in those same investment fund documents, and (3) charging the Plan a "Day One" management fee.[3]

The Partial Award did not grant the Plan any damages.  Instead, over White Oak's objection, the Partial Award gave the Plan another opportunity to present evidence of any damages.  After the Partial Award, White Oak made five written submissions to the Arbitrator

---

[3] One of the agreements governing the Plan's investments in a White Oak fund contained an industry standard "Day One" provision.  The purpose of a Day One provision is to provide "investment diversification" to subsequent investors in a fund by placing them on "equal footing with the prior investors" by giving them ownership of a pro-rata portion of the loans that the investment funds made before the investment was made.  (Ex. G at 188.)  Under the Day One provision, the Plan agreed to pay a $1.9 million management fee based on the fund's loan investments before the Plan joined the Fund and participated in those loan investments, and also received an immediate $2.6 million *profit* from those loan investments – for a *net profit* of $700,000.

strenuously objecting to the findings in the Partial Award, and presented testimony from two experts along with other evidence.  White Oak's additional submissions after the Partial Award made clear that: (1) the IMA and the agreements governing the Plan's investments in White Oak's funds plainly provide for an in-kind distribution – not an all-cash distribution – and that the Plan had refused White Oak's attempts to make an in-kind distribution; (2) management fees compensate White Oak for managing the business and affairs of its funds, and therefore could not be ill-gotten "profits" as both a matter of fact and clear Second Circuit law, and (3) that in order to disgorge any ill-gotten profits or recover any damages from White Oak, the ERISA statute and clear Second Circuit law required the Plan to prove that White Oak improperly obtained profits or was otherwise damaged as a result of an ERISA violation – a burden that the Plan never even claimed to have satisfied.

After the Partial Award, the Plan submitted expert testimony of its purported damages, seeking $120 million in damages.  The Plan did not disagree that the IMA called for an in-kind distribution, or that the management fees used to manage the investment funds in which the Plan was invested were not profits.  The Plan simply claimed that these issues had already been decided by the Partial Award.  The Plan also agreed that none of the alleged ERISA violations caused any damages to the Plan or resulted in any ill–gotten profits to White Oak, but argued (incorrectly) that causation is not required under ERISA.

On August 4, 2021, the Arbitrator issued the Award, which rejected the Plan's request for a $120 million money judgment, and awarded the Plan no damages.  Moreover, the Arbitrator rejected the Plan's argument that the fees White Oak received for managing the White Oak funds in which the Plan invested, including the Day One management fee, were ill-gotten profits because they reimbursed White Oak for the cost of managing the Plan's investment with White

6

Oak.  Importantly, the Award expressly "modified" the Partial Award by denying all claims not granted in the Award, including the Partial Award's findings of technical ERISA violations.

Though White Oak prevailed in the arbitration and the Plan received zero money damages in the Award, the Arbitrator nevertheless awarded the Plan "attorneys' fees and costs" under ERISA, without identifying the amount of such fees and costs.  No attorneys' fees or costs should be awarded to the Plan because the Plan lost the arbitration on all claims, and was awarded no damages.  As a matter of clear and settled ERISA law, attorneys' fees and costs are recoverable only if the plaintiff has "some success" on the merits of its claims.  Courts have held that a plaintiff that fails to recover any damages did not have "some success" on the merits.  The Award contains no findings of any ERISA violations, states that it modifies the Partial Award based on additional argument and evidence presented after the Partial Award was issued, and denies all claims not expressly granted in the Award.  Because the Plan recovered no damages – despite seeking a money judgment of $120 million – the Plan plainly did not have any success on the merits and is not entitled to *any* attorneys' fees or costs.

The *most* the Plan could possibly claim as "some success" on the merits are three preliminary, technical ERISA violations referred to in the Partial Award, but not in the Award. Even if those preliminary findings of technical violations were not rejected in the Award (which they were), such "trivial" victories are plainly not sufficient to constitute "some success on the merits" under ERISA.  The Partial Award's reference to purported technical ERISA violations, such as including never-invoked indemnification provisions in fund agreements, plainly were clearly trivial, and resulted in no damages to the Plan.  Courts have routinely refused to award attorneys' fees and costs on the basis of such trivial findings.

Further, courts have held that an ERISA plaintiff does not obtain success on the merits if it receives nothing more than the relief that was available to the plaintiff before it initiated legal proceedings.  Here, the only relief that the Plan obtained is an in-kind distribution of its investments with White Oak, which is precisely the relief White Oak had been offering the Plan since 2018.  As the Arbitrator correctly found, White Oak has always stood ready to make an in-kind distribution to the Plan since 2018, but the Plan consistently rejected the in-kind distribution.  The Plan sought an all-cash money judgment in lieu of the in-kind distribution, and the Arbitrator flatly rejected the Plan's request, ordering the in-kind distribution White Oak had offered.  Thus, the Plan only received the relief that was available to it before the arbitration. The Plan is not entitled to attorneys' fees or costs under ERISA.[4]

In addition, the Plan failed to establish that its requested attorneys' fees and costs were reasonable and recoverable under ERISA.  The most important factor in considering the "reasonableness" of attorneys' fees is success on the merits.  Here, the Plan had no success on the merits, so its request in the arbitration for over $7.1 million in attorneys' fees and costs is not reasonable as a matter of law.  Moreover, the Plan refused to provide fee invoices in connection with its initial fee petition.  Under clear New York law, the failure to timely provide fee invoices is fatal to a fee petition.  When the Plan ultimately provided invoices (in connection with the Plan's reply brief), the invoices were so heavily redacted that they prevented White Oak from assessing the reasonableness of the Plan's requested fees.  That said, what little the Plan left unredacted in the invoices showed that the Plan failed to exercise billing judgment.  Nor did the Plan establish that its sky-high billing rates—which by the conclusion of the arbitration were as high as $1,795 per hour—were reasonable.  Indeed, the Plan negotiated an alternative fee

---

[4] Also, the award of an in-kind distribution was pursuant to the parties' contract, not ERISA.  Thus, the award of an in-kind distribution pursuant to contract provides no basis to award attorneys' fees under ERISA.

arrangement with the Plan's counsel midway through the arbitration that provided for a 20% discount from counsel's standard hourly rates.  Not only did the Plan refuse to provide White Oak with that alternative fee agreement, the Plan improperly sought to recover a windfall by seeking the full hourly rates for the Plan's counsel, without giving effect to the discounted fee arrangement.  In addition, the Plan sought to recover expenses, such as over $870,000 in expert fees, that are plainly not recoverable under ERISA as a matter of law.  The Plan clearly failed to meet its burden to recover attorneys' fees and costs.

The Award should also be vacated to the extent that the Award's reference to "interest" refers to prejudgment interest.[5]  As with attorneys' fees and costs, no prejudgment interest can be awarded as a matter of law because the Plan did not prevail at the arbitration.  The Plan wrongly argues that prejudgment interest was awarded on "Plan assets and management fees."  The Arbitrator did not award the Plan any "assets" or "management fees."  The Arbitrator ordered the Plan to accept an in-kind distribution that the Plan had previously refused to accept.  The Arbitrator also rejected the Plan's request for management fees because those fees were compensation for services, not profits, much less ill-gotten profits.  In fact, the Arbitrator did not award *any* money damages whatsoever on which prejudgment interest could be calculated.

For these reasons, the award of attorneys' fees, costs and interest (to the extent the Award is referring to prejudgment interest) should be vacated, and the Petition should be denied.

## JURISDICTION AND VENUE

The Plan's arbitration demand was based on claims that White Oak violated ERISA.  (Ex. C, Amended Demand for Arbitration at 1; Ex. B, Partial Award at 14.)  Therefore, this Court has

---

[5] To the extent that the Award refers to interest earned on the Plan's loan investments, that interest was provided to the Plan in connection with the in-kind distribution.

federal-question jurisdiction over this petition to vacate the arbitration award.  *Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009) (explaining that federal question jurisdiction exists for a petition to vacate an arbitration award if the underlying dispute arises under federal law); *Doscher v. Sea Port Grp. Secs., LLC*, 832 F.3d 372, 388 (2d Cir. 2016) (same).

