**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE TRUSTEES OF THE NEW YORK
STATE NURSES ASSOCIATION PENSION
PLAN,

               Petitioners,

    v.

WHITE OAK GLOBAL ADVISORS, LLC,

              Respondent.

Civil Action No. 21 Civ. ____

## MEMORANDUM OF LAW IN SUPPORT OF PETITION TO CONFIRM ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

COVINGTON & BURLING LLP
C. William Phillips
Jonathan M. Sperling
Cléa P.M. Liquard
The New York Times Building
620 Eighth Avenue
New York, New York 10018
212-841-1000
cphillips@cov.com
jsperling@cov.com
cliquard@cov.com

Robert Newman
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-6000
rnewman@cov.com

*Attorneys for Petitioners Trustees of the New York State Nurses Association Pension Plan*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

I.      White Oak's Breach of Its ERISA Fiduciary Duties. ........................................... 2

II.     The AAA Arbitration Proceeding. ........................................................................ 5

III.    The Arbitrator's Findings and the Partial Final Award. ....................................... 5

IV.     Post-Partial Final Award Proceedings and the Arbitrator's Final Award............ 9

ARGUMENT ..................................................................................................................... 13

I.      The Court Has Jurisdiction Over the Action and Respondent. .......................... 13

II.     The Court Should Confirm And Enter Judgment Upon the Awards. ................. 14

III.    The Precise Amounts Awarded Are Apparent From the Awards and Record
        Relied Upon by the Arbitrator. .......................................................................... 16

IV.     The Court Should Grant Post-Award Prejudgment Interest. ............................. 20

CONCLUSION.................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council, Inc.,*
No. 13 Civ. 2608 (JGK), 2014 WL 840965 (S.D.N.Y. Mar. 4, 2014) ....................................21

*D.H. Blair & Co. v. Gottdiener,*
462 F.3d 95 (2d Cir. 2006)..............................................................................................14, 15

*Doctor's Assocs. v. Stuart,*
85 F.3d 975 (2d Cir. 1996)....................................................................................................14

*First Capital Real Estate Invs., LLC v. SDDCO Brokerage Advisors, LLC,*
355 F. Supp. 3d 188 (S.D.N.Y. 2019).............................................................................7, 8, 21

*Fischer v. CGA Computer Assocs., Inc.,*
612 F. Supp. 1038 (S.D.N.Y. 1985)..................................................................................17, 18

*Flender Corp. v. Techna-Quip Co.,*
953 F.2d 273 (7th Cir. 1992) .................................................................................................17

*Gerlind Global Reins. Corp.,*
No. 98 Civ. 9185 (LAP), 1999 WL 553767 (S.D.N.Y. July 29, 1999) .................................17

*Idea Nuova, Inc. v. GM Licensing Grp., Inc.,*
617 F.3d 177 (2d Cir. 2010)...................................................................................................13

*Landau v. Eisenberg,*
922 F.3d 495 (2d Cir. 2019).....................................................................................13, 15, 16

*LaScala v. Scrufari,*
479 F.3d 213 (2d Cir. 2007)....................................................................................................6

*Leigh v. Engle,*
727 F.2d 113 (7th Cir. 1984) ..................................................................................................6

*Liberty Re (Bermuda) Ltd. v. Transamerica Occidental Life Ins. Co.,*
No. 04 Civ. 5044 (NRB), 2005 WL 1216292 (S.D.N.Y. May 23, 2005)...............................17

*Lowen v. Tower Asset Mgmt., Inc.,*
829 F.2d 1209 (2d Cir. 1987)..................................................................................................6

*Salus Capital Partners, LLC v. Moser,*
289 F. Supp. 3d 468 (S.D.N.Y. 2018)....................................................................................20

*Estate of Scherban v. Lynch*,
    No. 14-CV-6312 (VSB), 2021 WL 2581278 (S.D.N.Y. June 23, 2021)..........................17, 18

*Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*,
    119 F. Supp. 3d 240 (S.D.N.Y. 2015)....................................................................................8, 9

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
    592 F.3d 329 (2d Cir. 2010).................................................................................................15, 16

*Truong v. New York Hotel and Motel Trades Council, AFL-CIO*,
    No. 07 Civ. 11383 (RJH), 2009 WL 798937 (S.D.N.Y. Mar. 26, 2009)..................................2

*Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.*,
    737 F.2d 150 (2d Cir. 1984)....................................................................................................20

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*,
    103 F.3d 9 (2d Cir. 1997).........................................................................................................15

*Zeiler v. Deitsch*,
    500 F.3d 157 (2d Cir. 2007)......................................................................................................2

**Statutes**

9 U.S.C. § 9 ................................................................................................................................13

9 U.S.C. § 10(a)(1)-(4)................................................................................................................15

9 U.S.C. § 11(c) ..........................................................................................................................18

28 U.S.C. § 1331..........................................................................................................................13

28 U.S.C. § 1391(b)-(c) ..............................................................................................................14

29 U.S.C. § 1002(21)(A)................................................................................................................3

29 U.S.C. § 1002(38) .....................................................................................................................3

29 U.S.C. § 1109(a) ......................................................................................................................8

29 U.S.C. § 1132(g)(1) .................................................................................................................8

N.Y. C.P.L.R. § 302......................................................................................................................14

N.Y. C.P.L.R. §§ 5001–5004........................................................................................................21

**INTRODUCTION**

The Trustees ("Trustees") of the New York State Nurses Association Pension Plan (the

"Plan"), the largest pension fund for nurses in the State of New York, bring this action to

confirm arbitration awards against one of the Plan's investment managers, White Oak Global

Advisors, LLC ("White Oak").  Following an extensive arbitration proceeding, an arbitrator

found that White Oak breached its fiduciary duties to the Plan and engaged in several acts of

self-dealing in violation of the law.

