# <u>EXHIBIT C</u>

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   SAN FRANCISCO
SEOUL   SHANGHAI   SILICON VALLEY   WASHINGTON

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1000

<u>By Federal Express</u>                                                    September 26, 2018

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

   <u>Re:  Amended Demand for Arbitration</u>

Dear Case Filing Specialists:

   Pursuant to the Investment Management Agreement dated January 6, 2014, as amended and renewed on January 1, 2016 (the "IMA Contract"),[1] we write to demand arbitration and to provide notice of this dispute between the Trustees of The New York State Nurses Association Pension Plan (the "Plan" or "NYSNA PP") and White Oak Global Advisors, LLC ("White Oak"). This amended demand supersedes the demand filed on August 1, 2018.  The purpose of the arbitration is to determine whether White Oak violated the Employee Retirement Income Security Act of 1974 ("ERISA") and breached the IMA Contract in connection with the management of the Plan's assets, as well as the damages that result from such breaches.  We describe many of the key allegations below.

   Pursuant to the IMA Contract, the arbitration will be conducted in the City of New York by the American Arbitration Association ("AAA").  This dispute will be governed under the Commercial Arbitration Rules of the AAA and Supplementary Procedures for Large, Complex Disputes.

   The parties and their respective counsel are as follows:

<u>NYSNA PP</u>                                          <u>White Oak</u>

New York State Nurses Association Pension Plan  White Oak Global Advisors, LLC
P.O. Box 12430          3 Embarcadero Center, Suite 550
Albany, NY 12212-2430       San Francisco, CA 94111
Tel: 518-869-9501         Tel: 415-644-4100
Fax: 518-869-9529         Fax: 415-644-4199
email: cfell@rnbenefits.org      email: dray@whiteoaksf.com

---

[1] The 2014 and 2016 IMA Contract are attached as Exhibit A.  All capitalized terms not otherwise defined in this Demand for Arbitration have the definitions assigned to them in the IMA Contract.

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 2

<table>
<tr><td>The NYSNA PP's Counsel</td><td>White Oak's Counsel</td></tr>
<tr><td>

C. William Phillips
Robert Newman
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405
Tel: +1 212 841 1000
Fax: +1 212 841 1010
email: cphillips@cov.com
email: rnewman@cov.com

</td><td>

Phillip R. Sellinger
Leslie A. Klein
Greenberg Traurig, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932-0677
Tel: 973-360-7910
Fax: 973-295-1310
email: SellingerP@gtlaw.com
email: KleinL@gtlaw.com

</td></tr>
<tr><td>

Albert Kalter
Albert Kalter, P.C.
1325 Avenue of the Americas, 28th Floor
New York, NY 10019-6026
Tel: 212-946-5485
email: akalter@kalterlaw.com

</td><td>

David Ray
White Oak Global Advisors, LLC
3 Embarcadero Center, Suite 550
San Francisco, CA 94111
Tel: 212-218-6373
Fax: 415-644-4199
email: dray@whiteoaksf.com

</td></tr>
</table>

   As a result of White Oak's ERISA violations and breach of the IMA Contract, the NYSNA PP seeks damages totaling more than $7.5 million.  This includes disgorgement of all fees and profits earned by White Oak as a result of its decision to invest the Plan's assets in investments that benefitted White Oak at the expense of the Plan and were not compliant with law.  In addition, the Plan seeks the withdrawal and return of its investment, damages for any loss incurred due to the liquidation of the Plan's interest, attorney's fees, other damages associated with White Oak's ERISA violations and breach of contract, removal of White Oak as a fiduciary for the Plan's assets held in the underlying White Oak funds, and any other available legal or equitable relief.[2]

---

[2]  Under the applicable LPAs, White Oak is a fiduciary for the Plan's assets that it caused to be invested in the underlying funds which it managed.  White Oak Pinnacle Feeder Fund I, L.P. LPA, ¶ 3.11(a) ("The Partnership will hold 'plan assets' for purposes of the Plan Asset Regulation. As a result, the General Partner and the Manager both agree that they are fiduciaries for the Limited Partner with respect to the assets of the Partnership."); White Oak Pinnacle Fund, L.P. LPA, ¶3.11(a) ("At any time that the Partnership holds 'plan assets' for purposes of the Plan Asset Regulation, the General Partner and the Manager both agree that they are fiduciaries for all ERISA Partners with respect to the assets of the Partnership."); White Oak Summit Fund, L.P., LPA, ¶ 3.14(a) ("The General Partner, on its own behalf and on behalf of the Manager, agrees that both the General Partner and the Manager are fiduciaries of all ERISA Partners with respect to the assets of the Partnership.").

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 3


<u>Background</u>

    The Plan provides retirement benefits for Registered Nurses and other medical professionals predominately in the Metropolitan New York City area.  The Plan covers approximately 16,000 participants and nearly 9,000 retirees or their beneficiaries.  Collectively, the Plan holds assets of more than $3.8 billion.  The Plan is subject to ERISA, including its fiduciary obligations and prohibitions on self-dealing with respect to entities responsible for the management of the Plan's assets.

    On January 6, 2014, the NYSNA PP and White Oak entered into the IMA Contract, by which White Oak agreed to serve as an investment manager under section 3(38) of ERISA with authority to invest funds allocated to it in a direct lending strategy as White Oak determines in its sole discretion.  Under the IMA Contract, White Oak serves as an ERISA fiduciary and must act solely in the interest of participants and beneficiaries of the Plan.

    The Plan made an initial funding allocation of $80 million[3] to White Oak.  White Oak invested the Plan's initial allocation into the White Oak Pinnacle Feeder Fund I, L.P., ("Pinnacle Feeder").[4]  The Pinnacle Feeder invests all of its assets into the White Oak Pinnacle Fund, L.P. ("Pinnacle Master").[5]  In March 2015, an additional $35 million was committed under the IMA Contract, which White Oak, in its discretion, invested in the White Oak Summit Fund, L.P., ("Summit").[6]

    White Oak serves as the investment manager for Pinnacle Feeder, Pinnacle Master, and Summit.  As investment manager of Pinnacle Master and Summit, White Oak is permitted to receive management fees and carried interest in addition to fees it collects under the IMA Contract.[7]  To date, the Plan has paid more than $7 million in management fees and expenses to White Oak under Pinnacle Master and nearly $650,000 in management fees and expenses to White Oak under Summit.

---

[3] On February 12, 2015, this fixed dollar amount was changed to a percentage of the Plan's assets.  The allocation target for White Oak was changed from a fixed dollar amount of $80 million to 60% of the Plan's sub-asset class allocation of the Fixed Income allocation.

[4] The White Oak Pinnacle Feeder Fund I Limited Partnership Agreement ("Pinnacle Feeder LPA"), dated December 31, 2013, is attached as Exhibit B.

[5] The White Oak Pinnacle Fund Limited Partnership Agreement ("Pinnacle Master LPA"), dated March 15, 2012, is attached as Exhibit C.

[6] The White Oak Summit Fund Limited Partnership Agreement ("Summit LPA"), dated March 1, 2016, is attached as Exhibit D.

[7] There is an offset provision under the IMA Contract to reduce the fees paid to White Oak "by the pro rata share" of the investment advisory fees paid under Summit and Pinnacle.  IMA Contract § 9(c).  However, the fund fees provide an additional benefit to White Oak to the extent they exceed any IMA Contract fees, for example after the IMA Contract terminates.

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 4

By using its discretion to invest the Plan's assets into the funds it manages, White Oak bound the Plan to contractual terms in the fund LPAs that are contrary to the IMA Contract, violate the law, and personally benefit White Oak. In doing so, White Oak breached the fiduciary duty of loyalty and trust owed to the Plan.

As investment manager of pension plan assets, White Oak is under both federal statutory and state contractual obligations to act as a fiduciary to manage the assets in the best interest of the Plan. The IMA Contract specifically identifies White Oak's duties as fiduciary:

IMA Contract § 2 <u>Investment Account Assets.</u>

(a) ... The Investment Account Assets and the Allocated Amount constitute assets of an employee benefit plan subject to Part 4 of Title I of ERISA.

IMA Contract § 4 <u>Standard of Care.</u>

(a) The Investment Manager shall perform its duties hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and in such manner as to comply with Section 404(a)(1)(B) of ERISA and any regulations promulgated pursuant thereto.

(b) The Investment Manager shall diversify the Investment Account Assets subject to the Investment Guidelines so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and in such manner as shall comply with the requirements of Section 404(a)(1)(C) of ERISA and any regulations promulgated pursuant thereto.

(c) The Investment Manager shall discharge its duties hereunder with respect to the Investment Account solely in the interest of, and for the exclusive purpose of providing benefits for, the participants in the Plan and their beneficiaries, in accordance with the Plan and Trust Agreement (and other documents and instruments governing the Plan), this Agreement, any Investment Guidelines, ERISA and other applicable law.

(d) The Investment Manager shall not effectuate any investment transaction that directly or indirectly shall cause the Plan, the Trustees or any other fiduciary thereof (including the Investment Manager, or any affiliate thereof), to violate Sections 406 through 408 of ERISA, or Section 4975 of the Code.

(e) Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940 for which the Investment Manager (or an affiliate thereof) is the investment advisor, the Investment Manager shall comply in all respects with United States Department of Labor

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 5

> Prohibited Transaction Class Exemption 77-4, or any successor class exemption thereto.[8]

<u>ERISA Violations</u>

White Oak violated ERISA in its management of the Plan's assets.  Among other violations, White Oak violated ERISA's prohibition on self-dealing by using its discretion to invest the Plan's assets in its own funds, which provided fees, profits and other substantial benefits to White Oak.  White Oak also used Plan assets to enter into agreements with service providers in violation of ERISA's prohibited transaction rules.  Further, White Oak violated its duty of loyalty by using Plan assets to benefit itself and failing to disclose certain information to NYSNA PP.  In addition, White Oak violated its duty of prudence by managing Plan assets in a manner that caused ERISA violations.

A.      Self-Dealing

ERISA prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."[9]  This prohibition on self-dealing was violated by White Oak in several ways, including but not limited to those described below.

First, purportedly acting under the authority of the IMA Contract, White Oak entered into Limited Partnership Agreements (LPAs) that locked the Plan into a financial relationship with illiquid assets and no withdrawal right.[10]  This benefited White Oak because, even if the IMA Contract was terminated (and, indeed, White Oak did terminate the IMA Contract), the Plan's assets were locked into investment funds that could not be terminated under the LPAs and required the Plan to continue paying fees and expenses to White Oak.

The IMA Contract gives White Oak full discretion to choose the funds in which it invests Plan assets.  Section 1(a) of the IMA Contract makes White Oak's discretion abundantly clear:

---

[8] *See also* IMA Contract § 11 <u>Representations of Investment Manager.</u>

[9] ERISA § 406(b)(1); 29 U.S.C. § 1106(b)(1).

[10] As the sole limited partner in Pinnacle Feeder, the Plan has no withdrawal right.  Pinnacle Feeder LPA § 10.5.  The partnership's term is seven years from December 31, 2013, subject to three additional one-year extensions, as determined by the General Partner and consented to by the Limited Partner.  Pinnacle Feeder LPA § 10.1.  Acknowledging this defect, White Oak amended section 10.5 of the Pinnacle Feeder LPA on August 31, 2018, after NYSNA PP filed its first demand for arbitration, permitting the Limited Partner to demand a withdrawal of the assets of the fund.  However, because Pinnacle Feeder's assets consist of assets distributed by the Pinnacle Master fund, the assets may consist, in the discretion of White Oak, of a note from the fund (controlled by White Oak).

As an ERISA Partner in Summit, the Plan has a withdrawal right upon 60 days' notice.  However, the General Partner may elect to pay the Plan the fair value of its interest in Summit in the form of a note issued by Summit with an 8% interest rate.  Summit LPA § 10.5.  The Plan cannot get its money back until the maturity of the note, which can be as long as seven years from the date of the final closing.

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 6

"[t]rustees hereby appoint the Investment Manager and delegate to the Investment Manager fiduciary responsibility over the Allocated Amount ... including the sole, exclusive and full discretion and authority to invest plan assets."  White Oak exercised this discretion when it made the decision to invest Plan assets into the Pinnacle Feeder Fund.

The terms of the Pinnacle Feeder Fund I LPA are in violation of ERISA.  The Pinnacle Feeder contains no withdrawal right for Plan assets.  Pinnacle Feeder Section 10.5 states, "[t]he Limited Partner may not voluntarily withdraw from the Partnership prior to its dissolution and winding up."

Second, the LPAs are structured to allow White Oak to receive transaction fees from the funds that could increase the total fees White Oak earns, without commensurate benefit to the Plan.  By forming LPAs with terms beneficial to itself, and then using its discretion under the IMA contract to place the Plan's assets into these fund LPAs, White Oak violated ERISA's prohibition on self-dealing.

Furthermore, by using its discretion under the IMA to invest Plan assets in White Oak's own funds, White Oak conferred on itself certain contractual rights to the detriment of the NYSNA PP.  For example, among other provisions, the LPAs require the NYSNA PP to indemnify, through the partnership, the General Partner (also a White Oak entity) and White Oak (as manager) for certain claims or liabilities relating to their conduct, even though the IMA does not require the NYSNA PP to indemnify White Oak.  In addition, the LPAs permit the general partner (a White Oak affiliate) or White Oak (as manager) to waive investment fees for White Oak affiliates who invest in the LPAs, thereby requiring the NYSNA PP and other investors to subsidize the investment costs of White Oak affiliates.  The LPAs also permit White Oak to employ its affiliates as agents, to lend money to the partnerships, to transact with affiliates, to sell a defaulting Limited Partner's interest on terms within the General Partner's sole discretion, and to waive the default of any partner affiliated with White Oak, among other potential benefits.  And, the LPAs permit White Oak to disclose the fact of the NYSNA PP's investment in the funds when the General Partner determines that doing so is in the best interest of the funds, *i.e.*, to solicit additional investments that could, in turn, provide additional management fees to White Oak.

B.      Improper Agreements with Service Providers

ERISA also prohibits a fiduciary to cause a plan to enter into a transaction in which a party in interest provides services to the plan.[11]  An exception is made for "reasonable arrangements with a party in interest ... if no more than reasonable compensation is paid therefor."[12]  By failing to implement the MFN (as described below), White Oak charged fees that were not reasonable.

---

[11] ERISA § 406(a)(1)(C); 29 U.S.C. § 1106(a)(1)(C).

[12] *Id.*

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 7

     In addition, the lack of a withdrawal right from the Pinnacle Feeder LPA is also a violation of ERISA.[13]  U.S. Labor Department regulations provide that "[n]o contract or arrangement is reasonable ... if it does not permit termination by the plan without penalty to the plan on reasonably short notice."[14]  The IMA Contract accordingly includes a provision permitting NYSNA PP to terminate the IMA immediately.[15]  However, White Oak used its discretion under the IMA Contract to place the Plan's funds in an arrangement whereby White Oak is retained as the investment manager and cannot be terminated until the fund closes. Pinnacle Feeder Section 10.5 states, "[t]he Limited Partner may not voluntarily withdraw from the Partnership prior to its dissolution and winding up."

     Lastly, the fund LPAs contain unreasonable terms regarding conflicts of interest.[16] Pinnacle Master states that White Oak may enter into certain potentially conflicted transactions with the approval or advice of an advisory committee that is "either comprised of (i) individual representatives of selected Limited Partners ... or (ii) an independent third party selected by a majority of the Limited Partners ...".[17]  However, Pinnacle Feeder is one of the limited partners, and the manager of Pinnacle Feeder is White Oak.  In other words, the Pinnacle Master establishes a procedure for White Oak to resolve conflicts that involves seeking advice or consent from White Oak or its representatives or appointees.  (Summit has a similar provision and, so long as the IMA Contract is in place, White Oak oversees that investment and any conflicts resolution process.)

     C.     Violation of Duty of Loyalty

     White Oak violated ERISA's duty of loyalty, which requires a plan fiduciary to act "solely in the interest of participants and beneficiaries."[18]  First, all of White Oak's self-dealing actions, described above, including locking-in the Plan's assets and increasing fees, are a violation of

---

[13] Pinnacle Feeder LPA § 10.5.

[14] DOL ERISA Regulation 2550.408b-2(c).

[15] "This Agreement may be terminated at any time by the Trustees without penalty by giving the Investment Manager written notice of such termination date." IMA Contract § 13(c).

[16] Pinnacle Feeder LPA § 3.15 (a)-(c); Summit LPA § 3.18 (a)-(c).

[17] "The General Partner shall establish an advisory committee either comprised of (i) individual representatives of selected Limited Partners, at least a majority of whom are not affiliated with the General Partner or its Affiliates (the "Limited Partner Advisory Committee") or (ii) an independent third party selected by a majority of the Limited Partners not affiliated with the General Partner or its Affiliates (the "Third Party Advisory Committee" and, together with the Limited Partner Advisory Committee, the "Advisory Committee"), in each case, to provide approval (as specified in Section 3.4 of this Agreement) or advice to the General Partner on matters relating to the resolution of potential conflicts of interest involving the Partnership and the General Partner Group and such other matters as may be referred to it from time to time by the General Partner."  Pinnacle Master LPA § 3.16.

[18] ERISA § 404(a)(1).

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 8

ERISA's duty of loyalty.  Furthermore, White Oak failed to provide a detailed accounting of fees to enable the Plan to monitor White Oak's compliance with IMA Contract terms (specifically, the most favored nations clause).

This failure to provide a detailed accounting is still ongoing.  As recently as March 1, 2018, the Plan sent a request to White Oak, under ERISA Section 408(b)(2), for White Oak to disclose all direct and indirect compensation it received as a service provider covered by that section.  White Oak failed to meet the April 16, 2018, deadline to disclose this information.  To date, this information has not been provided to the Plan.  This failure to disclose highly relevant information to the Plan is a further violation of the duties of loyalty and candor owed to the Plan.

D.     Violation of Duty of Prudence

White Oak breached ERISA's duty of prudence, which requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[19]  White Oak's self-dealing, as outlined above, and its management of Plan assets in a manner that caused ERISA violations, is a further violation of ERISA's duty of prudence.

Contractual Violations

White Oak has also failed to adhere to the terms of the IMA Contract.  The IMA Contract requires White Oak to fulfill its fiduciary obligations under ERISA[20] and, as explained above, White Oak has failed to honor those obligations.

In addition, the IMA Contract contains a "most favored nations" clause ("MFN"), in which White Oak agreed to give the Plan the best terms it makes available to any other investor of similar size and for similar services.

IMA Contract § 9 Fees.

(e) The Investment Manager expressly acknowledges, represents, warrants and agrees that: (i) under no circumstances will the fee set forth in Schedule C result in payment by the Trustees or the Trust of fees exceeding those that would be payable - for management of assets approximately equal in value to the Investment Account - by any of the Investment Manager's other clients for whom it provides the same or similar services and (ii) in the event the Investment Manager (1) has already entered, or (2) at any time in the future enters into an agreement with another client to provide the same or similar services pursuant to a fee schedule that would produce a lower fee for investing assets approximately

---

[19] ERISA § 404(a)(1)(B).

[20] IMA Contract § 4 Standard of Care.

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 9

equal in value to, or less than, the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth in Schedule C.

In contravention of this clause, White Oak manages similar accounts for other clients for lower management fees, lower performance fees, and with higher hurdle rates.  The Plan has not realized the benefit of this clause in many instances.  For comparison, the fee structure in the IMA Contract provides White Oak with a 1.35% management fee on committed capital and a 20% performance fee after a 7.5% hurdle is met.[21]  A separate account managed by White Oak with a $30 million investment has a 1% management fee of the net asset value ("NAV") and a 15% performance fee after a 7% hurdle.  Yet another White Oak client pays a 1.6% management fee on NAV and a 20% performance fee after an 8% hurdle.

The Plan has reason to believe other White Oak clients also have more favorable fee arrangements, in violation of the IMA Contract's MFN, but White Oak has failed to provide a complete accounting of the fees charged to others, notwithstanding requests by the Plan.  By not automatically applying the more favorable terms to the Plan's fee structure, White Oak is in breach of the MFN clause of the IMA Contract.

Over the lifetime of the relationship, the Plan paid White Oak more than $6.3 million dollars in management fees alone, including more than $6 million from the Pinnacle fund investment and nearly $350,000 in the Summit fund investment.  Performance fees will be assessed and due at the end of the fund term, potentially adding millions of dollars to the Plan's damages calculation.

<u>The Instant Dispute</u>

The Plan became aware of potential IMA Contract violations by White Oak and immediately restricted White Oak from making any further investments on its behalf.[22]  The Plan nonetheless tried in good faith to work through the issues with White Oak.  Likewise, when the Plan became aware of lower fee structures for other White Oak clients, the Plan requested in writing to be given the benefits of the IMA Contract's MFN.  White Oak refused and gave notice to terminate the IMA Contract in December 2017.

In an effort to resolve this dispute prior to the filing of this demand for arbitration, the Plan sent a letter to White Oak requesting the benefits it was entitled to under the IMA Contract.  Once potential ERISA violations came to light, in addition to the IMA Contract claims, the parties met in person and engaged in discussions on how to resolve this dispute before invoking formal dispute resolution processes.  The parties failed to reach a resolution.

Section 24 of the IMA Contract, entitled <u>Resolution of Disputes</u>, provides:

---

[21] IMA Contract Schedule C, 1 - 2.

[22] A written letter was sent from NYSNA PP to White Oak on April 12, 2016.

**COVINGTON**

American Arbitration Association
September 26, 2018
Page 10

> Any dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association in the City of New York. The arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusted pension funds and investments on their behalf.

Section 22 of the IMA Contract, entitled <u>Applicable Law</u>, provides:

> Except to the extent otherwise provided in ERISA, this Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York (without giving effect to the principles thereof relating to the conflict of laws).

Please note that the summary provided in this Amended Demand for Arbitration is not intended as an exhaustive statement of NYSNA PP's case or allegations, and the Plan reserves its right to amend or supplement the claims and requests for relief, as this matter proceeds.

The Plan proposes that the arbitration take place in New York, New York. As provided in Section 24 of the IMA Contract, "[t]he arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusted pension funds and investments on their behalf."

Finally, in accordance with Rule 4(g) of the AAA Commercial Arbitration Rules, we have dispatched today to White Oak and its counsel at Greenberg Traurig, LLP, a copy of this Amended Demand for Arbitration and, in connection with the filing of the first demand, previously enclosed a check for the applicable filing fee of $7,700 in accordance with the Standard Fee Schedule.

We appreciate your assistance with this matter.

Respectfully,

C. William Phillips /RSN

C. William Phillips

Robert Newman

Enclosure

# EXHIBIT A

INVESTMENT MANAGEMENT AGREEMENT ("Agreement")
made as of the 6th day of January, 2014, by and between the TRUSTEES OF
THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN
("Trustees") and WHITE OAK GLOBAL ADVISORS, LLC, ("Investment
Manager").

## W I T N E S S E T H:

WHEREAS, the Trustees, as distinguished from their individual
capacity such that the Trustees shall not be personally liable for any causes of
action arising out of the services performed under this Agreement, desire to
retain the Investment Manager to have fiduciary responsibility over the
amount allocated by the Trustees (the "Allocated Amount"), for investment in
private commingled investment vehicles such as limited liability companies
and limited partnerships that pursue direct lending strategies for investing in
private credit opportunities, the assets of which are considered assets of the
Plan by operation of ERISA (each, a "Vehicle"), including the sole, exclusive
and full discretion to invest plan assets in a total amount not to exceed the
Allocated Amount in one or more Vehicles consistent with this Agreement,
and to maintain under its sole and exclusive investment supervision and

management certain assets ("Investment Account Assets") (as that term is defined in subparagraph 2(a) hereof) of the trust ("Trust") established pursuant to the Agreement and Declaration of Trust ("Trust Agreement") of the New York State Nurses Association Pension Plan, as from time to time amended ("Plan"), which assets are to be deposited with The Northern Trust Company, as custodial agent ("Custodian"), or such other custodian or subcustodians, as may be designated by the Trustees or the Custodian, in accordance with the terms and conditions hereinafter set forth, and the Investment Manager desires to accept such retention in accordance with such terms and conditions.

NOW, THEREFORE, it is agreed as follows:

1. **<u>Appointment.</u>**

(a)     Effective as of December 31, 2013, pursuant to the authority granted under Article VII, Section 1(m) of the Trust Agreement, and Section 402(c)(3) of the Employee Retirement Income Security Act of 1974, as from time to time amended ("ERISA"), the Trustees hereby appoint the Investment Manager and delegate to the Investment Manager fiduciary responsibility over the Allocated Amount listed on Schedule B, including the sole, exclusive and full discretion and authority to invest plan assets in a total amount not to exceed the  Allocated Amount in one or more Vehicles consistent with the provisions of this Agreement, and the sole, exclusive and full discretion and authority to

—2—

manage and invest the Investment Account Assets (as that term is defined in subparagraph 2(a), hereof) consistent with Investment Guidelines (as that term is defined in subparagraph 1(c) hereof).

(b)    As a result of this appointment and delegation, the Investment Manager shall have sole responsibility for the investment of the Allocated Amount in one or more Vehicles and the management of the Investment Account Assets and, to the extent permitted under ERISA, the Trustees shall not be liable for any acts or omissions of the Investment Manager or be under any obligation to invest or otherwise manage the Investment Account Assets.

(c)    The Investment Manager hereby accepts this appointment and delegation and agrees to assume sole, exclusive and full discretion and authority to invest (including committing to invest) plan assets in a total amount not to exceed the Allocated Amount by committing plan assets to one or more Vehicles and to manage the Investment Account Assets in accordance with and subject to: (i) the terms and conditions of this Agreement, including any statement of investment policy and written investment guidelines or directions, which from time to time shall be promulgated by the Trustees and delivered to the Investment Manager, expressing the investment objectives, restrictions and policies of the Trustees (collectively, the "Investment Guidelines"), which Investment Guidelines, and any future amendments thereto, shall be

–3–

incorporated by reference into this Agreement; provided, however, that the issuance of any Investment Guidelines or other directions to the Investment Manager shall not in any manner be construed as an acceptance by the Trustees of any investment management discretion or authority to make investments in Vehicles with respect to the Allocated Amount or any investment management or supervisory responsibility with respect to the Investment Account by the Trustees (and the Trustees shall not, as a result of issuing Investment Guidelines or other directions, be liable for any acts or omissions of the Investment Manager with respect to any Investment Account Assets);  (ii) compliance with ERISA and other applicable law; and (iii)  the current funding policy and method that have been established to carry out the objectives of the Trust and Plan.

(d)    The current Investment Guidelines are attached hereto as Schedule A (and made a part hereof).

(e)    By execution of this agreement, the Investment Manager hereby accepts the current Investment Guidelines referred to in Subparagraph 1(d) and any amendments thereto which may be promulgated by the Trustees (and not objected to in writing by the Investment Manager within five (5) days after receipt thereof), and agrees to be bound thereby in connection with the performance of its duties under this Agreement.

(f)    To the extent that any provision of this Agreement may be

inconsistent with the provisions of any Investment Guidelines, the Investment Guidelines shall be controlling.

(g) The Investment Manager shall advise the Trustees immediately if it determines that the Investment Guidelines are not prudent.

(h) Under no circumstances shall the Investment Manager invest Investment Account Assets in any investments or strategies not specifically sanctioned by, and/or prohibited under, the Investment Guidelines.

## 2. Investment Account Assets.

(a) The Investment Account Assets, shall consist of the investments in Vehicles made on behalf of the Plan by the Investment Manager pursuant to this agreement, including all appreciation thereof, additions to the Investment Account Assets, and distributions of assets other than cash from a Vehicle (the "Investment Account") but excluding (i) cash distributions returned or distributed to the Plan as an investor in a Vehicle under the Vehicle's relevant partnership agreement or other governing instrument, (ii) cash proceeds from the sale of securities distributed to the Plan as such an investor, and (iii) that portion of the Allocated Amount that the Investment Manager has either not yet committed to a Vehicle or that has been committed but not yet called by the Vehicle's manager. The Investment Account Assets and the Allocated Amount constitute assets of an employee

–5–

benefit plan subject to Part 4 of Title I of ERISA.

(b)     The Trustees shall direct the Custodian to act in accordance with the instructions of the Investment Manager.  The Investment Manager shall under no circumstances act as custodian of the Investment Account Assets or otherwise have custody or physical control of the Investment Account Assets. The physical possession of all securities, funds and other property which constitute the Investment Account Assets shall at all times be held, controlled and administered by the Custodian, and all such cash, securities, funds and other property shall be held on the books and records of the Custodian in a manner so as to establish clearly that they are held as part of the Investment Account provided for in this Agreement.

(c)     The Investment Account Assets shall remain a part of, and subject to, the terms and conditions of the Trust Agreement and the Plan, and shall be held at all times exclusively for the purposes for which the Trust and Plan were established.   All advisory and management powers, duties and responsibilities relating to the Investment Account shall be exercised exclusively by, and circumscribed by, the Investment Manager pursuant to the provisions of the Trust Agreement relating to such powers, duties and responsibilities, and which are incorporated herein by reference (as if fully set forth herein).

**3.    Duties and Powers of Investment Manager.**

During the term of its appointment, the Investment Manager shall, subject to its fiduciary obligations referred to in paragraph 4, hereof, ERISA, and other applicable law, and in a manner consistent with the investment objectives, restrictions and other policies of the Trustees which shall be expressed in any Investment Guidelines:

(a)    have the power and obligation to manage the Investment Account in its sole and absolute discretion, subject to its fiduciary obligations referred to in Paragraph 4 hereof, the Investment Advisers Act of 1940, all rules and regulations promulgated pursuant thereto and any other rule, regulation or order of the Securities and Exchange Commission (collectively, the "Advisers Act"), ERISA and other applicable law, and in a manner consistent with the asset classification and investment management style contemplated by this Agreement;

(b)    provide investment advice and recommendations with respect to the Investment Policy and Guidelines;

(c)    in the name and on behalf of the Plan, to enter into and/or execute agreements of limited partnership and limited liability company agreements, subscription agreements, investor questionnaires, and such other documents as the Investment Manager deems necessary or appropriate with respect to the Investment Account Assets and in accordance with the terms of

–7–

the Investment Policy and Guidelines; and

        (d)     in the case of investments in a Vehicle, to appoint the person or entity with authority to manage (including the power to acquire or dispose of) the Vehicle's assets as an "investment manager" of the Plan pursuant to ERISA Section 402(c)(3) for the limited purpose of permitting such person or entity to engage in the administrative and management activities authorized under the terms of the Vehicle's organization documents and any agreement(s) between such person or entity and the Investment Manager in which event White Oak Global Advisors, LLC shall be deemed a "named fiduciary" of the Plan with respect to the foregoing appointment only (as opposed to an "investment manager") and an "investment manager" with respect to investment and reinvestment of Investment Account Assets of the Vehicle and the monitoring of such investment.

        (i)     Before investing in any Vehicle, the Investment Manager shall examine the valuation methodology utilized by that Vehicle to determine that the valuation methodology is independently and objectively verifiable and that the valuation factors used are sound and prudent.

        (ii)     The Investment Manager shall collect information pertaining to investments, securities, the economy, and other matters pertinent to making the determinations required of it herein.  Such review shall be conducted to determine, in the Investment Manager's sole discretion based on

–8–

the information available to it or which would be available to it upon exercise of prudent discretion under ERISA (including any information or advice given to it by the Trustees pursuant to the Investment Guidelines), the advisability of

(1) retaining some or all of such funds and other property constituting the Allocated Amount and selling if prudent to do so;

(2) selling, exchanging, redeeming, liquid-dating or disposing of some or all of the Investment Account Assets;

(3) investing some or all of the Allocated Amount in other Vehicles; or

(4) taking such action or actions as is prudent under the circumstances.

(iii) The Investment Manager shall promptly notify the Plan's accounting department and the Custodian of all commitments of the Allocated Amount and purchases, sales and other dispositions of the Investment Account Assets.

(iv) The Investment Manager shall give the Custodian (as appropriate) such instructions or directions as may be necessary, and thereupon execute and complete all such certificates, proxies, consents and other documents necessary or appropriate to effectuate the powers of the Investment Manager under this Agreement. However, no person other than

–9–

the Investment Manager may make a decision with respect to the exercise of rights appurtenant to Investment Account Assets or make commitments to Vehicles with respect to the Allocated Amount.

(v)     The Investment Manager shall have the power to make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other documents or instruments that may be necessary or appropriate to carry out the powers granted to it under this Agreement.

(vi)     The Investment Manager shall have the power to compromise or settle any claim, debt or obligation due to the Plan arising out of the Plan's investments of Allocated Assets in Vehicles where immediate action is necessary to prevent a loss to the Investment Account Assets.

(vii)     The Investment Manager shall from time to time certify to the Trustees and the Custodian the name or names of the person or persons authorized to act on the Investment Manager's behalf hereunder, and shall furnish the Trustees and the Custodian with a specimen of their signatures.  Any individual so certified shall be deemed to be the Investment Manager's authorized representative.  When any individual so certified shall cease to have authority to act on its behalf, or is replaced, the Investment Manager shall promptly give written notice of that fact to the Trustees and the Custodian.  However, until such notice is received by the Trustees and the

Custodian (pursuant to the procedures set forth in Paragraph 16), the Trustees and the Custodian may continue to treat such person(s) as an authorized representative(s) of the Investment Manager.

(viii) The Trustees shall certify to the Investment Manager the name or names of the person or persons authorized to act on the Trustees' behalf hereunder. When any individual so certified shall cease to have authority to act on the Trustees' behalf, or is replaced, the Trustees shall promptly give written notice to the Investment Manager. However, until such notice is received by the Investment Manager (pursuant to the procedures set forth in Paragraph 16), the Investment Manager may continue to treat such person(s) as an authorized representative(s) of the Trustees.

(ix) The Investment Manager shall have power to:

(1) exercise any option, conversion or subscription rights appurtenant to any securities or other property of the Investment Account, or to sell any such rights;

(2) join in, dissent from, and oppose the reorganization, consolidation, recapitalization, liquidation, merger, sale, mortgage, pledge or lease of any securities or other property within the Investment Account Assets;

(3) deposit any securities or other property of the Investment Account Assets with any protective, reorganization or similar

–11–

committee, and to pay or agree to pay out of the Investment Account Assets part of the expenses and compensation of any such committee and any assessments levied with respect to any securities or other property so deposited; and

(4)     exercise all other ancillary rights or duties in connection with the Investment Account Assets necessary to implement any of the powers contained herein.

(x)     The Investment Manager shall also:

(1)     develop, implement and monitor an investment plan with respect to the Allocated Amount which shall set forth the steps by which the Plan will prudently and reasonably implement a Direct Lending Strategy portfolio consistent with the long term goals and objectives of the Plan's overall strategy for investing in private credit opportunities and taking into consideration the Plan's overall fixed income investing portfolio. This plan shall be consistent with the Investment Guidelines provided by the Plan to the Investment Manager, shall provide for prudent diversification of Direct Lending Strategy investments, including by investment vehicles, and shall take into consideration economic conditions and all other relevant factors. The investment plan shall be reviewed as often as prudently necessary by the Investment Manager, who shall make modifications thereto, if any, to the extent necessary to meet the requirements of this Agreement.

(2)    periodically meet with and provide all relevant information to the Plan's advisors, as reasonably required by the advisors to monitor the activities of the Investment Manager;

(3)    provide ongoing Direct Lending Strategy market trend analysis and information reasonably accessible to the Investment Manager to assist the Trustees in understanding the asset class.

(4)    sell or hold, at the discretion of the Investment Manager, all securities distributed to the Investment Account in accordance with its policy.

(5)    anything in this Agreement to the contrary notwithstanding, in acquiring interests for the Investment Account the Investment Manager shall not effect any transaction without first determining whether the investment is consistent with the Investment Guidelines.

(e)    If the Plan should call on the Investment Manager to perform services which the Investment Manager believes are not included in the services set forth in this Agreement, the Investment Manager shall advise the Trustees in writing and shall not undertake performance thereof without the written consent of the Trustees.  Except as provided in this Agreement, the Plan shall not be obligated to pay any fees for services of the Investment Manager not authorized in advance in writing.

4.   **Standard of Care.**

(a)   The Investment Manager shall perform its duties hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and in such manner as to comply with Section 404(a)(1)(B) of ERISA and any regulations promulgated pursuant thereto.

(b)   The Investment Manager shall diversify the Investment Account Assets subject to the Investment Guidelines so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and in such manner as shall comply with the requirements of Section 404(a)(1)(C) of ERISA and any regulations promulgated pursuant thereto.

(c)   The Investment Manager shall discharge its duties hereunder with respect to the Investment Account solely in the interest of, and for the exclusive purpose of providing benefits for, the participants in the Plan and their beneficiaries, in accordance with the Plan and Trust Agreement (and other documents and instruments governing the Plan), this Agreement, any Investment Guidelines, ERISA and other applicable law.

(d)   The Investment Manager shall not effectuate any investment transaction that directly or indirectly shall cause the Plan, the Trustees or any other fiduciary thereof (including the Investment Manager, or

any affiliate thereof), to violate Sections 406 through 408 of ERISA, or Section 4975 of the Code.

(e)     Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940 for which the Investment Manager (or an affiliate thereof) is the investment advisor, the Investment Manager shall comply in all respects with United States Department of Labor Prohibited Transaction Class Exemption 77-4, or any successor class exemption thereto.

## 5.     Procedures.

(a)     All transactions in the Investment Account authorized by this Agreement shall be consummated by payment to, or delivery by, the Custodian, or such other subcustodian as may be designated by the Custodian, of all securities or other property due to or from the Investment Account.

(b)     Instructions of the Investment Manager to the Custodian, or such other subcustodian, shall be made in writing, sent by first-class mail, or at the option of the Investment Manager, orally and immediately confirmed in writing as soon as practicable thereafter, or by such other means of confirmation as may be approved, from time to time, by the Custodian.

6.   **Reports; Meetings; Accounting.**

(a)    The Investment Manager shall provide the Trustees with quarterly reports concerning the status of the Investment Account within four weeks after the end of each quarter.  However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time as is available to the Investment Manager.

(b)    The reports required by subparagraph 6(a), shall include (but shall not necessarily be limited to) a detailed description of each Investment Account Asset, setting forth the total commitment amount, and the date(s) and amount(s) of all capital calls, redemptions and other similar transactions with respect to the Investment Account Assets during the calendar quarter.  However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time as is available to the Investment Manager.

(c)    Representatives of the Investment Manager shall meet with the Trustees or Investment Committee at such times as the Trustees may reasonably request, at no additional cost to the Plan.

(d)    The Trustees shall instruct the Custodian to provide the

Investment Manager with periodic reports concerning the status of the Investment Account.

(e)     The Investment Manager shall keep accurate and detailed accounts of all investments, receipts, disbursements, actions with respect to interests and other transactions relating to the Investment Account, and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by the Trustees. On at least a quarterly basis, and within thirty (30) days after the effective date of the removal or resignation of the Investment Manager (as provided respectively in subparagraphs 13(c) and 13(d) hereof), the Investment Manager shall file with and deliver to the Trustees a written account setting forth all investments, receipts, disbursements, and other transactions effected by it in connection with the Investment Account (including, without limitation, the information required by subparagraph 6(b), hereof), and certifying as to the accuracy of the information set forth therein. Such account may incorporate by reference any and all schedules and other statements setting forth investments, receipts, disbursements, and other transactions effected during the period for which such account is rendered and which the Investment Manager has furnished to the Trustees prior to the filing of such account. The Investment Manager shall furnish the Trustees such financial statements, and other information, as the Trustees may reasonably request from time to time with respect to the

–17–

Investment Account Assets.

(f)    The Investment Manager shall provide to the Trustees annually a written report describing its operating procedures and controls applicable to its services pursuant to this Agreement and any actions it has taken during the year pursuant thereto.  The Investment Manager will, upon request of the Trustees, meet with the Plan's auditors to review that report.

(g)    The Investment Manager shall also provide, or cause each limited partnership or limited liability company to provide, the Trustees with annual reports within one hundred twenty (120) days after each calendar year.  The reports shall include (but shall not be limited to) a status report with respect to each investment.  To the extent that the Trustees do not receive reports or K-1 tax forms from the managers of each Vehicle disclosing the amount of unrelated business taxable income (as such term is used in Internal Revenue Code Sections 512 through 514) recognized by the Investment Account, the Investment Manager shall use reasonable effort to obtain such information from the applicable manager(s) as promptly as practicable.

7.    **Confidential Relationship.**

(a)    The Investment Manager shall regard as confidential all information concerning the affairs of the Trustees and the Plan not otherwise made public by the Trustees.

–18–

(b)     Provided that the Investment Manager promptly provides
prior notice to the Trustees (except where such prior notice is prohibited by
law), it may disclose confidential information with respect to the Investment
Account, only if required to do so by law, regulation or other binding authority
(that is not superseded or preempted by ERISA), in which event the
Investment Manager shall provide the Trustees with prompt notice of such
request.     In the event that the Investment Manager discloses confidential
information in accordance with subparagraph 7(b) without prior notice to the
Trustees (because such disclosure is required by law and prior notification
thereof to the Trustees is prohibited by law), the Investment Manager shall
notify the Trustees concerning such disclosure as soon as practicable and
permissible by law.

## 8.     Services to Other Clients.

(a)     It is understood that the Investment Manager performs
investment advisory services for various clients.  The Trustees agree that the
Investment Manager may give advice and take action with respect to any of its
other clients which may differ from the advice or action taken with respect to
the Investment Account, or the timing or nature of action taken with respect to
the Investment Account, provided that it continues to be the policy and
practice of the Investment Manager not to favor or disfavor consistently or

–19–

consciously any client or class of clients in the allocation of investment opportunities that the Investment Manager believes would be suitable for such client or class of clients, so that, to the extent practical, such opportunities will be allocated among all of the Investment Manager's clients over a period of time on a fair and equitable basis and in conformity with this Agreement and ERISA.

(b)     Nothing in this Agreement shall impose upon the Investment Manager any obligation to purchase or sell, or to recommend for purchase or sale, for the Investment Account any security which the Investment Manager, its principals, affiliates or employees, may purchase or sell for its or their own accounts or for the account of any other client, if, subject to the standards for discharge of the Investment Manager's fiduciary duties and terms of the Agreement, in the reasonable opinion of the Investment Manager such investment would be unsuitable for the Investment Account or if the Investment Manager determines in the best interest of the Investment Account it would be impractical or undesirable.

(c)     The Investment Manager's exercise of its duties pursuant to this Agreement shall be given priority over the Investment Manager's acquiring or redeeming the same interests for its personal account, and the Investment Manager agrees to abide by Professional Standards of Conduct (internally and from industry associations such the CFA Institute) with respect

to priority of transactions.

**9. Fees.**

(a)   The sole compensation of the Investment Manager for its services rendered hereunder shall be calculated and payable as set forth in Schedule C (attached hereto and made a part hereof).

(b)   The Investment Manager shall not accept any fees or other compensation from any other party or source (whether directly or indirectly) in connection with or relating to its services hereunder without the prior express written consent of the Trustees.   The Investment Manager shall disclose in writing to the Trustees any compensation paid or payable to or by the Investment Manager from any source (whether directly or indirectly) in connection with this Agreement or the services provided by the Investment Manager hereunder.

(c)   Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940, or otherwise invests Fund assets in a collective investment vehicle for which the Investment Manager (or an affiliate thereof) is the investment adviser, the fees otherwise payable to the Investment Manager under this Paragraph 9 shall be reduced by the pro rata share of the investment advisory fees or other fees

–21–

paid by the investment company or other collective investment vehicle to the Investment Manager (or an affiliate thereof) and the Investment Manager shall comply in all respects with United States Department of Labor Prohibited Transaction Class Exemption 77-4 (or any successor class exemption).

(d)    Unless the Investment Manager obtains advance written approval from the Trustees, the Investment Manager shall have no right to pay (or otherwise debit) any fees, expenses or other monies (including, without limitation, for payment of its own fees) from the Investment Account or from any account maintained on behalf of the Plan by the Custodian.

(e)    The Investment Manager expressly acknowledges, represents, warrants and agrees that: (i) under no circumstances will the fee set forth in Schedule C result in payment by the  Trustees or the Trust of fees exceeding those that would be payable — for management of assets approximately equal in value to the Investment Account — by any of the Investment Manager's other clients for whom it provides the same or similar services and (ii) in the event the Investment Manager (1) has already entered, or (2) at any time in the future enters into an agreement with another client to provide the same or similar services pursuant to a fee schedule that would produce a lower fee for investing assets approximately equal in value to, or less than, the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth in Schedule C.

(f)     The Investment Manager shall not accept any fees or compensation from any parent company or affiliate of the Investment Manager or any third-party or source including the collective investment fund in connection with or relating to its services hereunder without the prior express written consent of the Trustees and shall disclose to the Trustees any compensation paid or payable to it or to a parent company or affiliate from any source (whether direct or indirect) in connection with this Agreement or its services hereunder.     In the event that any such fees or compensation referenced in the preceding sentence are directly or indirectly paid in connection with the Investment Manager's services hereunder, the fees or compensation otherwise payable under this paragraph 9 shall be reduced by any such payments to the Investment Manager or any parent company or affiliate thereof).

## 10.     Valuation.

For the purpose of any reports as hereinabove provided, all property comprising the Investment Account Assets shall be valued at fair market value, computed in accordance with such reasonable and commercially acceptable valuation method determined by the Investment Manager, in accordance with its fiduciary duties under ERISA to reflect their fair market value.

–23–

**11.  Representations of Investment Manager.**

The Investment Manager expressly acknowledges, represents, warrants and agrees that:

(a)   it is an "investment manager" (as that term is defined in Section 3(38) of ERISA) of the Trust with respect to the assets of the Trust at any time constituting the Investment Account, and it will continue to maintain that status and comply with all applicable provisions of ERISA as long as this Agreement shall remain in effect; and, to the limited extent set forth in subparagraph 3(d) hereof, it will be a "named fiduciary" of the Plan as that term is defined in Section 402(a) of ERISA.

(b)   it is a "fiduciary" (as that term is defined in Section 3(21)(A) of ERISA) of the Trust with respect to the Plan and the assets of the Trust at any time constituting the Investment Account, and it is not subject to any of the disqualifications described in Section 411 of ERISA; or Part I(g) of the United States Department of Labor Prohibited Transaction Class Exemption 84-14 (the "QPAM Exemption");

(c)   it is, and as long as this Agreement shall remain in effect will continue to qualify as, a "qualified professional asset manager" (as that term is defined in the QPAM Exemption) with respect to the Investment Account, and that it shall satisfy all of the terms and conditions of Part I of the QPAM Exemption unless another prohibited transaction exemption is

–25–

available or the Investment Manager's actions with respect to the Investment Account will not give rise to a non-exempt prohibited transaction under ERISA or the Code;

(d)     it is, and will continue to be during the term of this Agreement (i) registered in good standing as an investment adviser under the Advisers Act; (ii) a bank as defined in the Advisers Act; or (iii) an insurance company qualified to manage, acquire or dispose of any asset of a plan under the laws of more than on state;

(e)     it will notify the Trustees immediately in writing if it ever ceases to be registered as an investment adviser under the Advisers Act or otherwise no longer meets the requirements of Section 3(38) of ERISA;

(f)     it will not take any action with respect to the Investment Account that would require the Fund or the Investment Account to become a registered investment company under the Investment Company Act of 1940, as may be amended from time to time;

(g)     it has completed, obtained or performed (and, when required, will complete, obtain or perform) all registrations, filings, approvals, authorizations, consents or examinations required by ERISA, the Advisers Act or other applicable law (or any government or governmental authority) for the performance of the acts contemplated by this Agreement and, during the term of this Agreement, it shall comply with all existing, new or amended statutes

of the United States (and any other government or governmental authority) having jurisdiction over its activities which are applicable to its performance under this Agreement;

(h)    it has, by appropriate action, duly authorized the execution and implementation of this Agreement; such authorization or execution does not violate any obligation by which the Investment Manager is bound or any applicable law; and this Agreement has been executed on behalf of the Investment Manager by a person (or persons) authorized to transact business on behalf of the Investment Manager and shall be binding upon the Investment Manager in accordance with its terms;

(i)    the personnel of the Investment Manager who will be responsible for carrying out the terms of this Agreement are individuals experienced in the making of investments of the nature contemplated by this Agreement and one or more bonds have been obtained by the Investment Manager, in accordance with and in an amount not less than the amount required by Section 412 of ERISA, which provides the Trust protection against fraud or dishonesty (either directly or through connivance with others) on the part of the Investment Manager, and each of its officers, directors, employees and agents, and such bond will be in an amount of no less than $1,000,000;

(j)    it shall fully indemnify, defend and hold the Trustees harmless from, and against, any and all claims, liabilities, losses, damages,

costs, expenses (including attorneys' fees and court costs) which the Trustees incur or suffer as a result of, or relating to, or arising out of, claims of any breach by the Investment Manager of (i) its fiduciary responsibilities under ERISA (including, without limitation, those set forth in paragraph 4 hereof), the Advisers Act or other applicable law, with respect to the assets of the Plan at any time constituting the Investment Account; (ii) any of the acknowledgments, representations, warranties or agreements made in this Agreement; or (iii) any other provision of this Agreement.   Notwithstanding the preceding sentence, nothing in this subparagraph 11(j) is intended to or shall limit any rights that the Trustees may otherwise have against the Investment Manager under ERISA, the Advisers Act or other applicable law. In any claim for a breach of fiduciary duty, responsibility or obligation by the Investment Manager, the Investment Manager agrees to extend the applicable statute of limitations to the later of (i) six years from the discovery of any breach; (ii) three years from the final disposition of any investment to which the breach relates; or (iii) the period provided by the applicable statute of limitations;

       (k)    there currently exists in full force and effect an insurance policy protecting the Investment Manager (and each of its officers, directors, partners and employees) against liability or loss for a breach of fiduciary responsibility, and the coverage limitations of such policy equal or exceed

Five Million Dollars $5,000,000); and the deductible of such policy does not exceed Five Hundred Thousand Dollars ($500,000) the Investment Manager warrants and agrees that such insurance policy shall be maintained at all times while this Agreement is in effect; and the Investment Manager warrants and agrees that it shall provide the Trustees with notice of any change to, or termination of, the policy;

(l)     There currently exists in full force and effect an insurance policy protecting the Investment Manager (and its officers, directors and employees) against liability or loss for errors and omissions, and the coverage limitations of such policy equal or exceed Five Million Dollars ($5,000,000); and the Investment Manager warrants that such insurance policy shall be maintained at all times while this Agreement is in effect; and the Investment Manager warrants and agrees that it shall provide the Trustees with notice of any change to, or termination of, the policy;

(m)     where the Trustees have given written authority for the Investment Manager to invest in, and the Investment Account assets consist of, foreign currency, securities, or other property, the Investment Manager shall comply with all requirements of Section 404(b) of ERISA and any regulations promulgated pursuant thereto (including, without limitation, 29 C.F.R. §2550.404b-1or any successor legislation) in the event that it invests or reinvests any portion of the Investment Account Assets in (i) securities of a

corporation, company or other entity or person which is not organized under the laws of the United States or a State, or the principal trading market for which is outside the jurisdiction of the district courts of the United States; (ii) securities issued by a government other than the government of the United States or of a State (or any political subdivision, agency or instrumentality of such a government); (iii) currency issued by a government other than the government of the United States; or (iv) other foreign securities or property;

(n)     it shall promptly advise the Trustees in the event of any (i) change in control of the Investment Manager or in the investment professionals involved in the management of the Investment Account, or (ii) material weakness identified in the Investment Manager's annual compliance review;

(o)     it shall promptly notify the Trustees of any threatened or actual material adverse change in (i) the Investment Manager's financial condition, or (ii) the value or nature of the Investment Account;

(p)     neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors, partners or employees, ever has been (i) convicted of or pleaded guilty (or nolo contendere) to a felony or misdemeanor involving (1) an investment or investment-related business, (2) fraud, false statements or omissions, or (3) the wrongful taking of property, bribery, forgery, counterfeiting or extortion; (ii)

found by a court to be in violation of any federal or state investment (or investment-related) statutes or regulations; (iii) found by the U.S. Securities and Exchange Commission, or any other federal or state regulatory agency or self-regulating organizations, to have (1) made a false statement or omission, (2) been involved in a violation of its regulations or statutes, (3) been a cause of an investment-related business having its authorization to do business denied, suspended, revoked or restricted; or (iv) found to be in violation of Section 411 of ERISA or Part I(q) of the QPAM Exemption; nor is any claim, proceeding or litigation that might lead to the foregoing presently pending;

(q)      neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors, partners or employees ever has (i) had an insurance or bonding company deny, pay out on or revoke a fidelity bond or fiduciary liability insurance policy; (ii) filed a bankruptcy or insolvency petition (or been declared bankrupt) or had a trustee appointed under the Securities Investor Protection Act; or (iii) had its registration revoked or its activities restricted by the U.S. Securities and Exchange Commission; nor is any claim, proceeding or litigation which might lead to the foregoing presently pending;

(r)      true and complete copies of (i) the Investment Manager's current Form ADV and any supplements thereto, (ii) the fidelity bond described in subparagraph 11(i) hereof or a certificate in lieu thereof, and (iii)

the insurance policies described in subparagraphs 11(k) and 11(l) hereof or a certificate in lieu thereof, have been delivered to the Trustees as of the effective date of this Agreement.  True and complete copies of any changes, modifications, interpretations or new, revised or replacement issuances of such documents (including any annual supplements to Form ADV) will be delivered to the Trustees as promptly as practicable after the adoption, execution or submission thereof;

(s)      neither the Investment Manager, any of its subsidiaries, divisions, or other affiliates, nor any of their officers, directors, partners, or employees, is prevented from performing any services to the Fund under this Agreement as a result of Section 411 of ERISA or Part I(g) of the QPAM Exemption.

(t)      whether the Investment Manager invests Account Assets in one or more collective investment funds organized by White Oak Global Advisors, LLC, is within the sole and exclusive discretion of the Investment Manager, provided that investments in the Vehicle shall only be made, or continued, to the extent that such fund(s) are managed in accordance with the provisions of this Agreement, anything in the Vehicle's governing documents to the contrary notwithstanding, and that any such investments shall not: (i) give rise to a non-exempt prohibited transaction for purposes of ERISA; and (ii) violate Section 404 of ERISA.  In that event, upon the direction of the

Investment Manager, the Trustees shall execute a subscription agreement for each such fund as required of all portfolio participants. The Trustees understand that the Investment Manger is currently considering investing Account Assets in the White Oak Pinnacle Fund, L.P., directly or through a feeder fund, the White Oak Pinnacle Feeder Fund I, L.P., and that if Investment Account Assets are invested in the White Oak Pinnacle Fund, L.P. and/or the White Oak Pinnacle Feeder Fund I, L.P., the fees for such investments shall be adjusted in accordance with the terms of paragraph 9. The Investment Manager further acknowledges that the subscription agreements shall not constitute a waiver of any of the obligations White Oak Global Advisors, LLC has as Investment Manager under this Agreement.

(u)     it shall provide copies of all documents necessary pursuant to paragraph 3(c) of this Agreement.

(v)     the foregoing acknowledgments, representations, warranties and agreements are understood to be relied upon by the Trustees, shall be continuing in nature, and shall survive the expiration of this Agreement; and

(w)     it shall promptly notify the Trustees in the event that any of the foregoing acknowledgments, representations, warranties or agreements shall no longer be true or accurate

–33–

12. **Representations of the Trustees.**

   The Trustees expressly acknowledge, represent, warrant and agree that:

   (a)  the Trustees are the "named fiduciaries" of the Plan with respect to the management or disposition of Plan assets and are authorized by the Trust Agreement to appoint an investment manager to manage (including the power to acquire and dispose of) assets of the Plan, and to appoint a named fiduciary for the limited purposes set forth in subparagraph 3(d) hereof;

   (b)  true and complete copies of the Plan and Trust Agreement have been delivered to the Investment Manager;

   (c)  the Trustees have by appropriate action duly authorized the appointment of the Investment Manager and the execution and implementation of this Agreement, which has been executed on behalf of the Trustees by a person or persons authorized to do so and, at the request of the Investment Manager, shall deliver such evidence of such authority as the Investment Manager shall reasonably request;

   (d)  in the event that the Trustees adopt any Investment Guidelines (other than those set forth in Schedule A) or any amendment to such Investment Guidelines, true and complete copies will be delivered to the Investment Manager as promptly as practicable after the adoption thereof; and

   (e)  if another entity should be substituted as the Custodian of

the Investment Account Assets, the Investment Manager shall be notified of such substitution and the substituted entity will thereafter be deemed to be the Custodian for purposes of this Agreement.

**13. Amendment and Termination.**

(a)    This Agreement may be modified or amended by the Trustees or the Investment Manager, at any time and from time to time and in whole or in part, but only by the mutual written agreement of the Trustees and the Investment Manager.

(b)    This Agreement shall continue in full force and effect from the day and year first above written, unless terminated as hereinafter provided. Within thirty (30) days of the termination of this Agreement (in accordance with either subparagraphs 13(c) or 13(d) hereof), the Investment Manager shall transfer to the Trustees (or their duly authorized representatives) all books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession, along with the documents and information required by paragraph 6 hereof as directed by the Trustees (or their duly authorized representatives). The Investment Manager shall continue to cooperate with the Trustees to facilitate the transition of the Investment Account to the management of the Trustees, another investment manager appointed by the Trustees, or any other

–35–

duly appointed representative of the Trustees.

(c)  This Agreement may be terminated at any time by the Trustees without penalty by giving the Investment Manager written notice of such termination date.

(d)  The Investment Manager may terminate this Agreement upon at least ninety (90) days prior written notice to the Trustees of such termination date.  Notwithstanding the foregoing, in the event of termination of this Agreement by the Investment Manager, the Investment Manager agrees that, if requested by the Trustees, it will continue to act as Investment Manager until the earlier of the selection by the Trustees of its successor or the expiration of the six (6) month period commencing with the date on which this Agreement is scheduled to terminate in accordance with the Investment Manager's notice.

(e)  Any termination notice given by either party shall not affect or preclude the consummation of any transaction initiated prior to the receipt by one party of the other's termination notice (or, if the Investment Manager continues to act until the selection of a successor in accordance with subparagraph 13(d), hereof, any transaction initiated during the period during which the Investment Manager so continues to act, in which case all of the terms and conditions of this Agreement shall apply to such transaction).

(f)  Any fees paid to the Investment Manager hereunder will

be prorated to the date as of which termination of this Agreement is effective, and any unearned portion thereof will be refunded to the Trustees.

(g)     Unless the Trustees notify the Investment Manager that the Trustees have decided to extend the term of this Agreement beyond December 31, 2015, this Agreement shall terminate on December 31, 2015.

## 14. Non-Assignability.

This Agreement and the duties, responsibilities and benefits hereunder, may not be assigned by the Investment Manager (including, without limitation, any assignment as defined in the Investment Act of 1940) without the advance express written consent of the Trustees. If a purported assignment without the advance express written consent of the Trustees occurs, this Agreement shall automatically terminate as of the date of the purported assignment, and the provisions of subparagraph 13(f) hereof, shall become operative as of that date.

## 15. Exculpation.

(a)     It is understood and agreed that the individuals executing this Agreement on behalf of the Plan do so solely in their representative capacities as Trustees and fiduciaries of the Plan, and not in their personal or individual capacities.   In addition, it is understood and agreed that any obligation of the Trustees set forth in this Agreement is an obligation of the

–37–

Plan and performed by the Trustees solely in the representative capacity as Trustees of the Plan and not in their personal or individual capacities. Accordingly, the execution and performance of this Agreement shall impose no personal liability on the Trustees (or their employees, agents, or representatives).   In the event of any breach, non-performance or other default by the Plan or the Trustees under this Agreement, the Investment Manager agrees not to seek any personal judgment against the Trustees (or their employees, agents or representatives), or their heirs, executors or administrators, but shall look solely to the assets of the Investment Account for (i) the satisfaction of any claim that the Investment Manager may have against the Trustees (or their employees, agents or representatives); or (ii) the collection of any judgment recovered against the Plan based upon a breach by the Plan or the Trustees of any of the terms, conditions or covenants under this agreement .

(b)    No property or assets of the Trustees (or their employees, agents or representatives) shall be subject in any manner whatsoever to any levy, judgment, execution or other enforcement proceeding for the satisfaction of the Investment Manager's remedies arising from or related to either this Agreement or the relationship between the Investment Manager and the Plan or the Trustees.

**16. Notices.**

Unless otherwise specified herein, all notices, instructions and advices with respect to security transactions (or any other matters) contemplated by this Agreement, shall be deemed duly given to or received by the appropriate (i) when delivered in writing or delivered by such other means reasonably expected to be adequate under the circumstances (including, without limitation, by cable, wire, telegram, telex, telecopy, telefax, electronic mail or any other such system, whereby the receiver of such information is able to verify by codes or otherwise with a reasonable degree of certainty the identity of the sender of such communication) to the addresses below; or (ii) on the third business day after the date on which it is deposited by first-class mail, postage prepaid, in either case when addressed as follows:

    (a)    To the Trustees:

> New York State Nurses Association Pension Plan
> P. O. Box 12430
> Albany, New York 12212
>
> Attn:  Russell M. Niemie
>         Chief Investment Officer

    (b)    To the Investment Manager:

> White Oak Global Advisors, LLC
> 3 Embarcadero Center, Suite 550
> San Francisco, CA 94111
>
> Attn:  General Counsel

–39–

or to such other address or addresses as any of the parties shall subsequently furnish to the other in writing.

## 17. **Entire Agreement.**

This Agreement (including any agreements incorporated herein by reference) sets forth the entire understanding of the parties hereto and is intended to be the complete and exclusive statement of the terms hereof. This Agreement may not be modified or amended except by a writing signed by the parties hereto. This Agreement supersedes and cancels any and all prior agreements (including any Investment Guidelines) between the parties, whether written or oral, relating to investment management of assets of the Trust.

## 18. **Construction and Severability.**

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or any

regulations promulgated pursuant thereto), or the Advisers Act. In the event of any inconsistency between this Agreement and the Trust Agreement, the provisions of the Trust Agreement shall govern.

## 19. Interpretation.

Should any provision of this Agreement require interpretation or construction, it is agreed by the parties hereto that the court, arbitrator, administrative body or other entity interpreting or construing such document shall not apply a presumption that the provisions hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agents prepared the same, it being agreed that all parties (either directly or by their respective counsel) have fully participated in the negotiation and preparation of all provisions of this Agreement.

## 20. Titles.

The titles set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect, nor shall they in any way affect the substance of any provisions contained in this Agreement.

## 21. Inurement.

This Agreement shall inure to the benefit of the Trustees and their

successors and assigns, and the participants and beneficiaries of the Plan.

## 22. **Applicable Law**.

Except to the extent otherwise provided in ERISA, this Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York (without giving effect to the principles thereof relating to the conflict of laws).

## 23. **Successor Laws.**

Any references in this Agreement to a section of ERISA, the Advisers Act or the Code (or other applicable law), or to any regulations or administrative pronouncements thereunder, shall include a reference to any successor provision of ERISA, the Advisers Act or the Code (or other applicable law, or any successor regulations or administrative pronouncements thereunder.

## 24. **Resolution of Disputes.**

Any dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association in the City of New York. The arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusted pension funds and investments

on their behalf.

## 25. **Counterparts.**

This Agreement may be executed in counterpart copies, each of which shall be deemed an original, but all of which shall be considered the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN

By_____
CHRISTOPHER BERNER, Chairperson

By_____
NANCY KALEDA, Secretary

WHITE OAK GLOBAL ADVISORS, LLC

By_____
BARBARA J. S. MCKEE,
Managing Member

–43–

## SCHEDULE A

## INVESTMENT GUIDELINES

The following constitute the current Investment Guidelines applicable to the Investment Manager and are subject to future amendment by the Trustees (in accordance with Paragraph 1 of the Agreement):

## SCHEDULE B

## INITIAL ALLOCATED AMOUNT

The following amount shall constitute the initial Amount referred

to in this Agreement:

Eighty Million Dollars ($80,000,000.00)

SCHEDULE C

INVESTMENT MANAGER FEE SCHEDULE

The compensation of the Investment Manager shall be in accordance with the following schedule:

1.   <u>Management Fee</u>

The Investment Manager shall receive a semi-annual management fee, payable in advance as of January 1 and July 1 of each year, and calculated at the annualized rate of one hundred and thirty five basis points (1.35%) of the initial Allocated Amount.  The management fee shall be prorated for any semi-annual period that is less than a full six (6) months.

2.   <u>Carried Interest</u>

Any distributable cash from a particular investment of the initial Allocated Amount shall be apportioned in the following manner and priority:

(i)     First, one hundred percent (100%) to the Trustees of the NYSNA Pension Plan ("Trustees") until the cumulative distributions to the Trustees equals the cumulative contributions from the initial Allocated Amount to the investment;

(ii)    Second, one hundred percent (100%) to the Trustees until the cumulative distributions to the Trustees in excess of the cumulative contributions to the investment provides the Trustees with a cumulative return of seven and one-half percent (7.5%) per annum, compounded annually, on the Trustees' aggregate outstanding investment calculated from the date that the initial Allocated Amount is contributed to the investment until the date on which such initial Allocated Amount is returned to the Trustees;

(iii)   Third, one hundred percent (100%) to the Investment Manager until the Investment Manager has received, with respect to the

Trustees, an amount equal to twenty percent (20%) of the sum of all distributions made to the Trustees pursuant to subparagraph (ii) above; and

(iv)    Fourth, eighty percent (80%) to the Trustees and twenty percent (20%) to the Investment Manger.

The aggregate amount, if any, distributable to the Investment Manger in accordance with subparagraphs (iii) and (iv) above, shall be referred to as a "Carried Interest."

3.    Adjustment of Management Fee and Carried Interest

If Investment Account assets are invested in the White Oak Pinnacle Fund, L.P., the White Oak Pinnacle Feeder Fund I, L.P. and/or any other collective investment fund of the Investment Manager or any parent company or affiliate, the Management Fee and Carried Interest set forth above shall be adjusted in accordance with the terms of paragraph 9 of this Agreement.

INVESTMENT MANAGEMENT AGREEMENT ("Agreement") made as of the 1st day of January, 2016, by and between the TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN ("Trustees") and WHITE OAK GLOBAL ADVISORS, LLC, ("Investment Manager").

## WITNESSETH:

WHEREAS, the Trustees, as distinguished from their individual capacity such that the Trustees shall not be personally liable for any causes of action arising out of the services performed under this Agreement, entered into an agreement dated the 1st day of January 2014, retaining the Investment Manager to have fiduciary responsibility over the amount allocated by the Trustees (the "Allocated Amount"), for investment in private commingled investment vehicles such as limited liability companies and limited partnerships that pursue direct lending strategies for investing in private credit opportunities, the assets of which are considered assets of the Plan by operation of ERISA (each, a "Vehicle"), including the sole, exclusive and full discretion to invest plan assets in a total amount not to exceed the Allocated Amount in one or more Vehicles consistent with this Agreement, and to

maintain under its sole and exclusive investment supervision and management certain assets ("Investment Account Assets") (as that term is defined in subparagraph 2(a) hereof) of the trust ("Trust") established pursuant to the Agreement and Declaration of Trust ("Trust Agreement") of the New York State Nurses Association Pension Plan, as from time to time amended ("Plan"), which assets are to be deposited with The Northern Trust Company, as custodial agent ("Custodian"), or such other custodian or subcustodians, as may be designated by the Trustees or the Custodian, in accordance with the terms and conditions hereinafter set forth, and

WHEREAS, said agreement has expired and the parties desire to renew and restate the terms and conditions of said retention.

NOW, THEREFORE, it is agreed as follows:

**1.**   **Appointment.**

(a)   Effective as of December 31, 2015, pursuant to the authority granted under Article VII, Section 1(m) of the Trust Agreement, and Section 402(c)(3) of the Employee Retirement Income Security Act of 1974, as from time to time amended ("ERISA"), the Trustees hereby appoint the Investment Manager and delegate to the Investment Manager fiduciary responsibility over the Allocated Amount listed on Schedule B, including the sole, exclusive and full discretion and authority to invest plan assets in a total amount not to exceed

–2–

the Allocated Amount in one or more Vehicles consistent with the provisions of this Agreement, and the sole, exclusive and full discretion and authority to manage and invest the Investment Account Assets (as that term is defined in subparagraph 2(a), hereof) consistent with Investment Guidelines (as that term is defined in subparagraph 1(c) hereof).

(b)     As a result of this appointment and delegation, the Investment Manager shall have sole responsibility for the investment of the Allocated Amount in one or more Vehicles and the management of the Investment Account Assets and, to the extent permitted under ERISA, the Trustees shall not be liable for any acts or omissions of the Investment Manager or be under any obligation to invest or otherwise manage the Investment Account Assets.

(c)     The Investment Manager hereby accepts this appointment and delegation and agrees to assume sole, exclusive and full discretion and authority to invest (including committing to invest) plan assets in a total amount not to exceed the Allocated Amount by committing plan assets to one or more Vehicles and to manage the Investment Account Assets in accordance with and subject to: (i) the terms and conditions of this Agreement, including any statement of investment policy and written investment guidelines or directions, which from time to time shall be promulgated by the Trustees and delivered to the Investment Manager, expressing the investment objectives, restrictions and

–3–

policies of the Trustees (collectively, the "Investment Guidelines"), which Investment Guidelines, and any future amendments thereto, shall be incorporated by reference into this Agreement; provided, however, that the issuance of any Investment Guidelines or other directions to the Investment Manager shall not in any manner be construed as an acceptance by the Trustees of any investment management discretion or authority to make investments in Vehicles with respect to the Allocated Amount or any investment management or supervisory responsibility with respect to the Investment Account by the Trustees (and the Trustees shall not, as a result of issuing Investment Guidelines or other directions, be liable for any acts or omissions of the Investment Manager with respect to any Investment Account Assets); (ii) compliance with ERISA and other applicable law; and (iii) the current funding policy and method that have been established to carry out the objectives of the Trust and Plan.

(d)     The current Investment Guidelines are attached hereto as Schedule A (and made a part hereof).

(e)     By execution of this agreement, the Investment Manager hereby accepts the current Investment Guidelines referred to in Subparagraph 1(d) and any amendments thereto which may be promulgated by the Trustees (and not objected to in writing by the Investment Manager within five (5) days after receipt thereof), and agrees to be bound thereby in connection with the

-4-

performance of its duties under this Agreement.

(f)    To the extent that any provision of this Agreement may be inconsistent with the provisions of any Investment Guidelines, the Investment Guidelines shall be controlling.

(g)    The Investment Manager shall advise the Trustees immediately if it determines that the Investment Guidelines are not prudent.

(h)    Under no circumstances shall the Investment Manager invest Investment Account Assets in any investments or strategies not specifically sanctioned by, and/or prohibited under, the Investment Guidelines.

## 2.    **Investment Account Assets.**

(a)    The Investment Account Assets, shall consist of the investments in Vehicles made on behalf of the Plan by the Investment Manager pursuant to this agreement, including all appreciation thereof, additions to the Investment Account Assets, and distributions of assets other than cash from a Vehicle (the "Investment Account") but excluding (i) cash distributions returned or distributed to the Plan as an investor in a Vehicle under the Vehicle's relevant partnership agreement or other governing instrument, (ii) cash proceeds from the sale of securities distributed to the Plan as such an investor, and (iii) that portion of the Allocated Amount that the Investment Manager has either not yet committed to a Vehicle or that has been

−5−

committed but not yet called by the Vehicle's manager. The Investment Account Assets and the Allocated Amount constitute assets of an employee benefit plan subject to Part 4 of Title I of ERISA.

(b)     The Trustees shall direct the Custodian to act in accordance with the instructions of the Investment Manager.  The Investment Manager shall under no circumstances act as custodian of the Investment Account Assets or otherwise have custody or physical control of the Investment Account Assets. The physical possession of all securities, funds and other property which constitute the Investment Account Assets shall at all times be held, controlled and administered by the Custodian, and all such cash, securities, funds and other property shall be held on the books and records of the Custodian in a manner so as to establish clearly that they are held as part of the Investment Account provided for in this Agreement.

(c)     The Investment Account Assets shall remain a part of, and subject to, the terms and conditions of the Trust Agreement and the Plan, and shall be held at all times exclusively for the purposes for which the Trust and Plan were established.   All advisory and management powers, duties and responsibilities relating to the Investment Account shall be exercised exclusively by, and circumscribed by, the Investment Manager pursuant to the provisions of the Trust Agreement relating to such powers, duties and responsibilities, and which are incorporated herein by reference (as if fully set forth herein).

**3.   Duties and Powers of Investment Manager.**

During the term of its appointment, the Investment Manager shall,
subject to its fiduciary obligations referred to in paragraph 4, hereof, ERISA,
and other applicable law, and in a manner consistent with the investment
objectives, restrictions and other policies of the Trustees which shall be
expressed in any Investment Guidelines:

(a)     have the power and obligation to manage the Investment
Account in its sole and absolute discretion, subject to its fiduciary obligations
referred to in Paragraph 4 hereof, the Investment Advisers Act of 1940, all rules
and regulations promulgated pursuant thereto and any other rule, regulation or
order of the Securities and Exchange Commission (collectively, the "Advisers
Act"), ERISA and other applicable law, and in a manner consistent with the
asset classification and investment management style contemplated by this
Agreement;

(b)     provide investment advice and recommendations with
respect to the Investment Policy and Guidelines;

(c)     in the name and on behalf of the Plan, to enter into and/or
execute agreements of limited partnership and limited liability company
agreements, subscription agreements, investor questionnaires, and such other
documents as the Investment Manager deems necessary or appropriate with
respect to the Investment Account Assets and in accordance with the terms of

–7–

the Investment Policy and Guidelines; and

(d)  in the case of investments in a Vehicle, to appoint the person or entity with authority to manage (including the power to acquire or dispose of) the Vehicle's assets as an "investment manager" of the Plan pursuant to ERISA Section 402(c)(3) for the limited purpose of permitting such person or entity to engage in the administrative and management activities authorized under the terms of the Vehicle's organization documents and any agreement(s) between such person or entity and the Investment Manager in which event White Oak Global Advisors, LLC shall be deemed a "named fiduciary" of the Plan with respect to the foregoing appointment only (as opposed to an "investment manager") and an "investment manager" with respect to investment and reinvestment of Investment Account Assets of the Vehicle and the monitoring of such investment.

(i)  Before investing in any Vehicle, the Investment Manager shall examine the valuation methodology utilized by that Vehicle to determine that the valuation methodology is independently and objectively verifiable and that the valuation factors used are sound and prudent.

(ii)  The Investment Manager shall collect information pertaining to investments, securities, the economy, and other matters pertinent to making the determinations required of it herein.  Such review shall be conducted to determine, in the Investment Manager's sole discretion based on

−8−

the information available to it or which would be available to it upon exercise of prudent discretion under ERISA (including any information or advice given to it by the Trustees pursuant to the Investment Guidelines), the advisability of

(1)     retaining some or all of such funds and other property constituting the Allocated Amount and selling if prudent to do so;

(2)     selling, exchanging, redeeming, liquid-dating or disposing of some or all of the Investment Account Assets;

(3)     investing some or all of the Allocated Amount in other Vehicles; or

(4)     taking such action or actions as is prudent under the circumstances.

(iii)     The Investment Manager shall promptly notify the Plan's accounting department and the Custodian of all commitments of the Allocated Amount and purchases, sales and other dispositions of the Investment Account Assets.

(iv)     The Investment Manager shall give the Custodian (as appropriate) such instructions or directions as may be necessary, and thereupon execute and complete all such certificates, proxies, consents and other documents necessary or appropriate to effectuate the powers of the Investment Manager under this Agreement. However, no person other than

the Investment Manager may make a decision with respect to the exercise of rights appurtenant to Investment Account Assets or make commitments to Vehicles with respect to the Allocated Amount.

(v)     The Investment Manager shall have the power to make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other documents or instruments that may be necessary or appropriate to carry out the powers granted to it under this Agreement.

(vi)    The Investment Manager shall have the power to compromise or settle any claim, debt or obligation due to the Plan arising out of the Plan's investments of Allocated Assets in Vehicles where immediate action is necessary to prevent a loss to the Investment Account Assets.

(vii)   The Investment Manager shall from time to time certify to the Trustees and the Custodian the name or names of the person or persons authorized to act on the Investment Manager's behalf hereunder, and shall furnish the Trustees and the Custodian with a specimen of their signatures. Any individual so certified shall be deemed to be the Investment Manager's authorized representative. When any individual so certified shall cease to have authority to act on its behalf, or is replaced, the Investment Manager shall promptly give written notice of that fact to the Trustees and the Custodian. However, until such notice is received by the Trustees and the

–10–

Custodian (pursuant to the procedures set forth in Paragraph 16), the Trustees and the Custodian may continue to treat such person(s) as an authorized representative(s) of the Investment Manager.

(viii)   The Trustees shall certify to the Investment Manager the name or names of the person or persons authorized to act on the Trustees' behalf hereunder.   When any individual so certified shall cease to have authority to act on the Trustees' behalf, or is replaced, the Trustees shall promptly give written notice to the Investment Manager.   However, until such notice is received by the Investment Manager (pursuant to the procedures set forth in Paragraph 16), the Investment Manager may continue to treat such person(s) as an authorized representative(s) of the Trustees.

(ix)   The Investment Manager shall have power to:

(1)   exercise any option, conversion or subscription rights appurtenant to any securities or other property of the Investment Account, or to sell any such rights;

(2)   join in, dissent from, and oppose the reorganization, consolidation, recapitalization, liquidation, merger, sale, mortgage, pledge or lease of any securities or other property within the Investment Account Assets;

(3)   deposit any securities or other property of the Investment Account Assets with any protective, reorganization or similar

−11−

committee, and to pay or agree to pay out of the Investment Account Assets part of the expenses and compensation of any such committee and any assessments levied with respect to any securities or other property so deposited; and

(4)     exercise all other ancillary rights or duties in connection with the Investment Account Assets necessary to implement any of the powers contained herein.

(x)     The Investment Manager shall also:

(1)     develop, implement and monitor an investment plan with respect to the Allocated Amount which shall set forth the steps by which the Plan will prudently and reasonably implement a Direct Lending Strategy portfolio consistent with the long term goals and objectives of the Plan's overall strategy for investing in private credit opportunities and taking into consideration the Plan's overall fixed income investing portfolio. This plan shall be consistent with the Investment Guidelines provided by the Plan to the Investment Manager, shall provide for prudent diversification of Direct Lending Strategy investments, including by investment vehicles, and shall take into consideration economic conditions and all other relevant factors. The investment plan shall be reviewed as often as prudently necessary by the Investment Manager, who shall make modifications thereto, if any, to the extent necessary to meet the requirements of this Agreement.

(2)     periodically meet with and provide all relevant information to the Plan's advisors, as reasonably required by the advisors to monitor the activities of the Investment Manager;

(3)     provide ongoing Direct Lending Strategy market trend analysis and information reasonably accessible to the Investment Manager to assist the Trustees in understanding the asset class.

(4)     sell or hold, at the discretion of the Investment Manager, all securities distributed to the Investment Account in accordance with its policy.

(5)     anything in this Agreement to the contrary notwithstanding, in acquiring interests for the Investment Account the Investment Manager shall not effect any transaction without first determining whether the investment is consistent with the Investment Guidelines.

(e)     If the Plan should call on the Investment Manager to perform services which the Investment Manager believes are not included in the services set forth in this Agreement, the Investment Manager shall advise the Trustees in writing and shall not undertake performance thereof without the written consent of the Trustees.  Except as provided in this Agreement, the Plan shall not be obligated to pay any fees for services of the Investment Manager not authorized in advance in writing.

–13–

4.   **Standard of Care.**

(a)   The Investment Manager shall perform its duties hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and in such manner as to comply with Section 404(a)(1)(B) of ERISA and any regulations promulgated pursuant thereto.

(b)   The Investment Manager shall diversify the Investment Account Assets subject to the Investment Guidelines so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and in such manner as shall comply with the requirements of Section 404(a)(1)(C) of ERISA and any regulations promulgated pursuant thereto.

(c)   The Investment Manager shall discharge its duties hereunder with respect to the Investment Account solely in the interest of, and for the exclusive purpose of providing benefits for, the participants in the Plan and their beneficiaries, in accordance with the Plan and Trust Agreement (and other documents and instruments governing the Plan), this Agreement, any Investment Guidelines, ERISA and other applicable law.

(d)   The Investment Manager shall not effectuate any investment transaction that directly or indirectly shall cause the Plan, the Trustees or any other fiduciary thereof (including the Investment Manager, or

–14–

any affiliate thereof), to violate Sections 406 through 408 of ERISA, or Section 4975 of the Code.

(e) Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940 for which the Investment Manager (or an affiliate thereof) is the investment advisor, the Investment Manager shall comply in all respects with United States Department of Labor Prohibited Transaction Class Exemption 77-4, or any successor class exemption thereto.

## 5. Procedures.

(a) All transactions in the Investment Account authorized by this Agreement shall be consummated by payment to, or delivery by, the Custodian, or such other subcustodian as may be designated by the Custodian, of all securities or other property due to or from the Investment Account.

(b) Instructions of the Investment Manager to the Custodian, or such other subcustodian, shall be made in writing, sent by first-class mail, or at the option of the Investment Manager, orally and immediately confirmed in writing as soon as practicable thereafter, or by such other means of confirmation as may be approved, from time to time, by the Custodian.

**6.    Reports; Meetings; Accounting.**

   (a) The Investment Manager shall provide the Trustees with quarterly reports concerning the status of the Investment Account within four weeks after the end of each quarter.  However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time as is available to the Investment Manager.

   (b) The reports required by subparagraph 6(a), shall include (but shall not necessarily be limited to) a detailed description of each Investment Account Asset, setting forth the total commitment amount, and the date(s) and amount(s) of all capital calls, redemptions and other similar transactions with respect to the Investment Account Assets during the calendar quarter.  However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time as is available to the Investment Manager.

   (c) Representatives of the Investment Manager shall meet with the Trustees or Investment Committee at such times as the Trustees may reasonably request, at no additional cost to the Plan.

   (d) The Trustees shall instruct the Custodian to provide the

Investment Manager with periodic reports concerning the status of the Investment Account.

(e)    The Investment Manager shall keep accurate and detailed accounts of all investments, receipts, disbursements, actions with respect to interests and other transactions relating to the Investment Account, and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by the Trustees. On at least a quarterly basis, and within thirty (30) days after the effective date of the removal or resignation of the Investment Manager (as provided respectively in subparagraphs 13(c) and 13(d) hereof), the Investment Manager shall file with and deliver to the Trustees a written account setting forth all investments, receipts, disbursements, and other transactions effected by it in connection with the Investment Account (including, without limitation, the information required by subparagraph 6(b), hereof), and certifying as to the accuracy of the information set forth therein. Such account may incorporate by reference any and all schedules and other statements setting forth investments, receipts, disbursements, and other transactions effected during the period for which such account is rendered and which the Investment Manager has furnished to the Trustees prior to the filing of such account. The Investment Manager shall furnish the Trustees such financial statements, and other information, as the Trustees may reasonably request from time to time with respect to the

Investment Account Assets.

(f)     The Investment Manager shall provide to the Trustees annually a written report describing its operating procedures and controls applicable to its services pursuant to this Agreement and any actions it has taken during the year pursuant thereto.  The Investment Manager will, upon request of the Trustees, meet with the Plan's auditors to review that report.

(g)     The Investment Manager shall also provide, or cause each limited partnership or limited liability company to provide, the Trustees with annual reports within one hundred twenty (120) days after each calendar year.  The reports shall include (but shall not be limited to) a status report with respect to each investment.  To the extent that the Trustees do not receive reports or K-1 tax forms from the managers of each Vehicle disclosing the amount of unrelated business taxable income (as such term is used in Internal Revenue Code Sections 512 through 514) recognized by the Investment Account, the Investment Manager shall use reasonable effort to obtain such information from the applicable manager(s) as promptly as practicable.

## 7.    **Confidential Relationship.**

(a)     The Investment Manager shall regard as confidential all information concerning the affairs of the Trustees and the Plan not otherwise made public by the Trustees.

–18–

(b)     Provided that the Investment Manager promptly provides prior notice to the Trustees (except where such prior notice is prohibited by law), it may disclose confidential information with respect to the Investment Account, only if required to do so by law, regulation or other binding authority (that is not superseded or preempted by ERISA), in which event the Investment Manager shall provide the Trustees with prompt notice of such request.    In the event that the Investment Manager discloses confidential information in accordance with subparagraph 7(b) without prior notice to the Trustees (because such disclosure is required by law and prior notification thereof to the Trustees is prohibited by law), the Investment Manager shall notify the Trustees concerning such disclosure as soon as practicable and permissible by law.

## 8.    Services to Other Clients.

(a)     It is understood that the Investment Manager performs investment advisory services for various clients.  The Trustees agree that the Investment Manager may give advice and take action with respect to any of its other clients which may differ from the advice or action taken with respect to the Investment Account, or the timing or nature of action taken with respect to the Investment Account, provided that it continues to be the policy and practice of the Investment Manager not to favor or disfavor consistently or

–19–

consciously any client or class of clients in the allocation of investment opportunities that the Investment Manager believes would be suitable for such client or class of clients, so that, to the extent practical, such opportunities will be allocated among all of the Investment Manager's clients over a period of time on a fair and equitable basis and in conformity with this Agreement and ERISA.

(b)     Nothing in this Agreement shall impose upon the Investment Manager any obligation to purchase or sell, or to recommend for purchase or sale, for the Investment Account any security which the Investment Manager, its principals, affiliates or employees, may purchase or sell for its or their own accounts or for the account of any other client, if, subject to the standards for discharge of the Investment Manager's fiduciary duties and terms of the Agreement, in the reasonable opinion of the Investment Manager such investment would be unsuitable for the Investment Account or if the Investment Manager determines in the best interest of the Investment Account it would be impractical or undesirable.

(c)     The Investment Manager's exercise of its duties pursuant to this Agreement shall be given priority over the Investment Manager's acquiring or redeeming the same interests for its personal account, and the Investment Manager agrees to abide by Professional Standards of Conduct (internally and from industry associations such the CFA Institute) with respect

to priority of transactions.

## 9. Fees.

(a)     The sole compensation of the Investment Manager for its services rendered hereunder shall be calculated and payable as set forth in Schedule C (attached hereto and made a part hereof).

(b)     The Investment Manager shall not accept any fees or other compensation from any other party or source (whether directly or indirectly) in connection with or relating to its services hereunder without the prior express written consent of the Trustees.  The Investment Manager shall disclose in writing to the Trustees any compensation paid or payable to or by the Investment Manager from any source (whether directly or indirectly) in connection with this Agreement or the services provided by the Investment Manager hereunder.

(c)     Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940, or otherwise invests Fund assets in a collective investment vehicle for which the Investment Manager (or an affiliate thereof) is the investment adviser, the fees otherwise payable to the Investment Manager under this Paragraph 9 shall be reduced by the pro rata share of the investment advisory fees or other fees

paid by the investment company or other collective investment vehicle to the Investment Manager (or an affiliate thereof) and the Investment Manager shall comply in all respects with United States Department of Labor Prohibited Transaction Class Exemption 77-4 (or any successor class exemption).

(d) Unless the Investment Manager obtains advance written approval from the Trustees, the Investment Manager shall have no right to pay (or otherwise debit) any fees, expenses or other monies (including, without limitation, for payment of its own fees) from the Investment Account or from any account maintained on behalf of the Plan by the Custodian.

(e) The Investment Manager expressly acknowledges, represents, warrants and agrees that: (i) under no circumstances will the fee set forth in Schedule C result in payment by the Trustees or the Trust of fees exceeding those that would be payable — for management of assets approximately equal in value to the Investment Account — by any of the Investment Manager's other clients for whom it provides the same or similar services and (ii) in the event the Investment Manager (1) has already entered, or (2) at any time in the future enters into an agreement with another client to provide the same or similar services pursuant to a fee schedule that would produce a lower fee for investing assets approximately equal in value to, or less than, the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth in Schedule C.

–22–

(f)     The Investment Manager shall not accept any fees or compensation from any parent company or affiliate of the Investment Manager or any third-party or source including the collective investment fund in connection with or relating to its services hereunder without the prior express written consent of the Trustees and shall disclose to the Trustees any compensation paid or payable to it or to a parent company or affiliate from any source (whether direct or indirect) in connection with this Agreement or its services hereunder.   In the event that any such fees or compensation referenced in the preceding sentence are directly or indirectly paid in connection with the Investment Manager's services hereunder, the fees or compensation otherwise payable under this paragraph 9 shall be reduced by any such payments to the Investment Manager or any parent company or affiliate thereof).

## 10.    Valuation.

For the purpose of any reports as hereinabove provided, all property comprising the Investment Account Assets shall be valued at fair market value, computed in accordance with such reasonable and commercially acceptable valuation method determined by the Investment Manager, in accordance with its fiduciary duties under ERISA to reflect their fair market value.

## 11.  **Representations of Investment Manager.**

The Investment Manager expressly acknowledges, represents, warrants and agrees that:

(a)  it is an "investment manager" (as that term is defined in Section 3(38) of ERISA) of the Trust with respect to the assets of the Trust at any time constituting the Investment Account, and it will continue to maintain that status and comply with all applicable provisions of ERISA as long as this Agreement shall remain in effect; and, to the limited extent set forth in subparagraph 3(d) hereof, it will be a "named fiduciary" of the Plan as that term is defined in Section 402(a) of ERISA.

(b)  it is a "fiduciary" (as that term is defined in Section 3(21)(A) of ERISA) of the Trust with respect to the Plan and the assets of the Trust at any time constituting the Investment Account, and it is not subject to any of the disqualifications described in Section 411 of ERISA; or Part I(g) of the United States Department of Labor Prohibited Transaction Class Exemption 84-14 (the "QPAM Exemption");

(c)  it is, and as long as this Agreement shall remain in effect will continue to qualify as, a "qualified professional asset manager" (as that term is defined in the QPAM Exemption) with respect to the Investment Account, and that it shall satisfy all of the terms and conditions of Part I of the QPAM Exemption unless another prohibited transaction exemption is

available or the Investment Manager's actions with respect to the Investment Account will not give rise to a non-exempt prohibited transaction under ERISA or the Code;

(d)   it is, and will continue to be during the term of this Agreement (i) registered in good standing as an investment adviser under the Advisers Act; (ii) a bank as defined in the Advisers Act; or (iii) an insurance company qualified to manage, acquire or dispose of any asset of a plan under the laws of more than on state;

(e)   it will notify the Trustees immediately in writing if it ever ceases to be registered as an investment adviser under the Advisers Act or otherwise no longer meets the requirements of Section 3(38) of ERISA;

(f)   it will not take any action with respect to the Investment Account that would require the Fund or the Investment Account to become a registered investment company under the Investment Company Act of 1940, as may be amended from time to time;

(g)   it has completed, obtained or performed (and, when required, will complete, obtain or perform) all registrations, filings, approvals, authorizations, consents or examinations required by ERISA, the Advisers Act or other applicable law (or any government or governmental authority) for the performance of the acts contemplated by this Agreement and, during the term of this Agreement, it shall comply with all existing, new or amended statutes

–25–

of the United States (and any other government or governmental authority) having jurisdiction over its activities which are applicable to its performance under this Agreement;

(h)   it has, by appropriate action, duly authorized the execution and implementation of this Agreement; such authorization or execution does not violate any obligation by which the Investment Manager is bound or any applicable law; and this Agreement has been executed on behalf of the Investment Manager by a person (or persons) authorized to transact business on behalf of the Investment Manager and shall be binding upon the Investment Manager in accordance with its terms;

(i)   the personnel of the Investment Manager who will be responsible for carrying out the terms of this Agreement are individuals experienced in the making of investments of the nature contemplated by this Agreement and one or more bonds have been obtained by the Investment Manager, in accordance with and in an amount not less than the amount required by Section 412 of ERISA, which provides the Trust protection against fraud or dishonesty (either directly or through connivance with others) on the part of the Investment Manager, and each of its officers, directors, employees and agents, and such bond will be in an amount of no less than $1,000,000;

(j)   it shall fully indemnify, defend and hold the Trustees harmless from, and against, any and all claims, liabilities, losses, damages,

–26–

costs, expenses (including attorneys' fees and court costs) which the Trustees incur or suffer as a result of, or relating to, or arising out of, claims of any breach by the Investment Manager of (i) its fiduciary responsibilities under ERISA (including, without limitation, those set forth in paragraph 4 hereof), the Advisers Act or other applicable law, with respect to the assets of the Plan at any time constituting the Investment Account; (ii) any of the acknowledgments, representations, warranties or agreements made in this Agreement; or (iii) any other provision of this Agreement.  Notwithstanding the preceding sentence, nothing in this subparagraph 11(j) is intended to or shall limit any rights that the Trustees may otherwise have against the Investment Manager under ERISA, the Advisers Act or other applicable law. In any claim for a breach of fiduciary duty, responsibility or obligation by the Investment Manager, the Investment Manager agrees to extend the applicable statute of limitations to the later of (i) six years from the discovery of any breach; (ii) three years from the final disposition of any investment to which the breach relates; or (iii) the period provided by the applicable statute of limitations;

(k)     there currently exists in full force and effect an insurance policy protecting the Investment Manager (and each of its officers, directors, partners and employees) against liability or loss for a breach of fiduciary responsibility, and the coverage limitations of such policy equal or exceed

–27–

Five Million Dollars $5,000,000); and the deductible of such policy does not exceed Five Hundred Thousand Dollars ($500,000) the Investment Manager warrants and agrees that such insurance policy shall be maintained at all times while this Agreement is in effect; and the Investment Manager warrants and agrees that it shall provide the Trustees with notice of any change to, or termination of, the policy;

(l)     There currently exists in full force and effect an insurance policy protecting the Investment Manager (and its officers, directors and employees) against liability or loss for errors and omissions, and the coverage limitations of such policy equal or exceed Five Million Dollars ($5,000,000); and the Investment Manager warrants that such insurance policy shall be maintained at all times while this Agreement is in effect; and the Investment Manager warrants and agrees that it shall provide the Trustees with notice of any change to, or termination of, the policy;

(m)     where the Trustees have given written authority for the Investment Manager to invest in, and the Investment Account assets consist of, foreign currency, securities, or other property, the Investment Manager shall comply with all requirements of Section 404(b) of ERISA and any regulations promulgated pursuant thereto (including, without limitation, 29 C.F.R. §2550.404b-1or any successor legislation) in the event that it invests or reinvests any portion of the Investment Account Assets in (i) securities of a

corporation, company or other entity or person which is not organized under the laws of the United States or a State, or the principal trading market for which is outside the jurisdiction of the district courts of the United States; (ii) securities issued by a government other than the government of the United States or of a State (or any political subdivision, agency or instrumentality of such a government); (iii) currency issued by a government other than the government of the United States; or (iv) other foreign securities or property;

(n)     it shall promptly advise the Trustees in the event of any (i) change in control of the Investment Manager or in the investment professionals involved in the management of the Investment Account, or (ii) material weakness identified in the Investment Manager's annual compliance review;

(o)     it shall promptly notify the Trustees of any threatened or actual material adverse change in (i) the Investment Manager's financial condition, or (ii) the value or nature of the Investment Account;

(p)     neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors, partners or employees, ever has been (i) convicted of or pleaded guilty (or nolo contendere) to a felony or misdemeanor involving (1) an investment or investment-related business, (2) fraud, false statements or omissions, or (3) the wrongful taking of property, bribery, forgery, counterfeiting or extortion; (ii)

found by a court to be in violation of any federal or state investment (or investment-related) statutes or regulations; (iii) found by the U.S. Securities and Exchange Commission, or any other federal or state regulatory agency or self-regulating organizations, to have (1) made a false statement or omission, (2) been involved in a violation of its regulations or statutes, (3) been a cause of an investment-related business having its authorization to do business denied, suspended, revoked or restricted; or (iv) found to be in violation of Section 411 of ERISA or Part I(q) of the QPAM Exemption; nor is any claim, proceeding or litigation that might lead to the foregoing presently pending;

(q)    neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors, partners or employees ever has (i) had an insurance or bonding company deny, pay out on or revoke a fidelity bond or fiduciary liability insurance policy; (ii) filed a bankruptcy or insolvency petition (or been declared bankrupt) or had a trustee appointed under the Securities Investor Protection Act; or (iii) had its registration revoked or its activities restricted by the U.S. Securities and Exchange Commission; nor is any claim, proceeding or litigation which might lead to the foregoing presently pending;

(r)    true and complete copies of (i) the Investment Manager's current Form ADV and any supplements thereto, (ii) the fidelity bond described in subparagraph 11(i) hereof or a certificate in lieu thereof, and (iii)

the insurance policies described in subparagraphs 11(k) and 11(l) hereof or a certificate in lieu thereof, have been delivered to the Trustees as of the effective date of this Agreement.  True and complete copies of any changes, modifications, interpretations or new, revised or replacement issuances of such documents (including any annual supplements to Form ADV) will be delivered to the Trustees as promptly as practicable after the adoption, execution or submission thereof;

(s)    neither the Investment Manager, any of its subsidiaries, divisions, or other affiliates, nor any of their officers, directors, partners, or employees, is prevented from performing any services to the Fund under this Agreement as a result of Section 411 of ERISA or Part I(g) of the QPAM Exemption.

(t)    whether the Investment Manager invests Account Assets in one or more collective investment funds organized by White Oak Global Advisors, LLC, is within the sole and exclusive discretion of the Investment Manager, provided that investments in the Vehicle shall only be made, or continued, to the extent that such fund(s) are managed in accordance with the provisions of this Agreement, anything in the Vehicle's governing documents to the contrary notwithstanding, and that any such investments shall not: (i) give rise to a non-exempt prohibited transaction for purposes of ERISA; and (ii) violate Section 404 of ERISA.  In that event, upon the direction of the

–31–

Investment Manager, the Trustees shall execute a subscription agreement for each such fund as required of all portfolio participants. The Trustees understand that the Investment Manger is currently considering investing Account Assets in the White Oak Pinnacle Fund, L.P., directly or through a feeder fund, the White Oak Pinnacle Feeder Fund I, L.P., and that if Investment Account Assets are invested in the White Oak Pinnacle Fund, L.P. and/or the White Oak Pinnacle Feeder Fund I, L.P., the fees for such investments shall be adjusted in accordance with the terms of paragraph 9. The Investment Manager further acknowledges that the subscription agreements shall not constitute a waiver of any of the obligations White Oak Global Advisors, LLC has as Investment Manager under this Agreement.

(u)     it shall provide copies of all documents necessary pursuant to paragraph 3(c) of this Agreement.

(v)     the foregoing acknowledgments, representations, warranties and agreements are understood to be relied upon by the Trustees, shall be continuing in nature, and shall survive the expiration of this Agreement; and

(w)     it shall promptly notify the Trustees in the event that any of the foregoing acknowledgments, representations, warranties or agreements shall no longer be true or accurate.

## 12. **Representations of the Trustees.**

The Trustees expressly acknowledge, represent, warrant and agree that:

(a)   the Trustees are the "named fiduciaries" of the Plan with respect to the management or disposition of Plan assets and are authorized by the Trust Agreement to appoint an investment manager to manage (including the power to acquire and dispose of) assets of the Plan, and to appoint a named fiduciary for the limited purposes set forth in subparagraph 3(d) hereof;

(b)   true and complete copies of the Plan and Trust Agreement have been delivered to the Investment Manager;

(c)   the Trustees have by appropriate action duly authorized the appointment of the Investment Manager and the execution and implementation of this Agreement, which has been executed on behalf of the Trustees by a person or persons authorized to do so and, at the request of the Investment Manager, shall deliver such evidence of such authority as the Investment Manager shall reasonably request;

(d)   in the event that the Trustees adopt any Investment Guidelines (other than those set forth in Schedule A) or any amendment to such Investment Guidelines, true and complete copies will be delivered to the Investment Manager as promptly as practicable after the adoption thereof; and

(e)   if another entity should be substituted as the Custodian of

-33-

the Investment Account Assets, the Investment Manager shall be notified of such substitution and the substituted entity will thereafter be deemed to be the Custodian for purposes of this Agreement.

**13. Amendment and Termination.**

(a)     This Agreement may be modified or amended by the Trustees or the Investment Manager, at any time and from time to time and in whole or in part, but only by the mutual written agreement of the Trustees and the Investment Manager.

(b)     This Agreement shall continue in full force and effect from the day and year first above written, unless terminated as hereinafter provided. Within thirty (30) days of the termination of this Agreement (in accordance with either subparagraphs 13(c) or 13(d) hereof), the Investment Manager shall transfer to the Trustees (or their duly authorized representatives) all books, records, accounts, cash, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession, along with the documents and information required by paragraph 6 hereof as directed by the Trustees (or their duly authorized representatives). The Investment Manager shall continue to cooperate with the Trustees to facilitate the transition of the Investment Account to the management of the Trustees, another investment manager appointed by the Trustees, or any other

duly appointed representative of the Trustees.

(c)     This Agreement may be terminated at any time by the Trustees without penalty by giving the Investment Manager written notice of such termination date.

(d)     The Investment Manager may terminate this Agreement upon at least ninety (90) days prior written notice to the Trustees of such termination date. Notwithstanding the foregoing, in the event of termination of this Agreement by the Investment Manager, the Investment Manager agrees that, if requested by the Trustees, it will continue to act as Investment Manager until the earlier of the selection by the Trustees of its successor or the expiration of the six (6) month period commencing with the date on which this Agreement is scheduled to terminate in accordance with the Investment Manager's notice.

(e)     Any termination notice given by either party shall not affect or preclude the consummation of any transaction initiated prior to the receipt by one party of the other's termination notice (or, if the Investment Manager continues to act until the selection of a successor in accordance with subparagraph 13(d), hereof, any transaction initiated during the period during which the Investment Manager so continues to act, in which case all of the terms and conditions of this Agreement shall apply to such transaction).

(f)     Any fees paid to the Investment Manager hereunder will

–35–

be prorated to the date as of which termination of this Agreement is effective, and any unearned portion thereof will be refunded to the Trustees.

(g)     Unless the Trustees notify the Investment Manager that the Trustees have decided to extend the term of this Agreement beyond December 31, 2017, this Agreement shall terminate on December 31, 2017.

## 14. Non-Assignability.

This Agreement and the duties, responsibilities and benefits hereunder, may not be assigned by the Investment Manager (including, without limitation, any assignment as defined in the Investment Act of 1940) without the advance express written consent of the Trustees.  If a purported assignment without the advance express written consent of the Trustees occurs, this Agreement shall automatically terminate as of the date of the purported assignment, and the provisions of subparagraph 13(f) hereof, shall become operative as of that date.

## 15. Exculpation.

(a)     It is understood and agreed that the individuals executing this Agreement on behalf of the Plan do so solely in their representative capacities as Trustees and fiduciaries of the Plan, and not in their personal or individual capacities.   In addition, it is understood and agreed that any obligation of the Trustees set forth in this Agreement is an obligation of the

Plan and performed by the Trustees solely in the representative capacity as Trustees of the Plan and not in their personal or individual capacities. Accordingly, the execution and performance of this Agreement shall impose no personal liability on the Trustees (or their employees, agents, or representatives). In the event of any breach, non-performance or other default by the Plan or the Trustees under this Agreement, the Investment Manager agrees not to seek any personal judgment against the Trustees (or their employees, agents or representatives), or their heirs, executors or administrators, but shall look solely to the assets of the Investment Account for (i) the satisfaction of any claim that the Investment Manager may have against the Trustees (or their employees, agents or representatives); or (ii) the collection of any judgment recovered against the Plan based upon a breach by the Plan or the Trustees of any of the terms, conditions or covenants under this agreement .

      (b)    No property or assets of the Trustees (or their employees, agents or representatives) shall be subject in any manner whatsoever to any levy, judgment, execution or other enforcement proceeding for the satisfaction of the Investment Manager's remedies arising from or related to either this Agreement or the relationship between the Investment Manager and the Plan or the Trustees.

**16. Notices.**

Unless otherwise specified herein, all notices, instructions and advices with respect to security transactions (or any other matters) contemplated by this Agreement, shall be deemed duly given to or received by the appropriate (i) when delivered in writing or delivered by such other means reasonably expected to be adequate under the circumstances (including, without limitation, by cable, wire, telegram, telex, telecopy, telefax, electronic mail or any other such system, whereby the receiver of such information is able to verify by codes or otherwise with a reasonable degree of certainty the identity of the sender of such communication) to the addresses below; or (ii) on the third business day after the date on which it is deposited by first-class mail, postage prepaid, in either case when addressed as follows:

      (a)    To the Trustees:

> New York State Nurses Association Pension Plan
> P. O. Box 12430
> Albany, New York 12212
>
> Attn:  Russell M. Niemie
>        Chief Investment Officer

      (b)    To the Investment Manager:

> White Oak Global Advisors, LLC
> 3 Embarcadero Center, Suite 550
> San Francisco, CA 94111
>
> Attn:  General Counsel

or to such other address or addresses as any of the parties shall subsequently furnish to the other in writing.

## 17. Entire Agreement.

This Agreement (including any agreements incorporated herein by reference) sets forth the entire understanding of the parties hereto and is intended to be the complete and exclusive statement of the terms hereof. This Agreement may not be modified or amended except by a writing signed by the parties hereto. This Agreement supersedes and cancels any and all prior agreements (including any Investment Guidelines) between the parties, whether written or oral, relating to investment management of assets of the Trust.

## 18. Construction and Severability.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or any

regulations promulgated pursuant thereto), or the Advisers Act.  In the event of any inconsistency between this Agreement and the Trust Agreement, the provisions of the Trust Agreement shall govern.

**19.  Interpretation.**

Should any provision of this Agreement require interpretation or construction, it is agreed by the parties hereto that the court, arbitrator, administrative body or other entity interpreting or construing such document shall not apply a presumption that the provisions hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agents prepared the same, it being agreed that all parties (either directly or by their respective counsel) have fully participated in the negotiation and preparation of all provisions of this Agreement.

**20.  Titles.**

The titles set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect, nor shall they in any way affect the substance of any provisions contained in this Agreement.

**21.  Inurement.**

This Agreement shall inure to the benefit of the Trustees and their

successors and assigns, and the participants and beneficiaries of the Plan.

## 22. **Applicable Law.**

Except to the extent otherwise provided in ERISA, this Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York (without giving effect to the principles thereof relating to the conflict of laws).

## 23. **Successor Laws.**

Any references in this Agreement to a section of ERISA, the Advisers Act or the Code (or other applicable law), or to any regulations or administrative pronouncements thereunder, shall include a reference to any successor provision of ERISA, the Advisers Act or the Code (or other applicable law, or any successor regulations or administrative pronouncements thereunder.

## 24. **Resolution of Disputes.**

Any dispute arising under this Agreement shall be resolved by arbitration of the American Arbitration Association in the City of New York. The arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusted pension funds and investments

−41−

on their behalf.

## 25. Counterparts.

This Agreement may be executed in counterpart copies, each of which shall be deemed an original, but all of which shall be considered the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

TRUSTEES OF THE NEW YORK STATE
NURSES ASSOCIATION PENSION PLAN

Approved For Signature
Albert Kalter P.C.

By _____
NANCY KALEDA, Chairperson

By _____
JEFFREY COHEN, Secretary

WHITE OAK GLOBAL ADVISORS, LLC

By _____
BARBARA J. S. MCKEE,
Managing Member

–42–

## SCHEDULE A

## INVESTMENT GUIDELINES

The following constitute the current Investment Guidelines applicable to the Investment Manager and are subject to future amendment by the Trustees (in accordance with Paragraph 1 of the Agreement):

## New York State Nurses Association Pension Plan

INVESTMENT GUIDELINES

FOR

White Oak Global Advisors, LLC

Originated January 9, 2014

Revised February 12, 2015

### I. OVERVIEW

The following investment objectives and portfolio guidelines are intended as a policy outline White Oak Global Advisors, LLC ("White Oak") in its investment of assets for the Trustees (the "Trustees") of the New York State Nurses Association Pension Plan (the "Plan"). It covers the major areas of concern to the Trustees: return objectives, risk control, permissible and prohibited investments. The purpose of this document is to make the Trustees' expectations clear and to help ensure that the assets entrusted to White Oak are managed at all times in accordance with the fiduciary and other obligations imposed on White Oak by its agreement with the Trustees and the Employee Retirement Income Security Act of 1974 (ERISA).

White Oak was retained by the Trustees to invest Plan assets in a range of investment vehicles that pursue a direct lending strategy that are expected to generate levels of investment return in excess of those generally available in the public bond markets. The specific objectives and investment constraints for this portfolio are detailed in the following sections.

### II. INVESTMENT OBJECTIVES

The Trustees have designated the following investment objectives for White Oak:

A. To invest Plan assets in direct lending securities which include private commingled investment vehicles such as limited liability companies and limited partnerships of which the strategies pursue only senior secured first lien loans with a target current income in excess of 6% annually.

B. To maximize potential risk-adjusted return consistent with a focus on small to middle market borrowers and the investment constraints put forth below and with the Plan's tax-exempt status.

C. To limit risk through diversification and prudent investment selection.

D. To manage the level of commitments within the portfolio, targeting a funded allocation of 60% of the Alternatives sub-asset class of the Fixed Income allocation through time.*

*Prior to February 1, 2015, the commitment was an initial $80.0 million commitment.

## III. ASSET ALLOCATION

The Trustees intend to control asset allocations at the Plan level. Thus, each investment manager is selected to perform a specific role within the overall Plan, and is not expected to determine gross asset allocations individually.

The portfolio's current target funded allocation is 60% of the Alternatives sub-asset class allocation of the Fixed Income allocation.** Annually, by December 31st, White Oak will review the then-current total Plan assets and expected future Plan growth (both available from the Plan office). Considering the existing portfolio structure, and expected drawdowns and distributions, White Oak will provide a written pacing plan to the Plan office.

The White Oak pacing plan will provide 10-year annual projections of the dollar amount they expect to draw from or distribute to the Plan. White Oak's annual pacing plan will also include projected future commitments and redemptions and will consider anticipated growth of the Plan's assets.

### Asset-Type Assignment

White Oak has been selected as a manager of a direct lending strategy. White Oak is expected to invest in direct lending securities, limited partnerships or limited liability companies consistent with the provisions of these guidelines. The private partnerships in which White Oak invests may be illiquid and may hold securities that are publically traded or privately placed or otherwise illiquid.

## IV. PERMISSIBLE INVESTMENTS

White Oak is expected to invest only in securities, limited liability companies or limited partnerships that pursue direct lending strategies, however, White Oak has complete discretion as to what investment vehicles it will select.

## V. PROHIBITED INVESTMENTS

White Oak's mandate as a direct lending manager is limited to investing through securities, limited liability or limited partnership structure vehicles.

All other investment structure types are prohibited.

## VI. LIMITATIONS ON INVESTMENTS

White Oak will commit Plan assets to Permissible Investments provided, however, that it will not commit to aggregate commitments which would lead to a funded allocation beyond the target without prior written approval by the Trustees.

**At December 31, 2014, total Plan assets were $2.99 billion. The Policy Allocation to Fixed Income was 16%. The sub-asset class allocation to Alternative Fixed Income Strategies was 30%. White Oak's allocation of 60% of the sub-asset allocation to Alternatives Fixed Income equated to a current target funded amount of $86.0 million.

2

A.    **Limitation on Specific Investments**
Excluding commingled funds, no more than 8% of the total portfolio shall be committed to a single investment.

B.    **Limitation on Foreign Investment Strategies**
Non-U.S. focused investment strategies may not comprise more than 25% of the portfolio's targeted total commitment.

If any of the above limitations on specific investments is violated, the manager must address the issue in writing with the Trustees within sixty days.

## VII.   TRADING

In accordance with the fiduciary and other obligations imposed on White Oak by its agreement with the Trustees and ERISA, all trades executed by the manager must be for the exclusive benefit of the Plan's participants and beneficiaries.  The manager is expected to seek best execution on all trades.  Further, the manager is prohibited from trading through its own, or any affiliated brokerage operations.

## VIII.   PROXY VOTING

The Trustees have delegated the responsibility of voting all stock proxies to White Oak. The Trustees believe that the voting of proxies constitutes an investment decision by equity managers, and that prudent voting of proxies is important to the overall performance of the Plan and should be executed in a timely fashion.  White Oak is expected to provide a full accounting of proxy votes in writing every calendar year.

## IX.   ON-GOING SUITABILITY

White Oak's suitability as an investment manager will be judged continuously from many perspectives: stability of professional staff and capabilities, adherence to investment disciplines, risk management, business practices, investment performance, and client communication.  Failure to perform adequately in any of these areas may be grounds for termination.

The return earned by White Oak will be calculated using industry standard procedures.

During the initial capital commitment phase of the portfolio, returns will almost certainly be lower than the long-term objectives, due to the "J-curve" effect.  Because such vehicles are generally priced at the lower of cost or appraised value, price appreciation is rarely captured until liquidation.  Thus, reported performance for the first few years of the program may be low (and possibly negative during early periods) compared to the following targets.

White Oak will be expected to meet or outperform, net of underlying management fees the following policy benchmarks:

- current income in excess of 6% measured annually
- total return of the Barclays Universal Index plus 300 basis points measured over a three-year period.

## X. REPORTS

### PERFORMANCE ANALYSES

A Performance Measurement Report ("PMR") shall be submitted to the Plan by the Investment Manager on a quarterly basis no later than 45 days following receipt of all quarterly capital statements from the underlying portfolio investments. Each PMR shall contain historical time-weighted and/or internal rates of returns for each of the Portfolios' investments, as appropriate. Additionally, a comparison shall be made of each investment's actual performance to its objective. Returns and current income shall be aggregated, along with information on investment attributes, on a total portfolio basis. Comparisons shall be made of actual results to the respective performance benchmark, investment parameters and analysis of compliance with guidelines or objectives contained in this statement relating to the Portfolio.

Each quarter, the PMR shall provide a written implementation/pacing plan, including details on the current status of the portfolio and include quarterly projections regarding capital commitments, capital calls and distributions for the following one-year period. Information will also be provided on prospective investments under review.

## XI. REPORTING REQUIREMENTS

The Trustees consider timely, accurate and high quality communication by the Plan's Investment Managers essential and in the best interests of the Plan. Accordingly, White Oak is responsible for (1) maintaining appropriate records and documentation to satisfy its contractual and fiduciary obligations and to demonstrate compliance with the Investment Guidelines, and (2) informing the Trustees' representatives defined as the Plan's Chief Investment Officer, Investment Department Staff, and any other service provider(s) to the Plan as identified in writing to White Oak. Without limiting the generality of the foregoing, White Oak is to:

A. Inform the Trustees' representatives in writing immediately following any significant developments at White Oak, including without limitation, those directly related to its internal operation and the management of the Plan's assets. Without limiting the generality of the forgoing, the Trustees' representatives shall be notified immediately in writing of:

   1. the loss or addition (or pending loss or addition) of key personnel who have been (or will be) providing services to the Plan's portfolio;

   2. all clients gained or lost and any significant change in White Oak's total assets under management for both White Oak's consulting clients and discretionary clients;

   3. current or pending complaints or legal proceedings against White Oak;

   4. investigations of White Oak involving ERISA or other laws; or

   5. any other significant corporate changes affecting White Oak, including but not limited to, structure or ownership.

4

B. Inform the Trustees' representatives in writing prior to any significant change in investment strategy or risk posture.

C. Inform the Trustees representatives immediately in writing of all investment activities (to include new commitments, capital calls, redemptions and distributions).

D. Inform the Trustees' representatives immediately in writing of any Investment Guideline deviations, along with explanations and appropriate plan for corrective action.

E. Meet in person with the Trustees and/or their representatives in their offices at their request on reasonable notice to discuss investment results and plans or any other relevant matters.

F. Respond immediately to written requests from the Trustees and/or their representatives for additional information on Investment Guideline matters and any other matters concerning.

## XII. FIDUCIARY RESPONSIBILITY AND COMPLIANCE

White Oak shall perform its investment responsibilities consistent with its overriding fiduciary obligations. White Oak is responsible for all aspects of portfolio management as set forth in the firm's investment management agreement with the Trustees.

APPROVED BY THE INVESTMENT COMMITTEE OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN

ATTESTED TO BY _____

Nancy Kaleda, Chairperson

_____

Jeffrey Cohen, Secretary

ACCEPTED BY White Oak Global Advisors LLC

_____

Barbara J. S. McKee, Managing Member

Approved For Signature
Albert Kalter P.C

5

## SCHEDULE B

## ALLOCATED AMOUNT

The following amount shall constitute the Allocated Amount referred to in this Agreement:

## *Consolidated Accounting*
30 Nov 15

### ◆ Asset Detail for Consolidations

#### *Venture Capital and Partnerships*

| Description | Shares/Par Value | Local market price Accrued | | | Unrealized gain/loss | | |
|---|---|---|---|---|---|---|---|
| Manager | Asset ID | income/expense | Market value | Cost | Market | Translation | Total |
| **Partnerships** | | | | | | | |
| **Global Region - USD** | | | | | | | |
| WHITE OAK PINNACLE FEEDER FUND I LP | 75,768,949.350 | 81,463,939.000000 | 81,463,939.00 | 75,768,949.35 | 5,694,989.65 | 0.00 | 5,694,989.65 |
| | CUSIP: 991PC6992 | 0.00 | | | | | |
| NYSNA WHITE OAK | 75,768,949.350 | 0.00 | 81,463,939.00 | 75,768,949.35 | 5,694,989.65 | 0.00 | 5,694,989.65 |
| Total USD | | 0.00 | 81,463,939.00 | 75,768,949.35 | 5,694,989.65 | 0.00 | 5,694,989.65 |
| Total Global Region | | 0.00 | 81,463,939.00 | 75,768,949.35 | 5,694,989.65 | 0.00 | 5,694,989.65 |
| **United States - USD** | | | | | | | |
| WHITE OAK SUMMIT FUND | 11,650,903.750 | 11,658,365.000000 | 11,658,365.00 | 11,650,903.75 | 7,461.25 | 0.00 | 7,461.25 |
| | CUSIP: 991XTGI95 | 0.00 | | | | | |
| NYSNA WHITE OAK | 11,650,903.750 | 0.00 | 11,658,365.00 * | 11,650,903.75 | 7,461.25 | 0.00 | 7,461.25 |
| | *Market value based on prices received from an external manager or other client-directed pricing source | | | | | | |
| Total USD | | 0.00 | 11,658,365.00 | 11,650,903.75 | 7,461.25 | 0.00 | 7,461.25 |
| Total United States | | 0.00 | 11,658,365.00 | 11,650,903.75 | 7,461.25 | 0.00 | 7,461.25 |
| **Total partnerships** | | 0.00 | 93,122,304.00 | 87,419,853.10 | 5,702,450.90 | 0.00 | 5,702,450.90 |
| **Total venture capital and partnerships** | | 0.00 | 93,122,304.00 | 87,419,853.10 | 5,702,450.90 | 0.00 | 5,702,450.90 |

#### *Cash and Cash Equivalents*

| Description | Shares/Par Value | Exchange rate Accrued | | | Unrealized gain/loss | | |
|---|---|---|---|---|---|---|---|
| Manager | Asset ID | income/expense | Market value | Cost | Market | Translation | Total |
| **Funds – short term investment** | | | | | | | |
| USD - United States dollar | | 1.000000 | 543.95 | 543.95 | 0.00 | 0.00 | 0.00 |
| | CUSIP: 195998B16 | 79.01 | | | | | |
| NYSNA WHITE OAK | | 79.01 | 543.95 | 543.95 | 0.00 | 0.00 | 0.00 |
| Total Funds - Short Term Investment - all currencies | | 79.01 | 543.95 | 543.95 | 0.00 | 0.00 | 0.00 |
| Total funds - short term investment - all countries | | 79.01 | 543.95 | 543.95 | 0.00 | 0.00 | 0.00 |

**Northern Trust**

*Generated by Northern Trust from periodic data on 24 ... 15 C0099*



## SCHEDULE C

## INVESTMENT MANAGER FEE SCHEDULE

The compensation of the Investment Manager shall be in

accordance with the following schedule:

1.    Management Fee

The Investment Manager shall receive a semi-annual management fee, payable in advance as of January 1 and July 1 of each year, and calculated at the annualized rate of one hundred and thirty five basis points (1.35%) of the initial Allocated Amount. The management fee shall be prorated for any semi-annual period that is less than a full six (6) months.

2.    Carried Interest

Any distributable cash from a particular investment of the initial Allocated Amount shall be apportioned in the following manner and priority:

(i)    First, one hundred percent (100%) to the Trustees of the NYSNA Pension Plan ("Trustees") until the cumulative distributions to the Trustees equals the cumulative contributions from the initial Allocated Amount to the investment;

(ii)    Second, one hundred percent (100%) to the Trustees until the cumulative distributions to the Trustees in excess of the cumulative contributions to the investment provides the Trustees with a cumulative return of seven and one-half percent (7.5%) per annum, compounded annually, on the Trustees' aggregate outstanding investment calculated from the date that the initial Allocated Amount is contributed to the investment until the date on which such initial Allocated Amount is returned to the Trustees;

(iii)    Third, one hundred percent (100%) to the Investment Manager until the Investment Manager has received, with respect to the

-45-

Trustees, an amount equal to twenty percent (20%) of the sum of all distributions made to the Trustees pursuant to subparagraph (ii) above; and

(iv)    Fourth, eighty percent (80%) to the Trustees and twenty percent (20%) to the Investment Manger.

The aggregate amount, if any, distributable to the Investment Manger in accordance with subparagraphs (iii) and (iv) above, shall be referred to as a "Carried Interest."

3.    Adjustment of Management Fee and Carried Interest

If Investment Account assets are invested in the White Oak Pinnacle Fund, L.P., the White Oak Pinnacle Feeder Fund I, L.P. and/or any other collective investment fund of the Investment Manager or any parent company or affiliate, the Management Fee and Carried Interest set forth above shall be adjusted in accordance with the terms of paragraph 9 of this Agreement.

# EXHIBIT B

**WHITE OAK PINNACLE FEEDER FUND
I, L.P.**

LIMITED PARTNERSHIP AGREEMENT

December 31, 2013

## TABLE OF CONTENTS

ARTICLE I        DEFINITIONS............................................................................. 1

    SECTION  1.1.      Definitions................................................................... 1

ARTICLE II        GENERAL PROVISIONS ...................................................... 1

    SECTION  2.1.      Partnership Name........................................................ 1
    SECTION  2.2.      Registered Office; Business Address............................ 1
    SECTION  2.3.      Purposes of the Partnership; Master-Feeder Structure.................. 1
    SECTION  2.4.      Liability of the Partners ............................................. 2
    SECTION  2.5.      Admission of Limited Partner...................................... 2

ARTICLE III        MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP ............. 3

    SECTION  3.1.      Management Generally ............................................... 3
    SECTION  3.2.      Authority of the General Partner................................. 3
    SECTION  3.3.      Management Fee.......................................................... 5
    SECTION  3.4.      Transactions with Affiliates....................................... 6
    SECTION  3.5.      Other Activities; Devotion of Time ........................... 6
    SECTION  3.6.      Books and Records; Accounting Method; Fiscal Year................ 7
    SECTION  3.7.      Partnership Information and Tax Returns..................... 7
    SECTION  3.8.      Confidentiality .......................................................... 7
    SECTION  3.9.      Reserved..................................................................... 8
    SECTION  3.10.      Temporary Investment of Funds................................ 8
    SECTION  3.11.      Certain ERISA Matters .............................................. 8
    SECTION  3.12.      Valuation.................................................................... 9
    SECTION  3.13.      Reliance by Third Parties ........................................... 9
    SECTION  3.14.      Borrowings................................................................. 9
    SECTION  3.15.      Conflicts of Interest................................................. 10
    SECTION  3.16.      Reserved................................................................... 11
    SECTION  3.17.      Avoidance of UBTI................................................... 11
    SECTION  3.18.      Investment Committee .............................................. 11

ARTICLE IV        INVESTMENTS AND INVESTMENT OPPORTUNITIES....................... 12

    SECTION  4.1.      Investments Generally .............................................. 12
    SECTION  4.2.      Investment Restrictions............................................ 12
    SECTION  4.3.      Co-Investment Opportunities.................................... 12

ARTICLE V        EXPENSES...................................................................... 12

    SECTION  5.1.      Definition and Payment of Manager Expenses........... 12
    SECTION  5.2.      Partnership Expenses ............................................... 12

ARTICLE VI        CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS.......... 14

    SECTION  6.1.      Capital Commitments ............................................... 14
    SECTION  6.2.      Capital Call Procedure ............................................. 15
    SECTION  6.3.      Default by Limited Partner ....................................... 15
    SECTION  6.4.      Remedies Not Limited ............................................. 17
    SECTION  6.5.      Reserved................................................................... 18
    SECTION  6.6.      Excluded Limited Partners........................................ 18

ARTICLE VII        DISTRIBUTIONS; CAPITAL ACCOUNTS ................................................. 19

    SECTION  7.1.        Distributions ................................................................. 19
    SECTION  7.2.        Capital Accounts; Adjustments to Capital Accounts ................... 22
    SECTION  7.3.        Tax Allocations ............................................................. 23
    SECTION  7.4.        Tax Credits ................................................................... 24
    SECTION  7.5.        Loans and Withdrawal of Contribution ........................... 24
    SECTION  7.6.        No Obligation to Restore ............................................... 24
    SECTION  7.7.        Other Tax Matters ........................................................ 24

ARTICLE VIII       REPORTS TO LIMITED PARTNERS ................................................. 24

    SECTION  8.1.        Independent Public Accountants ..................................... 24
    SECTION  8.2.        Reports ........................................................................ 24

ARTICLE IX         EXCULPATION AND INDEMNIFICATION ......................................... 25

    SECTION  9.1.        Exculpation ................................................................. 25
    SECTION  9.2.        Indemnification ............................................................ 25
    SECTION  9.3.        Exclusive Jurisdiction ................................................... 26

ARTICLE X          TERM AND DISSOLUTION OF THE PARTNERSHIP ............................ 26

    SECTION  10.1.       Term ............................................................................ 26
    SECTION  10.2.       Dissolution .................................................................. 26
    SECTION  10.3.       Liquidation of the Partnership ....................................... 27
    SECTION  10.4.       Distribution Upon Dissolution of the Partnership ..................... 27
    SECTION  10.5.       No Voluntary Withdrawal by Limited Partner ........................... 28
    SECTION  10.6.       Required Withdrawal of Limited Partner ................................. 28
    SECTION  10.7.       Payments Upon Withdrawal ........................................... 28

ARTICLE XI         TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST ...... 29

    SECTION  11.1.       Transferability of the General Partner's Interest ........................ 29
    SECTION  11.2.       Withdrawal of the General Partner .............................. 29
    SECTION  11.3.       Removal of the General Partner .................................. 29

ARTICLE XII        TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST ............. 30

    SECTION  12.1.       Conditions for Transfer ................................................ 30
    SECTION  12.2.       Substitute Limited Partner; Recognition of Transfer ................... 31

ARTICLE XIII       MISCELLANEOUS ................................................................. 31

    SECTION  13.1.       Amendments ............................................................... 31
    SECTION  13.2.       Reserved ...................................................................... 32
    SECTION  13.3.       Notices ........................................................................ 32
    SECTION  13.4.       Successors; Counterparts .............................................. 33
    SECTION  13.5.       Governing Law; Severability ......................................... 33
    SECTION  13.6.       Filings ......................................................................... 33
    SECTION  13.7.       Power of Attorney ........................................................ 33
    SECTION  13.8.       No Right to Partition .................................................... 34
    SECTION  13.9.       Goodwill ..................................................................... 34

SECTION  13.10.    Headings ...................................................................................... 34
SECTION  13.11.    Entire Agreement ....................................................................... 34
SECTION  13.12.    Submission to Jurisdiction ......................................................... 34

# LIMITED PARTNERSHIP AGREEMENT

## OF

## WHITE OAK PINNACLE FEEDER FUND I, L.P.

LIMITED PARTNERSHIP AGREEMENT dated as of December ___, 2013, of WHITE OAK PINNACLE FEEDER FUND I, L.P., by and among WHITE OAK PARTNERS, LLC, a limited liability company formed under the laws of Delaware, as General Partner, and Pension Board of the New York State Nurses Association, as the sole Limited Partner.

WHEREAS, the parties hereto desire to form a limited partnership in accordance with the Partnership Act;

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.1.     Definitions.     Capitalized terms used herein without definition have the meanings assigned to such terms in Appendix A attached hereto.  Unless otherwise expressly stated herein, references to Sections are references to Sections in this Agreement.  Unless otherwise indicated or required by the context, defined terms in the singular include the plural and vice versa.

## ARTICLE II
## GENERAL PROVISIONS

SECTION 2.1.     Partnership Name.  The name of the Partnership is "White Oak Pinnacle Feeder Fund I, L.P.".

SECTION 2.2.     Registered Office; Business Address.

(a)     Registered Office of the Partnership.  The Partnership shall maintain a registered office at National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, DE 19904.  National Registered Agents, Inc. will act as the registered agent of the Partnership.  The General Partner may change the registered office and registered agent in its sole discretion.

(b)     Business Address of the Partnership and the General Partner.  The business address of the Partnership and the General Partner shall be 88 Kearny Street, 4th Floor, San Francisco, CA 94108 or such other place as the General Partner shall determine from time to time in its sole discretion.  The General Partner shall promptly notify the Limited Partner of any change in the business address of the Partnership or of the General Partner.

SECTION 2.3.     Purposes of the Partnership; Master-Feeder Structure.

(a)     The purposes of the Partnership are (a) to acquire, hold and dispose of investments in Partnership Investments, (b) pending utilization or disbursement of funds, to make Temporary Investments, and (c) to engage in such activities as the General Partner deems necessary or desirable for the accomplishment of the above purposes or the furtherance of any of the powers herein set forth and to do every other act and thing incident thereto or connected therewith.   The Partnership shall have the power to do any and all acts necessary, appropriate, desirable, incidental or convenient to or for the furtherance of the purposes described in this Section 2.3, including, without limitation, any and all of the powers that may be exercised on behalf of the Partnership by the General Partner pursuant to this Agreement.

(b)     The Partnership will invest all of its assets through White Oak Pinnacle Fund, L.P. (the "Master Fund").   All Partnership Investments will be made at the Master Fund level.   The General Partner and Manager act as the "general partner" and "manager" of the Master Fund, respectively.

SECTION  2.4.     <u>Liability of the Partners</u>.

(a)     <u>Liability of the General Partner</u>.   Except as otherwise provided in the Partnership Act or this Agreement, the General Partner shall have unlimited liability with respect to the debts, obligations and other liabilities of the Partnership.

(b)     <u>Liability of the Limited Partner</u>.   Except as specifically set forth in this Agreement or as provided in the Partnership Act, (i) the Limited Partner shall not be obligated to make any contribution to the Partnership of any amount in excess of its Capital Commitment or other payments provided for herein, and (ii) the Limited Partner shall not have any personal liability whatsoever in its capacity as the Limited Partner for the repayment of debts, liabilities, losses or other obligations of the Partnership.

SECTION  2.5.     <u>Admission of Limited Partner</u>.   As of the date of this Agreement, the Limited Partner hereby makes a Capital Commitment to the Partnership in the amount of $80 million.   In addition, as of the date of this Agreement, the Limited Partner shall make a Capital Contribution in cash directly to the Master Fund in the amount of $[___] million. The General Partner, in its sole discretion, may permit the Limited Partner to increase its Capital Commitment to the Partnership at any time after the date of this Agreement.


# ARTICLE III
# MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP

SECTION  3.1.     <u>Management Generally</u>.   The management, administration and control of, and the determination of policies with respect to, the Partnership and its affairs shall be vested exclusively in the General Partner.   The General Partner has delegated the portfolio management and administrative services of the Partnership to the Manager.   The Limited Partner shall have no part in the management, administration or control of the Partnership and shall have no authority or right to act for or on behalf of the Partnership in connection with any matter.

SECTION 3.2.     Authority of the General Partner.   Subject to the other provisions of this Agreement, the General Partner shall have the power and authority, in its own name or on behalf of and in the name of the Partnership, to carry out any and all of the objects and purposes of the Partnership, and to perform all acts which it may, in its sole discretion, deem necessary or desirable in furtherance thereof, including, without limitation, the power and authority to:

(a)     identify investment opportunities for the Partnership;

(b)     invest or reinvest in, or acquire, hold, retain, manage, monitor, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of any assets held by or on behalf of the Partnership, including Partnership Investments;

(c)     employ, on behalf of and at the expense of the Partnership, any and all financial advisers, brokers, attorneys, accountants, consultants, appraisers, servicers, custodians of the assets of the Partnership or other agents, including, but not limited to, the Administrator, on such terms and for such compensation as the General Partner may determine, whether or not such Person may be an Affiliate of the General Partner or may also be otherwise employed by the General Partner or by any Affiliate of the General Partner (but subject to Section 3.4) and terminate such employment;

(d)     make all elections, investigations, evaluations and other decisions, binding the Partnership thereby, that may, in the sole discretion of the General Partner, be necessary or desirable for the investment or reinvestment in, or acquisition, holding, retention, management, monitoring, ownership, capitalization, merging, restructuring, sale, transfer, conveyance, assignment, exchange, pledge or other disposition of any assets held by or on behalf of the Partnership, including Partnership Investments;

(e)     incur expenses and other obligations incident to the operation and management of the Partnership, and, to the extent that funds of the Partnership are available for such purpose, make payments on behalf of the Partnership in its own name or in the name of the Partnership;

(f)     lend money to the Partnership or cause the Partnership to borrow money, on a secured or unsecured basis, pursuant to Section 3.14;

(g)     bring, defend, settle and dispose of any Proceeding;

(h)     establish reserves for contingencies and for any other Partnership purpose;

(i)     distribute funds to the Limited Partner by way of cash or otherwise pursuant to this Agreement;

(j)     prepare or cause to be prepared reports, statements and other information for distribution to the Limited Partner;

(k)     prepare and file all necessary returns and statements, pay all taxes, assessments and other impositions applicable to the assets of the Partnership, and withhold amounts with respect thereto from funds otherwise distributable to the Limited Partner;

    (l) maintain records and accounts of all operations and expenditures of the Partnership;

    (m) determine the accounting methods and conventions to be used in the preparation of any accounting or financial records of the Partnership as provided in Section 3.6;

    (n) convene a meeting with the Limited Partner;

    (o) open, maintain and close accounts with banks, brokerage firms, custodians or other financial institutions and deposit, maintain and withdraw funds in the name of the Partnership and draw checks or other orders for the payment of moneys;

    (p) enter into, execute, deliver and perform any contract, agreement or other instrument as the General Partner shall determine, in its sole discretion, to be necessary or desirable to further the purposes of the Partnership, including granting or refraining from granting any waivers, consents and approvals with respect to any of the foregoing and any matters incident thereto;

    (q) appoint the Manager (which is an affiliate of the General Partner) to provide portfolio management, administrative, accounting and other services to the Partnership and to source, select, acquire, manage and dispose of the Partnership Investments;

    (r) value the assets and liabilities of the Partnership, in accordance with Section 3.12;

    (s) acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership, a Partnership Investment and any Covered Person or for any purpose convenient or beneficial to the Partnership;

    (t) require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the Person or entity contracting with the Partnership is to look solely to the Partnership and its assets for satisfaction of any debts owed or claims asserted;

    (u) create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets, in accordance with Section 10.4(b);

    (v) effect a dissolution of the Partnership as provided herein; and

    (w) act for and on behalf of the Partnership in all matters incidental to the foregoing.

    Notwithstanding the foregoing provisions of this Section 3.2, the General Partner shall have the power to do all things and discharge all duties or requirements required of or imposed on a general partner by applicable law (whether or not on behalf of the Partnership).  In addition, the General Partner shall have the power to perform all acts that it may, in its sole discretion, deem necessary or desirable in connection with the performance of its duties

hereunder.  The General Partner may, in its sole discretion, delegate certain administrative duties hereunder to such third Persons as the General Partner may designate from time to time.

SECTION  3.3.       Management Fee.

(a)       In consideration for the management services to be rendered pursuant to this Agreement, the Manager shall receive a semi-annual management fee, payable in advance as of January 1 and July 1, each year, and calculated at the specified annualized rate set forth in clause (b) below (the "Management Fee").  The Management Fee shall be prorated for any semi-annual period that is less than a full six (6) months.  The Manager shall receive the Management Fee at the Partnership level.  No Management Fee will be paid to the Manager at the Master Fund level.

(b)       During the Investment Period, the Manager shall receive at the beginning of each semi-annual period a Management Fee equal to an annualized rate of one hundred and thirty five basis points (1.35%) of the Limited Partner's Capital Commitment.  Following the Investment Period, the semi-annual Management Fee will be equal to one hundred and thirty five basis points (1.35%) per annum of the Limited Partner's Capital Contributions invested in Partnership Investments that have not been the subject of a disposition or write-down by the Partnership (it being understood that a disposition shall include the writing down of a Partnership Investment to zero for tax purposes, effective as of the effective date of such write-down).

(c)       Any Transaction Fees earned by a member of the General Partner Group during any semi-annual period shall be retained by such member but one hundred percent (100%) of such Transaction Fees shall be deemed to be applied to reduce: (i) the amount of the Management Fees in such semi-annual period or future semi-annual periods or (ii) any other Partnership Expenses.

SECTION  3.4.       Transactions with Affiliates.   In addition to transactions specifically contemplated by this Agreement, the General Partner, when acting in its capacity as a general partner of the Partnership, is, to the extent legally permissible, hereby authorized to purchase property or obtain services from, sell property to or provide services to, borrow funds or otherwise deal with the General Partner, as well as counterparties that are Affiliates of the General Partner (including any investment fund and managed account managed or advised by the General Partner or its Affiliates), provided that, in connection with any such dealing, such dealing shall (a) be on terms no less favorable to the Partnership than would be obtained on an arm's length basis and (b) have received the prior written approval of the Limited Partner.  The Limited Partner acknowledges and agrees that the purchase or sale of property, the performance of such services, the borrowing of such funds, other dealings, or the receipt of such compensation may give rise to conflicts of interest between the Partnership and the Limited Partner, on the one hand, and the General Partner or such Affiliate, on the other hand. Notwithstanding the foregoing, the General Partner shall not cause the Partnership to enter into any transactions with itself or its Affiliates, unless such transactions are exempt from the prohibited transaction restrictions under ERISA and the Code.

SECTION  3.5.       Other Activities; Devotion of Time.   Members of the General Partner Group shall devote so much of their respective business time to the affairs of the Partnership as they consider, in their sole discretion, to be appropriate to enable the Partnership

to carry out its business as contemplated herein.  Except as otherwise set forth in Section 3.4, this Agreement does not in any way restrict the ability of a member of the General Partner Group to engage independently or with others, for its or their own accounts and for the accounts of others, in other business ventures and activities of every nature and description, whether such ventures are competitive with the business of the Partnership or otherwise.  The Partnership and the Limited Partner shall not have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income or profits derived therefrom.

SECTION  3.6.    Books and Records; Accounting Method; Fiscal Year.

(a)    Books and Records.  The General Partner shall keep or cause to be kept at the address of the General Partner set forth in Section 2.2(b) full and accurate books and records of the Partnership.  Subject to Section 3.8(b), such books and records shall be available, upon ten Business Days notice to the General Partner, for inspection by the Limited Partner or its duly authorized agents or representatives at the offices of the General Partner (or such other location designated by the General Partner, in its sole discretion) during normal business hours.

(b)    Accounting Methods.  The General Partner shall determine, in its sole discretion, the accounting methods and conventions to be used in the preparation of any accounting or financial records or reports of the Partnership, which methods and conventions shall be in accordance with U.S. generally accepted accounting principles (except as otherwise specified herein).

(c)    Fiscal Year.  Unless otherwise required by applicable law, the fiscal year of the Partnership shall end on December 31st.

SECTION  3.7.    Partnership Information and Tax Returns.  The General Partner shall cause to be prepared and timely filed all information and tax returns required to be filed by the Partnership, if any.  The General Partner may, in its sole discretion, make, or refrain from making, any income or other tax elections for the Partnership that it deems necessary or advisable, including an election pursuant to Section 754 of the Code (provided that the General Partner shall not elect for the Partnership to be treated as a corporation for federal income tax purposes).

SECTION  3.8.    Confidentiality.

(a)    Confidentiality Obligation of the Limited Partner.  The Limited Partner agrees to keep confidential and not to disclose to any Person (other than to directors, officers, partners, employees or the Limited Partner's plan sponsor, agents, legal counsel, independent auditors or consultants responsible for matters relating to the Partnership (each an "Authorized Representative")) all information and documents relating to the Partnership and its affairs, including, without limitation, any information (i) relating to any Partnership Investment, (ii) provided to the Limited Partner pursuant to Article VIII, and (iii) provided to the Limited Partner prior to or after its admission to the Partnership relating to the General Partner Group, provided that in each case the Limited Partner may make such disclosure (x) if the information being disclosed is otherwise generally available to the public, or (y) if such disclosure is, in the written opinion of legal counsel (satisfactory to the General Partner) for such Limited Partner or Authorized Representative, required by applicable law or regulation.  Prior to any disclosure to

any Authorized Representative of the Limited Partner of any information referred to in the first sentence of this Section 3.8(a), the Limited Partner shall advise such Authorized Representative of the obligations set forth in this Section 3.8(a) and obtain the agreement of such Authorized Representative to keep such information confidential and otherwise comply with this Section 3.8(a) as though such Authorized Representative were the Limited Partner.  Notwithstanding the terms of this Section 3.8(a) or any other express or implied agreement, arrangement or understanding to the contrary, each party to this Agreement (and their respective Authorized Representatives) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership, and all materials of any kind (including opinions or other tax analyses) that are provided to the party to the extent related to such tax treatment and tax structure.

The General Partner hereby acknowledges that the Limited Partner and its administrator have an obligation under Section 101(k) of ERISA (collectively with any regulations thereunder, "Section 101(k)") to provide certain information to certain interested parties and agrees that the Limited Partner shall not be subject to any otherwise applicable confidentiality provision in connection with its compliance with Section 101(k) requirements. The General Partner agrees that at the time any information regarding the Partnership is furnished to the Limited Partner, the General Partner shall indicate with specificity what (if any) information contained therein constitutes "proprietary information" within the meaning of Section 101(k) and the Limited Partner shall not disclose such "proprietary information" to interested persons.  The General Partner hereby expressly agrees to indemnify the Limited Partner and its administrator against any and all claims, liabilities, damages, court costs or reasonable expenses (including reasonable attorneys' fees) that the Limited Partner and/or its administrator incur or suffer as a result of the Limited Partner and/or its administrator omitting such information in connection with a request for information made under Section 101(k) of ERISA in the event such information is determined not to be "proprietary information" within the meaning of Section 101(k).

(b)      Right of General Partner to Keep Information Confidential.  The General Partner may, to the maximum extent permitted by applicable law, keep confidential from the Limited Partner any information (including, without limitation, information requested by the Limited Partner pursuant to Section 3.6 and information otherwise required to be delivered to the Limited Partner pursuant to Article VIII) with respect to any Partnership Investment or potential Partnership Investment (i) which the Partnership or the General Partner is required by law, agreement or otherwise to keep confidential, or (ii) the disclosure of which the General Partner reasonably believes may have an adverse effect on the ability of the Partnership to consummate any proposed Partnership Investment or any transaction directly or indirectly related to, or giving rise to, such Partnership Investment.

Without the Limited Partner's prior written consent, none of the Partnership, the General Partner, the Manager or any of their Affiliates shall (a) use the Limited Partner's name or derivations thereof in advertising, publicity, marketing materials, private placement memorandum or other offering materials or other similar publication or document and/or (b) infer that the Partnership has been endorsed by the Limited Partner.  Notwithstanding clause (a) above, the General Partner and its Affiliates may (i) disclose the Limited Partner's name and subscription amount if the General Partner first determines in good faith that such disclosure is in the best interests of the Partnership in connection with a Partnership Investment; and (ii) make

any other disclosure regarding the Limited Partner's investment in the Partnership required by law, legal process or stock exchange rule, in each case, without obtaining the prior written consent of the Limited Partner.

SECTION  3.9.        <u>Reserved</u>.

SECTION  3.10.        <u>Temporary Investment of Funds</u>.  The General Partner shall invest cash held by the Partnership in Temporary Investments, including all amounts being held by the Partnership for future investment in Partnership Investments, payment of Partnership Expenses or distribution to the Partners (including, without limitation, any amounts held by the Partnership pursuant to Section 7.1(e)).

SECTION  3.11.        <u>Certain ERISA Matters</u>.

(a)        The Partnership will hold "plan assets" for purposes of the Plan Asset Regulation.  As a result, the General Partner and the Manager both agree that they are fiduciaries for the Limited Partner with respect to the assets of the Partnership.

(b)        The General Partner shall use its best efforts to not engage in a "prohibited transaction" (as defined in ERISA and the Code) on behalf of the Partnership.

SECTION  3.12.        <u>Valuation</u>.  Whenever the Fair Value of Securities or property is required to be determined under this Agreement, such Fair Value shall be determined by Navigant Consulting Inc. or such other independent Person (such as an investment banking firm) selected by the Limited Partner.  The Fair Value of any Securities distributed by the Partnership shall take into account any related fees and expenses incurred in connection with the disposition of such Securities.

SECTION  3.13.        <u>Reliance by Third Parties</u>.   Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth, and shall not be required to inquire as to the General Partner's authority to bind the Partnership.

SECTION  3.14.        <u>Borrowings</u>.  The Partnership may borrow funds under a credit facility on market-based terms in order to fund the acquisition of Partnership Investments or pay Partnership Expenses pending the Partnership's receipt of required Capital Contributions from the Limited Partner or other receipts of cash.

By executing this Agreement, the Limited Partner expressly agrees that the General Partner may pledge the assets of the Partnership and its rights hereunder as security for any borrowing and that its Capital Commitment obligation, the right to deliver Capital Call Notices, the right to receive all amounts in respect of Capital Contributions and any other assets of the Partnership, may be pledged to secure any borrowings or indebtedness incurred by the Partnership.  In connection with any borrowing or indebtedness incurred by the Partnership, the Limited Partner agrees that it shall, upon request, confirm its Remaining Capital Commitment, and execute such other documents as may reasonably be requested by any lender; provided, that the Limited Partner shall not be required to (i) execute any document that would subject the Limited Partner to any obligation beyond the amount of the Limited Partner's unfunded Capital Commitment or (ii) execute or obtain any legal opinions prepared by legal counsel.

To the extent the Limited Partner is not in default of any obligation to make Capital Contributions or other payments, the General Partner shall give the Limited Partner the opportunity, upon at least five (5) Business Days' notice, to make a Capital Contribution to the Partnership in an amount equal to any such borrowing, and such borrowing (and the interest expense relating thereto) shall not be allocated to the Limited Partner.

SECTION  3.15.    Conflicts of Interest.

(a)    While the General Partner intends to avoid situations involving conflicts of interest, the Limited Partner acknowledges that there may be situations in which the interests of the Partnership conflict with the interests of the General Partner Group, including the conflicts of interest identified in the Master Fund's Offering Memorandum.  The Limited Partner agrees that the activities of the members of the General Partner Group not prohibited by this Agreement may be engaged in by the General Partner Group, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty owed by any member of the General Partner Group to the Partnership or to the Limited Partner, except to the extent such party engaged in conduct that constitutes (i) fraud, (ii) willful and material breach of the duties set forth in this Agreement or under the Act, (iii) gross negligence or (iv) willful and material breach of any applicable fiduciary or other duty under federal or other applicable law; provided, however, that the Limited Partner does not agree to any conflict of interest that would be a prohibited transaction under ERISA or the Code.

(b)    The Partnership and the General Partner Group will seek to resolve any conflicts with respect to investment opportunities involving the Partnership in a manner which the General Partner deems equitable to the extent possible under prevailing facts and circumstances; provided that, the General Partner shall have the right, subject to Section 4.3, to allocate any investment opportunity which comes to its attention wholly or primarily to any entity or entities other than the Partnership.

(c)    On any issue involving actual conflicts of interest not provided for elsewhere in this Agreement, the General Partner will be guided by its good faith judgment as to the best interests of the Partnership, and shall take such actions as are determined to be necessary or appropriate to ameliorate the conflicts of interest.

SECTION  3.16.    Reserved.

SECTION  3.17.    Avoidance of UBTI.    The General Partner shall use reasonable efforts to structure Partnership Investments and otherwise conduct the business of the Partnership in a manner that is not likely to cause the Limited Partner to have any "unrelated business taxable income" ("UBTI"), including, without limitation, any "unrelated debt-financed income" (as those terms are defined in Sections 512 and 514 of the Code) to the extent consistent with its goal of maximizing the pre-tax income of all investors in the Master Fund, provided that reasonably equivalent investment structures are available to the Partnership which will not produce UBTI.  Notwithstanding the foregoing, the General Partner shall not be required to make any effort to avoid the recognition of UBTI by the Limited Partner to the extent such recognition would be attributable (a) to borrowings pursuant to Section 3.14, or (b) to the borrowing of money on a short-term basis by the Partnership which is to be repaid through Capital

Contributions.  The General Partner and its Affiliates shall not be liable to the Limited Partner in connection with any UBTI reported by the Limited Partner.

SECTION 3.18.    <u>Investment Committee</u>.  The Manager has established an investment committee ("Investment Committee") to (a) approve potential Partnership Investments, (b) assess and manage the risks for such Partnership Investments and (c) continually monitor such Partnership Investments.  All decisions regarding the acquisition and disposition of Partnership Investments will be made by the unanimous decision of the Investment Committee.  The members of the Investment Committee are the Principals and such other individuals as are selected by the Principals from time-to-time.


# ARTICLE IV
# INVESTMENTS AND INVESTMENT OPPORTUNITIES

SECTION 4.1.    <u>Investments Generally</u>.  The assets of the Partnership shall, to the extent not required for the payment of Partnership Expenses or otherwise necessary for the conduct of the Partnership's business, and subject to Section 3.10, be invested through the Master Fund in such Partnership Investments as the General Partner shall determine in its sole discretion.

SECTION 4.2.    <u>Investment Restrictions</u>.  The Master Fund generally will not invest more than (i) twenty-five percent (25%) of its aggregate Capital Commitments in a single market sector; or (ii) eight percent (8%) of its aggregate Capital Commitments in the Securities of any single Portfolio Company, each measured at cost at the time of investment; provided, however, that the General Partner has the discretion to exceed these percentage limitations if it makes a good faith determination that such additional investment is in the best interests of the Master Fund and the Master Fund Advisory Committee approves of such additional investment.

SECTION 4.3.    <u>Co-Investment Opportunities</u>.  The General Partner may, in its sole discretion, provide the Limited Partner, strategic investors, lenders and others with an opportunity to co-invest with the Master Fund in Partnership Investments, provided that the terms of any such co-investment are no more favorable than the investment terms offered to the Master Fund.  Co-investment opportunities may be effected through limited partnerships or other entities formed to effect such co-investments ("Co-Investment Funds").  The General Partner will allocate available co-investment opportunities among the Master Fund, any Co-Investment Funds and any other investment fund or managed account managed by the General Partner Group in such manner as it determines in its sole discretion, and, in the case of the Partnership, in accordance with the requirements of ERISA.


# ARTICLE V
# EXPENSES

SECTION 5.1.    <u>Definition and Payment of Manager Expenses</u>.  As between the General Partner, the Manager and the Partnership, the Manager and the General Partner shall be solely responsible for and shall pay their own respective Manager Expenses.  As used herein,

the term "Manager Expenses" means the organizational and operating expenses of the General Partner and the Manager, including salaries and employee benefit expenses of employees, office rent, supplies and telecommunication expenses.

SECTION  5.2.        Partnership Expenses.

(a)        Payment of Partnership Expenses.  The Partnership shall be responsible for and shall pay all Partnership Expenses, as well as its pro rata share of Master Fund Expenses.

(b)        Definition of Partnership Expenses and Master Fund Expenses.  As used herein, the term "Partnership Expenses" and "Master Fund Expenses" means all expenses or obligations of the Partnership or Master Fund, respectively, or otherwise incurred by the General Partner or Manager on behalf of the Partnership or Master Fund in connection with this Agreement and the Master Fund LPA, respectively, other than any expense that would be considered a Manager Expense.

(c)        Specified Partnership Expenses and Master Fund Expenses.  The parties agree that all of the following constitute Partnership Expenses and Master Fund Expenses, and comprise some, but not necessarily all, of the types of expenses that may constitute Partnership Expenses and Master Fund Expenses, depending upon the context in which such expenses are incurred:

(i)        all out-of-pocket expenses incurred by the Partnership and Master Fund or on their behalf that are directly related to the organization of the Partnership and the Master Fund, including, without limitation, legal, tax, accounting, filing and printing fees relating to such organization, travel expenses, the production of marketing materials and the audits of past internal rates of returns relating to such marketing materials (collectively, the "Organizational Expenses");

(ii)        expenses related to the sourcing, due diligence, valuation and potential acquisition of Partnership Investments, regardless of whether such acquisition is actually consummated, as well as the holding, monitoring and sale of Partnership Investments;

(iii)        legal, tax, auditing, consulting, accounting, valuation services, loan servicing, and other professional expenses;

(iv)        costs and expenses for the preparation of the Partnership's and Master Fund's financial statements, tax returns and IRS Schedules K-1;

(v)        litigation expenses of the Partnership and Master Fund;

(vi)        out-of-pocket expenses incurred in connection with the collection of amounts due to the Partnership or Master Fund from any Person;

(vii)        insurance premiums related to protection of Covered Persons against any liability arising out of, related to or incurred in connection with this Agreement;

(viii)   expenses incurred in connection with any Proceeding involving the Partnership and/or Master Fund (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith; provided, however, that any such expenses which, if incurred by any Person, would not be indemnifiable under Article IX, shall not constitute Partnership Expenses;

(ix)   fees and expenses of the Administrator at the Partnership and Master Fund level;

(x)   any indemnification obligation and any other indemnity contribution or reimbursement obligations of the Partnership and/or Master Fund with respect to any Person, whether payable in connection with a Proceeding involving the Partnership, the Master Fund or otherwise, in each case, to the extent available under applicable law and the provisions of Section 9.2;

(xi)   Management Fees;

(xii)   any Borrowing Costs relating to any borrowings incurred by the Partnership; and

(xiii)   all expenses incurred in connection with the dissolution and liquidation of the Partnership and/or Master Fund.

## ARTICLE VI
## CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS

SECTION  6.1.        Capital Commitments.

(a)   Agreement to Contribute Capital.  Subject to Sections 6.1(b) and (d), 6.2, 7.1(b) and 9.2, the Limited Partner hereby agrees to make Capital Contributions, in an aggregate amount equal at any time to its Remaining Capital Commitment, during the Investment Period. The Partnership may make commitments to Partnership Investments during the Investment Period.  Following the Investment Period, the Limited Partner shall cease to be obligated to contribute capital in respect of its Remaining Capital Commitment; provided, however, that the Limited Partner shall remain obligated to make a Capital Contribution in respect of its Remaining Capital Commitments to (i) fund Partnership Expenses, Master Fund Expenses and liabilities (including, without limitation, the Management Fee and any Partnership borrowings), (ii) permit the Partnership to fulfill investment commitments made prior to the expiration of the Investment Period, including, without limitation, for purposes of making Partnership Investments made pursuant to rights acquired prior to the expiration of the Investment Period, and (iii) fund Follow-On Investments.  Notwithstanding anything to the contrary herein, the Limited Partner will participate in any Follow-On Investment in the same proportion that it participates in the original Partnership Investment to which such Follow-On Investment relates.  Further, in the event that after the expiration of the Investment Period there exists outstanding indebtedness of the Partnership secured by the Capital Commitment of the Limited Partner, the Limited Partner's obligation to so contribute capital shall continue, to the extent of its pro rata portion of such

indebtedness, calculated as the Master Fund level, until such time as such indebtedness is paid in full.

(b)    Release of Commitments, etc.  Notwithstanding the provisions of Section 6.1(a), the General Partner may, in its sole discretion, cancel some or all of the Remaining Capital Commitments of the Limited Partner at any time if the General Partner determines that changes in any applicable law or regulation make it necessary for the Partnership to do so.

(c)    Capital Commitment of the General Partner Group.  Certain principals of the Manager have invested a significant portion of their liquid net worth into other investment funds and managed accounts advised by the Manager and its Affiliates that pursue a substantially similar investment strategy to the Partnership and, at times, will invest alongside the Master Fund.

(d)    Key Person Event.  If at any time during the Investment Period (i) at least two (2) of the Investment Committee members die, become legally incompetent or are disabled (i.e., unable by reason of disease, illness or injury to perform his or her duties with respect to the Partnership for 90 consecutive days, or otherwise cease to be active in the affairs of the Partnership for 90 consecutive days) or (ii) the General Partner Transfers all or a portion of its GP Interest to any Person not affiliated with the General Partner or its Affiliates (each, a "Key Person Event"), then the General Partner will provide the Limited Partner with written notice of such Key Person Event within thirty (30) days following the occurrence thereof.  Thereafter, the Investment Period will terminate if the Limited Partner elects in writing to terminate the Investment Period; provided that any such termination shall not prevent the Partnership from: (i) completing any proposed Partnership Investment with respect to which it has entered into a legally binding agreement to invest in prior to such election by the Limited Partner; (ii) paying any Partnership Expenses relating to existing or committed Partnership Investments, or (iii) satisfying any of its obligations in respect of any borrowings or other extensions of credit which are secured, in whole or in part, by the Limited Partner's Capital Commitment.

SECTION  6.2.    Capital Call Procedure.

(a)    Generally.  The Limited Partner shall make Capital Contributions to the Partnership and/or Master Fund as needed with respect to the Partnership Investments, to pay Partnership Expenses and Master Fund Expenses or to maintain a reserve in such amounts, to such account and at such times (including at a Closing) as the General Partner shall specify in notices ("Capital Call Notices") delivered from time to time to the Limited Partner.  All Capital Contributions shall be paid to the Partnership and/or Master Fund by wire transfer in immediately available funds to the account specified in the Capital Call Notice by 11:00 A.M. (New York City time) on the date specified in the applicable Capital Call Notice.  Capital Contributions may include amounts that the General Partner determines, in its sole discretion, are necessary or desirable to establish reserves in respect of potential Partnership Investments, Partnership Expenses or Master Fund Expenses.

(b)    Capital Call Notices.  Each Capital Call Notice shall specify:

(i)    the Capital Call Amount;

(ii)     the required Capital Contribution to be made by the Limited Partner;

(iii)    the date (the "Capital Call Date") on which such Capital Contribution is due; and

(iv)    the account to which such Capital Contribution should be paid.

The General Partner shall deliver each Capital Call Notice at least ten (10) Business Days before the Capital Call Date.

SECTION  6.3.        Default by Limited Partner.

(a)     In General.  The Limited Partner agrees that (i) payment of its required Capital Contributions and amounts required pursuant to Sections 6.2 and 9.2 when due is of the essence, and is to be made absolutely and unconditionally in each case without any set-off, withholding, counterclaim, defense or reduction, (ii) any Default by the Limited Partner would cause injury to the Partnership, the Master Fund and to the other investors in the Master Fund and (iii) that the amount of damages caused by any such injury would be extremely difficult to calculate.  Accordingly, the Limited Partner agrees that upon any Event of Default by the Limited Partner, the Limited Partner may, in the General Partner's sole discretion, (I) not share in any gain realized by the Partnership or Master Fund on any disposition of a Partnership Investment occurring after the date of Default (regardless of when the Partnership Investment was made), (II) continue to share in any loss realized by the Partnership or Master Fund on any disposition of any Partnership Investment in which the Limited Partner participated, and/or (III) have the entire balance in its Capital Account forfeited (the amount of the reduction to be distributed pro rata to all other investors in the Master Fund).

Except as expressly provided in the Partnership Agreement, the obligations of the Limited Partner to the Partnership, or under the Partnership Agreement, shall continue regardless of the remedies pursued by the Partnership.

Upon the occurrence of any Default, the General Partner shall promptly notify the Limited Partner of its defaulting status.

(b)     Action by General Partner.  Upon the occurrence of an Event of Default, the General Partner may take such actions as it determines, in its sole discretion, are appropriate with respect to the defaulted amount, including, but not limited to:

(i)     increasing its own Capital Contribution;

(ii)     causing the sale, transfer or other disposition of all of the LP Interest of the Limited Partner or causing the Limited Partner to sell, transfer or otherwise dispose of all of its LP Interest, after a twenty (20) day period during which the General Partner will solicit bids for the purchase of such LP Interest, on such terms as are determined by the General Partner and the proposed transferee;

(iii)     causing the Partnership to borrow money from third parties, the General Partner or any of its Affiliates in order to fund the Limited Partner's Capital Call

obligation.  The Borrowing Costs with respect to any borrowing pursuant to this Section 6.3(b)(iii) shall be charged to the Capital Account of the Limited Partner.  Any such borrowing will constitute a separate obligation of the Limited Partner and not the Partnership and will be secured by (A) the Capital Commitments of the Limited Partner, (B) the Limited Partner's LP Interest, and (C) a personal guarantee of the Limited Partner in an amount not to exceed one hundred percent (100%) of the amount of the borrowing attributable to the Limited Partner; or

(iv)    immediately institute legal procedures against the Limited Partner to collect all amounts owed by the Limited Partner to the Partnership or any other person, together with interest, at the maximum rate provided by law from the date of the Default plus all related collection expenses, including reasonable attorney's fees.

(c)    Defaulting Partner's Remaining Capital Commitment.  In its sole discretion, the General Partner may take any or all of the following actions in respect of the Remaining Capital Commitment of the Limited Partner if it is in Default:

(i)    cause the Limited Partner to forfeit all or a portion of its interest in distributions to be derived from Partnership Investments that have been made by the Partnership as of the date of the Event of Default;

(ii)    require the Limited Partner to sell its LP Interest to a purchaser determined in the sole discretion of the General Partner.  In the sole discretion of the General Partner, such sale may be (A) at a price determined by the General Partner and (B) in exchange for a non-recourse, non-interest bearing note secured by the LP Interest sold and payable solely from distributions receivable with respect to the LP Interest sold; and

(iii)    reduce or cancel the Remaining Capital Commitment of the Limited Partner on such terms as the General Partner determines, in its sole discretion, (which may include leaving the Limited Partner obligated to pay the Management Fee and to make Capital Contributions with respect to Partnership Expenses and Master Fund Expenses up to the amount of the Limited Partner's Remaining Capital Commitment immediately prior to the time such Remaining Capital Commitment is so reduced or canceled).

SECTION  6.4.    Remedies Not Limited.  The rights and remedies referred to in Sections 6.2 and 6.3 shall be in addition to, and not in limitation of, any other rights available to the General Partner or the Partnership under this Agreement or at law or in equity.  In addition, unless the Remaining Capital Commitment of the Limited Partner is decreased to zero pursuant to Section 6.3(c)(iii), an Event of Default by such Limited Partner shall not relieve the Limited Partner of its obligation to make Capital Contributions subsequent to such Event of Default.  The Limited Partner will be obligated to pay all of the expenses incurred by the Partnership in pursuing any remedial actions, including reasonable attorney's fees.

SECTION  6.5.    Reserved.

SECTION  6.6.    Excluded Limited Partners.

(a)      Notwithstanding anything to the contrary contained herein, the General Partner shall cancel the obligation of the Limited Partner to make any Capital Contribution with respect to a particular Partnership Investment if either (i) it determines based upon advice of counsel (a copy of which advice shall be provided to the Limited Partner) that there is a reasonable likelihood that the Limited Partner's participation in the economics of such Partnership Investment would (a) impose a material tax, regulatory or other burden on the Partnership, the Master Fund or the other investors in the Master Fund (b) result in a violation of any applicable law, regulation or administrative practice to which the Limited Partner, the Partnership, the Master Fund or the particular Partnership Investment involved is subject, or (ii) the Limited Partner provides to the General Partner written advice from a reputable and experienced law firm satisfactory to the General Partner concluding that the Limited Partner's participation in the economics of such Partnership Investment (a) is illegal or otherwise prohibited by statute or regulation applicable to the Limited Partner or (b) would result in materially unfavorable tax, legal or regulatory consequences to the Limited Partner.  The Limited Partner shall not participate in the economics of any particular Partnership Investment with respect to which it does not make a Capital Contribution pursuant to this Section 6.6(a).

(b)      No Commitment Reduction for Limited Partner.  The Remaining Capital Commitment of the Limited Partner shall not be reduced as a result of its exclusion from participation in a Partnership Investment pursuant to this Section 6.6.

## ARTICLE VII
## DISTRIBUTIONS; CAPITAL ACCOUNTS

SECTION  7.1.      Distributions.

(a)      Distribution.  Subject to the following sentence, proceeds derived by the Partnership from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to the Limited Partner during the Investment Period or within eighteen (18) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of eighteen (18) months after the expiration of the Investment Period.  The Limited Partner may elect in its Subscription Agreement to receive quarterly distributions of interest, dividend and other similar payments from Partnership Investments.  Notwithstanding the foregoing, the amount of any such quarterly distribution will be reduced by any amounts that the General Partner considers prudent reserves to meet the future expenses and liabilities of the Partnership.  Any Distributable Cash derived by the Partnership from a particular Partnership Investment will be apportioned in the following manner and priority:

(i)      First, one hundred percent (100%) to the Limited Partner until the cumulative distributions to the Limited Partner equals the cumulative Capital Contributions of the Limited Partner to the Partnership;

(ii)      Second, one hundred percent (100%) to the Limited Partner until the cumulative distributions to the Limited Partner in excess of its cumulative Capital

Contributions provides the Limited Partner with a cumulative return of seven and one-half percent (7.5%) per annum, compounded annually, on the Limited Partner's aggregate outstanding Capital Contributions calculated from the date that such Capital Contributions are contributed to the Partnership until the date on which such Capital Contributions are returned to the Limited Partner;

(iii)      Third, one hundred percent (100%) to the General Partner until the General Partner has received, with respect to the Limited Partner, an amount equal to twenty percent (20%) of the sum of all distributions made to the Limited Partner pursuant to subparagraph (ii) above; and

(iv)      Fourth, eighty percent (80%) to the Limited Partner and twenty percent (20%) to the General Partner.

The aggregate amount, if any, distributable to the General Partner in accordance with sub-paragraphs (iii) and (iv) of this Section 7.1(a) above, shall be referred to as a "Carried Interest." The General Partner shall receive the Carried Interest at the Partnership level.  No Carried Interest will be allocated to the General Partner at the Master Fund level.

The General Partner will utilize its best efforts to provide at least five (5) Business Days notice to the Limited Partner prior to making any distributions, which notice shall include the sources of such distribution and the anticipated amount to be distributed (including detailed figures showing the portion of such distribution attributable to return of capital, realized losses, Partnership Expenses, Master Fund Expenses, Organizational Expenses, Management Fees, and profits and Carried Interest distributions).

(b)      Reinvestment of Distributed Capital.  Subject to the second sentence of Section 7.1(a), proceeds derived by the Partnership from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to the Limited Partner during the Investment Period or within eighteen (18) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of eighteen (18) months after the expiration of the Investment Period.  The General Partner will notify the Limited Partner quarterly of its Remaining Capital Commitment, including any distributions to the Limited Partner that are being added to its Remaining Capital Commitment.

(c)      Distributions in Kind.  The Partnership may distribute property in kind and in such amounts as the General Partner shall, at its sole discretion, determine.  Any distribution in kind shall be made to the Limited Partner in accordance with Section 10.4, and shall be treated for purposes thereof as if such distribution in kind was a cash distribution in an amount equal to the then Fair Value of the distributed assets.  The Capital Account of the Limited Partner shall be adjusted in accordance with Section 7.2, immediately prior to any such distribution in kind, to reflect the gain or loss that would be recognized had the assets to be distributed in kind been sold for their Fair Value to a third party on an arm's-length basis.  In connection with any distribution in kind of interests in securities or other property to the Limited Partner under this Agreement (including pursuant to this Article VII and Article X), the General Partner shall notify the Limited Partner that the Limited Partner may request that such securities or other property not be

distributed to it, but instead sold for cash on its behalf.  If the Limited Partner so requests, the General Partner shall use commercially reasonable efforts to sell such securities or other property and distribute the cash proceeds of such sale to the Limited Partner net of any relevant reasonable costs and expenses.

(d)      Withholding of Certain Amounts.   Notwithstanding anything else contained in the Agreement, the General Partner may, in its sole discretion, withhold from any distribution of cash or property by the Partnership to the Limited Partner, the following amounts:

(i)      any amounts then due from the Limited Partner to the Partnership or to the General Partner or to any other Person in connection with the Partnership; and

(ii)      any amounts required to pay or to reimburse the Partnership for the payment of any withholding or other taxes properly attributable to the Limited Partner (including, without limitation, withholding taxes and interest, penalties and expenses incurred in respect thereof).

Any withholding described in Section 7.1(d)(i) or (ii) above shall be treated for all purposes of this Agreement as (i) having been distributed to the Limited Partner, and (ii) having been contributed by the Limited Partner to the Partnership or paid by the Limited Partner to the General Partner or such other Person, as the case may be (and the payment of such amounts by the Partnership shall not constitute Partnership Expenses or Master Fund Expenses).   Any withholding described in Section 7.1(d)(ii) shall be made at the maximum applicable statutory tax rate under applicable law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower tax rate is applicable.  Any amounts withheld pursuant to this Section 7.1(d) shall be applied by the General Partner to discharge the obligation in respect of which such amounts were withheld.

(e)      Amounts Held in Reserve.   In addition to the rights set forth in Section 7.1(d), the General Partner shall have the right, in its sole discretion, to withhold amounts otherwise distributable by the Partnership to the Limited Partner in order to make such provision as the General Partner in its sole discretion deems necessary or advisable for Follow-On Investments and the payment of any and all expenses, debts, liabilities and obligations, contingent or otherwise, of the Partnership.

(f)      Income from Temporary Investments.   Income and gains realized by the Partnership with respect to Temporary Investments will generally be reserved for future expenses, investments in Partnership Investments and other reserves; however, the General Partner, in its sole discretion, may from time to time distribute such income and gains to the Limited Partner.

(g)      Amounts Subject to Recall; Reserves.   Both during and following the Term of the Partnership, the Partnership may require the Limited Partner to recontribute to the Partnership amounts up to the aggregate distributions previously made to it by the Partnership if necessary to satisfy the Partnership's obligations set forth in (i) the Partnership Act or (ii) the indemnification and contribution obligations under Article IX of this Agreement.   The Partnership may reserve Remaining Capital Commitments or retain funds in amounts appropriate in the sole judgment of the General Partner to provide for recalled capital, Partnership Expenses,

Master Fund Expenses or Follow-On Investments, as well as for contingencies. Any distributions recalled pursuant to this Section 7.1(g) shall not be treated as Capital Contributions but shall be treated as returns of distributions and reductions in Distributable Cash, in making subsequent distributions pursuant to Sections 7.1(c) and Section 10.4.

(h)     Tax Distributions.  Notwithstanding Section 7.1(a), the General Partner may, in its sole discretion, cause the Partnership, either prior to, together with or subsequent to any distribution pursuant to Section 7.1(a), to make distributions to the Partners regardless of their tax status, in amounts intended to enable the Partners (or any Person whose tax liability is determined by reference to the income of the Partners) to discharge their U.S. federal, state and local income tax liabilities arising from the allocations made (or to be made), or distributions made, pursuant to Article VII.  The amount distributable to the Partners pursuant to this Section 7.1(h) shall be an amount equal to the product of (i) the cumulative taxable income, if any, of the Partnership allocated to the Partners pursuant to Article VII from the inception of the Partnership (as determined under Code Section 703(a) but including separately stated items described in Code Section 702(a) and without taking into account any special status of the Partners), times (ii) the Assumed Tax Rate.  The amount distributable to the Partners pursuant to Section 7.1(a) shall be reduced by the amount distributed to the Partners pursuant to this Section 7.1(h), and the amount so distributed pursuant to this Section 7.1(h) shall be deemed to have been distributed to the extent of such reduction pursuant to Section 7.1(a) for purposes of making the calculations required by Section 7.1(a).

(i)     Partnership Act.  Notwithstanding anything in this Agreement to the contrary, the Partnership shall not make any distributions pursuant to this Agreement except to the extent permitted by the Partnership Act.

(j)     Uninvested Amounts.  In the event the General Partner draws down amounts from the Limited Partner pursuant to Capital Call Notices which are not expended by the Partnership as originally contemplated, the General Partner may, in its sole discretion, distribute such amounts to the Limited Partner.  Any amounts so distributed prior to the end of the Investment Period shall be treated as an unreturned Capital Contribution for purposes of Section 7.1(a) for the period of time from the day such amounts were drawn down to the day such amounts were so distributed.

(k)     Partial Disposition.  For all purposes of this Agreement, with respect to the sale or other disposition of a portion of a Partnership Investment, such portion shall be treated as having been a separate Partnership Investment from the remaining Partnership Investment retained by the Partnership, and the related income and Capital Contributions with respect to such portion of the Partnership Investment which was sold or otherwise disposed of shall be treated as having been divided between the portion which was sold or disposed of and the portion retained by the Partnership on a pro rata basis.

SECTION  7.2.     Capital Accounts; Adjustments to Capital Accounts.

(a)     Capital Account.  There shall be established for each Partner, on the books and records of the Partnership, an account (a "Capital Account"), which shall initially be zero and which shall be adjusted as set forth in this Section 7.2.

(b)     Adjustments to Capital Account.   The Capital Accounts of the Partners shall be adjusted as follows:

(i)     Cash Contributions.   The amount of cash contributed or deemed contributed to the Partnership by the Partners shall be credited to the Capital Account of such Partners;

(ii)     Distributions.   The amount of cash and the Fair Value of other property distributed or deemed distributed by the Partnership to the Partners in accordance with this Agreement shall be debited against the Capital Account of such Partners;

(iii)     Net Profit.   The amount of any Net Profit allocated to the Partners under this Agreement shall be credited to the Capital Account of such Partners; and

(iv)     Net Loss.   The amount of any Net Loss allocated to the Partners under this Agreement shall be debited against the Capital Account of such Partners.

(c)     Allocation of Net Profit and Net Loss.   Except as provided elsewhere in this Agreement, Net Profits (and items thereof) for any fiscal year (or portion thereof) shall be allocated among the Partners in a manner so as to conform, in the sole judgment of the General Partner, as nearly as practicable with the related distributions that would be made to the Partners during such fiscal year pursuant to Section 7.1(a) if the Partnership had distributed all of such Net Profits.   Except as provided elsewhere in this Agreement, Net Losses (and items thereof) for any fiscal year shall be allocated among the Partners in the following order and priority:  (i) first, among the Partners in proportion to, and in reverse order of, the amount of the cumulative Net Profits previously allocated to them until the cumulative amount of Net Losses equals the cumulative amount of Net Profits, and (ii) thereafter, any remaining Net Losses shall be allocated among the Partners in proportion to their respective Capital Account balances.

(d)     Determination of Net Profits and Net Losses.   "Net Profits" or "Net Losses" of the Partnership shall mean the net operating profits or net operating losses, as the case may be, for a fiscal year determined on the basis of accounting utilized by the Partnership in accordance with U.S. generally accepted accounting principles consistently applied (except as otherwise specified herein) and further in accordance with the following: there shall be deducted in computing Net Profits and Net Losses the Partnership Expenses and Master Fund Expenses incurred pursuant to Section 5.2 and the Management Fee accrued pursuant to Section 3.3.

(e)     Capital Account Adjustments.   All matters concerning the computation of Capital Accounts, the allocation of items of Partnership income, gain, loss, deduction and expense for all purposes of this Agreement and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion.   Such determinations shall be final and conclusive as to all the Partners.   Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the General Partner shall determine, in its sole discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Partners, the General Partner may make such modification.

SECTION  7.3.        <u>Tax Allocations</u>.

(a)        For U.S. federal, state and local income tax purposes, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Partners as nearly as possible in the same manner as the corresponding item of income, expense, gain or loss is allocated pursuant to the other provisions of this Article VII.

(b)        Notwithstanding anything else to the contrary contained herein, if any Partner has a deficit Capital Account for any fiscal year as a result of any unexpected adjustment, allocation or distribution of the type described in Treasury Regulation Section 1.704-1(b)(2)(d)(4) through (6), then items of the Partnership's income and gain shall be specially allocated to each Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, as quickly as possible, provided that an allocation pursuant to this subsection (b) shall be made only if and to the extent that such Partner would have such Capital Account deficit after all other allocations provided for in subsection (a) of this Section 7.3 have been tentatively made as if this subsection (b) were not in this Agreement.   This subsection (b) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

SECTION  7.4.        <u>Tax Credits</u>.   Tax credits, if any, shall be equitably allocated among the Partners by the General Partner.   It is intended that the Capital Accounts will be maintained at all times in accordance with Section 704 of the Code and applicable Treasury Regulations thereunder, and that the provisions hereof relating to the Capital Accounts be interpreted in a manner consistent therewith.   The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to this Section 7.4 if necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations, provided that no such change shall have an adverse effect upon the amount distributable to any Partner hereunder.

SECTION  7.5.        <u>Loans and Withdrawal of Contribution</u>.   Except as expressly provided herein, the Limited Partner shall not be permitted to borrow or make an early withdrawal of, any portion of the Capital Contributions made by it.

SECTION  7.6.        <u>No Obligation to Restore</u>.   The General Partner shall have no obligation to restore a negative balance in its Capital Account.

SECTION  7.7.        <u>Other Tax Matters</u>.

(a)        The General Partner is hereby designated as the "Tax Matters Partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code (and any similar provisions under any applicable state or local or foreign tax laws).   The Tax Matters Partner shall have the discretionary authority to make all tax elections on behalf of the Partnership and the Limited Partner.   The Tax Matters Partner shall make all decisions in such capacity and in such manner as it determines to be in the best interests of all of the Partners.   All expenses incurred by the Tax Matters Partner while acting in such capacity shall be paid or reimbursed by the Partnership.

(b)        It is the intention of the Partners that the Partnership be treated as a partnership for all relevant tax purposes.   The General Partner shall therefore not permit the

Partnership to elect, and the Partnership shall not elect, to be treated as an association taxable as a corporation for U.S. federal income, state or local income tax purposes under Treasury Regulations Section 301.7701-3(a) or under any corresponding provision of state or local law.

# ARTICLE VIII
# REPORTS TO LIMITED PARTNERS

SECTION 8.1.     Independent Public Accountants.  The financial statements of the Partnership shall be audited as of the end of each fiscal year by a firm of independent public accountants as shall be selected from time to time by the General Partner.

SECTION 8.2.     Reports.

(a)     Audited Financial Statements.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner, or its designee, shall prepare, and shall cause the independent auditors to audit, and shall deliver to the Limited Partner, audited financial statements (prepared in accordance with U.S. generally accepted accounting principles) setting forth as of the end of such fiscal year:

(i)      a balance sheet of the Partnership;

(ii)     an income statement of the Partnership; and

(iii)    a statement of the Partnership's capital.

(b)     Additional Reports.  Within ninety (90) days after the end of each calendar quarter or calendar year, as applicable, the Limited Partner will be sent, as applicable, (i) a quarterly unaudited report comprised of the Partnership's balance sheet and income statement, and the Limited Partner's capital account statement, which will include the Limited Partner's remaining Capital Commitment, and a specific statement of any distributions made to the Limited Partner that are subject to recall for reinvestment pursuant to Section 7.1 of this Agreement, as applicable; and (ii) the Partnership's holdings summary report.  In addition, the General Partner's quarterly report shall disclose to the Limited Partner if any investment restrictions set forth in Section 4.2 have been exceeded by the Master Fund at any time during the prior quarter and the Master Fund Advisory Committee's approval of such transactions.

(c)     Tax and ERISA Information.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner shall cause the independent public accountants to prepare and transmit, as promptly as possible, a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable the Limited Partner to prepare its U.S. federal income tax return, if any.  In addition, the General Partner agrees to timely provide the Limited Partner such information regarding its investment in the Partnership as may be reasonably requested by the Limited Partner for purposes of completing its annual Form 5500 (including any schedules or attachments thereto) or any other information reports or filings required by the U.S. Department of Labor or the Internal Revenue Service.  In addition, the General Partner agrees to timely provide to the Limited Partner such information

and disclosures as may be required under, and in accordance with, Section 408(b)(2) of ERISA and the regulations thereunder, to the extent applicable.

# ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

SECTION 9.1.  Exculpation.  No Covered Person will be liable to the Partnership or to the Limited Partner for any act or omission taken or suffered by such Covered Person, to the extent that such act or omission is not attributable to such Covered Person's (i) gross negligence, (ii) willful misconduct or bad faith, (iii) losses due to the gross negligence of employees, brokers or other agents of the Partnership or (iv) any intentional and material breach of the Partnership Agreement (each of items (i) through (iv) are hereinafter referred to as "Disabling Conduct").  Notwithstanding the foregoing, Covered Persons shall be liable to the Partnership and the Limited Partner for any breach of fiduciary duty under ERISA.

SECTION 9.2.  Indemnification.

(a)  The Partnership will indemnify, to the maximum extent permitted by law, each Covered Person against any and all claims, liabilities, damages and related expenses, including legal fees, incurred by them by reason of any action performed or omitted in connection with the activities of the Partnership or in dealing with third parties on behalf of the Partnership unless such action or omission is determined pursuant to a final, non-appealable judgment to constitute Disabling Conduct.  Notwithstanding the foregoing, Covered Persons shall not be indemnified for any breach of fiduciary duty under ERISA.

(b)  Notwithstanding anything to the contrary contained herein, in the case of any Proceeding instituted against the Partnership or a Covered Person on or before the third anniversary of the expiration of the Partnership's Term, the Partnership may require the Limited Partner to recontribute to the Partnership amounts up to fifty percent (50%) of the aggregate amount of the distributions previously made to it in order to satisfy the Partnership's indemnification obligations under subsection (a); provided, however, that the Limited Partner will not individually be obligated with respect to such indemnification obligations beyond the amount of its aggregate unfunded Capital Commitments and Capital Account balances.

(c)  The Partnership will, in the sole discretion of the General Partner and upon advice of counsel to the effect that a Covered Person is likely to be found entitled to indemnification pursuant to this Section 9.2, advance to any Covered Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any Proceeding.  Any such advance will be subject to repayment to the extent that it is finally judicially determined that the Covered Person was not entitled to indemnification.  The Partnership will indemnify and hold harmless each Person that is a responsible withholding agent against all claims, liabilities and expenses (not resulting from such Person's willful misconduct) relating to such Person's obligation to withhold and pay any withholding or other taxes payable by the Partnership or as a result of the Limited Partner's participation in the Partnership.

(d)  All of the foregoing contribution or recontribution obligations shall survive the termination of this Agreement.

SECTION 9.3.     <u>Exclusive Jurisdiction</u>.  To the fullest extent permitted by applicable law, the General Partner and the Limited Partner hereby agrees that any claim, action or proceeding by the Limited Partner seeking any relief whatsoever against any Covered Person based on, arising out of, or in connection with, this Agreement or the Partnership's business or affairs shall be brought only in the U.S. federal courts located in California and not in any other State or U.S. federal court in the United States of America or any court in any other country. The General Partner and each Limited Partner acknowledges that, in the event of any breach of this provision, the Covered Persons have no adequate remedy at law and shall be entitled to injunctive relief to enforce the terms of this Section 9.3.

## ARTICLE X
## TERM AND DISSOLUTION OF THE PARTNERSHIP

SECTION 10.1.     <u>Term</u>.  Unless sooner dissolved pursuant to Section 10.2, the Partnership shall continue for seven (7) years from December 31, 2013, subject to extension, in the sole discretion of the General Partner, of up to three (3) additional one (1) year periods (the "Term") as determined to be reasonably necessary by the General Partner to effect an orderly liquidation of the Partnership Investments and consented to by the Limited Partner.

SECTION 10.2.     <u>Dissolution</u>.  Subject to the Partnership Act, the Partnership shall be dissolved and its affairs shall be wound up upon the earliest of:

(a)     the expiration of the Term of the Partnership as determined in accordance with Section 10.1;

(b)     the bankruptcy, liquidation, dissolution or insolvency of the General Partner;

(c)     the withdrawal of the General Partner pursuant to Section 11.2; and

(d)     any date determined by the General Partner in its sole discretion.

Upon the occurrence of an event specified in clauses (b) or (c) above, the Limited Partner may agree to continue the Partnership and in such event will select a new general partner.

SECTION 10.3.     <u>Liquidation of the Partnership</u>.  Upon dissolution, the Partnership's business shall be liquidated in an orderly manner.  Except as provided in the second succeeding sentence, the General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.  The responsibilities of the General Partner shall be consistent with the responsibilities provided for it in this Agreement.  If there shall be no General Partner, the Limited Partner may appoint one or more Persons to act as the liquidator in carrying out such liquidation.  In performing its duties, the General Partner or such other appointed person, as the case may be (the "Liquidator"), is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Partnership in any reasonable manner that the Liquidator shall determine to be in the best interest of the Partners.

SECTION 10.4.     <u>Distribution Upon Dissolution of the Partnership</u>.

(a)   <u>Liquidating Distribution</u>.   Upon dissolution of the Partnership, the Liquidator winding up the affairs of the Partnership shall determine, in its sole discretion, which assets of the Partnership shall be sold and which assets of the Partnership shall be retained for distribution in kind to the Partners.  The Capital Accounts shall be adjusted in accordance with Section 7.2, immediately prior to any such distribution in kind to reflect the gain or loss that would be recognized had the assets to be distributed in kind been sold for their Fair Value.  After all liabilities (contingent or otherwise) of the Partnership have been satisfied or duly provided for (as determined by the Liquidator in its sole discretion), the remaining assets of the Partnership shall be distributed to the Partners in accordance with Article VII.  Any goodwill of the Partnership, and any right to use of the Partnership's name, shall belong exclusively to the General Partner.

(b)   <u>Liquidating Trust, etc</u>.  If the Partnership is unable to dispose of all of its interests in a Partnership Investment prior to its termination, the Liquidator may, in its sole discretion, and subject to the Partnership Act, transfer such interests to a trust established for the benefit of the Partners for purposes of liquidating Partnership assets, collecting amounts owed to the Partnership and paying any debts, liabilities or other obligations of the Partnership or the General Partner arising out of, or in connection with, this Agreement or the Partnership's business or affairs.

The assets of any trust established pursuant to this Section 10.4(b) shall be distributed to the Partners from time to time, in the sole discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement.

(c)   <u>No Priority</u>.   The Limited Partner shall look solely to the assets of the Partnership for the return of the Limited Partner's aggregate Capital Contributions in Partnership Investments.

SECTION 10.5.   <u>No Voluntary Withdrawal by Limited Partner</u>.   The Limited Partner may not voluntarily withdraw from the Partnership prior to its dissolution and winding up, and no LP Interest is redeemable or repurchasable by the Partnership at the option of the Limited Partner.  Except as expressly provided in this Agreement, no event affecting the Limited Partner (including death, bankruptcy or insolvency) shall affect its obligations under this Agreement or affect the Partnership.

SECTION 10.6.   <u>Required Withdrawal of Limited Partner</u>.   The General Partner, upon thirty (30) Business Days' prior written notice, may require the Limited Partner to withdraw from the Partnership at the end of any fiscal quarter in which such notice is given if the General Partner determines, in its sole discretion, that the continued participation of the Limited Partner in the Partnership would adversely affect either the Partnership, the Master Fund, the General Partner or the Manager (e.g., by involving the Partnership, the Master Fund, the General Partner or the Manager in litigation or causing the Partnership to be required to register under the Investment Company Act).   In such an instance, the Limited Partner shall not contribute additional capital to the Partnership in respect of subsequent Capital Calls and its LP Interest will be entirely terminated.  Any required withdrawal pursuant to this Section 10.6 shall be based on the Fair Value of the withdrawing Limited Partner's LP Interest.

SECTION 10.7.    <u>Payments Upon Withdrawal</u>.    Upon the required withdrawal of the  Limited Partner (assuming not in Default), ninety percent (90%) of the Limited Partner's Capital Account balance on the termination date shall be paid to the Limited Partner within ninety (90) days thereof or as soon thereafter as the Partnership has funds available therefore.  The remaining ten percent (10%) of the balance of the Limited Partner's Capital Account on the termination date shall be paid to the Limited Partner upon completion of the audit of the Partnership's financial statements for the fiscal year involved or as soon thereafter as is reasonably practicable.  Such Capital Account balance may not necessarily reflect the market value of a Partnership Investment.  The Limited Partner shall not be entitled to receive or demand any other or further distributions, including any distributions pursuant to Section 17-604 of the Partnership Act.  Any incremental legal or accounting expenses incurred by the Partnership as a result of the Limited Partner's required withdrawal may, in the sole discretion of the General Partner, be charged to the Limited Partner through a reduction of the distributions to the Limited Partner.

# ARTICLE XI
## TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST

SECTION 11.1.    <u>Transferability of the General Partner's Interest</u>.    The General Partner may not, directly or indirectly, Transfer all or a portion of its general partner interest in the Partnership (the "GP Interest") to any Person.  Notwithstanding the foregoing, the General Partner may make a Transfer of all or any portion of its GP Interest (i) to an Affiliate or to a Person which succeeds to the private equity business of the General Partner as an entirety, (ii) to any Person in connection with a pledge securing a loan made to the Partnership, or (iii) with the prior written consent of the Limited Partner.  The General Partner may at any time, in its sole discretion, admit any Person to whom the General Partner is permitted to make a Transfer pursuant to the immediately preceding sentence as an additional general partner of the Partnership, and such transferee shall be deemed admitted to the Partnership as a General Partner of the Partnership immediately prior to such Transfer and shall continue the business of the Partnership without dissolution.  Except as otherwise provided in Sections 11.2 and 11.3, the General Partner may not withdraw from the Partnership or be removed as a general partner of the Partnership.

SECTION 11.2.    <u>Withdrawal of the General Partner</u>.    The General Partner shall be permitted to withdraw as a general partner of the Partnership, unless, in the opinion of counsel to the Partnership, the General Partner's withdrawal as a general partner would result in a violation of any law or regulation of the U.S. or any State thereof.  In the event that the General Partner withdraws from the Partnership pursuant to this Section 11.2, the Partnership shall dissolve and its affairs wound up in accordance with Article X (subject to the right that the Limited Partner has to continue the Partnership and elect a new general partner in accordance with Section 10.2).

SECTION 11.3.    <u>Removal of the General Partner</u>.

(a)    The General Partner may be removed upon the occurrence of a "Cause Event" on not less than thirty (30) days' written notice from the Limited Partner; provided, however, that (i) the General Partner will not be removed if, within the thirty (30) day period

following such written notice, the General Partner cures the Cause Event to the satisfaction of the Limited Partner.  For this purpose, the term "Cause Event" shall mean Disabling Conduct by the General Partner or Manager as determined by a final, non-appealable judgment of any court or governmental body referenced in Section 13.12 that has a material adverse effect on the Partnership.

(b)     Within fifteen (15) days after the removal of the General Partner, the Partnership shall distribute to the General Partner an amount in cash equal to the value of the General Partner's Capital Account balance as of the date of such removal; provided, however that such amounts owed in respect of the General Partner's Capital Account may be reduced to reflect any damages suffered by the Partnership as a result of the General Partner's breach of its duties as described in Section 11.3(a), as finally determined in a judgment by any court or governmental body referenced in Section 13.12.

(c)     Upon the removal of the General Partner for a Cause Event pursuant to clause (a) above, (i) the Management Agreement among the Manager, the Partnership and the Master Fund shall immediately be amended to remove the Partnership and the Manager shall be entitled to receive the Management Fee accrued through the date of such removal with respect to the Partnership but shall not be entitled to receive any Management Fee accruing from the Partnership after such date, (ii) the General Partner shall be entitled to receive fifty percent (50%) of the Carried Interest with respect to the amount of the appreciation in the value of the Partnership Investments attributable to the Partnership on the date of the General Partner's removal that has accrued as of such date, but shall not be entitled to receive the remaining fifty percent (50%) of the Carried Interest on the existing investment appreciation through the date of removal or any Carried Interest on any appreciation in the value of any Partnership Investment attributable to the Partnership that accrues after such removal date, and (iii) the General Partner and the Manager shall be entitled to receive from the Partnership any reimbursements or expenses due and owing to it by the Partnership.

## ARTICLE XII
## TRANSFERABILITY OF THE LIMITED PARTNER'S INTEREST

SECTION  12.1.     Conditions for Transfer.

(a)     Consent of the General Partner.  The Limited Partner may Transfer all or any part of its LP Interest only with the consent in writing of the General Partner, which consent may not be unreasonably withheld, and only upon the satisfaction of the conditions specified in Section 12.1(b).  The General Partner hereby agrees that it shall consent to the transfer of all or any part of the Limited Partner's LP Interest to a successor trustee or trustees, or a successor trust or trusts and to the admission and substitution of any such successor trustee or successor trust as a Limited Partner of the Partnership; *provided* that any such transfer otherwise complies with this Article XII, *provided, however,* that notwithstanding Section 12.1(b), the General Partner shall not require the delivery of an opinion of counsel in connection with any such transfer.

(b)     Conditions Required to be Satisfied.  Unless required by applicable law or permitted in the sole discretion of the General Partner, the Limited Partner may not Transfer all or any part of its LP Interest, and no attempted or purported Transfer of such LP Interest shall be

effective, unless (i) after giving effect thereto, such Transfer would not otherwise terminate the Partnership for the purposes of Section 708 of the Code, (ii) such Transfer would not result in a violation of applicable law, including any federal and state securities laws and provided that, if such Transfer would cause the General Partner to violate any covenant of this Agreement or any Subscription Agreement and the General Partner has taken all reasonable steps to prevent such violation, the General Partner shall not be liable to the Partnership as a result thereof and the General Partner shall be indemnified by the Limited Partner for any losses, costs, damages or expenses incurred as a result of such violation, (iii) such Transfer would not cause the Partnership to lose its status as a partnership that is not a publicly-traded partnership for federal income tax purposes or cause the Partnership to become subject to the Investment Company Act, (iv) such Transfer would not result in the Limited Partner losing its limited liability under the Partnership Act, (v) if requested by the General Partner, the Limited Partner has delivered a favorable opinion in form and substance satisfactory to the General Partner from counsel satisfactory to the General Partner as to the matters referred to in clauses (ii), (iii) and (iv) above; and (vi) such Transfer occurs on a date approved by the General Partner.

SECTION 12.2.    Substitute Limited Partner; Recognition of Transfer.    A purchaser, assignee or transferee of the Limited Partner's LP Interest (a "Transferee") shall have the right to become a Substitute Limited Partner only if the following conditions (in addition to those set forth in Section 12.1 above) are satisfied:

(a)    A duly executed and acknowledged written instrument of assignment or document of transfer satisfactory in form and substance to the General Partner shall have been filed with the Partnership;

(b)    The Limited Partner and the Transferee shall have executed and acknowledged such other instruments and documents and taken such other action as the General Partner shall reasonably deem necessary or desirable to effect such substitution;

(c)    The Limited Partner or the Transferee shall have paid to the Partnership such amount of money as is sufficient to cover all costs, fees and expenses (including attorneys fees) incurred by or on behalf of the Partnership in connection with such substitution; and

(d)    The General Partner shall have consented to such substitution.

In the event of the admission of a Transferee as a Substitute Limited Partner, all references herein to the Limited Partner shall be deemed to apply to such Substitute Limited Partner and such Substitute Limited Partner shall succeed to all rights and obligations of the Limited Partner hereunder, including the Capital Account balance of the Limited Partner.

A Transferee who is not admitted to the Partnership as a Substitute Limited Partner shall have none of the rights of, and no liability as, a Partner and the assignor in such case shall remain fully liable for the unpaid portion of its Capital Commitment.

# ARTICLE XIII
# MISCELLANEOUS

SECTION  13.1.      Amendments.

(a)      Except as otherwise expressly provided herein, this Agreement may be modified or amended, and any provision hereof may be waived, by a writing signed by or on behalf of the General Partner; provided that, no such modification, amendment or waiver shall (a) materially increase or extend any financial obligation or liability of the Limited Partner beyond that set forth herein or permitted hereby without the consent of the Limited Partner, (b) materially and adversely affect the rights of the Limited Partner without the consent of the Limited Partner, or (c) change the provisions of this Section 13.1 without the consent of the Limited Partner.

(b)      The Limited Partner authorizes the General Partner to elect to apply the safe harbor set forth in proposed Treasury Regulation Section 1.83-3(l) (under which the fair value of a GP Interest that is Transferred in connection with the performance of services is treated as being equal to the liquidation value of the GP Interest) if such proposed Treasury Regulation or a similar Treasury Regulation is promulgated as a final or temporary Treasury Regulation.  If the General Partner determines that the Partnership should make such election, the General Partner is hereby authorized to amend this Agreement without the consent of the Limited Partner (so long as such amendment is not reasonably expected to have a material adverse effect on the Limited Partner) to provide that (i) the Partnership is authorized and directed to elect the safe harbor, (ii) the Partnership and the Limited Partner (including any Person to whom a GP Interest is Transferred in connection with the performance of services) will comply with all requirements of the safe harbor with respect to all Partnership interests Transferred in connection with the performance of services while such election remains in effect, and (iii) the Partnership and the Limited Partner will take all actions necessary, including providing the Partnership with any required information, to permit the Partnership to comply with the requirements set forth or referred to in the applicable Treasury Regulations for such election to be effective until such time (if any) as the General Partner determines, in its sole discretion, that the Partnership should terminate such election.  The General Partner is further authorized to amend this Agreement to modify Article VII to the extent the General Partner determines in its discretion that such modification is necessary or desirable as a result of the issuance of Treasury Regulations relating to the tax treatment of the transfer of a Partnership interest in connection with the performance of services.  Notwithstanding anything to the contrary in this Agreement, the Limited Partner expressly confirms and agrees that it will be legally bound by any such amendment.

SECTION  13.2.      Reserved.

SECTION  13.3.      Notices.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or similar writing) and shall be given to such party (a) if such party is the Limited Partner, at its address or facsimile number set forth in a schedule filed with the records of the Partnership or such other address or facsimile number as the Limited Partner may hereafter specify by notice to the General Partner for such purpose, or (b) if such party is the General Partner or the Partnership, at the address set forth in Section 2.2(b).  Each such notice, request or other communication shall be effective (i) if given by

facsimile, when such facsimile is transmitted to the facsimile number specified and the appropriate answerback or confirmation is received, (ii) if given by mail, five (5) days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid, (iii) if given by overnight courier, forty-eight (48) hours after such communication is received by such courier, or (iv) if given by any other means, when delivered at the address specified pursuant to this Section 13.3.

SECTION 13.4.    Successors; Counterparts.   This Agreement (i) shall be binding upon the successors and permitted assigns of the Partners, and (ii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

SECTION 13.5.    Governing Law; Severability.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to the conflict of laws principles thereof).  In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Partnership Act.  If it shall be determined by a court of competent jurisdiction that any provision or wording of this Agreement shall be invalid or unenforceable under the Partnership Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement, in which case this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

SECTION 13.6.    Filings.   The General Partner shall promptly prepare, following the execution and delivery of this Agreement, any documents required to be filed and recorded, or which the General Partner determines, in its sole discretion, are appropriate for filing and recording, under the Partnership Act, and the General Partner shall promptly cause each such document to be filed and recorded in accordance with the Partnership Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Partnership may hereafter establish a place of business.  The General Partner shall also promptly cause to be filed, recorded and published such statements of fictitious business name and other notices, certificates, statements or other instruments required by any provision of applicable law of any jurisdiction which governs the conduct of the General Partner's business from time to time.

SECTION 13.7.    Power of Attorney.

(a)    Appointment of Attorney-In-Fact.   The Limited Partner does hereby constitute and appoint the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign and file (i) any amendment to the Certificate of Limited Partnership of the Partnership required because of an amendment to this Agreement or in order to effectuate any change in the membership of the Partnership, (ii) any amendments to this Agreement in accordance with Section 13.1, (iii) all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Delaware to effectuate, implement and continue the valid and subsisting existence of the Partnership or to dissolve the Partnership, and (iv) any agreements, documents, guarantees, or other instruments relating to any such borrowings or indebtedness incurred by the Partnership

and the Limited Partner agrees to cooperate with the Partnership in providing all relevant documentation in connection with such borrowings or indebtedness; provided, the General Partner may not make, execute, sign or file any document, agreement, guarantee or other instrument that would subject the Limited Partner to any obligation beyond the amount of the Limited Partner's unfunded Capital Commitment.

(b)     Power Coupled With an Interest.  The power of attorney granted pursuant to this Section 13.7 shall (i) survive and not be affected by the subsequent death, legal incapacity, disability, dissolution, termination or bankruptcy of the Limited Partner granting such power of attorney or the Transfer of all or any portion of the Limited Partner's LP Interest, and (ii) extend to the Limited Partner's successors, permitted assigns and legal representatives.

SECTION  13.8.      No Right to Partition.  To the extent permitted by law, and except as otherwise expressly provided in this Agreement, the Limited Partner, on behalf of itself and its shareholders, partners, heirs, executors, administrators, personal or legal representatives, successors and permitted assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition or similar action of the Partnership or any asset of the Partnership, or any interest which is considered to be partnership property, regardless of the manner in which title to such property may be held.

SECTION  13.9.      Goodwill.  No value shall be placed on the name or goodwill of the Partnership.

SECTION  13.10.      Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

SECTION  13.11.      Entire Agreement.  This Agreement and the Subscription Agreement constitutes the entire agreement among the Partners with respect to the subject matter hereof, and supersede any prior agreement or understanding among them with respect to such subject matter.

SECTION  13.12.      Submission to Jurisdiction.  Each party irrevocably consents and agrees that any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof may be brought in the courts of the State of California or the U.S. federal courts for California and, by execution and delivery of this Agreement, each party hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof.  Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Section shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein.

IN WITNESS WHEREOF, the undersigned have executed and delivered this document dated as of 31st Day of December 31, 2013.

GENERAL PARTNER:

WHITE OAK PARTNERS, LLC

By:_____

     Name:   Barbara J. S. McKee
     Title:    Managing Member

LIMITED PARTNER:

TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN

BY: WHITE OAK GLOBAL ADVISORS, LLC

ITS: INVESTMENT MANAGER

By:_____

     Name:   Barbara J. S. McKee
     Title:    Managing Member

Appendix A

DEFINITIONS

"Administrator" shall mean any administrator selected by the General Partner for the Partnership from time to time.

"Affiliate" of any specified Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Partnership Agreement, as amended or restated from time to time.

"Assumed Tax Rate" means the highest effective marginal combined federal, state and local income tax rate for the calendar year involved applicable to any individual resident in New York City (taking into account the deductibility of state and local income taxes for federal income tax purposes).

"Authorized Representative" has the meaning set forth in Section 3.8(a).

"Borrowing Costs" means with respect to any borrowing, any interest, fees or expenses attributable to such borrowing, but shall not include any repayment of principal.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"Capital Account" has the meaning set forth in Section 7.2(a).

"Capital Call" means a capital call of cash contributions from the Limited  Partner except as otherwise provided pursuant to a Capital Call Notice in accordance with Article VI.

"Capital Call Amount" means the aggregate Capital Contributions to be made on any date by the Limited Partner pursuant to Article VI.

"Capital Call Date" has the meaning set forth in Section 6.2(b).

"Capital Call Notice" has the meaning set forth in Section 6.2(a).

"Capital Commitment" means an amount equal to $80 million that the Limited Partner committed to the Partnership as of the date of this Agreement pursuant to Section 2.5.

"Capital Contribution" means, with respect to the Limited Partner, a cash contribution (or deemed cash contribution) made by the Limited Partner to the Partnership pursuant to Section 2.5, Article VI and Article IX.

"Carried Interest" has the meaning set forth in Section 7.1(a).

"Cause Event" has the meaning set forth in Section 11.3(a).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Co-Investment Funds" has the meaning set forth in Section 4.3.

"Covered Person" means a member of the General Partner Group and/or Master Fund Advisory Committee.

"Default" means any failure of the Limited Partner to make all or a portion of any required Capital Contribution on the applicable Capital Call Date or other due date.

"Distributable Cash" means cash receipts of all kinds derived by the Partnership from its ownership or disposition of Partnership Investments (whether or not distributed pursuant to Section 7.1(a)) less (x) any amounts retained by the Partnership in accordance with Section 7.1(e), and (y) any income derived by the Partnership from Temporary Investments.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" means any Default that shall have not been (i) cured by the Limited Partner within ten (10) Business Days after the occurrence of such Default, or (ii) waived by the General Partner on such terms as determined by the General Partner in its sole discretion before such Default has otherwise become an Event of Default pursuant to clause (i) hereof.

"Fair Value" means the valuation of a Partnership Investment or other Partnership property by Navigant Consulting Inc. or such other independent Person (such as an investment banking firm) selected by the Limited Partner in accordance with Section 3.12.

"Follow-On Investments" means an additional investment of capital by the Partnership in an existing Partnership Investment.

"General Partner" means White Oak Partners, LLC, a Delaware limited liability company, and its successors.

"General Partner Group" means the General Partner, the Manager and their respective Affiliates, officers, directors, members, principals, stockholders, employees, controlling persons, representatives or other agents.

"GP Interest" has the meaning set forth in Section 11.1.

"Investment Committee" has the meaning set forth in Section 3.18.

"Investment Company Act" means the Investment Company Act of 1940, as amended from time to time.

"Investment Period" means the period during which the Partnership may make commitments to Partnership Investments. The Investment Period shall commence on the date of this Agreement and end twenty four (24) months following December 31, 2013.

"Key Person Event" has the meaning set forth in Section 6.1(d).

"Limited Partner" means Pension Board of the New York State Nurses Association and any Transferee approved by the General Partner to be admitted to the Partnership.

"Liquidator" has the meaning set forth in Section 10.3.

"LP Interest" means a limited partnership interest in the Partnership.

"Management Agreement" shall mean the investment management agreement by and among the Partnership, the Master Fund and the Manager.

"Management Fee" has the meaning set forth in Section 3.3(a).

"Manager" means White Oak Global Advisors, LLC, a Delaware limited liability company.

"Manager Expenses" has the meaning set forth in Section 5.1.

"Marketable Securities" means securities for which a public market (national exchange or NASDAQ national market) exists and which may be traded by the Limited Partner without restrictions.

"Master Fund" means White Oak Pinnacle Fund, L.P., a Delaware limited partnership.

"Master Fund Advisory Committee" means the advisory committee established at the Master Fund level.

"Master Fund Expenses" has the meaning set forth in Section 5.2(b).

"Master Fund LPA" has the meaning set forth in Section 3.16.

"Net Losses" has the meaning set forth in Section 7.2(d).

"Net Profits" has the meaning set forth in Section 7.2(d).

"Offering Memorandum" means the Confidential Offering Memorandum of the Master Fund and any amendments or supplements thereto.

"Organizational Expenses" has the meaning set forth in Section 5.2(c)(i).

"Partners" means the General Partner and the Limited Partner.

"Partnership" means White Oak Pinnacle Feeder Fund I, L.P., a Delaware limited partnership.

"Partnership Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"Partnership Expenses" has the meaning set forth in Section 5.2(b).

"Partnership Investment" means an investment by the Partnership in accordance with the Master Fund's Offering Memorandum.

"Person" means any individual, partnership, corporation, trust, limited liability company, limited liability partnership, joint stock company or other legal entity.

"Plan Asset Regulation" means Department of Labor Regulation Section 2510.3-101 or any successor thereto.

"Portfolio Company" means companies that the Partnership invests in through the Master Fund.

"Prime Rate" means the rate of interest published from time to time on the Bloomberg U.S. Treasury and Money Markets page under the heading "Prime Rate," or if not so published, the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as identified in writing by the General Partner to the Limited Partner.

"Principals" means, collectively, Andre Hakkak, Barbara McKee, Ali Amiry and David Hackett.

"Proceeding" means any action, claim, suit, investigation, arbitration or proceeding, whether at law or in equity, and whether by or before any court, arbitrator, governmental body or other administrative, regulatory or other agency or commission.

"Remaining Capital Commitment" means, with respect to the Limited Partner at any time, the excess, if any, of (i) the Limited Partner's Capital Commitment at such time over (ii) the Limited Partner's aggregate Capital Contributions made prior to such time.  For purposes of this definition, the Limited Partner's aggregate Capital Contributions shall be reduced by the aggregate amount theretofore distributed to the Limited Partner pursuant to Section 7.1(a) prior to the end of the Investment Period in accordance with Section 7.1(b).

"Securities" means shares of capital stock, limited partnership interests, warrants, options, bonds, notes, debentures, other securities and equity interests of whatever kind of any Person, whether or not publicly traded or readily marketable, and any other financial instruments which exist now or are hereafter created.

"Subscription Agreement" means the subscription agreement entered into by the Limited Partner in connection with its purchase of LP Interests.

"Substitute Limited Partner" means any purchaser, assignee, transferee or other recipient of all or any portion of the Limited Partner's LP Interest who is admitted as a Limited Partner to the Partnership in accordance with this Agreement.

"Tax Matters Partner" has the meaning set forth in Section 7.7.

"Temporary Investment" means investments in (i) short-term money market investments issued by issuers in the two highest rating categories as stated by nationally recognized statistical ratings organizations, (ii) obligations backed by full faith and credit of the U.S. federal government and with a maturity date not in excess of eighteen (18) months from the date of purchase by the Partnership, (iii) interest-bearing bank or brokerage accounts and/or certificates of deposit issued by banks with undivided capital and surplus of $100,000,000 or more, and (iv) other comparable investments as determined by the General Partner in its sole discretion.

"Term" of the Partnership has the meaning set forth in Section 10.1.

"Transaction Fees" means any directors' fees from Portfolio Companies, transaction fees, closing fees, monitoring fees, amendment fees, break-up fees or any other similar advisory fees in connection with any services provided by a member of the General Partner Group to a Portfolio Company in which the Partnership has invested.

"Transfer" means a direct or indirect sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of a GP Interest or a LP Interest, other than in connection with a pledge by the General Partner of any such interests made in connection with a borrowing by the Partnership.

"Transferee" has the meaning set forth in Section 12.2.

"Treasury Regulations" means the regulations of the U.S. Treasury Department issued pursuant to the Code.

"UBTI" has the meaning set forth in Section 3.17.

"U.S." means the United States of America.

# EXHIBIT C

**WHITE OAK PINNACLE FUND, L.P.**



LIMITED PARTNERSHIP AGREEMENT

March 15, 2012

TABLE OF CONTENTS

ARTICLE I        DEFINITIONS................................................................................. 1

    SECTION  1.1.     Definitions.................................................................. 1

ARTICLE II       GENERAL PROVISIONS .......................................................... 1

    SECTION  2.1.     Partnership Name ....................................................... 1
    SECTION  2.2.     Registered Office; Business Address ........................... 1
    SECTION  2.3.     Purposes of the Partnership........................................ 1
    SECTION  2.4.     Liability of the Partners ............................................. 2
    SECTION  2.5.     Admission of Limited Partners ................................... 2

ARTICLE III      MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP ............. 3

    SECTION  3.1.     Management Generally ............................................... 3
    SECTION  3.2.     Authority of the General Partner................................ 3
    SECTION  3.3.     Management Fee ........................................................ 6
    SECTION  3.4.     Transactions with Affiliates....................................... 6
    SECTION  3.5.     Other Activities; Devotion of Time ........................... 7
    SECTION  3.6.     Books and Records; Accounting Method; Fiscal Year................. 7
    SECTION  3.7.     Partnership Information and Tax Returns.................... 7
    SECTION  3.8.     Confidentiality .......................................................... 8
    SECTION  3.9.     Meetings of Limited Partners..................................... 9
    SECTION  3.10.    Temporary Investment of Funds ................................ 9
    SECTION  3.11.    Certain ERISA Matters .............................................. 9
    SECTION  3.12.    Valuation .................................................................. 10
    SECTION  3.13.    Reliance by Third Parties........................................... 10
    SECTION  3.14.    Borrowings................................................................ 10
    SECTION  3.15.    Conflicts of Interest.................................................. 11
    SECTION  3.16.    Advisory Committee .................................................. 11
    SECTION  3.17.    Avoidance of UBTI.................................................... 13
    SECTION  3.18.    Investment Committee ............................................... 13

ARTICLE IV       INVESTMENTS AND INVESTMENT OPPORTUNITIES....................... 13

    SECTION  4.1.     Investments Generally ............................................... 13
    SECTION  4.2.     Investment Restrictions.............................................. 13
    SECTION  4.3.     Co-Investment Opportunities..................................... 13

ARTICLE V        EXPENSES...................................................................................... 14

    SECTION  5.1.     Definition and Payment of Manager Expenses........................... 14
    SECTION  5.2.     Partnership Expenses ................................................ 14

ARTICLE VI       CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS.......... 15

    SECTION  6.1.     Capital Commitments ................................................ 15
    SECTION  6.2.     Capital Call Procedure .............................................. 16
    SECTION  6.3.     Default by Limited Partners....................................... 17
    SECTION  6.4.     Remedies Not Limited ............................................... 19
    SECTION  6.5.     Special Provisions Related to ERISA Partners........................... 19
    SECTION  6.6.     Excluded Limited Partners......................................... 20

ARTICLE VII  DISTRIBUTIONS; CAPITAL ACCOUNTS ............................................... 21

 SECTION 7.1. Distributions ........................................................................ 21
 SECTION 7.2. Capital Accounts; Adjustments to Capital Accounts .................. 24
 SECTION 7.3. Tax Allocations .................................................................. 25
 SECTION 7.4. Tax Credits .......................................................................... 26
 SECTION 7.5. Loans and Withdrawal of Contribution ...................................... 26
 SECTION 7.6. No Obligation to Restore ..................................................... 26
 SECTION 7.7. Other Tax Matters ............................................................... 26

ARTICLE VIII  REPORTS TO LIMITED PARTNERS ............................................ 27

 SECTION 8.1. Independent Public Accountants ............................................ 27
 SECTION 8.2. Reports ............................................................................... 27

ARTICLE IX  EXCULPATION AND INDEMNIFICATION ............................................ 28

 SECTION 9.1. Exculpation ........................................................................ 28
 SECTION 9.2. Indemnification ................................................................. 28
 SECTION 9.3. Exclusive Jurisdiction ........................................................ 29

ARTICLE X  TERM AND DISSOLUTION OF THE PARTNERSHIP ......................... 29

 SECTION 10.1. Term ................................................................................. 29
 SECTION 10.2. Dissolution ...................................................................... 29
 SECTION 10.3. Liquidation of the Partnership ........................................... 30
 SECTION 10.4. Distribution Upon Dissolution of the Partnership ................... 30
 SECTION 10.5. No Voluntary Withdrawal by Limited Partners ......................... 31
 SECTION 10.6. Required Withdrawal of Limited Partners ............................... 31
 SECTION 10.7. Payments Upon Withdrawal ................................................ 32

ARTICLE XI  TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST ...... 32

 SECTION 11.1. Transferability of the General Partner's Interest ................... 32
 SECTION 11.2. Withdrawal of the General Partner ...................................... 32
 SECTION 11.3. Removal of the General Partner .......................................... 33

ARTICLE XII  TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST ............. 34

 SECTION 12.1. Conditions for Transfer .................................................... 34
 SECTION 12.2. Substitute Limited Partner; Recognition of Transfer ................ 34

ARTICLE XIII  MISCELLANEOUS ........................................................... 35

 SECTION 13.1. Amendments ................................................................... 35
 SECTION 13.2. Approvals ........................................................................ 36
 SECTION 13.3. Notices ............................................................................ 36
 SECTION 13.4. Successors; Counterparts ................................................... 37
 SECTION 13.5. Governing Law; Severability ............................................... 37
 SECTION 13.6. Filings ............................................................................. 37
 SECTION 13.7. Power of Attorney ............................................................. 37
 SECTION 13.8. No Right to Partition ........................................................ 38
 SECTION 13.9. Goodwill ......................................................................... 38

SECTION  13.10.     Headings ...................................................................................... 38
SECTION  13.11.     Entire Agreement ...................................................................... 38
SECTION  13.12.     Submission to Jurisdiction ........................................................ 38

# LIMITED PARTNERSHIP AGREEMENT

## OF

## WHITE OAK PINNACLE FUND, L.P.

LIMITED PARTNERSHIP AGREEMENT dated as of March 15, 2012, of WHITE OAK PINNACLE FUND, L.P., by and among WHITE OAK PARTNERS, LLC, a limited liability company formed under the laws of Delaware, as General Partner, and the Persons who sign copies of the Agreement to become Limited Partners.

WHEREAS, the parties hereto desire to form a limited partnership in accordance with the Partnership Act;

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.1.     Definitions.    Capitalized terms used herein without definition have the meanings assigned to such terms in Appendix A attached hereto.  Unless otherwise expressly stated herein, references to Sections are references to Sections in this Agreement.  Unless otherwise indicated or required by the context, defined terms in the singular include the plural and vice versa.

## ARTICLE II
## GENERAL PROVISIONS

SECTION 2.1.     Partnership Name.  The name of the Partnership is "White Oak Pinnacle Fund, L.P.".

SECTION 2.2.     Registered Office; Business Address.

(a)     Registered Office of the Partnership.  The Partnership shall maintain a registered office at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  Corporation Service Company will act as the registered agent of the Partnership.  The General Partner may change the registered office and registered agent in its sole discretion.

(b)     Business Address of the Partnership and the General Partner.  The business address of the Partnership and the General Partner shall be 88 Kearny Street, 4th Floor, San Francisco, CA 94108 or such other place as the General Partner shall determine from time to time in its sole discretion.  The General Partner shall promptly notify the Limited Partners of any change in the business address of the Partnership or of the General Partner.

SECTION 2.3.     Purposes of the Partnership.    The purposes of the Partnership are (a) to acquire, hold and dispose of investments in Partnership Investments, (b)

pending utilization or disbursement of funds, to make Temporary Investments, and (c) to engage in such activities as the General Partner deems necessary or desirable for the accomplishment of the above purposes or the furtherance of any of the powers herein set forth and to do every other act and thing incident thereto or connected therewith.  The Partnership shall have the power to do any and all acts necessary, appropriate, desirable, incidental or convenient to or for the furtherance of the purposes described in this Section 2.3, including, without limitation, any and all of the powers that may be exercised on behalf of the Partnership by the General Partner pursuant to this Agreement.

SECTION  2.4.        Liability of the Partners.

(a)        Liability of the General Partner.   Except as otherwise provided in the Partnership Act or this Agreement, the General Partner shall have unlimited liability with respect to the debts, obligations and other liabilities of the Partnership.

(b)        Liability of the Limited Partners.  Except as specifically set forth in this Agreement or as provided in the Partnership Act, (i) a Limited Partner shall not be obligated to make any contribution to the Partnership of any amount in excess of its Capital Commitment or other payments provided for herein, and (ii) no Limited Partner (or former Limited Partner) shall have any personal liability whatsoever in its capacity as a Limited Partner for the repayment of debts, liabilities, losses or other obligations of the Partnership.

SECTION  2.5.        Admission of Limited Partners.

(a)        Initial Closing.    The Initial Closing will be held on such date as determined by the General Partner in its sole discretion.  On the Initial Closing Date, each Person whose subscription for an LP Interest has been accepted by the General Partner on behalf of the Partnership shall make a Capital Contribution in cash to the Partnership in an amount determined by the General Partner, in its sole discretion.  Upon making such Capital Contribution, each such Person shall become a Limited Partner and shall be shown as such in the Partnership's records.

(b)        Subsequent Closings.    Through the Final Closing Date, the General Partner may admit one or more Additional Limited Partners, upon satisfaction of the following conditions:  (i) each such Additional Limited Partner shall execute this Agreement and such other documents determined by the General Partner, (ii) the Partnership would not be required to register as an investment company under the Investment Company Act, and (iii) the Additional Limited Partner makes a Capital Contribution equal to the aggregate amount that the Limited Partner would have been required to contribute to the Partnership from the Initial Closing Date through the date of the Subsequent Closing if it had been admitted to the Partnership as a Limited Partner on the Initial Closing Date (net of, with respect to those Limited Partners who participated in prior Closings ("Existing Limited Partners"), any distributions actually made by the Partnership to the Existing Limited Partners during such period).  Notwithstanding anything contained herein to the contrary, in the event that the General Partner determines, in its sole discretion, that there has been a material change or significant event relating to a Partnership Investment held by the Partnership on the date of a Subsequent Closing, then the amount of the Capital Contributions made by an Additional Limited Partner pursuant to clause (iii) of the immediately preceding sentence shall then be appropriately adjusted to reflect such a different valuation.  The aggregate amount of Capital Contributions contributed by an Additional Limited

Partner to the Partnership pursuant to the first sentence of this subsection (b) that are attributable to the cumulative amount of the Management Fees that would have been payable if such Additional Limited Partner had been admitted to the Partnership on the Initial Closing Date shall be paid by the Partnership to the Manager.  The General Partner will distribute the remaining amount of such Capital Contributions to the Existing Limited Partners in proportion to their respective prior Capital Contributions.  Any amount so distributed to an Existing Limited Partner that represents a recovery of previously made Capital Contributions, will result in a corresponding increase in the amount of such Existing Limited Partner's Remaining Capital Commitment which is subject to subsequent drawdown by the Partnership during the Investment Period.  Except in accordance with Article XII, no Limited Partner will be admitted to the Partnership after the Final Closing.

(c)      Increase in Capital Commitments.  Through the Final Closing Date, the General Partner may permit any Existing Limited Partner to increase its Capital Commitment on the date of Subsequent Closing, provided that all conditions of Section 2.5(b) have been satisfied as though such Limited Partner were an Additional Limited Partner with respect to such increase. For purposes of subsection (b) above, such an Existing Limited Partner shall be treated as an Additional Limited Partner with respect to its additional Capital Commitments.

## ARTICLE III
## MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP

SECTION 3.1.      Management Generally.  The management, administration and control of, and the determination of policies with respect to, the Partnership and its affairs shall be vested exclusively in the General Partner.  The General Partner has delegated the portfolio management and administrative services of the Partnership to the Manager.  The Limited Partners shall have no part in the management, administration or control of the Partnership and shall have no authority or right to act for or on behalf of the Partnership in connection with any matter.

SECTION 3.2.      Authority of the General Partner.  Subject to the other provisions of this Agreement, the General Partner shall have the power and authority, in its own name or on behalf of and in the name of the Partnership, to carry out any and all of the objects and purposes of the Partnership, and to perform all acts which it may, in its sole discretion, deem necessary or desirable in furtherance thereof, including, without limitation, the power and authority to:

(a)      identify investment opportunities for the Partnership;

(b)      invest or reinvest in, or acquire, hold, retain, manage, monitor, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of any assets held by or on behalf of the Partnership, including Partnership Investments;

(c)      employ, on behalf of and at the expense of the Partnership, any and all financial advisers, brokers, attorneys, accountants, consultants, appraisers, servicers, custodians of the assets of the Partnership or other agents, including, but not limited to, the Administrator, on such terms and for such compensation as the General Partner may determine, whether or not

such Person may be an Affiliate of the General Partner or may also be otherwise employed by the General Partner or by any Affiliate of the General Partner (but subject to Section 3.4) and terminate such employment;

(d)    make all elections, investigations, evaluations and other decisions, binding the Partnership thereby, that may, in the sole discretion of the General Partner, be necessary or desirable for the investment or reinvestment in, or acquisition, holding, retention, management, monitoring, ownership, capitalization, merging, restructuring, sale, transfer, conveyance, assignment, exchange, pledge or other disposition of any assets held by or on behalf of the Partnership, including Partnership Investments;

(e)    incur expenses and other obligations incident to the operation and management of the Partnership, and, to the extent that funds of the Partnership are available for such purpose, make payments on behalf of the Partnership in its own name or in the name of the Partnership;

(f)    lend money to the Partnership or cause the Partnership to borrow money, on a secured or unsecured basis, pursuant to Section 3.14;

(g)    bring, defend, settle and dispose of any Proceeding;

(h)    establish reserves for contingencies and for any other Partnership purpose;

(i)    distribute funds to the Partners by way of cash or otherwise pursuant to this Agreement;

(j)    prepare or cause to be prepared reports, statements and other information for distribution to the Partners;

(k)    prepare and file all necessary returns and statements, pay all taxes, assessments and other impositions applicable to the assets of the Partnership, and withhold amounts with respect thereto from funds otherwise distributable to any Partner;

(l)    maintain records and accounts of all operations and expenditures of the Partnership;

(m)    determine the accounting methods and conventions to be used in the preparation of any accounting or financial records of the Partnership as provided in Section 3.6;

(n)    convene meetings of the Limited Partners as provided in Section 3.9;

(o)    open, maintain and close accounts with banks, brokerage firms, custodians or other financial institutions and deposit, maintain and withdraw funds in the name of the Partnership and draw checks or other orders for the payment of moneys;

(p)    enter into, execute, deliver and perform any contract, agreement or other instrument as the General Partner shall determine, in its sole discretion, to be necessary or desirable (i) in connection with the sale of LP Interests, including the Subscription Agreements, or (ii) to further the purposes of the Partnership, including granting or refraining from granting

any waivers, consents and approvals with respect to any of the foregoing and any matters incident thereto;

(q)     appoint the Manager (which is an affiliate of the General Partner) to provide portfolio management, administrative, accounting and other services to the Partnership and to source, select, acquire, manage and dispose of the Partnership Investments;

(r)     value the assets and liabilities of the Partnership, in accordance with Section 3.12;

(s)     establish separate classes of LP Interests with such rights and privileges as the General Partner shall determine;

(t)     acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership, a Partnership Investment and any Covered Person or for any purpose convenient or beneficial to the Partnership;

(u)     require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the Person or entity contracting with the Partnership is to look solely to the Partnership and its assets for satisfaction of any debts owed or claims asserted;

(v)     create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets, in accordance with Section 10.4(b);

(w)     convert the Partnership into a feeder fund, and establish other feeder funds in parallel with the Partnership, that implement their investment programs and other activities through a master fund, and to amend this Agreement pursuant thereto to reflect such "master-feeder" structure; provided, however, that if the Partnership is converted into a feeder fund pursuant to this Section 3.2 (w), and an ERISA Partner invests directly or indirectly through or in a feeder fund or master fund, the ERISA Partner shall be afforded substantially the same protections in respect to such funds as is afforded by the Partnership by virtue of the ERISA Partner's status as an ERISA Partner;

(x)     effect a dissolution of the Partnership as provided herein; and

(y)     act for and on behalf of the Partnership in all matters incidental to the foregoing.

Notwithstanding the foregoing provisions of this Section 3.2, the General Partner shall have the power to do all things and discharge all duties or requirements required of or imposed on a general partner by applicable law (whether or not on behalf of the Partnership).  In addition, the General Partner shall have the power to perform all acts that it may, in its sole discretion, deem necessary or desirable in connection with the performance of its duties hereunder.  The General Partner may, in its sole discretion, delegate certain administrative duties hereunder to such third Persons as the General Partner may designate from time to time.

SECTION 3.3.     Management Fee.

(a)     In consideration for the management services to be rendered pursuant to this Agreement, the Manager shall receive a semi-annual management fee, payable in advance as of January 1 and July 1, each year, and calculated at the specified annualized rate set forth in clause (b) below (the "Management Fee"). The Management Fee shall be prorated for any semi-annual period that is less than a full six (6) months.

(b)     During the Investment Period, the Manager shall receive at the beginning of each semi-annual period a Management Fee equal to an annualized rate of (i) for a Capital Commitment under $100 million (in the aggregate), one hundred and seventy five basis points (1.75%) of the aggregate Capital Commitment of each Limited Partner, or (ii) for a Capital Commitment equal to or in excess of $100 million (in the aggregate), one hundred and fifty basis points (1.50%) of the aggregate Capital Commitment of each Limited Partner. Following the Investment Period, the semi-annual Management Fee will be equal to one hundred and seventy five basis points (1.75%) or one hundred and fifty basis points (1.50%) per annum, as the case may be, of the Capital Contributions of each Limited Partner invested in Partnership Investments attributable to such Limited Partner that have not been the subject of a disposition or write-down by the Partnership (it being understood that a disposition shall include the writing down of a Partnership Investment to zero for tax purposes, effective as of the effective date of such write-down).

(c)     Any Transaction Fees earned by a member of the General Partner Group during any semi-annual period shall be retained by such member but one hundred percent (100%) of such Transaction Fees shall be deemed to be applied to reduce: (i) the amount of the Management Fees in such semi-annual period or future semi-annual periods or (ii) any other Partnership Expenses.

(d)     Waiver, etc. The Manager may, in its sole discretion, waive or reduce the Management Fee for certain Limited Partners. The General Partner will not be assessed a Management Fee with respect to its capital invested in the Partnership.

SECTION 3.4.     Transactions with Affiliates. In addition to transactions specifically contemplated by this Agreement, the General Partner, when acting in its capacity as a general partner of the Partnership, is, to the extent legally permissible, hereby authorized to purchase property or obtain services from, sell property to or provide services to, borrow funds or otherwise deal with the General Partner, as well as counterparties that are Affiliates of the General Partner (including any investment fund and managed account managed or advised by the General Partner or its Affiliates), provided that, in connection with any such dealing, such dealing shall (a) be on terms no less favorable to the Partnership than would be obtained on an arm's length basis and (b) have received the prior written approval of the Advisory Committee or the approval of a majority of the Limited Partners who are not affiliated with the General Partner or its Affiliates. Each Limited Partner acknowledges and agrees that the purchase or sale of property, the performance of such services, the borrowing of such funds, other dealings, or the receipt of such compensation may give rise to conflicts of interest between the Partnership and the Limited Partners, on the one hand, and the General Partner or such Affiliate, on the other hand. Notwithstanding the foregoing, at any time that the assets of the Partnership are "plan assets," the General Partner shall not cause the Partnership to enter into any transactions with

itself or its Affiliates, unless such transactions are exempt from the prohibited transactions restrictions under ERISA and the Code.

SECTION 3.5.    Other Activities; Devotion of Time.    Members of the General Partner Group shall devote so much of their respective business time to the affairs of the Partnership as they consider, in their sole discretion, to be appropriate to enable the Partnership to carry out its business as contemplated herein.  Except as otherwise set forth in Section 3.4, this Agreement does not in any way restrict the ability of a member of the General Partner Group to engage independently or with others, for its or their own accounts and for the accounts of others, in other business ventures and activities of every nature and description, whether such ventures are competitive with the business of the Partnership or otherwise.  Neither the Partnership nor any Limited Partner shall have any rights or obligations by virtue of this Agreement in and to such independent ventures and activities or the income or profits derived therefrom.

SECTION 3.6.    Books and Records; Accounting Method; Fiscal Year.

(a)    Books and Records.  The General Partner shall keep or cause to be kept at the address of the General Partner set forth in Section 2.2(b) full and accurate books and records of the Partnership.  Each Limited Partner shall be shown as a limited partner of the Partnership on such books and records.  Subject to Section 3.8(b), such books and records shall be available, upon ten Business Days notice to the General Partner, for inspection by each Limited Partner or its duly authorized agents or representatives at the offices of the General Partner (or such other location designated by the General Partner, in its sole discretion) at reasonable times during business hours.  Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner.  Notwithstanding the forgoing, a Limited Partner shall not have the ability to identify any other Limited Partner in the Partnership.  As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any identifying information of the other Limited Partners in the Partnership and, if such books and records cannot be redacted, such books and records will not be made available for inspection to such Limited Partner.

(b)    Accounting Methods.  The General Partner shall determine, in its sole discretion, the accounting methods and conventions to be used in the preparation of any accounting or financial records or reports of the Partnership, which methods and conventions shall be in accordance with U.S. generally accepted accounting principles (except as otherwise specified herein).

(c)    Fiscal Year.  Unless otherwise required by applicable law, the fiscal year of the Partnership shall end on December 31st.

SECTION 3.7.    Partnership Information and Tax Returns.  The General Partner shall cause to be prepared and timely filed all information and tax returns required to be filed by the Partnership, if any.  The General Partner may, in its sole discretion, make, or refrain from making, any income or other tax elections for the Partnership that it deems necessary or advisable, including an election pursuant to Section 754 of the Code (provided that the General Partner shall not elect for the Partnership to be treated as a corporation for federal income tax purposes).

SECTION 3.8.      Confidentiality.

(a)      Confidentiality Obligation of Limited Partners.   Each Limited Partner agrees to keep confidential and not to disclose to any Person (other than to directors, officers, partners or employees of (or, in the case of any ERISA Partner, the plan sponsor of), or agents, legal counsel, independent auditors or consultants for, such Limited Partner responsible for matters relating to the Partnership (each an "Authorized Representative")) all information and documents relating to the Partnership and its affairs, including, without limitation, any information (i) relating to any Partnership Investment, (ii) provided to such Limited Partner pursuant to Article VIII, and (iii) provided to such Limited Partner prior to or after its admission to the Partnership relating to the General Partner Group, provided that in each case such Limited Partner may make such disclosure (x) if the information being disclosed is otherwise generally available to the public, or (y) if such disclosure is, in the written opinion (satisfactory to the General Partner) of legal counsel (satisfactory to the General Partner) for such Limited Partner or Authorized Representative, required by applicable law or regulation.   Prior to any disclosure to any Authorized Representative of a Limited Partner of any information referred to in the first sentence of this Section 3.8(a), such Limited Partner shall advise such Authorized Representative of the obligations set forth in this Section 3.8(a) and obtain the agreement of such Authorized Representative to keep such information confidential and otherwise comply with this Section 3.8(a) as though such Authorized Representative were a Limited Partner.   Notwithstanding the terms of this Section 3.8(a) or any other express or implied agreement, arrangement or understanding to the contrary, each party to this Agreement (and their respective Authorized Representatives) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership, and all materials of any kind (including opinions or other tax analyses) that are provided to the party to the extent related to such tax treatment and tax structure.

The General Partner hereby acknowledges that each ERISA Partner and its administrator have an obligation under Section 101(k) of ERISA (collectively with any regulations thereunder, "Section 101(k)") to provide certain information to certain interested parties and agrees that each ERISA Partner shall not be subject to any otherwise applicable confidentiality provision in connection with the ERISA Partner's compliance with Section 101(k) requirements.   The General Partner agrees that at the time any information regarding the Partnership is furnished to an ERISA Partner, the General Partner shall indicate with specificity what (if any) information contained therein constitutes "proprietary information" within the meaning of Section 101(k) and the ERISA Partner shall not disclose such "proprietary information" to interested persons.   The General Partner hereby expressly agrees to indemnify each ERISA Partner and its administrator against any and all claims, liabilities, damages, court costs or reasonable expenses (including reasonable attorneys' fees) that the ERISA Partner and/or its administrator incur or suffer as a result of the ERISA Partner and/or its administrator omitting such information in connection with a request for information made under Section 101(k) of ERISA in the event such information is determined not to be "proprietary information" within the meaning of Section 101(k).

(b)      Right of General Partner to Keep Information Confidential.   The General Partner may, to the maximum extent permitted by applicable law, keep confidential from any Limited Partner any information (including, without limitation, information requested by such Limited Partner pursuant to Section 3.6 and information otherwise required to be delivered to

such Limited Partner pursuant to Article VIII) with respect to any Partnership Investment or potential Partnership Investment (i) which the Partnership or the General Partner is required by law, agreement or otherwise to keep confidential, or (ii) the disclosure of which the General Partner reasonably believes may have an adverse effect on the ability of the Partnership to consummate any proposed Partnership Investment or any transaction directly or indirectly related to, or giving rise to, such Partnership Investment.

Without a Limited Partner's prior written consent, none of the Partnership, the General Partner, the Manager or any of their Affiliates shall (a) use the Limited Partner's name or derivations thereof in advertising, publicity, marketing materials, private placement memorandum or other offering materials or other similar publication or document and/or (b) infer that the Partnership has been endorsed by the Limited Partner.  Notwithstanding clause (a) above, the General Partner and its Affiliates may inform other Limited Partners and prospective investors in the Partnership of the fact and amount of the Limited Partner's subscription to the Partnership; disclose the Limited Partner's name and subscription amount if the General Partner first determines in good faith that such disclosure is in the best interests of the Partnership in connection with a Partnership Investment; and make any other disclosure regarding the Limited Partner's investment in the Partnership required by law, legal process or stock exchange rule, in each case, without obtaining the prior written consent of the Limited Partner.

SECTION 3.9.    <u>Meetings of Limited Partners</u>.  The General Partner or Limited Partners holding at least 25% of the LP Interests in the Partnership may call a meeting of the Limited Partners at any time for any purpose of the Partnership.  The General Partner will give timely notice of such meeting to each Limited Partner.  Such notice shall specify the time and place of such meeting.  Actions may be approved at any such meeting upon the approval of a majority of the Limited Partners not affiliated with the General Partner or its Affiliates present at such meeting; provided that greater than 50% of the Limited Partners not affiliated with the General Partner or its Affiliates are present in person or by proxy at such meeting.

SECTION 3.10.    <u>Temporary Investment of Funds</u>.  The General Partner shall invest cash held by the Partnership in Temporary Investments, including all amounts being held by the Partnership for future investment in Partnership Investments, payment of Partnership Expenses or distribution to the Partners (including, without limitation, any amounts held by the Partnership pursuant to Section 7.1(e)).

SECTION 3.11.    <u>Certain ERISA Matters</u>.

(a)    If the General Partner determines, in its sole discretion, that the interests of ERISA Partners would be "significant" for purposes of the Plan Asset Regulation, the General Partner is authorized to take any action it considers appropriate under the circumstances, including (i) reducing the interests of ERISA Partners in the Partnership pursuant to Section 6.5 so that the participation in the Partnership of ERISA Partners is not significant for purposes of the Regulation, or (ii) the permitting the Partnership to hold plan assets for purposes of the Plan Asset Regulation.  At any time that the Partnership holds "plan assets" for purposes of the Plan Asset Regulation, the General Partner and the Manager both agree that they are fiduciaries for all ERISA Partners with respect to the assets of the Partnership.

(b)     In the event the General Partner permits the Partnership to hold "plan assets" for purposes of the Plan Asset Regulation, and notwithstanding any provision of this Agreement to the contrary, the General Partner (i) shall promptly notify each ERISA Partner as soon as it has reason to believe that the Partnership's assets may constitute plan assets for ERISA purposes, and (ii) shall use its best efforts to conduct the business of the Partnership so that the Partnership does not cause the Partnership and/or any ERISA Partner to engage in a "prohibited transaction" as defined in ERISA and the Code; provided that the General Partner shall be permitted to rely on any information provided by an ERISA Partner in its Subscription Agreement or in supplemental requests for information from the General Partner with respect to the requirements of this clause (ii).

(c)     The General Partner will notify all Limited Partners within ten (10) Business Days of the Final Closing Date whether or not the Partnership will be deemed to be holding "plan assets" for purposes of the Plan Asset Regulation.

SECTION 3.12.     Valuation.  Whenever the Fair Value of property is required to be determined under this Agreement, such Fair Value shall be determined by the General Partner, in its sole discretion, in a reasonable manner.  Such valuations and determinations shall be final and binding on the Partners.

Any Securities distributed by the Partnership shall be valued by the General Partner at the Fair Value thereof as reasonably determined by the General Partner, taking into account any related fees and expenses incurred in connection with the disposition of such Securities.  The General Partner will employ an independent pricing service (such as an investment banking firm) for purposes of consulting on the Fair Value of any Partnership Investments or any Securities.  Notwithstanding the foregoing, at any time that the Partnership holds "plan assets" for purposes of the Plan Asset Regulation, the Fair Value of such Securities and other Partnership property shall be determined by an independent Person selected by Limited Partners not affiliated with the General Partner or its Affiliates owning at least fifty-one percent (51%) of the LP Interests to the extent necessary to comply with the provisions of ERISA.

SECTION 3.13.     Reliance by Third Parties.   Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth, and shall not be required to inquire as to the General Partner's authority to bind the Partnership.

SECTION 3.14.     Borrowings.  The Partnership may borrow funds under a credit facility on market-based terms in order to fund the acquisition of Partnership Investments or pay Partnership Expenses pending the Partnership's receipt of required Capital Contributions from Limited Partners or other receipts of cash.

By executing this Agreement, each Limited Partner expressly agrees that the General Partner may pledge the assets of the Partnership and its rights hereunder as security for any borrowing and that its Capital Commitment obligation, the right to deliver Capital Call Notices to the Limited Partners, the right to receive all amounts in respect of Capital Contributions and any other assets of the Partnership, may be pledged to secure any borrowings or indebtedness incurred by the Partnership.  In connection with any borrowing or indebtedness incurred by the Partnership, each Limited Partner agrees that it shall, upon request, confirm its

Remaining Capital Commitment, and execute such other documents as may reasonably be requested by any lender; provided, that a Limited Partner shall not be required to (i) execute any document that would subject such Limited Partner to any obligation beyond the amount of such Limited Partner's unfunded Capital Commitment or (ii) execute or obtain any legal opinions prepared by legal counsel.

The General Partner shall be required to give each Limited Partner that is exempt from income taxation pursuant to Section 501 of the Code (a "Tax-Exempt Limited Partner") who has previously requested in writing that the General Partner do so and who is not then in default on any obligation to make Capital Contributions or other payments, the opportunity, upon at least five (5) Business Days' notice, to make a Capital Contribution to the Partnership in the amount equal to such Tax-Exempt Limited Partner's pro rata share of such borrowing, and such borrowing (and the interest expense relating thereto) shall not be allocated to such Tax-Exempt Limited Partner.

SECTION 3.15.    Conflicts of Interest.

(a)    While the General Partner intends to avoid situations involving conflicts of interest, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership conflict with the interests of the General Partner Group, including the conflicts of interest identified in the Offering Memorandum.  Each Limited Partner agrees that the activities of the members of the General Partner Group not prohibited by this Agreement may be engaged in by the General Partner Group, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty owed by any member of the General Partner Group to the Partnership or to any Partner, except to the extent such Affiliate engaged in conduct that constitutes (i) fraud, (ii) willful and material breach of the duties set forth in this Agreement or under the Act, (iii) gross negligence or (iv) willful and material breach of any applicable fiduciary or other duty under federal or other applicable law; provided, however, that the Limited Partners do not agree to any conflicts of interest at any time that the assets of the Partnership are "plan assets" to the extent that such conflict of interest would be a prohibited transaction under ERISA or the Code.

(b)    The Partnership and the General Partner Group will seek to resolve any conflicts with respect to investment opportunities involving the Partnership in a manner which the General Partner deems equitable to the extent possible under prevailing facts and circumstances; provided that, the General Partner shall have the right, subject to Section 4.3, to allocate any investment opportunity which comes to its attention wholly or primarily to any entity or entities other than the Partnership.

(c)    On any issue involving actual conflicts of interest not provided for elsewhere in this Agreement, the General Partner will be guided by its good faith judgment as to the best interests of the Partnership, and shall take such actions as are determined to be necessary or appropriate to ameliorate the conflicts of interest.

SECTION 3.16.    Advisory Committee.  The General Partner shall establish an advisory committee either comprised of (i) individual representatives of selected Limited Partners, at least a majority of whom are not affiliated with the General Partner or its Affiliates (the "Limited Partner Advisory Committee") or (ii) an independent third party selected by a

majority of the Limited Partners not affiliated with the General Partner or its Affiliates (the "Third Party Advisory Committee" and, together with the Limited Partner Advisory Committee, the "Advisory Committee"), in each case, to provide approval (as specified in Section 3.4 of this Agreement) or advice to the General Partner on matters relating to the resolution of potential conflicts of interest involving the Partnership and the General Partner Group and such other matters as may be referred to it from time to time by the General Partner. Subject to the terms and conditions set forth in this Section, the size, terms of appointment and all other matters relating to the Limited Partner Advisory Committee shall be determined in the sole discretion of the General Partner. Any member of the Limited Partner Advisory Committee (i) may resign by giving the General Partner prior written notice, and (ii) shall be deemed removed upon the designating Limited Partner becoming a Defaulting Partner. The General Partner may, in its sole discretion, disapprove of any individual representative on the Limited Partner Advisory Committee designated by any Limited Partner and shall have the right to remove any such Person from the Limited Partner Advisory Committee at any time upon notice to such Person and the other members of the Limited Partner Advisory Committee with an explanation for such removal; provided, that the General Partner may not remove any Person from the Limited Partner Advisory Committee that is not affiliated with the General Partner or its Affiliates without the consent of (i) a majority of the members of the Limited Partner Advisory Committee that are not affiliated with the General Partner or its Affiliates or (ii) the Limited Partner whose representative is proposed to be removed. The Advisory Committee shall have the authority to (i) provide approval with respect to the affiliated party transactions contemplated by Section 3.4 of this Agreement, (ii) review and investigate any related party transactions identified in the Partnership's quarterly, annual or other reports or financial statements and (iii) approve any waiver of the default provisions set forth in Section 6.3 of this Agreement by the General Partner in favor of the General Partner or any Affiliate of the General Partner. The approval of the Limited Partner Advisory Committee (including any formal advice or guidance provided to the General Partner) shall require the affirmative vote of a majority of the members thereof that are not affiliated with the General Partner or its Affiliates. The formal advice or guidance of the Advisory Committee specifically regarding conflicts of interest shall be binding upon the General Partner. Members of the Advisory Committee may participate in a meeting of the Advisory Committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Except as set forth below, members of the Advisory Committee will not be acting in a fiduciary capacity with respect to the Partnership or any Limited Partners in connection with the functions of the Advisory Committee. The Partnership will bear any expenses related to the functions of the Advisory Committee. Notwithstanding the foregoing, at any time that the assets of the Partnership are "plan assets," the powers granted to the General Partner with respect to the Limited Partner Advisory Committee, specifically the powers to appoint and remove members of the Limited Partner Advisory Committee shall instead be exercisable by a majority of Limited Partners not affiliated with the General Partner or its Affiliates. At any time that the assets of the Partnership are "plan assets," the Advisory Committee shall be a fiduciary with respect to the Partnership, and the members of the Advisory Committee may receive such compensation from the Partnership as determined by a majority of the Limited Partners that are not affiliated with the General Partner or its Affiliates. The General Partner shall provide to each Limited Partner (a) a detailed description of conflicts of interests reviewed by the Advisory Committee promptly following each meeting thereof, and (b) upon such Limited Partner's request, a detailed description of the topics discussed at any Advisory Committee meeting along with copies of all written materials provided to the Advisory Committee in connection with any such meeting.

SECTION 3.17.    Avoidance of UBTI.   The General Partner shall use reasonable efforts to structure Partnership Investments and otherwise conduct the business of the Partnership in a manner that is not likely to cause any Tax-Exempt Limited Partner to have any "unrelated business taxable income" ("UBTI"), including, without limitation, any "unrelated debt-financed income" (as those terms are defined in Sections 512 and 514 of the Code) to the extent consistent with its goal of maximizing the pre-tax income of all Partners, provided that reasonably equivalent investment structures are available to the Partnership which will not produce UBTI and will not have an adverse impact on a significant number of the other Limited Partners.   Notwithstanding the foregoing, the General Partner shall not be required to make any effort to avoid the recognition of UBTI by a Tax-Exempt Limited Partner to the extent such recognition would be attributable (a) to borrowings pursuant to Section 3.14, or (b) to the borrowing of money on a short-term basis by the Partnership which is to be repaid through Capital Contributions.   The General Partner and its Affiliates shall not be liable to any Tax-Exempt Limited Partners in connection with any UBTI reported by such Limited Partners.

SECTION 3.18.    Investment Committee.   The Manager has established an investment committee ("Investment Committee") to (a) approve potential Partnership Investments, (b) assess and manage the risks for such Partnership Investments and (c) continually monitor such Partnership Investments.   All decisions regarding the acquisition and disposition of Partnership Investments will be made by the unanimous decision of the Investment Committee.   The members of the Investment Committee are the Principals and such other individuals as are selected by the Principals from time-to-time.

## ARTICLE IV
## INVESTMENTS AND INVESTMENT OPPORTUNITIES

SECTION 4.1.    Investments Generally.   The assets of the Partnership shall, to the extent not required for the payment of Partnership Expenses or otherwise necessary for the conduct of the Partnership's business, and subject to Section 3.10, be invested in such Partnership Investments as the General Partner shall determine in its sole discretion.

SECTION 4.2.    Investment Restrictions.   The Partnership generally will not invest more than (i) twenty-five percent (25%) of its aggregate Capital Commitments in a single market sector; or (ii) eight percent (8%) of its aggregate Capital Commitments in the Securities of any single Portfolio Company, each measured at cost at the time of investment; provided, however, that the General Partner has the discretion to exceed these percentage limitations if it makes a good faith determination that such additional investment is in the best interests of the Partnership and the Advisory Committee approves of such additional investment.

SECTION 4.3.    Co-Investment Opportunities.   The General Partner may, in its sole discretion, provide certain of the Limited Partners, strategic investors, lenders and others with an opportunity to co-invest with the Partnership in Partnership Investments, provided that the terms of any such co-investment are no more favorable than the investment terms offered to the Partnership.   Co-investment opportunities may be effected through limited partnerships or other entities formed to effect such co-investments ("Co-Investment Funds").   The General Partner will allocate available co-investment opportunities among the Partnership, any Co-Investment Funds and any other investment fund or managed account managed by the General

Partner Group in such manner as it determines in its sole discretion, and, at any time that the assets of the Partnership are "plan assets," in accordance with the requirements of ERISA.

## ARTICLE V
## EXPENSES

SECTION 5.1. <u>Definition and Payment of Manager Expenses</u>. As between the General Partner, the Manager and the Partnership, the Manager and the General Partner shall be solely responsible for and shall pay their own respective Manager Expenses. As used herein, the term "Manager Expenses" means the organizational and operating expenses of the General Partner and the Manager, including salaries and employee benefit expenses of employees, office rent, supplies and telecommunication expenses.

SECTION 5.2. <u>Partnership Expenses</u>.

(a) <u>Payment of Partnership Expenses</u>. The Partnership shall be responsible for and shall pay all Partnership Expenses.

(b) <u>Definition of Partnership Expenses</u>. As used herein, the term "Partnership Expenses" means all expenses or obligations of the Partnership or otherwise incurred by the General Partner or Manager on behalf of the Partnership in connection with this Agreement other than any expense that would be considered a Manager Expense.

(c) <u>Specified Partnership Expenses</u>. The parties agree that all of the following constitute Partnership Expenses, and comprise some, but not necessarily all, of the types of expenses that may constitute Partnership Expenses, depending upon the context in which such expenses are incurred:

(i) all out-of-pocket expenses incurred by the Partnership or on its behalf that are directly related to the organization of the Partnership and the marketing of LP Interests to prospective Limited Partners, including, without limitation, legal, tax, accounting, filing and printing fees relating to such organization, travel expenses, the production of marketing materials and the audits of past internal rates of returns relating to such marketing materials (collectively, the "Organizational Expenses"); provided, that any fees payable to a placement agent engaged by the Partnership to offer and sell LP Interests shall either be borne (i) by the Partnership, in which event the Management Fee otherwise payable to the Manager shall be reduced by an amount equal to 100% of the placement fees paid by the Partnership or (ii) directly by the Limited Partner referred to the Partnership by the placement agent;

(ii) expenses related to the sourcing, due diligence, valuation, and potential acquisition of Partnership Investments, regardless of whether such acquisition is actually consummated, the holding, monitoring and sale of Partnership Investments;

(iii) legal, tax, auditing, consulting, accounting, valuation services, loan servicing, and other professional expenses;

(iv)     costs and expenses for the preparation of the Partnership's financial statements, tax returns and IRS Schedules K-1;

(v)     litigation expenses of the Partnership;

(vi)     out-of-pocket expenses incurred in connection with the collection of amounts due to the Partnership from any Person;

(vii)     insurance premiums related to protection of Covered Persons against any liability arising out of, related to or incurred in connection with this Agreement;

(viii)     expenses incurred in connection with any Proceeding involving the Partnership (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith; provided, however, that any such expenses which, if incurred by any Person, would not be indemnifiable under Article IX, shall not constitute Partnership Expenses;

(ix)     fees and expenses of the Administrator;

(x)     any indemnification obligation and any other indemnity contribution or reimbursement obligations of the Partnership with respect to any Person, whether payable in connection with a Proceeding involving the Partnership or otherwise, in each case, to the extent available under applicable law and the provisions of Section 9.2;

(xi)     Management Fees (to be allocated among Limited Partners as contemplated by Section 3.3);

(xii)     any Borrowing Costs relating to any borrowings incurred by the Partnership; and

(xiii)     all expenses incurred in connection with the dissolution and liquidation of the Partnership.

## ARTICLE VI
## CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS

SECTION  6.1.          Capital Commitments.

(a)     Agreement to Contribute Capital.  Subject to Sections 6.1(b) and (d), 6.2, 6.5, 7.1(b) and 9.2, each Partner hereby agrees to make Capital Contributions, in an aggregate amount equal at any time to its Remaining Capital Commitment, during the Investment Period. The Partnership may make commitments to Partnership Investments during the Investment Period.  Following the Investment Period, Partners shall cease to be obligated to contribute capital in respect of their Remaining Capital Commitment; provided, however, that Partners shall remain obligated to make a Capital Contribution in respect of their Remaining Capital Commitments to (i) fund Partnership Expenses and liabilities (including, without limitation, the

Management Fee and any Partnership borrowings), (ii) permit the Partnership to fulfill investment commitments made prior to the expiration of the Investment Period, including, without limitation, for purposes of making Partnership Investments made pursuant to rights acquired prior to the expiration of the Investment Period, and (iii) fund Follow-On Investments. Notwithstanding anything to the contrary herein, each Limited Partner will participate in any Follow-On Investment in the same proportion that it participates in the original Partnership Investment to which such Follow-On Investment relates.  Further, in the event that after the expiration of the Investment Period there exists outstanding indebtedness of the Partnership secured by the Capital Commitments of the Limited Partners, the Limited Partners obligation to so contribute capital shall continue, to the extent of its pro rata portion of such indebtedness vis-à-vis all other Limited Partners, until such time as such indebtedness is paid in full.

(b)     <u>Release of Commitments, etc</u>.  Notwithstanding the provisions of Section 6.1(a), the General Partner may, in its sole discretion, cancel some or all of the Remaining Capital Commitments of all Partners at any time if the General Partner determines that changes in any applicable law or regulation make it necessary for the Partnership to do so.

(c)     <u>Capital Commitment of the General Partner Group</u>.  Certain principals of the Manager have invested a significant portion of their liquid net worth into other investment funds and managed accounts advised by the Manager and its Affiliates that pursue a substantially similar investment strategy to the Partnership and, at times, invest alongside the Partnership. Such principals will also invest into the Partnership.

(d)     <u>Key Person Event</u>.  If at any time during the Investment Period (i) at least two (2) of the Principals die, become legally incompetent or are disabled (i.e., unable by reason of disease, illness or injury to perform his or her duties with respect to the Partnership for 90 consecutive days, or otherwise cease to be active in the affairs of the Partnership for 90 consecutive days) or (ii) the General Partner Transfers all or a portion of its GP Interest to any Person not affiliated with the General Partner or its Affiliates (each, a "Key Person Event"), then the General Partner will provide the Limited Partners with written notice of such Key Person Event within thirty (30) days following the occurrence thereof.  Thereafter, the Investment Period will terminate if Limited Partners representing at least two-thirds (66-2/3%) of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner and its Affiliates affirmatively elect in writing to terminate the Investment Period; provided that any such termination shall not prevent the Partnership from: (i) completing any proposed Partnership Investment with respect to which it has entered into a legally binding agreement to invest in prior to such election by the Limited Partners; (ii) paying any Partnership Expenses relating to existing or committed Partnership Investments, or (iii) satisfying any of its obligations in respect of any borrowings or other extensions of credit which are secured, in whole or in part, by the Capital Commitments.

SECTION  6.2.     <u>Capital Call Procedure</u>.

(a)     <u>Generally</u>.  Each Limited Partner shall make Capital Contributions to the Partnership as needed with respect to the Partnership Investments, to pay Partnership Expenses or to maintain a reserve in such amounts, to such account and at such times (including at a Closing) as the General Partner shall specify in notices ("Capital Call Notices") delivered from time to time to such Limited Partner.  All Capital Contributions shall be paid to the Partnership

by wire transfer in immediately available funds to the account specified in the Capital Call Notice by 11:00 A.M. (New York City time) on the date specified in the applicable Capital Call Notice. Capital Contributions may include amounts that the General Partner determines, in its sole discretion, are necessary or desirable to establish reserves in respect of potential Partnership Investments or Partnership Expenses.

(b)     Capital Call Notices.  Each Capital Call Notice shall specify:

(i)     the Capital Call Amount;

(ii)     the required Capital Contribution to be made by such Limited Partner;

(iii)     the date (the "Capital Call Date") on which such Capital Contribution is due; and

(iv)     the account to which such Capital Contribution should be paid.

The General Partner shall deliver each Capital Call Notice at least ten (10) Business Days before the Capital Call Date (other than a Capital Call Notice relating to a Capital Contribution payable at a Closing) including the date of delivery of the Capital Call Notice.

(c)     Amounts of Required Capital Contributions for each Partner.  Subject to Section 2.5, in connection with any Capital Call, each Partner shall be required to make a Capital Contribution equal to the product of (i) such Partner's Remaining Commitment Percentage and (ii) the Capital Call Amount specified in the applicable Capital Call Notice.

SECTION 6.3.     Default by Limited Partners.

(a)     In General.  Each Partner agrees that (i) payment of its required Capital Contributions and amounts required pursuant to Sections 6.2 and 9.2 when due is of the essence, and is to be made absolutely and unconditionally in each case without any set-off, withholding, counterclaim, defense or reduction, (ii) any Default by any Limited Partner would cause injury to the Partnership and to the other Partners, and (iii) that the amount of damages caused by any such injury would be extremely difficult to calculate.  Accordingly, each Partner agrees that upon any Event of Default by a Limited Partner, such Defaulting Partner may, in the General Partner's sole discretion, (I) not share in any gain realized by the Partnership on any disposition of a Partnership Investment occurring after the date of Default (regardless of when the Partnership Investment was made), (II) continue to share in any loss realized by the Partnership on any disposition of any Partnership Investment in which the Defaulting Partner participated, and/or (III) have the entire balance in its Capital Account forfeited (the amount of the reduction to be distributed pro rata to all Partners, other than the Defaulting Partner).

Except as expressly provided in the Partnership Agreement, the obligations of any Defaulting Partner to the Partnership, or under the Partnership Agreement, shall continue regardless of the remedies pursued by the Partnership.

Upon the occurrence of any Default, the General Partner shall promptly notify the Limited Partner who has committed such Default of its status as a Defaulting Partner.

(b)    <u>Action by General Partner</u>.  Upon the occurrence of an Event of Default, the General Partner may take such actions as it determines, in its sole discretion, are appropriate with respect to the defaulted amount, including, but not limited to:

(i)    drawing-down additional capital from non-Defaulting Partners;

(ii)    increasing its own Capital Contribution;

(iii)    causing the sale, transfer or other disposition of all of the LP Interest of the Defaulting Partner or causing the Defaulting Partner to sell, transfer or otherwise dispose of all of its LP Interest, after a twenty (20) day period during which the General Partner will solicit bids for the purchase of such LP Interest, to another non-Defaulting Partner or to a third-party on such terms as are determined by the General Partner and the proposed transferee;

(iv)    causing the Partnership to borrow money from third parties, non-Defaulting Partners, the General Partner or any of its Affiliates in order to fund the Defaulting Limited Partner's Capital Call obligation.  The Borrowing Costs with respect to any borrowing pursuant to this Section 6.3(b)(iv) shall be charged to the Capital Account of the Defaulting Partner.  Any such borrowing will constitute a separate obligation of the Defaulting Partner and not the Partnership and will be secured by (A) the Capital Commitments of the Defaulting Partner, (B) the Defaulting Partner's LP Interest, and (C) a personal guarantee of the Defaulting Partner in an amount not to exceed one hundred percent (100%) of the amount of the borrowing attributable to the Defaulting Partner; or

(v)    immediately institute legal procedures against the Defaulting Partner to collect all amounts owed by such Defaulting Partner to the Partnership or any other person, together with interest, at the maximum rate provided by law from the date of the Default plus all related collection expenses, including reasonable attorney's fees.

(c)    <u>Additional Capital Call Notice</u>.  If additional capital is drawn down pursuant to Section 6.3(b)(i) with respect to any amount that is in Default, the General Partner shall deliver an additional Capital Call Notice in accordance with Section 6.2(b) to the non-Defaulting Limited Partners, and the required Capital Contribution of each such Limited Partner shall be increased by an amount calculated with respect to the amount that remains to be funded in accordance with Section 6.2(c) (determined without regard to the Capital Commitment of the Defaulting Partner); provided that no Limited Partner can be required to contribute in excess of its Remaining Capital Commitment.

(d)    <u>Defaulting Partner's Remaining Capital Commitment</u>.  In its sole discretion, the General Partner may take any or all of the following actions in respect of the Remaining Capital Commitment of any Defaulting Partner:

(i)    cause the Defaulting Partner to forfeit all or a portion of its interest in distributions to be derived from Partnership Investments that have been made by the Partnership as of the date of the Event of Default;

(ii)     require the Defaulting Partner to sell its LP Interest to a purchaser determined in the sole discretion of the General Partner.  In the sole discretion of the General Partner, such sale may be (A) at a price determined by the General Partner and (B) in exchange for a non-recourse, non-interest bearing note secured by the LP Interest sold and payable solely from distributions receivable with respect to the LP Interest sold;

(iii)     seek commitments of capital from additional investors (which may, in the General Partner's sole discretion, include Existing Limited Partners or the General Partner) up to the amount of the Defaulting Partner's Remaining Capital Commitment.  If any such commitment is received from any Existing Limited Partner, such Limited Partner's Capital Commitment and Remaining Capital Commitment shall be increased accordingly.  If any such commitment is received from an investor that is not an Existing Limited Partner, such investor shall, after executing such instruments and delivering such opinions and other documents (including an executed counterpart to this Agreement) as are in form and substance satisfactory to the General Partner, be admitted to the Partnership as a Substitute Limited Partner and shown as such on the books and records of the Partnership and shall be deemed to have a Capital Commitment and a Remaining Capital Commitment equal to the commitment for which such investor has subscribed.  After the appropriate adjustment of the Capital Commitment and the Remaining Capital Commitment of the Limited Partner or admission of the Substitute Limited Partner as more fully provided in Section 12.2, the Capital Commitment and Remaining Capital Commitment of the Defaulting Partner shall be decreased accordingly; and

(iv)     reduce or cancel the Remaining Capital Commitment of the Defaulting Partner on such terms as the General Partner determines, in its sole discretion, (which may include leaving such Defaulting Partner obligated to pay the Management Fee and to make Capital Contributions with respect to Partnership Expenses up to the amount of such Partner's Remaining Capital Commitment immediately prior to the time such Remaining Capital Commitment is so reduced or canceled).

(e)     Waiver of Default Provisions in favor of the General Partner or its Affiliates.  The General Partner may waive any or all of the actions set forth in this Section 6.3 for any Defaulting Partner that is affiliated with the General Partner or its Affiliates only upon the prior written approval of the Advisory Committee.

SECTION  6.4.     Remedies Not Limited.  The rights and remedies referred to in Sections 6.2 and 6.3 shall be in addition to, and not in limitation of, any other rights available to the General Partner or the Partnership under this Agreement or at law or in equity.   In addition, unless the Remaining Capital Commitment of any Defaulting Partner is decreased to zero pursuant to Section 6.3(d)(iv), an Event of Default by such Limited Partner shall not relieve such Defaulting Partner of its obligation to make Capital Contributions subsequent to such Event of Default.  A Defaulting Partner will be obligated to pay all of the expenses incurred by the Partnership in pursuing any remedial actions, including reasonable attorney's fees.

SECTION  6.5.     Special Provisions Related to ERISA Partners.  In the event that the General Partner determines that absent action pursuant to this Section 6.5, LP Interests in the Partnership of ERISA Partners will be "significant" under the Plan Asset Regulation, the

General Partner, in its sole discretion, may reduce the Capital Commitment of each ERISA Partner (pro rata based upon the amount of each such Capital Commitment) so that the interests of ERISA Partners in the Partnership are not "significant" for purposes of the Plan Asset Regulation.

SECTION 6.6.       Excluded Limited Partners.

(a)       Notwithstanding anything to the contrary contained herein, the General Partner shall cancel the obligation of any Limited Partner (an "Excluded Limited Partner") to make any Capital Contribution with respect to a particular Partnership Investment if either (i) it determines based upon advice of counsel (a copy of which advice shall be provided to the Excluded Limited Partner to be excluded) that there is a reasonable likelihood that the Excluded Limited Partner's participation in the economics of such Partnership Investment would (a) impose a material tax, regulatory or other burden on the Partnership or the other Limited Partners or (b) result in a violation of any applicable law, regulation or administrative practice to which the Excluded Limited Partner, the Partnership or the particular Partnership Investment involved is subject, or (ii) the Excluded Limited Partner provides to the General Partner written advice from a reputable and experienced law firm satisfactory to the General Partner concluding that the Excluded Limited Partner's participation in the economics of such Partnership Investment (a) is illegal or otherwise prohibited by statute or regulation applicable to such Excluded Limited Partner or (b) would result in materially unfavorable tax, legal or regulatory consequences to such Excluded Limited Partner.   An Excluded Limited Partner shall not participate in the economics of any particular Partnership Investment with respect to which it does not make a Capital Contribution pursuant to this Section 6.6(a).

Any determination pursuant to clause (i) of the immediately preceding paragraph shall, if possible, be communicated to such Excluded Limited Partner at or prior to the time that the General Partner delivers Capital Call Notices relating to the Capital Contributions in question to the other Limited Partners.   Such Capital Call Notices shall provide the amount of any additional capital which such other Limited Partners shall be required to contribute as a result of the developments set forth above or, if such determination is not made until after a Capital Call Notice for such Partnership Investment has been delivered to the other Limited Partners (but in any event within ten (10) calendar days after the consummation of such Partnership Investment), the General Partner may then deliver a new Capital Call Notice to each other Limited Partner which is able to participate in such Partnership Investment indicating the additional Capital Contribution to be made in respect of such Partnership Investment, and, subject to the proviso set forth in this Section 6.6, each such Limited Partner shall make an additional Capital Contribution in respect of such Partnership Investment as soon as practicable but in no even later than five (5) calendar days after having been given such new Capital Call Notice.   Additional Capital Contributions called for pursuant to this Section 6.6 shall be made by each such other Limited Partner in an amount which bears the same ratio to the aggregate additional Capital Contributions of all other Limited Partners as such other Limited Partner's Remaining Capital Commitment bears to the Remaining Capital Commitments of all such other Limited Partners; provided that no Limited Partner shall be obligated to contribute an amount in excess of such Limited Partner's Remaining Capital Commitment.

(b)   No Commitment Reduction for Excluded Limited Partner.   The Remaining Capital Commitment of any Excluded Limited Partner shall not be reduced as a result of its exclusion from participation in a Partnership Investment pursuant to this Section 6.6.

## ARTICLE VII
## DISTRIBUTIONS; CAPITAL ACCOUNTS

SECTION 7.1.    Distributions.

(a)   Distribution.   Subject to the following sentence, proceeds derived by the Partnership from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to a Limited Partner during the Investment Period or within eighteen (18) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of eighteen (18) months after the expiration of the Investment Period.   Limited Partners may elect in the Subscription Agreements to receive quarterly distributions of interest, dividend and other similar payments from Partnership Investments (any Limited Partner electing to receive such quarterly distributions, an "Electing Partner").   Notwithstanding the foregoing, the amount of any such quarterly distribution will be reduced by any amounts that the General Partner considers prudent reserves to meet the future expenses and liabilities of the Partnership.   Any Distributable Cash derived by the Partnership from a particular Partnership Investment will initially be apportioned among the Partners in proportion to their respective Capital Contributions relating to the acquisition of the Partnership Investment.   The amount so apportioned to the General Partner shall be distributed to the General Partner.   The amount so apportioned to each Limited Partner shall then be immediately reapportioned between the Limited Partner and the General Partner in the following manner and priority:

(i)   First, one hundred percent (100%) to the Limited Partner until the cumulative distributions to such Limited Partner equals the cumulative Capital Contributions of such Limited Partner to the Partnership;

(ii)   Second, one hundred percent (100%) to the Limited Partner until the cumulative distributions to such Limited Partner in excess of its cumulative Capital Contributions provides such Limited Partner with a cumulative return of seven and one-half percent (7.5%) per annum, compounded annually, on such Limited Partner's aggregate outstanding Capital Contributions calculated from the date that such Capital Contributions are contributed to the Partnership until the date on which such Capital Contributions are returned to such Limited Partner;

(iii)   Third, one hundred percent (100%) to the General Partner until the General Partner has received, with respect to the Limited Partner, an amount equal to twenty percent (20%) of the sum of all distributions made to (x) such Limited Partner pursuant to subparagraph (ii) above and (y) the General Partner with respect to such Limited Partner pursuant to this subparagraph (iii); and

(iv)     Fourth, eighty percent (80%) to the Limited Partner and twenty percent (20%) to the General Partner.

The aggregate amount, if any, distributable to the General Partner in accordance with sub-paragraphs (iii) and (iv) of this Section 7.1(a) above, shall be referred to as a "Carried Interest." The General Partner may, in its sole discretion reduce or waive the Carried Interest for any Limited Partner.

The General Partner will utilize its best efforts to provide at least five (5) Business Days notice to Limited Partners prior to making any distribution to Limited Partners, which notice shall include the sources of such distribution and the anticipated amount to be distributed (including detailed figures showing the portion of such distribution attributable to return of capital, realized losses, Partnership Expenses, Organizational Expenses, Management Fees, and profits and Carried Interest distributions).

(b)     Reinvestment of Distributed Capital.  Subject to the second sentence of Section 7.1(a), proceeds derived by the Partnership from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to a Limited Partner during the Investment Period or within eighteen (18) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of eighteen (18) months after the expiration of the Investment Period.  The General Partner will notify the Limited Partners quarterly of their Remaining Capital Commitment, including any distributions to Limited Partners that are being added to their Remaining Capital Commitment.

(c)     Distributions in Kind.  The Partnership may distribute property in kind and in such amounts as the General Partner shall, at its sole discretion, determine.  Any distribution in kind shall be made to the Partners in accordance with Section 10.4, and shall be treated for purposes thereof as if such distribution in kind was a cash distribution in an amount equal to the then Fair Value of the distributed assets.  The Capital Accounts of the Partners shall be adjusted in accordance with Section 7.2, immediately prior to any such distribution in kind, to reflect the gain or loss that would be recognized had the assets to be distributed in kind been sold for their Fair Value to a third party on an arm's-length basis.  In connection with any distribution in kind of interests in securities or other property to a Limited Partner under this Agreement (including pursuant to this Article VII and Article X), the General Partner shall notify the Limited Partner that the Limited Partner may request that such securities or other property not be distributed to it, but instead sold for cash on its behalf.  If the Limited Partner so requests, the General Partner shall use commercially reasonable efforts to sell such securities or other property and distribute the cash proceeds of such sale to the Limited Partner net of any relevant reasonable costs and expenses.  In each such event, such securities or other property shall be deemed to have been distributed to the Limited Partner at the same time and at the same valuation that the securities or other property were distributed to the other Limited Partners.

(d)     Withholding of Certain Amounts.    Notwithstanding anything else contained in the Agreement, the General Partner may, in its sole discretion, withhold from any distribution of cash or property by the Partnership to any Limited Partner contemplated by this Agreement, the following amounts:

(i)      any amounts then due from such Limited Partner to the Partnership or to the General Partner or to any other Person in connection with the Partnership; and

(ii)     any amounts required to pay or to reimburse the Partnership for the payment of any withholding or other taxes properly attributable to such Limited Partner (including, without limitation, withholding taxes and interest, penalties and expenses incurred in respect thereof).

Any withholding described in Section 7.1(d)(i) or (ii) above shall be treated for all purposes of this Agreement as (i) having been distributed to the Limited Partner, and (ii) having been contributed by such Limited Partner to the Partnership or paid by such Limited Partner to the General Partner or such other Person, as the case may be (and the payment of such amounts by the Partnership shall not constitute Partnership Expenses). Any withholding described in Section 7.1(d)(ii) shall be made at the maximum applicable statutory tax rate under applicable law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower tax rate is applicable. Any amounts withheld pursuant to this Section 7.1(d) shall be applied by the General Partner to discharge the obligation in respect of which such amounts were withheld.

(e)      Amounts Held in Reserve. In addition to the rights set forth in Section 7.1(d), the General Partner shall have the right, in its sole discretion, to withhold amounts otherwise distributable by the Partnership to the Partners in order to make such provision as the General Partner in its sole discretion deems necessary or advisable for Follow-On Investments and the payment of any and all expenses, debts, liabilities and obligations, contingent or otherwise, of the Partnership.

(f)      Income from Temporary Investments. Income and gains realized by the Partnership with respect to Temporary Investments will generally be reserved for future expenses, investments in Partnership Investments and other reserves; however, the General Partner, in its sole discretion, may from time to time distribute such income and gains pro rata among the Partners based on their respective Capital Contributions.

(g)      Amounts Subject to Recall; Reserves. Both during and following the Term of the Partnership, the Partnership may require the Partners to recontribute to the Partnership amounts up to the aggregate distributions previously made to them by the Partnership if necessary to satisfy the Partnership's obligations set forth in (i) the Partnership Act or (ii) the indemnification and contribution obligations under Article IX of this Agreement. The Partnership may reserve Remaining Capital Commitments or retain funds in amounts appropriate in the sole judgment of the General Partner to provide for recalled capital, Partnership Expenses or Follow-On Investments, as well as for contingencies. Any distributions recalled pursuant to this Section 7.1(g) shall not be treated as Capital Contributions but shall be treated as returns of distributions and reductions in Distributable Cash, in making subsequent distributions pursuant to Sections 7.1(c) and Section 10.4.

(h)      Tax Distributions. Notwithstanding Section 7.1(a), the General Partner may, in its sole discretion, cause the Partnership, either prior to, together with or subsequent to any distribution pursuant to Section 7.1(a), to make distributions to all Partners regardless of their tax status, in amounts intended to enable such Partners (or any Person whose tax liability is

determined by reference to the income of any such Partner) to discharge their U.S. federal, state and local income tax liabilities arising from the allocations made (or to be made), or distributions made, pursuant to Article VII.  The amount distributable to any Partner pursuant to this Section 7.1(h) shall be an amount equal to the product of (i) the cumulative taxable income, if any, of the Partnership allocated to the Partner pursuant to Article VII from the inception of the Partnership (as determined under Code Section 703(a) but including separately stated items described in Code Section 702(a) and without taking into account any special status of any Partner), times (ii) the Assumed Tax Rate.  The amount distributable to any Partner pursuant to Section 7.1(a) shall be reduced by the amount distributed to such Partner pursuant to this Section 7.1(h), and the amount so distributed pursuant to this Section 7.1(h) shall be deemed to have been distributed to the extent of such reduction pursuant to Section 7.1(a) for purposes of making the calculations required by Section 7.1(a).

(i)       Partnership Act.   Notwithstanding anything in this Agreement to the contrary, the Partnership shall not make any distributions pursuant to this Agreement except to the extent permitted by the Partnership Act.

(j)       Uninvested Amounts.   In the event the General Partner draws down amounts from the Partners pursuant to Capital Call Notices which are not expended by the Partnership as originally contemplated, the General Partner may, in its sole discretion, distribute such amounts among the Partners pro rata in accordance with the manner in which they funded such amounts.  Any amounts so distributed prior to the end of the Investment Period shall be treated as an unreturned Capital Contribution for purposes of Section 7.1(a) for the period of time from the day such amounts were drawn down to the day such amounts were so distributed.

(k)       Partial Disposition.   For all purposes of this Agreement, with respect to the sale or other disposition of a portion of a Partnership Investment, such portion shall be treated as having been a separate Partnership Investment from the remaining Partnership Investment retained by the Partnership, and the related income and Capital Contributions with respect to such portion of the Partnership Investment which was sold or otherwise disposed of shall be treated as having been divided between the portion which was sold or disposed of and the portion retained by the Partnership on a pro rata basis.

SECTION  7.2.       Capital Accounts; Adjustments to Capital Accounts.

(a)       Capital Account.  There shall be established for each Partner, on the books and records of the Partnership, an account (a "Capital Account"), which shall initially be zero and which shall be adjusted as set forth in this Section 7.2.

(b)       Adjustments to Capital Account.   The Capital Accounts of the Partners shall be adjusted as follows:

(i)       Cash Contributions.   The amount of cash contributed or deemed contributed to the Partnership by any Partner shall be credited to the Capital Account of such Partner;

(ii)      Distributions.   The amount of cash and the Fair Value of other property distributed or deemed distributed by the Partnership to any Partner  in

accordance with this Agreement shall be debited against the Capital Account of such Partner;

      (iii)   <u>Net Profit</u>.  The amount of any Net Profit allocated to any Partner under this Agreement shall be credited to the Capital Account of such Partner; and

      (iv)   <u>Net Loss</u>.  The amount of any Net Loss allocated to any Partner under this Agreement shall be debited against the Capital Account of such Partner.

      (c)   <u>Allocation of Net Profit and Net Loss</u>.  Except as provided elsewhere in this Agreement, Net Profits (and items thereof) for any fiscal year (or portion thereof) shall be allocated among the Partners in a manner so as to conform, in the sole judgment of the General Partner, as nearly as practicable with the related distributions that would be made to the Partners during such fiscal year pursuant to Section 7.1(a) if the Partnership had distributed all of such Net Profits.  Except as provided elsewhere in this Agreement, Net Losses (and items thereof) for any fiscal year shall be allocated among the Partners in the following order and priority:  (i) first, among the Partners in proportion to, and in reverse order of, the amount of the cumulative Net Profits previously allocated to them until the cumulative amount of Net Losses equals the cumulative amount of Net Profits, and (ii) thereafter, any remaining Net Losses shall be allocated among the Partners in proportion to their respective Capital Account balances.

      (d)   <u>Determination of Net Profits and Net Losses</u>.  "Net Profits" or "Net Losses" of the Partnership shall mean the net operating profits or net operating losses, as the case may be, for a fiscal year determined on the basis of accounting utilized by the Partnership in accordance with U.S. generally accepted accounting principles consistently applied (except as otherwise specified herein) and further in accordance with the following: there shall be deducted in computing Net Profits and Net Losses the Partnership Expenses incurred pursuant to Section 5.2 and the Management Fee accrued pursuant to Section 3.3.

      (e)   <u>Capital Account Adjustments</u>.  All matters concerning the computation of Capital Accounts, the allocation of items of Partnership income, gain, loss, deduction and expense for all purposes of this Agreement and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion.  Such determinations shall be final and conclusive as to all the Partners.  Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the General Partner shall determine, in its sole discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Partners, the General Partner may make such modification.

      SECTION  7.3.   <u>Tax Allocations</u>.

      (a)   For U.S. federal, state and local income tax purposes, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Partners as nearly as possible in the same manner as the corresponding item of income, expense, gain or loss is allocated pursuant to the other provisions of this Article VII.

      (b)   Notwithstanding anything else to the contrary contained herein, if any Partner has a deficit Capital Account for any fiscal year as a result of any unexpected adjustment,

allocation or distribution of the type described in Treasury Regulation Section 1.704-1(b)(2)(d)(4) through (6), then items of the Partnership's income and gain shall be specially allocated to each Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, as quickly as possible, provided that an allocation pursuant to this subsection (b) shall be made only if and to the extent that such Partner would have such Capital Account deficit after all other allocations provided for in subsection (a) of this Section 7.3 have been tentatively made as if this subsection (b) were not in this Agreement.   This subsection (b) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

SECTION 7.4.   <u>Tax Credits</u>.   Tax credits, if any, shall be equitably allocated among the Partners by the General Partner.   It is intended that the Capital Accounts will be maintained at all times in accordance with Section 704 of the Code and applicable Treasury Regulations thereunder, and that the provisions hereof relating to the Capital Accounts be interpreted in a manner consistent therewith.   The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to this Section 7.4 if necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations, provided that no such change shall have an adverse effect upon the amount distributable to any Partner hereunder.

SECTION 7.5.   <u>Loans and Withdrawal of Contribution</u>.   Except as expressly provided herein, no Partner shall be permitted to borrow or make an early withdrawal of, any portion of the Capital Contributions made by it.

SECTION 7.6.   <u>No Obligation to Restore</u>.   The General Partner shall have no obligation to restore a negative balance in its Capital Account.

SECTION 7.7.   <u>Other Tax Matters</u>.

(a)   The General Partner is hereby designated as the "Tax Matters Partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code (and any similar provisions under any applicable state or local or foreign tax laws).   The Tax Matters Partner shall have the discretionary authority to make all tax elections on behalf of the Partnership and the other Partners.   The Tax Matters Partner shall make all decisions in such capacity in such manner as it determines to be in the best interests of all of the Partners.   All expenses incurred by the Tax Matters Partner while acting in such capacity shall be paid or reimbursed by the Partnership.

(b)   It is the intention of the Partners that the Partnership be treated as a partnership for all relevant tax purposes.   The General Partner shall therefore not permit the Partnership to elect, and the Partnership shall not elect, to be treated as an association taxable as a corporation for U.S. federal income, state or local income tax purposes under Treasury Regulations Section 301.7701-3(a) or under any corresponding provision of state or local law.

(c)   With respect to any issue raised in a tax audit, which primarily affects Tax-Exempt Limited Partners, the General Partner shall consult with such Limited Partners through the course of the tax audit and shall not settle any such issue nor extend any statute of limitations with respect thereto without the consent of Tax-Exempt Limited Partners owning at

least two-thirds of the LP Interests held by Tax-Exempt Limited Partners not affiliated with the General Partner or its Affiliates.

## ARTICLE VIII
## REPORTS TO LIMITED PARTNERS

SECTION  8.1.        Independent Public Accountants.  The financial statements of the Partnership shall be audited as of the end of each fiscal year by a firm of independent public accountants as shall be selected from time to time by the General Partner.

SECTION  8.2.        Reports.

(a)        Audited Financial Statements.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner, or its designee, shall prepare, and shall cause the independent auditors to audit, and shall deliver to each Partner, audited financial statements (prepared in accordance with U.S. generally accepted accounting principles) setting forth as of the end of such fiscal year:

(i)        a balance sheet of the Partnership;

(ii)        an income statement of the Partnership; and

(iii)        a statement of the Partnership's capital.

(b)        Additional Reports.  Within ninety (90) days after the end of each calendar quarter or calendar year, as applicable, each Limited Partner will be sent, as applicable, (i) a quarterly unaudited report comprised of the Partnership's balance sheet and income statement, and the Limited Partner's capital account statement, which will include the Limited Partner's remaining capital commitment, and a specific statement of any distributions made to each Partner that are subject to recall for reinvestment pursuant to Section 7.1 of this Agreement, as applicable; and (ii) the Partnership's holdings summary report.  In addition, the General Partner's quarterly report shall disclose to Limited Partners if any investment restrictions set forth in Section 4.2 have been exceeded by the Partnership at any time during the prior quarter and the Advisory Committee's approval of such transactions.

(c)        Tax Information.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner shall cause the independent public accountants to prepare and transmit, as promptly as possible, a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable each Partner to prepare its U.S. federal income tax return, if any.  The General Partner shall mail such materials to (i) each Partner, and (ii) each former Partner (or its successors or assigns) who may require such information in preparing its U.S. federal income tax return, if any.

(d)        Reporting for ERISA Partners.  The General Partner agrees to timely provide each ERISA Partner such information regarding its investment in the Partnership as may be reasonably requested by the ERISA Partner for purposes of completing its annual Form 5500 (including any schedules or attachments thereto) or any other information reports or filings required by the U.S. Department of Labor or the Internal Revenue Service.  In addition, the

General Partner agrees to timely provide to each ERISA Partner such information and disclosures as may be required under, and in accordance with, Section 408(b)(2) of ERISA and the regulations thereunder, to the extent applicable.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

SECTION 9.1.    <u>Exculpation</u>.   No Covered Person will be liable to the Partnership or to any Limited Partner for any act or omission taken or suffered by such Covered Person, to the extent that such act or omission is not attributable to such Covered Person's (i) gross negligence, (ii) willful misconduct or bad faith, (iii) losses due to the gross negligence of employees, brokers or other agents of the Partnership or (iv) any intentional and material breach of the Partnership Agreement (each of items (i) through (iv) are hereinafter referred to as "Disabling Conduct").   No Limited Partner will be liable to the Partnership or any Limited Partner for any action taken by any other Limited Partner in its capacity as such. Notwithstanding the foregoing, at any time that the assets of the Partnership constitute "plan assets," Covered Persons shall be liable to the Partnership and the ERISA Partners for any breach of fiduciary duty under ERISA.

SECTION 9.2.    <u>Indemnification</u>.

(a)    The Partnership will indemnify, to the maximum extent permitted by law, each Covered Person against any and all claims, liabilities, damages and related expenses, including legal fees, incurred by them by reason of any action performed or omitted in connection with the activities of the Partnership or in dealing with third parties on behalf of the Partnership unless such action or omission is determined pursuant to a final, non-appealable judgment to constitute Disabling Conduct.   Notwithstanding the foregoing, at any time that the assets of the Partnership constitute "plan assets," Covered Persons shall not be indemnified for any breach of fiduciary duty under ERISA.

(b)    Notwithstanding anything to the contrary contained herein, in the case of any Proceeding instituted against the Partnership or a Covered Person on or before the third anniversary of the expiration of the Partnership's Term, the Partnership may require Limited Partners to recontribute to the Partnership amounts up to fifty percent (50%) of the aggregate amount of the distributions previously made to them in order to satisfy the Partnership's indemnification obligations under subsection (a); provided, however, that Limited Partners will not individually be obligated with respect to such indemnification obligations beyond the amount of their aggregate unfunded Capital Commitments and Capital Account balances.

(c)    The Partnership will, in the sole discretion of the General Partner and upon advice of counsel to the effect that a Covered Person is likely to be found entitled to indemnification pursuant to this Section 9.2, advance to any Covered Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any Proceeding which arises out of such conduct, unless such Proceeding (x) alleges Disabling Conduct and (y) was brought against the Covered Person by Limited Partners representing at least 66.66% of the aggregate LP Interests of Limited Partners other than the LP Interests of Defaulting Partners and the LP Interests held by the General Partner and its Affiliates, in which

event such advance may only be made with the consent of the Advisory Committee.  Any such advance will be subject to repayment to the extent that it is finally judicially determined that the Covered Person was not entitled to indemnification.  The Partnership will indemnify and hold harmless each Person that is a responsible withholding agent against all claims, liabilities and expenses (not resulting from such Person's willful misconduct) relating to such Person's obligation to withhold and pay any withholding or other taxes payable by the Partnership or as a result of a Limited Partner's participation in the Partnership.

(d)     All of the foregoing contribution or recontribution obligations shall survive the termination of this Agreement.

SECTION 9.3.     Exclusive Jurisdiction.  To the fullest extent permitted by applicable law, the General Partner and each Limited Partner hereby agrees that any claim, action or proceeding by any Limited Partner seeking any relief whatsoever against any Covered Person based on, arising out of, or in connection with, this Agreement or the Partnership's business or affairs shall be brought only in the U.S. federal courts located in California and not in any other State or U.S. federal court in the United States of America or any court in any other country.  The General Partner and each Limited Partner acknowledges that, in the event of any breach of this provision, the Covered Persons have no adequate remedy at law and shall be entitled to injunctive relief to enforce the terms of this Section 9.3.  Notwithstanding anything to the contrary, a government sponsored retirement plan shall not be treated as having submitted hereby to the jurisdiction of the U.S. federal courts in California when law, regulation or policy prohibits such a plan from submitting to the jurisdiction of courts beyond its own jurisdiction.


# ARTICLE X
# TERM AND DISSOLUTION OF THE PARTNERSHIP

SECTION 10.1.     Term.  Unless sooner dissolved pursuant to Section 10.2, the Partnership shall continue for seven (7) years from the Final Closing Date, subject to extension, in the sole discretion of the General Partner, of up to three (3) additional one (1) year periods (the "Term") as determined to be reasonably necessary by the General Partner to effect an orderly liquidation of the Partnership Investments and consented to by the Advisory Committee.

SECTION 10.2.     Dissolution.  Subject to the Partnership Act, the Partnership shall be dissolved and its affairs shall be wound up upon the earliest of:

(a)     the expiration of the Term of the Partnership as determined in accordance with Section 10.1;

(b)     the bankruptcy, liquidation, dissolution or insolvency of the General Partner;

(c)     the withdrawal of the General Partner pursuant to Section 11.2; and

(d)     any date determined by the General Partner in its sole discretion.

Upon the occurrence of an event specified in clauses (b) or (c) above, Limited Partners not affiliated with the General Partner or its Affiliates owning at least seventy five percent (75%) of the LP Interests may agree to continue the Partnership and in such event will select a new general partner.

SECTION 10.3.    Liquidation of the Partnership.    Upon dissolution, the Partnership's business shall be liquidated in an orderly manner.    Except as provided in the second succeeding sentence, the General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.    The responsibilities of the General Partner shall be consistent with the responsibilities provided for it in this Agreement.    If there shall be no General Partner, the Limited Partners, upon the approval of the Required Limited Partners, may appoint one or more Persons to act as the liquidator in carrying out such liquidation.    In performing its duties, the General Partner or such other appointed person, as the case may be (the "Liquidator"), is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Partnership in any reasonable manner that the Liquidator shall determine to be in the best interest of the Partners.

SECTION 10.4.    Distribution Upon Dissolution of the Partnership.

(a)    Liquidating Distribution.    Upon dissolution of the Partnership, the Liquidator winding up the affairs of the Partnership shall determine, in its sole discretion, which assets of the Partnership shall be sold and which assets of the Partnership shall be retained for distribution in kind to the Partners.    The Capital Accounts shall be adjusted in accordance with Section 7.2, immediately prior to any such distribution in kind to reflect the gain or loss that would be recognized had the assets to be distributed in kind been sold for their Fair Value.    After all liabilities (contingent or otherwise) of the Partnership have been satisfied or duly provided for (as determined by the Liquidator in its sole discretion), the remaining assets of the Partnership shall be distributed to the Partners in accordance with Article VII.    Any goodwill of the Partnership, and any right to use of the Partnership's name, shall belong exclusively to the General Partner.

(b)    Liquidating Trust, etc.    If the Partnership is unable to dispose of all of its interests in a Partnership Investment prior to its termination, the Liquidator may, in its sole discretion, and subject to the Partnership Act, transfer such interests to a trust established for the benefit of the Partners for purposes of liquidating Partnership assets, collecting amounts owed to the Partnership and paying any debts, liabilities or other obligations of the Partnership or the General Partner arising out of, or in connection with, this Agreement or the Partnership's business or affairs.

The assets of any trust established pursuant to this Section 10.4(b) shall be distributed to the Partners from time to time, in the sole discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement.

(c)    Clawback Payments.    Upon the dissolution of the Partnership, the General Partner will be obligated to make a payment to the Limited Partners (the "Clawback Payment") equal to the amount of any Carried Interest received by the General Partner to the extent that either (i) the General Partner has received Carried Interest distributions in excess of twenty

percent (20%) of the aggregate amount of the Net Profits of the Partnership or (ii) the Limited Partners have not received a return of their Capital Contributions to the Partnership plus a cumulative return on such Capital Contributions equal to seven and one-half percent (7.5%) as set forth in Section 7.1(a), and such calculation of any required payment shall be made if and to the extent such Limited Partners ultimately have to return any amounts to the Partnership due to the Limited Partner clawback provisions set forth in Section 7.1(g) and 9.2(b).  The Partnership shall distribute the Clawback Payment to the Limited Partners in proportion to their respective Capital Contributions.  Notwithstanding the foregoing, the amount of the Clawback Payment shall not exceed the aggregate amount of the Carried Interest received by the General Partner with respect to all Partnership Investments, net of applicable income taxes.

(d)     No Priority.  Each Partner shall look solely to the assets of the Partnership for the return of such Partner's aggregate Capital Contributions in Partnership Investments and no Partner shall have priority over any other Partner as to the return of such Capital Contributions.

SECTION 10.5.     No Voluntary Withdrawal by Limited Partners.  A Limited Partner may not voluntarily withdraw from the Partnership prior to its dissolution and winding up, and no LP Interest is redeemable or repurchasable by the Partnership at the option of a Limited Partner.  Except as expressly provided in this Agreement, no event affecting a Limited Partner (including death, bankruptcy or insolvency) shall affect its obligations under this Agreement or affect the Partnership.  Notwithstanding the foregoing, at any time during which the assets of the Partnership constitute "plan assets," any ERISA Partner may elect to withdraw from the Partnership by providing written notice to the General Partner of its request for such a withdrawal at least sixty (60) days prior to the requested withdrawal date.   On such withdrawal date, the withdrawing ERISA Partner shall be paid the Fair Value of its LP Interest; provided, however, that, at the sole discretion of the General Partner, all or a portion of such payment may be made in the form of a note issued by the Partnership, which note shall bear interest at the rate of seven and one-half percent (7.5%) per annum, compounded annually, shall be pre-payable at any time, and shall have a final maturity date no later than seven (7) years from the Final Closing Date.

SECTION 10.6.     Required Withdrawal of Limited Partners.  The General Partner, upon thirty (30) Business Days' prior written notice, may require any Limited Partner to withdraw from the Partnership at the end of any fiscal quarter in which such notice is given if the General Partner determines, in its sole discretion, that the continued participation of such Limited Partner in the Partnership would adversely affect either the Partnership, the General Partner or the Manager (e.g., by involving the Partnership, the General Partner, the Manager or any Partner in litigation, or causing the Partnership to be required to register under the Investment Company Act or other reasons including, without limitation, if the General Partner, in its sole discretion, determines that the holding of a LP Interest by any Limited Partner could result in the Partnership being subject to ERISA).  In such an instance, the withdrawing Limited Partner shall not contribute additional capital to the Partnership in respect of subsequent Capital Calls and the withdrawing Limited Partner's LP Interest will be entirely terminated.   Any required withdrawal of ERISA Partners to avoid the assets of the Partnership being "plan assets" shall be pro rata among the ERISA Partners.  Any required withdrawal pursuant to this Section 10.6 shall be based on the Fair Value of the withdrawing Limited Partner's LP Interest.

SECTION 10.7.    Payments Upon Withdrawal.  Upon the withdrawal of a Limited Partner who is not a Defaulting Partner, ninety percent (90%) of the withdrawing Limited Partner's Capital Account balance on the termination date shall be paid to such Limited Partner within ninety (90) days thereof or as soon thereafter as the Partnership has funds available therefore.  The remaining ten percent (10%) of the balance of such withdrawing Limited Partner's Capital Account on the termination date shall be paid to such Limited Partner upon completion of the audit of the Partnership's financial statements for the fiscal year involved or as soon thereafter as is reasonably practicable.  Such Capital Account balance may not necessarily reflect the market value of a Partnership Investment.  Such Limited Partner shall not be entitled to receive or demand any other or further distributions, including any distributions pursuant to Section 17-604 of the Partnership Act.  All expenses of a withdrawal of capital from the Partnership by a Limited Partner generally will be borne by the Partnership; provided, however, that any incremental legal or accounting expenses incurred by the Partnership as a result of withdrawals of capital of a Limited Partner may, in the sole discretion of the General Partner, be charged to such Limited Partner through a reduction of the distributions to such withdrawing Limited Partner; and, provided further, that any expenses of a withdrawal of capital from the Partnership by an ERISA Partner required to avoid the assets of the Partnership being "plan assets" shall be borne by the General Partner.

## ARTICLE XI
## TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST

SECTION 11.1.    Transferability of the General Partner's Interest.  The General Partner may not, directly or indirectly, Transfer all or a portion of its general partner interest in the Partnership (the "GP Interest") to any Person.  Notwithstanding the foregoing, the General Partner may make a Transfer of all or any portion of its GP Interest (i) to an Affiliate or to a Person which succeeds to the private equity business of the General Partner as an entirety, (ii) to any Person in connection with a pledge securing a loan made to the Partnership, or (iii) with the prior written consent of the Required Limited Partners.  The General Partner may at any time, in its sole discretion, admit any Person to whom the General Partner is permitted to make a Transfer pursuant to the immediately preceding sentence as an additional general partner of the Partnership, and such transferee shall be deemed admitted to the Partnership as a General Partner of the Partnership immediately prior to such Transfer and shall continue the business of the Partnership without dissolution.  Except as otherwise provided in Sections 11.2 and 11.3, the General Partner may not withdraw from the Partnership or be removed as a general partner of the Partnership.

SECTION 11.2.    Withdrawal of the General Partner.  The General Partner shall be permitted to withdraw as a general partner of the Partnership, unless, in the opinion of counsel to the Partnership, the General Partner's withdrawal as a general partner would result in a violation of any law or regulation of the U.S. or any State thereof.  In the event that the General Partner withdraws from the Partnership pursuant to this Section 11.2, the Partnership shall dissolve and its affairs wound up in accordance with Article X (subject to the right that Limited Partners have to continue the Partnership and elect a new general partner in accordance with Section 10.2).

SECTION  11.3.    Removal of the General Partner.

(a)    The General Partner may be removed upon the occurrence of a "Cause Event" on not less than thirty (30) days' written notice from Limited Partners not affiliated with the General Partner or its Affiliates owning at least seventy-five percent (75%) of the aggregate Capital Commitments of the Limited Partners; provided, however, that (i) the General Partner will not be removed if, within the thirty (30) day period following such written notice, the General Partner cures the Cause Event to the satisfaction of at least seventy-five percent (75%) of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner or its Affiliates, and (ii) the General Partner may call a meeting of the Limited Partners for the purpose of a confirmatory vote on the removal of the General Partner which may override or confirm the removal decision.  For this purpose, the term "Cause Event" shall mean Disabling Conduct by the General Partner or Manager as determined by a final, non-appealable judgment of any court or governmental body referenced in Section 13.12 that has a material adverse effect on the Partnership.  Notwithstanding the foregoing, at any time that the assets of the Partnership are "plan assets," the General Partner may be removed without the occurrence of a Cause Event on not less than sixty (60) days' written notice from Limited Partners not affiliated with the General Partner or its Affiliates owning at least eighty-five percent (85%) of the aggregate Capital Commitments of the Limited Partners.

(b)    Within fifteen (15) days after the removal of the General Partner and upon a vote of the Required Limited Partners, the Partnership shall distribute to the General Partner an amount in cash equal to the value of the General Partner's Capital Account balance as of the date of such removal; provided, however that such amounts owed in respect of the General Partner's Capital Account may be reduced to reflect any damages suffered by the Partnership as a result of the General Partner's breach of its duties as described in Section 11.3(a), as finally determined in a judgment by any court or governmental body referenced in Section 13.12.

(c)    Upon the removal of the General Partner for a Cause Event pursuant to clause (a) above, (i) the Management Agreement between the Manager and the Partnership shall immediately be terminated and the Manager shall be entitled to receive the Management Fee accrued through the date of such removal but shall not be entitled to receive any Management Fee accruing after such date, (ii) the General Partner shall be entitled to receive fifty percent (50%) of the Carried Interest with respect to the amount of the appreciation in the value of the Partnership Investments that are held by the Partnership on the date of the General Partner's removal that has accrued as of such date, but shall not be entitled to receive the remaining fifty percent (50%) of the Carried Interest on the existing investment appreciation through the date of removal or any Carried Interest with respect to any appreciation in the value of any Partnership Investment accruing after such removal date, and (iii) the General Partner and the Manager shall be entitled to receive from the Partnership any reimbursements or expenses due and owing to it by the Partnership.

(d)    Upon the removal of the General Partner without a Cause Event pursuant to clause (a) above, (i) the Management Agreement between the Manager and the Partnership shall immediately be terminated and the Manager shall be entitled to receive the Management Fee accrued through the date of such removal but shall not be entitled to receive any Management Fee accruing after such date, (ii) the General Partner shall be entitled to receive one hundred percent (100%) of the Carried Interest with respect to the amount of the appreciation in

the value of the Partnership Investments that are held by the Partnership on the date of the General Partner's removal that has accrued as of such date, but shall not be entitled to receive the Carried Interest with respect to any appreciation in the value of any Partnership Investment accruing after such removal date, and (iii) the General Partner and the Manager shall be entitled to receive from the Partnership any reimbursements or expenses due and owing to it by the Partnership.

## ARTICLE XII
## TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST

SECTION  12.1.　　　Conditions for Transfer.

(a)　　Consent of the General Partner.  A Limited Partner may Transfer all or any part of its LP Interest only with the consent in writing of the General Partner, which consent may be withheld by the General Partner in its sole discretion, and only upon the satisfaction of the conditions specified in Section 12.1(b).  The General Partner hereby agrees that it shall (i) consent to the transfer of all or any part of an ERISA Partner's LP Interest to a successor trustee or trustees, or a successor trust or trusts and (ii) to the admission and substitution of any such successor trustee or successor trust as a Limited Partner or Limited Partners of the Partnership; *provided* that any such transfer otherwise complies with this Article XII, *provided, however,* that notwithstanding Section 12.1(b), the General Partner shall not require the delivery of an opinion of counsel in connection with any such transfer.  The General Partner further agrees not to unreasonably withhold its consent to a transfer of all or any part of an ERISA Partner's LP Interest to the extent such transfer otherwise complies with this Article XII.

(b)　　Conditions Required to be Satisfied.  Unless required by applicable law or permitted in the sole discretion of the General Partner, no Limited Partner may Transfer all or any part of its LP Interest, and no attempted or purported Transfer of such LP Interest shall be effective, unless (i) after giving effect thereto, such Transfer would not otherwise terminate the Partnership for the purposes of Section 708 of the Code, (ii) such Transfer would not result in a violation of applicable law, including any federal and state securities laws and provided that, if such Transfer would cause the General Partner to violate any covenant of this Agreement or any Subscription Agreement and the General Partner has taken all reasonable steps to prevent such violation, the General Partner shall not be liable to the Partnership as a result thereof and the General Partner shall be indemnified by such Limited Partner for any losses, costs, damages or expenses incurred as a result of such violation, (iii) such Transfer would not cause the Partnership to lose its status as a partnership that is not a publicly-traded partnership for federal income tax purposes or cause the Partnership to become subject to the Investment Company Act, (iv) such Transfer would not result in Limited Partners losing their limited liability under the Partnership Act, (v) if requested by the General Partner, such Limited Partner has delivered a favorable opinion in form and substance satisfactory to the General Partner from counsel satisfactory to the General Partner as to the matters referred to in clauses (ii), (iii) and (iv) above; and (vi) such Transfer occurs on a date approved by the General Partner.

SECTION 12.2.   Substitute Limited Partner; Recognition of Transfer.   A purchaser, assignee or transferee of a Limited Partner's LP Interest (a "Transferee") shall have the right to become a Substitute Limited Partner only if the following conditions (in addition to those set forth in Section 12.1 above) are satisfied:

(a)   A duly executed and acknowledged written instrument of assignment or document of transfer satisfactory in form and substance to the General Partner shall have been filed with the Partnership;

(b)   The Limited Partner and the Transferee shall have executed and acknowledged such other instruments and documents and taken such other action as the General Partner shall reasonably deem necessary or desirable to effect such substitution;

(c)   The Limited Partner or the Transferee shall have paid to the Partnership such amount of money as is sufficient to cover all costs, fees and expenses (including attorneys fees) incurred by or on behalf of the Partnership in connection with such substitution; and

(d)   The General Partner shall have consented to such substitution.

In the event of the admission of a Transferee as a Substitute Limited Partner, all references herein to the Limited Partners shall be deemed to apply to such Substitute Limited Partner and such Substitute Limited Partner shall succeed to all rights and obligations of the transferor Limited Partner hereunder, including the Capital Account balance of such transferor.

A Transferee who is not admitted to the Partnership as a Substitute Limited Partner shall have none of the rights of, and no liability as, a Partner and the assignor in such case shall remain fully liable for the unpaid portion of its Capital Commitment.

If a Limited Partner requests the General Partner's assistance in identifying a possible purchaser of all or any portion of such Limited Partner's LP Interest, then, subject to any applicable confidentiality obligations and avoidance of the assets of the Partnership constituting ERISA "plan assets" (if they are not already prior to such transfer), the General Partner shall use commercially reasonable efforts to (a) inform such Limited Partner that the other Limited Partners might be interested in acquiring such LP Interest, and (b) provide written notice to the other Limited Partners of such Limited Partner's interest in selling all or any portion of the LP Interest, it being understood no Limited Partner shall have any obligation to purchase the LP Interest from such Limited Partner by reason of this provision.

## ARTICLE XIII
## MISCELLANEOUS

SECTION 13.1.   Amendments.

(a)   Except as otherwise expressly provided herein, this Agreement may be modified or amended, and any provision hereof may be waived, by a writing signed by or on behalf of the General Partner; provided that, no such modification, amendment or waiver shall (a) materially increase or extend any financial obligation or liability of a Limited Partner beyond that set forth herein or permitted hereby without the consent of such adversely affected Limited

Partner, (b) materially and adversely affect the rights of a Limited Partner without the consent of such adversely affected Limited Partner, or (c) change the provisions of this Section 13.1 without the consent of each Limited Partner.  Any consent required by this Section 13.1 may be obtained by the Partnership sending notice to the Limited Partners of the proposed amendment and instructing the Limited Partners who object to such amendment to notify the Partnership of their objection in writing within thirty (30) days after such notice.  In such case, Limited Partners who have not so objected to the proposed amendment will be deemed to have approved the amendment.

        (b)     Each Partner authorizes the General Partner to elect to apply the safe harbor set forth in proposed Treasury Regulation Section 1.83-3(l) (under which the Fair Value of a GP Interest that is Transferred in connection with the performance of services is treated as being equal to the liquidation value of the GP Interest) if such proposed Treasury Regulation or a similar Treasury Regulation is promulgated as a final or temporary Treasury Regulation.  If the General Partner determines that the Partnership should make such election, the General Partner is hereby authorized to amend this Agreement without the consent of any other Partner or other Person (so long as such amendment is not reasonably expected to have a material adverse effect on any Limited Partner) to provide that (i) the Partnership is authorized and directed to elect the safe harbor, (ii) the Partnership and each of its Partners (including any Person to whom a GP Interest is Transferred in connection with the performance of services) will comply with all requirements of the safe harbor with respect to all Partnership interests Transferred in connection with the performance of services while such election remains in effect, and (iii) the Partnership and each of its Partners will take all actions necessary, including providing the Partnership with any required information, to permit the Partnership to comply with the requirements set forth or referred to in the applicable Treasury Regulations for such election to be effective until such time (if any) as the General Partner determines, in its sole discretion, that the Partnership should terminate such election.  The General Partner is further authorized to amend this Agreement to modify Article VII to the extent the General Partner determines in its discretion that such modification is necessary or desirable as a result of the issuance of Treasury Regulations relating to the tax treatment of the transfer of a Partnership interest in connection with the performance of services.  Notwithstanding anything to the contrary in this Agreement, each Partner expressly confirms and agrees that it will be legally bound by any such amendment.

        SECTION 13.2.    <u>Approvals</u>.  Except as otherwise specifically provided herein, each Limited Partner agrees that, to the extent permitted by applicable law, for purposes of granting the approval of the Limited Partners with respect to any proposed action of the Partnership, the General Partner or any Affiliate of the General Partner, the written approval of the Required Limited Partners shall bind the Partnership and each Limited Partner and shall have the same legal effect as the written approval of each Partner.  The General Partner may request the written approval of the Required Limited Partners to approve any matter that the General Partner determines, in its sole discretion, necessary or desirable to be so approved.

        SECTION 13.3.    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or similar writing) and shall be given to such party (a) if such party is a Limited Partner, at its address or facsimile number set forth in a schedule filed with the records of the Partnership or such other address or facsimile number as such Limited Partner may hereafter specify by notice to the General Partner for such purpose, or (b) if such party is the General Partner or the Partnership, at the address set forth in Section

2.2(b).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified and the appropriate answerback or confirmation is received, (ii) if given by mail, five (5) days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid, (iii) if given by overnight courier, forty-eight (48) hours after such communication is received by such courier, or (iv) if given by any other means, when delivered at the address specified pursuant to this Section 13.3.

SECTION 13.4.    Successors; Counterparts.    This Agreement (i) shall be binding upon the successors and permitted assigns of the Partners, and (ii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

SECTION 13.5.    Governing Law; Severability.    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to the conflict of laws principles thereof).  In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Partnership Act.  If it shall be determined by a court of competent jurisdiction that any provision or wording of this Agreement shall be invalid or unenforceable under the Partnership Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement, in which case this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

SECTION 13.6.    Filings.    The General Partner shall promptly prepare, following the execution and delivery of this Agreement, any documents required to be filed and recorded, or which the General Partner determines, in its sole discretion, are appropriate for filing and recording, under the Partnership Act, and the General Partner shall promptly cause each such document to be filed and recorded in accordance with the Partnership Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Partnership may hereafter establish a place of business.  The General Partner shall also promptly cause to be filed, recorded and published such statements of fictitious business name and other notices, certificates, statements or other instruments required by any provision of applicable law of any jurisdiction which governs the conduct of the General Partner's business from time to time.

SECTION 13.7.    Power of Attorney.

(a)    Appointment of Attorney-In-Fact.    Each Limited Partner does hereby constitute and appoint the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign and file (i) any amendment to the Certificate of Limited Partnership of the Partnership required because of an amendment to this Agreement or in order to effectuate any change in the membership of the Partnership, (ii) any amendments to this Agreement in accordance with Section 13.1, (iii) all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Delaware to effectuate, implement and continue the valid and subsisting existence of the Partnership or to dissolve the Partnership, and (iv) any agreements, documents, guarantees,

or other instruments relating to any such borrowings or indebtedness incurred by the Partnership and each Limited Partner agrees to cooperate with the Partnership in providing all relevant documentation in connection with such borrowings or indebtedness; provided, the General Partner may not make, execute, sign or file any document, agreement, guarantee or other instrument that would subject a Limited Partner to any obligation beyond the amount of such Limited Partner's unfunded Capital Commitment.

(b)    Power Coupled With an Interest.  The power of attorney granted pursuant to this Section 13.7 shall (i) survive and not be affected by the subsequent death, legal incapacity, disability, dissolution, termination or bankruptcy of the Limited Partner granting such power of attorney or the Transfer of all or any portion of such Limited Partner's LP Interest, and (ii) extend to such Limited Partner's successors, permitted assigns and legal representatives.

SECTION 13.8.    No Right to Partition.  To the extent permitted by law, and except as otherwise expressly provided in this Agreement, the Partners, on behalf of themselves and their shareholders, partners, heirs, executors, administrators, personal or legal representatives, successors and permitted assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition or similar action of the Partnership or any asset of the Partnership, or any interest which is considered to be partnership property, regardless of the manner in which title to such property may be held.

SECTION 13.9.    Goodwill.  No value shall be placed on the name or goodwill of the Partnership.

SECTION 13.10.    Headings.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

SECTION 13.11.    Entire Agreement.  This Agreement and the Subscription Agreement constitutes the entire agreement among the Partners with respect to the subject matter hereof, and supersede any prior agreement or understanding among them with respect to such subject matter.  Notwithstanding the provisions of this Agreement, including without limitation Section 13.1, or the provisions of any Subscription Agreements, the parties hereto agree that the General Partner, without the approval of any Limited Partner or any other Person, may enter into a side letter or similar written agreement (an "Other Agreement") on its own behalf and on behalf of the Partnership with Limited Partners which have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or any Subscription Agreements.  The parties hereto agree that any terms contained in an Other Agreement with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or any Subscription Agreements.  The representations and warranties of the General Partner and the Limited Partners in, and the other provisions of, the Subscription Agreements and any Other Agreements, and the obligations of the Partners pursuant to Article IX of this Agreement, shall survive the termination or expiration of this Agreement and the termination, dissolution and winding up of the Partnership.

SECTION 13.12.    Submission to Jurisdiction.  Each party irrevocably consents and agrees that any legal action or proceeding with respect to this Agreement and any

action for enforcement of any judgment in respect thereof may be brought in the courts of the State of California or the U.S. federal courts for California and, by execution and delivery of this Agreement, each party hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof.  Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Section shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein.

IN WITNESS WHEREOF, the undersigned have executed and delivered this document dated as of _____ __, 20__.

GENERAL PARTNER:

WHITE OAK PARTNERS, LLC

By: _____
    Name: Barbara J.S. McKee
    Title: Managing Member


LIMITED PARTNERS:

[SIGNATURES OF LIMITED PARTNERS ARE SET FORTH ON SEPARATE SIGNATURE PAGES]

Appendix A

DEFINITIONS

"Additional Limited Partner" means a Limited Partner admitted to the Partnership at a Closing subsequent to the Initial Closing.

"Administrator" shall mean any administrator selected by the General Partner for the Partnership from time to time.

"Advisory Committee" has the meaning set forth in Section 3.16.

"Affiliate" of any specified Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Partnership Agreement, as amended or restated from time to time.

"Assumed Tax Rate" means the highest effective marginal combined federal, state and local income tax rate for the calendar year involved applicable to any individual resident in New York City (taking into account the deductibility of state and local income taxes for federal income tax purposes).

"Authorized Representative" has the meaning set forth in Section 3.8(a).

"Borrowing Costs" means with respect to any borrowing, any interest fees or expenses attributable to such borrowing, but shall not include any repayment of principal.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"Capital Account" has the meaning set forth in Section 7.2(a).

"Capital Call" means a capital call of cash contributions from all Partners except as otherwise provided pursuant to a Capital Call Notice in accordance with Article VI.

"Capital Call Amount" means the aggregate Capital Contributions to be made on any date by the Partners pursuant to Article VI.

"Capital Call Date" has the meaning set forth in Section 6.2(b).

"Capital Call Notice" has the meaning set forth in Section 6.2(a).

"Capital Commitment" means, with respect to any Partner at any time, the amount specified as such Partner's Capital Commitment at the time such Partner was admitted to the Partnership.

"Capital Contribution" means, with respect to any Partner, a cash contribution (or deemed cash contribution) made by such Partner to the Partnership pursuant to Section 2.5, Article VI and Article IX.

"Carried Interest" has the meaning set forth in Section 7.1(a).

"Cause Event" has the meaning set forth in Section 11.3(a).

"Clawback Payment" has the meaning set forth in Section 10.4(c).

"Closing" means a closing of the sale of LP Interests to investors and such investors' admission as Limited Partners, or an Existing Limited Partner's increase of its Capital Commitment.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Co-Investment Funds" has the meaning set forth in Section 4.3.

"Covered Person" means a member of the General Partner Group or the Advisory Committee.

"Default" means any failure of a Limited Partner to make all or a portion of any required Capital Contribution on the applicable Capital Call Date or other due date.

"Defaulting Partner" means, at any time, each Limited Partner, who, at or prior to such time, has committed or has been deemed to have committed a Default that has become an Event of Default.

"Disposed Investment" has the meaning set forth in Section 7.1(a)(i).

"Distributable Cash" means cash receipts of all kinds derived by the Partnership from its ownership or disposition of Partnership Investments (whether or not distributed pursuant to Section 7.1(a)) less (x) any amounts retained by the Partnership in accordance with Section 7.1(e), and (y) any income derived by the Partnership from Temporary Investments.

"Electing Partner" has the meaning set forth in Section 7.1(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Election Date" means the date, if any, on or before the Final Closing Date on which the General Partner elects to rely upon the twenty-five percent (25%) limit contained in the Plan Asset Regulation to avoid having the Partnership's assets be deemed to be subject to ERISA.

"ERISA Partner" means any Limited Partner that is (i) an employee benefit plan which is subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, (ii) a plan or individual retirement account which is subject to Section 4975 of the Code, or (iii) a nominee

for, or is using the assets of, or is a trust established pursuant to, one or more employee benefit plans, or other such plans or individual retirement accounts.

"Event of Default" means any Default that shall have not been (i) cured by the Limited Partner who committed such Default within ten (10) Business Days after the occurrence of such Default, or (ii) waived by the General Partner on such terms as determined by the General Partner in its sole discretion before such Default has otherwise become an Event of Default pursuant to clause (i) hereof and, to the extent required pursuant to Section 6.3 with respect to any Defaulting Partner that is affiliated with the General Partner or its Affiliates, only upon the prior written approval of the Advisory Committee.

"Excluded Limited Partner" has the meaning set forth in Section 6.6(a).

"Existing Limited Partners" has the meaning set forth in Section 2.5(b).

"Fair Value" means the valuation of a Partnership Investment or other Partnership property by the General Partner (or other Person) in good faith in accordance with Section 3.12.

"Final Closing" means the last Closing which shall take place not later than eighteen (18) months after the Initial Closing Date.

"Final Closing Date" means the date of the Final Closing.

"Follow-On Investments" means an additional investment of capital by the Partnership in an existing Partnership Investment.

"General Partner" means White Oak Partners, LLC, a Delaware limited liability company, and its successors.

"General Partner Group" means the General Partner, the Manager and their respective Affiliates, officers, directors, members, principals, stockholders, employees, controlling persons, representatives or other agents.

"GP Interest" has the meaning set forth in Section 11.1.

"Initial Closing" means the first Closing.

"Initial Closing Date" means the date of the Initial Closing.

"Initial Investment Date" means the date of the Partnership's first investment in a Partnership Investment.

"Investment Committee" has the meaning set forth in Section 3.18.

"Investment Company Act" means the Investment Company Act of 1940, as amended from time to time.

"Investment Period" means the period during which the Partnership may make commitments to Partnership Investments.  The Investment Period shall commence on the date of the Initial Closing and end twenty-four (24) months following the last day of the month that

includes the Final Closing Date; provided, however, that at any time after the second anniversary of the Initial Closing Date, Limited Partners not affiliated with the General Partner or its Affiliates owning at least eighty-five percent (85%) of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner or its Affiliates may elect to terminate the Investment Period.

"Key Person Event" has the meaning set forth in Section 6.1(d).

"Limited Partner" means, at any time, any Person who is at such time a limited partner of the Partnership.

"Limited Partner Advisory Committee" has the meaning set forth in Section 3.16.

"Liquidator" has the meaning set forth in Section 10.3.

"LP Interest" means an interest in the Partnership as a Limited Partner.

"Management Agreement" shall mean the investment management agreement by and between the Partnership and the Manager.

"Management Fee" has the meaning set forth in Section 3.3(a).

"Manager" means White Oak Global Advisors, LLC, a Delaware limited liability company.

"Manager Expenses" has the meaning set forth in Section 5.1.

"Marketable Securities" means securities for which a public market (national exchange or NASDAQ national market) exists and which may be traded by the Limited Partners without restrictions.

"Net Losses" has the meaning set forth in Section 7.2(d).

"Net Profits" has the meaning set forth in Section 7.2(d).

"Offering Memorandum" means the Confidential Offering Memorandum of the Partnership and any amendments or supplements thereto.

"Organizational Expenses" has the meaning set forth in Section 5.2(c)(i).

"Other Agreement" has the meaning set forth in Section 13.11.

"Partners" means the General Partner and the Limited Partners.

"Partnership" means White Oak Pinnacle Fund, L.P., a Delaware limited partnership.

"Partnership Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"Partnership Expenses" has the meaning set forth in Section 5.2(b).

"Partnership Investment" means an investment by the Partnership in accordance with the Partnership's Offering Memorandum.

"Person" means any individual, partnership, corporation, trust, limited liability company, limited liability partnership, joint stock company or other legal entity.

"Plan Asset Regulation" means Department of Labor Regulation Section 2510.3-101 or any successor thereto.

"Portfolio Company" means companies that the Partnership invests in.

"Prime Rate" means the rate of interest published from time to time on the Bloomberg U.S. Treasury and Money Markets page under the heading "Prime Rate," or if not so published, the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as identified in writing by the General Partner to the Limited Partners.

"Principals" means, collectively, Andre Hakkak, Barbara McKee, Ali Amiry and David Hackett.

"Proceeding" means any action, claim, suit, investigation, arbitration or proceeding, whether at law or in equity, and whether by or before any court, arbitrator, governmental body or other administrative, regulatory or other agency or commission.

"Remaining Capital Commitment" means, with respect to any Partner at any time, the excess, if any, of (i) such Partner's Capital Commitment at such time over (ii) such Partner's aggregate Capital Contributions made prior to such time.  For purposes of this definition, any Partner's aggregate Capital Contributions shall be reduced by the aggregate amount theretofore distributed to such Partner pursuant to Section 7.1(a) prior to the end of the Investment Period in accordance with Section 7.1(b).

"Remaining Commitment Percentage" means, with respect to any Partner at any time, the percentage derived by (i) dividing such Partner's Remaining Capital Commitment at such time by (ii) the aggregate amount of all Partners' Remaining Capital Commitments.

"Required Limited Partners" means, at any time, Limited Partners (other than Defaulting Partners and Limited Partners affiliated with the General Partner or its Affiliates) representing at least a majority of the aggregate amount of all Limited Partners' (other than Defaulting Partners' and Limited Partners affiliated with the General Partner or its Affiliates) Capital Commitments at such time.

"Securities" means shares of capital stock, limited partnership interests, warrants, options, bonds, notes, debentures, other securities and equity interests of whatever kind of any Person, whether or not publicly traded or readily marketable, and any other financial instruments which exist now or are hereafter created.

"Subscription Agreements" mean the subscription agreements entered into by the respective Limited Partners in connection with their purchases of LP Interests.

"Subsequent Closings" means each Closing held after the Initial Closing up to and including the Final Closing.

"Substitute Limited Partner" means any purchaser, assignee, transferee or other recipient of all or any portion of any Limited Partner's Interest who is admitted as a Limited Partner to the Partnership in accordance with Sections 6.3(d)(iii) or 12.2.

"Tax-Exempt Limited Partner" has the meaning set forth in Section 3.14.

"Tax Matters Partner" has the meaning set forth in Section 7.7.

"Temporary Investment" means investments in (i) short-term money market investments issued by issuers in the two highest rating categories as stated by nationally recognized statistical ratings organizations, (ii) obligations backed by full faith and credit of the U.S. federal government and with a maturity date not in excess of eighteen (18) months from the date of purchase by the Partnership, (iii) interest-bearing bank or brokerage accounts and/or certificates of deposit issued by banks with undivided capital and surplus of $100,000,000 or more, and (iv) other comparable investments as determined by the General Partner in its sole discretion.

"Term" of the Partnership has the meaning set forth in Section 10.1.

"Third Party Advisory Committee" has the meaning set forth in Section 3.16.

"Transaction Fees" means any directors' fees from Portfolio Companies, transaction fees, closing fees, monitoring fees, amendment fees, break-up fees or any other similar advisory fees in connection with any services provided by a member of the General Partner Group to a Portfolio Company in which the Partnership has invested.

"Transfer" means a direct or indirect sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of a GP Interest or a LP Interest, other than in connection with a pledge by the General Partner of any such interests made in connection with a borrowing by the Partnership.

"Transferee" has the meaning set forth in Section 12.2.

"Treasury Regulations" means the regulations of the U.S. Treasury Department issued pursuant to the Code.

"UBTI" has the meaning set forth in Section 3.17.

"U.S." means the United States of America.

# EXHIBIT D

**WHITE OAK SUMMIT FUND, L.P.**

SECOND AMENDED AND RESTATED

LIMITED PARTNERSHIP AGREEMENT

March 1, 2016

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ...................................................................................................1

    SECTION  1.1.     Definitions...................................................................................1

ARTICLE II GENERAL PROVISIONS ...............................................................................1

    SECTION  2.1.     Partnership Name.........................................................................1
    SECTION  2.2.     Registered Office; Principal Office. ...........................................1
    SECTION  2.3.     Purposes of the Partnership.........................................................2
    SECTION  2.4.     Liability of the Partners. .............................................................2
    SECTION  2.5.     Admission of Limited Partners. ..................................................2

ARTICLE III MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP ......................4

    SECTION  3.1.     Management Generally.................................................................4
    SECTION  3.2.     Authority of the General Partner..................................................4
    SECTION  3.3.     Parallel Funds..............................................................................7
    SECTION  3.4.     Manager; Management Fee...........................................................7
    SECTION  3.5.     Administrator; Administration Fee. .............................................9
    SECTION  3.6.     Transactions with Affiliates.......................................................10
    SECTION  3.7.     Other Activities; Successor Vehicles; Devotion of Time. ............10
    SECTION  3.8.     Key Person Event.......................................................................11
    SECTION  3.9.     Books and Records; Accounting Method; Fiscal Year.................12
    SECTION  3.10.    Partnership Information; Tax Elections; Tax Returns; Tax Basis
                      Adjustments. ..............................................................................13
    SECTION  3.11.    Confidentiality. ..........................................................................14
    SECTION  3.12.    Meetings of Limited Partners.....................................................15
    SECTION  3.13.    Temporary Investment of Funds.................................................15
    SECTION  3.14.    Certain ERISA Matters. .............................................................16
    SECTION  3.15.    UBTI, ECI and Other Tax Considerations...................................16
    SECTION  3.16.    Reliance by Third Parties............................................................16
    SECTION  3.17.    Borrowings; Financings..............................................................16
    SECTION  3.18.    Conflicts of Interest....................................................................17
    SECTION  3.19.    Independent Investor Representative...........................................18
    SECTION  3.20.    Investment Committee.................................................................19
    SECTION  3.21.    Valuation....................................................................................20

ARTICLE IV INVESTMENTS AND INVESTMENT OPPORTUNITIES.................................20

    SECTION  4.1.     Investments Generally. ...............................................................20
    SECTION  4.2.     Investment Restrictions...............................................................20
    SECTION  4.3.     Co-Investment Opportunities......................................................20

ARTICLE V EXPENSES .....................................................................................................21

i

SECTION 5.1.     Definition and Payment of Manager Expenses..............................21
SECTION 5.2.     Partnership Expenses. ....................................................................21

ARTICLE VI CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS...................23

SECTION 6.1.     Capital Commitments. ....................................................................23
SECTION 6.2.     Capital Call Procedure. ..................................................................24
SECTION 6.3.     Default by Limited Partners............................................................24
SECTION 6.4.     Remedies Not Limited. ...................................................................27
SECTION 6.5.     Excluded Limited Partners..............................................................27
SECTION 6.6.     Maximum Capital Commitments......................................................28

ARTICLE VII DISTRIBUTIONS; CAPITAL ACCOUNTS ......................................................28

SECTION 7.1.     Distributions....................................................................................28
SECTION 7.2.     Capital Accounts; Adjustments to Capital Accounts.....................32
SECTION 7.3.     Book Allocations. ............................................................................32
SECTION 7.4.     Tax Allocations. ..............................................................................34
SECTION 7.5.     Tax Credits.......................................................................................34
SECTION 7.6.     Loans and Withdrawal of Contribution. .........................................34
SECTION 7.7.     Other Tax Matters. ..........................................................................34

ARTICLE VIII REPORTS TO LIMITED PARTNERS ................................................................35

SECTION 8.1.     Independent Public Accountants......................................................35
SECTION 8.2.     Reports. ............................................................................................35

ARTICLE IX EXCULPATION AND INDEMNIFICATION; RETURN OF CERTAIN
          DISTRIBUTIONS ................................................................................................36

SECTION 9.1.     Exculpation. .....................................................................................36
SECTION 9.2.     Indemnification. ...............................................................................36
SECTION 9.3.     Insufficiency of Damages.................................................................37
SECTION 9.4.     Return of Certain Distributions........................................................37

ARTICLE X TERM AND DISSOLUTION OF THE PARTNERSHIP.......................................40

SECTION 10.1.    Term..................................................................................................40
SECTION 10.2.    Dissolution. ......................................................................................40
SECTION 10.3.    Liquidation of the Partnership. ........................................................40
SECTION 10.4.    Distribution Upon Dissolution of the Partnership. .........................40
SECTION 10.5.    No Voluntary Withdrawal by Limited Partners................................42
SECTION 10.6.    Required Withdrawal of Limited Partners........................................42
SECTION 10.7.    Payments Upon Withdrawal. ...........................................................42

ARTICLE XI TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST...............43

SECTION 11.1.    Transferability of the General Partner's Interest. ...........................43

ii

SECTION  11.2.        Withdrawal of the General Partner. ................................................43
SECTION  11.3.        Removal of the General Partner. ...................................................43

ARTICLE XII TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST....................45

SECTION  12.1.        Conditions for Transfer. ...............................................................45
SECTION  12.2.        Substitute Limited Partner; Recognition of Transfer. ...................46

ARTICLE XIII MISCELLANEOUS ............................................................46

SECTION  13.1.        Amendments. ................................................................................46
SECTION  13.2.        Approvals. .....................................................................................47
SECTION  13.3.        Notices. ..........................................................................................47
SECTION  13.4.        Successors; Counterparts. .............................................................48
SECTION  13.5.        Governing Law; Severability. .......................................................48
SECTION  13.6.        Filings. ...........................................................................................48
SECTION  13.7.        No Right to Partition. ....................................................................48
SECTION  13.8.        Goodwill. .......................................................................................48
SECTION  13.9.        Headings. .......................................................................................48
SECTION  13.10.       Entire Agreement. .........................................................................49
SECTION  13.11.       Submission to Jurisdiction. ...........................................................49
SECTION  13.12.       $200 Million Capital Commitments. .............................................49

APPENDIX A ...................................................................................................56

**SECOND AMENDED AND RESTATED**

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**WHITE OAK SUMMIT FUND, L.P.**

This SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT dated as of March 1, 2016 amends and restates in its entirety the Amended and Restated Limited Partnership Agreement dated as of June 30, 2015, of WHITE OAK SUMMIT FUND, L.P., by and among White Oak Partners 2, LLC, a limited liability company formed under the laws of Delaware, as General Partner, and the Persons who sign copies of the Agreement to become Limited Partners.

WHEREAS, the parties hereto desire to form a limited partnership in accordance with the Partnership Act.

WHEREAS, pursuant to Section 3.2(x) hereof the General Partner may amend this Agreement in certain circumstances subject to certain provisos as set forth therein.

WHEREAS, the General Partner hereby amends and restates the Partnership Agreement in accordance with Section 3.2(x) in accordance with the General Partner's authority to amend the terms hereof pursuant to Section 13.1.

NOW, THEREFORE, the parties hereto agree as follows:

**ARTICLE I**
**DEFINITIONS**

SECTION 1.1.    <u>Definitions</u>.    Capitalized terms used herein without definition have the meanings assigned to such terms in Appendix A attached hereto.  Unless otherwise expressly stated herein, references to Sections are references to Sections in this Agreement.  Unless otherwise indicated or required by the context, defined terms in the singular include the plural and vice versa.

**ARTICLE II**
**GENERAL PROVISIONS**

SECTION 2.1.    <u>Partnership Name</u>.  The name of the Partnership is "**White Oak Summit Fund, L.P.**".

SECTION 2.2.    <u>Registered Office; Principal Office</u>.

(a)    <u>Registered Office of the Partnership</u>.  The Partnership shall maintain a registered office at Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.  Corporation Service Company will act as the registered agent of the

1

Partnership.  The General Partner may change the registered office and registered agent in its sole discretion.

(b)      Business Address of the Partnership and the General Partner.  The principal office of the Partnership and the General Partner shall be 3 Embarcadero Center, Suite 550, San Francisco, CA 94111 or such other place as the General Partner shall determine from time to time in its sole discretion.  The General Partner shall promptly notify the Limited Partners of any change in the principal office of the Partnership or of the General Partner.

SECTION  2.3.      Purposes of the Partnership.   The purposes of the Partnership are (a) to originate, acquire, hold and dispose of Partnership Investments on behalf of the Limited Partners in the manner determined by the Manager in its sole and absolute discretion, (b) pending utilization or disbursement of funds, to make Temporary Investments, and (c) to engage in any lawful activity for which limited partnerships may be organized under the laws of the state of Delaware as the General Partner deems necessary or desirable for the accomplishment of the above purposes or the furtherance of any of the powers herein set forth and to do every other act and thing incident thereto or connected therewith.  The Partnership shall have all the powers available to it as a limited partnership organized under the laws of the state of Delaware to do any and all acts necessary, appropriate, desirable, incidental or convenient to or for the furtherance of the purposes described in this Section 2.3.  Without prejudice to the generality of the foregoing the General Partner shall have the power, for and on behalf of the Partnership, to issue loan notes, incur indebtedness and grant security and give guarantees in respect thereof.

SECTION  2.4.      Liability of the Partners.

(a)      Liability of the General Partner.  Except as otherwise provided in the Partnership Act or this Agreement, the General Partner shall have unlimited liability with respect to the debts, obligations and other liabilities of the Partnership.

(b)      Liability of the Limited Partners.  Except as specifically set forth in this Agreement or as provided in the Partnership Act, (i) a Limited Partner shall not be obligated to make any contribution to the Partnership of any amount in excess of its Capital Commitment or other payments provided for herein, and (ii) no Limited Partner (or former Limited Partner) shall have any personal liability whatsoever in its capacity as a Limited Partner for the repayment of debts, liabilities, losses or other obligations of the Partnership.  Except as provided for in Section 3.17(b), no person other than the General Partner (including any creditor of the Partnership or the General Partner) may call capital or require any Limited Partner to meet its Capital Commitment.

SECTION  2.5.      Admission of Limited Partners.

(a)      Initial Closing.  The Initial Closing will be held on such date as determined by the General Partner in its sole discretion.  On the Initial Closing Date, each Person whose subscription for an LP Interest has been accepted by the General Partner on behalf of the Partnership shall make a Capital Contribution in cash to the Partnership in an amount determined by the General Partner, in its sole discretion.  Upon making such Capital

Contribution, each such Person shall become a Limited Partner and shall be shown as such in the Partnership's records.

(b)    Subsequent Closings.    Through the Final Closing Date, the General Partner may admit one or more Additional Limited Partners on such fixed dates as determined exclusively by the General Partner, upon satisfaction of the following conditions: (i) each such Additional Limited Partner or its attorney-in-fact shall execute a counterpart signature page to this Agreement, which shall be deemed for all purposes to constitute an amendment to this Agreement providing for such admission, and such other documents determined by the General Partner, (ii) the Partnership would not be required to register as an investment company under the Investment Company Act, and (iii) the Additional Limited Partner makes a Capital Contribution equal to the aggregate amount that the Limited Partner would have been required to contribute to the Partnership from the Initial Closing Date through the date of the applicable Subsequent Closing if it had been admitted to the Partnership as a Limited Partner on the Initial Closing Date (such amount, the "**Subsequent LP Capital Contribution**") (net of, with respect to those Limited Partners who participated in prior Closings ("**Existing Limited Partners**"), (yy) any distributions actually made by the Partnership to the Existing Limited Partners during such period and (zz) any amount distributed to the Existing Limited Partners pursuant to clause (iii) of this Section 2.5(b) that represents a Capital Contribution Recovery), calculated from the Initial Closing Date to the date of applicable the Subsequent Closing Date.

(i)    Notwithstanding anything contained herein to the contrary, in the event that the General Partner determines, in its sole discretion, that there has been a material change or significant event relating to one or more Partnership Investments held by the Partnership (either directly or through a Subsidiary Fund) on the date of a Subsequent Closing, then the amount of the Subsequent LP Capital Contributions shall then be appropriately adjusted to reflect such a different valuation.

(ii)    The aggregate amount of Subsequent LP Capital Contributions contributed by an Additional Limited Partner to the Partnership pursuant to the first sentence of Section 2.5(b) that is attributable to the cumulative amount of the Management Fees and Administration Fees, if any, that would have been payable if such Additional Limited Partner had been admitted to the Partnership on the Initial Closing Date shall be paid by the Partnership to the Manager out of the Additional Limited Partner's Capital Account in the manner specified in Section 3.4 as though the Additional Limited Partner invested on the Initial Closing Date.

(iii)    The General Partner may distribute up to the remaining amount of such Subsequent LP Capital Contributions to the Existing Limited Partners in proportion to such Existing Limited Partners' respective prior Capital Contributions.  Any amount so distributed to an Existing Limited Partner that represents a recovery of previously made Capital Contributions (such amount, a "**Capital Contribution Recovery**"), will result in a corresponding increase in the amount of such Existing Limited Partner's Remaining Capital Commitment which is subject to subsequent drawdown by the Partnership during the Investment Period.  Except in accordance with Article XII, no Limited Partner will be admitted to the Partnership after the Final Closing.

(iv)    [Reserved].

3

(c)     Increase in Capital Commitments.  Through the Final Closing Date, the General Partner may permit any Existing Limited Partner to increase its Capital Commitment on the date of a Subsequent Closing, provided that all conditions of Section 2.5(b) have been satisfied as though such Limited Partner were an Additional Limited Partner with respect to such increase.  For purposes of Section 2.5(b), such an Existing Limited Partner shall be treated as an Additional Limited Partner with respect to its additional Capital Commitments.

(d)     Final Closing.  The General Partner shall use its reasonable efforts to hold the Partnership's Final Closing within 12 months of the Initial Closing Date; provided, however, that the General Partner shall in its discretion be entitled to hold the Final Closing, to the extent that the General Partner determines necessary or appropriate, up to and including on the 18-month anniversary of the Initial Closing Date.

## ARTICLE III
## MANAGEMENT AND OPERATIONS OF THE PARTNERSHIP

SECTION 3.1.     Management Generally.    As among the Partners, the management, administration and control of, and the determination of policies with respect to, the Partnership and its affairs shall be vested exclusively in the General Partner.  The General Partner has delegated, and will continue to delegate, the portfolio management of the Partnership's investments to the Manager pursuant to such Manager's corresponding Management Agreement.  The General Partner will provide administrative services to the Partnership or may serve as Administrator.  The Limited Partners shall have no part in the management, administration or control of the Partnership and shall have no authority or right to act for or on behalf of the Partnership in connection with any matter.

SECTION 3.2.     Authority of the General Partner.  Subject to the other provisions of this Agreement, the General Partner shall have the power and authority, in its own name or on behalf of and in the name of the Partnership, to carry out any and all of the objects and purposes of the Partnership, and to perform all acts that it may, in its sole discretion, deem necessary or desirable in furtherance thereof, including, without limitation, the power and authority to:

(a)     identify investment opportunities for the Partnership;

(b)     originate or make loans, invest or reinvest in, or acquire, hold, retain, manage, monitor, own, sell, transfer, convey, assign, exchange, pledge or otherwise dispose of any assets held by or on behalf of the Partnership, including Partnership Investments;

(c)     employ, on behalf of and at the expense of the Partnership, any and all financial advisers, brokers, dealers, attorneys, accountants, consultants, appraisers, servicers, custodians of the assets of the Partnership or other agents, including, but not limited to, administrative agent(s) as may be described from time to time in addition to the Administrator, on such terms and for such compensation as the General Partner may determine, whether or not such Person may be an Affiliate of the General Partner or may also be otherwise employed by the General Partner or by any Affiliate of the General Partner (but subject to Section 3.6) and terminate such employment;

4811-7067-2931.36

(d)      make all elections, investigations, evaluations and other decisions, binding the Partnership thereby, that may, in the sole discretion of the General Partner, be necessary or desirable for the investment or reinvestment in, or acquisition, holding, retention, management, monitoring, ownership, capitalization, merging, restructuring, sale, transfer, conveyance, assignment, exchange, pledge or other disposition of any assets held by or on behalf of the Partnership, including Partnership Investments;

(e)      incur expenses and other obligations incident to the operation and management of the Partnership, and, to the extent that funds of the Partnership are available for such purpose, make payments on behalf of the Partnership in its own name or in the name of the Partnership;

(f)      lend money to the Partnership or cause the Partnership to borrow money, on a secured or unsecured basis, pursuant to Section 3.17;

(g)      bring, defend, settle and dispose of any Proceeding;

(h)      establish reserves for contingencies and for any other Partnership purpose;

(i)      distribute funds to the Partners by way of cash or otherwise pursuant to this Agreement;

(j)      prepare or cause to be prepared reports, statements and other information for distribution to the Partners;

(k)      prepare and file all necessary returns and statements, pay all taxes, assessments and other impositions applicable to the assets of the Partnership, and withhold amounts with respect thereto from funds otherwise distributable to any Partner;

(l)      maintain records and accounts of all operations and expenditures of the Partnership;

(m)      determine the accounting methods and conventions to be used in the preparation of any accounting or financial records of the Partnership as provided in Section 3.9;

(n)      convene meetings of the Limited Partners as provided in Section 3.12;

(o)      open, maintain and close accounts with banks, brokerage firms, custodians or other financial institutions and deposit, maintain and withdraw funds in the name of the Partnership and draw checks or other orders for the payment of moneys;

(p)      enter into, execute, deliver and perform any contract, agreement or other instrument as the General Partner shall determine, in its sole discretion, to be necessary or desirable (i) in connection with the sale of LP Interests, including the Subscription Agreements, or (ii) to further the purposes of the Partnership, including granting or refraining from granting any waivers, consents and approvals with respect to any of the foregoing and any matters incident thereto;

(q)      appoint the Initial Manager (which is an affiliate of the General Partner) to serve as Manager, and, subject to Section 3.4, terminate the Manager and appoint a replacement Manager;

(r)      appoint the Initial Administrator to serve as Administrator, and, subject to Section 3.5, terminate such appointment and appoint a replacement Administrator;

(s)      value the assets and liabilities of the Partnership, in accordance with Section 3.21;

(t)      establish separate classes of LP Interests with such rights and privileges as the General Partner shall determine;

(u)      acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership, a Partnership Investment and any Covered Person or for any purpose convenient or beneficial to the Partnership;

(v)      require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the Person or entity contracting with the Partnership is to look solely to the Partnership and its assets for satisfaction of any debts owed or claims asserted;

(w)      create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets, in accordance with Section 10.4(b);

(x)      convert the Partnership into a feeder fund, and/or establish other feeder funds to carry out their investment programs through investment in the Partnership or otherwise, and to amend this Agreement pursuant thereto to reflect such "master-feeder" structure; provided, however, that if the Partnership is converted into a feeder fund pursuant to this Section 3.2(w), and an ERISA Partner invests directly or indirectly through or in a feeder fund or master fund, the ERISA Partner shall be afforded substantially the same protections in respect to such funds as is afforded by the Partnership by virtue of the ERISA Partner's status as an ERISA Partner; provided, further, that if the Partnership is converted into a feeder fund pursuant to this Section 3.2(w), in no event shall the material terms hereof be altered by such conversion; provided still further that if other feeder funds are established, the General Partner may enter into arrangements with such feeder funds that have different terms than those set forth herein;

(y)      invest all or substantially all of the Partnership's assets in a Subsidiary Fund;

(z)      effect a dissolution of the Partnership as provided herein; and

(aa)      act for and on behalf of the Partnership in all matters incidental to the foregoing.

6

Notwithstanding the foregoing provisions of this Section 3.2, the General Partner shall have the power to do all things and discharge all duties or requirements required of or imposed on a general partner by applicable law (whether or not on behalf of the Partnership).  In addition, the General Partner shall have the power to perform all acts that it may, in its sole discretion, deem necessary or desirable in connection with the performance of its duties hereunder.  The General Partner may, in its sole discretion, delegate certain administrative duties hereunder to such third Persons as the General Partner may designate from time to time.

SECTION  3.3.        Parallel Funds.  In order to facilitate investment by certain investors including, without limitation, foreign investors, tax-exempt investors and investors subject to ERISA, the General Partner has established one or more parallel funds (collectively, the "**Parallel Funds**") and may establish similar vehicles in the future.  Each Parallel Fund shall be controlled by the General Partner or one of its Affiliates to the extent practicable in light of such legal, tax, contractual and regulatory considerations. The General Partner and/or the Manager may enter into arrangements with any Parallel Fund that vary any of the terms set forth herein with respect to such Parallel Funds or any investors therein.  For avoidance of doubt, no Limited Partner will be obliged to invest in a Parallel Fund.

SECTION  3.4.        Manager; Management Fee.

(a)     *Appointment of the Manager.*

(i)     The Initial Manager will serve as the Manager pursuant to the terms and conditions of its corresponding Management Agreement until and unless the Initial Manager is terminated as the Manager in accordance with this Section 3.4.

(ii)    Subject to the conditions set out in this Section 3.4: (A) the Limited Partners may, by means of a vote of a majority in interest of the Required Limited Partners terminate the current Manager and direct the General Partner to terminate its corresponding Management Agreement, subject to the terms and conditions set forth such Management Agreement; and (B) upon any such termination, the Limited Partners will, by means of a vote of a majority in interest of the Required Limited Partners, select a new Manager and determine the terms and conditions under which such new Manager will serve the Partnership. Upon such selection and determination, the General Partner will appoint such new Manager to serve in such capacity and negotiate in good faith and execute such new Manager's Management Agreement on behalf of the Partnership.

(b)     *Management Services*. The Manager will provide portfolio management, and other services to the Partnership and to source, select, acquire, manage and dispose of the Partnership Investments.

(c)     *Management Fee Calculation*.  In consideration for the management services to be rendered pursuant to the Management Agreement, the Partnership out of each Limited Partner's Capital Account may bear quarterly management fees (the "Management Fee"), payable in advance as of January 1, April 1, July 1, October 1 of each year (periods during the Partnership's term that conclude on such days, each a "**Quarterly Period**").  The Management Fee shall be prorated for any Quarterly Period that is less than a full three (3)

months.  In the event of any proration, any pre-paid Management Fee shall be repaid promptly. Except as provided in Section 13.12, the Management Fee with respect to the individual Limited Partners shall be equal to the following amounts:

> (i)      with respect to a Limited Partner whose aggregate Capital Commitment is less than $25 million: the sum of (a) 0.125% (corresponding to an annual rate of 0.50%) of such Limited Partner's Capital Commitment *less* such Limited Partner's Capital Contributions invested in Partnership Investments attributable to such Limited Partner; *plus* (b) 0.3125% (corresponding to an annual rate of 1.25%) of such Limited Partner's Capital Contributions invested in Partnership Investments attributable to such Limited Partner, valued at their fair market value as of the start of each Quarterly Period; *plus* (c) such Limited Partner's Carried Interest; and

> (ii)      with respect to a Limited Partner whose aggregate Capital Commitment is $25 million or more: the sum of (a) 0.25% (corresponding to an annual rate of 1.00%) of such Limited Partner's Capital Contributions invested in Partnership Investments attributable to such Limited Partner valued at their fair market value as of the start of each Quarterly Period.  Fair market value shall be determined in the same manner as used in determining the Partnership's net asset value; *plus* (b) such Limited Partner's Carried Interest.

Clauses (a) and (b) of Section 3.4(c)(i) and clause (a) of Section 3.4(c)(ii) shall be referred to herein as the "**Fixed Management Fee**."

> (d)      *Management Fee Reduction*.    Limited Partners admitted to the Partnership at the Initial Closing shall be entitled to a 10% reduction in the amount of the Fixed Management Fee that would otherwise be borne by such Limited Partner for a period beginning on the date the Partnership's first Partnership Investment is made and concluding on the one-year anniversary thereof.

> (e)      *Transaction Fees*.   Any Transaction Fees earned by a member of the General Partner Group during any Quarterly Period shall be retained by such member but one hundred percent (100%) of such Transaction Fees shall be applied to reduce: (i) the amount of the Fixed Management Fees in the next Quarterly Period and, if such Transaction Fees have not been fully offset in such Quarterly Period, in future Quarterly Periods  (ii) any other Partnership Expenses and/or (iii) the Carried Interest.  Transaction Fees shall not in any case include the Administration Fee.  Transaction Fees that are not fully offset pursuant to this Section 3.4(e)(i), (ii) or (iii), upon termination of the Partnership shall be distributed to the Limited Partners *pro rata* in accordance with their respective Capital Account balances, except that Limited Partners will be given the opportunity by the General Partner to decline to receive such Transaction Fee distributions, in which case any remaining Transaction Fee offsets will be distributed to the non-electing Limited Partners, pro rata.

> (f)      *Management Fee Waiver*.   The Manager may, in its sole discretion, waive or reduce the Management Fee for Affiliates and for certain Limited Partners, including with respect to Limited Partners who have been advised to invest in the Partnership by a common consulting firm(s) or other intermediary and whose aggregate Capital Commitments exceed certain thresholds and for the General Partner and its affiliates.  Except for its share of

Management Fees payable by or on behalf of a Subsidiary Fund, the General Partner will not be assessed a Management Fee with respect to its capital invested in the Partnership.

(g)     *Commonly Advised Entities.*  To the extent that: (i) any single Limited Partner or group of Limited Partners have engaged a third party consultant, adviser, or other intermediary (each such party, a "**Third Party Consultant**"); (ii) each such Limited Partner has been introduced to the Partnership by such Third Party Consultant; (iii) each such Limited Partner has decided to make its Capital Commitment based exclusively upon  and directly as a result of such Third Party Consultant's introduction and recommendation; and (iv) the aggregate Capital Commitments to the Partnership of all Limited Partners advised by any particular Third Party Consultant exceed such thresholds as the General Partner may, from time to time, determine, then, notwithstanding Section 3.4(c), the Management Fee to be borne by such Limited Partners shall as specified in a separate agreement between the Manager and the applicable Third Party Consultant.

(h)     *Management Fee Offset.*  In the event that a Subsidiary Fund bears a management or similar fee, then such fee will be credited on a dollar-for-dollar basis against the Management Fee otherwise chargeable to a Limited Partner (the "**Fixed Management Fee Offset**") such that the aggregate Fixed Management Fee paid by the Limited Partner directly from its Capital Account or indirectly by virtue of its investment in the Subsidiary Funds shall not exceed the applicable amount specified in Section 3.4(c) after giving effect to the Fixed Management Fee Offset.  In the event that a Subsidiary Fund bears a carried interest or similar performance-based fee, then such interest or fee will be credited on a dollar-for-dollar basis against the Carried Interest otherwise chargeable to a Limited Partner (the "**Carried Interest Offset**") such that the aggregate Carried Interest paid by the Limited Partner directly from its Capital Account or indirectly by virtue of its investment in the Subsidiary Funds shall not exceed the applicable amount specified in Section 3.4(c) and as set forth in the definition of "Carried Interest" after giving effect to the Carried Interest Offset.

(i)     *Management Fee Not Affected by Defaulting Limited Partners.* Notwithstanding anything in the Partnership Agreement to the contrary, in no event shall a Limited Partner have any obligation to pay Management Fees in respect of any amount other than in respect of that Limited Partner's Capital Account(s) including, without limitation, that the Limited Partner shall in no event be required to pay Management Fees on interests of any Defaulting Partner absent that Limited Partner's prior written consent.

SECTION  3.5.          Administrator; Administration Fee.

(a)     Appointment of the Administrator.

(i)     The Initial Administrator will serve as the Administrator pursuant to this Agreement until and unless the Initial Administrator is terminated as the Administrator in accordance with this Section 3.5.

(ii)     Subject to the conditions set out in this Section 3.5: (A) the Limited Partners may, by means of a vote of a majority in interest of the Required Limited Partners direct the General Partner to terminate its appointment; and (B) upon any such termination, the Limited Partners will, by means of a vote of a majority in

interest of the Required Limited Partners, select a new Administrator and determine the terms and conditions under which such new Administrator shall serve the Partnership. Upon such selection and determination, the General Partner will appoint such new Administrator to serve in such capacity and negotiate in good faith and execute an administration agreement on behalf of the Partnership.

(b)     *Administration Services.* The Administrator will provide administrative, accounting and other services to the Partnership mutually agreed upon by the General Partner and the Partnership.

(c)     *Administration Fee.* In consideration for the administration services to be rendered, the Partnership out of each Limited Partner's Capital Account may bear an aggregate administration fee for each Quarterly Period, in advance, (the "**Administration Fee**") equal to 1.25 basis points (0.0125%) of aggregate Capital Commitments.  The General Partner may waive the Administration Fee with respect to certain Limited Partners or Affiliates and, in such cases, *pro rata* in proportion to such Person(s)' applicable portion thereof.

SECTION  3.6.     <u>Transactions with Affiliates</u>.  In addition to transactions specifically contemplated by this Agreement, the General Partner, when acting in its capacity as a general partner of the Partnership, is, to the extent legally permissible, hereby authorized to purchase property or obtain services from, sell property to or provide services to, borrow funds or otherwise deal with the itself, as well as counterparties that are Affiliates of the General Partner (including the Manager and any investment fund or  account managed or advised by the General Partner or its Affiliates, including any Subsidiary Fund), provided that, in connection with any such dealing, such dealing shall (a) be on terms no less favorable to the Partnership than would be obtained on an arm's length basis and (b) have received the prior written approval of the Independent Investor Representative or the approval of a majority of the Limited Partners who are not affiliated with the General Partner or its Affiliates.   Each Limited Partner acknowledges and agrees that the purchase or sale of property, the performance of such services, the borrowing of such funds, other dealings, or the receipt of such compensation may give rise to conflicts of interest between the Partnership and the Limited Partners, on the one hand, and the General Partner or such Affiliate, on the other hand.  Notwithstanding the foregoing, the General Partner shall not cause the Partnership to enter into any transactions with itself or its Affiliates, unless such transactions are exempt from the prohibited transactions restrictions under ERISA and the Code.

SECTION  3.7.     <u>Other Activities; Successor Vehicles; Devotion of Time</u>.

(a)     Except as otherwise explicitly provided for herein, no member of the General Partner Group shall be required to manage the Partnership or any Subsidiary Fund as its sole and exclusive function.  Members of the General Partner Group and their respective Affiliates may engage in and possess interests in other business ventures and investment opportunities of every kind, nature or description, independently or with others, including, but not limited to: management of other investment partnerships; investments in, financing, acquisition or disposition of securities; investment and management counseling; providing brokerage and investment banking services; or serving as officers, directors, managers, consultants, advisors or agents of other companies, partners of any partnership, members of any limited liability company or trustees of any trust (and may receive fees, commissions,

10

remunerations or reimbursement of expenses in connection with such activities), whether or not such activities may conflict with any interest of the Partnership or any of the Partners. The General Partner shall, and shall cause the Manager and any of its Affiliates to, devote such time to the Partnership's business as the General Partner, in its sole discretion, shall deem to be necessary to manage and supervise the Partnership's business and affairs in an efficient manner.

(b)     Notwithstanding anything to the contrary herein, the Manager and its Affiliates will not call capital for any Successor Fund prior to the earlier of (A) the end of the Investment Period and (B) the date on which (x) at least 70% of the aggregate Capital Commitments have been drawn down or committed by a legally binding written agreement (including, without limitation, a letter of intent) to be invested, or (y) at least 80% of the aggregate Capital Commitments have been drawn down or committed by a legally binding written agreement (including, without limitation, a letter of intent) to be invested, or reserved (by prior written notification to the Independent Investor Representative) for Partnership Expenses and/or Follow-On Investments; provided that any reservation of Capital Commitments for Partnership Expenses and/or Follow-On Investments shall be approved by the Independent Investor Representative. The term "**Successor Funds**" shall mean any new (i) small business investment companies, (ii) business development companies, (iii) collateralized loan obligations or series thereof, (iv) so-called "master-custody agreements," (v) any investment fund, limited partnership or other similar investment vehicle and, (vi) separately managed accounts and coinvestment funds for specific investors except for (a) any pre-existing entities as of the date of such investor's subscription or (b) any Parallel Fund existing prior to the Final Closing Date that is subject to the provisions of Section 6.6, hereof. For the avoidance of doubt, this provision shall not restrict the Manager from marketing or accepting capital commitments for a Successor Fund prior to the events described in clause (x) or clause (y) of this Section 3.7(b).

(c)     The General Partner and its Affiliates (and their respective principals, officers, directors, partners, shareholders, members, managers, employees, agents, affiliates or other representatives) may serve as general partner, investment adviser, manager, or in a similar capacity to Successor Funds, investment funds, managed accounts, capital pools, and may have, make, or maintain investments in their own name or through other entities and may serve as a principal officer, director, partner, shareholder, member, manager, employee, agent, affiliate or other representative of one or more investment funds, partnerships, securities firms, or advisory firms (all such other vehicles and entities, "**Other Clients**"). The General Partner and its Affiliates (and their respective principals, officers, directors, partners, shareholders, members, managers, employees, agents, affiliates or other representatives) may give advice or take action with respect to the Other Clients that differs significantly from the advice given with respect to the Partnership.  Neither the Partnership nor any Limited Partner shall have any rights or obligations by virtue of this Agreement in or to the independent ventures and activities as related to the Other Clients or to the income or profits derived therefrom.

SECTION  3.8.     <u>Key Person Event</u>.

(a)     A Primary Key Person Event shall be deemed to have occurred if, at any time during the Investment Period, both of Andre Hakkak and Barbara McKee become legally incompetent or are disabled (i.e., unable by reason of disease, illness or injury to perform his or

her duties with respect to the Partnership for 90 consecutive days) or otherwise cease to be active in the affairs of the Partnership for 90 consecutive days (collectively "**Disabled**").

(b)     A Secondary Key Person Event shall be deemed to have occurred if at any time during the Investment Period (i) either of Andre Hakkak or Barbara McKee and at least two (2) of Ali Amiry, David Hackett, or Darius Mozaffarian (collectively, the "**Principals**") become Disabled, or (ii) the General Partner transfers all or a portion of its general partner interest to any person not under common control (as defined under the Advisers Act) with the General Partner or its affiliates.  A Primary Key Person Event and a Secondary Key Person Event are referred to collectively as a Key Person Event.

(c)     Should a Key Person Event take place, the General Partner will provide the Limited Partners with written notice (the "**Key Person Event Notice**") specifying the occurrence of either a Primary Key Person Event or a Secondary Key Person Event within thirty (30) days following the occurrence thereof.

(d)     Upon the issuance of a Key Person Event Notice occasioned by a Primary Key Person Event, the Investment Period will terminate unless Limited Partners representing at least a majority (50.01%) of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner and its affiliates affirmatively elect in writing to continue the Investment Period (a "**Primary Key Person Event Waiver**").  A waiver shall only be effective if a Primary Key Person Event Waiver is obtained within 90 days of the date of the Primary Key Person Event Notice.

(e)     Upon the occurrence of a Secondary Key Person Event, the Investment Period will terminate if Limited Partners representing at least two thirds (66 2/3%) of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner and its affiliates affirmatively elect in writing to terminate the Investment Period (a "**Secondary Key Person Event Termination**"). A Secondary Key Person Event Termination shall only be effective if the Secondary Key Person Event election is made within 90 days of the issuance of the Secondary Key Person Event Notice.

(f)     Notwithstanding the occurrence of either the failure to obtain a Primary Key Person Event Waiver or the occurrence of a Secondary Key Person Event Termination, as the case may be, any termination of the Investment Period as a result of either circumstance shall not prevent the Partnership from: (i) completing any proposed investment with respect to which it has entered into a legally binding agreement to invest in prior to such election by the Limited Partners; (ii) paying any Partnership Expenses (as defined herein) relating to existing or committed investments, or (iii) satisfying any of its obligations in respect of any borrowings or other extensions of credit which are secured, in whole or in part, by the Capital Commitments.

SECTION  3.9.        Books and Records; Accounting Method; Fiscal Year.

(a)     Books and Records.  The General Partner shall keep or cause to be kept at the principal office of the General Partner set forth in Section 2.2(b) full and accurate books and records of the Partnership.  Each Limited Partner shall be shown as a limited partner of the Partnership on such books and records.  Subject to Section 3.11(b), such books and records

shall be available, upon ten (10) Business Days' notice to the General Partner, for inspection by each Limited Partner or its duly authorized agents or representatives at the principal offices of the General Partner (or such other location designated by the General Partner, in its sole discretion) at reasonable times during business hours.  Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner. Notwithstanding the forgoing, a Limited Partner shall not have the ability to identify any other Limited Partner in the Partnership.  As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any identifying information of the other Limited Partners in the Partnership and, if such books and records cannot be redacted, such books and records will not be made available for inspection to such Limited Partner.  The General Partner shall retain the Partnership's books and records for a period of six years after termination of the Partnership or any longer period as may be required by ERISA.

(b)     <u>Accounting Methods</u>.  The General Partner shall determine, in its sole discretion, the accounting methods and conventions to be used in the preparation of any accounting or financial records or reports of the Partnership, which methods and conventions shall be in accordance with U.S. generally accepted accounting principles (except as otherwise specified herein).

(c)     <u>Fiscal Year</u>.  Unless otherwise required by applicable law, the fiscal year of the Partnership shall end on December 31.

SECTION  3.10.     <u>Partnership Information; Tax Elections; Tax Returns; Tax Basis Adjustments</u>.

(a)     <u>General</u>.  The General Partner shall cause to be prepared and timely filed all information and tax returns required to be filed by the Partnership, if any.  The General Partner may, in its sole discretion, make, or refrain from making, any income or other tax elections for the Partnership that it deems necessary or advisable, including an election pursuant to Section 754 of the Code (provided that the General Partner shall not elect for the Partnership to be treated as a corporation for federal income tax purposes).

(b)     <u>Tax Basis Adjustments</u>.  The General Partner may make an election to have the Partnership treated as an "electing investment partnership" for purposes of Section 743 of the Code.  If the General Partner elects to have the Partnership treated as an "electing investment partnership," the other Partners shall cooperate with the General Partner to maintain that status and shall not knowingly take any action that would be inconsistent with such election.  Upon reasonable request, the Partners shall provide the General Partner with any information available to them necessary to allow the Partnership to comply with (a) its obligations to make tax basis adjustments under Section 734 or 743 of the Code or (b) its obligations as an electing investment partnership.  Each Limited Partner agrees that it shall not make an election under Section 732(d) of the Code with respect to any property distributed to it by the Partnership without the prior written consent of the General Partner.

13

SECTION 3.11.    Confidentiality.

(a)    Confidentiality Obligation of Limited Partners.  Each Limited Partner agrees to keep confidential and not to disclose to any Person (other than to directors, officers, partners or employees of (or, in the case of any ERISA Partner, the plan sponsor of), or agents, legal counsel, independent auditors or consultants for, such Limited Partner responsible for matters relating to the Partnership (each an "**Authorized Representative**")) all information and documents relating to the Partnership and its affairs, including, without limitation, any information (i) relating to any Partnership Investment, (ii) provided to such Limited Partner pursuant to Article VIII, and (iii) provided to such Limited Partner prior to or after its admission to the Partnership relating to the General Partner Group, provided that in each case such Limited Partner may make such disclosure (x) if the information being disclosed is otherwise generally available to the public, or (y) if such disclosure is, in the written opinion (satisfactory to the General Partner) of legal counsel (satisfactory to the General Partner) for such Limited Partner or Authorized Representative, required by applicable law or regulation. Prior to any disclosure to any Authorized Representative of a Limited Partner of any information referred to in the first sentence of this Section 3.11(a), such Limited Partner shall advise such Authorized Representative of the obligations set forth in this Section 3.11(a) and obtain the agreement of such Authorized Representative to keep such information confidential and otherwise comply with this Section 3.11(a) as though such Authorized Representative were a Limited Partner.  Notwithstanding the terms of this Section 3.11(a) or any other express or implied agreement, arrangement or understanding to the contrary, each party to this Agreement (and their respective Authorized Representatives) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership, and all materials of any kind (including opinions or other tax analyses) that are provided to the party to the extent related to such tax treatment and tax structure.  Notwithstanding the foregoing, a Limited Partner may discuss otherwise confidential information about the Partnership with other Limited Partners.

The General Partner hereby acknowledges that each ERISA Partner and its administrator have an obligation under Section 101(k) of ERISA (collectively with any regulations thereunder, "**Section 101(k)**") to provide certain information to certain interested parties and agrees that each ERISA Partner shall not be subject to any otherwise applicable confidentiality provision in this Agreement in connection with the ERISA Partner's compliance with Section 101(k) requirements.  The General Partner agrees that at the time any information regarding the Partnership is furnished to an ERISA Partner, the General Partner shall indicate with specificity what (if any) information contained therein constitutes "proprietary information" within the meaning of Section 101(k), and the ERISA Partner shall not disclose such "proprietary information" to interested persons. The General Partner hereby expressly agrees to indemnify each ERISA Partner and its administrator against any and all claims, liabilities, damages, court costs or reasonable expenses (including reasonable attorneys' fees) that the ERISA Partner and/or its administrator incur or suffer as a result of the ERISA Partner and/or its administrator omitting such information in connection with a request for information made under Section 101(k) of ERISA in the event such information is determined not to be "proprietary information" within the meaning of Section 101(k).

(b)    Right of General Partner to Keep Information Confidential.  The General Partner may, to the maximum extent permitted by applicable law, keep confidential from any

14

Limited Partner any information (including, without limitation, information requested by such Limited Partner pursuant to Section 3.9 and information otherwise required to be delivered to such Limited Partner pursuant to Article VIII) with respect to any Partnership Investment or potential Partnership Investment (i) that the Partnership or the General Partner is required by law, agreement or otherwise to keep confidential, or (ii) the disclosure of which the General Partner reasonably believes may have an adverse effect on the ability of the Partnership to consummate any proposed Partnership Investment or any transaction directly or indirectly related to, or giving rise to, such Partnership Investment.

Without a Limited Partner's prior written consent, none of the Partnership, the General Partner, the Manager or any of their Affiliates shall (a) use the Limited Partner's name or derivations thereof in advertising, publicity, marketing materials, private placement memorandum or other offering materials or other similar publication or document and/or (b) infer that the Partnership has been endorsed by the Limited Partner. Notwithstanding clause (a) above, the General Partner and its Affiliates may inform other Limited Partners and prospective investors in the Partnership of the fact and amount of the Limited Partner's subscription to the Partnership; disclose the Limited Partner's name and subscription amount if the General Partner first determines in good faith that such disclosure is in the best interests of the Partnership in connection with a Partnership Investment; and make any other disclosure regarding the Limited Partner's investment in the Partnership required by law, legal process or stock exchange rule, in each case, without obtaining the prior written consent of the Limited Partner.

SECTION 3.12.     Meetings of Limited Partners.

(a)     *Calling a Meeting.*   The General Partner or Limited Partners representing at least 75% of the LP Interests in the Partnership may call a meeting of the Limited Partners at any time for any purpose relating to the business of the Partnership. The General Partner will give timely notice of such meeting to each Limited Partner in accordance with Section 13.3. Such notice shall specify the time and place of such meeting. Actions may be approved at any meeting upon the approval of Limited Partners representing at least 75% of the LP Interests and not affiliated with the General Partner or its Affiliates present at such meeting; provided that Limited Partners representing at least 50% of the LP Interests and not affiliated with the General Partner or its Affiliates are present in person or by proxy at such meeting.

(b)     *Election of Subsidiary Fund Directors.*   In the event that a Subsidiary Fund holds an annual or special meeting of the holders of its voting securities for the purpose of voting on the election or re-election of one or more directors of such Subsidiary Fund, the General Partner will call a meeting of the Limited Partners for the purpose of voting in connection with the election of each such director. Each Limited Partner shall be entitled to vote "for", "withhold" or to "abstain". The General Partner will vote the securities of the Subsidiary Fund held by the Partnership "for" the election of each such director and shall cast votes "withholding" or "abstaining" in the same proportion as the Interests of the Limited Partners vote in such election.

SECTION 3.13.     Temporary Investment of Funds.   The General Partner shall invest in Temporary Investments cash held by the Partnership, including all amounts being held by the Partnership for future investment in Partnership Investments, payment of Partnership

Expenses or distribution to the Partners (including, without limitation, any amounts held by the Partnership pursuant to Section 7.1(f)).

SECTION  3.14.      Certain ERISA Matters.

(a)      The General Partner, on its own behalf and on behalf of the Manager, agrees that both the General Partner and the Manager are fiduciaries of all ERISA Partners with respect to the assets of the Partnership.

(b)      The General Partner shall use commercially reasonable efforts to conduct the business of the Partnership so that it does not cause the Partnership and/or any ERISA Partner to engage in a "prohibited transaction" as defined in ERISA and the Code; provided that the General Partner shall be permitted to rely on any information provided by an ERISA Partner in its Subscription Agreement or in supplemental requests for information from the General Partner with respect to the requirements of this clause (b).

SECTION  3.15.      UBTI, ECI and Other Tax Considerations.

(a)      Notwithstanding any other provision of this Agreement, the Partnership shall use commercially reasonable efforts to avoid the incurrence of any item of "unrelated business taxable income," within the meaning of Section 512 of the Code ("**UBTI**").

(b)      Notwithstanding any other provision of this Agreement, the Partners understand that the Partnership's income may be treated as, and the Partnership's investment activities may cause non-U.S. Limited Partners to incur, income that is "effectively connected" to the conduct of a trade or business in the United States within the meaning of Sections 864, 871, 882 and 897 of the Code.

(c)      For the avoidance of doubt, the Partnership will be deemed to have satisfied its undertakings pursuant to Section 3.16(a) in connection with the incurrence of any item of UBTI by reason of: (i) any workout or restructuring of a Partnership Investment or bankruptcy of an issuer, including, but not limited to, the receipt of securities that may generate UBTI; (ii) any borrowing, hedging, financing or payments specifically permitted or provided for in the Offering Memorandum or this Agreement (or similar borrowing, hedging, financing or payments by a Subsidiary Fund); (iii) any loan origination activity deemed to be undertaken by the Partnership; (iv) any fees received from the issuer of a debt obligation held by the Partnership (or a Subsidiary Fund); or (v) any securities received in connection with the origination of a debt obligation.

SECTION  3.16.      Reliance by Third Parties.   Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth, and shall not be required to inquire as to the General Partner's authority to bind the Partnership.

SECTION  3.17.      Borrowings; Financings

(a)      The Partnership may either borrow funds under a credit facility or enter into a financing (including, but not limited to, pursuant to a forward contract) on market-based terms in order to fund the acquisition of Partnership Investments or pay Partnership Expenses,

16

in each case pending the Partnership's receipt of required Capital Contributions from Limited Partners or other receipts of cash.

(b)     By executing this Agreement, each Limited Partner expressly agrees that the General Partner may pledge, secure, or otherwise encumber the assets of the Partnership and such Limited Partner's rights hereunder as security for any borrowing and that such Limited Partner's Capital Commitment obligation, the right to deliver Capital Call Notices to the Limited Partners, the right to receive all amounts in respect of Capital Contributions and any other assets of the Partnership, may be pledged to secure any borrowings or indebtedness incurred by the Partnership.  In connection with any borrowing or indebtedness incurred by the Partnership, each Limited Partner agrees that it shall, upon request, confirm its Remaining Capital Commitment, and execute such other documents as may reasonably be requested by any lender; provided, that a Limited Partner shall not be required to (i) execute any document that would subject such Limited Partner to any obligation beyond the amount of such Limited Partner's unfunded Capital Commitment or (ii) execute or obtain any legal opinions prepared by legal counsel.  The General Partner shall not pledge its interest in the Partnership under any circumstances.

(c)     The Partnership's borrowing of money, issuance of guarantees and taking on leverage directly or through its Subsidiaries is limited to borrowings under a credit facility or a financing on market-based terms in order to fund the acquisition of investments or the payment of fund expenses by the Partnership or its Subsidiaries, in each case pending the Subsidiary's receipt of capital contributions from its limited partners and for not longer than 90 days and not in excess of the lower amount of (i) 10% of the aggregate Capital Commitments or (ii) the amount of the aggregate Capital Commitments that is available for draw down from such limited partners.

SECTION  3.18.     Conflicts of Interest.

(a)     While the General Partner intends to avoid situations involving conflicts of interest, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership conflict with the interests of the General Partner Group, including the conflicts of interest identified in the Offering Memorandum.  Each Limited Partner (i) acknowledges that the General Partner, the Manager and their respective Affiliates are engaged in a broad spectrum of activities, including providing investment management services, financial advisory services and brokerage services and engaging in principal investing activities and the business of sponsoring and managing investment funds and in the ordinary course of their business may engage in activities in which their interests or the interests of their clients or customers may conflict with the interests of the Partnership or a Partnership Investment; and (ii) agrees that the activities of any Other Clients (or other related investment vehicles), the General Partner, the Manager and their respective Affiliates authorized or contemplated by this Section 3.18 or in any other provision of this Agreement may be engaged in by such Other Client, the General Partner, the Manager or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any other agreement contemplated herein or any duty that might be owed by any such Person to the Partnership or to any Partner at law or in equity or otherwise except to the extent such Affiliate engaged in conduct that constitutes (i) a breach of such party's fiduciary duty under ERISA, (ii) negligence, (iii) willful and material breach of the duties set forth in this

Agreement or under the Partnership Act, or (iv) willful and material breach of any applicable fiduciary or other duty under federal or other applicable law.

(b)     The Partnership and the General Partner Group will seek to resolve any conflicts with respect to investment opportunities involving the Partnership in a manner which the General Partner deems equitable to the extent possible under prevailing facts and circumstances; provided that, the General Partner shall have the right, subject to Section 4.3, to allocate any investment opportunity which comes to its attention wholly or primarily to any Other Client, entity or entities other than the Partnership.

(c)     On any matter involving a conflict of interest not provided for in this Section 3.18 or elsewhere in this Agreement, each of the General Partner and the Manager will be guided by its good faith judgment as to the best interests of the Partnership and shall take such actions as are determined by the General Partner or the Manager, as the case may be, after giving consideration to issues that may arise under ERISA (if applicable), to be necessary or appropriate to ameliorate such conflicts of interest.  If the General Partner or the Manager consults with the Independent Investor Representative with respect to a matter giving rise to a conflict of interest, and if the Independent Investor Representative waives such conflict of interest or the General Partner or the Manager acts in a manner, or pursuant to standards or procedures, approved by the Independent Investor Representative with respect to such conflict of interest, then, subject to ERISA (if applicable), none of the Other Clients, the General Partner, the Manager or any of their respective Affiliates shall have any liability to the Partnership or any Partner for such actions in respect of such matter taken in good faith by them, including actions in the pursuit of their own interests, and such actions shall not constitute a breach of this Agreement or any other agreement contemplated herein or of any duty or obligation of such Person at law or in equity or otherwise.

SECTION  3.19.     Independent Investor Representative.

(a)     The General Partner shall establish an investor representative body comprised of third party individuals that are not members of the General Partner Group or its Affiliates, or officers, directors, or employees thereof, to act on each Limited Partner's behalf and on behalf of the Partnership (the "**Independent Investor Representative**").

(b)     The Independent Investor Representative is specifically empowered, in its independent fiduciary determination, to: (i) provide approval or advice to the General Partner on matters relating to the resolution of potential conflicts of interest, including with respect to transactions between the Partnership and members of the General Partner Group (as specified in Section 3.6 of this Agreement), including those that may be identified in the Partnership's quarterly, annual or other reports of financial statements; (ii) approve any waiver of the default provisions set forth in Section 6.3 of this Agreement by the General Partner in favor of the General Partner or any Affiliate of the General Partner; (iii) originate certain term and asset-backed loans if the Manager and General Partner are prohibited from doing so under ERISA rules and regulations; and (iv) provide approval or advice with respect to such other matters as may be referred to it from time to time by the Manager and the General Partner.  In connection with the exercise of the foregoing rights and responsibilities, the Independent Investor Representative may consult with the Partnership's auditor and other professional

advisers and may engage independent legal, accounting or other similar professional advisers at the Partnership's reasonable expense.

(c)     The Independent Investor Representative shall be Harrison Fiduciary Group, an independent fiduciary management firm.  Subject to the terms and conditions set forth in this Section, the terms of appointment (including, for the avoidance of doubt, successor appointments) and all other matters relating to the Independent Investor Representative (including removal of members of the Independent Investor Representative) (i) shall be determined by a vote of a majority in interest of LP Interests not affiliated with the Manager or the General Partner or (ii) with respect to the replacement of a member of the Independent Investor Representative, shall be nominated by the remaining member(s) of the Independent Investor Representative (if any) or, if all members are disabled or otherwise unable to participate in such nomination, by a vote of a majority in interest of the LP Interests not affiliated with the Manager or the General Partner.

(d)     The approval of the Independent Investor Representative (including any formal advice or guidance provided to the General Partner) shall require the affirmative vote of a majority of the members thereof.  The formal advice or guidance of the Independent Investor Representative specifically regarding conflicts of interest shall be binding upon the General Partner.  Members of the Independent Investor Representative may participate in a meeting of the Independent Investor Representative by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.

(e)     The Partnership will bear any expenses related to the functioning of the Independent Investor Representative.

(f)     The Independent Investor Representative shall be a fiduciary with respect to the Partnership, and the members of the Independent Investor Representative may receive such compensation from the Partnership as determined by a majority in interest of the LP Interests that are not affiliated with the General Partner or its Affiliates.

(g)     The General Partner shall provide to each Limited Partner, upon such Limited Partner's request, a detailed description of the topics discussed at any Independent Investor Representative meeting along with copies of all written materials provided to the Independent Investor Representative in connection with any such meeting.

SECTION 3.20.     Investment Committee.  The Manager has established an investment committee ("**Investment Committee**") to (a) approve potential Partnership Investments, (b) assess and manage the risks for such Partnership Investments and (c) continually monitor such Partnership Investments.  All decisions regarding the acquisition and disposition of Partnership Investments will be made by a majority decision of the Investment Committee.  The members of the Investment Committee are the Principals and such other individuals as are selected by the Principals from time-to-time.

SECTION  3.21.      Valuation.

(a)      The Partnership's valuation agent (the "**Valuation Agent**") shall provide third-party valuations of the Partnership Investments.  The valuations assigned to the Partnership Investments by the Valuation Agent(s) shall be conclusive and binding as to all parties.  The Partnership's initial Valuation Agent shall be Navigant Consulting, Inc.  The Independent Investor Representative shall have the full authority to appoint successor Valuation Agent(s); provided, however, that any such successor Valuation Agent shall: (i) not be affiliated with the Manager or the General Partner; and (ii) be reasonably and commercially qualified to engage in the duties required of the Valuation Agent.

(b)      Any Securities distributed by the Partnership shall be valued by the Valuation Agent at the Fair Value thereof as reasonably determined by the Valuation Agent, taking into account any related fees and expenses incurred in connection with the disposition of such Securities.

(c)      The net asset value of the Partnership shall be determined by the fund's administrator, using the valuations given to Partnership Investments by the Valuation Agent.

## ARTICLE IV
## INVESTMENTS AND INVESTMENT OPPORTUNITIES

SECTION  4.1.      Investments Generally.  The assets of the Partnership shall, to the extent not required for the payment of Partnership Expenses or otherwise necessary for the conduct of the Partnership's business, and subject to Section 3.13, be invested in such Partnership Investments as the General Partner shall determine in its sole discretion.

SECTION  4.2.      Investment Restrictions.  The Partnership (looking through any Subsidiary Fund) generally will not invest more than (i) twenty-five percent (25%) of its aggregate Capital Commitments in a single market sector; (ii) eight percent (8%) of its aggregate Capital Commitments in any single Partnership Investment or (iii) twenty-five percent (25%) of its aggregate Capital Commitments in Partnership Investments primarily organized and/or operating outside of the United States and Canada each measured at cost at the time of investment; provided, however, that the General Partner has the discretion to exceed these percentage limitations if it makes a good faith determination that such additional investment is in the best interests of the Partnership and the Independent Investor Representative approves of such additional investment.  The Partnership will not engage in venture capital lending deals with borrowers that have less than $20 million of revenue unless there are meaningful assets (e.g., cash, accounts receivable, inventory or property plant and equipment) that support a given loan on net orderly liquidation value (NOLV) basis.

SECTION  4.3.      Co-Investment Opportunities.  At any time, the General Partner or an Affiliate thereof may in its sole discretion provide any person (including any Limited Partner)  (a "Third Party Co-Investor") with the opportunity to co-invest (other than in their capacity as Partners, if applicable, and no such co-investment shall be considered a Capital Contribution) with the Partnership in the Partnership Investments.  Any such co-investment may, if the General Partner so requires, be made directly through managed accounts or through one or more investment partnerships or other vehicles or accounts (each a "Co-Investment Fund")

formed to facilitate such co-investment. Any such offer may be made to such Persons in such proportions as the General Partner shall determine in its sole discretion, and the General Partner may allocate such portion of an investment opportunity to a Co-Investment Fund as the General Partner determines in its sole discretion to be appropriate. Participation by a Third Party Co-Investor in a co-investment opportunity, whether directly or through a Co-Investment Fund: (i) shall be made on such terms and conditions that the General Partner shall deem in its sole discretion to be appropriate (which, for the avoidance of doubt, may be more favorable than the terms upon which the Partnership participates in such applicable Partnership Investment); and (ii) shall be entirely the responsibility and investment decision of such Third Party Co-Investor, and none of the Partnership, the General Partner, the Manager or any of their respective Affiliates shall assume any risk, responsibility or expense, or be deemed to have provided any investment advice, in connection therewith. The General Partner will allocate available co-investment opportunities among the Partnership, any Co-Investment Funds and any other investment fund or managed account managed by the General Partner Group in such manner as it determines in its sole discretion (but subject to compliance with the requirements of ERISA).

## ARTICLE V
## EXPENSES

SECTION 5.1. Definition and Payment of Manager Expenses. As between the General Partner, the Manager and the Partnership, the Manager and the General Partner shall be solely responsible for and shall pay their own respective Manager Expenses. As used herein, the term "Manager Expenses" means the organizational and operating expenses (including compliance or regulatory costs (including, for avoidance of doubt, all costs and expenses associated with the Manager's or the General Partner's compliance with the Advisers Act)) of the General Partner and the Manager, including salaries and employee benefit expenses of employees, office rent, supplies and telecommunication expenses.

SECTION 5.2. Partnership Expenses.

(a) Payment of Partnership Expenses. The Partnership shall be responsible for and shall pay all Partnership Expenses.

(b) Definition of Partnership Expenses. As used herein, the term "Partnership Expenses" means all expenses or obligations of the Partnership or otherwise incurred by the General Partner or Manager on behalf of the Partnership in connection with this Agreement other than any expense that would be considered a Manager Expense.

(c) Specified Partnership Expenses. The parties agree that all of the following constitute Partnership Expenses, and comprise some, but not necessarily all, of the types of expenses that may constitute Partnership Expenses, depending upon the context in which such expenses are incurred:

(i) Certain out-of-pocket expenses incurred by the Partnership or on its behalf that are directly related to the organization of the Partnership and the marketing of LP Interests to prospective Limited Partners, including, without limitation, legal and auditor fees, filing fees, blue sky fees and foreign registration fees for the Partnership (if applicable) (collectively, the "**Organizational Expenses**"); provided, that the aggregate

of such Organizational Expenses shall not exceed $2 million; provided further, that any fees payable to a placement agent engaged by the Partnership to offer and sell LP Interests shall be borne directly by the General Partner or Manager;

(ii)     expenses related to the sourcing, due diligence, valuation, and potential acquisition of Partnership Investments, provided that such acquisition is actually consummated, the holding, monitoring and sale of Partnership Investments;

(iii)     legal, tax, auditing, consulting, accounting, valuation services, loan servicing, and other professional expenses (including, at the General Partner's discretion, with respect to individual Partnership Investments);

(iv)     costs and expenses for the preparation of the Partnership's financial statements, tax returns and IRS Schedules K-1;

(v)     litigation expenses of the Partnership;

(vi)     out-of-pocket expenses incurred in connection with the collection of amounts due to the Partnership from any Person;

(vii)     insurance premiums related to protection of Covered Persons against any liability arising out of, related to or incurred in connection with this Agreement;

(viii)     expenses incurred in connection with any Proceeding involving the Partnership (including the cost of any investigation and preparation) and the amount of any judgment or settlement paid in connection therewith; provided, however, that any such expenses which, if incurred by any Person, would not be indemnifiable under Article IX, shall not constitute Partnership Expenses;

(ix)     fees and expenses of the Administrator;

(x)     any indemnification obligation and any other indemnity contribution or reimbursement obligations of the Partnership with respect to any Person, whether payable in connection with a Proceeding involving the Partnership or otherwise, in each case, to the extent available under applicable law and the provisions of Section 9.2;

(xi)     Management Fees (to be allocated among Limited Partners as contemplated by Section 3.4) and Administration Fees (to be allocated as contemplated by Section 3.5);

(xii)     any Borrowing Costs relating to any borrowings incurred by the Partnership;

(xiii)     any costs charged or borne by a Subsidiary Fund to its investors (except as provided in clause (d) below; and,

22

(xiv)   all expenses incurred in connection with the dissolution and liquidation of the Partnership.

(d)   Master Fund Expenses.   Limited Partners shall not bear any portion of a Subsidiary Fund's organizational expenses and/or a Subsidiary Fund's operational expenses except to the extent that such expenses are substantially equivalent to and in lieu of a Partnership Expense as periodically determined by the General Partner with the approval of the Independent Investor Representative.   To the extent that such expenses are charged to the Partnership that are not so determined by the General Partner, the General Partner shall rebate or refund the amount of such expenses to the Partnership.

## ARTICLE VI
## CAPITAL COMMITMENTS AND CAPITAL CONTRIBUTIONS

SECTION  6.1.        Capital Commitments.

(a)        Agreement to Contribute Capital.   Subject to Sections 3.8, 6.1(b), 6.2, 6.5, 7.1(c) and 9.2, each Partner hereby agrees to make Capital Contributions, in an aggregate amount equal at any time to its Remaining Capital Commitment, during the Investment Period. The Partnership may make commitments to Partnership Investments during the Investment Period.  Following the Investment Period, Partners shall cease to be obligated to contribute capital in respect of their Remaining Capital Commitment; provided, however, that Partners shall remain obligated to make a Capital Contribution in respect of their Remaining Capital Commitments to (i) fund Partnership Expenses and liabilities (including, without limitation, the Management Fee and any Partnership borrowings), (ii) permit the Partnership to fulfill investment commitments made prior to the expiration of the Investment Period, including, without limitation, for purposes of making Partnership Investments made pursuant to rights acquired prior to the expiration of the Investment Period, and (iii) fund Follow-On Investments.   Notwithstanding anything to the contrary herein, each Limited Partner will participate in any Follow-On Investment in the same proportion that it participates in the original Partnership Investment to which such Follow-On Investment relates.  Further, in the event that after the expiration of the Investment Period there exists outstanding indebtedness of the Partnership secured by the Capital Commitments of the Limited Partners, the Limited Partners obligation to so contribute capital shall continue, to the extent of its pro rata portion of such indebtedness vis-à-vis all other Limited Partners, until such time as such indebtedness is paid in full.

(b)        Release of Capital Commitments.   Notwithstanding the provisions of Section 6.1(a), the General Partner may, in its sole discretion, cancel some or all of the Remaining Capital Commitments of all Partners at any time if the General Partner determines that changes in any applicable law or regulation make it necessary for the Partnership to do so.

(c)        Minimum Capital Commitment.   The minimum Capital Commitment of any Limited Partner shall be $5 million, though the General Partner, in its sole discretion, may (i) accept Capital Commitments in lesser amounts, or (ii) demand a higher minimum Capital Commitment from some or all Limited Partners.

(d)     Capital Commitment of the General Partner Group.  Certain principals of the Manager have invested a significant portion of their liquid net worth into other investment funds and managed accounts advised by the Manager and its Affiliates that pursue a substantially similar investment strategy to the Partnership and, at times, invest alongside the Partnership.  Such principals will also invest into the Partnership.

SECTION  6.2.       Capital Call Procedure.

(a)     Generally.  Each Limited Partner shall make Capital Contributions to the Partnership with respect to the Partnership Investments, to pay Partnership Expenses or to maintain a reserve in such amounts, to such account and at such times (including at a Closing) as the General Partner shall specify in notices ("**Capital Call Notices**") delivered from time to time to such Limited Partner.  All Capital Contributions shall be paid to the Partnership by wire transfer in immediately available funds to the account specified in the Capital Call Notice by 11:00 A.M.  (New York City time) on the date specified in the applicable Capital Call Notice.  Capital Contributions may include amounts that the General Partner determines, in its sole discretion, are necessary or desirable to establish reserves in respect of potential Partnership Investments or Partnership Expenses.

(b)     Capital Call Notices.  Each Capital Call Notice shall specify:

(i)     the Capital Call Amount;

(ii)    the required Capital Contribution to be made by such Limited Partner;

(iii)   the date (the "**Capital Call Date**") on which such Capital Contribution is due; and

(iv)    the account to which such Capital Contribution should be paid.

The General Partner shall deliver each Capital Call Notice at least seven (7) Business Days before the Capital Call Date (other than a Capital Call Notice relating to a Capital Contribution payable at a Closing) including the date of delivery of the Capital Call Notice.

(c)     Amounts of Required Capital Contributions for each Partner.  Subject to Section 2.5, in connection with any Capital Call, each Partner shall be required to make a Capital Contribution equal to the product of (i) such Partner's Remaining Commitment Percentage and (ii) the Capital Call Amount specified in the applicable Capital Call Notice.

SECTION  6.3.       Default by Limited Partners.

(a)     In General.  Each Partner agrees that (i) payment of its required Capital Contributions and amounts required pursuant to Sections 6.2 and 9.2 when due is of the essence, and is to be made absolutely and unconditionally in each case without any set-off, withholding, counterclaim, defense or reduction, (ii) any Default by any Limited Partner would cause injury to the Partnership and to the other Partners, and (iii) that the amount of damages caused by any such injury would be extremely difficult to calculate.  Accordingly, each Partner agrees that upon any Event of Default by a Limited Partner, such Defaulting Partner may, in

24

the General Partner's sole discretion, (I) not share in any gain realized by the Partnership on any disposition of a Partnership Investment occurring after the date of Default (regardless of when the Partnership Investment was made), (II) continue to share in any loss realized by the Partnership on any disposition of any Partnership Investment in which the Defaulting Partner participated, and/or (III) have the entire balance in its Capital Account forfeited (the amount of the reduction to be distributed pro rata to all Partners, other than the Defaulting Partner).

Except as expressly provided in the Partnership Agreement, the obligations of any Defaulting Partner to the Partnership, or under the Partnership Agreement, shall continue regardless of the remedies pursued by the Partnership.

Upon the occurrence of any Default, the General Partner shall promptly notify the Limited Partner who has committed such Default of its status as a Defaulting Partner.

(b)  Action by General Partner.  Upon the occurrence of an Event of Default, the General Partner may take such actions as it determines, in its sole discretion, are appropriate with respect to the defaulted amount, including, but not limited to:

(i)  drawing-down additional capital from non-Defaulting Partners up to their Remaining Capital Commitment;

(ii)  increasing its own or its Affiliates Capital Contributions;

(iii)  causing the sale, transfer or other disposition of all of the LP Interest of the Defaulting Partner or causing the Defaulting Partner to sell, transfer or otherwise dispose of all of its LP Interest, after a twenty (20) day period during which the General Partner will solicit bids for the purchase of such LP Interest, to another non-Defaulting Partner or to a third-party on such terms as are determined by the General Partner and the proposed transferee;

(iv)  causing the Partnership to borrow money from third parties, non-Defaulting Partners, the General Partner or any of its Affiliates in order to fund the Defaulting Limited Partner's Capital Call obligation.  The Borrowing Costs with respect to any borrowing pursuant to this Section 6.3(b)(iv) shall be charged to the Capital Account of the Defaulting Partner.  Any such borrowing will constitute a separate obligation of the Defaulting Partner and not the Partnership and will be secured by (A) the Capital Commitments of the Defaulting Partner, (B) the Defaulting Partner's LP Interest, and (C) a personal guarantee of the Defaulting Partner in an amount not to exceed one hundred percent (100%) of the amount of the borrowing attributable to the Defaulting Partner; or

(v)  immediately institute legal procedures against the Defaulting Partner to collect all amounts owed by such Defaulting Partner to the Partnership or any other person, together with interest, at the maximum rate provided by law from the date of the Default plus all related collection expenses, including reasonable attorney's fees.

(c)  Additional Capital Call Notice.  If additional capital is drawn down pursuant to Section 6.3(b)(i) with respect to any amount that is in Default, the General Partner shall deliver an additional Capital Call Notice in accordance with Section 6.2(b) to the non-

Defaulting Limited Partners, and the required Capital Contribution of each such Limited Partner shall be increased by an amount calculated with respect to the amount that remains to be funded in accordance with Section 6.2(c) (determined without regard to the Capital Commitment of the Defaulting Partner); provided that no Limited Partner can be required to contribute in excess of its Remaining Capital Commitment.

(d)      Defaulting Partner's Remaining Capital Commitment.   In its sole discretion, the General Partner may take any or all of the following actions in respect of the Remaining Capital Commitment of any Defaulting Partner:

(i)      cause the Defaulting Partner to forfeit all or a portion of its interest in distributions to be derived from Partnership Investments that have been made by the Partnership as of the date of the Event of Default;

(ii)      require the Defaulting Partner to sell its LP Interest to a purchaser determined in the sole discretion of the General Partner.  In the sole discretion of the General Partner, such sale may be (A) at a price determined by the General Partner or the Independent Investor Representative at the General Partner's request and (B) in exchange for a non-recourse, non-interest bearing note secured by the LP Interest sold and payable solely from distributions receivable with respect to the LP Interest sold;

(iii)      seek commitments of capital from additional investors (which may, in the General Partner's sole discretion, include Existing Limited Partners or the General Partner) up to the amount of the Defaulting Partner's Remaining Capital Commitment.  If any such commitment is received from any Existing Limited Partner, such Limited Partner's Capital Commitment and Remaining Capital Commitment shall be increased accordingly.  If any such commitment is received from an investor that is not an Existing Limited Partner, such investor shall, after executing such instruments and delivering such opinions and other documents (including an executed counterpart to this Agreement) as are in form and substance satisfactory to the General Partner, be admitted to the Partnership as a Substitute Limited Partner and shown as such on the books and records of the Partnership and shall be deemed to have a Capital Commitment and a Remaining Capital Commitment equal to the commitment for which such investor has subscribed.  After the appropriate adjustment of the Capital Commitment and the Remaining Capital Commitment of the Limited Partner or admission of the Substitute Limited Partner as more fully provided in Section 12.2, the Capital Commitment and Remaining Capital Commitment of the Defaulting Partner shall be decreased accordingly; and

(iv)      reduce or cancel the Remaining Capital Commitment of the Defaulting Partner on such terms as the General Partner or the Independent Investor Representative at the General Partner's request determines, in its sole discretion, (which may include leaving such Defaulting Partner obligated to pay the Management Fee and to make Capital Contributions with respect to Partnership Expenses up to the amount of such Partner's Remaining Capital Commitment immediately prior to the time such Remaining Capital Commitment is so reduced or canceled).

4811-7067-2931.36

(e)      Waiver of Default Provisions in favor of the General Partner or its Affiliates.  The General Partner may waive any or all of the actions set forth in this Section 6.3 for any Defaulting Partner that is affiliated with the General Partner or its Affiliates only upon the prior written approval of the Independent Investor Representative.

SECTION  6.4.      Remedies Not Limited.  The rights and remedies referred to in Sections 6.2 and 6.3 shall be in addition to, and not in limitation of, any other rights available to the General Partner or the Partnership under this Agreement or at law or in equity.   In addition, unless the Remaining Capital Commitment of any Defaulting Partner is decreased to zero pursuant to Section 6.3(d)(iv), an Event of Default by such Limited Partner shall not relieve such Defaulting Partner of its obligation to make Capital Contributions subsequent to such Event of Default.  A Defaulting Partner will be obligated to pay all of the expenses incurred by the Partnership in pursuing any remedial actions, including reasonable attorney's fees.

SECTION  6.5.      Excluded Limited Partners.

(a)      Notwithstanding anything to the contrary contained herein, the General Partner shall cancel the obligation of any Limited Partner (an "**Excluded Limited Partner**") to make any Capital Contribution with respect to a particular Partnership Investment if either (i) the General Partner determines based upon advice of counsel (a copy of which advice shall be provided to the Excluded Limited Partner to be excluded) that there is a reasonable likelihood that the Excluded Limited Partner's participation in the economics of such Partnership Investment would (a) impose a material tax, regulatory or other burden on the Partnership or the other Limited Partners or (b) result in a violation of any applicable law, regulation or administrative practice to which the Excluded Limited Partner, the Partnership or the particular Partnership Investment involved is subject, or (ii) the Excluded Limited Partner provides the General Partner written advice from a reputable and experienced law firm satisfactory to the General Partner concluding that the Excluded Limited Partner's participation in the economics of such Partnership Investment (a) is illegal or otherwise prohibited by statute or regulation applicable to such Excluded Limited Partner or (b) would result in materially unfavorable tax, legal or regulatory consequences to such Excluded Limited Partner.  An Excluded Limited Partner shall not participate in the economics of any particular Partnership Investment with respect to which it does not make a Capital Contribution pursuant to this Section 6.5(a).

Any determination pursuant to clause (i) of the immediately preceding paragraph shall, if possible, be communicated to such Excluded Limited Partner at or prior to the time that the General Partner delivers Capital Call Notices relating to the Capital Contributions in question to the other Limited Partners.   Such Capital Call Notices shall provide the amount of any additional capital which such other Limited Partners shall be required to contribute as a result of the developments set forth above or, if such determination is not made until after a Capital Call Notice for such Partnership Investment has been delivered to the other Limited Partners (but in any event within ten (10) calendar days after the consummation of such Partnership Investment), the General Partner may then deliver a new Capital Call Notice to each other Limited Partner which is able to participate in such Partnership Investment indicating the additional Capital Contribution to be made in respect of such Partnership Investment, and, subject to the proviso set forth in the ultimate sentence of this Section 6.5, each such Limited Partner shall make an additional Capital Contribution in respect of such Partnership Investment as soon as practicable but in no even later than five (5) calendar days after having been given such new Capital Call

Notice.  Additional Capital Contributions called for pursuant to this Section 6.5 shall be made by each such other Limited Partner in an amount which bears the same ratio to the aggregate additional Capital Contributions of all other Limited Partners as such other Limited Partner's Remaining Capital Commitment bears to the Remaining Capital Commitments of all such other Limited Partners; provided that no Limited Partner shall be obligated to contribute an amount in excess of such Limited Partner's Remaining Capital Commitment.

(b)     No Commitment Reduction for Excluded Limited Partner.     The Remaining Capital Commitment of any Excluded Limited Partner shall not be reduced as a result of its exclusion from participation in a Partnership Investment pursuant to this Section 6.5.

SECTION  6.6.     Maximum Capital Commitments.  The Partnership shall not accept aggregate Capital Commitments to the Partnership in excess of $2 billion without the approval of the Independent Investor Representative.  Capital commitments to any Subsidiary Fund or Parallel Fund will be included, without duplication, when determining whether the foregoing $2 billion threshold has been met.

## ARTICLE VII
## DISTRIBUTIONS; CAPITAL ACCOUNTS

SECTION  7.1.     Distributions.

(a)     Distribution.  Subject to the following sentence, proceeds derived by the Partnership from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments (directly or by a Subsidiary Fund) that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to a Limited Partner during the Investment Period or within twelve (12) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of twelve (12) months after the expiration of the Investment Period.  Limited Partners may elect in the Subscription Agreements to receive quarterly distributions of interest, dividend and other similar payments from Partnership Investments (any Limited Partner electing to receive such quarterly distributions, an "**Electing Partner**"); provided that such amounts will: (i) not be added to the Limited Partner's Remaining Capital Commitment; (ii) be capped at 2% per quarter of such Limited Partner's Capital Contributions invested in Partnership Investments; and (iii) be apportioned and distributed as set forth in this Section 7.1.  Notwithstanding the foregoing, the amount of any such quarterly distribution will be reduced by any amounts that the General Partner considers prudent reserves to meet the future expenses and liabilities of the Partnership. Distributable Cash derived by the Partnership from a particular Partnership Investment will initially be apportioned among the Partners in proportion to their respective Capital Contributions relating to the acquisition of the Partnership Investment (as determined by the General Partner in its reasonable discretion, taking into account the terms of this Agreement, including, but not limited to the admission of Additional Limited Partners and Defaults).  The amount so apportioned to the General Partner shall be distributed to the General Partner.  The amount so apportioned to each Limited Partner (net of Partnership Expenses and the Management Fee and Administration Fee borne by such Limited Partner, if any) shall then be distributed to such Limited Partner.

28

The General Partner will utilize commercially reasonable efforts to provide at least five (5) Business Days' notice to Limited Partners prior to making any distribution to Limited Partners, which notice shall include the sources of such distribution and the anticipated amount to be distributed (including detailed figures showing the portion of such distribution attributable to return of capital, realized losses, Partnership Expenses, Organizational Expenses, Management Fees and profits).

    (b) <u>Distributions Prior to the Final Closing Date</u>.  Distributable Cash earned during the period between the Initial Closing Date and the next Subsequent Closing Date ("**Initial Period Distributable Cash**") shall be allocated among the Partners such that Initial Closing Date Capital Contributions shall be entitled to a priority return paid out of such Initial Period Distributable Cash equal to the full amount of the Initial Period Distributable Cash earned with respect to Partnership Investments made prior to the next Subsequent Closing and allocated only to Members as of the Initial Closing Date (the "**Initial Closing Priority Return**") in proportion to which their Capital Commitments bears to the aggregate Capital Commitments from all such Initial Closing Date investors ("**Initial Closing Date Investors**").

Initial Closing Date Investors and investors who made Capital Commitments at the next Subsequent Closing Date shall receive a priority return equal to the Distributable Cash earned with respect to Partnership Investments made on or after the such Subsequent Closing, and prior to the second Subsequent Closing, pro rata, in proportion to which their Capital Commitments bears to the aggregate Capital Commitments.

Initial Closing Date Investors and Investors who made Capital Commitments at the first Subsequent Closing, together with Investors who made Capital Commitments at the second Subsequent Closing, shall receive a priority return equal to the Distributable Cash earned on or after the second Subsequent Closing and before the third Subsequent Closing, pro rata, in the manner described above.

This methodology shall be applied as to each Subsequent Closing in a similar manner.

Investors who purchase on the Final Closing Date will not receive any distributions from Distributable Cash earned prior to the Final Closing Date.

After the Final Closing Date, the Initial Closing Date Investors and those who purchased at Subsequent Closing dates will not be entitled to priority returns of Distributable Cash and Distributable Cash will be apportioned as noted above, initially based on Partner Capital Commitments.

    (c) <u>Reinvestment of Distributed Capital</u>.  Subject to the second sentence of Section 7.1(a), proceeds derived by the Partnership or the Master Fund from interest, dividend or other similar payments with respect to a Partnership Investment or from the sale or other disposition of Partnership Investments that (i) constitute a return of Capital Contributions (but not income or gain) and (ii) are distributed to a Limited Partner during the Investment Period or within twelve (12) months from the end of the Investment Period will be added to the Limited Partner's Remaining Capital Commitment and again be available for drawdowns for a period of twelve (12) months after the expiration of the Investment Period.  The General Partner will

notify the Limited Partners quarterly of their Remaining Capital Commitment, including any distributions to Limited Partners that are being added to their Remaining Capital Commitment.

(d)     Distributions in Kind.  The Partnership may distribute property in kind and in such amounts as the General Partner shall, at its sole discretion, determine *provided that* in the event that the General Partner distributes property in-kind other than pursuant to Sections 10.4 or 10.5 hereof, the General Partner will distribute property that it believes in good faith to be marketable.  Any distribution in kind made to the Partners in accordance with Section 10.4 shall be treated for purposes thereof as if such distribution in kind was a cash distribution in an amount equal to the then Fair Value of the distributed assets.  In connection with any distribution in kind of interests in securities or other property to a Limited Partner under this Agreement (including pursuant to this Article VII and Article X), the General Partner shall notify the Limited Partner that the Limited Partner may request that such securities or other property not be distributed to it, but instead sold for cash on its behalf.  If the Limited Partner so requests, the General Partner shall use commercially reasonable efforts to sell such securities or other property and distribute the cash proceeds of such sale to the Limited Partner net of any relevant reasonable costs and expenses.  In each such event, such securities or other property shall be deemed to have been distributed to the Limited Partner at the same time and at the same valuation that the securities or other property were distributed to the other Limited Partners.

(e)     Withholding of Certain Amounts.  Notwithstanding anything else contained in the Agreement, the General Partner may, in its sole discretion, withhold from any distribution of cash or property by the Partnership to any Limited Partner contemplated by this Agreement, the following amounts:

(i)     any amounts then due from such Limited Partner to the Partnership or to the General Partner or to any other Person in connection with the Partnership; and

(ii)     any amounts required to pay or to reimburse the Partnership for the payment of any withholding or other taxes properly attributable to such Limited Partner (including, without limitation, withholding taxes and interest, penalties and expenses incurred in respect thereof).

Any withholding described in Section 7.1(e)(i) or (ii) above shall be treated for all purposes of this Agreement as (i) having been distributed to the Limited Partner, and (ii) having been contributed by such Limited Partner to the Partnership or paid by such Limited Partner to the General Partner or such other Person, as the case may be (and the payment of such amounts by the Partnership shall not constitute Partnership Expenses).  Any withholding described in Section 7.1(e)(ii) shall be made at the maximum applicable statutory tax rate under applicable law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower tax rate is applicable.  Any amounts withheld pursuant to this Section 7.1(e) shall be applied by the General Partner to discharge the obligation in respect of which such amounts were withheld.

(f)     Amounts Held in Reserve.  In addition to the rights set forth in Section 7.1(e), the General Partner shall have the right, in its sole discretion, to withhold amounts otherwise distributable by the Partnership to the Partners in order to make such provision as the General Partner in its sole discretion deems necessary or advisable for Follow-On Investments

and the payment of any and all expenses, debts, liabilities and obligations, contingent or otherwise, of the Partnership

(g)   Income from Temporary Investments.  Income and gains realized by the Partnership with respect to Temporary Investments will generally be reserved for future expenses, investments in Partnership Investments and other reserves; provided, however, the General Partner, in its sole discretion, may from time to time distribute such income and gains pro rata among the Partners based on their respective Capital Contributions with respect to such Temporary Investments.

(h)   Tax Distributions.  Notwithstanding Section 7.1(a), the General Partner shall cause the Partnership, either prior to, together with or subsequent to any distribution pursuant to Section 7.1(a), to make distributions to all Partners regardless of their tax status, in amounts intended to enable such Partners (or any Person whose tax liability is determined by reference to the income of any such Partner) to discharge their U.S. federal, state and local income tax liabilities arising from the allocations made (or to be made), or distributions made, pursuant to Article VII.  The amount distributable to any Partner pursuant to this Section 7.1(h) shall be an amount equal to the product of (i) the cumulative taxable income, if any, of the Partnership allocated to the Partner pursuant to Article VII from the inception of the Partnership (as determined under Code Section 703(a) but including separately stated items described in Code Section 702(a) and without taking into account any special status of any Partner),  multiplied by (ii) the Assumed Tax Rate.  The amount distributable to any Partner pursuant to Section 7.1(a) shall be reduced by the amount distributed to such Partner pursuant to this Section 7.1(h), and the amount so distributed pursuant to this Section 7.1(h) shall be deemed to have been distributed to the extent of such reduction pursuant to Section 7.1(a) for purposes of making the calculations required by Section 7.1(a).

(i)   Partnership Act.  Notwithstanding anything in this Agreement to the contrary, the Partnership shall not make any distributions pursuant to this Agreement except to the extent permitted by the Partnership Act.

(j)   Uninvested Amounts.  In the event the General Partner draws down amounts from the Partners pursuant to Capital Call Notices which are not expended by the Partnership as originally contemplated, the General Partner may, in its sole discretion, distribute such amounts among the Partners pro rata in accordance with the manner in which they funded such amounts.  Any amounts so distributed prior to the end of the Investment Period shall be treated as an unreturned Capital Contribution for purposes of Section 7.1(a) for the period of time from the day such amounts were drawn down to the day such amounts were so distributed.

(k)   Partial Disposition.  For all purposes of this Agreement, with respect to the sale or other disposition of a portion of a Partnership Investment, such portion shall be treated as  having been a separate Partnership Investment from the remaining Partnership Investment retained by the Partnership, and the related income and Capital Contributions with respect to such portion of the Partnership Investment which was sold or otherwise disposed of shall be treated as having been divided between the portion which was sold or disposed of and the portion retained by the Partnership on a pro rata basis.

SECTION 7.2.      Capital Accounts; Adjustments to Capital Accounts.

(a)      Capital Accounts.  There shall be established on the books of the Partnership a capital account for each Partner (a "**Capital Account**").

(i)      There shall be added to the Capital Account of each Partner (A) such Partner's Capital Contributions (including liabilities of the Partnership assumed by such Partner as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(c)) to the Partnership and (B) such Partner's distributive share of Net Income and any item in the nature of income or gain that is specially allocated to the Partner pursuant to Section 7.3.

(ii)      There shall be subtracted from the Capital Account of each Partner (x) the amount of any money (including liabilities of such Partner assumed by the Partnership as provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(c)), and the Gross Asset Value of any other property, distributed to such Partner and (y) such Partner's distributive share of Net Loss and any item in the nature of loss or expense that is specially allocated to such Partner pursuant to Section 7.3.

(iii)      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704(b) of the Code and Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations. If the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such regulations, the General Partner may make such modifications.  Capital Accounts also shall be adjusted as set forth in other provisions of this Agreement.

(b)      No Deficit Restoration Obligation. Notwithstanding anything in this Agreement to the contrary, no Partner shall have any obligation to make up or otherwise make a capital contribution with respect to a deficit balance in its Capital Account. A negative balance in a Partner's Capital Account shall not create any liability on the part of that Partner to any third party.

(c)      Capital Account Adjustments.  All matters concerning the computation of Capital Accounts, the allocation of items of Partnership income, gain, loss, deduction and expense for all purposes of this Agreement and the adoption of any accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion.  Such determinations shall be final and conclusive as to all the Partners.  Notwithstanding anything expressed or implied to the contrary in this Agreement, in the event the General Partner shall determine, in its sole discretion, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to effectuate the intended economic sharing arrangement of the Partners, the General Partner may make such modification.

SECTION 7.3.      Book Allocations.

(a)      Allocation of Net Profit and Net Loss, Generally.  Except as explicitly provided elsewhere in this Agreement, the items of income, gain, loss or deduction of the

32

Partnership comprising Net Income or Net Loss for a fiscal year shall be allocated by the General Partner among the Partners in a manner such that the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to:

   (i) the distributions that would be made to such Partner pursuant to Section 7.1(b) (as adjusted by the other provision of Article VII) if (x) the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, (y) all Partnership liabilities were satisfied (limited in the case of each Nonrecourse Liability to the Gross Asset Value of the assets securing such liability) and (z) the net assets of the Partnership were distributed in accordance with Section 7.1(b) (as adjusted by the other provision of Article VII) to the Partners immediately after making such allocations, minus

   (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of the assets.

The foregoing allocations shall be adjusted in the sole and absolute discretion of the General Partner to take into account any charges or adjustments to be made to a Partner's Capital Account under this Agreement, including but not limited to, expenses specially charged to a Partner or a Partner's Capital Account and Defaults.

   (b) <u>Loss Limitation</u>.  Notwithstanding anything to the contrary in Section 7.3(a), the amount of items of Partnership expense and loss allocated pursuant to Section 7.3(a) to any Partner shall not exceed the maximum amount of such items that can be so allocated without causing such Partner to have an Adjusted Capital Account Deficit at the end of any fiscal year, unless each Partner would have an Adjusted Capital Account Deficit. All such items in excess of the limitation set forth in this Section 7.3(b) shall be allocated first, to the other Partners until they would not be entitled to any further allocation, and thereafter to the Partners as determined by the General Partner in its sole and absolute discretion.

   (c) <u>Special Allocations</u>.  Notwithstanding anything to the contrary contained in this Article VII, special allocations shall be made in respect of any minimum gain chargeback as required by Section 1.704-2 of the Treasury Regulations, and any qualified income offset as required by Section 1.704-1(b)(2)(ii)(d)(3) of the Treasury Regulations. If any Partner has a deficit Capital Account at the end of any fiscal year which is in excess of the sum of (i) the amount, if any, that such Partner is obligated to restore pursuant to this Agreement, and (ii) the amount such Partner is deemed obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible; <u>provided</u>, <u>that</u>, such an allocation shall be made only if and to the extent that a Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VII have been tentatively made as if this sentence were not in this Agreement.  Nonrecourse Deductions shall be allocated to the Partners as determined by the General Partner.  Partner Nonrecourse Deductions shall be allocated to the Partner who bears the economic risk of loss with respect to the Liability to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(j) of the Treasury Regulations.  Each Partner's share of any Nonrecourse Liabilities, for

33

purposes of Section 1.752-3(a)(3) of the Treasury Regulations, shall be determined by the General Partner.

SECTION 7.4.    Tax Allocations.

(a)    General.  Each item of income, gain, loss, deduction or credit for federal income tax purposes that corresponds to an item of income, gain, loss or expense that is either taken into account in computing Net Income or Net Loss or is specially allocated pursuant to Section 7.3 (a "**Book Item**") shall be allocated among the Partners in the same proportion as the corresponding Book Item; provided, that, in the case of any Partnership asset the Gross Asset Value of which differs from its adjusted tax basis for federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for federal income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (using any permissible method determined by the General Partner) so as to take account of the difference between the Gross Asset Value and the adjusted tax basis of such asset.

(b)    All tax credits shall be allocated among the Partners as determined by the General Partner, in its sole and absolute discretion, consistent with applicable law.

(c)    The tax allocations made pursuant to this Section 7.4 shall be solely for tax purposes and shall not affect any Partner's Capital Account or share of non-tax allocations or distributions under this Agreement.

(d)    The Partners are aware of the income tax consequences of the allocations made by this Agreement and will report their shares of Net Income and Net Loss and other items of Partnership gross income, gain, loss and deduction for income tax purposes consistently with this Agreement as determined by the General Partner and as reported to them (or to be reported to them) on Internal Revenue Service Form 1065 Schedule K-1 (or such successor form).

SECTION 7.5.    Tax Credits.  Tax credits, if any, shall be equitably allocated among the Partners by the General Partner.  It is intended that the Capital Accounts will be maintained at all times in accordance with Section 704 of the Code and applicable Treasury Regulations thereunder, and that the provisions hereof relating to the Capital Accounts be interpreted in a manner consistent therewith.  The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to this Section 7.5 if necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations, provided that no such change shall have an adverse effect upon the amount distributable to any Partner hereunder.

SECTION 7.6.    Loans and Withdrawal of Contribution.  Except as expressly provided herein, no Partner shall be permitted to borrow or make an early withdrawal of, any portion of the Capital Contributions made by it.

SECTION 7.7.    Other Tax Matters.

(a)    The General Partner is hereby designated as the "**Tax Matters Partner**" of the Partnership within the meaning of Section 6231(a)(7) of the Code (and any similar provisions under any applicable state or local or foreign tax laws).  The Tax Matters Partner

34

shall have the discretionary authority to make all tax elections on behalf of the Partnership and the other Partners.  The Tax Matters Partner shall make all decisions in such capacity in such manner as it determines to be in the best interests of all of the Partners.  All expenses incurred by the Tax Matters Partner while acting in such capacity shall be paid or reimbursed by the Partnership.

(b)     It is the intention of the Partners that the Partnership be treated as a partnership for all relevant tax purposes.  The General Partner shall therefore not permit the Partnership to elect, and the Partnership shall not elect, to be treated as an association taxable as a corporation for U.S. federal income, state or local income tax purposes under Treasury Regulation Section 301.7701-3(a) or under any corresponding provision of state or local law.

(c)     With respect to any issue raised in a tax audit, which primarily affects Tax-Exempt Limited Partners, the General Partner shall consult with such Limited Partners through the course of the tax audit and shall not settle any such issue nor extend any statute of limitations with respect thereto without the consent of Tax-Exempt Limited Partners owning at least two-thirds of the LP Interests held by Tax-Exempt Limited Partners not affiliated with the General Partner or its Affiliates.

(d)     Notwithstanding anything in this Agreement to the contrary, subject to acting in the interest of the Partners of the Partnership as a whole, the General Partner agrees to elect, or to cause the Partnership or any Alternative Investment Vehicle to elect to pass on any imputed underpayment of tax (including any penalties and interest thereon) to the Partners under Section 6226 of the Code as enacted in P.L. 114-74, as long as such law continues to be in effect, and, thereafter, in accordance with any superseding law, (and, in each case, in accordance with any Treasury Regulations promulgated or other guidance issued thereunder).  In the event that the General Partner determines that it is in the best interest of the Partners to have the Partnership pay an assessed imputed underpayment of tax, the General Partner shall use reasonable best efforts to allocate the burden of (or any reduction or diminution in distributable proceeds resulting from) any imputed underpayment to the Partners to whom such amounts are specifically attributable (whether as a result of their tax status, actions, inactions, or otherwise), as determined by the General Partner.

**ARTICLE VIII**
**REPORTS TO LIMITED PARTNERS**

SECTION 8.1.     Independent Public Accountants.  The financial statements of the Partnership shall be audited as of the end of each fiscal year by a firm of independent public accountants as shall be selected from time to time by the General Partner.

SECTION 8.2.     Reports.

(a)     Audited Financial Statements.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner, or its designee, shall prepare, and shall cause the independent auditors to audit, and shall deliver to each Partner, audited financial statements (prepared in accordance with U.S. generally accepted accounting principles) setting forth as of the end of such fiscal year (i) a balance sheet of the Partnership; (ii) an income statement of the Partnership; and (iii) a statement of the Partnership's capital.

35

(b)    Additional Reports.  Within ninety (90) days after the end of each calendar quarter or calendar year, as applicable, (except the end of the calendar quarter or calendar year coincident with the end of the fiscal year) each Limited Partner will be sent, (i) a quarterly unaudited report including the Partnership's balance sheet and income statement, and a statement, which will include the Limited Partner's Remaining Capital Commitment, and a specific statement of any distributions made to each Partner that are subject to recall for reinvestment pursuant to Section 7.1 of this Agreement, as applicable; and (ii) the Partnership's holdings summary report.  In addition, the General Partner's quarterly report shall disclose to Limited Partners if any investment restrictions set forth in Section 4.2 have been exceeded by the Partnership at any time during the prior quarter and the Independent Investor Representative's approval of such transactions.

(c)    Tax Information.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner shall cause the independent public accountants to prepare and transmit, as promptly as possible, a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable each Partner to prepare its U.S. federal income tax return, if any.  The General Partner shall mail such materials to (i) each Partner, and (ii) each former Partner (or its successors or assigns) who may require such information in preparing its U.S. federal income tax return, if any.

(d)    Reporting for ERISA Partners. The General Partner agrees to timely provide each ERISA Partner such information regarding its investment in the Partnership as may be reasonably requested by the ERISA Partner for purposes of completing its annual Form 5500 (including any schedules or attachments thereto) or any other information reports or filings required by the U.S. Department of Labor or the Internal Revenue Service.  In addition, the General Partner agrees to timely provide to each ERISA Partner such information and disclosures as may be required under, and in accordance with, Section 408(b)(2) of ERISA and the regulations thereunder, to the extent applicable.

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION; RETURN OF CERTAIN DISTRIBUTIONS

SECTION 9.1.    Exculpation.    To the fullest extent permitted under applicable law (including ERISA) no Covered Person will be liable to the Partnership or to any Limited Partner for any act or omission taken or suffered by such Covered Person, to the extent that such act or omission is not attributable to such Covered Person's (i) violation of its fiduciary duties under ERISA, (ii) negligence, (iii) willful misconduct or bad faith, (iv) losses due to the gross negligence of employees, brokers or other agents of the Partnership or (v) material breach of the Partnership Agreement, (vi) or fraud (each of items (i) through (vi) are hereinafter referred to as "**Disabling Conduct**").  No Limited Partner will be liable to the Partnership or any Limited Partner for any action taken by any other Limited Partner in its capacity as such.

SECTION 9.2.    Indemnification.

(a)    The Partnership will indemnify, to the maximum extent permitted under applicable law, each Covered Person against any and all claims, liabilities, damages and related expenses, including legal fees, incurred by them by reason of any action performed or omitted

36

in connection with the activities of the Partnership or in dealing with third parties on behalf of the Partnership unless such action or omission is determined pursuant to a final, non-appealable judgment of a court or governmental body referenced in Section 13.11 to constitute Disabling Conduct.  Notwithstanding the foregoing, Covered Persons shall not be indemnified for any breach of fiduciary duty under ERISA, and no Covered Person shall be indemnified for actions or omissions on behalf of a Partnership  Investment unless (i) such action or omission was taken on behalf of the Partnership and (ii) such action or omission occurred no later than six months after the Partnership's ultimate disposition of such Partnership  Investment in its entirety and any claims related thereto.  Prior to requesting indemnification payments under this Section 9.2, each Covered Person shall use commercially reasonable efforts to seek indemnification from other available sources.  Notwithstanding the foregoing, Covered Persons shall not be indemnified for any breach of fiduciary duty under ERISA or for Proceedings solely among members of the General Partner Group ("**Internal Disputes**").  For avoidance of doubt, a Covered Person's losses in their Capital Account in the Partnership or any Parallel Fund shall not be indemnifiable.

(b)	The Partnership will, in the sole discretion of the General Partner and upon advice of counsel to the effect that a Covered Person is likely to be found entitled to indemnification pursuant to this Section 9.2, advance to any Covered Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any Proceeding which arises out of such conduct, unless such Proceeding (i) is an Internal Dispute or (ii) (x) alleges Disabling Conduct and (y) was brought against the Covered Person by Limited Partners representing at least 66.66% of the aggregate LP Interests of Limited Partners other than the LP Interests of Defaulting Partners and the LP Interests held by the General Partner and its Affiliates, in which event such advance may only be made with the consent of the Independent Investor Representative.  Any such advance will be subject to repayment to the extent that it is determined pursuant to a final, non-appealable judgment that the Covered Person was not entitled to indemnification.  The Partnership will indemnify and hold harmless each Person that is a responsible withholding agent against all claims, liabilities and expenses (not resulting from such Person's willful misconduct) relating to such Person's obligation to withhold and pay any withholding or other taxes payable by the Partnership or as a result of a Limited Partner's participation in the Partnership.

(c)	All of the contribution obligations herein set forth shall survive the termination of this Agreement.

SECTION  9.3.	<u>Insufficiency of Damages</u>.  The General Partner and each Limited Partner acknowledges that, in the event of any breach of this provision, the rights and remedies available at law to the Covered Persons are hereby stipulated and deemed to be insufficient, and in the case of any action to enforce this Article IX, the Covered Persons shall be entitled to injunctive relief to enforce the terms thereof.

SECTION  9.4.	<u>Return of Certain Distributions</u>.

Subject to the provisions of this Section 9.4, each Partner (including any former Partner) and the Manager (together, the Giveback Participants) may be required to return distributions made to such Giveback Participant (either directly by the Partnership, in the case of a Partner or former Partner, or by a Subsidiary Fund, in the case of the Manager) for the purpose

37

of meeting such Giveback Participant's share of Partnership obligations (whether arising under this Agreement, under the Partnership Act, or otherwise), as determined pursuant to Section 9.4(a) and (b), in an amount up to, but in no event in excess of, the lesser of (i) 25% of the aggregate amount of distributions actually received by such Giveback Participant from the Partnership and (ii) 25% of such Giveback Participant's total Capital Commitment, *provided, that* the limitation in clause (ii) above shall not apply to the Manager.  The General Partner will endeavor to notify each Limited Partner promptly of becoming aware of any claim or action as further provided in Section 9.4(d).

(a)     Subject to the provisions of this Section 9.4, if an obligation to return distributions is related to, or arises out of, the acquisition, holding or disposition of a Partnership Investment and that is not otherwise an amount added to the Limited Partner's Remaining Capital Account balance by operation of the First Sentence of Section 7.1 (the amount of such obligation, an "**Investment Giveback Amount**"):

(i)     each Partner (including any former Partner) having an interest in such Partnership Investment shall be obligated to contribute an amount equal to the product of (I) the percentage that the aggregate proceeds received as distributions by such Partner with respect to such Partnership Investment that are in excess of the Capital Contributions of such Partner with respect thereto, represents of the aggregate proceeds (in excess of Capital Contributions with respect thereto) received as distributions by all Partners with respect to such Partnership Investment and (II) the lesser of (X) the aggregate proceeds generated by such Partnership Investment and (Y) such Investment Giveback Amount;

(ii)     to the extent that such Investment Giveback Amount exceeds the amount given back in (i) above, each Partner (including any former Partner) having an interest in such Partnership Investment shall be obligated to contribute an additional amount equal to the product of (I) the percentage that distributions to such Partner representing a return of such Partner's Capital Contribution with respect to the applicable Partnership Investment represents of the aggregate distributions to all Partners representing a return of Capital Contributions with respect to such Partnership Investment and (II) the amount of such excess, up to the aggregate amount of Capital Contributions with respect to such Partnership Investment;

(iii)     to the extent that such Investment Giveback Amount exceeds the amounts given back in (i) and (ii) above, each Partner (including any former Partner) shall be obligated to contribute an amount equal to the product of (I) the percentage that its aggregate distributions received represent of aggregate distributions received by all Partners and (II) the amount of such excess, up to the aggregate amount of distributions received by all Partners; and

(iv)     the Manager shall be required to return its portion of Carried Interest, if any, attributable to such Partnership Investment.

(b)     Subject to the provisions of this Section 9.4, if an obligation is unrelated to the acquisition, holding or disposition of a Partnership Investment (the amount of such obligation, an "**Other Giveback Amount**"), the Manager shall first be required to return its

Carried Interest distributions and then each Partner (or former Partner) shall be obligated to contribute a *pro rata* portion of the remaining Other Giveback Amount equal to the percentage that such Partner's aggregate distributions received represents of the aggregate distributions received by all Partners

(c)  The obligations of each Giveback Participant under this Section 9.4 will survive any dissolution or termination of the Partnership, but will not extend beyond the earlier of (i) the third anniversary of the distribution to which the obligation relates or (ii) the third anniversary of the final distributions in liquidation of the Partnership (unless notice of a pending obligation has been given to the Limited Partners within such period).

(d)  Promptly after receipt by the Partnership of a notice of any claim or the commencement of any action the result of which may be an Investment Giveback Amount or Other Giveback Amount hereunder, the Partnership will, if a claim in respect thereof is to be made against one or more Partners under Section 9.4(a) or (b), notify such Partners in writing of such claim or the commencement of such action; provided, however, that the failure to notify any Partner will not relieve any such Partner from any obligation or liability it may have to the Partnership hereunder or otherwise.

(e)  Upon any determination (at any time and from time to time) by the General Partner that obligations have been incurred that result in an Investment Giveback Amount or Other Giveback Amount hereunder, the General Partner will promptly provide written notification thereof to each Partner. Such notification will include a reasonable description of the nature of such obligations, the amount of the required contribution or payment by each Partner and the date by which contribution or payment by the Partners must be made. Prior to the contribution or payment deadline, each Partner will deliver to the General Partner or the Person or Persons specified by the General Partner the amount of the required contribution or payment.

(f)  If a Partner makes a contribution or payment pursuant to this Section 9.4 with respect to a distribution previously received by the Partner (or predecessor to the Partner), (a) the contribution will not be treated as a Capital Contribution for purposes of Section 8.1, and (b) the distribution will be treated as if it had not been made for all Partnership purposes.

(g)  Nothing in this Section 9.4 or elsewhere in this Agreement will relieve any Partner of any other obligation which it may have under the Delaware Act or any other provision of applicable law. If, notwithstanding the terms of this Agreement, it is determined under applicable law that any Partner has received a distribution which is required to be returned to or for the account of the Partnership or Partnership creditors, then the obligation under applicable law of any Partner to return all or any part of a distribution made to such Partner shall be the obligation of such Partner and not of any other Partner.  In addition to the foregoing, a Partner that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Partnership under applicable law shall return such distribution within 30 days after demand therefor by the General Partner.

## ARTICLE X
## TERM AND DISSOLUTION OF THE PARTNERSHIP

SECTION 10.1.     Term.  Unless sooner dissolved pursuant to Section 10.2, the Partnership shall continue for seven (7) years from the Final Closing Date, subject to extension, in the sole discretion of the General Partner, of up to three (3) additional one (1) year periods (the "**Term**") as determined to be reasonably necessary by the General Partner to effect an orderly liquidation of the Partnership Investments and consented to by the Independent Investor Representative.

SECTION 10.2.     Dissolution.  Subject to the Partnership Act, the Partnership shall be dissolved and its affairs shall be wound up upon the earliest of:

(a)     the expiration of the Term of the Partnership as determined in accordance with Section 10.1;

(b)     the bankruptcy, liquidation, dissolution or insolvency of the General Partner;

(c)     the withdrawal of the General Partner pursuant to Section 11.2 or the removal of the General Partner pursuant to Section 11.3; and

(d)     any date determined by the General Partner with the consent of 75% of the Interests of the Limited Partner who are not affiliated with the General Partner or its Affiliates.

Upon the occurrence of an event specified in clauses (b) or (c) above, Limited Partners not affiliated with the General Partner or its Affiliates owning at least seventy five percent (75%) of the LP Interests may agree to continue the Partnership and in such event will select a new general partner.

SECTION 10.3.     Liquidation of the Partnership.  Upon dissolution, the Partnership's business shall be liquidated in an orderly manner.  Except as provided in the penultimate sentence of this Section 10.3, the General Partner shall be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.  The responsibilities of the General Partner shall be consistent with the responsibilities provided for it in this Agreement.  If there shall be no General Partner, the Limited Partners, upon the approval of the Required Limited Partners, may appoint one or more Persons to act as the liquidator in carrying out such liquidation.  In performing its duties, the General Partner or such other appointed person, as the case may be (the "**Liquidator**"), is authorized to sell, distribute, exchange or otherwise dispose of the assets of the Partnership in any reasonable manner that the Liquidator shall determine to be in the best interest of the Partners.

SECTION 10.4.     Distribution Upon Dissolution of the Partnership.

(a)     Liquidating Distribution.  Upon dissolution of the Partnership, the Liquidator winding up the affairs of the Partnership shall determine, in its sole discretion, which assets of the Partnership shall be sold and which assets of the Partnership shall be retained for distribution in kind to the Partners.  After all liabilities (contingent or otherwise) of

the Partnership have been satisfied or duly provided for (as determined by the Liquidator in its sole discretion), the remaining assets of the Partnership shall be distributed to the Partners *pro rata* in accordance with their positive Capital Account balances.   Any goodwill of the Partnership, and any right to use of the Partnership's name, shall belong exclusively to the General Partner.

(b)     <u>Liquidating Trust</u>.   If the Partnership is unable to dispose of all of its interests in a Partnership Investment prior to the Partnership's liquidation, the Liquidator may, in its sole discretion, and subject to the Partnership Act, transfer such interests to a trust established for the benefit of the Partners for purposes of liquidating Partnership assets, collecting amounts owed to the Partnership and paying any debts, liabilities or other obligations of the Partnership or the General Partner arising out of, or in connection with, this Agreement or the Partnership's business or affairs.

The assets of any trust established pursuant to this Section 10.4(b) shall be distributed to the Partners from time to time, in the sole discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement.

(c)     <u>Clawback Payments</u>.   Upon the dissolution of the Partnership, the General Partner shall cause the Manager to make (or, if a carried interest or similar performance-based fee has been paid by a Subsidiary Fund to a Subsidiary Manager, cause such Subsidiary Manager to make) a payment to the Partnership (for further distribution for the Limited Partners) (the "**Clawback Payment**") to the extent that either (i) the Partnership has paid to the Manager (or indirectly to such Subsidiary Manager) Carried Interest payments in excess of the Carried Interest payable to the Manager calculated on an aggregate basis or (ii) the Limited Partners have not received a return of their Capital Contributions invested in Partnership Investments plus a cumulative return on such Capital Contributions invested in Partnership Investments equal to seven percent (7%), compounded annually, as set forth in the definition of "Carried Interest" under this Agreement (provided that any such calculation of any required payment may be made as an offset if and to the extent such Limited Partners ultimately have to return any amounts to the Partnership due to the Limited Partner Investment Giveback provisions set forth in Section 9.4.   The Clawback Payment shall equal the amount required to be returned by the Manager (or Subsidiary Manager, as applicable) such that the conditions in clauses (i) and (ii) above are no longer true, *provided, that*, in the event of the termination of the Manager, the Clawback Payment by the Manager shall be pro-rated in accordance with the provisions of Section 11.3. The Partnership shall distribute the Clawback Payment to the Limited Partners in proportion to their respective Capital Contributions.   Notwithstanding the foregoing, the amount of the Clawback Payment shall not exceed the aggregate amount of the Carried Interest received by the Manager (or Subsidiary Manager, as applicable) with respect to all Partnership Investments, net of applicable income taxes paid or payable (increased by any tax benefit received as a result of the Clawback Payment).

(d)     <u>No Priority</u>.   Each Partner shall look solely to the assets of the Partnership for the return of such Partner's aggregate Capital Contributions in Partnership Investments and no Partner shall have priority over any other Partner as to the return of such Capital Contributions.

SECTION 10.5.      No Voluntary Withdrawal by Limited Partners.  A Limited Partner may not voluntarily withdraw in whole or in part from the Partnership prior to its dissolution and winding up, and no LP Interest is redeemable or repurchasable by the Partnership at the option of a Limited Partner.  Except as expressly provided in this Agreement, no event affecting a Limited Partner (including death, incompetency, bankruptcy or insolvency) shall affect its obligations under this Agreement or affect the Partnership.  Upon the death, incompetence, bankruptcy, insolvency, liquidation or dissolution of a Limited Partner, the rights and obligations of that Limited Partner under this Agreement shall inure to the benefit of, and shall be binding upon, that Limited Partner's successor(s), estate or legal representative, and each such Person shall be treated as an assignee of that Limited Partner's interest for purposes of Article XII until such time as such Person may be admitted as a Partner pursuant to that Article.  Notwithstanding the foregoing, any ERISA Partner may elect to withdraw from the Partnership by providing written notice to the General Partner of its request for such a withdrawal at least sixty (60) days prior to the requested withdrawal date.  On such withdrawal date, the withdrawing ERISA Partner shall be paid the Fair Value of its LP Interest; provided, however, that, at the sole discretion of the General Partner, all or a portion of such payment may be made in the form of a note issued by the Partnership, which note shall bear interest at the rate of eight percent (8%) *per annum*, compounded annually, shall be pre-payable at any time, and shall have a final maturity date no later than seven (7) years from the Final Closing Date.

SECTION 10.6.      Required Withdrawal of Limited Partners.  The General Partner, upon thirty (30) Business Days' prior written notice, may require any Limited Partner to withdraw from the Partnership at the end of any fiscal quarter in which such notice is given if (i) the General Partner determines, in its sole discretion upon advice of counsel, that the continued participation of such Limited Partner in the Partnership would adversely affect the Partnership, or (ii) the General Partner determines, pursuant to an opinion of counsel, that the continued participation of such Limited Partner in the Partnership would result in adverse tax, regulatory or legal effects on the General Partner or the Manager (e.g., by involving the Partnership, the General Partner, the Manager or any Partner in litigation, potentially adverse tax consequences, or causing the Partnership to be required to register under the Investment Company Act or other reasons).  In such an instance, the withdrawing Limited Partner shall not contribute additional capital to the Partnership in respect of subsequent Capital Calls and the withdrawing Limited Partner's LP Interest will be entirely terminated.  Any required withdrawal pursuant to this Section 10.6 shall be based on the Fair Value of the withdrawing Limited Partner's LP Interest (either in cash or in kind, or in the form of a term note).

SECTION 10.7.      Payments Upon Withdrawal.  Upon the withdrawal of a Limited Partner who is not a Defaulting Partner, ninety percent (90%) of the withdrawing Limited Partner's Capital Account balance on the withdrawal date shall be paid (in cash or in kind) to such Limited Partner within ninety (90) days thereof or as soon thereafter as the Partnership has funds available therefor.  The remaining ten percent (10%) of the balance of such withdrawing Limited Partner's Capital Account on the withdrawal date shall be paid to such Limited Partner upon completion of the audit of the Partnership's financial statements for the fiscal year involved or as soon thereafter as is reasonably practicable.  Such Capital Account balance may not necessarily reflect the market value of a Partnership Investment.  Such Limited Partner shall not be entitled to receive or demand any other or further distributions, including any distributions pursuant to Section 17-604 of the Partnership Act.  All expenses of a withdrawal of capital from the Partnership by a Limited Partner generally will be borne by the Partnership;

42

provided, however, that any incremental legal or accounting expenses incurred by the Partnership as a result of withdrawals of capital of a Limited Partner other than an ERISA Partner may, in the sole discretion of the General Partner, be charged to such Limited Partner through a reduction of the distributions to such withdrawing Limited Partner.

## ARTICLE XI
## TRANSFERABILITY OF THE GENERAL PARTNER'S INTEREST

SECTION 11.1.    <u>Transferability of the General Partner's Interest</u>.    The General Partner may not, directly or indirectly, Transfer all or a portion of its general partner interest in the Partnership (the "**GP Interest**") to any Person.  Notwithstanding the foregoing, the General Partner may make a Transfer of all or any portion of its GP Interest (i) to an Affiliate or to a Person which succeeds to the private equity business of the General Partner as an entirety, (ii) to any Person in connection with a pledge securing a loan made to the Partnership, or (iii) with the prior written consent of the Required Limited Partners.  The General Partner may at any time, in its sole discretion, admit any Person to whom the General Partner is permitted to make a Transfer pursuant to the immediately preceding sentence as an additional general partner of the Partnership, and such transferee shall be deemed admitted to the Partnership as a General Partner of the Partnership immediately prior to such Transfer and shall continue the business of the Partnership without dissolution.  Except as otherwise provided in Sections 11.2 and 11.3, the General Partner may not withdraw from the Partnership or be removed as a general partner of the Partnership.

SECTION 11.2.    <u>Withdrawal of the General Partner</u>.    The General Partner shall be permitted to withdraw as a general partner of the Partnership, unless, in the opinion of counsel to the Partnership, the General Partner's withdrawal as a general partner would result in a violation of any law or regulation of the U.S. or any State thereof.  In the event that the General Partner withdraws from the Partnership pursuant to this Section 11.2, the Partnership shall dissolve and its affairs wound up in accordance with Article X (subject to the right that Limited Partners have to continue the Partnership and elect a new general partner in accordance with Section 10.2).

SECTION 11.3.    <u>Removal of the General Partner</u>.

(a)    The General Partner shall notify the Limited Partners within 30 days of the occurrence of a Cause Event ("**Cause Event Notice**").  The General Partner may be removed upon the occurrence of a "Cause Event" on not less than thirty (30) days' written notice (calculated from the date such Cause Event Notice was received by the Limited Partners) from Limited Partners not affiliated with the General Partner or its Affiliates owning at least a majority in interest of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner or its Affiliates ("**Removal Notice**"); provided, however, that (i) the General Partner will not be removed if, within the thirty (30) day period following such Removal Notice, the General Partner cures the Cause Event to the satisfaction of at least a majority in interest of the aggregate Capital Commitments of the Limited Partners not affiliated with the General Partner or its Affiliates, and (ii) in the event of a Cause Event that is not cured, within the thirty (30) day period following the Removal Notice, the General Partner may call a meeting of the Limited Partners in accordance with Section 3.12 for the purpose of a confirmatory vote on the removal of the General Partner which may override or confirm the

removal decision.  For this purpose, the term "**Cause Event**" shall mean Disabling Conduct by the General Partner or Manager as determined by a final, non-appealable judgment of any court or governmental body referenced in Section 13.11 that has a material adverse effect on the Partnership.

       (b)     Notwithstanding the foregoing, the General Partner may be removed without the occurrence of a Cause Event by Limited Partners (other than Defaulting Partners and Limited Partners affiliated with the General Partner or its Affiliates) representing at least seventy-five percent (75%) of the aggregate amount of all Limited Partners' (other than Defaulting Partners' and Limited Partners affiliated with the General Partner or its Affiliates) Capital Commitments at such time.

       (c)     Within fifteen (15) days after the removal of the General Partner and upon a vote of the Required Limited Partners, the Partnership shall distribute to the General Partner an amount in cash equal to the value of the General Partner's Capital Account balance as of the date of such removal; provided, however that such amounts owed in respect of the General Partner's Capital Account may be reduced to reflect any damages suffered by the Partnership as a result of the General Partner's breach of its duties as described in Section 11.3(a), as determined by a final, non-appealable judgment (or any judgment pursuant to Section 13.12(a)) by any court or governmental body referenced in Section 13.11.

       (d)     Upon the removal of the General Partner for a Cause Event pursuant to clause (a) above, (i) the Management Agreement between the Initial Manager and the Partnership shall immediately be terminated and the Initial Manager shall be entitled to receive the Fixed Management Fee and Administration Fee accrued through the date of such removal but shall not be entitled to receive any Fixed Management Fee or Administration fee accruing after such date, (ii) the Initial Manager shall be entitled to receive fifty percent (50%) of the Carried Interest with respect to the amount of the appreciation in the value of the Partnership Investments that are held by the Partnership on the date of the General Partner's removal that has accrued as of such date, but shall not be entitled to receive the remaining fifty percent (50%) of the Carried Interest on the existing investment appreciation through the date of removal or any Carried Interest with respect to any appreciation in the value of any Partnership Investment accruing after such removal date, and (iii) the General Partner and the Manager shall be entitled to receive from the Partnership any reimbursements or expenses due and owing to it by the Partnership.

       (e)     Upon the removal of the General Partner for any reason other than a Cause Event pursuant to clause (a) above, (i) the Management Agreement between the Manager and the Partnership shall immediately be terminated and the Manager shall be entitled to receive the Management Fee accrued through the date of such removal but shall not be entitled to receive any Management Fee accruing after such date, (ii) the Manager shall be entitled to receive one hundred percent (100%) of the Carried Interest with respect to the amount of the appreciation in the value of the Partnership Investments that are held by the Partnership on the date of the General Partner's removal that has accrued as of such date, but shall not be entitled to receive the Carried Interest with respect to any appreciation in the value of any Partnership Investment accruing after such removal date, and (iii) the General Partner and the Manager shall be entitled to receive from the Partnership any reimbursements or expenses due and owing to it by the Partnership.

**ARTICLE XII**
**TRANSFERABILITY OF A LIMITED PARTNER'S INTEREST**

SECTION  12.1.      <u>Conditions for Transfer</u>.

(a)      <u>Consent of the General Partner</u>.  A Limited Partner may Transfer all or any part of its LP Interest only with the prior written consent of the General Partner, which consent may be withheld by the General Partner in its sole discretion, and only upon the satisfaction of the conditions specified in Section 12.1(b).  The General Partner hereby agrees that it shall (i) consent to the transfer of all or any part of an ERISA Partner's LP Interest to a successor trustee or trustees, or a successor trust or trusts and (ii) to the admission and substitution of any such successor trustee or successor trust as a Limited Partner or Limited Partners of the Partnership; *provided* that any such transfer otherwise complies with this Article XII, *provided, however,* that notwithstanding Section 12.1(b), the General Partner shall not require the delivery of an opinion of counsel in connection with any such transfer by an ERISA Partner.  The General Partner further agrees not to unreasonably withhold its consent to a transfer of all or any part of an ERISA Partner's LP Interest to the extent such transfer otherwise complies with this Article XII.

(b)      <u>Conditions Required to be Satisfied</u>.  Unless required by applicable law or permitted in the sole discretion of the General Partner, no Limited Partner may Transfer all or any part of its LP Interest, and no attempted or purported Transfer of such LP Interest shall be effective, unless (i) after giving effect thereto, such Transfer would not otherwise terminate the Partnership for the purposes of Section 708 of the Code, (ii) such Transfer would not result in a violation of applicable law, including any federal and state securities laws (or would require registration of the Limited Partner's LP Interest thereunder) and provided that, if such Transfer would cause the General Partner to violate any covenant of this Agreement or any Subscription Agreement and the General Partner has taken all reasonable steps to prevent such violation, the General Partner shall not be liable to the Partnership as a result thereof and the General Partner shall be indemnified by such Limited Partner for any losses, costs, damages or expenses incurred as a result of such violation, (iii) such Transfer would not cause the Partnership to lose its status as a partnership that is not a publicly-traded partnership for federal income tax purposes or cause the Partnership to become subject to the Investment Company Act, (iv) such Transfer would not result in Limited Partners losing their limited liability under the Partnership Act, (v) if requested by the General Partner, such Limited Partner has delivered a favorable opinion in form and substance satisfactory to the General Partner from counsel satisfactory to the General Partner as to the matters referred to in clauses (ii), (iii) and (iv) above; and (vi) such Transfer occurs on a date approved by the General Partner.

(c)      <u>Costs</u>.  Without limiting the foregoing, the transferor and transferee of an LP Interest will indemnify and hold harmless the Partnership for reasonable out-of-pocket expenses incurred by the Partnership in connection with the Transfer of such LP Interest, including, but not limited to, additional accounting, tax preparation and other administrative expenses reasonably incurred (or to be incurred) by the Partnership in the case of a Transfer that results in tax basis adjustments under Section 743 of the Code or related provisions. In the case of a Transfer that is expected to result in future expenses of the type described in the preceding sentence, the General Partner may estimate the amount of such expenses in good faith, and such estimate shall be final.  If the Partnership is not reimbursed for all such

expenses within a reasonable period of time, the General Partner may charge the assignee's Capital Account for such unreimbursed expenses.

SECTION 12.2.    Substitute Limited Partner; Recognition of Transfer.    A purchaser, assignee or transferee of a Limited Partner's LP Interest (a "**Transferee**") shall have the right to become a Substitute Limited Partner only if the following conditions (in addition to those set forth in Section 12.1 above) are satisfied:

(a)    A duly executed and acknowledged written instrument of assignment or document of transfer satisfactory in form and substance to the General Partner shall have been filed with the Partnership;

(b)    The Limited Partner and the Transferee shall have executed and acknowledged such other instruments and documents and taken such other action as the General Partner shall reasonably deem necessary or desirable to effect such substitution;

(c)    The Limited Partner or the Transferee shall have paid to the Partnership such amount of money as is sufficient to cover all costs, fees and expenses (including attorneys' fees) incurred by or on behalf of the Partnership in connection with such substitution, whether or not such substitution is consummated; and

(d)    The General Partner shall have consented to such substitution.

In the event of the admission of a Transferee as a Substitute Limited Partner, all references herein to the Limited Partners shall be deemed to apply to such Substitute Limited Partner and such Substitute Limited Partner shall succeed to all rights and obligations of the transferor Limited Partner hereunder, including the Capital Account balance of such transferor.

A Transferee who is not admitted to the Partnership as a Substitute Limited Partner shall have none of the rights of, and no liability as, a Partner and the assignor in such case shall remain fully liable for the unpaid portion of its Capital Commitment.

## ARTICLE XIII
## MISCELLANEOUS

SECTION 13.1.    Amendments.

(a)    Except as otherwise expressly provided herein, this Agreement may be modified or amended, and if amended, restated as amended, and any provision hereof may be waived, by a writing signed by or on behalf of the General Partner; provided that, no such modification, amendment or waiver shall (a) materially increase or extend any financial obligation or liability of a Limited Partner beyond that set forth herein or permitted hereby without the consent of such adversely affected Limited Partner, (b) materially and adversely affect the rights of a Limited Partner without the consent of such adversely affected Limited Partner, or (c) change the provisions of this Section 13.1 without the consent of each Limited Partner.  Any consent required by this Section 13.1 may be obtained by the Partnership sending notice to the Limited Partners of the proposed amendment and instructing the Limited Partners who object to such amendment to notify the Partnership of their objection in writing within

46

thirty (30) days after such notice.  In such case, Limited Partners who have not so objected to the proposed amendment will be deemed to have approved the amendment.

(b)     Each Partner authorizes the General Partner to elect to apply the safe harbor set forth in proposed Treasury Regulation Section 1.83-3(l) (under which the Fair Value of a GP Interest that is Transferred in connection with the performance of services is treated as being equal to the liquidation value of the GP Interest) if such proposed Treasury Regulation or a similar Treasury Regulation is promulgated as a final or temporary Treasury Regulation.  If the General Partner determines that the Partnership should make such election, the General Partner is hereby authorized to amend this Agreement without the consent of any other Partner or other Person (so long as such amendment is not reasonably expected to have a material adverse effect on any Limited Partner) to provide that (i) the Partnership is authorized and directed to elect the safe harbor, (ii) the Partnership and each of its Partners (including any Person to whom a GP Interest is Transferred in connection with the performance of services) will comply with all requirements of the safe harbor with respect to all Partnership interests Transferred in connection with the performance of services while such election remains in effect, and (iii) the Partnership and each of its Partners will take all actions necessary, including providing the Partnership with any required information, to permit the Partnership to comply with the requirements set forth or referred to in the applicable Treasury Regulations for such election to be effective until such time (if any) as the General Partner determines, in its sole discretion, that the Partnership should terminate such election.  The General Partner is further authorized to amend this Agreement to modify Article VII to the extent the General Partner determines in its discretion that such modification is necessary or desirable as a result of the issuance of Treasury Regulations relating to the tax treatment of the transfer of a Partnership interest in connection with the performance of services.  Notwithstanding anything to the contrary in this Agreement, each Partner expressly confirms and agrees that it will be legally bound by any such amendment.

SECTION 13.2.     Approvals.   Except as otherwise specifically provided herein, each Limited Partner agrees that, to the extent permitted by applicable law, for purposes of granting the approval of the Limited Partners with respect to any proposed action of the Partnership, the General Partner or any Affiliate of the General Partner, the written approval of the Required Limited Partners shall bind the Partnership and each Limited Partner and shall have the same legal effect as the written approval of each Partner.  The General Partner may request the written approval of the Required Limited Partners to approve any matter that the General Partner determines, in its sole discretion, necessary or desirable to be so approved.

SECTION 13.3.     Notices.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile or similar writing) and shall be given to such party (a) if such party is a Limited Partner, at its address or facsimile number set forth in a schedule filed with the records of the Partnership or such other address or facsimile number as such Limited Partner may hereafter specify by notice to the General Partner for such purpose, or (b) if such party is the General Partner or the Partnership, at the address set forth in Section 2.2(b).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such facsimile is transmitted to the facsimile number specified and the appropriate answerback or confirmation is received, (ii) if given by mail, five (5) days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid, (iii) if given by overnight courier, forty-eight (48) hours after such communication is received by

47

such courier, or (iv) if given by any other means, when delivered at the address specified pursuant to this Section 13.3.

SECTION 13.4.     Successors; Counterparts.   This Agreement (i) shall be binding upon the successors and permitted assigns of the Partners, and (ii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

SECTION 13.5.     Governing Law; Severability.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to the conflict of laws principles thereof).   In particular, it shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Partnership Act.   If it shall be determined by a court of competent jurisdiction that any provision or wording of this Agreement shall be invalid or unenforceable under the Partnership Act or other applicable law, such invalidity or unenforceability shall not invalidate the entire Agreement, in which case this Agreement shall be construed so as to limit any term or provision so as to make it enforceable or valid within the requirements of applicable law, and, in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid or unenforceable provisions.

SECTION 13.6.     Filings.   The General Partner shall promptly prepare, following the execution and delivery of this Agreement, any documents required to be filed and recorded, or which the General Partner determines, in its sole discretion, are appropriate for filing and recording, under the Partnership Act, and the General Partner shall promptly cause each such document to be filed and recorded in accordance with the Partnership Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Partnership may hereafter establish a place of business. The General Partner shall also promptly cause to be filed, recorded and published such statements of fictitious business name and other notices, certificates, statements or other instruments required by any provision of applicable law of any jurisdiction which governs the conduct of the General Partner's business from time to time.

SECTION 13.7.     No Right to Partition.   To the extent permitted by law, and except as otherwise expressly provided in this Agreement, the Partners, on behalf of themselves and their shareholders, partners, heirs, executors, administrators, personal or legal representatives, successors and permitted assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition or similar action of the Partnership or any asset of the Partnership, or any interest which is considered to be partnership property, regardless of the manner in which title to such property may be held.

SECTION 13.8.     Goodwill.   No value shall be placed on the name or goodwill of the Partnership.

SECTION 13.9.     Headings.   Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope or intent of this Agreement or any provision hereof.

SECTION 13.10.    Entire Agreement.  This Agreement and the Subscription Agreement constitutes the entire agreement among the Partners with respect to the subject matter hereof, and supersede any prior agreement or understanding among them with respect to such subject matter.  Notwithstanding the provisions of this Agreement, including without limitation Section 13.1, or the provisions of any Subscription Agreements, the parties hereto agree that the General Partner, without the approval of any Limited Partner or any other Person, may enter into a side letter or similar written agreement (an "**Other Agreement**") on its own behalf and on behalf of the Partnership with Limited Partners which have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or any Subscription Agreements.  The parties hereto agree that any terms contained in an Other Agreement with a Limited Partner shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or any Subscription Agreements.  The representations and warranties of the General Partner and the Limited Partners in, and the other provisions of, the Subscription Agreements and any Other Agreements, the provisions of Section 11.3 of this Agreement, and the obligations of the Partners pursuant to Article IX of this Agreement, shall survive the termination or expiration of this Agreement and the termination, dissolution and winding up of the Partnership.

SECTION 13.11.    Submission to Jurisdiction.  To the fullest extent permitted by law, each party irrevocably consents and agrees that any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof shall be brought exclusively in the courts of the State of California or the U.S. federal courts for California and, by execution and delivery of this Agreement, each party hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof.  Each party hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.  Notwithstanding anything to the contrary, a government sponsored retirement plan shall not be treated as having submitted hereby to the jurisdiction of the California courts or the U.S. federal courts in California when applicable law, regulation or policy prohibits such a plan from submitting to the jurisdiction of courts beyond its own jurisdiction.

SECTION 13.12.    $200 Million Capital Commitments.

(a)    The General Partner agrees to and acknowledges that the following economic terms as set forth in this Section 13.12, in their entirety, constitute the economic terms applicable to each Limited Partner whose Capital Commitment to the Partnership equals or exceeds $200 million (a "**Large Limited Partner**") as of the Final Closing Date.

(b)    [Reserved].

(c)    *Carried Interest Calculation*.  The term "**Large Limited Partner Carried Interest**" means a contingent management fee borne by the Large Limited Partner and determined as follows:

49

(i)     first, eighty-five percent (85%) of the distributions that otherwise would be made to the Large Limited Partner under the Partnership Agreement after the Large Limited Partner has received aggregate distributions equal to the sum of:

(A)     the cumulative Capital Contributions of the Large Limited Partner, and

(B)     an amount necessary to provide the Large Limited Partner with a cumulative return of seven percent (7%) *per annum*, compounded annually, on the Large Limited Partner's cumulative Capital Contributions calculated from the date that such Capital Contributions are contributed to the Partnership until the date on which such Capital Contributions are returned to the Large Limited Partner; until the amount paid to the Manager as Carried Interest under this clause (i) equals fifteen percent (15%) of the sum of (x) the amount paid as Carried Interest under this clause (i) and (y) the amounts described in clause (i)(B); and

(ii)    thereafter fifteen percent (15%) of the amount otherwise to be distributed to such Large Limited Partner; provided, that, the Manager may, in its sole and absolute discretion reduce or waive the Carried Interest to be borne by any Partner.

Notwithstanding the foregoing, if any payment to the Manager pursuant to the above definition of Large Limited Partner Carried Interest (the "**Relevant Distribution**") would result in the cumulative payments to the Manager with respect to such Large Limited Partner exceeding the amount that would have been paid to the Manager if all payments to the Manager pursuant to clauses (i) and (ii) above and distributions to the Large Limited Partner pursuant to this Agreement were effected as of the same date (except that the calculation of the preferred return set forth within clause (i)(B) above will be determined on the basis of the timing of actual distributions made) (such excess amount, if any, the "**Excess Manager Amount**"), then amounts otherwise payable to the Manager pursuant to the definition of Large Limited Partner Carried Interest in respect of the Relevant Distribution will instead be distributed to the Large Limited Partner to the extent necessary such that, to the extent possible, the Excess Manager Amount is equal to zero after giving effect to the Relevant Distribution.

(d)     *Large Limited Partner Management Fee Calculation.* Section 3.4(c)(ii) of this Agreement notwithstanding, the quarterly Management Fee applicable to a Large Limited Partner's Capital Account shall be an amount equal to the sum of:

(i)     the Large Limited Partner Management Fee Rate (as defined below) times that Large Limited Partner's Capital Contributions invested in Partnership Investments attributable to the Large Limited Partner valued at their fair market value as of the start of each Quarterly Period (fair market value shall be determined in the same manner as used in determining the Partnership's net asset value and shall be reduced by the amount of any write-offs or write-downs applicable to such Partnership Investments); *plus*

50

(ii)      the Large Limited Partner Carried Interest.

(e)      *Large Limited Partner Management Fee Rate Calculation.* Section 3.4(c)(ii) of this Agreement, notwithstanding, the "**Large Limited Partner Management Fee Rate**" mean and shall be calculated as follows:

(i)      Until the expiration of the seventh (7th) year following the Final Closing Date, the Large Limited Partner Management Fee Rate shall equal 0.225% (corresponding to an annual rate of 0.90%); and,

(ii)      thereafter, the Large Limited Partner Management Fee Rate shall equal 0.150% (corresponding to an annual rate of 0.60%); and

(iii)      provided that, the Large Limited Partner Management Fee Rate shall equal zero (0) at the end of the Term of the Partnership (including any extensions as permitted under this Agreement).

(f)      *Clawback Payments.* The provisions hereof notwithstanding, the term "Clawback Payment" defined in first sentence of Section 10.4 shall be modified and applied to Large Limited Partners as follows:

Upon the dissolution of the Partnership, the General Partner shall cause the Manager to make (or, if a carried interest or similar performance-based fee has been paid by a Subsidiary Fund to a Subsidiary Manager, cause such Subsidiary Manager to make) a payment to the Large Limited Partner's Capital Account (for further distribution to the Large Limited Partner) (the "**Clawback Payment**") to the extent that either (i) the Large Limited Partner's Capital Account has paid to the Manager (or indirectly to such Subsidiary Manager) Carried Interest payments in excess of the Carried Interest payable to the Manager calculated on an aggregate basis or (ii) the Large Limited Partner has not received a return of its Capital Contributions plus a cumulative return on such Capital Contributions equal to seven percent (7%), compounded annually, as set forth in the definition of "Large Limited Carried Interest" under this Agreement (provided that any such calculation of any required payment may be made as an offset if and to the extent the Large Limited Partner ultimately has to return any amounts to the Partnership due to the Limited Partner Investment Giveback provisions set forth in Section 9.4 as applied to the Large Limited Partner.

This is to confirm that, in the event of a tax distribution to the Manager (or Subsidiary Manager) to enable the Manager (or Subsidiary Manager) to pay income tax on Carried Interest, the amount of such distribution will be taken into account when determining whether or not there should be a Clawback Payment. For avoidance of doubt, the parties acknowledge that the General Partner (through an affiliate) will invest in the Master Fund, rather than the Partnership.

(g)      *Interim Clawback Payments.*  The provisions hereof notwithstanding, the following provisions shall only apply to the Large Limited Partners as follows:

51

(i)       Not later than ninety (90) days after each Interim Clawback Date (defined below), the General Partner shall determine if any Interim Clawback Payment (defined below) is owed to a Large Limited Partner.  If an Interim Clawback Payment is owed, the General Partner shall cause the Manager to make (or, if a carried interest or similar performance-based fee has been paid by a Subsidiary Fund to a Subsidiary Manager, cause such Subsidiary Manager to make) a payment to the Large Limited Partner's Capital Account,  within five (5) Business Days after the General Partner determines an Interim Clawback Payment is owed (each an "**Interim Clawback Payment**") as of such Interim Clawback Date.  The Interim Clawback Payment of such Large Limited Partner shall be calculated in the same manner that the Clawback Payment is calculated pursuant to Section 13.12(f) above; provided that, for purposes of calculating the Interim Clawback Payment such Interim Clawback Date shall be treated as the date of the dissolution of the Partnership and any Partnership Investments which have not as of such time been the subject of a disposition shall be deemed to have been disposed of at Fair Value.  The Partnership shall distribute any amount so returned to such Large Limited Partner.

(ii)       Payments of the Interim Clawback Payment shall (A) be treated as a return of Large Limited Partner Carried Interest payments previously received by the Manager for purposes of Section 7.1 and Section 10.4 and the receipt of additional Distributable Cash by such Large Limited Partner and (B) shall reduce any subsequent Interim Clawback Payment (including any Clawback Payment) previously paid or required to be paid pursuant to this Agreement.  The General Partner shall be authorized to take into account Interim Clawback Payments for purposes of calculating all subsequent distributions to the Partners under Section 7.1.  In the event a distribution is made pursuant to Section 7.1, or the Fair Value of the Partnership assets increases, after an Interim Clawback Date but on or prior to payment of the related Interim Clawback Payment, such Interim Clawback Payment shall be adjusted to reflect the amount of such distribution or increase in value.  The term "**Interim Clawback Date**" shall mean the date upon which the Investment Period is terminated or expires pursuant to the terms of this Agreement and the date that is seven (7) years after the Final Closing Date.  The Interim Clawback Payment, to the extent not paid when due, shall accrue interest at the rate of 8% per annum (on the basis of a 365 day year) until it has been paid to the Partnership in full.

(h)       Section 3.4(c)(ii) of this Agreement notwithstanding, the amount determined in Section 13.12(d)(i) shall be the Fixed Management Fee applicable to each Large Limited Partner.

(i)       For avoidance of doubt, the Large Limited Partner Management Fee payable by each Large Limited Partner's Capital Account shall only be payable for the Term, as defined in Section 10.1.

(j)       The other provisions of this Agreement notwithstanding, Section 3.4(h) of this Agreement shall be replaced with respect to each Large Limited Partner and the following shall apply in its place:

4811-7067-2931.36

*Management Fee Offset for Large Limited Partners.*  In the event that a Subsidiary Fund bears a management or similar fee, then such fee will be credited on a dollar-for-dollar basis against the Management Fee otherwise chargeable to the Large Limited Partner (the "**Large Limited Partner Fixed Management Fee Offset**") such that the aggregate Large Limited Partner Fixed Management Fee paid by the Large Limited Partner directly from its Capital Account or indirectly by virtue of its investment in the Subsidiary Funds shall not exceed the applicable amount specified in Section 13.12(d)(i) of this Agreement after giving effect to the Large Limited Partner Fixed Management Fee Offset.  In the event that a Subsidiary Fund bears a carried interest or similar performance-based fee, then such interest or fee will be credited on a dollar-for-dollar basis against the Carried Interest otherwise chargeable to a Large Limited Partner (the "**Large Limited Partner Carried Interest Offset**") such that the aggregate Large Limited Partner Carried Interest paid by the Large Limited Partner directly from its Capital Account or indirectly by virtue of its investment in the Subsidiary Funds shall not exceed the applicable amount specified in Section 13.12(b) of this Agreement after giving effect to the Large Limited Partner Carried Interest Offset.

(k)     *Large Limited Partner Supplemental Definition of Cause Event.*  The General Partner shall notify the Large Limited Partners (the "**Large Limited Partner Cause Event Notice**") in the event of Disabling Conduct by the General Partner or Manager as determined either (i) by any court or governmental body referenced in Section 13.11 thereof or (ii) at the initiative and election of a majority in interest of the Large Limited Partners, by means of a determination of an Arbitrator (as defined below), in each case that has a material adverse effect on the Partnership  ("**Large Limited Partner Cause Event**").  Within thirty (30) days of receipt of a Large Limited Partner Cause Event Notice, the Large Limited Partners (other than Defaulting Partners and Large Limited Partners affiliated with the General Partner or its Affiliates) representing at least a majority of the aggregate amount of all Large Limited Partners' (other than Defaulting Partners' and Large Limited Partners affiliated with the General Partner or its Affiliates) Capital Commitments at such time may determine that such Large Limited Partner Cause Event shall be deemed a "Cause Event" for purposes of Section 11.3 hereof.

(l)     *Arbitration.*

(i)     AAA Arbitration.  The parties agree to submit claims of Disabling Conduct (a "Claim") brought by a Large Limited Partner to arbitration at the election of the Large Limited Partner pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et. seq*. The arbitration will be administered by AAA.  The Claims shall be decided by a single arbitrator (the "**Arbitrator**").

(ii)     Selection of Arbitrator.  Within two weeks after the Large Limited Partner submits to the General Partner a Claim, each side shall identify five potential arbitrators who reside or work in the San Francisco, California area.  The Parties shall rank their choices from one to five, with one being the most preferred.  If there is an arbitrator on the lists on which the Parties agree, that arbitrator shall be selected by the Parties.  If there is more than one arbitrator in common, the Parties shall select the arbitrator with the lowest collective score.  If there is no agreement, both sides shall

identify five additional, alternate candidates within two weeks and continue this process until a common arbitrator is selected.  In the event of an impasse, the Parties agree to submit the matter to AAA for selection of the arbitrator.

(iii)    Location of Hearing.  The hearing will occur in the San Francisco, California area, in the State of California, at a time and place to be mutually agreed upon by the Parties and the Arbitrator.  This Agreement shall be binding upon and inure to the benefit of the Parties, their heirs, successors and assigns.  Review of any decision of the Arbitrator shall be limited to those matters set forth in 9 U.S.C. § 10(a).  The Arbitration shall be governed by AAA's Commercial Arbitration Rules and Mediation Procedures, amended October 1, 2013, except to the extent such rules are modified or supplemented herein.

(iv)    Discovery.  Discovery will be permitted in accordance with the Federal Rules of Civil Procedure, except to the extent such rules are modified or supplemented below.

(A)    Use of Deposition Transcripts at Hearing.  The Parties may offer deposition testimony in lieu of live testimony at the arbitration hearing.  Any evidentiary objections that were raised during the depositions may be renewed at the arbitration hearing and ruled upon by the Arbitrator.

(B)    Third-Party Discovery.  The Parties may subpoena documents and testimony from relevant third-party witnesses consistent with the Federal Rules of Civil Procedure.  Witness fees for any third-party subpoenaed deponent shall be in the same amount as provided for witnesses in trials in the U.S. District Court as specified by the Large Limited Partner.

(v)    Communication with the Arbitrator.  Neither the Parties nor anyone acting on behalf of the Parties shall communicate *ex parte* with the Arbitrator about the merits of the claims prior to the commencement of the arbitration or following its conclusion until the Arbitrator has issued its award in writing to the Parties.

(vi)    Each Party shall bear equally the costs of AAA and the Arbitrator. Each Party shall bear its own costs and expenses.

(vii)    Confidentiality.   The arbitration proceedings, including all documents and information exchanged during the arbitration, and any award, judgment or result shall be confidential.

(viii)    Entry of Award.  Judgment based on any aware or ruling of the arbitrators may be entered by any court having jurisdiction.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Second Amended and Restated Limited Partnership Agreement as of the date first set out above.

54

IN WITNESS WHEREOF, the undersigned have executed and delivered this Second Amended and Restated Limited Partnership Agreement as of the date first set out above.

**GENERAL PARTNER**:

WHITE OAK PARTNERS 2, LLC

By: _____

    Name: Barbara J-S McKee

    Title: Manager

**LIMITED PARTNERS**:

[SIGNATURES OF LIMITED PARTNERS ARE SET FORTH ON SEPARATE SIGNATURE PAGES]

Appendix A

## DEFINITIONS

"Additional Limited Partner" means a Limited Partner admitted to the Partnership at a Closing subsequent to the Initial Closing, or an Existing Limited Partner that increases its Capital Commitment pursuant to Section 2.5(c).

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(ii)     credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(iii)     debit to such Capital Account the items described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Administration Fee" has the meaning set forth in Section 3.5(a).

"Administrator" shall mean the administrator of the Partnership.

"Affiliate" of any specified Person or a Person "affiliated with" another Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Partnership Agreement, as amended or restated from time to time.

"Assumed Tax Rate" means the highest effective combined federal, state and local income tax rate for the calendar year involved applicable to any individual resident in New York City (taking into account the deductibility of state and local income taxes for federal income tax purposes).

"Authorized Representative" has the meaning set forth in Section 3.11(a).

"Borrowing Costs" means with respect to any borrowing, any interest fees or expenses attributable to such borrowing, but shall not include any repayment of principal.

56

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized by law to close.

"Capital Account" has the meaning set forth in Section 7.2(a).

"Capital Call" means a capital call of cash contributions from all Partners except as otherwise provided pursuant to a Capital Call Notice in accordance with Article VI.

"Capital Call Amount" means the aggregate Capital Contributions to be made on any date by the Partners pursuant to Article VI.

"Capital Call Date" has the meaning set forth in Section 6.2(b).

"Capital Call Notice" has the meaning set forth in Section 6.2(a).

"Capital Commitment" means, with respect to any Partner at any time, the amount specified as such Partner's Capital Commitment at the time such Partner was admitted to the Partnership.

"Capital Contribution" means, with respect to any Partner, a cash contribution (or deemed cash contribution) made by such Partner to the Partnership pursuant to Section 2.5, Article VI and Article IX.

"Capital Contribution Recovery" has the meaning set forth in Section 2.5(b).

"Carried Interest" means a contingent management fee borne by a Limited Partner and determined as follows: (i) first, 100% of the distributions that otherwise would be made to such Limited Partner under this Agreement after such Limited Partner has received aggregate distributions equal to the sum of: (A) the cumulative Capital Contributions of such Limited Partner invested in Partnership Investments, and (B) an amount necessary to provide such Limited Partner with a cumulative return of seven percent (7%) *per annum*, compounded annually, on such Limited Partner's aggregate outstanding Capital Contributions invested in Partnership Investments calculated from the date that such Capital Contributions are contributed to the Partnership until the date on which such Capital Contributions are returned to such Limited Partner; until the amount paid to the Manager as Carried Interest under this clause (i) equals fifteen percent (15%) of the sum of (x) the amount paid as Carried Interest under this clause (i) and (y) the amounts described in clause (i)(B); and (ii) thereafter fifteen percent (15%) of the amount otherwise to be distributed to such Limited Partner; provided, that, the Manager may, in its sole and absolute discretion reduce or waive the Carried Interest to be borne by any Partner.

"Carried Interest Offset" has the meaning set forth in Section 3.4(h).

"Cause Event" has the meaning set forth in Section 11.3(a).

"Cause Event Notice" has the meaning set forth in Section 11.3(a).

"Clawback Payment" has the meaning set forth in Section 10.4(c).

"Closing" means a closing of the sale of LP Interests to investors and such investors' admission as Limited Partners, or an Existing Limited Partner's increase of its Capital Commitment.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Co-Investment Funds" has the meaning set forth in Section 4.3.

"Covered Person" means a member of the General Partner Group or the Independent Investor Representative.

"Default" means any failure of a Limited Partner to make all or a portion of any required Capital Contribution on the applicable Capital Call Date or other due date.

"Defaulting Partner" means, at any time, each Limited Partner, who, at or prior to such time, has committed or has been deemed to have committed a Default that has become an Event of Default.

"Disabled" has the meaning set forth in Section 3.8.

"Disabling Conduct" has the meaning set forth in Section 9.1.

"Distributable Cash" means cash receipts of all kinds derived by the Partnership from its ownership or disposition of Partnership Investments (whether or not distributed pursuant to Section 7.1(a)) less (x) any amounts retained by the Partnership in accordance with Section 7.1(e), and (y) any income derived by the Partnership from Temporary Investments.

"Electing Partner" has the meaning set forth in Section 7.1(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Partner" means any Limited Partner that is (i) an employee benefit plan which is subject to the provisions of Part 4 of Subtitle B of Title I of ERISA, (ii) a plan or individual retirement account which is subject to Section 4975 of the Code, or (iii) a nominee for, or is using the assets of, or is a trust established pursuant to, one or more employee benefit plans, or other such plans or individual retirement accounts.

"Event of Default" means any Default that shall have not been (i) cured by the Limited Partner who committed such Default within ten (10) Business Days after the occurrence of such Default, or (ii) waived by the General Partner on such terms as determined by the General Partner in its sole discretion before such Default has otherwise become an Event of Default pursuant to clause (i) hereof and, to the extent required pursuant to Section 6.3 with respect to any Defaulting Partner that is affiliated with the General Partner or its Affiliates, only upon the prior written approval of the Independent Investor Representative.

"Excess Manager Amount" has the meaning set forth in Section 13.12(c).

"Excluded Limited Partner" has the meaning set forth in Section 6.5(a).

"Existing Limited Partners" has the meaning set forth in Section 2.5(b).

"Fair Value" means the valuation of a Partnership Investment or other Partnership property by the General Partner (or other Person) in good faith in accordance with Section 3.21.

"Final Closing" means the Partnership's last Closing.

"Final Closing Date" means the date of the Final Closing.

"Fixed Management Fee" has the meaning set forth in Section 3.4(c).

"Fixed Management Fee Offset" has the meaning set forth in Section 3.4(f).

"Follow-On Investments" means an additional investment of capital by the Partnership in an existing Partnership Investment.

"General Partner" means White Oak Partners 2, LLC, a Delaware limited liability company, and its successors.

"General Partner Group" means the General Partner, the Manager and their respective Affiliates, partners, officers, directors, members, principals, stockholders, employees, controlling persons, representatives or other agents.

"GP Interest" has the meaning set forth in Section 11.1.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(iv)    the Gross Asset Value of any asset contributed by a Partner to the Partnership is the Fair Value of such asset as determined at the time of contribution;

(v)    the Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross Fair Values as of the following times: (a) the acquisition of any additional interest in the Partnership by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a *de minimis* amount of property as consideration for an interest in the Partnership; (c) the grant of an interest in the Partnership (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Partnership by an existing Partner acting in a Partner capacity, or by a new Partner acting in a Partner capacity or in anticipation of becoming a Partner; (d) the liquidation of the Partnership within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g) and (e) such other times determined by the General Partner in its sole and absolute discretion; provided, that, the adjustments pursuant to clauses (a), (b), (c) and (d) above shall be made only if the General Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and

4811-7067-2931.36

(vi)    the Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal the gross Fair Value of such asset on the date of distribution.

"Independent Investor Representative" has the meaning set forth in Section 3.19.

"Initial Administrator" means White Oak Partners 2, LLC, a Delaware limited liability company.

"Initial Closing" means the first Closing.

"Initial Closing Date" means the date of the Initial Closing.

"Initial Closing Date Investor" has the meaning set for in Section 7.1(b).

"Initial Closing Priority Return" has the meaning set forth in Section 7.1(b).

"Initial Manager" means White Oak Global Advisors, LLC, a Delaware limited liability company.

"Initial Period Distributable Cash" has the meaning set forth in Section 7.1(b).

"Interim Clawback Date" has the meaning set forth in Section 13.12(g).

"Interim Clawback Payment" has the meaning set forth in Section 13.12(g).

"Investment Committee" has the meaning set forth in Section 3.20.

"Investment Company Act" means the Investment Company Act of 1940, as amended from time to time.

"Investment Giveback Amount" has the meaning set forth in Section 9.4.

"Investment Period" means the period during which the Partnership may make commitments to Partnership Investments.  The Investment Period shall commence on the date of the Initial Closing and end  twenty four (24) months following the last day of the month that includes the Final Closing Date, provided that the General Partner may extend the Investment Period for six (6) months, and provided further that the Investment Period may be terminated upon a resolution adopted by 75% of the Interests held by the Limited Partners not affiliated with the General Partner at a meeting called in accordance with Section 3.12.

"Key Person Event" has the meaning set forth in Section 3.8.

"Key Person Event Notice" has the meaning set forth in Section 3.8.

"Key Person Event Termination" has the meaning set forth in Section 3.8.

"Large Limited Partner" has the meaning set forth in Section 13.12(a).

"Large Limited Partner Carried Interest" has the meaning set forth in Section 13.12(c).

"Large Limited Partner Carried Interest Offset" has the meaning set forth in Section 13.12(f).

"Large Limited Partner Cause Event" shall have the meaning set forth in Section 13.12.

"Large Limited Partner Cause Event Notice" shall have the meaning set forth in Section 13.12.

"Large Limited Partner Fixed Management Fee Offset" has the meaning set forth in Section 13.12(f).

"Large Limited Partner Management Fee Rate" has the meaning set forth in Section 13.12(d)(ii).

"Limited Partner" means, at any time, any Person who is at such time a limited partner of the Partnership.

"Liquidator" has the meaning set forth in Section 10.3.

"LP Interest" means an interest in the Partnership as a Limited Partner.

"Management Agreement" shall mean the investment management or similar agreement by and between the Partnership and the Manager.

"Management Fee" has the meaning set forth in Section 3.4(c).

"Manager" means the manager of the Partnership's investments.

"Manager Expenses" has the meaning set forth in Section 5.1.

"Master Fund" means the Subsidiary Fund in which the Partnership invests directly.

"Net Income" and "Net Loss" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such fiscal year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss) with the following adjustments (without duplication):

(i)     any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this paragraph, shall be added to such income or loss;

61

(ii) any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss pursuant to this paragraph, shall be subtracted from such taxable income or loss;

(iii) if the Gross Asset Value of any Partnership asset is adjusted pursuant to subdivisions (ii) or (iii) of the definition of "Gross Asset Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss;

(iv) gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v) in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, such amounts shall instead be determined in accordance with the requirements of Treasury Regulation Section 1.704-1(b)(2)(iv)(g); and

(vi) any items which are specially allocated pursuant to the provisions of Section 7.3(b) or (c) shall not be taken into account in computing Net Income or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Sections 1.704-2(b)(1) and 1.704 2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(3).

"Offering Memorandum" means the Confidential Offering Memorandum of the Partnership and any amendments or supplements thereto.

"Organizational Expenses" has the meaning set forth in Section 5.2(c)(i).

"Other Agreement" has the meaning set forth in Section 13.10.

"Other Clients" has the meaning set forth in Section 3.7(c).

"Other Giveback Amount" has the meaning set forth in Section 9.4.

"Parallel Fund" has the meaning set forth in Section 3.3.

"Partners" means the General Partner and the Limited Partners.

62

"Partnership" means White Oak Summit Fund, L.P., a Delaware limited partnership.

"Partnership Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

"Partnership Expenses" has the meaning set forth in Section 5.2(b).

"Partnership Investment" means the origination or extension of loans or credit of any kind, whether secured or unsecured, and/or investment in corporate credit, asset-based loans, or debt instruments, and any investment by the Partnership in accordance with the Partnership's Offering Memorandum by means of an investment in the Master Fund which will in turn will invest in underlying Subsidiary Funds that invest in such loans, credits and instruments. .

"Partnership Minimum Gain" has the same meaning as the term "partnership minimum gain" set forth in Treasury Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"Partner Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Treasury Regulation Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if the Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulation Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i)(2).

"Person" means any individual, partnership, corporation, trust, limited liability company, limited liability partnership, joint stock company or other legal entity.

"Plan Asset Regulation" means Department of Labor Regulation Section 2510.3-101 or any successor thereto.

"Primary Key Person Event" has the meaning set forth in Section 3.8.

"Principals" has the meaning set forth in Section 3.8.

"Proceeding" means any action, claim, suit, investigation, arbitration or proceeding, whether at law or in equity, and whether by or before any court, arbitrator, governmental body or other administrative, regulatory or other agency or commission.

"Relevant Distribution" has the meaning set forth in Section 13.12(c).

"Remaining Capital Commitment" means, with respect to any Partner at any time, the excess, if any, of (i) such Partner's Capital Commitment at such time over (ii) such Partner's aggregate Capital Contributions made prior to such time.  For purposes of this definition, any Partner's aggregate Capital Contributions shall be reduced by the aggregate amount theretofore

distributed to such Partner pursuant to Section 7.1(a) prior to the end of the Investment Period in accordance with Section 7.1(b).

"Remaining Commitment Percentage" means, with respect to any Partner at any time, the percentage derived by (i) dividing such Partner's Remaining Capital Commitment at such time by (ii) the aggregate amount of all Partners' Remaining Capital Commitments.

"Removal Notice" has the meaning set forth in Section 11.3.

"Required Limited Partners" means, at any time, Limited Partners (other than Defaulting Partners and Limited Partners affiliated with the General Partner or its Affiliates) representing at least a majority of the aggregate amount of all Limited Partners' (other than Defaulting Partners' and Limited Partners affiliated with the General Partner or its Affiliates) Capital Commitments at such time.

"Secondary Key Person Event" has the meaning set forth in Section 3.8.

"Securities" means shares of capital stock, limited partnership interests, warrants, options, bonds, notes, debentures, other securities and equity interests of whatever kind of any Person, whether or not publicly traded or readily marketable, and any other financial instruments which exist now or are hereafter created.

"Subscription Agreements" mean the subscription agreements entered into by the respective Limited Partners in connection with their purchases of LP Interests.

"Subsequent Closings" means each Closing held after the Initial Closing up to and including the Final Closing.

"Subsequent LP Capital Contribution" has the meaning set forth in Section 2.5(b).

"Subsidiary Fund" means any fund in which the Partnership directly or indirectly invests.

"Subsidiary Manager" means an investment manager of a Subsidiary Fund.

"Substitute Limited Partner" means any purchaser, assignee, transferee or other recipient of all or any portion of any Limited Partner's Interest who is admitted as a Limited Partner to the Partnership in accordance with Sections 6.3(d)(iii) or 12.2.

"Successor Fund" has the meaning set forth in Section 3.7(b).

"Tax-Exempt Limited Partner" means a Limited Partner that is exempt from income taxation pursuant to Section 501 of the Code.

"Tax Matters Partner" has the meaning set forth in Section 7.7.

"Temporary Investment" means investments in (i) short-term money market investments issued by issuers in the two highest rating categories as stated by nationally

recognized statistical ratings organizations, (ii) obligations backed by full faith and credit of the U.S. federal government and with a maturity date not in excess of eighteen (18) months from the date of purchase by the Partnership, (iii) interest-bearing bank or brokerage accounts and/or certificates of deposit issued by banks with undivided capital and surplus of $100,000,000 or more, and (iv) other comparable investments as determined by the General Partner in its sole discretion.

"Term" of the Partnership has the meaning set forth in Section 10.1.

"Third Party Co-Investor" has the meaning set forth in Section 4.3.

"Third Party Consultant" has the meaning set forth in Section 3.4.

"Transaction Fees" means any directors' fees from a portfolio company, transaction fees, origination fees, closing fees, monitoring fees, amendment fees, break-up fees or any other similar advisory fees received by a member of the General Partner Group in connection with any services provided by a member of the General Partner Group to a portfolio company in which the Partnership has invested.

"Transfer" means a direct or indirect sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of a GP Interest or a LP Interest, other than in connection with a pledge by the General Partner of any such interests made in connection with a borrowing by the Partnership.

"Transferee" has the meaning set forth in Section 12.2.

"Treasury Regulations" means the temporary and final regulations of the U.S. Treasury Department issued pursuant to the Code.

"U.S." means the United States of America.

"Valuation Agent" has the meaning set forth in Section 3.21.

4811-7067-2931.36