**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE TRUSTEES OF THE NEW YORK
STATE NURSES ASSOCIATION PENSION
PLAN,

               Petitioners,

   v.

WHITE OAK GLOBAL ADVISORS, LLC,

               Respondent.

Civil Action No. 21–cv–08330

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PETITION TO CONFIRM
ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT AND
IN OPPOSITION TO WHITE OAK GLOBAL ADVISORS, LLC'S PETITION TO
VACATE, IN PART, AN ARBITRATION AWARD**

COVINGTON & BURLING LLP
C. William Phillips
Jonathan M. Sperling
Cléa P.M. Liquard
The New York Times Building
620 Eighth Avenue
New York, New York 10018
212-841-1000
cphillips@cov.com
jsperling@cov.com
cliquard@cov.com

Robert Newman
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-6000
rnewman@cov.com

*Attorneys for Petitioners Trustees of the New
York State Nurses Association Pension Plan*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.      The Arbitrator's Liability Findings, and Orders Directing Removal of White Oak
        and Disgorgement of Assets and Management Fees, Must be Confirmed. ...................... 3

        A.      The Arbitrator Determined that White Oak Breached Its ERISA Fiduciary
                Duties. ................................................................................................................ 4

        B.      The Arbitrator Ordered that White Oak be Removed as a Fiduciary. ................... 9

        C.      The Arbitrator Ordered White Oak to Disgorge Plan Assets Valued at
                more than $96 million. ...................................................................................... 11

        D.      The Arbitrator Ordered White Oak to Disgorge More than $9 Million in
                Management Fees. ............................................................................................. 17

                1.      White Oak's arguments cannot be squared with the plain language
                        of the awards. ......................................................................................... 17

                2.      White Oak's reliance on arguments the arbitrator rejected cannot
                        be used to evade the express terms of the awards and are incorrect
                        on their own terms. ................................................................................. 21

II.     There is No Basis to Vacate the Arbitrator's Award of Attorneys' Fees and
        Prejudgment Interest. ................................................................................................... 24

        A.      The Arbitrator's Award of Attorneys' Fees and Costs Was Not Rendered
                in "Manifest Disregard of the Law." .................................................................. 26

                1.      An award of attorneys' fees was warranted because the Plan
                        achieved "some success" on the merits. ................................................... 27

                2.      White Oak's attempt to relitigate reasonableness of the fees and
                        costs awarded fails. ................................................................................. 30

                3.      The arbitrator's award of expert fees is supported by case law from
                        this District. ............................................................................................ 33

        B.      The Arbitrator's Award of Prejudgment Interest Was Not Rendered in
                "Manifest Disregard of the Law." ...................................................................... 34

III.    Post-Award Pre-judgment Interest Should be Awarded By this Court. ......................... 35

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpaca Shop Franchise Co. v. Roxburgh*,
  No. 3:05 CV 1203 (SRU), 2010 WL 2976918 (D. Conn. July 22, 2010) ................................8

*Ballinasmalla Holdings Ltd. v. FCStone Merch. Servs., LLC*,
  No. 18-CV-12254 (PKC), 2020 WL 814711 (S.D.N.Y. Feb. 19, 2020) ..............................33

*In re Bay Harbour Assocs., L.P.*,
  56 F. App'x 21 (2d Cir. 2003) ...........................................................................................12

*Bekker v. Neuberger Berman Grp. 401(K) Plan Inv. Comm.*,
  504 F. Supp. 3d 265, 271 (S.D.N.Y. 2020)........................................................................33

*Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*,
  212 F. Supp. 2d 226 (S.D.N.Y. 2002)................................................................................32

*Brightman v. 1199SEIU Health Care Employees Pension Fund*,
  No. 18-cv-4932 (LJL), 2021 WL 809373 (S.D.N.Y. Mar. 2, 2021).....................................28

*Cefali v. Buffalo Brass Co., Inc.*,
  748 F. Supp. 1011 (W.D.N.Y. 1990) ..................................................................................33

*Chios Charm Shipping Co. v. Rionda*,
  No. 93 CIV. 6313 (SS), 1994 WL 132141 (S.D.N.Y. Apr. 12, 1994).....................................4

*Cooper Dev. Co. v. Friedman*,
  No. 92 Civ. 7572 (JSM), 1994 WL 172401 (S.D.N.Y. May 4, 1994)....................................32

*D.H. Blair & Co., Inc. v. Gottdiener*,
  462 F.3d 95 (2d Cir. 2006)....................................................................................... *passim*

*Diplomatic Man, Inc. v. Nike, Inc.*,
  No. 08 Civ. 139 (GEL), 2009 WL 935674 (S.D.N.Y. Apr. 7, 2009) .....................................32

*Doe v. Unum Life Ins. Co. of Am.*,
  12 Civ. 9327 (LAK) (AJP), 2016 WL 335867 (S.D.N.Y. Jan. 28, 2016) .............................34

*Donachie v. Liberty Life Assur. Co.*,
  745 F.3d 41 (2d Cir. 2014)................................................................................................26

*Duam Glob. Holdings Corp. v. Ybrant Digit. Ltd.*,
  No. 13-CV-3135 (AJN), 2015 WL 5853783 (S.D.N.Y. Oct. 6, 2015)....................................3

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*,
  552 U.S. 576, 128 S. Ct. 1396 (2008).................................................................................3

*Hardt v. Reliance Standard Life Ins. Co.*,
  560 U.S. 242, 130 S. Ct. 2149 (2010)..................................................................26, 28, 29

*JB Hunt Transp., Inc. v. BNSF Ry. Co.*,
  9 F.4th 663 (8th Cir. 2021) ................................................................................................8

*Jones v. Unum Life Ins. Co. of Am.*,
  223 F.3d 130 (2d Cir. 2000)..............................................................................................34

*LaScala v. Scrufari*,
  479 F.3d 213 (2d Cir. 2007)................................................................................................7

*Leigh v. Engle*,
  727 F.2d 113 (1984)..........................................................................................................21

*Loc. 30, Int'l Union of Operating Eng'rs, AFL-CIO v. Wood Grp. Power Operations LLC*,
  CV 13-02499, 2014 WL 12831796 (S.D.N.Y. Aug. 4, 2014)...........................................10, 16

*Lowen v. Tower Asset Mgmt., Inc.*,
  829 F.2d 1209 (2d Cir. 1987).........................................................................................7, 22

*Major League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa, S.A.*,
  No. 1:19-cv-8669 (MKV), 2020 WL 5518361 (S.D.N.Y. Sept. 14, 2020) ...........................31

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ......................................................................................33

*Nat'l Union Fire Ins. Co. Pittsburgh, PA v. Odyssey Am. Reins. Corp.*,
  No. 05 Cv. 7539 (DAB), 2009 WL 4059183 (S.D.N.Y. Nov. 18, 2009) ..............................32

*Porzig v. Dresdner, Kleinwort, Benson, N.A. LLC*,
  497 F.3d 133 (2d Cir. 2007)..........................................................................................30, 31

*Salus Capital Partners, LLC v. Moser*,
  289 F. Supp. 3d 468, 483 (S.D.N.Y. 2018).......................................................................35

*Scarangella v. Grp. Health, Inc.*,
  731 F.3d 146 (2d Cir. 2013)..............................................................................................26

*Schusterman v. Mazzone*,
  19 Civ. 212 (PAE), 2019 WL 2547142 (S.D.N.Y. June 19, 2019) .......................................10

*Seneca Nation of Indians v. New York*,
   988 F.3d 618 (2d Cir. 2021)......................................................................................2, 25, 34

*Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*,
   119 F. Supp. 3d 240, 269 (S.D.N.Y. 2015)................................................................23

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662, 130 S. Ct. 1758 (2010)......................................................................25

*T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
   592 F.3d 329 (2d Cir. 2010)...............................................................................24, 30

*Truong v. New York Hotel & Motel Trades Council, AFL-CIO*,
   No. 07 Civ. 11383 (RJH), 2009 WL 798937 (S.D.N.Y. Mar. 26, 2009)...........................2, 10

*U.S. Bank Nat'l Ass'n v. Dexia Real Est. Cap. Mkts*,
   No. 12 Civ. 9412 (PAE), 2016 WL 6996176 (S.D.N.Y. Nov. 30, 2016).............................33

*Util. Workers Union of Am. v. Missouri-American Water Co.*,
   No. 4:09 CV 1875 (DDN), 2010 WL 3908933 (E.D. Mo. Sept. 30, 2010)...........................8

*Wallace v. Buttar*,
   378 F.3d 182 (2d Cir. 2004)...................................................................... *passim*

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*,
   103 F.3d 9 (2d Cir. 1997)..................................................................................24

*Zeiler v. Deitsch*,
   500 F.3d 157 (2d Cir. 2007)...............................................................................10

**Statutes**

9 U.S.C. § 9....................................................................................................3, 4, 11, 19

9 U.S.C. § 10(a)(1)-(4)....................................................................................24

29 U.S.C. § 1106.................................................................................. *passim*

29 U.S.C. § 1132(g)(1)....................................................................................26

## PRELIMINARY STATEMENT

White Oak's opposition and cross-motion papers are a 35-page effort to persuade this Court to "ignore[] what cannot properly be ignored."  Dkt. 29, Mem. Op. Unsealing Documents (Nov. 10, 2021) at 2.[1]  The arbitrator concluded in the written awards that White Oak "engaged in numerous prohibited transactions" under "ERISA Section 406(b)(1)," and ordered White Oak to "disgorge all assets" worth "$96,213,778.83," disgorge "some fees, and profits" totaling more than $9 million, pay 80% of the "attorneys' fees and costs as proposed by the Plan," and awarded "pre-judgment interest ... at the New York statutory rate of 9%."  Dkt. 21.1, Phillips Decl., Ex. A at 15 (Partial Final Award, hereinafter "PFA"); Dkt. 21.2, Phillips Decl. Ex. B at 6, 10-11 (Final Award, hereinafter "FA").

