IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION PENSION PLAN, | ) ) ) ) | |
| Petitioners, | ) ) | Case No. 21-cv-8330 (LAK) |
| v. | ) ) | |
| WHITE OAK GLOBAL ADVISORS, LLC, | ) ) | |
| Respondent. | ) | |

**MEMORANDUM OF WHITE OAK GLOBAL ADVISORS, LLC IN RESPONSE TO
THE COURT'S FEBRUARY 10, 2022 ORDER**

SIDLEY AUSTIN LLP
James Heyworth
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

and

Thomas K. Cauley, Jr. (*pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Respondent White Oak Global Advisors, LLC*

White Oak Global Advisors, LLC ("White Oak") submits this memorandum in response to the Court's February 10, 2022 order. (Dkt. 45.) In that order, Your Honor asked three questions, to which White Oak responds below.

**Question 1**. Is there a "final" award before the Court?

**Response**: Yes, the August 4, 2021 arbitration award (the "Award") is a final award. (Dkt. 31, Ex. A.)

**Question 2**. Assuming that (1) there is, (2) it orders disgorgement of the Plan assets' NAV as measured on August 4, 2021, and (3) fails to specify the NAV as of that date, does the Federal Arbitration Act permit the Court to determine the proper NAV?

**Response**: Absent the agreement of the parties, the Federal Arbitration Act does not permit the Court to determine the net asset value ("NAV") of the Plan's investments with White Oak as of August 4, 2021, because such a determination would constitute an impermissible fact finding by the Court in contravention of the Federal Arbitration Act. *See Zeiler v. Deitsch*, 500 F.3d 157, 169 (2nd Cir. 2007) (explaining that a petition to confirm an arbitration award is "a summary proceeding in nature, which is not intended to involve complex factual determinations . . . [a] district court confirming an arbitration award does little more than give the award the force of a court order.").

However, to confirm the Award's order that White Oak "disgorge the NAV of the Plan[1] . . . as of [the] date of the FINAL AWARD," it is not necessary for the Court to determine the NAV of the Plan's assets invested with White Oak on August 4, 2021. The Award's order that White Oak "disgorge the NAV of the Plan" requires White Oak to make an in-kind distribution to the Plan of the Plan's pro-rata ownership interest in all of the assets held in the Summit and

---

[1] The "Plan" refers to The Trustees of the New York State Nurses Association Pension Plan.

1

Pinnacle Funds as of August 4, 2021, pursuant to the Investment Management Agreement ("IMA") between White Oak and the Plan and the documents governing the Plan's investments in the Pinnacle and Summit Funds. The Award specifically references Section 13(b) of the IMA, which requires White Oak to transfer to the Plan "accounts, cash, securities (and other evidence of ownership) and all other property of the [Plan]" in White Oak's possession, and to "facilitate the transition of the [Plan's] Investment Account to the management of the [Plan] [or] another investment manager appointed by the [Plan]." (Dkt. 31, Ex. A at 9.) It is undisputed that Section 13(b) of the IMA is a standard industry provision requiring an in-kind distribution. An in-kind distribution simply involves transferring to the Plan a portion of each of the assets the Pinnacle and Summit Funds held on August 4, 2021, corresponding to the Plan's percentage ownership interest in those Funds on that date, which has never been disputed. Calculating the NAV of the Plan's investments with White Oak in the Pinnacle and Summit Funds on August 4, 2021 (or any other date) is not necessary to effect the in-kind distribution to the Plan.

  The Pinnacle and Summit Funds are "closed-end" investment funds (Dkt. 31, Ex. N at 4), meaning that after they raised initial capital from investors, the Funds closed and no longer accepted capital from new or existing investors. (Ex. A § 2.5(a), (b); Ex. B § 2.5(a), (b).[2]) Each investor's ownership interest in the Funds is proportionate to the overall capital investment or contribution by all investors to the Funds. *See, e.g.*, Dkt. 31, Ex. J, § 7.1(a) (providing that distributions from the Funds shall "be apportioned among the Partners [investors] in proportion to their respective Capital Contributions . . ."). The Pinnacle and Summit Funds also have "lock-up" periods, which is the amount of time that investors agree that the Funds will hold their investments in the Funds. (Dkt. 31, Ex. N at 4; Ex. C at 176-77.) The lock-up periods for the

---

[2] Exhibits A, B, and C are attached to the Declaration of Thomas K. Cauley, Jr. filed herewith.