Venue is proper in this District because the award was rendered in New York City in accordance with the IMA. (Ex. D, IMA – 2016 at § 24.)  9 U.S.C. § 10(a) (explaining that "the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration").

## **FACTUAL BACKGROUND**

### A.    **The Parties**

White Oak is an investment manager that manages investment funds, structured as limited partnerships, that make loans to small and medium-sized companies.  (Ex. E, Tr. 1125–30.)  The investment funds make a profit for investors in those funds from the interest payments on those loans.  (*Id.*)  The two White Oak investment funds in which the Plan invested were the Pinnacle Feeder Fund I, L.P. (the "Pinnacle Fund") and the Summit Fund, L.P. (the "Summit Fund") (collectively, the "Funds").  (Ex. D, IMA - 2016 at § 11(t)-(w), Schedule B.)

The Plan is an ERISA-governed pension plan.  The trustees of the Plan (the "Trustees") manage the Plan and its assets.  (Ex. E, Tr. 214-16.)  The Plan also employs its own staff to manage its investments.  (Ex. B, Partial Award at 1.)

### B.    **The Plan Knowingly Invested With White Oak to Access Its Direct Lending Strategy in Illiquid Loans through the Pinnacle and Summit Funds.**

In January 2014 and again in January 2016, the Plan signed an IMA each with a two-year term.  (Ex. D at § 13(g).).  Under both IMAs, the Plan agreed to provide money to White Oak for White Oak to invest in its own Funds.  (*Id.* at 1.)  The Funds are structured as limited

partnerships, with the investors in the Funds, such as the Plan, as limited partners. Because the Funds invested in long-term, illiquid loans, the limited partnership agreements for the Funds (the "LPAs") have "lock-up" periods whereby investors could not receive their investments back in cash from the Funds before the Funds' long-term loans had been paid off. (Ex. J, §§ 7.1, 10.1, 10.5; Ex. K, §§ 7.1, 10.1, 10.5; Ex. O, §§ 7.1, 10.1, 10.5.). As the Partial Award correctly found, the Plan was well-aware of the Funds' lock-up periods. (Ex. B, Partial Award at 26-27.) The undisputed evidence at the arbitration was that the Funds' lock-up periods were industry standard. (Ex. N, Palzer Declaration at 4-5.)

If an investor sought to exit the Funds before the lock-up periods expired, the Funds' LPAs also contained industry-standard provisions allowing an investor to receive an in-kind distribution of the investor's pro-rata interests in the Funds' long-term loans and uninvested cash, instead of an all-cash payment. (Ex. J, § 7.1(c); Ex. K, § 7.1(d); Ex. O, § 7.1(c); Ex. E, Tr. 180-83.) Likewise, the IMA specifically provides that upon termination of the IMA the Plan shall receive an in-kind distribution of the investments in the Plan's "Investment Account," that is the Plan's pro-rata interest in the assets (loans and uninvested cash) held by the Funds, rather than an all-cash payment based on the value of the investments. The IMA provides:

> the Investment Manager shall transfer to the Trustees (or their duly authorized representatives) *all books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession*, along with the documents and information required by paragraph 6 hereof as directed by the Trustees (or their duly authorized representatives).

(Ex. D § 13(b) (emphasis added).) White Oak's industry expert testified—and his testimony was never even contested—that Section 13(b) of the IMA is "the textbook definition of [an] in-kind distribution." (Ex. G, Tr. at 185.)

**C.** **White Oak Terminated the IMA and, Consistent with the IMA, Offered to Make an In-Kind Distribution, which the Plan Refused to Accept.**

The IMA provides that White Oak could terminate the IMA upon 90 days' written notice. (Ex. D §§ 13(c),(d).)  On December 18, 2017, White Oak provided the Plan with 90 days' written notice of its intent to terminate the IMA.  (Ex. P, December 18, 2017 Email; Ex. E, Tr. at 1191-92).  Nine days later, on December 27, 2017, the Plan's CIO exercised the Plan's right to extend the IMA for a six-month period (until September 18, 2018) or until it selected a successor investment manager, if sooner.  (Ex. Q, December 27, 2017 Email).  Even though White Oak had terminated the IMA, the Plan's CIO explained that the Plan wanted to remain invested with White Oak for as long as possible, testifying:  "We just thought it was a great contract and we wanted to continue with [it] as long as possible." (Ex. E, Tr. at 392.)

At the end of the Plan's six-month extension period White Oak had not received any instruction from the Plan on whether the in-kind distribution should be made to the Plan or a successor investment manager.  (Ex. E, Tr. at 1194-95.)  Accordingly, White Oak wrote the Plan on September 18, 2018 and stated that White Oak "[was] going to treat the IMA as if it were still in effect despite the notice of termination."  (Ex. E, Tr. at 1195.)  After September 18, 2018, despite repeated offers by White Oak to make an in–kind distribution, the Plan never authorized the in–kind distribution, nor did the Plan identify a successor investment manager to accept the in–kind distribution.  (Ex. A at 9.)  Instead, on July 31, 2018, the Plan brought an arbitration against White Oak for purported ERISA violations seeking over $120 million in damages.

**D.** **White Oak Earned a Reasonable Management Fee Under the IMA.**

Under the IMA, the Plan agreed to pay White Oak a 1.35% management fee for White Oak's investment management services.  (Ex. D at Schedule C.)  The Plan falsely argues in its Petition that "the arbitrator found that White Oak had charged the Plan management fees in

excess of amounts that had been agreed upon, including for periods before the Plan engaged White Oak." (Dkt. 1, Mem. at 1.)  However, it was undisputed that White Oak collected no more in management fees than it was entitled to collect under the IMA, and the Arbitrator never found otherwise.[6] (Ex. E, Tr. at 519-20 (Fell); Tr. at 37-38; Ex. I, Ciancanelli Decl. at 10.)  It is further undisputed that White Oak's compensation for its management services was at all times reasonable.  An external consultant that the Plan hired to examine the reasonableness of White Oak's management fees found that "all [management] fees were within the 'reasonable' window" (Ex. S at NYSNA00003799) and concluded: "Overall, we had no concerns with the [management] fees being assessed." (Ex. M at NYSNA00002989.)  It is further undisputed that White Oak's management fees reimbursed White Oak for the services provided to the two Funds (the Pinnacle and Summit Funds) in which the Plan was invested.  There is no evidence that any portion of those fees constituted a profit to White Oak.

After the Partial Award, White Oak argued to the Arbitrator that the management fees it received are not profits, but rather cover White Oak's overhead expenses for managing the business of the Funds. (Ex. L, July 1 Ltr.)  The Plan's own expert agreed, describing White Oak's management fees as the fees White Oak earned for "managing the business and affairs" of the Funds. (Ex. R, Simon Aff. at ¶ 12; Ex. G, Tr. at 37:13-14 ("Q. And aren't [White Oak employees] paid from the management fees? A. Correct".)  Nor could the Plan's expert identify any profit component in the management fees White Oak received after paying overhead expenses. (Ex. G, Tr. 29 ("A. I'm not aware one way or the other of whether there were such profits…."), 93 (Q. "[D]o you have any reason to believe that White Oak even makes a profit

---

[6] With respect to the Day One Fee, the Partial Award found that the Day One Fee was "agreed to by the Plan through its decision to invest in the Fund and direction to pay the fee from Plan assets." (Ex. B, Partial Award at 26.)

from the management fees after it pays the expenses it has to employees and overhead and rent?
A. I have no idea . . . nor do I think it's relevant.").).  The Arbitrator ultimately adopted White
Oak's argument that the fees White Oak received for managing the business of the Funds,
including the Day One management fee, are not "profits."  (Ex. A at 10.)