In particular, the arbitrator found that White Oak had charged the Plan management fees

in excess of amounts that had been agreed upon, including for periods before the Plan engaged

White Oak.  In addition, White Oak retained the Plan's assets after its contract ended, thereby

generating additional management fees to which it was not entitled.  During the course of its

management of the Plan's assets, White Oak also granted itself an indemnification right, placing

the Plan's assets at risk to confer a benefit upon itself.  The arbitrator also determined, in

response to a counterclaim by White Oak, that the Trustees of the Plan neither participated in,

nor were responsible for, White Oak's many wrongful acts.

The arbitrator rendered a Partial Final Award on November 30, 2020 in favor of the

Trustees, and on August 4, 2021, rendered a Final Award that "incorporated" the Partial Final

Award "within th[e] Final Award."  The arbitrator ordered the removal of White Oak as the

Plan's fiduciary and investment manager, and awarded the Plan disgorgement of the Plan's

assets and management fees paid to White Oak, in addition to prejudgment interest on those

amounts, as well as attorneys' fees.  Although not all of the precise amounts awarded to the Plan

are apparent from the face of the Final Award, the absence of exact quantification is not a basis

to refuse to confirm the awards.  Calculation of the amounts owed is ministerial and is readily

ascertainable from documents in the record upon which the arbitrator relied.

Under well-established Second Circuit precedent, arbitration awards are entitled to substantial deference and must be confirmed except in limited circumstances not present here. The Trustees therefore respectfully request that this Court confirm the Partial Final Award and Final Award and enter judgment thereon.[1]

## FACTUAL BACKGROUND

### I.     White Oak's Breach of Its ERISA Fiduciary Duties.

The New York State Nurses Association Pension Plan holds approximately $4 billion in retirement funds for nurses who are members of the New York State Nurses Association, which is the oldest union of registered nurses in the United States. *See* Phillips Decl. Ex. A (cited to hereinafter as "PFA") at 1. The Plan is governed by the Trustees, who in turn employ in-house investment staff and engage outside investment advisors to manage investment of the Plan's pension assets. *Id.*

In 2014, the Trustees engaged White Oak to manage and invest certain Plan assets. *Id.* at 1-2. In January 2014, the parties executed an investment management agreement ("IMA"), the terms of which were extended and renewed between the parties in January 2016. *Id.* at 7; Phillips Decl. Ex. C (cited to hereinafter as the "IMA"). Under the IMA, the Plan made an initial

---

[1] This Petition seeks only to confirm the arbitrator's awards and convert the awards into a judgment. The Trustees anticipate that once a judgment is entered, there will be additional proceedings to enforce the judgment given White Oak's failure to comply with the Final Award to date. *See Zeiler v. Deitsch*, 500 F.3d 157, 170 (2d Cir. 2007) ("[E]nforcement is not confirmation. Once confirmed, the awards become enforceable court orders, and, when asked to enforce such orders, a court is entitled to require actions to achieve compliance with them."). At this stage, however, the issue of White Oak's compliance has no bearing on confirmation of the arbitral awards. *See, e.g., Truong v. New York Hotel and Motel Trades Council, AFL-CIO*, No. 07 Civ. 11383 (RJH), 2009 WL 798937, at *1 (S.D.N.Y. Mar. 26, 2009) ("Whether plaintiff has complied with the awards, however, is immaterial to whether this Court should confirm the awards, because confirmation simply turns an award into an enforceable judicial order.").

allocation of $80 million for investment by White Oak, and subsequently allocated an additional

$35 million to White Oak for investment.  *See* PFA at 6, 11.

In exchange for those commitments, White Oak undertook fiduciary responsibilities

under ERISA[2] with respect to managing the pension assets.  Specifically, under the IMA, White

Oak was appointed an "Investment Manager" and the Trustees "delegate[d] to the Investment

Manager fiduciary responsibility over the Allocated Amount ... including the sole, exclusive and

full discretion and authority to invest plan assets."  IMA at NYSNA0000910; *see also* PFA at 2.

White Oak "expressly acknowledge[d], represent[ed], warrant[ed], and agree[d]" that it "is an

'investment manager'" and "'fiduciary'" with respect to the Plan's assets, as those terms are

defined in Sections 3(38) and 3(21)(A) of ERISA respectively.  IMA at NYSNA00000932; *see*

*also* 29 U.S.C. §1002(38), §1002(21)(A).

White Oak agreed "to manage the Investment Account Assets in accordance with and

subject to ... compliance with ERISA and other applicable law."  PFA at 3; IMA at

NYSNA00000911-12; *see also* IMA at NYSNA00000922-23 (White Oak "shall not effectuate

any investment transaction that directly or indirectly shall cause the Plan, the Trustees or any

other fiduciary (including the Investment Manager, or any affiliate thereof), to violate Sections

406 through 408 of ERISA, or Section 4975 of the Code.").  And while the parties agreed that

White Oak had the "sole and exclusive discretion" to invest the Plan's assets in "funds organized

by White Oak Global Advisors, LLC," White Oak agreed that "any such investments shall not:

(i) give rise to a non-exempt prohibited transaction for purposes of ERISA; and (ii) violate

Section 404 of ERISA."  PFA at 4; IMA at NYSNA00000939.