In the face of those clear rulings, White Oak constructs an alternative reality according to which it convinced the arbitrator to abandon entirely her findings in the Partial Final Award and instead "adopt White Oak's position" that it did not breach its fiduciary duties and does not owe anything to the Plan except in the form of an "in-kind distribution" of the Plan's minority interests in debt and equity investments.  That tale, however, is contradicted in every instance by the express terms of the Final Award and the Partial Final Award, the latter of which was "incorporated" into the Final Award.  FA at 1, 10.  The arbitrator's rulings, as expressed in her written awards, cannot be subverted by "unsworn contention[s] by counsel," Dkt. 29, Mem. Op. at 3, or material outside the written awards, which White Oak relies on to manufacture its purported "reading" of the awards.

Indeed, White Oak's "interpretation" of the awards is so strained that, to achieve a

---

[1] White Oak advances substantially the same arguments in opposition to the Petition to Confirm and in support of its cross-motion to vacate.  For that reason, this memorandum addresses both the opposition and the cross-motion.

semblance of coherence with its position that *White Oak*, and not the Plan, "prevailed at the arbitration," it must argue that the award of attorneys' fees and prejudgment interest was made in "manifest disregard of the law."  The arbitrator's award of fees and prejudgment interest itself underscores the fatal flaws in White Oak's rendering of the awards; and White Oak does not and cannot establish that the arbitrator "willfully flouted the governing law by refusing to apply it" when she awarded attorneys' fees and prejudgment interest.  *Seneca Nation of Indians v. New York*, 988 F.3d 618, 626 (2d Cir. 2021).

Nor is the suggestion that White Oak has already complied with the Award—and it clearly has not—of any relevance to these cross-motions, which concern only *confirmation,* not enforcement, of the arbitration awards.  As numerous courts in this Circuit have observed, whether a party has complied with an arbitration award is "immaterial to whether this Court should confirm the awards, because confirmation simply turns an award into an enforceable judicial order."  *Truong v. New York Hotel & Motel Trades Council, AFL-CIO*, No. 07 Civ. 11383 (RJH), 2009 WL 798937, at *1 (S.D.N.Y. Mar. 26, 2009).  White Oak's (non)compliance with the arbitrator's awards will be the subject of a motion to enforce the awards once they are confirmed and converted to a judgment.

Indeed, it is telling that White Oak does not argue that the arbitrator's liability findings, nor its orders directing White Oak's removal and disgorgement of assets and fees, should be vacated, modified, or corrected.  Instead, White Oak's opposition and cross-motion attempt to achieve through a tendentious "interpretation" of the arbitration awards, the outcome it hoped to yield in the arbitration proceedings, but which the arbitrator soundly rejected as made plain by the language of the awards themselves.

Because there is no basis to "vacate[], modif[y], or correct[]" the arbitrator's awards

under the Federal Arbitration Act (FAA), this Court "must grant" the petition to confirm.  9

U.S.C. § 9; *accord D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006); *see also Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587, 128 S. Ct. 1396, 1405 (2008)

("There is nothing malleable about 'must grant,' which unequivocally tells courts to grant

confirmation in all cases, except when one of the 'prescribed' exceptions applies.").

## ARGUMENT

I.     **The Arbitrator's Liability Findings, and Orders Directing Removal of White Oak and Disgorgement of Assets and Management Fees, Must be Confirmed.**

White Oak attempts to supplant the express rulings made by the arbitrator in the awards,

suggesting that the arbitrator's Final Award "did not find that White Oak breached any fiduciary

duties," compelled (despite ostensibly concluding that White Oak did not violate ERISA) White

Oak to make only an "in-kind distribution" of the Plan's assets, and did not order White Oak to

"disgorge any fees."  Dkt. 12 ("Opp.") at 23.  Each of those bald assertions is inconsistent with

the express language of the arbitrator's Final Award contained in passages that White Oak does

not mention in its briefing.

Instead, White Oak rehashes at length prior arguments it made to the arbitrator ostensibly

to support a "reading" of the Final Award that is inconsistent with its text.  That effort is

fundamentally misguided because it is a cardinal principle of interpretation that one looks to the

plain language of the arbitration award to understand its meaning.  *See Duam Glob. Holdings

Corp. v. Ybrant Digit. Ltd.*, No. 13-CV-3135 (AJN), 2015 WL 5853783, at *3 (S.D.N.Y. Oct. 6,

2015) ("In interpreting an arbitration award, a court should look to the plain language of the

award.").  Where, as is the case here, a party offers an interpretation of the award that is

inconsistent with its plain language, it must be rejected.  *See, e.g., id.* (rejecting interpretation of

arbitration award that was "not supported by the text" and "contrary to the language" of the

award); *Chios Charm Shipping Co. v. Rionda*, No. 93 CIV. 6313 (SS), 1994 WL 132141, at *3 (S.D.N.Y. Apr. 12, 1994) (rejecting interpretation of arbitration award that "would be inconsistent with the award's plain language").  Moreover, when a federal court is asked to confirm an arbitration award it "may not conduct a reassessment of the evidentiary record." *Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004).  As the Second Circuit has emphasized: "To the extent that a federal court may look upon the evidentiary record of an arbitration proceeding at all, it may do so *only* for the purpose of discerning whether a colorable basis exists for the panel's award...."  *Id.* (emphasis in original).

The Plan, therefore, will not respond point-by-point to the numerous misstatements in White Oak's 22-page background sections,[2] which have no bearing on what was in fact determined by the arbitrator as expressed in the Final Award and the incorporated Partial Final Award.  Below, the Plan identifies the clear and unambiguous language in the arbitrator's awards determining White Oak's liability, rejecting White Oak's counterclaim against the Trustees, and ordering White Oak to remove itself as fiduciary and disgorge assets and fees, which the Plan asks this Court to confirm.  There are no grounds for vacating, modifying, or correcting the awards; accordingly, the petition to confirm the Final Award and incorporated Partial Final Award "must [be] grant[ed]."  9 U.S.C. § 9.

A.     **The Arbitrator Determined that White Oak Breached Its ERISA Fiduciary Duties.**

In the Partial Final Award, the arbitrator concluded that "White Oak has engaged in numerous prohibited transactions pursuant to ERISA Section 406(b)(1), [2]9 U.S.C. Sec.

---

[2] By way of example, White Oak asserts that after "the Partial Award was issued, the Plan never disputed that the IMA allowed for an in-kind distribution."  Opp. at 18.  Even the documents White Oak attached to its brief prove that statement false.  *See, e.g.*, Dkt. 31.6, Cauley Decl., Ex. F at 8-9 (arguing that the IMA requires return of the Plan's "cash").

1106(b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA." PFA at 15. In particular, the arbitrator found:

1. "White Oak ... violated ERISA Section 406(b)(1) ... by executing the Pinnacle and Summit feeder subscription funds pursuant to its fiduciary authority under the Plan ['s IMA] that resulted in its ability to control Plan assets and earn fees on the assets, despite its termination of the IMA with the Plan." PFA at 22. In other words, White Oak used its fiduciary authority to give itself the unilateral right to hold the Plan's money and to continue collecting fees even after termination of the IMA—rights contrary to the express terms the parties agreed to in the IMA.

2. White Oak collected more than $1.9 million in retroactive management fees (or so-called "Day One Fees"), covering a period of nearly two years *before* the IMA was signed and before White Oak started to provide services to the Plan. As the arbitrator put it: "The IMA does not authorize payment of a Day One Investor Fee ... [and] White Oak could not have provided any fiduciary services before the IMA was in effect." PFA at 28.

3. "White Oak engaged in a prohibited transaction pursuant to ERISA Section 406(b)(1) when it exercised its discretionary powers to provide indemnification against potential legal liability through the subscription fund documents." PFA at 20. That is, White Oak drafted the agreements governing the Plan's investments so that White Oak granted indemnification rights to itself, backed by the Plan's assets—a benefit not agreed to in the IMA.[3]

---

[3] The arbitrator also rejected White Oak's counterclaim brought under ERISA and asserted against the Trustees in their personal capacity, holding that "there has been no showing that Plan Trustees breached any fiduciary duties and that all violations arise solely from White Oak's 'acts or omissions' with respect to the management of Plan assets." PFA at 31; *see also* PFA at 32 ("White Oak failed to identify any trustee who had actual knowledge of White Oak breaches of fiduciary duty and who nevertheless 'participated' in that breach.") (internal alterations omitted). White Oak does not contest this aspect of the arbitrator's findings, which was "incorporated" into the Final Award. *See* FA at 10.