2

Pinnacle and Summit Funds do not expire, at the earliest, until December 31, 2021 and March 1, 2023, respectively – which are after the August 4, 2021 effective date of the in-kind distribution to the Plan.[3]  (Dkt. 31, Ex. N at 4.)  Because the Funds are closed-end funds with lock-up periods, the investors' pro-rata ownership interest in the Funds remain fixed.  (*See* Dkt. 31, Ex. N at 7 (explaining that Pinnacle Fund investors were treated as all having invested in the Fund on "Day One" and having a "pro rata share" of all of the Fund's assets).)  Accordingly, after the Plan invested in the Funds, its pro-rata ownership interest in the Funds remained constant through the effective date of the in-kind distribution on August 4, 2021.

An in-kind distribution in a closed-end fund is best illustrated by an example.  If an investor invests $2,000 in an investment fund that has a total of $10,000 of investor capital, the investor has a 20% ownership interest in the fund.  In an in-kind distribution of that investor's interest in the fund, the investor would receive 20% of each of the fund's assets – securities, loans and/or cash – on the date of the in-kind distribution.  Here, the Plan's ownership interest in the Funds has never been in dispute.  Consequently, an in-kind distribution to the Plan involves distributing to the Plan its fractional ownership interest in all of the assets, including uninvested cash, held by the Pinnacle Fund and Summit Fund.

It is not necessary to separately calculate the NAV of the assets an investor is to receive in an in-kind distribution, because the value of the pro-rata distribution of assets that an investor receives in an in-kind distribution necessarily equals the NAV of the investor's investment at the

---

[3] The Funds invested in long-term, illiquid loans, and thus in the Funds' "lock up" provision investors agreed that they could not receive their investments back in cash from the Funds before the Funds' long-term loans had been paid off.  (Dkt. 12 at 11.)  Instead, if an investor sought to exit the Funds before the lock-up periods expired, the Funds' LPAs (and the Plan's IMA) contained industry-standard provisions allowing an investor to receive an in-kind distribution of the investor's pro-rata interests in the Funds' long-term loans and uninvested cash, instead of an all-cash payment.  (*Id.*)  As the Arbitrator found, the Plan was well-aware of the Funds' lock-up periods.  (Dkt. 31, Ex. B at 26-27.)

time of the in-kind distribution.  If, for example, the NAV of an investment fund on the effective date of the in-kind distribution is $10,000, and the investor receiving the in-kind distribution had a 20% ownership interest in that fund, the NAV of the investor's in-kind distribution on the effective date of the distribution would be $2,000.  If the NAV of the fund on the effective date of the in-kind distribution was only $5,000, the NAV of the investor's 20% in-kind distribution would be $1,000.  But in either case the investor would receive the *exact same* assets through the in-kind distribution – 20% of the securities, loans, cash and whatever other assets the fund held as of the effective date of the in-kind distribution.  More importantly for purposes of responding to the Court's question, in all cases the NAV of the investor's 20% interest in the fund on the effective date of the in-kind distribution would necessarily *exactly equal* the value of the 20% pro rata share of the fund's assets that the investor stood to receive through the in-kind distribution.  Calculating the NAV of the fund's assets, or the NAV of an investor's 20% interest in those assets, on any particular day is therefore not necessary to effect an in-kind distribution. The investor simply receives its 20% pro rata distribution of the assets that the fund owns "in kind" as of effective date of the distribution – whether those assets be securities, loans or cash – and regardless of the value placed on those assets on the date of the in-kind distribution.

       The in-kind distribution provision in the Summit and Pinnacle Funds' limited partnership agreements ("LPAs") makes clear that the in-kind distribution of the Funds' assets necessarily equals what an investor would have received if an investor had been paid the NAV of its investment in the Funds in the form of cash, instead of through an in-kind distribution.  But it is not necessary to calculate the NAV for purposes of an in-kind distribution.  The provision states:

> Distributions in Kind. . . . The Partnership may distribute property in kind . . . and shall be treated . . . *as if such distribution in kind was a cash distribution in an amount equal to the Fair Value [NAV] of the distributed assets*.