> **E.      White Oak Never Received Any Performance Fees.**

The Petition incorrectly argues that "the arbitrator's Final Award modified [the Partial
Award] by permitting White Oak to retain performance fees."  (Dkt. 1, Pet. at ¶ 29).  It was
undisputed that White Oak *never* received any "performance" fees, or any other fees based on
the performance of the Funds' investments.  (*See, e.g.*, Dkt. 1, Mem. at 10-11.)  The Arbitrator's
reference to White Oak retaining its "performance fees," which the Arbitrator described as fees
for "*managing* the business and affairs of Pinnacle and Summit, rather than profits to White
Oak" is clearly a reference to the management fees that White Oak earned for managing the
Pinnacle and Summit Funds.[7]  (Ex. A at 10.)

> ## PROCEDURAL HISTORY

> **A.      The Plan's Arbitration Demand.**

The Plan filed its demand for arbitration on July 31, 2018, which the Plan amended on
September 26, 2018 (the "Demand").  (Ex. C.)  In the arbitration, the Plan claimed that White
Oak breached the IMA and violated ERISA by, among other things, (a) including never-invoked
indemnification provisions in the agreements governing the investment funds, (b) investing the
Plan's money in illiquid loan investments, and (c) by purportedly charging the Plan higher
management fees than other White Oak clients, in violation of the IMA's MFN provision.  As

---

[7] To the extent that there was any question that the Award rejected the Plan's request for disgorgement of
management fees, including the Day One management fee, the Award states that "[a]ll claims not expressly granted
herein are DENIED," which denial would include the Plan's request for the disgorgement of management fees that
the Plan had paid White Oak.  (Ex. A at ¶ 9.)

relief, the Plan sought an award requiring White Oak to pay the Plan, all in cash, the full value of its investments in the White Oak investment funds (as opposed to an in-kind distribution of the Plan's pro rata portion of the Funds' assets), and requiring White Oak to disgorge all management fees White Oak earned under the IMA for managing the Plan's investments.

**B.**     **The Arbitration Hearing and Partial Award.**

Between December 16, 2019 through December 20, 2019 the Arbitrator, Rosemary Townley, held a week-long, in person arbitration hearing.  At the conclusion of the hearing, each party rested its case.  (Ex. E, Tr. at 1563:2.)  The Arbitrator notified the parties by email dated June 22, 2020 that the record would close on July 1, 2020 and that a "Final Award" would be issued on October 1, 2020.  Subsequently, the Arbitrator sought and obtained the parties' consent to extend the deadline by which to issue the Final Award to December 1, 2020.

Despite the fact that the parties never agreed to bifurcate the issues of liability and damages, the Arbitrator issued a Partial Award on November 30, 2020 solely on liability issues. The Partial Award rejected the Plan's argument that White Oak had breached the IMA's MFN provision by charging the Plan management fees that were higher than the management fees White Oak charged its other clients.  (Ex. B, Partial Award at 27.)  The Partial Award also rejected the Plan's allegation that White Oak violated the IMA and ERISA when White Oak entered into Limited Partnership Agreements (LPAs) that "locked up" the Plan into a financial relationship with illiquid assets." (*Id.* at 8.)  The Arbitrator found that the Plan was "repeatedly advised of the Pinnacle's Fund lock-up period . . . and raised no concerns." (*Id.* at 26.)

In the Partial Award, the Arbitrator preliminarily found that White Oak committed three technical violations of ERISA because White Oak:

- Had the option in the Funds' LPAs (which was never exercised) of giving the Plan an interest–bearing note if the Plan sought to withdraw its investment before the Funds' lock-up period expired, (*Id.* at 24–25.)

15

- "committed a prohibited transaction by granting itself indemnification rights" in the Funds' LPAs (*Id.* at 21.), which were also never exercised, and

- charged a "Day One" management fee, which was not specifically authorized by the IMA.  (*Id.* at 27–28.)

The Partial Award also ordered White Oak to remain as the Plan's investment manager until the Plan appointed a replacement investment manager.  (*Id.* at 36.)

The Partial Award did not grant any monetary relief to the Plan or any other relief (aside from ordering White Oak to remain as the Plan's investment manager until such time as the Plan appointed a replacement investment manager).  Instead, the Partial Award ordered the appointment of "an ERISA attorney or accountant" to "develop an accurate account of the scope of the damages[.]"[8]  (*Id.* at 35–36.)

### C.   After the Partial Award Was Issued, White Oak Made Numerous Evidentiary and Legal Submissions to the Arbitrator.

The Petition argues that "[t]he only matter left open after the Partial Final Award . . . was the precise calculation of amounts due" to the Plan.  (Dkt. 1, Pet. at ¶ 22.)  That is simply not true.  After the Partial Award there were extensive proceedings before the Arbitrator. Subsequent to the Partial Award, the parties submitted over a dozen written submissions to the Arbitrator and additional evidence, including testimony from three expert witnesses during a one-day Zoom hearing on June 17, 2021.

In White Oak's post-Partial Award submissions, White Oak made clear that Section 13(b) of the IMA and the LPAs for the Funds were entirely consistent in allowing White Oak to make an in-kind distribution to the Plan of its investments, and did not require White Oak to

---

[8] After the Arbitrator issued the Partial Award, White Oak objected to the Partial Award because, among other things, the Partial Award's requirement that an ERISA attorney or accountant be appointed to investigate any damages to the Plan exceeded the Arbitrator's authority and because the Plan was being given an unfair second opportunity to present evidence of damages, which it failed to prove at the week-long arbitration hearing.

make an all-cash payment to the Plan, as the Plan argued.  (Ex. L, Jan. 28, 2021 Ltr., Feb. 18, 2021 Ltr., Mar. 22, 2021 Ltr., May 19, 2021 Ltr., July 1, 2021 Ltr.)  White Oak's industry expert provided unrefuted testimony that the in-kind distribution provisions in the IMA and LPAs are industry standard.  (Ex. N, Palzer Declaration at 5-6.)

In its post-Partial Award submissions, White Oak also made clear that the management fees White Oak earned, including the Day One management fee, could not be ill-gotten profits as the Plan argued.  (Ex. L.)  White Oak cited evidence, including testimony from the Plan's own expert, that management fees are used to pay White Oak's overhead associated with "managing the business and affairs" of the Pinnacle and Summit Funds, such as White Oak employee salaries, employee benefits and office rent.  (*Id.*, July 1, 2021 Ltr. at 4-5.)  The Plan's own expert conceded that there was no evidence that White Oak profited from the management fees it earned.  (Ex. R, Simon Aff. at ¶ 12.)  White Oak also cited Second Circuit caselaw holding that management fees cannot be considered "profits" to the extent that they compensate an investment manager for services that the investment manager provided.[9]  (Ex. L, Feb. 18, 2021 Ltr. at 12–13; Mar. 22, 2021 Ltr. at 7; May 19, 2021 Ltr. at 26; July 1, 2021 Ltr. at 4.)

In connection with the Day One management fee, White Oak submitted undisputed evidence after the Partial Award that, as a Day One investor, the Plan agreed to pay a $1.9 million management fee based on the Pinnacle Fund's pre-existing loan investments, and also received a $2.6 million *profit* from those pre-existing loan investments.  (Ex. E, Tr. 786-87 (Wagner).)  The undisputed evidence that White Oak presented after the Partial Award was that

---

[9] *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1216 (2d Cir. 1987) (Section 408(c)(2) "exempts [from disgorgement] the fees paid pursuant to a plan's investment management agreements."); *N.Y. Dist. Council of Carpenters Pension Fund v. Savasta*, No. 99 CV 11362(GBD), 2005 WL 22872, at *3 (S.D.N.Y. Jan. 4, 2005) ("The fees do not amount to illegal profits or ill-gotten gains derived directly from defendants' alleged culpable acts. The fees were paid for services rendered by defendants pursuant to their alleged agreement with the Fund.").

as a result of being treated as a Day One investor, the Plan realized a net *benefit* of $700,000, without putting any capital at risk.  (Ex. E, Tr. 1167, 403-404 (Fell).)  Because the Plan was not damaged by the Day One provision – it received a net benefit of over $700,000 – the Arbitrator correctly rejected the Plan's damages claim that it be refunded the Day One management fee that it paid to White Oak.