---

[2] "ERISA" refers to the Employee Retirement Income Security Act of 1974, ERISA § 2, *et seq.*,
29 U.S.C. § 1001, *et seq.*

Using its delegated authority under the IMA, White Oak invested the Plan's money in two proprietary White Oak funds, the Pinnacle Fund and Summit Fund. *See, e.g.*, PFA at 9. White Oak created, drafted, and designed the terms of the documents that govern the Plan's investment in those funds, and White Oak signed those documents on behalf of the Plan. *See, e.g.*, *id.* at 8, 20, 23.  In late 2015, the Plan's Chief Investment Officer ("CIO") recommended that the Trustees renew the IMA with White Oak. *See id.* at 6-7.  Shortly after the IMA was renewed in 2016, the CIO left his position at the Plan. *See id.*  The Trustees subsequently learned that their former CIO had taken a position as a partner at White Oak, a position he had negotiated with White Oak at the same time he was recommending—without disclosure of those negotiations—that the Trustees renew the IMA with White Oak. *See id.*  The Trustees and Plan investment staff subsequently began to investigate the White Oak account and discovered that White Oak was failing to meet certain obligations under the IMA. *Id.* at 8-12.  After the Plan began to raise questions with White Oak, and while the Trustees' and Plan staff's investigation into these issues was ongoing, White Oak abruptly and unilaterally terminated the IMA in December 2017, subject to the IMA's 90-day notice period. *Id.* at 12-14.  Pending resolution of the issues it had identified, the Plan exercised its right under the IMA to extend the terms for an additional six months to allow the Trustees to further investigate and review the arrangement. *Id.* at 14.

The IMA terminated on September 18, 2019. *Id.* at 14.  The arbitrator found that, despite the IMA terminating, "White Oak continues to hold approximately $88.7 million of the Plan's assets and charges the Plan management fees. ... As of June 30, 2019, the Plan has paid White Oak a total of approximately $5,346,777 in management fees." *Id.* at 15.

## II.   The AAA Arbitration Proceeding.

On or about July 31, 2018, "the Trustees filed a demand for arbitration seeking, among other relief, the withdrawal and return of the Plan's investment." *Id.* at 14 (internal quotations omitted). Pursuant to the dispute resolution provision in the parties' IMA, the arbitration was conducted according to the rules of the American Arbitration Association ("AAA") and venued in New York City. IMA at NYSNA00000949; Phillips Decl. ¶¶ 8, 10.

The Trustees' demand for arbitration outlined White Oak's breaches of its fiduciary duties under ERISA. PFA at 14. The Trustees contended that White Oak used the fiduciary authority granted to it under the IMA to give itself benefits and fees to which the Trustees did not agree under the IMA, and therefore breached its ERISA fiduciary obligations and violated ERISA's prohibited transactions rules. Phillips Decl. ¶ 7; *see also* ERISA § 406, 29 U.S.C. § 1106(b)(1); ERISA § 404, 29 U.S.C. § 1104(a)(1). The Trustees also asserted a contractual claim for breach of the "most favored nations" provision in the IMA. Phillips Decl. ¶ 7. In response, White Oak asserted a counterclaim against the Trustees in their personal capacity alleging that the Trustees knew of, and participated in, any breach of fiduciary duties by White Oak. *Id.*

Over the following approximately year-and-a-half, the parties engaged in extensive discovery and motion practice, leading up to a week-long in-person hearing in December 2019 at the AAA offices in New York, New York. *Id.* ¶¶ 9–10. Following the hearing, the parties submitted lengthy post-hearing briefing, collectively amounting to over 200 pages. *Id.* ¶ 10.

## III.   The Arbitrator's Findings and the Partial Final Award.

On November 30, 2020, the arbitrator issued a Partial Final Award. The 37-page reasoned award concluded that "White Oak has engaged in numerous prohibited transactions

pursuant to ERISA Section 406(b)(1), [2]9 U.S.C. § 1106(b)(1) and as a result received either

compensation or benefits beyond that agreed to by the Trustees under the IMA." PFA at 15.

ERISA Section 406 imposes specific, *per se* prohibitions on transactions by investment

managers and other fiduciaries. Included among the prohibitions is the rule that an ERISA

fiduciary "shall not ... deal with the assets of the plan in his own interest or for his own account."

ERISA § 406(b)(1); 29 U.S.C. § 1106(b)(1). Thus, while ERISA permits an investment manager

to receive reasonable compensation for services rendered, any fees or compensation the

investment manager causes itself to receive *beyond* that which is specifically agreed to by a

plan's trustees is a *per se* violation of ERISA 406(b).

As the arbitrator observed, ERISA's "'prohibited transaction rules are designed to

prevent the use of plan assets for any interest, financial or nonfinancial, other than an interest of

the Plan and its beneficiaries.'" PFA at 20 (quoting *Leigh v. Engle*, 727 F.2d 113, 127 (7th Cir.

1984)). Accordingly, "'the protective provisions of section 406(a)(l)(D) and (b)(l) should be

read broadly in light of Congress' concern with the welfare of plan beneficiaries.'" *Id.* at 19

(quoting *Leigh*, 727 F.2d at 126). Indeed, as the Second Circuit has remarked, the fiduciary

obligations imposed under ERISA are "the highest duty known to the law." *LaScala v. Scrufari*,

479 F.3d 213, 221 (2d Cir. 2007); *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209,

1213 (2d Cir. 1987) (ERISA Section 406(b) "protects beneficiaries by prohibiting transactions

tainted by a conflict of interest and thus highly susceptible to self-dealing").