White Oak does not dispute these clear findings in the Partial Final Award, but contends that the arbitrator subsequently "modified" these findings in the Final Award "by denying all claims ..., including the Partial Award's findings of technical ERISA violations."  Opp. at 7. That position cannot be reconciled with the express language of the Final Award, which "incorporated" the findings of the Partial Final Award.  FA at 1, 10.  The first paragraph of the Final Award states:  "The November 2020 PFA [Partial Final Award] is hereby incorporated into this instant Final Award."  *Id*. at 1.  Under the section of the Final Award titled "Award," the arbitrator again states:  "The Partial Final Award dated November 30, 2020 is hereby incorporated within this Final Award."  *Id.* at 10.  White Oak does not mention, let alone explain, how its position can be squared with these unambiguous statements in the Final Award.  Rather, White Oak invokes the portion of the Final Award denying "[a]ll claims not expressly granted herein," but it blinks reality to suggest that a generic statement denying all other claims was intended to reverse findings the arbitrator expressly reaffirmed and incorporated no less than three times in the Final Award.  *See* FA at 1, 6, 10.  On the contrary, the arbitrator was clearly denying the battery of misdirected allegations that White Oak advanced against the arbitrator in an attempt to overturn the findings in the Partial Final Award.  *See id.* at 1-6 (rejecting White Oak's "claims ... that the Arbitrator engage in major procedural due process violations").

Moreover, as is apparent from the express language in the Final Award, the arbitrator did not revisit or revise the liability findings made in the Partial Final Award, but rather limited the new findings in the Final Award to a determination of the *amounts* awarded.  As the Final Award states:  "The reasons governing the finding that Respondent must disgorge all assets, and some fees, and profits, are more fully set out in the Partial-Final Award ... (appended) and will not be repeated in this section ... as the focus will be on the actual computation of the damages amount

due." FA at 6. *See also id.* at 1 ("The merits of this matter were heard during a week-long-proceeding [in December 2019], and a Partial Final Award was issued ... leaving the decision regarding the issues of Damages ... and Attorneys' Fees and Costs ... to be addressed thereafter in this instant Final Award"); *id.* (describing the "substantive issues" addressed in the Final Award as "damages and attorneys' fees/costs"); FA at 6 (arbitrator decided "the issues of this case in two steps, by first deciding the case on the merits and then moving on to damages and attorneys' fees and costs"). The Final Award did "modify" "*certain areas* of the PFA," FA at 8 (emphasis added), but the modifications are as expressly stated in the Final Award itself—*viz.*, clarifying that White Oak's disgorgement of Plan assets need not be in "all cash," and allowing White Oak to "offset[]" performance fees from the total fees and profits that it must disgorge. *Id.* at 6, 9, 10.

Nor is it credible for White Oak to attempt to brush aside its breaches of ERISA fiduciary duties as mere "technical" violations. *See, e.g.*, Opp. at 5, 7. White Oak violated its duties of loyalty and care under ERISA 404 and 406(b) owed to the Plan and to New York's nurses, the Plan beneficiaries. The Second Circuit has observed that fiduciary duties under ERISA are "the highest duty known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 221 (2d Cir. 2007). As that court explained, ERISA Section 406(b) "protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). Indeed, the "'crucible of congressional concern'" when it drafted ERISA was precisely the type of "'misuse and mismanagement of plan assets,' particularly self-dealing by plan managers" that White Oak was found to have engaged in here *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8, 105 S. Ct. 3085, 3090 n.8 (1985)). White Oak's effort to downplay the gravity of its breach of fiduciary duties finds no support in the law nor in the arbitrator's awards.

Finally, White Oak's objection to the declaratory relief sought by the Plan is

unwarranted.  Opp. at 25.  The Plan asks that, as part of confirming the arbitration awards, the

Court simply reduce to a declaration the arbitrator's liability findings—specifically, that White

Oak breached its fiduciary duties to the Plan (see above) and that the Trustees neither had

knowledge of, nor participated in, White Oak's breach of fiduciary duties, *see* PFA at 31-32—

the latter of which White Oak does not contest.  In other words, the Plan asks this Court only to

convert the liability findings that are "'already [contained in] a final arbitration award'" into "'a

judgment of the court,'" Opp. at 25 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d

Cir. 1984)).  A number of courts have recognized such relief is appropriate.  *See JB Hunt

Transp., Inc. v. BNSF Ry. Co.*, 9 F.4th 663, 669 (8th Cir. 2021) ("assuming Hunt's interpretation

of the Award is correct, it was entitled to a declaratory judgment to that effect once the district

court had confirmed the Award"); *Util. Workers Union of Am. v. Missouri-American Water Co.*,

No. 4:09 CV 1875 (DDN), 2010 WL 3908933, at *3 (E.D. Mo. Sept. 30, 2010).

The cases cited by White Oak are not to the contrary.  None address requests for

declaratory relief that simply confirms liability findings rendered in a final arbitration award;

rather, the courts in those cases rejected a party's request to adjudicate standalone claims

separate and apart from confirming the arbitration award.  *See* Opp. at 25 (citing *Trs. for the

Mason Tenders Dist. Council Welfare Fund Pension Plan, Annuity Fund & Training Program

Fund v. Odessy Constr. Corp.*, No. 1:14-cv-1560 (GHW), 2014 WL 3844619 (S.D.N.Y. Aug. 1,

2014) (treating complaint as "petition to confirm an arbitration award" and declining to address

"*adjudication* of ERISA claims") (emphasis added);  *Alpaca Shop Franchise Co. v. Roxburgh*,

No. 3:05 CV 1203 (SRU), 2010 WL 2976918, at *4 (D. Conn. July 22, 2010) (refusing to award

"reasonable storage costs" because that was "an argument that must be arbitrated pursuant to the arbitration provision" in the parties' agreement).

**B.      The Arbitrator Ordered that White Oak be Removed as a Fiduciary.**

White Oak is equally off base when it purports to "oppose" confirmation of the relief awarded by the arbitrator.  Chief among the remedies awarded in the Partial Final Award was "removal [of White Oak] as fiduciary/investment manager of the Plan's assets."  PFA at 36.  By "incorporat[ing]" the Partial Final Award into the Final Award, the arbitrator reaffirmed that White Oak must be removed as the Plan's fiduciary and investment manager.  *See* FA at 10.  The arbitrator directed White Oak's removal "[i]n light of the numerous prohibited transactions it has engaged in, as well as breaches of the IMA, as set forth in the ... partial final award."  PFA at 36.

Removal of White Oak as fiduciary and investment manager is a critical component of the relief awarded by the arbitrator.  As detailed in the arbitrator's Partial Final Award, part of the basis of White Oak's self-dealing and breach of its ERISA fiduciary duties was the fact that White Oak used its authority as the Plan's investment manager to lock the Plan's assets into proprietary White Oak funds, without allowing the Plan a mechanism for retrieving its money and exiting the relationship with White Oak.  As the arbitrator put it:  "White Oak violated ERISA Section 406(b)(1) … by executing the [White Oak] Pinnacle and Summit feeder subscription [agreements] pursuant to its fiduciary authority ... that resulted in its ability to control Plan assets and earn fees on the assets, despite its termination of the IMA with the Plan."  PFA at 22.  Accordingly, among the key remedies sought by the Plan and granted by the arbitrator was to remove White Oak's "ability to control Plan assets."  *Id*. at 22.

White Oak addresses this component of relief only in passing, asserting without supporting citation that it has "made a full in-kind distribution ... of all the Plan's assets," is "no longer managing any of the Plan's assets," and therefore, the Plan's request "that White Oak be

removed ... makes no sense."  Opp. at 25.  Even if those factual predicates were true (which, as explained below, they are not), is it well settled in this Circuit that whether a party has "complied with the awards ... is immaterial to whether this Court should confirm the awards, because confirmation simply turns an award into an enforceable judicial order."  *Truong*, 2009 WL 798937 at *1.  As the Second Circuit made clear, "prior compliance" with an arbitration award is not "a ground for refusal to confirm an arbitration award."  *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).  *See also Schusterman v. Mazzone*, 19 Civ. 212 (PAE), 2019 WL 2547142, at *4 (S.D.N.Y. June 19, 2019) ("prior compliance is not a ground for refusal of confirmation of an arbitral award"; "issues of compliance and confirmation are distinct from each other") (internal quotations omitted); *Loc. 30, Int'l Union of Operating Eng'rs, AFL-CIO v. Wood Grp. Power Operations LLC*, CV 13-02499 (GRB), 2014 WL 12831796, at *3 (S.D.N.Y. Aug. 4, 2014) ("Whether a party has complied with the arbitration award has no bearing on whether the arbitration award should be confirmed.") (internal quotations and alterations omitted). Accordingly, compliance with an arbitration award becomes relevant only when a party seeks to enforce the court's order confirming the award, as the Plan anticipates it will be required to do here.  *See Zeiler*, 500 F.3d at 170 ("[E]nforcement is not confirmation.  Once confirmed, the awards become enforceable court orders").