4

(Dkt. 31, Ex. J, § 7.1(c); Dkt. 31, Ex. K, § 7.1(d) (emphasis added).)  The point here is that if an investor is given an in-kind, pro rata distribution of the Funds' assets equal to the investor's percentage ownership interest in the Funds, the investor will be receiving a distribution "equal to the Fair Value [NAV] of the distributed assets."  Consequently, calculating the NAV of the Plan's investments on August 4, 2021 – the date of the Award – is neither necessary nor relevant to confirming the Award's order that White Oak make an in-kind distribution to the Plan.  Again, a pro-rata in-kind distribution, by definition, reflects the NAV of the Plan's investments in the Funds as of August 4, 2021.

Because the Funds have investors with fixed percentage ownership interests for the duration of the Funds, an "in-kind distribution" involves nothing more than distributing to the Plan that portion of each of the assets held by the Funds in accordance with the Plan's percentage ownership interest in the Funds.  The Plan's percentage ownership interest in the Funds has never been in dispute.  The Pinnacle and Summit Funds hold commercial loans and some cash.  An in-kind distribution to the Plan therefore involves distributing to the Plan the Plan's fractional ownership interest in the outstanding loans and the cash that the Pinnacle and Summit Funds held on August 4, 2021, based upon the Plan's ownership interest in the Funds.

The Award did not grant the Plan any money damages, but instead adopted White Oak's argument following the partial award that the Plan is solely entitled to an in-kind distribution as of the date of the Award.[4]  The Award makes clear that the "Arbitrator never ordered in her

---

[4] The Award found that since 2018 "White Oak unsuccessfully attempted in writing to return the Funds to the Plan" through an in-kind distribution, and that White Oak should not be "penalized for the Plan's lack of action" in instructing White Oak where to make the in-kind distribution.  (Dkt. 31, Ex. A at 9.)  Because the only relief the Award grants to the Plan is an in-kind distribution, which the Award found White Oak always stood ready to make, the Plan did not prevail at the arbitration and there is no basis to award any attorneys' fees or prejudgment interest to the Plan.

[Partial Final Award] that the Final Award requires all cash damages."[5]  (Dkt. 31, Ex. A at 9.) The Award's order that White Oak must "disgorge the NAV of the Plan" as of August 4, 2021 is an order that White Oak make an in-kind distribution of the Plan's pro-rata interest in all of the assets held by the Pinnacle and Summit Funds.  (*Id.* at 10 ¶ 2.)  The Award specifically notes that the disgorgement of the NAV of the Plan through an in-kind distribution "may not include all cash," but rather the Plan's proportionate share of the cash that the Pinnacle and Summit Funds held on August 4, 2021 that had not been invested in loans.  (*Id.* at 10 ¶ 2.)

Quoting from Section 13(b) of the IMA, which is the IMA's in-kind distribution provision, the Award explains that disgorging "the NAV of [the Plan's] investment" means that White Oak shall "transfer to the Plan" "cash," "securities" and "other evidences of ownership" in White Oak's possession and "facilitate the transition of the Investment Account to the management of the Trustees [or] another investment manager appointed by the Trustee[s]." (Dkt. 31, Ex. A at 9.)  As stated, it is undisputed that Section 13(b) of the IMA is an industry standard in-kind distribution provision.[6]  (Dkt. 31, Ex. N at 2.)  Similarly, the Funds' LPAs expressly allow for in-kind distributions, providing:

> Distributions in Kind. . . . The Partnership may distribute property in kind . . .

(Dkt. 31, Ex. J, § 7.1(c); Dkt. 31, Ex. K, § 7.1(d).)

It is further undisputed that to effect the in-kind distribution of the Plan's property held by White Oak, White Oak need only distribute to the Plan the Plan's proportionate ownership

---

[5] In particular, the Award states that White Oak "shall [] retain[]" the fees it earned for "managing the business and affairs" of White Oak's Funds, and denies "[a]ll claims not expressly granted herein[.]" (Dkt. 31, Ex. A at 10 ¶ 3, 11 ¶ 9.)