Finally, White Oak cited the ERISA statute itself and clear Second Circuit law that expressly states that ERISA only allows damages for "*losses* to the plan *resulting from* each such breach" of fiduciary duty.[10]  (Ex. L, Jan. 28, 2021 Ltr. at 10; Feb. 18, 2021 Ltr. at 11; Mar. 22, 2021 Ltr. at 6; May 19, 2021 Ltr. at 26–27; July 1, 2021 Ltr. at 3–4.)  White Oak argued that it did not violate ERISA.  (*E.g., id.*, Jan. 28, 2021 Ltr. at 10.)  But regardless, the ERISA violations that the Plan alleged, such as including never-invoked indemnification provisions in the Funds' LPAs, did not cause the Plan any damages.

After the Partial Award was issued, the Plan never disputed that the IMA allowed for an in-kind distribution.  Instead, the Plan simply claimed that the Partial Award already ordered an all-cash payment.  (Ex. F.)  The Plan also argued—without providing evidence or law—that White Oak's management fees, including the Day One fee, constitute ill–gotten profits that should be refunded to the Plan.  (*Id.*)  The Plan also did not present any evidence that any of the preliminary, technical violations mentioned in the Partial Award caused any damages whatsoever to the Plan.  Instead, the Plan argued that causation was "irrelevant" to its ERISA claims.  (*Id.*, May 19 Ltr. at 10 n.8; Ex. G, Tr. at 49: "I'll only note further for the record that causation . . . is

---

[10] 29 U.S.C. § 1109(a) (emphasis added); *see also, e.g., Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 285 (S.D.N.Y. 2018) ("[I]n order to be entitled to recover damages [for an ERISA violation], the Plan(s) must have also suffered a causally related loss."); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 261 (S.D.N.Y. 2012) ("The Second Circuit interpreted the language 'resulting from' [contained in Section 409(a), 29 U.S.C. § 1109(a)] to make causation an element of the claim, for which plaintiffs have the burden of proof. . . .").

not a relevant consideration.").

**D.    The Award**

On August 4, 2021, the Arbitrator issued the Award.  (Ex. A.)  In the Award, the

Arbitrator states that she had reviewed "all briefs and testimony" since the Partial Award was

issued.  (*Id.* at 10.)  The Arbitrator explains in the Award that the Partial Award was "partial"

because "all evidence had not been presented concerning several areas, as evidenced by the

subject matter of the arguments contained in the briefs post-[Partial Award]." (*Id.* at 8.)  In

particular, the Arbitrator explains that the briefs and expert testimony following the Partial

Award "clarified the questions presented, especially around the applicability of statutory

construction." (*Id.*)  The statutory construction issue presented concerned White Oak's argument

that the ERISA statute required the Plan to establish that an ERISA violation *caused* the Plan

damages in order to recover from White Oak – which requirement the Plan failed to establish.

The Plan did not dispute that the preliminary, technical ERISA violations mentioned in the

Partial Award did not cause any damages to the Plan or cause White Oak to receive ill-gotten

profits.  Instead, the Plan argued that it did need to establish causation.

The Arbitrator expressly explains that the Award "modified" the Partial Award "to reflect

the evidence revealed throughout the briefing and the experts presented" after the Partial Award

was issued. (*Id.*)  Based on that new evidence and legal argument, the Arbitrator adopted White

Oak's positions in the Award and expressly modified the Partial Award, including by denying all

claims not expressly granted in the Award.  (*Id.* at 11.)

In the Award, the Arbitrator did not find that White Oak breached its fiduciary duties or

committed any ERISA violations.  The Arbitrator also rejected the Plan's contention that it

should be awarded $120 million in money damages, and awarded *zero* damages to the Plan.

Contrary to the Plan's assertion, there is no "precise dollar amounts" awarded to the Plan

anywhere in the Award.  In truth, the Arbitrator rejected wholesale the Plan's request for any damages.  (*Id.* at 9–11.)

As noted, additional evidence that White Oak presented after the Partial Award included evidence that Section 13(b) of the IMA and the LPAs for the Funds contained industry standard provisions allowing for in-kind distributions.  The Arbitrator agreed with White Oak that the express language of Section 13(b) of the IMA only requires White Oak to make an in-kind distribution by:

> transfer[ring] to the Plan all books, records, accounts, cash, securities (and other evidence of ownership) and all other property of the Trustees and the Plan in the Investment Manager Possession' and [by] 'facilitat[ing] the transition of the Investment Account to the management of the Trustees [or] another investment manager appointed by the Trustee[s].

(*Id.* at 9 (quoting §13(b) of IMA).)  Based on evidence that White Oak submitted after the Partial Award, the Arbitrator also correctly recognized that White Oak had been attempting to make that in-kind distribution to the Plan since the IMA terminated in September 2018, and that White Oak should not be "penalized" because the Plan refused to instruct White Oak where it should make that in-kind distribution.  (*Id.*)  The Arbitrator stated:

> [The] evidence demonstrates that White Oak unsuccessfully attempted in writing to return the Funds to the Plan after the 6-month holding period. White Oak notified the Plan it would continue investing the money in the same manner and for the same charges as before and until such time that the Plan advises White Oak of its successor investment manager or when it is ready to receive the funds itself. White Oak should not be penalized for the Plan's lack of action in notifying the Fund that it had a new investment manager or some other means of handling its funds, though it was clear that it was unhappy with White Oak at that time.

(*Id.* at 9.)  After finding that the Plan was only entitled to an in-kind distribution, the Arbitrator adopted White Oak's argument that the Plan must accept an in-kind distribution from White Oak, and ordered that the in-kind distribution must be made within 30 days of the Award:

> 2. WHITE OAK shall disgorge the NAV of the Plan, which may not include all cash, as of date of this FINAL AWARD. Disgorgement, including interest, shall

take place no later than 30 calendar days after the issuance of this Award unless the
parties agree otherwise.

*(Id.* at 10.)

Subsequent to the Award, White Oak made an in-kind distribution to the Plan on

September 3, 2021, as ordered in the Award, which the Plan accepted.  Remarkably, the  Petition

never once mentions either that the Arbitrator ordered the Plan to accept an in-kind distribution,

or that White Oak has already made the in-kind distribution to the Plan (which included the

Plan's uninvested cash).  Instead, no fewer than eight times, the Plan states that the Award

ordered the return of the Plan's assets valued at $96 million, and the Plan requests "entry of

judgment thereon."  (Dkt. 1, Mem. at 10, 12, 18; Dkt. 1, Pet. at 6–7.)

In addition, the Arbitrator rejected the Plan's request for disgorgement of management

fees as ill-gotten profits to White Oak, including the "Day One" management fee.  Between the

Partial Award and the Award, White Oak argued to the Arbitrator that the fees it earned were not

"profits," but instead were used to pay expenses for managing the business of the Funds.  The

Arbitrator agreed with White Oak that the fees that it earned are not "profits."  The Arbitrator

found that White Oak's management fees, which the Arbitrator called "performance fees,"

"constitute reimbursement for *managing* the business and affairs of Pinnacle and Summit, rather

than profits of White Oak."  (Ex. A at 10 (emphasis added).)  The Arbitrator's finding is

consistent with the evidence and legal authority White Oak submitted after the Partial Award,

including testimony from the Plan's own expert who described management fees as fees for

managing the business and affairs of the Funds and not profits, and clear Second Circuit caselaw

holding that management fees cannot be ill-gotten profits.  (Ex. L, Ex. R, Simon Aff. ¶ 12.)