Applying well-established law, the arbitrator analyzed the question framed by the parties

in their post-hearing briefing: "[W]hether White Oak exercised its fiduciary authority to cause

the Plan to pay it[] fees and compensation to which it was not entitled under the IMA or agreed

to by the Trustees." PFA at 15 (quoting White Oak Post-Hr'g Opp. Br. at 42 n.39). The

-6-

arbitrator concluded that White Oak had engaged in "numerous prohibited transactions" in violation of its fiduciary duties under ERISA 406(b)(1). *Id.* Specifically, the arbitrator concluded that White Oak breached its ERISA fiduciary duties, and received compensation or benefits beyond those agreed to by the Trustees under the IMA, in the following three ways:

*First*, White Oak drafted and signed fund agreements and subscription documents on behalf of the Plan that locked the Plan's money into the Pinnacle and Summit Funds, White Oak's proprietary investment funds. This had the effect of prohibiting the Trustees from retrieving the Plan's money, and allowed White Oak to continue collecting fees on the Plan's money, even *after* White Oak terminated the IMA. *Id.* at 22 ("White Oak ... violated ERISA Section 406(b)(1) ... by executing the Pinnacle and Summit feeder subscription funds pursuant to its fiduciary authority under the Plan that resulted in its ability to control Plan assets and earn fees on the assets, despite its termination of the IMA with the Plan."). As the arbitrator found, that outcome—which has clear benefits to White Oak—is contrary to the express terms of the IMA, which permitted the Trustees to exit the relationship with White Oak and demand the Plan's money back at any time. *See id.* at 22-24 ("the language of the Pinnacle and Summit Feeder funds regarding the Plan's ability to exit are not consistent with the IMA").

*Second*, White Oak charged the Plan more than $1.9 million in management fees that were not agreed to by the Trustees under the IMA. *See id.* at 28. These $1.9 million in management fees are referred to as the "retroactive management fees" or the "Day One Fees," because White Oak charged these management fees retroactively for a period of nearly two years *before* the IMA was ever in force, *i.e.*, for a period of time during which White Oak provided no services to, and had no agreement with, the Plan. *Id.* at 27-28; Phillips Decl. ¶ 24. As the

arbitrator concluded, "[t]he IMA does not authorize payment of a Day One Investor Fee ... White Oak could not have provided any fiduciary services before the IMA was in effect."  PFA at 28.

*Third*, White Oak designed the Pinnacle and Summit Fund agreements (which it then signed on behalf of the Plan) so that they gave White Oak indemnification rights backed by the Plan's assets—a benefit to White Oak not provided for under the IMA.  *See id.* at 20 ("White Oak engaged in a prohibited transaction pursuant to ERISA Section 406(b)(1) when it exercised its discretionary powers to provide indemnification against potential legal liability through the subscription fund documents.").

In light of the "numerous prohibited transactions [White Oak] has engaged in," the arbitrator awarded the following remedies to the Plan:  (i) "the NAV [net asset value] of its investments"; (ii) "disgorgement of profits, and any fees White Oak collected, including all Day One Fees, from the time White Oak first collected any fees from the Plan until the date that assets are returned to the Plan"; (iii) "Removal [of White Oak] as fiduciary/investment manager"; (iv) "[t]he Plan's attorneys' fees"; and (v) prejudgment interest at the New York statutory rate of 9%.  *Id.* at 35-37.

These remedies are expressly authorized under ERISA statutory and case law, as well as the arbitrator's general remedial powers.  *See, e.g.*, 29 U.S.C. § 1109(a) (breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan ... [and] restore to such plan any profits ... made through use of assets of the plan ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary"); 29 U.S.C. § 1132(g)(1) (attorneys' fees); AAA Comm. R. 47 ("arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties"); *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d

240, 269 (S.D.N.Y. 2015) (finding it necessary and appropriate to disgorge profits to "make the plans whole").

Finally, the arbitrator concluded that White Oak's counterclaim against the Trustees failed because the Trustees neither knew of, nor participated in, White Oak's breaches of fiduciary duties, *see* PFA at 31-32, and denied the Trustees' contractual claim based on breach of the most favored nations provision in the IMA. *Id.* at 27.

## IV.   Post-Partial Final Award Proceedings and the Arbitrator's Final Award.

The only matter left open after the Partial Final Award was the precise calculation of amounts due under each category of relief awarded—*i.e.*, the "NAV of [the Plan's] investments," the amount of "profits[] and any fees" to be disgorged, attorneys' fees and costs, and prejudgment interest. *Id.* at 35-37. As part of the Partial Final Award, the arbitrator ordered the parties to jointly appoint a third-party accountant to conduct an inquest into the exact quantum owed to the Plan, including the proper amount for disgorgement. *See id.* at 35. White Oak, however, "refused to participate with this aspect of the Order" and made clear that it would not participate in any process involving an appointed accountant. Phillips Decl. Ex. B (cited to hereinafter as "FA") at 7. The Trustees were therefore compelled to retain Cornerstone Research, an independent economic and financial consultancy, to provide an assessment of the amounts owed by White Oak based on the documents available to the Trustees. Phillips Decl. ¶ 12.