In any event, White Oak's assertion that it has disgorged the Plan's assets and is "no longer managing any of the Plan's assets" is false, as one might suspect from the fact that White Oak provides no support for that statement.  White Oak's purported "in-kind distribution" neither distributed all of the Plan's assets to the Plan nor removed White Oak as the Plan's fiduciary and investment manager.  For example, the purported distribution of Plan assets included equity interests in entities that are either affiliates of White Oak or managed by White Oak.  *See*

Schwartz Decl. ¶¶4–5.  The so-called "distribution" of Plan assets also included a note for a loan that White Oak caused the Plan (without Plan knowledge or consent) to make in favor of White Oak's affiliates.  *See id.*  Even after being ordered to do so, White Oak has failed to relinquish the Plan's assets, leaving it in breach of the awards.

For the reasons given above, the Plan will defer providing a full explanation of White Oak's failure to comply with the arbitration awards until the point at which it seeks to enforce the Court's judgment.  For purposes of the Plan's current petition to confirm the awards, the only relevant consideration is whether there is a valid basis to vacate, modify, or correct the arbitrator's award ordering removal of White Oak "as fiduciary/investment manager of the Plan's assets."  PFA at 36; FA at 1, 10 (incorporating Partial Final Award).  Because there is no such basis—indeed, White Oak does not even suggest that there is—the Court must grant the petition.  *See* 9 U.S.C. § 9.

### C.    The Arbitrator Ordered White Oak to Disgorge Plan Assets Valued at more than $96 million.

Similarly misplaced is White Oak's attempt to construe the awards as "requiring the Plan to accept an in-kind distribution," Opp. at 23—by which White Oak means a purported transfer of the Plan's fractional minority interests in the underlying debt and equity investments.  The plain language of the arbitrator's awards, however, is to the contrary.

The Final Award reaffirmed the arbitrator's prior determination that "Respondent must disgorge all assets"—that is, "White Oak shall disgorge the NAV [net asset value] of the Plan," which the arbitrator found amounted to "$96,213,778.83."  FA at 6, 10, 11; *see also* PFA at 35 (determining that "[t]he Plan must be granted the NAV of its investments" and ordering "[d]isgorgement" … of [a]ssets).  The arbitrator clarified in her Final Award that White Oak is

-11-

not required to return the $96,213,778.83 in "all cash," but contemplated that some amount of the Plan's assets will be returned in cash.  FA at 9-10.

Those provisions must also be read in light of the other relief awarded, including the order directing White Oak's removal as a fiduciary and investment manager.  *Cf. In re Bay Harbour Assocs., L.P.*, 56 F. App'x 21, 23 (2d Cir. 2003) ("It is a cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other.") (internal quotations omitted).  When read together, those two components of relief direct White Oak to disgorge the Plan's assets and permit White Oak to disgorge the assets in a form other than "all cash," but only to the extent consistent with (i) White Oak's obligations to disgorge "all assets" at their net asset value, FA at 6, 10, and (ii) its "remov[al] as investment manager," PFA at 36; FA at 10 (incorporating Partial Final Award).  In other words, the total value of the assets disgorged must equal at least the net asset value that the arbitrator determined (more than $96 million), and the disgorgement, in whatever form, must not leave any assets with White Oak or permit White Oak to continue serving as the Plan's investment manager.

White Oak does not contest that it was ordered to disgorge the Plan's assets, but contends that the arbitrator "adopted White Oak's argument" that it could satisfy its obligation to disgorge assets entirely through an "in-kind distribution" of its own devising.  Opp. at 20.  White Oak points to the passage of the Final Award that quotes the termination provision of the parties' investment management agreement ("IMA"), which White Oak argues contemplated an in-kind distribution upon termination of the IMA.  Opp. at 20 (quoting FA at 9); *see also id*. at 16-17, 11. But neither that passage nor any other in the Final Award "requir[es] the Plan to accept an in-kind distribution," Opp. at 23, and none of White Oak's arguments are to the contrary.

*First*, and most obviously, the express terms of the Final Award order White Oak to "disgorge the NAV" of the Plan's investments, FA at 10, and nowhere "adopt" the position that the disgorgement should take the form only of an in-kind distribution. Indeed, the arbitrator acknowledged in the Final Award that "Respondent avers" that the arbitrator's Partial Final Award would allow it to "make an in-kind distribution," FA at 7, but, the arbitrator conspicuously did not award an "in-kind distribution," and instead ordered White Oak to "disgorge" the value of the Plan's assets and determined that the "total of all Plan assets" amounted to "96,213,778.83."  FA at 10, 11.

*Second*, the arbitrator's reference to the IMA language quoted in the Final Award was made in the context of clarifying that disgorgement of Plan assets need not take the form of "all cash damages."  FA at 9.  That, however, does not amount to an agreement that White Oak may distribute the Plan's minority interests in the investments solely "in kind."  On the contrary, the Final Award emphasizes that some of the Plan's assets would be paid to the Plan in cash.  For example, the arbitrator reiterated in the Final Award that "it is irrelevant whether the 'cash' to be returned is currently encumbered ... or is not readily available as it is not the Plan's burden to locate the source of such funding."  *Id*. at 9-10.

*Third*, the tribunal's refusal to order an in-kind distribution makes sense in light of—and is the only reading of the Final Award that is consist with—the arbitrator's parallel rulings that White Oak must "disgorge all assets" at the net asset value, FA at 6, 10, and be "remov[ed] as fiduciary [and] investment manager." PFA at 36; FA at 10 (incorporating Partial Final Award). That is because White Oak's purported "in-kind distribution" does not "disgorge all" of the Plan's "assets" to the Plan, nor does it give the Plan control over its investments, but rather leaves White Oak in place as an investment manager and fiduciary.  *See* Schwartz Decl. ¶¶4–5.

-13-

For that same reason, the in-kind distribution that White Oak advocates for cannot be squared with the arbitrator's express findings of liability, including her determination that White Oak violated ERISA precisely by locking the Plan's money in investments under White Oak's control—the same result that would be occasioned by White Oak's in-kind distribution. *See* PFA at 25 (concluding that White Oak breached its fiduciary duties "by creating the situation of preventing the Plan from reclaiming its assets and using the funds in a manner not contemplated pursuant to the language of the IMA...").

Thus, White Oak proposes a "reading" of the Final Award according to which the arbitrator directed disgorgement of Plan assets in a form that would simultaneously undermine other aspects of her own findings and award. That position strains the bounds of plausibility. When read as a whole, the awards make apparent that the arbitrator ordered White Oak to "disgorge all assets," but allowed that such disgorgement may not be in the form of "all cash," so long as it is consistent with the other relief awarded. Thus, to the extent that a distribution of the Plan's assets in forms *other* than cash would not equate to $96 million in value and/or cannot be accomplished in part or whole consistent with the arbitrator's order that White Oak be "removed" as a fiduciary and investment manager, the clear import of the Final Award is that the value of any such assets will be returned in "cash." *See* FA at 9-10.

*Fourth*, contrary to White Oak's suggestion, the arbitrator did not award merely "contractual" relief under the IMA. Opp. at 29, 2. As described above, the basis of White Oak's liability was its "numerous" breaches of fiduciary duty under ERISA 404 and 406(b)(1). *Supra* Sec. I.A. And it was under ERISA that the arbitrator awarded the Plan its attorneys' fees and costs. *See* PFA at 36 (awarding fees "by statute"); FA at 10. The only contract-based claim that the Plan asserted was for breach of the "Most Favored Nations" clause in the IMA, but that sole

contract-based claim was denied.  *See* PFA at 27.  It is thus implausible to suggest, as White Oak does, that the arbitrator awarded "contractual relief" under the IMA, Opp. at 29, when the basis for White Oak's liability was its breaches of its statutory ERISA duties.

*Fifth*, equally unavailing is the notion that the arbitrator's statement that White Oak "attempted in writing to return the Funds to the Plan" justifies reading White Oak's in-kind distribution limitation into the award.  FA at 9.  As the arbitrator determined in the Partial Final Award, in December 2017, White Oak notified the Plan that it was unilaterally terminating the IMA, effective 90 days from notice.  PFA at 14.  "The Plan exercised its right ... to extend the IMA for a six-month period."  *Id*.  In the interim, the Plan initiated arbitration against White Oak in July 2018.  *Id*.  After the arbitration began, on September 18, 2018, the day termination of the IMA became effective, White Oak "wrote to the Plan indicating that it intended to 'treat the IMA as if [it] were still in effect despite the notice of termination ... unless White Oak receives other instructions from the Trustees, While Oak will maintain the status quo....'  *Id*. at 14-15.  In the Final Award, the arbitrator remarked that "White Oak should not be penalized for the Plan's lack of action in notifying [White Oak] that it had a new investment manager or some other means of handling its funds, though it was clear that it was unhappy with White Oak at the time."  FA at 9.  Nothing in those remarks finds that White Oak "repeatedly" offered to make an "in-kind distribution," Opp. at 2, nor did the arbitrator state that White Oak is now required to distribute assets only in kind.

At best, the arbitrator's remarks explain why she later concluded that White Oak may "retain[]" "performance fees," while reaffirming that it must still disgorge "all assets, and some fees, and profits."  FA at 10, 6.  The award of "some fees, and profits" was made in tribute to White Oak's years-long breach of its ERISA fiduciary duties that were ongoing well before

September 2018, including without limitation collecting nearly $2 million in retroactive management fees from the Plan on "Day One" of the investments, putting the Plan's assets at risk to benefit White Oak, and "executing" investment documents in 2014 "that resulted in its ability to control Plan assets and earn fees on the assets, despite its termination of the IMA." PFA at 21, 22, 28.