[6] "[U]nder the [Federal Arbitration] Act, a court is authorized to examine the record of the arbitration for the purpose of determining whether it reveals any basis for vacating or modifying the award." *Warnaco, Inc. v. Sincere Garment & Sporting Goods Mfg. Co., Inc.*, No. 90 Civ. 2854 (RJW), 1992 WL 77645, at *1 n.1 (S.D.N.Y. Mar. 20, 1992).

interest in the loans and cash held by the Pinnacle and Summit Funds. Indeed, the Plan submitted an expert opinion to the Arbitrator explaining that an in-kind distribution is a transfer of pro-rata ownership interests in the Funds' investments, which states that:

> A distribution in kind (also referred to as an 'in-kind' distribution) is a distribution in the form of property other than cash, such as securities or assets. *In this case, the in-kind distribution would be a fractional or a percentage ownership in the private loans that White Oak issued to businesses through the Pinnacle and Summit Funds, which White Oak manages.*[7]

(Dkt. 31, Ex. R at 3, ¶ 7) (emphasis added.))  White Oak also submitted evidence from an industry expert that an in-kind distribution is a "pro rata" distribution to an investor "of the underlying assets of the fund in exactly the form that they exist . . . rather than liquidating them first" for cash. (Dkt. 31, Ex. N at 5; Ex. C at 181:3-18.)  Thus, in ordering an in-kind distribution, the Award requires White Oak to transfer to the Plan the Plan's pro-rata interest in the Funds' loans and cash as of August 4, 2021, which is precisely what White Oak did on September 3, 2021.  Because the Plan is to receive a percentage of the Funds' assets, based upon the Plan's percentage ownership in the Funds, determining the NAV of the Plan's investment in the Funds is not necessary to effect the in-kind distribution.

Here, the Plan's ownership interest in the Pinnacle and Summit Funds is calculated based on the amount of capital the Plan invested in the Funds as a percentage of the overall capital invested in the Funds by other investors, which has never been in dispute.  The Plan's proportionate ownership interest in the Funds – which has remained constant since the Plan invested in the Funds – is reflected in the accounting records of the Funds maintained by an independent third-party fund administrator.  The in-kind distribution entitles the Plan to receive

---

[7] The Plan's expert ignored the fact that the Plan is also entitled to receive its percentage ownership of the cash that the Funds held that was not invested in loans as of the effective date of the in-kind distribution.

7

its proportionate ownership interest in each of the underlying assets held by the Funds on August 4, 2021, which includes the Plan's fractional ownership interest in the Funds' uninvested cash and each of the Funds' loans.  The NAV of the Plan's investment in the Funds at any particular point in time (and in particular, on the date the in-kind distribution became effective) is simply not necessary to effecting the in-kind distribution.  That is because the Plan is entitled to receive its proportionate ownership interest in all the assets the Funds held as of the effective date of the in-kind distribution, irrespective of what the NAV may be.

The Plan raised the issue of the Plan's NAV by incorrectly arguing that the Arbitrator ordered White Oak to "disgorge all assets worth $96,213,778.83." (Dkt. 32 at 1, 17.)  In response, White Oak argued that the Award nowhere orders White Oak to disgorge assets "worth" $96 million or "worth" any other specific amount. (Dkt. 39 at 5-6.)  Rather, White Oak explained that the Award ordered White Oak to "disgorge the NAV of the Plan" as of August 4, 2021, which the Award explains means an in-kind distribution in accordance with Section 13(b) of the IMA. (*Id.* at 5.)  In further response to the Plan's argument, White Oak noted that as of September 30, 2021 – the first date on which NAVs were calculated after the August 4, 2021 effective date for the in-kind distribution – the NAV of the Plan's investments was $78.9 million, not $96 million as the Plan seeks as part of this proceeding.[8] (Dkt. 40, Fross Decl. at 3, ¶ 8.)  As White Oak argued, a judgment ordering White Oak to return "assets valued at" $96 million, as the Plan now seeks, could not properly be characterized as a "disgorgement," because it would exceed the value of the Plan's proportionate ownership interest in the Funds as of the date of the Award. (Dkt. 39 at 5.)