The Plan argues that the Arbitrator only allowed White Oak to retain performance fees.

(Dkt. 1, Mem. at 12.)  But as discussed, the Plan never paid any performance fees to White Oak

so there would be no "performance fees" for White Oak to retain.  Further, the Award specifically states that "[a]ll claims not expressly granted herein are DENIED," which necessarily includes the Plan's request for disgorgement of management fees, including the Day One management fee.  (Ex. A ¶ 9, p.11.)  Thus, the Arbitrator plainly rejected the Plan's request for a refund of management fees that White Oak earned.

The Award also awarded the Plan (improperly) an unspecified amount of attorneys' fees and costs, "reduced by 20% since the Plan did not prevail on all claims, notably the [MFN] claim" and stated that "[n]o interest shall be paid with respect to attorneys' fees and costs owed." (*Id.* ¶ 4, p. 10.)

## STANDARD OF REVIEW

A petition to confirm is only available to enter judgment on the relief ordered in a final arbitration award and not new relief outside of what is ordered in the final arbitration award. *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) ("[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.").  A petition to confirm an arbitration award should not be granted if there is a basis to vacate the award.  *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998).  A court must overturn an arbitrator's award "if it was rendered in manifest disregard of the law."  *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019).  An arbitrator acts in manifest disregard of the law where the "governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," but the arbitrator "decided to ignore it or pay no attention to it."  *NDrive, Navigation Sys. S.A. v. LG Elecs. Inc.*, 2018 WL 8983479, at *5 (S.D.N.Y. Nov. 8, 2018) (quoting *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 452 (2d Cir. 2011)).

## ARGUMENT

I.    **The Plan's Petition Seeking Management Fees, Attorneys' Fees, Costs, Prejudgment Interest and Declaratory Relief Should Be Denied.**

The only relief granted in the Award is an order requiring the Plan to accept an in-kind distribution, and an unspecified amount of attorneys' fees and "interest." The Award did not order White Oak to pay any damages or disgorge any profits. The Award also did not find that White Oak breached any fiduciary duties and did not enter any declaratory relief. Because White Oak has already made the in-kind distribution, and the Plan has already accepted it, confirming the award of the in-kind distribution would serve no practical purpose.[11] The award of attorneys' fees and "interest," to the extent it refers to prejudgment interest, should be vacated for the reasons discussed below.

### A.    The Award Did Not Grant the Plan Management Fees.

The Plan makes the patently false assertion in its Petition that in the "Final Award, the arbitrator confirmed that White Oak 'must disgorge . . . some fees, and profits,' but modified the Partial Final Award to allow White Oak to retain performance fees." (Dkt. 1, Mem. at 19.) The Award could not have "allowed" White Oak to retain "performance fees," because it was undisputed that White Oak never received any fees based on the performance of the Funds' investments. (*See, e.g.*, *id.* at 10–11.) There were no performance fees for White Oak to retain.

Nor did the Award order White Oak to "disgorge" "some fees, and profits" as the Plan asserts. The Award nowhere states that it is awarding disgorgement of any fees or profits. To

---

[11] Contrary to the Plan's argument, the Arbitrator did not order White Oak to "return the Plan's assets valued at $96,213,778.83." Rather, the Arbitrator ordered a return of the "NAV of the Plan . . . as of the date of this Final Award." The Final Award was issued on August 4, 2021, and White Oak returned the value of the Plan's assets as of that date. The Plan argues that the "$96 million figure is taken from the summary that the [Plan's] expert submitted to the arbitrator[.]" (Dkt. 1, Mem. at 18.) But the summary that the Plan's expert submitted shows that the Plan was seeking a cash payment of $94.6 million based on the value of the Plan's investment as of September 18, 2018 – three years before the Award was issued. (Dkt. 1, Pet.) Again, the Arbitrator's Award nowhere orders White Oak to return assets valued at $96 million as the Plan wrongly argues to the Court.

the contrary, the Arbitrator clearly rejected the Plan's request for a management fee refund, which the Plan argued should be disgorged as ill-gotten profits to White Oak.  Instead, the Arbitrator accepted White Oak's argument that the management fees constituted payment for services White Oak provided to the Funds in which the Plan invested.

The Arbitrator's reference to White Oak retaining its "performance fees," which the Arbitrator described as fees for "*managing* the business and affairs of Pinnacle and Summit, rather than profits of White Oak," is clearly a reference to the management fees that White Oak earned for managing the Pinnacle and Summit Funds.[12]  (Ex. A at 10 ¶ 3.)  The Plan's own expert described management fees as fees for "managing the business and affairs" of the Funds.  (Ex. R, Simon Suppl. ¶ 12.)  To the extent that there was any question that the Award rejected the Plan's request for disgorgement of management fees, including the "Day One" management fee, the Award states that "[a]ll claims not expressly granted herein are DENIED," which denial would include the Plan's request for the disgorgement of management fees that the Plan had paid White Oak.  (Ex. A ¶ 9, p.11.)  Accordingly, the Plan's request that this Court "confirm" disgorgement of over $9 million in management fees should be denied, because the Arbitrator did not award the Plan any management fees.

**B.    The Award Did Not Find Any Breaches of Fiduciary Duty or Enter Any Declaratory Relief.**

The Plan also seeks a declaratory judgment that White Oak breached its fiduciary duties, that the Trustees did not breach their fiduciary duties and that White Oak is removed as the Plan's fiduciary and investment manager.  As an initial matter, the Award does not contain any

---

[12] Likewise, the Arbitrator did not award the Plan a refund of the $1.9 million "Day One" management fee, which was a fee White Oak earned for managing the Pinnacle Fund's  loan investments before the Plan joined the Fund and participated in those loan investments, and was completely offset by an immediate profit to the Plan of $2.6 million.

such declaratory relief or findings.  Indeed, while the Plan argued that White Oak breached its fiduciary duties to the Plan, the Award rejected all of the Plan's claims that it did not grant in the Award.  In addition, White Oak has made a full in-kind distribution to the Plan's new investment manager of all the Plan's assets that White Oak had managed, and is no longer managing any of the Plan's assets. The Petition's request that White Oak be removed as the Plan's investment manager therefore makes no sense.

Moreover, it would be improper for this Court to enter a declaratory judgment, as the Plan requests.  A petition to confirm is only available to enter judgment on the relief ordered in a final arbitration award.  *Florasynth*, 750 F.2d at 176 ("[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.").  A court cannot enter judgment pursuant to a petition to confirm granting relief that was not awarded in the arbitration.  *Tr. for the Mason Tenders Dist. Council Welfare Fund, Pension Fund, Annuity Fund & Training Program Fund v. Odessy Constr. Corp.,* No. 1:14–cv–1560–GHW, 2014 WL 3844619, at *1 n.1 (S.D.N.Y. Aug. 1, 2014) (concluding that "an action to confirm an arbitration award is not an appropriate vehicle for adjudication of ERISA claims for damages"); *see also, e.g.*, *Alpaca Shop Franchise Co. v. Roxburgh*, No. 3:05CV1203 (SRU), 2010 WL 2976918, at *4 (D. Conn. July 22, 2010) (declining "to award any other relief beyond what is awarded in the arbitration award").  Here, the Arbitrator did not find in the Award that the Plan was entitled to any declaratory relief.  Therefore, the Plan's request that this Court enter a declaratory judgment in the Plan's favor is improper and should be denied.

## II.    The Award's Order Granting Attorneys' Fees and Costs to the Plan Should Be Vacated.

Because the Plan did not prevail at the arbitration and did not establish the reasonableness of its requested attorneys' fees, the Arbitrator manifestly disregarded the law in awarding the

Plan attorneys' fees and costs.  Likewise, to the extent that the Arbitrator intended to award the

Plan costs that are not recoverable under ERISA, such as expert expenses, the Arbitrator further

manifestly disregarded the law.