Between January and May 2021, the Trustees submitted financial records, summaries, and briefing for the arbitrator to determine the amounts owed by White Oak under the various categories of relief awarded in the Partial Final Award. Among other things, the Trustees submitted the quarterly financial statements and other investor notices that White Oak sent the Plan over the life of the investments, which state the value of the Plan's assets and the fees as

reported each quarter through the end of 2020. *Id.* ¶¶ 13, 18, Ex. K. The Trustees' independent

expert at Cornerstone Research also prepared summaries of the amount of fees White Oak had

incurred and the net asset value of the Plan's assets, and calculated prejudgment interest on those

amounts. *Id.* ¶¶ 17, 19-22, Ex. J, Ex. L, Ex. M. These summaries, appended as Response

Exhibits 1-7 to the expert's Response Affidavit, simply take information from White Oak's own

financial records, organize it in a single document, and perform straightforward arithmetic to

calculate the sum of the reported fees, assets, and prejudgment interest. *Id.* ¶ 22, Ex. M at 1.

White Oak has not disputed the authenticity or accuracy of its financial records used as the basis

of these summaries, nor has White Oak challenged the summaries as an accurate reflection of the

figures in White Oak's financial reports (which in any event can easily be confirmed by

reviewing the financial statements themselves). *Id.* ¶ 22.

      As shown on these summaries, the value of the Plan's assets was identified as

$96,213,778.83. *Id.* ¶ 23, Ex. M at 1. The summaries also show that White Oak collected

millions of dollars in fees. Under the IMA, White Oak was permitted to collect two different

types of fees: Management fees and so-called performance fees (also referred to as "carried

interest" or "incentive fees"). White Oak charged the Plan management fees each quarter based

on the amount of Plan money allocated to White Oak for investment. *See* IMA at

NYSNA00000959. Separately, White Oak accrued performance fees based on the performance

of the investments. *Id.*; *see also* Phillips Decl. ¶ 24, Ex. K at 1-66 (White Oak quarterly

statements separately identifying "management fee" and "incentive allocation"), Ex. M at 1

(separately identifying management fees and performance fees).[3] The financial records and

---

[3] *See also* White Oak Global Advisors, LLC Form ADV, Part 2A dated March 31, 2021 at 9,
*available at*
https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRS

summaries submitted to the arbitrator show that White Oak collected more than $9.4 million in management fees, including the so-called "Day One Fees," and separately accrued more than $5.1 million in performance fees, each as of December 31, 2020.  Phillips Decl. ¶ 25, Ex. J at ¶ 8, Ex. M at 1.  The Trustees also submitted attorneys' fee applications to the arbitrator with invoices and other documentation demonstrating more than $7.15 million in attorneys' fees and costs as of May 19, 2021.  *Id.* ¶¶ 14–16, Ex. H, Ex. I.

White Oak submitted numerous responses to the Trustees' submissions, including rebuttal reports from two proffered experts.  *Id.* ¶¶ 14, 20, 26.  A one-day remote hearing was held on June 17, 2021, before the arbitrator during which each party had the opportunity to cross-examine the others' experts, followed by final written submissions.  *Id.* ¶¶ 27-28.

The arbitrator issued a Final Award on August 4, 2021, which incorporated the findings and remedies from the Partial Final Award.  FA at 1 ("The November 2020 PFA is hereby incorporated into this instant Final Award."); *id.* at 10.  As the arbitrator explained, the "reasons governing the findings that Respondent must disgorge all assets, and some fees, and profits, are more fully set forth in the Partial-Final Award."  *Id.* at 6.  In arriving at the final amounts owed by White Oak, the arbitrator accounted for certain "offsets" in the fees and profits that White Oak must disgorge.  Thus, as the arbitrator put it, the Final Award identified "the actual computation of damages amount due, less offsets if any, along with the attorneys' fees and costs" due to the Plan.  *Id.*  In particular, the Final Award ordered the following:

---

N_ID=705171 (discussing management fees and performance-based fees as separate forms of compensation)

*Disgorgement of Plan assets.*  As in the Partial Final Award, the Final Award ordered White Oak to disgorge "all [Plan] assets," the total value of which the arbitrator determined "is $96,213,778.83."  *Id.* at 6, 10, 11.

*Disgorgement of management fees.*  The arbitrator's Final Award ordered that "some fees, and profits" must be disgorged by White Oak, but offset the amount owed by allowing White Oak to retain the "performance fees."  *Id.* at 6, 10.  Although the precise amount of the fees and profits to be disgorged is not expressly stated in the Final Award, the Final Award did not disturb the provision of the Partial Final Award, expressly incorporated into the Final Award, requiring disgorgement of the management fees White Oak collected (including the so-called "Day One Fees").  White Oak collected $9,493,641.05 in management fees, inclusive of the more than $1.9 million in "Day One Fees," as of the end of 2020.  Phillips Decl. ¶¶ 24-25, Ex. J at ¶ 8, Ex. M at 1.

*Removal of White Oak as the Plan's fiduciary and investment manager.*  By "incorporat[ing]" the Partial Final Award into the Final Award, the arbitrator reaffirmed that White Oak must be removed as the Plan's fiduciary and investment manager—one of the critical components of relief set out in the Partial Final Award.  *See* FA at 10; PFA at 36.

*Attorneys' fees and costs.*  The Final Award directs White Oak to pay the Plan's "attorneys' fees and costs as proposed by the Plan" less a 20% reduction.  FA at 10.  The attorneys' fees and costs submitted by the Plan totaled $7,152,811.68.  Phillips Decl. ¶ 16, Ex. I.  Reducing that number by 20% yields $5,722,249.35 in attorneys' fees and costs awarded in the Final Award.  *Id.* ¶ 16.