*Sixth*, similarly unfounded is White Oak's passing argument, made in a footnote, that the arbitrator did not order White Oak to "return … assets valued at $96 million."  Opp. at 23 n.11. The Final Award states that "White Oak shall disgorge the NAV [net asset value]" of the Plan's investment, and concludes that "[t]he total of all Plan assets as of May 19, 2021 [the day of the parties' submissions] is $96,213,778.83."  FA at 10, 11.  The only plausible reading of the Final Award that gives meaning to both statements is that the arbitrator ordered White Oak to disgorge the Plan's assets valued at $96,213,778.83.

*       *       *

White Oak separately purports to "oppose" confirmation of the award on the ground that "White Oak has already made the in-kind distribution" and that the "Plan has already accepted it," therefore, "confirming the award ... would serve no practical purpose."  Opp. at 23.  As discussed above, "[w]hether a party has complied with the arbitration award has no bearing on whether the arbitration award should be confirmed."  *Wood Grp. Power Operations*, 2014 WL 12831796, at *3 (internal quotations and alterations omitted).  Thus, for present purposes, it suffices to note that, although White Oak purports to have made an "in-kind distribution" of the Plan's assets, that transfer does not comply with the arbitrator's orders for the reasons discussed above (among others).  Nor did the Plan "accept" the disputed transfer from White Oak; on the

contrary, the Plan repeatedly objected in writing to the transfer and White Oak's refusal to comply with the arbitrator's awards.  *See* Phillips Reply Decl. ¶8.

In short, White Oak does not contend that the award ordering White Oak to "disgorge" the net asset value of the Plan's assets should be vacated, modified, or corrected, and its attempts to contort that plain language of the awards to require only an "in-kind distribution" are inconsistent with the award's text and intent.  Accordingly, the Court should grant the Plan's request to confirm the arbitrator's award ordering White Oak to disgorge Plan assets valued at $96,213,778.83.

### D.  The Arbitrator Ordered White Oak to Disgorge More than $9 Million in Management Fees.

Equally flawed is White Oak's argument that the "Award did not grant the Plan management fees," Opp. at 23, which similarly contradicts the plain language of the awards and would require the Court to rewrite the Final Award to substitute the term "performance fees" for "management fees."

#### 1.  White Oak's arguments cannot be squared with the plain language of the awards.

The Partial Final Award ordered White Oak to "disgorge[] ... profits, and any fees White Oak collected, including all Day One Fees, from the time White Oak first collected any fees from the Plan until the date that the assets are returned to the Plan."  PFA at 35.  The order to disgorge "profits and any fees" applied to the two types of compensation White Oak accrued for managing the Plan's investments—performance fees and management fees, the latter of which includes the $1.9 million "Day One Fees."  *See* PFA at 27-28; Dkt. 18 ("Plan Br.") at 7-8.  In the Final Award, the arbitrator modified the Partial Final Award to account for "offsets" from the "amounts due" to the Plan.  FA at 6.  Specifically, the arbitrator concluded that "[p]erformance fees shall be retained by White Oak and not returned to the Plan."  FA at 10.  Apart from that

express "offset," the Final Award otherwise "incorporated" the findings in the Partial Final Award, including the requirement that White Oak disgorge all management fees such as the "Day One Fees" it collected.  *Id*. at 1, 10.  The arbitrator in fact emphasized in her Final Award that she was reaffirming her prior determination ordering White Oak to disgorge management fees, stating: "The reasons governing the finding that Respondent *must disgorge* all assets, *and some fees, and profits*, are more fully set forth in the Partial Final Award...."  FA at 6 (emphasis added); *see also id*. at 8 (discussion under the heading "*damages* and attorney fees and costs") (emphasis added).

In view of the express terms of the arbitrator's awards, White Oak's assertion that the Final Award "nowhere states that it is awarding disgorgement of any fees or profits," and that the arbitrator awarded "no damages," Opp. at 23, 1, simply ignores the clear text of the Final Award. Nor can the Final Award be squared with White Oak's view that when the arbitrator allowed White Oak to retain "performance fees," that was "clearly a reference to the management fees." Opp. at 24.  The Final Award specifically identified "performance fees" as the only type of fees that White Oak is permitted to retain.  And there is no question that "management fees" and "performance fees" (also known as incentive fees or carried interest) are different types of compensation that White Oak could earn under the IMA for managing the Plan's investments. *See* Dkt. 30.1, Phillips Decl., Ex. C at NYSNA00000959; *see also* Dkt. Plan Br. at 10-11.

White Oak points out that the Plan's expert, Mr. Simon, "described management fees as fees for 'managing the business and affairs'" of the investments, but nothing about that characterization supports White Oak's position.  Opp. at 24 (citing Dkt. 31.18, Cauley Decl., Ex. R at ¶12).  On the contrary, management and performance fees were the two types of compensation that the IMA contemplated White Oak could earn precisely for "managing" the

Plan's investments.  The principal "service" that White Oak was contracted to render under the IMA was "the power and obligation to *manage* the Investment Account."  Dkt. 30.1, Phillips Decl., Ex. C at NYSNA00000915 (emphasis added).  Section 9 of the IMA states that the "sole compensation of the Investment Manager for the services rendered hereunder" is as "set forth in Schedule C."  *Id.* at NYSNA00000929.  Schedule C, in turn, contemplated both "management fees" and "carried interest" (*i.e.*, performance fees) as compensation for White Oak's contracted services —that is, for, "manag[ing] the Investment Account."  *Id.* at NYSNA00000959; NYSNA00000915.  Thus, the fact that Mr. Simon characterized management fees as compensation for "managing the business and affairs" of the Plan's investments, and that the arbitrator used similar phrasing, in no way differentiates management fees from performance fees—both types of fees were compensation rendered for managing the investments.[4]

Moreover, the arbitrator herself repeatedly distinguished between "management fees" and "performance fees" in her written awards.  *See* PFA at 5 (discussing the IMA's provisions allowing White Oak to earn "performance fee, or 'carried interest,' of 20%" and "management fee" of 1.35%); *see also id.* at 15 (finding that as of "June 30, 2019, the Plan has paid White Oak a total of approximately $5,346,777 in management fees"); *id.* at 27 (discussing "performance fee").  Performance fees and management fees were also separately calculated as part of the parties' submissions on the amounts White Oak owes to the Plan.  *See* Dkt. 30.2, Phillips Decl., Ex. M at 1 (separately identifying management fees and performance fees); *id.* at 4 (calculating performance fees); *id.* at 5 (calculating management fees); *see also* Dkt. 21.11, Phillips Decl.,

---

[4] Indeed, as is clear from the portion of the record White Oak cites, Mr. Simon was not offering an opinion as to how management fees differ from performance fees.  Rather, Mr. Simon was rebutting another specious White Oak argument—the claim that the management fees White Oak collects are used to "reimburse expenses" rather than constituting income earned by White Oak.  *See* Dkt. 31.18, Cauley Decl., Ex R at ¶12.  As Mr. Simon pointed out, White Oak's own financial statements separately itemize "expenses" from "management fees."  *Id.*

Ex. K at 1-66 (White Oak quarterly statements separately identifying "management fee" and "incentive allocation").  Thus, if the arbitrator had intended to say that White Oak was entitled to retain "*management fees*," rather than "performance fees," she would have used those very words, as she did numerous times in the Partial Final Award.  And if White Oak were correct that the Final Award granted neither performance nor management fees to the Plan, then the arbitrator would not have needed to specifically address performance fees.

That conclusion is not altered by White Oak's argument that it has not "received any fees based on performance" so there are "no performance fees for White Oak to retain."  Opp. at 23. White Oak accrued performance fees and deducted them from the reported net asset value of the Plan's assets on a quarterly basis.  *See* Dkt. 31.18, Cauley Decl., Ex. R at ¶¶2-6; *see, e.g.*, Dkt. 21.11, Phillips Decl., Ex. K at 17 (Statement of Capital Account for the Quarter Ending December 31, 2017, subtracting "estimated incentive allocation" from "capital balance").  By allowing White Oak to "retain" performance fees, White Oak is permitted to keep the value of the performance fees that it reported as accrued and deducted from the reported value of the Plan's assets over the life of those investments.  *See* Dkt. 31.18, Cauley Decl., Ex. R at ¶5.

Similarly unfounded is the claim that the management fees White Oak collected were found to not constitute "profits."  Opp. at 13.  As an initial matter, it is irrelevant whether all of the management fees that White Oak was ordered to disgorge were entirely profit, because the arbitrator made clear that White Oak "must disgorge ... some *fees*" as well as "profits."  FA at 6 (emphasis added).  Further, White Oak's claim that the Plan's expert "conceded" that White Oak earned no profits and that management fees were simply to pay for "overhead" is entirely without support.  Opp. at 17.  Mr. Simon made no such statement and in fact opined that the management fees White Oak collected represented income precisely because they were "not

reimbursement of expenses that White Oak incurred." Dkt. 31.18, Cauley Decl., Ex. R at ¶12.