---

[8] The Funds' NAV fluctuates because the value of the Funds' assets fluctuates, such as, for example, when investor principal is repaid or interest income is distributed to investors, which decreases the Funds' NAV.  Importantly, as the NAV of the Funds fluctuates, the NAV of each investor's interest in the Funds fluctuates by the same percentage, so that the investor's proportionate interest in the Funds remains unchanged.

**Question 3**.   May the Court order a clarification remand to the Arbitrator to (a) determine the Plan's NAV on August 4, 2021, and (b) specify which assets are to be disgorged in kind and the dollar amount of cash disgorgement?

**Response**:  "A court may remand an award to an arbitration panel if the award is so indefinite or ambiguous that the court does not know exactly what it is being asked to enforce." *Hartford Fin. Holdings, Inc. v. Singer*, No. 08 Civ. 2459(PKC), 2010 WL 1838843, at *4 (S.D.N.Y. May 4, 2010) (internal quotation omitted)).  However, the Court need not remand to the Arbitrator because the Award is clear and unambiguous to the extent it orders White Oak to comply with Section 13(b) of the IMA by making an in-kind distribution to the Plan of the Plan's pro-rata ownership interests in the Summit and Pinnacle Funds.  *BSH Hausgeräte GmbH v. Kamhi*, 291 F. Supp. 3d 437, 445 (S.D.N.Y. 2018) ("[I]f the award is clear and unambiguous, it must be enforced.").  As explained in response to Question 2, calculating the Plan's NAV on August 4, 2021 is not necessary to confirm the Award's order that White Oak "disgorge the NAV of the Plan" as of August 4, 2021.  That is because the Plan necessarily receives the NAV of its investments when it receives the in-kind distribution.

Likewise, the Award does not need to identify the specific assets to be disgorged or the dollar amount of cash to be disgorged, because, again, the Award orders an in-kind distribution of the Plan's pro-rata interests in the Funds' loan investments and cash.  The assets and cash the Funds hold are not in dispute, and the Plan's percentage ownership interest in the Funds' assets and cash is also not in dispute.  It therefore is not necessary to specify the assets to be disgorged in kind or the dollar amount of the cash to be disgorged; the Plan will receive a slice of all assets, including the uninvested cash that the Funds hold, based upon the Plan's percentage ownership in the Fund – and that percentage ownership is not in dispute.

\* \* \*

While a calculation of the NAV as of August 4, 2021 and an identification of each individual asset subject to the in-kind distribution are not necessary to confirm the Award's order requiring White Oak to make an in-kind distribution, White Oak and the Plan could consent to provide that information to the Court.[9]  The NAV of the Funds is calculated for reporting periods by an independent third-party administrator for the Funds.  The Plan's pro-rata ownership interest in the Funds – which has been constant and has never been in dispute – is also calculated by that third-party administrator.  Likewise, the Funds' independent administrator maintains records of the assets held by the Funds.  Accordingly, if it would assist the Court and to expedite this proceeding, with the Plan's consent, White Oak could request that the Funds' third-party administrator calculate the NAV of the Plan's investment in the Funds as of August 4, 2021 and provide a list of the assets of the Funds in which the Plan held a pro-rata interest as of August 4, 2021, and submit that information to the Court.

\* \* \*

In summary, this Court should confirm the Award's order requiring White Oak to "disgorge the NAV of the Plan" as of August 4, 2021 – *i.e.*, to make an in-kind distribution consistent with Section 13(b) of the IMA, and vacate the Award's grant of attorneys' fees, costs and, to the extent awarded, prejudgment interest.

Dated: February 25, 2022                    Respectfully Submitted,

                                            By: */s/ Thomas K. Cauley, Jr.*
                                            Thomas K. Cauley, Jr. (*pro hac vice*)

---

[9] While parties cannot agree to confer subject matter jurisdiction on the Court, *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 733 (2d Cir. 2007), "[p]arties may consent to a particular form of procedure in the Federal court[.]" *In re Cord-Way Prods.*, 79 F. Supp. 672, 674 (E.D.N.Y. 1948).  Here, this Court has jurisdiction to resolve this dispute under the FAA, Dkt. 12 at 15, and the parties can consent to have the Court resolve the limited issue of the NAV as of August 4, 2021.