        **A.**      **The Plan Did Not Prevail on Its ERISA Claims.**

The Award's grant of attorneys' fees and costs under ERISA should be vacated because

the Plan did not prevail at the arbitration.  It is black-letter ERISA law that in order for a party to

recover discretionary attorneys' fees and costs under ERISA Section 1132(g)(1), the party must

demonstrate "some degree of success on the merits."  *Hardt v. Reliance Standard Life Ins. Co.*,

560 U.S. 242, 255 (2010).  Here, not only did the Plan not have "some degree of success on the

merits," it failed to have *any* success.  The Arbitrator rejected *all* of the relief sought by the Plan.

The only relief the Plan received was the very same relief that had been available to the Plan

before the Arbitrator issued the Award, namely, an in-kind distribution.  If anything, White Oak

should have been awarded its attorneys' fees as the prevailing party.  29 U.S.C. § 1132(g)(1)

("[T]he court in its discretion may allow a reasonable attorney's fee and costs of action to either

party.").

        ***i.***      ***The Plan Did Not Have Success on the Merits Because the Arbitrator Rejected the Plan's Request for a $120 Million Money Judgment and Awarded No Damages to the Plan.***

Courts have held that attorneys' fees are not properly awarded under ERISA if the

plaintiff fails to recover the relief that it sought.  In *Adler v. Raynor*, the plaintiffs sought various

relief, including injunctive relief and money damages.  No. 09 CIV. 08877 DLC, 2011 WL

5024412, at *2 (S.D.N.Y. Oct. 20, 2011).  The parties reached a settlement on terms favorable to

the defendant, but the plaintiffs then argued that they should be awarded their attorneys' fees

under ERISA.  The Court rejected plaintiffs' argument that they had "some success" on the

merits sufficient to recover attorneys' fees under ERISA because the plaintiffs did not achieve

"real substantive success." The *Adler* court stated:

> The other terms of the settlement, requiring compliance with document retention
> and production policies, are best characterized as procedural devices. They add no
> duty beyond what is already required by law, except for a somewhat modest
> requirement for written reports. In other words, they achieve *no real substantive*
> *success*, but instead merely [achieve] a minor procedural mechanism through which
> Plaintiffs might affix liability for future improprieties. Given the expansive nature
> of Plaintiffs' initial prayer for relief, the acceptance of these [settlement] terms,
> without any monetary damages, permanent injunctions, divestiture of purportedly
> improper investments, admissions of culpability, or rescission of contracts, can
> hardly be described as the kind of success necessary to meet the standard in *Hardt*.

*Id.* at *3 (emphasis added); *see also Curtis v. Alcoa, Inc.*, No. 3:06-CV-448-PLR-CCS, 2014 WL

2895468, at *4-7 (E.D. Tenn. June 26, 2014) (reasoning that, because the court had denied six of

the eight forms of the relief the plaintiff requested, the plaintiff had not achieved "success on the

merits" under ERISA); *Brightman v. 1199/seiu Health Care Emps. Pension Fund*, No. 18-CV-

4932 (LJL), 2021 WL 809373, at *17 (S.D.N.Y. Mar. 2, 2021) (rejecting attorneys' fees request

under ERISA because the plaintiff "achieved a result that set back the client").

 As in *Adler*, the Plan had "no real substantive success" in the arbitration. The Plan did

not recover *any* of the $121,511,393.44 it sought at the arbitration based on the Plan's purported

claims that White Oak had breached its fiduciary duties under ERISA.[13] Thus, there is no basis

to award the Plan any attorneys' fees.

 Moreover, courts have held that purely "procedural" or "trivial" rulings in the plaintiff's

favor are not sufficient to constitute "success on the merits" under ERISA. *Hardt*, 560 U.S. at

255 ("A claimant does not satisfy [the 'success on the merits'] requirement by achieving 'trivial

---

[13] It is black letter law that ERISA only allows damages for "losses to the plan *resulting* from each such breach" of
fiduciary duty. 29 U.S.C. § 1109(a) (emphasis added). Here, it was undisputed that none of the technical ERISA
violations referenced in the Partial Award, but rejected in the Award, resulted in any financial loss to the Plan or
caused White Oak to earn any ill-gotten profits. To the contrary, the Plan received over $33.8 million in profit
distributions from White Oak and the Plan's total return on its investment is over 46%.

success on the merits' or a 'purely procedural victory' . . . .") ; *Feldman's Med. Ctr. Pharmacy, Inc. v. CareFirst, Inc.*, 898 F. Supp. 2d 883, 906–07 (D. Md. 2012), *aff'd* 541 F. App'x 322 (4th Cir. 2013) (denying request for attorneys' fees under ERISA: "[N]ot only was the interest award—$11,983 trivial absolutely, it was trivial in comparison to what was sought—over $800,000. While [the plaintiff] won some interest defeating [the defendant's] argument that *no* further interest was due, it lost on the substantive issue at the core of its case. . . .").  Here, the Plan unreasonably claims to have incurred over $7.1 million in attorneys' fees and expenses to purportedly establish after a week-long arbitration hearing that White Oak committed three technical ERISA violations.  Those purported technical violations – which the Arbitrator ultimately rejected in the Award – are clearly trivial, and could not constitute success on the merits sufficient to justify an award of attorneys' fees.

ii.     ***The Plan Did Not Have Success on the Merits Because the Arbitrator Adopted White Oak's Position that the Plan is Solely Entitled to an In-Kind Distribution.***

In addition, courts have held that a plaintiff is not successful on the merits under ERISA if the plaintiff only receives relief that was available to it "before the litigation began."  *Bd. of Tr.'s of S. Cal. IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09 CIV. 6273 RMB AJP, 2013 WL 1189681, at *4-5 (S.D.N.Y. Mar. 21, 2013) (denying request for attorneys' fees under ERISA because "$630,000 was obtained by Plaintiff in settlement which was the same amount available to Plaintiff prior to commencing this litigation."); *Feldman's Med. Ctr. Pharmacy, Inc.*, 898 F. Supp. 2d at 905 (denying attorneys' fees under ERISA where defendant agreed to provide the relief requested by the plaintiff for reasons unrelated to the claims brought in the complaint); *Staats v. Procter & Gamble Long Term Disability Allowance Plan*, No. CIV.A. 11-1320, 2012 WL 3705000, at *5 (W.D. Pa. Aug. 27, 2012) (rejecting

attorneys' fees request where the "plaintiff's attainment of benefits [after filing the lawsuit] was not attributable to the substantive legal merits of her claim").

Here, the Arbitrator fully adopted White Oak's position that the Plan is only entitled to an in-kind distribution of its pro-rata investments in the Funds' loan investments and uninvested cash. As the Arbitrator correctly recognized, White Oak has always stood ready to make that in-kind distribution since September 18, 2018, but the Plan steadfastly refused to accept it. (Ex. A, Award at 9.) Thus, the Plan did not succeed on the merits of its ERISA claims because it only obtained relief that was available to it before the arbitration.

Further, the Arbitrator based her award of attorneys' fees on ERISA. But the Arbitrator did not award any relief to the Plan under ERISA. The sole relief that the Arbitrator awarded to the Plan of an in-kind distribution is *contractual* relief under Section 13 of the IMA. The IMA does not contain an attorneys' fees provision, and thus the IMA provides no basis for an award of attorneys' fees. In short, because the Arbitrator did not award any relief under ERISA, there is no basis for awarding attorneys' fees or costs to the Plan under ERISA.

For these reasons, the Plan did not prevail on the merits of its ERISA claims, and the Arbitrator manifestly disregarded the law in awarding attorneys' fees and costs to the Plan.

**B.    The Plan Wholly Failed to Show That Its Attorneys' Fees Were Reasonable.**

The Arbitrator's acceptance of the Plan's requested attorneys' fees, even with a 20% discount, is in manifest disregard of the law for a number of other reasons.