*Prejudgment interest.*  The Final Award grants "[p]rejudgment interest ... at the New York statutory rate of 9%," calculated on the amounts owed, except for attorneys' fees and costs.

-12-

FA at 10, 11.  As shown in the financial summaries submitted in the arbitration by the Trustees'

expert, prejudgment interest on the net asset value of the Plan's assets as of May 19, 2021

amounted to $22,799,932.11 and prejudgment interest on the management fees owed was

$3,875,020.34, in each case as of May 19, 2021.  Phillips Decl. ¶¶ 23, 25, Ex. M at 1.  Extending

the prejudgment interest calculation through the date of the Final Award, August 4, 2021, yields

$28,680,539.45 in combined prejudgment interest on the amounts awarded.  *Id.* at ¶ 25.

**ARGUMENT**

This Court has jurisdiction to and should confirm the arbitration awards rendered against

White Oak under Section 9 of the FAA.  The arbitrator's awards express a clear intent to award

the categories and amounts of relief described above.  To the extent that the Final Award does

not include precise calculations of the amounts owed, those figures can be easily ascertained

from the record relied upon by the arbitrator.

**I.      The Court Has Jurisdiction Over the Action and Respondent.**

The Court has jurisdiction over this Petition under 28 U.S.C. § 1331 and Section 9 of the

FAA, 9 U.S.C. § 9, because the underlying substantive controversy arose under federal law,

namely ERISA.  *See Landau v. Eisenberg*, 922 F.3d 495, 497-98 (2d Cir. 2019) ("when

determining subject matter jurisdiction over petitions to confirm arbitration awards under § 9,"

"district courts should 'look through' the petition to the underlying substantive controversy to

determine whether the claims arose under federal law").  The Court also has jurisdiction under

Section 9 of the FAA, because the parties expressly agreed to submit their dispute to AAA

arbitration for resolution, and thereby agreed to judicial confirmation of any resulting arbitration

award.  *See, e.g.*, *Idea Nuova, Inc. v. GM Licensing Grp., Inc.*, 617 F.3d 177, 181 (2d Cir. 2010)

(where parties' arbitration agreement provides for AAA arbitration, parties are agreeing to

-13-

judicial confirmation of arbitral awards for purposes of 9 U.S.C. § 9). The parties' IMA contains

a dispute resolution provision, which reads in full:

> Any dispute arising under this Agreement shall be resolved by
> arbitration of the American Arbitration Association in the City of
> New York. The arbitrator shall be selected by the parties from a
> panel of persons qualified and experienced with respect to jointly-
> trusted pension funds and investments on their behalf.

IMA at NYSNA00000949-50.

The Court has personal jurisdiction over White Oak because White Oak transacts

business in New York State, it maintains an office in New York City, the parties' IMA was

negotiated in New York State, and White Oak agreed to arbitration in New York City. *See id.*;

Phillips Decl. ¶¶ 5-6; *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996) ("A party who

agrees to arbitrate in a particular jurisdiction consents not only to personal jurisdiction but also to

venue of the courts within that jurisdiction."); *see also* N.Y. C.P.L.R. § 302 (personal jurisdiction

over entities transacting business in New York).

Venue is proper in this District because White Oak "resides" in the District by virtue of

being subject to the Court's personal jurisdiction, and because White Oak agreed to arbitration in

this District and the arbitration awards were made in this District. *See* 28 U.S.C. § 1391(b)-(c);

IMA at NYSNA00000949-50; *Doctor's Assocs.*, 85 F.3d at 983; *D.H. Blair & Co. v. Gottdiener*,

462 F.3d 95, 105 (2d Cir. 2006) ("the Supreme Court held that the FAA's venue provision must

be read permissively to allow a motion to confirm, vacate, or modify an arbitration award either

where the award was made or in any district proper under the general venue statute").

## II.     The Court Should Confirm And Enter Judgment Upon the Awards.

It is well established that "confirmation of an arbitration award is a summary proceeding

that merely makes what is already a final arbitration award a judgment of the court." *D.H.*

-14-

*Blair*, 462 F.3d at 110 (internal quotations omitted).  It is equally settled that "[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Landau*, 922 F.3d at 498 (internal quotations omitted).  As the Second Circuit has repeatedly held, "[t]he FAA creates a strong presumption in favor of enforcing arbitration awards and courts have an extremely limited role in reviewing such awards"; accordingly, "an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached." *Id.* (internal quotations and citations omitted); *accord D.H. Blair*, 462 F.3d at 110; *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997).

Conversely, "[t]he showing required to avoid summary confirmation of an arbitration award is high." *Willemijn,* 103 F.3d 9 at 12; *accord D.H. Blair*, 462 F.3d at 110.  An arbitration award is set aside only rarely, and only if one of the four grounds applies: (1) "corruption, fraud, or undue means"; (2) "evident partiality or corruption in the arbitrators"; (3) the "arbitrator is guilty of misconduct in refusing to postpone the hearing ... or in refusing to hear evidence pertinent and material to the controversy"; or (4) the "arbitrator exceeded [its] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(1)-(4).  The Second Circuit has recognized a "judicial gloss" on these four grounds, which allows an arbitration award to be set aside if it was rendered in "manifest disregard of the law." *See, e.g.*, *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 346 n.10 (2d Cir. 2010).