Moreover, it strains credulity to suggest that White Oak would agree to a compensation

arrangement under which it made no net profit.[5]

> ### 2. White Oak's reliance on arguments the arbitrator rejected cannot be used to evade the express terms of the awards and are incorrect on their own terms.

White Oak fares no better by rehashing its old arguments that were not credited by the

arbitrator and which cannot be used to override the express language in the awards.  For

example, White Oak claims that the management fees it charged were "reasonable"—a position

White Oak repeatedly, but unsuccessfully, attempted to convince the arbitrator to adopt.  Opp. at

13; *see also* Dkt. 31.8, Cauley Decl., Ex. H at 9.  The Trustees have never disputed that the rate

of management fees they authorized under the IMA would have been reasonable compensation

for the services it agreed to under the IMA, but White Oak did not deliver on those services and

instead engaged in self-dealing and "numerous prohibited transactions" under ERISA.  *See* PFA

at 15, 21, 22, 23, 25; FA at 10 (incorporating Partial Final Award).

Nor is it the case, as White Oak contends, that it is "undisputed" that "White Oak

collected no more in management fees than it was entitled to collect."  Opp. at 13.  White Oak

cites to testimony confirming that White Oak charged "a 1.35 percent management fee on

committed capital," Dkt. 31.5, Cauley Decl., Ex. E (Tr. 519:17-25), but that has nothing to do

with, and does not contradict, the arbitrator's finding that White Oak extracted fees from the Plan

---

[5]  In that regard, it bears mention that, notwithstanding that it was White Oak's burden, as the party "found to have breached their fiduciary duties," "to prove what, if any, claimed amounts were not gained through use of plan assets," *Leigh v. Engle*, 727 F.2d 113, 138-39 (1984), White Oak did not submit *any* evidence regarding the compensation it collected as a result of the Plan's investments (gross amount, net profit, or otherwise) and instead relied on vague, unsupported assertions of counsel.  *See, e.g.*, Opp. at 13 (citing to Dkt. 31.12, Cauley Decl., Ex. L, a collection of White Oak written submissions that contain no evidence as to what profits or amounts White Oak collected through use of Plan assets).  Indeed, as the arbitrator noted, White Oak "refused to participate" in the process she initially ordered to determine amounts to be disgorged.  FA at 6-7.

that were not authorized.  Most obviously, as the arbitrator concluded, White Oak did not

provide any services to the Plan from March 2012 to January 2014—the nearly two years before

the IMA went into effect—yet White Oak charged more than $1.9 million in retroactive so-

called "Day One" management fees for that period.  *See* PFA at 28 ("The IMA does not

authorize payment of a Day One Investor Fee ... [and] White Oak could not have provided any

fiduciary services before the IMA was in effect.").  As the tribunal found, even White Oak's

managing partner testified at the December 2019 hearing that she "cannot" "identify any

provision in Schedule C [the fee provision of the IMA] that specifically permits White Oak to

assess and receive fees for time periods prior to the effective date of the execution of the IMA."

PFA at 27-28.[6]  Even as to periods when the IMA was in effect, White Oak did not deliver on the

array of fiduciary services it promised to provide the Plan under the IMA and instead engaged in

years' long breach of its ERISA fiduciary obligations.  Accordingly, the notion that White Oak's

breaches of fiduciary duties "did not cause any damages to the Plan," Opp. at 19, is

demonstrably false and was rejected by the tribunal.

White Oak is equally unsuccessful in attempting to resuscitate its arguments that Second

Circuit law somehow forecloses disgorgement of management fees.  *See* Opp. at 17 & n.9.

White Oak points to the Second Circuit decision in *Lowen*, but the Second Circuit explained in

that case that an investment manager does not engage in prohibited self-dealing under ERISA

simply by receiving a reasonable fee for services rendered and agreed to by trustees.  *See Lowen*,

829 F.2d at 1216 ("Section 408(c)(2) provides that Section 406 shall not be construed to prohibit

---

[6] White Oak again rehashes (Opp. at 18) a failed argument that it repeatedly advanced in the arbitration—*viz.*, that the Plan supposedly made a "net benefit of $700,000" as a result of White Oak charging retroactive management fees—a claim that the arbitrator disregarded and which is found nowhere in her lengthy factual findings in the Partial Final Award.

any fiduciary from receiving any reasonable compensation for services rendered") (internal quotations omitted).  As explained above (and to the arbitrator), that is beside the point because, as the arbitrator found, the basis of White Oak's liability under ERISA is that it gave itself benefits and compensation that were *not* permitted under the IMA.  *See* PFA at 15 ("White Oak has engaged in numerous prohibited transactions ... and ... received either compensation or benefits beyond that agreed to by the Trustees under the IMA.").  Indeed, there is no question that management fees can be disgorged as a remedy under ERISA.  The New York district court did just that in *Severstal Wheeling*, where the court ruled that disgorgement of the "investment management fees" was "necessary and appropriate to make the plans whole" "[i]n light of Defendants' near-total dereliction of their duties under the Severstal Investment Management Agreement."  *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 269 (S.D.N.Y. 2015).  The arbitrator awarded the same here in light her findings of White Oak's "numerous prohibited transactions" under ERISA.  PFA at 15.

*     *     *

White Oak does not dispute that the amount of management fees it collected in connection with the Plan's assets totaled at least $9,493,641.05.  Nor could there be a basis to dispute that figure, which comes directly from the quarterly financial statements White Oak sent to the Plan.  *See* Plan Br. at 10; Dkt. 21, Phillips Decl. at ¶¶24-25; *id.* Ex. K at 1-66 (White Oak quarterly statements identifying "management fee" charged), Dkt. 30.2, Phillips Decl., Ex. M at 1 (identifying total management fees collected over life of the Plan's investments through December 31, 2020).

Accordingly, because there are no valid grounds to vacate, modify, or correct the arbitrator's award of management fees—nor has White Oak requested any such relief—the Court

-23-

should confirm the arbitrator's award ordering White Oak to disgorge $9,493,641.05 in management fees to the Plan.

## II.      There is No Basis to Vacate the Arbitrator's Award of Attorneys' Fees and Prejudgment Interest.

White Oak's cross-motion to vacate the portions of the arbitrator's orders awarding attorneys' fees and prejudgment interest on grounds that they were rendered in "manifest disregard of the law," is devoid of any support in the law and serves only to further demonstrate how far White Oak departs from any plausible "reading" of the arbitrator's written awards.

It is well established that a "motion to vacate ... is not an occasion for *de novo* review of an arbitral award." *Wallace*, 378 F.3d at 189. Rather, a court must confirm an arbitration award so long as there is "even a barely colorable justification for the outcome reached." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997). And, "[e]ven where explanation for an award is deficient or non-existent, [a court] will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." *T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).

"A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair*, 462 F.3d at 110. The FAA identifies four limited grounds that may warrant vacatur of an arbitration award, which require showing "corruption, fraud," "evident partiality," "misconduct" on the part of the arbitrator in "refusing to hear evidence," or instances where the arbitrator "exceeds [its] powers" or fails to render a final award. 9 U.S.C. § 10(a)(1)-(4). White Oak does not invoke any of those rare exceptions to summary confirmation under the FAA, and instead claims the arbitrator acted in "manifest disregard of the law." The Second Circuit has repeatedly admonished that "'manifest disregard of law' as applied to review of an arbitral award is a severely limited doctrine," which should be

applied "as a doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Wallace*, 378 F.3d at 189 (internal quotations omitted).

To vacate an arbitration award on that basis, White Oak must "prov[e] that: (1) the arbitrator knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator was well defined, explicit, and clearly applicable to the case." *D.H. Blair*, 462 F.3d at 110-11 (reversing district court and concluding that arbitrator's award of prejudgment interest on punitive damages was "not manifestly contrary to the law"). *See also Seneca Nation of Indians*, 988 F.3d at 626 ("To succeed in challenging an award under the manifest disregard standard, a party must make a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.") (internal quotations omitted).  Indeed, the standard is so exacting that it will not be met even by demonstrating that "the controlling legal principle and subsequent error is so obvious to the average qualified arbitrator that any different conclusion is absurd," unless there is also evidence that the "arbitrators actually knew of—and intentionally disregarded—the law." *D.H. Blair*, 462 F.3d at 111 (internal quotations omitted).  In other words, a party must "do more than show that the arbitrator committed an error—even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671, 130 S. Ct. 1758, 1767 (2010).

For the reasons given below, White Oak does not come close to making that showing as to the arbitrator's decision to award attorneys' fees and prejudgment interest to the Plan.

A.      **The Arbitrator's Award of Attorneys' Fees and Costs Was Not Rendered in "Manifest Disregard of the Law."**

The arbitrator held that the Plan was entitled to recover its attorneys' fees and costs under ERISA "because, by statute, the Plan achieved at least '*some* success' on the merits."  PFA at 36 (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254, 130 S. Ct. 2149, 2157 (2010)); *see also* 29 U.S.C. § 1132(g)(1) ("In any action under this subchapter [] by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.").  In the Final Award, the arbitrator concluded that the Plan was entitled to recover the attorneys' fees and costs it requested, but "reduced by 20% since the Plan did not prevail" on its contract claim under the "Most Favored Nation" clause in the IMA.  FA at 10.