When assessing proffered attorneys' fees, "[t]he party seeking fees bears the burden of demonstrating that its requested fees are reasonable." *1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council Inc.*, No. 13 Civ. 2608 (JGK), 2014 WL 840965, at *10 (S.D.N.Y. Mar. 4, 2014). The Second Circuit has recognized that where an Arbitrator fails to provide an explanation supporting the reasonableness of the requested attorneys' fees, it may be

appropriate for a reviewing court to "consider that absence of explanation when deciding whether the [Arbitration] Panel has acted in manifest disregard of the law."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 141–43 (2d Cir. 2007).  Here, the Arbitrator did not provide any explanation supporting the reasonableness of the Plan's requested attorneys' fees and costs, and that lack of any explanation should be considered in this case given the Plan's total failure to prevail on any of its claims and the Plan's failure to properly support its fee petitions.  As explained below, the Plan wholly failed to meet that burden for a number of reasons.

> ### i.      *The Plan did not achieve any success on the merits.*

"The most important factor in determining the reasonableness of a fee is the degree of success obtained."  *Pino v. Locascio*, 101 F.3d 235, 237 (2d Cir. 1996); *see also, e.g.*, *Klimbach v. Spherion Corp.*, 467 F. Supp. 2d 323, 331 (W.D.N.Y. 2006) (holding that a court should exclude from an attorneys' fee award any hours dedicated to unsuccessful claims).  Here, the Plan did not obtain any of its requested relief at the arbitration.  Accordingly, there is no basis to award any attorneys' fees or costs – and certainly not the more than $7.1 million that the Plan sought in the arbitration.

> ### ii.     *The Plan improperly delayed providing its invoices, and the invoices it eventually provided were too heavily redacted to allow White Oak to assess the reasonableness of the Plan's requested fees.*

The Plan failed to provide invoices with its initial fee petition, and instead improperly submitted heavily-redacted invoices for the first time in its reply, as well as in a supplemental fee petition.  The Plan's attempt to submit invoices for the first time in its reply is fatal to its fee request.  *U.S. ex rel. Karlin v. Noble Jewelry Holdings Ltd.*, No. 08 Civ. 7826(JGK)(KNF), 2012 WL 1228199, at *5 (S.D.N.Y. Apr. 9, 2012) (denying fee petition and refusing to consider "the [Claimant's] contemporaneous records[] — submitted for the first time in reply"); *see also*

*Feltzin v. Union Mall LLC*, 393 F. Supp. 3d 204, 215 (E.D.N.Y. 2019) ("Even for attorney's fees applications, arguments may not be made for the first time in a reply brief.").

Moreover, the invoices that the Plan eventually provided to White Oak (with its reply brief and in a separate supplemental petition) were so heavily redacted that White Oak could not assess the reasonableness of the fees sought. *See In re Fraidin*, 34 F. App'x 932, 933 (4th Cir. 2002) (holding that a party who was "denied the opportunity to challenge the . . . determination or reasonableness of the attorneys' fees awarded . . . was denied due process"); *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 800 (S.D. Tex. 2009) ("Redacted entries must be excluded if they do not provide sufficient information to classify and evaluate the activities and hours expended."). *See also* Appendix A hereto (providing examples). For these reasons alone, the Plan's request for attorneys' fees should have been denied.

### iii.    *The Plan's invoices demonstrate a severe lack of billing judgment.*

Another key factor in assessing the reasonableness of requested fees is whether the attorney exercised "billing judgment." *See Lunday v. City of Albany*, 42 F.3d 131, 133–34 (2d Cir. 1994) (holding that court must ensure counsel exercised "billing judgment" by taking a "conscientious and detailed inquiry into the validity of [counsel's] representations that a certain number of hours were usefully and reasonably expended" in order to award attorneys' fees).

Here, the Plan's counsel plainly did not exercise billing judgment. The simple fact is that the Plan's counsel incurred over $7.1 million in attorneys' fees and expenses for a one-week arbitration that resulted in the Plan receiving *zero* in money damages. Moreover, the heavily-redacted invoices that the Plan eventually provided to White Oak confirm that the Plan's counsel exercised decidedly poor judgment. For example, as shown in the time entries in Appendix A, the Plan sought to recover fees for time that the Plan's own counsel indicated in the invoice should be written off. The Plan further sought to bill White Oak – at $1,750 per hour – for time

31

that its lead lawyer spent reviewing the Plan's invoices for "write-offs" (write-offs that the Plan

now seeks to recover from White Oak).

> ### iv.     The Plan did not establish the reasonableness of its counsel's sky-high billing rates.

The Plan also did not establish that the sky-high billing rates that their attorneys charged

– which were as high as $1,750 per hour – are reasonable.  Of the nearly 100 New York firms

listed on the National Law Journal Billing Report that the Plan cited to support its billing rates,

not a single firm had partner rates as high as $1,750.  (Ex. V, Plan's Fee Reply Ex. 3.)  The

unreasonableness of the Plan's counsel's exceptionally-high billing rates is underscored by the

fact that the Plan negotiated a 20% discount from those standard rates, (Ex. T, Phillips

Declaration at ¶ 32), yet the Plan sought to recover the full hourly rates of its lawyers.[14]

In addition, the Plan improperly sought to charge White Oak – at sky-high billing rates –

for time that their lawyers spent performing administrative tasks, which is not recoverable.  *See,*

*e.g., Travel Leaders Grp., LLC v. Corley*, No. 19-cv-1595 (GBD) (JLC), 2019 WL 6647319, at

*16 (S.D.N.Y. Dec. 5, 2019) (finding requested hours to be "excessive" because entries

"reflect[ed] [attorneys performing] administrative work").  For example, an experienced Plan

lawyer, billing at rates of $670 and $775 per hour, spent hours on the administrative tasks of

overseeing the printing and organizing of documents for the Arbitrator.  In short, the Plan failed

to establish the reasonableness of their requested attorneys' fees.

> ## C.     Expert Fees Are Not Recoverable as a Matter of Law.

The Arbitrator awarded the Plan "costs," but did not address White Oak's argument that

the more than $890,000 in expert fees and other expenses are not recoverable under ERISA as a

---

[14] Despite White Oak's repeated requests, the Plan refused to produce its alternative fee agreement to White Oak. Further, the Plan never provided evidence concerning whether it eventually paid all of its counsel's invoices, and if so, at what billing rates.

matter of law.[15]  *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 137 F. Supp. 2d 351, 360 (S.D.N.Y. 2001) (collecting cases) ("As the cases have uniformly held, because section 502(g) does not explicitly permit the recovery of expert witness fees, expert witness fees are not allowable in these types of cases."), *vacated on other grounds*, 302 F.3d 18, 34–35 (2d Cir. 2002); *Garlock v. Nelson*, No. 96-CV-1096 (FJS), 1998 WL 315089, at *1 (N.D.N.Y. June 9, 1998) ("ERISA *does not specifically permit* fee-shifting for expert witness fees, and therefore the limitations provided in 28 U.S.C. § 1821 are applicable," which does not allow for the recovery of experts' hourly fees).  Thus, to the extent that the Award includes an award of expenses that are not recoverable as a matter of law, the Arbitrator's award is in manifest disregard of the law and should be vacated.

*     *     *

For the foregoing reasons, the Arbitrator acted in manifest disregard of the law in granting the Plan an unspecified amount of attorneys' fees and costs.  The Arbitrator's award should be vacated.

### III.    To the Extent that the Award Purports to Grant Prejudgment Interest, the Award Should Be Vacated.

The Award also states that the in-kind distribution shall include "interest."  To the extent that the Award refers to prejudgment interest (as opposed to interest earned on the Plan's loan investments – which has already been provided to the Plan as part of the in-kind distribution), it should be vacated.  There is no basis to award prejudgment interest, because White Oak, not the Plan, prevailed at the arbitration.