Thus, to avoid confirming an award, a court must find "more than error or misunderstanding with respect to the law," and instead there must be "some egregious

impropriety on the part of the arbitrator." *Id.* at 339. "Even where explanation for an award is deficient or non-existent, [a court] will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." *Id.*; *see also Landau*, 922 F.3d at 498 ("[A]n arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached.") (internal quotations omitted).

Here, there is no basis to challenge the Partial Final Award or Final Award on any of those limited and "exceedingly rare" grounds. *T.Co Metals*, 592 F.3d at 339. The parties jointly selected the arbitrator and there has been no suggestion—nor court there be—of fraud, corruption, or impartiality. Far from "refusing to hear evidence pertinent and material" to the dispute, the arbitrator accepted hundreds of pages of briefing from the parties, heard from nearly a dozen fact and expert witnesses and considered hundreds of exhibits during the week-long in-person hearing in December 2019, and heard additional testimony from the parties' experts in June 2021. *See* Phillips Decl. ¶¶ 9-10, 13-21, 26-28; FA at 1.

Finally, as described above, the arbitrator issued a detailed, reasoned award that is in accord with and relies on the governing ERISA rules and case law, makes factual findings based on the evidence presented, and awarded categories of relief expressly authorized under ERISA statutory and case law. Accordingly, the Court should confirm the awards.

## III.    The Precise Amounts Awarded Are Apparent From the Awards and Record Relied Upon by the Arbitrator.

Although the Final Award expressly states precise dollar amounts for only some of the categories of relief that it awards, this partial absence of exact quantification is not a basis to refuse to confirm the awards, because calculation of those amounts is ministerial.

Courts in this Circuit and elsewhere have long recognized that "[s]imply because the award does not quantify the money owed to a party does not necessarily mean that it is

ambiguous or that a remand is warranted." *In re Arbitration between Gerlind Global Reins. Corp.*, No. 98 Civ. 9185 (LAP), 1999 WL 553767, at *2 (S.D.N.Y. July 29, 1999). Rather, "an award may be confirmed where the true intent of the arbitrator is apparent" from the record or otherwise. *Id.*; *Liberty Re (Bermuda) Ltd. v. Transamerica Occidental Life Ins. Co.*, No. 04 Civ. 5044 (NRB), 2005 WL 1216292, at *3 (S.D.N.Y. May 23, 2005) (same). That is because remand to the arbitrator for clarification is a disfavored procedure and must be used "sparingly," otherwise it would "frustrat[e] the basic purposes of arbitration:  to resolve disputes speedily and to avoid the expense and delay of extensive court proceedings." *Fischer v. CGA Computer Assocs., Inc.*, 612 F. Supp. 1038, 1041 (S.D.N.Y. 1985).

Thus, courts have confirmed arbitration awards notwithstanding that the arbitrator "did not quantify the amount payable" where the "arbitrator resolved all claims before him, leaving to the district court only the ministerial computation of the amount owed." *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 280 (7th Cir. 1992). In *Flender*, for example, the Seventh Circuit noted that "a court is permitted to interpret and enforce an ambiguous award if the ambiguity can be resolved from the record." *Id.* The Seventh Circuit affirmed the district court's confirmation of the award and the calculation of damages, noting that the "computation was easily ascertainable from the documents" that the arbitrator and district court ordered the losing party to produce "from which [damages] could be calculated." *Id.* at 280, 276.

Similarly, courts have refused to find an award ambiguous where the award can be modified so as to effectuate the arbitrator's intent. *See, e.g.*, *Estate of Scherban v. Lynch*, No. 14-CV-6312 (VSB), 2021 WL 2581278, at *12 (S.D.N.Y. June 23, 2021) ("Remand should not be granted where the court can resolve any alleged ambiguities in the award by modification ... and an award must be confirmed ... where the true intent of the arbitrator is apparent.") (internal

quotations and citations omitted); *accord Fischer*, 612 F. Supp. at 1041. The FAA expressly grants courts the power to modify or correct an arbitration award where there was "an evident material mistake in the description of any person, thing, or property referred to in the award" or where the award is "imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C. § 11(c); *see also Estate of Scherban*, 2021 WL 2581278, at *4 (same). Under that statutory authority, a court "may modify or correct the award, so as to effect the intent thereof and promote justice between the parties." 9 U.S.C. § 11(c).

As explained below, to the extent there is any alleged ambiguity in the Final Award as to the relief awarded, the intent of the arbitrator is apparent from the Partial Final Award and Final Award and the amounts awarded are easily ascertained from documents in the record on which the arbitrator relied.

*Disgorgement of Plan assets.* The Final Award states that "Respondent must disgorge all assets"—*i.e.*, "White Oak shall disgorge the NAV [net asset value] of the Plan." FA at 6, 10. The arbitrator also made clear in the Final Award that the amount of the "NAV" is $96,213,778.83, which the arbitrator found is "the total of all Plan assets." FA at 11. The $96 million figure is taken from the summary that the Trustees' expert submitted to the arbitrator, which, as noted above, simply reflects the financial data reported *by White Oak* in its quarterly financial statements. *See supra* p.10; Phillips Decl. Ex. M at 1. Elsewhere in the Final Award, the arbitrator clarified that White Oak is not required to return the $96,213,778.83 in "all cash," but that some amount of the Plan's assets will be returned in cash. *See* FA at 9-10. Accordingly, the arbitrator awarded the return of the Plan's assets valued at $96,213,778.83, some but not all of which must be returned in cash.