Under ERISA, an award of fees and costs is warranted where a claimant "achiev[es] some success" on the merits, "even if not major success."  *Hardt*, 560 U.S. at 254, 130 S. Ct. at 2157 (claimant need not meet "'prevailing party' standard" in order to be awarded fees, which Congress intended to be available to "partially prevailing parties").  That deferential standard flows from the well-settled principle that "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating employee benefits rights."  *Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 155 (2d Cir. 2013) (internal citations omitted); *see also Donachie v. Liberty Life Assur. Co.*, 745 F.3d 41, 45-6, 47 (2d Cir. 2014) ("it is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights ... [G]ranting a prevailing plaintiff request for fees is appropriate absent some particular justification for not doing so.").

Against that legal background—and the arbitrator's findings that White Oak engaged in "numerous prohibited transactions" under ERISA and rejecting White Oak's counterclaim—the

arbitrator's award of 80% of the Plan's fees and costs in no way constitutes the sort of "egregious impropriety on the part of the arbitrator[]" that could warrant vacatur. *Wallace*, 378 F.3d at 189.  White Oak's arguments do not change that conclusion.

> **1.    An award of attorneys' fees was warranted because the Plan achieved "some success" on the merits.**

White Oak principally contends that the award of fees and costs was supposedly in manifest disregard of the law because the Plan "failed to have *any* success" in the arbitration and received only the relief that "was available to it before the litigation began"—an argument that is as out of step with the law as it is with the text of the Final Award.  Opp. at 26, 28 (emphasis in original) (internal quotations omitted).

As explained above, the arbitrator found that White Oak engaged in "numerous prohibited transactions" and self-dealing conduct in violation of its ERISA fiduciary duties to the Plan (Sec. I.A), "in light of" which, the arbitrator awarded that White Oak be removed as fiduciary and investment manager (Sec. I.B), disgorge the Plan's assets valued at more than $96 million (Sec. I.C), and repay more than $9 million in management fees that White Oak improperly collected (Sec. I.D).  PFA at 15, 36; FA at 10-11.  In addition, the Plan prevailed against White Oak's counterclaim, which alleged that the Plan's trustees knew about, and participated in, White Oak's wrongful acts.  PFA at 31–32.  The very fact that the arbitrator awarded the Plan 80% of its attorneys' fees and costs underscores the baselessness of White Oak's claim that the Plan "did not prevail at the arbitration."  Opp. at 26.  Indeed, the arbitrator explained that she was reducing the amount of fees requested by 20% because the Plan did not prevail on its contractual *Most Favored Nations claim*—the obvious implication being that the award of 80% of the Plan's fees and costs was made in tribute to the Plan having prevailed on its far more significant ERISA claims as well as successfully defending against White Oak's

counterclaim.  FA at 10 ("Attorneys' fees and costs as proposed by the Plan, shall be reduced by 20% since the Plan did not prevail on all claims, notably the Most Favored Nation claim.").

The motion to vacate contends that attorneys' fees were "not properly awarded" because the Plan "fail[ed] to recover the relief that it sought," Opp. at 26, but that misconstrues the relevant governing law and is an unsupported characterization of the Final Award.  A party need only show "some degree of success on the merits," a standard that does not require showing that a party recovered all the relief it sought, nor is it meant to occasion a "lengthy inquiry into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Hardt*, 560 U.S. at 255, 130 S. Ct. at 2158.  White Oak cites to a handful of cases to support its position, Opp. at 27, but those cases do not involve facts that are remotely similar to this case, nor do any involve review of an arbitration award under the extremely deferential standards mandated by Second Circuit law.  In *Adler v. Raynor*, for example, the parties *settled* the matter and there had "been *no showing* of prohibited transactions" under ERISA.  No. 09 Civ. 08877 (DLC) (THK), 2011 WL 5024412, at *3 (S.D.N.Y. Oct. 20, 2011) (emphasis added).  By contrast, here, the arbitrator determined that White Oak engaged in "numerous prohibited transactions pursuant to ERISA Section 406(b)(1), [2]9 U.S.C. Sec. 1106(b)(1) and as a result received either compensation or benefits beyond that agreed to by the Trustees under the IMA." PFA at 15.  The other cases cited by White Oak are equally inapposite.  *See* Opp. at 27 (citing *Curtis v. Alcoa, Inc.,* No. 06–CV–448 (PLR) (CCS), 2014 WL 2895468, at *6 (E.D. Tenn. June 26, 2014) (declining to award attorneys' fees in litigation where the court "refused to endorse the Plaintiffs' positions, and instead, found that the Defendant's actions were permissible and reasonable"); *Brightman v. 1199SEIU Health Care Employees Pension Fund*, No. 18-cv-4932 (LJL), 2021 WL 809373, at * (S.D.N.Y. Mar. 2, 2021) (refusing to award attorneys' fees where

the only claimed "success" was "remand to the Committee for further consideration," which "is precisely the type of 'purely procedural victory' that the Supreme Court held in *Hardt* cannot entitle a party to a fee award").  Indeed, White Oak does not cite a single case where a court vacated an arbitrator's award of attorneys' fees on grounds that the award was in manifest disregard of the law.

Similarly unavailing is the suggestion that "the sole relief" awarded is an "in-kind distribution" that was available to the Plan before arbitration.  Opp. at 29.  First, the plan sought removal of White Oak as its investment manager on account of breaches of fiduciary duty and, even if that were to be accomplished solely through an in-kind distribution, that would constitute success on the merits.  Second, White Oak does not dispute that the Plan succeeded with respect to White Oak's counterclaim.  Thus, even assuming for the sake of argument that White Oak were correct that the arbitrator ordered only an in-kind distribution (which it did not), the Plan would still have achieved substantial success on the merits.  In *Hardt*, for example, the US Supreme Court held that the claimant there had achieved more than "trivial success" because, although she had "failed to win summary judgment" on her claim, she had "persuaded the District Court to find that the [defendant] ha[d] failed to comply with the ERISA guidelines." 560 U.S. at 255, 130 S. Ct. at 2158.  Subsequently, the defendant in *Hardt* reconsidered the claimant's application for disability benefits and awarded her the benefits she had requested.  *Id.* at 256, at 2159.  Similarly here, even assuming for the moment that the arbitrator awarded only a distribution "in-kind," the arbitrator was persuaded that White Oak engaged in "numerous prohibited transactions" and self-dealing conduct under ERISA and at a minimum compelled White Oak to "disgorge" the Plan's assets.  Moreover, as explained above, the arbitrator ordered

far more than that, including that White Oak disgorge assets valued at more than $96 million and $9 million in fees.

Finally, White Oak cannot carry its burden of proving manifest disregard of the law because it never argued to the arbitrator that an award of attorneys' fees would be improper if the arbitrator awarded only a distribution of the Plan's assets "in kind."  Phillips Reply Decl. ¶8. White Oak therefore cannot establish that the arbitrator "actually knew of—and intentionally disregarded—the law." *D.H. Blair*, 462 F.3d at 111; *see also id.* at 112 (award of prejudgment interest was not in "manifest disregard of the law" because there was "no evidence that [the respondent] informed the arbitrators of the legal error of which they now complain").

## 2.    White Oak's attempt to relitigate reasonableness of the fees and costs awarded fails.

White Oak incorrectly contends that the arbitrator's award of fees and costs should be vacated because the arbitrator "did not provide any explanation supporting the reasonableness of the Plan's requested" fees and costs.  Opp. at 30.  But it is axiomatic that an "arbitrator's rationale for an award *need not be explained*, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case."  *D.H. Blair*, 462 F.3d at 110 (emphasis added).  *See also T.Co Metals*, 592 F.3d at 339 ("[e]ven where explanation for an award is deficient *or non-existent*" a court must confirm the arbitration award "if a justifiable ground for the decision can be inferred from the facts of the case.") (emphasis added).

White Oak cites a Second Circuit decision suggesting that it stands for the proposition that a court may "'consider that absence of [an] explanation when deciding whether the [Arbitration] Panel has acted in manifest disregard of the law'" in awarding fees, but that case provides no such support.  Opp. at 29-30 (quoting *Porzig v. Dresdner, Kleinwort, Benson, N.A. LLC*, 497 F.3d 133, 142 (2d Cir. 2007)).  In *Porzig*, the Second Circuit held that the absence of a

rationale was only appropriate to consider when the "circumstances that exist in [that] case are present—namely, where a court has already taken the rare and extreme step of vacating the original award for being issued in manifest disregard of the law, where the Panel on remand has acted plainly outside its authority with respect to one facet of the award," and where the court is unable to "examine the Panel's analytical methodology on the very issue that required the original vacatur and remand." *Porzig*, 497 F.3d at 141-42.  Needless to say, none of those circumstances are present here.

White Oak also challenges the record upon which the arbitrator awarded the fees and costs, arguing that the invoices submitted by the Plan were "too heavily redacted" and that the Plan's rates and hours were unreasonable.  *See* Opp. at 30-31.  But, "the Second Circuit does not recognize manifest disregard of the *evidence* as proper ground for vacating an arbitrator's award."  *Wallace*, 378 F.3d at 193 (emphasis added).  In any event, White Oak's arguments were already presented to the arbitrator in several written submissions and were appropriately rejected by the arbitrator.  Those arguments fare no better now.