---

[15] The only expert fee recoverable is the $40 per day witness fee (plus travel expenses) permitted by 28 U.S.C. § 1821, not the hourly fees of experts.  *Levy v. Young Adult Inst., Inc.*, No. 13-CV-2861 (JPO), 2019 WL 1434271, at *4 (S.D.N.Y. Mar. 30, 2019), *reconsideration denied*, No. 13-CV-2861 (JPO), 2019 WL 3454613 (S.D.N.Y. July 30, 2019).

Moreover, contrary to the Plan's assertion, the Arbitrator did not award prejudgment interest on the disgorgement of "Plan assets and management fees."  (Dkt. 1, Mem. at 20.)  The Arbitrator did not grant the Plan any money damages, let alone an award of "Plan assets or management fees."  Thus, there is no damages award upon which to calculate prejudgment interest.  *E.g., Great Am. Ins. Co. v. Wexler Ins. Agency, Inc.*, No. CV979397MMMBQRX, 2000 WL 36732271, at *3 (C.D. Cal. Apr. 19, 2000) ("Great American did not seek and did not recover damages for this conduct. Accordingly, there are no damages that would support an award of compound prejudgment interest."); *Olivares v. Brentwood Indus.*, No. 4:13-CV-04107, 2015 WL 13658070, at *2 (W.D. Ark. Apr. 13, 2015) ("Olivares is not entitled to any other compensatory damages, so there is no damages award upon which to base an award of prejudgment interest.").

Importantly, the Arbitrator expressly recognized that White Oak should not be "penalized" because the Plan frustrated White Oak's attempts to make an in-kind distribution. Awarding any prejudgment interest would constitute such a penalty.  Moreover, at all times the Plan has benefited from its investments with White Oak.  Since September 2018, which is the date the Plan argued White Oak should have made an all-cash payment to the Plan, the Plan has received over $6.2 million in profit distributions from White Oak.  (Ex. G, Tr. at 51.)  Thus, the Plan continued to benefit from its investment with White Oak up until White Oak made the in-kind distribution to the Plan on September 3, 2021.  Consistent with the Arbitrator's order requiring the Plan to accept an in-kind distribution no later than September 3, 2021, White Oak then made an in-kind distribution to the Plan on September 3, which has retained a new successor investment manager to manage that in-kind distribution.  The Plan received all interest payments and profits attributable to its investment with White Oak up until the September 3,

2021 in-kind distribution.  In short, the Plan benefitted handsomely from its investment with White Oak and there is no basis to award any prejudgment interest.

For the foregoing reasons, any award of prejudgment interest would be in manifest disregard of the law.

## **CONCLUSION**

For the foregoing reasons, White Oak respectfully requests that this Court (1) vacate the Award's grant of attorneys' fees, costs and, to the extent awarded, prejudgment interest, (2) deny the Plan's Petition, and (3) grant White Oak such further relief as the Court deems just and proper.

Dated: New York, New York

October 20, 2021

Respectfully Submitted,

SIDLEY AUSTIN LLP

By: */s/ James Heyworth*

James Heyworth
787 Seventh Avenue
New York, New York 10019
Tel.: (212) 839-5300
jheyworth@sidley.com

and

Thomas K. Cauley, Jr. (*pro hac vice* application forthcoming)
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Respondent White Oak Global Advisors, LLC*

**Appendix A**

**Improper Invoice Redactions**

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 05/14/18 | Karen Kiley Haughton | Begin first draft ███████████. | 2.70 |
| 05/15/18 | Karen Kiley Haughton | Continue drafting ███████████ | 2.40 |
| 05/16/18 | Karen Kiley Haughton | Continue drafting ██████████. | 3.10 |

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 10/24/18 | Patrick T. Lee | Legal research into ████████████████████ Researched ████████████████████████████. Exhaustive search for █████████████ | 7.10 |

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 11/22/19 | Amy Bond | Start drafting █████████████████ abou █. | 6.50 |
| 11/22/19 | Sara J. Dennis | Researched ███████████████████; researched ████████████████████ and discussed the █ with ████████ | 4.00 |

| Date | Timekeeper | Description | Hours |
|------|-----------|-------------|-------|
| 02/03/21 | Karen Kiley Haughton | Internal meeting regarding ██████████; internal discussions re █████ begin research on ██████ █████ | 5.80 |
| 02/03/21 | Clea Liquard | Provide guidance to Ms. Statucki on researching ████████████, and review research results. | 0.50 |
| 02/03/21 | Tazia L. Statucki | Researched ███████████████████, and drafted summary for team. | 4.50 |
| 02/03/21 | Tazia L. Statucki | Reviewed fee application filings ████████. | 0.80 |
| 02/04/21 | Robert S. Newman | Reviewing ██████████; e-mail with J. Sperling re same. | 0.30 |

| Date | Name | Description | Hours |
|---|---|---|---|
| 02/20/21 | Catherine M. Carulas | Conduct research ███████████████████████ ██████. | 3.00 |
| 02/20/21 | Clea Liquard | Emails about ██████████. | 0.20 |
| 02/20/21 | Tazia L. Statucki | Researched ████████████████████████████ ██. | 3.10 |
| 02/21/21 | Robert S. Newman | Reviewing and editing ████████; reviewing ████████████; e-mail with C. Liquard re same. | 1.50 |
| 02/21/21 | C. William Phillips | Review and edit ████████; review ████████; correspondence regarding same. | 2.50 |
| 02/21/21 | Karen Kiley Haughton | Revise ██████████████████; review and revise ██████████. | 7.60 |
| 02/21/21 | Clea Liquard | Review 17-page White Oak letter seeking reconsideration; related research on ████████; draft ██████████ for team review. | 5.40 |
| 03/03/21 | Patrick T. Lee | Review drafts and correspondence regarding ███████████. | 0.60 |
| 03/03/21 | Clea Liquard | Revisions to draft ████████████████████████; call with Mr. ████ to discuss ████████; review of letter from White Oak counsel regarding refusal to proceed; draft letter ████████; emails with team about the same. | 3.70 |
| 03/04/21 | C. William Phillips | Attention to correspondence and letter and submission to arbitrator; confer with team; correspond with client. | 2.00 |
| 03/04/21 | Jonathan M. Sperling | Review analysis of ████████; call with D. Pinsky regarding ████████; revise ████████; emails regarding same. | 1.20 |
| 03/04/21 | Karen Kiley Haughton | Research case law regarding ████████; communicate internally regarding research; review and provide comments on draft ████████. | 3.50 |
| 03/04/21 | Patrick T. Lee | Review draft ████████████████████. | 0.40 |
| 03/04/21 | Clea Liquard | Draft and revisions to ████████████; call with Mr. ████ about ████████; calls with Mr. Phillips and Cornerstone re ████████; emails with team about the same; review research from Ms. Haughton on ████████; call with Mr. Sperling. | 4.80 |

**Charging White Oak for Time to Be Written Off**

| | | | |
|---|---|---|---|
| 08/21/19 | Jamie A. Heine | [WRITE OFF] Travel to NYC for ████ deposition. | 2.50 |
| 01/28/20 | C. William Phillips | Review billing for write-offs. | 1.00 |
| 02/12/20 | C. William Phillips | Review and edit brief; review correspondence; review bill. | 1.00 |
| 03/31/20 | C. William Phillips | Review time logs; correspondence regarding White Oak brief; confer with C. Liquard regarding preparation of reply. | 0.70 |
| 12/10/20 | Jonathan M. Sperling | [write off] Revise internal case summary for intranet. | 0.50 |

**Administrative Tasks Performed by Experienced Attorneys**

| | | | |
|---|---|---|---|
| 04/22/19 | Karen Kiley Haughton | Prepare and send documents to the arbitrator; prepare and send production to White Oak. | 1.80 |
| 08/06/19 | Karen Kiley Haughton | Coordinate schedules regarding upcoming depositions. | 3.30 |
| 02/23/21 | Karen Kiley Haughton | Organize and oversee documents for the Arbitrator. | 4.00 |

(Ex. U.)