*Disgorgement of management fees.*  The Partial Final Award, which is incorporated into the Final Award, ordered White Oak to "disgorge[] ... profits, and any fees White Oak collected, including all Day One Fees, from the time White Oak first collected any fees from the Plan until the date that the assets are returned to the Plan."  PFA at 35.  As noted above, "Day One Fees" refers to the more than $1.9 million in management fees that White Oak charged the Plan retroactively before the IMA was effective.  *See supra* p.7.  In the Final Award, the arbitrator confirmed that White Oak "must disgorge ... some fees, and profits," but modified the Partial Final Award to allow White Oak to retain performance fees.  FA at 10 ("Performance fees shall be retained by White Oak and not returned to the Plan").  The Final Award otherwise incorporated the findings in the Partial Final Award, including the requirement that all other fees be disgorged by White Oak.  *See* FA at 6 ("Respondent must disgorge ... some fees[] and profits").  The only other fees that were the subject of disgorgement were management fees, including the "Day One Fees."  *See* Phillips Decl. ¶ 24, Ex. M at 1.

The calculation of the amount of management fees owed is easily ascertained from the financial statement summaries submitted by the Trustees' expert and relied on by the arbitrator.  *Id.* ¶ 25, Ex. M at 1.  As reflected on the summary, White Oak collected $9,493,641.05 in management fees as of December 31, 2020.  *Id.* ¶ 25, Ex. M at 1.  Accordingly, the arbitrator awarded disgorgement of $9,493,641.05 in management fees.

*Attorneys' fees and costs.*  The Final Award states that "Attorneys' fees and costs as proposed by the Plan, shall be reduced by 20%. ... No interest shall be paid with respect to attorneys' fees and costs owed."  FA at 10.  Again, although the Final Award does not state on its face the precise amount of attorneys' fees and costs owed, it expressly provides that attorneys' fees and costs are awarded in the amount "proposed" by Trustees, less 20%.  The attorneys' fees

and costs "proposed" by the Trustees can be ascertained from the face of their fee applications, and totaled $7,152,811.68.  *See* Phillips Decl. ¶ 16, Ex. I.  Reducing that number by 20% yields $5,722,249.35.  *Id.* ¶ 16.  Accordingly, the arbitrator awarded the Trustees $5,722,249.35 in attorneys' fees and costs.

> *Prejudgment interest*.  The Final Award states that "[p]re-judgment interest is awarded at the New York statutory rate of 9%."  FA at 11.  The Final Award also expressly states that prejudgment interest is not awarded on attorneys' fees and costs.  *Id.* at 10.  Prejudgment interest was therefore awarded on the other amounts ordered to be disgorged—*viz.*, Plan assets and management fees.  The amount of prejudgment interest can easily be calculated and is evident from the documents that were before the arbitrator.  As reflected on the submission from the Trustees' expert, prejudgment interest calculated at a rate of 9% through May 19, 2021 was $22,799,932.11 on Plan assets and $3,875,020.34 on management fees.  Phillips Decl. ¶¶ 23, 25, Ex. M at 1.  Extending prejudgment interest through the date of the Final Award, August 4, 2021, yields $28,680,539.45 in combined prejudgment interest on the amounts awarded.  *Id.* ¶ 25.  Accordingly, the arbitrator awarded the Plan $28,680,539.45 in prejudgment interest.

## IV.     The Court Should Grant Post-Award Prejudgment Interest.

The Plan should be awarded prejudgment interest for the period running from the date of the arbitration award to the date of this Court's judgment.  While the "decision whether to grant pre-judgment interest in arbitration confirmations is left to the district court," "[t]he Second Circuit has noted ... that there is 'a presumption in favor of prejudgment interest.'"  *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 483 (S.D.N.Y. 2018) (quoting *Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.,* 737 F.2d 150, 154 (2d Cir. 1984)) (awarding post-award prejudgment interest at rate of 9%).  And "[a]lthough the determination of the interest rate is also within the discretion of the trial court, the 'common practice among courts within the Second

Circuit is to grant interest at a rate of nine percent per annum—which is the rate of prejudgment interest under New York State law, N.Y. C.P.L.R. §§ 5001–5004—from the time of the award to the date of the judgment confirming the award.'" *Id.* (quoting *1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council, Inc.*, No. 13 Civ. 2608 (JGK), 2014 WL 840965, at \*8 (S.D.N.Y. Mar. 4, 2014)); s*ee also First Capital Real Estate Invs., LLC v. SDDCO Brokerage Advisors, LLC*, 355 F. Supp. 3d 188, 197 (S.D.N.Y. 2019) (awarding post-award, prejudgment interest at 9% and noting that arbitrator awarded prejudgment interest).   There is no reason for the Court to deviate from that presumption in this case, particularly in light of the arbitrator's award of prejudgment interest at the statutory rate of 9%.  *See First Capital Real Estate Invs.*, 355 F. Supp. 3d at 197.  Prejudgment interest should therefore be awarded at a rate of 9% for the period from August 4, 2021, the date of the Final Award, to the date of judgment on this Petition.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court issue an order confirming the Partial Final Award and Final Award, entering judgment thereon, and awarding post-award prejudgment interest to the Plan.

New York, New York
Dated: October __, 2021

COVINGTON & BURLING LLP

_____
C. William Phillips

Jonathan M. Sperling
Cléa P.M. Liquard
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1000
cphillips@cov.com
jsperling@cov.com
cliquard@cov.com

Robert Newman
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-6000
rnewman@cov.com

*Attorneys for Petitioners Trustees of the New
York State Nurses Association Pension Plan*