White Oak complains without basis that the Plan "submitted heavily-redacted invoices for the first time in its reply" brief supporting its fee application.  Opp. at 30.  As part of its initial fee application, the Plan provided invoices (without the narrative detail of work performed) and other documentation of its fees and costs. *See* Dkt. 11.20, Cauley Decl. Ex. T at ¶22; Dkt. 21.8, Phillips Decl., Ex. H at ¶2.  With its reply brief, the Plan submitted the narrative detail from the invoices, but with redactions covering the privileged and work-product protected material.  Dkt. 21.8, Phillips Decl., Ex. H at ¶14.  White Oak fails to mention that the arbitrator was provided fully unredacted copies of the invoices and White Oak was permitted a *sur-reply* after receiving the redacted invoices.  *Id.*; Dkt. 21, Phillips Decl. ¶14.  Redactions made to attorney invoices to

prevent disclosure of privileged and work-product protected information is routinely permitted in litigation and is not grounds for vacating an arbitrator's award of attorneys' fees and costs.  *See, e.g.*, *Major League Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa, S.A.*, No. 1:19-cv-8669 (MKV), 2020 WL 5518361, at *1, *4 (S.D.N.Y. Sept. 14, 2020) (refusing to vacate award of attorneys' fees where invoices provided to opposing party were "completely redacted"; "[N]o caselaw to suggest a manifest disregard of the law or fundamental unfairness with respect to the Arbitrator's decision to review MLB's invoices *in camera* over concerns of attorney-client privilege.  In fact, caselaw suggests the opposite...."); *Nat'l Union Fire Ins. Co. Pittsburgh, PA v. Odyssey Am. Reins. Corp.*, No. 05 Cv. 7539 (DAB), 2009 WL 4059183, at *3 (S.D.N.Y. Nov. 18, 2009) (refusing to vacate award of fees and costs where prevailing party had entirely redacted "all narrative descriptions" in invoices and provided arbitration panel with unredacted copies for *in camera* review with its reply brief).

Similarly, White Oak's complaints as to the hourly rates and work performed come nowhere close to establishing that the arbitrator "actually knew of—and intentionally disregarded—the law."  *D.H. Blair*, 462 F.3d at 111.  The fees and costs requested by the Plan were actually paid by the Plan on an ongoing basis throughout the arbitration, with no guarantee that the Plan would prevail in the arbitration against White Oak or that the Plan would recover its expenses.  Dkt. 11.20, Cauley Decl. Ex. T at ¶31; Dkt. 21.8, Phillips Decl., Ex. H at ¶18.  As is well established in this Circuit, the fact that a client "paid the[ ] bills ... is prima facie evidence of the reasonableness of the amount as a whole (beyond just the reasonableness of the hourly rates charged), since [the client] could not have assumed that it would be reimbursed in full, or even in part."  *Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 Civ. 139 (GEL), 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009).  *See also Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*,

212 F. Supp. 2d 226, 230-31 (S.D.N.Y. 2002); *Cooper Dev. Co. v. Friedman*, No. 92 Civ. 7572 (JSM), 1994 WL 172401, at *1 (S.D.N.Y. May 4, 1994).  Moreover, the Plan paid each timekeeper's customary rates, which are commensurate with the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  Dkt. 11.20, Cauley Decl. Ex. T at ¶15; Dkt. 21.8, Phillips Decl., Ex. H at ¶12.  *See, e.g.*, *Ballinasmalla Holdings Ltd. v. FCStone Merch. Servs., LLC*, No. 18-CV-12254 (PKC), 2020 WL 814711, at *4 (S.D.N.Y. Feb. 19, 2020) (partner rates above $1,000 per hour are reasonable); *U.S. Bank Nat'l Ass'n v. Dexia Real Est. Cap. Mkts*, No. 12 Civ. 9412 (PAE), 2016 WL 6996176, at *8 (S.D.N.Y. Nov. 30, 2016) ("partner billing rates in excess of $1,000 an hour[] are by now not uncommon in the context of complex commercial litigation").

### 3.    The arbitrator's award of expert fees is supported by case law from this District.

The arbitrator did not act in "manifest disregard of the law" when it awarded the Plan's expert witness fees because there is no "well defined, explicit, and clearly applicable" law precluding the award of expert fees to a party under ERISA.  *D.H. Blair*, 462 F.3d at 110-11 (vacatur on grounds of manifest disregard of the law requires "proving that ... the law ignored by the arbitrator was well defined, explicit, and clearly applicable to the case").  On the contrary, courts have frequently awarded expert fees and other routine litigation costs in ERISA litigations.  *See, e.g.*, *Bekker v. Neuberger Berman Grp. 401(K) Plan Inv. Comm.*, 504 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) (approving request for "the types of costs and expenses that are routinely reimbursed by paying clients, such as *experts' fees*, travel, mediation fees, and photocopying costs" in ERISA action) (emphasis added); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (awarding "ordinary and necessary costs such as ... *expert fees*, computer-assisted document organization, travel and copying") (emphasis added); *Cefali v.*

*Buffalo Brass Co., Inc.*, 748 F. Supp. 1011, 1023 (W.D.N.Y. 1990) (awarding expert witness fee in ERISA action).

*     *     *

For the reasons above, White Oak has failed to carry its "heavy burden" of proving the award of attorneys' fees and costs was in manifest disregard of the law.  *Seneca Nation of Indians*, 988 F.3d at 626.  White Oak does not dispute that the amount of attorneys' fees and costs at issue totals $5,722,249.35, which is the total fees and costs "proposed" by the Plan, less 20%.  *See* Plan Br. at 19-20; Dkt. 21.9 Phillips Decl., Ex. I at ¶16.  Accordingly, the Court should confirm the award of $5,722,249.35 in attorneys' fees and costs to the Plan.

### B. The Arbitrator's Award of Prejudgment Interest Was Not Rendered in "Manifest Disregard of the Law."

White Oak's bid to vacate the arbitrator's order awarding prejudgment interest is premised on the same flawed assertions that the Plan did not prevail in the arbitration and the arbitrator "did not grant the Plan any money damages," Opp. at 33-34, and thus fails for the same reasons as White Oak's other arguments.  Indeed, the very award of prejudgment interest itself undermines any notion that the arbitrator did not award money damages to the Plan.

As made plain by the text of the Final Award, the arbitrator ordered that "pre-judgment interest is awarded at the New York statutory rate of 9%" on the assets and fees to be disgorged to the Plan, excluding attorneys' fees and costs.  FA at 10, 11; *see also* FA at 10 ("Disgorgement, *including interest*, shall take place no later than 30 calendar days after the issuance of this Award....") (emphasis added).  Prejudgment interest at the New York statutory rate is routinely awarded to the prevailing party in ERISA litigations in this Circuit.  *See Doe v. Unum Life Ins. Co. of Am.*, 12 Civ. 9327 (LAK) (AJP), 2016 WL 335867, at *10 (S.D.N.Y. Jan. 28, 2016) (collecting cases); *Jones v. Unum Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (holding

in ERISA case that a "court need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government"). The arbitrator's award, therefore, does not constitute the type of "egregious impropriety on the part of the arbitrator[]" required for vacatur. *Wallace*, 378 F.3d at 189.

White Oak does not dispute that prejudgment interest running through August 4, 2021 (the date of the Final Award), as calculated on the more than $96 million in Plan assets and the more than $9 million in management fees, totals $28,680,539.45. *See* Plan Br. at 20; *see also* Dkt. 21, Phillips Decl. at ¶¶23, 25; Dkt. 30.2, Phillips Decl., Ex. M at 1. This Court should therefore confirm the award of prejudgment interest in the amount of $28,680,539.45.

## III.    Post-Award Pre-judgment Interest Should be Awarded By this Court.

White Oak does not oppose (or even address) the Plan's request for post-award pre-judgment interest. For the reasons set out in the Plan's moving papers, the Plan should be awarded prejudgment interest for the period running from the date of the Final Award to the date of this Court's judgment. *See* Plan Br. at 20-21. As courts have observed, there is "a presumption in favor of prejudgment interest" in this Circuit, commonly granted at 9%. *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 483 (S.D.N.Y. 2018) (quoting *Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.,* 737 F.2d 150, 154 (2d Cir. 1984)). Prejudgment interest should therefore be awarded at a rate of 9% for the period from August 4, 2021, the date of the Final Award, to the date of judgment on the Plan's Petition to Confirm Arbitration Award.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court confirm the arbitrator's Final Award and Partial Final Award as incorporated into the Final Award, entering judgment thereon, and awarding post-award prejudgment interest to the Plan.

New York, New York
Dated: November 24, 2021

COVINGTON & BURLING LLP

_ s/  C. William Phillips_____
C. William Phillips

Jonathan M. Sperling
Cléa P.M. Liquard
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1000
cphillips@cov.com
jsperling@cov.com
cliquard@cov.com

Robert Newman
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-6000
rnewman@cov.com

*Attorneys for Petitioners Trustees of the New*
*York State Nurses Association Pension Plan*