# COVINGTON

BEIJING  BRUSSELS  DUBAI  FRANKFURT  JOHANNESBURG
LONDON  LOS ANGELES  NEW YORK  PALO ALTO
SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

C. William Phillips

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T +1 212 841 1081
cphillips@cov.com

**By ECF**

February 28, 2023

The Honorable Judge Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:  *NYSNA Pension Plan v. White Oak Global Advisors LLC*, No. 21-cv-8330

Dear Judge Kaplan:

To satisfy this Court's judgment requiring (1) "disgorgement of the net asset value
[("NAV")] of the Plan's assets as of August 4, 2021"; and (2) "removal of White Oak as
fiduciary and investment manager," Dkt. 89, on September 3, 2021 White Oak purportedly
transferred to the Plan the fractional investment interests that White Oak attributed to the Plan as
of August 4, 2021 (the "Transferred Plan Investments"). The Plan sought discovery to assess
compliance, and now moves to compel White Oak's full responses to Interrogatory Nos. 2 and 3.

**White Oak Should Disclose the September 3 NAV, as Requested by Interrogatory 3.**

The judgment directs White Oak to disgorge "the net asset <u>value</u> of the Plan's assets as of
August 4, 2021." Dkt. 89 (emphasis added). Thus, the value of the non-cash Transferred Plan
Investments on their September 3, 2021 purported transfer date is needed to assess compliance.
Interrogatory No. 3 accordingly asks for "the value of each Transferred Plan Investment on the
date that the Transferred Plan Investment was purportedly transferred to the Plan." Ex. A at 3.

White Oak refused to respond on two meritless grounds. *First*, White Oak claims
irrelevance, arguing that it satisfied the judgment simply by transferring the specific investments
purportedly attributable to the Plan as of August 4. But the Court already rejected White Oak's

**COVINGTON**

argument that it should be required only to distribute the Plan's pro rata investment interests, and not the NAV as of a particular date. *E.g.*, Dkt. 59 at 18–20. The Court instead directed disgorgement of the Plan's August 4 NAV, not the fractional interests allegedly attributable to the Plan on that date. White Oak nonetheless proceeded to do nothing but transfer those pro rata interests. Discovery of the value of what White Oak delivered is thus needed, especially since the value appears to have decreased by the purported transfer date. *Compare* Ex. B ($86,396,215.23 August 4 NAV) *with* Ex. C ($78,910,292.99 September 30 NAV).

*Second*, White Oak claims that the September 3, 2021 NAV (*i.e.*, a non-quarter-end NAV) is nonexistent and incalculable. *See* Ex. D at 4. But "[a] party served with interrogatories is obliged to respond … not only by providing the information it has, but also the information within its control or otherwise obtainable by it." *In re Auction Houses Antitrust Litig.*, 196 F.R.D. 444, 445 (S.D.N.Y. 2000). White Oak can obtain the September 3 NAV, just as White Oak previously provided a similar, non-ordinary-course valuation of the Plan's August 4 NAV from its administrator SEI. Without a September 3 NAV, White Oak has no basis for asserting that the Transferred Plan Investments' value was equal to the August 4 NAV.

**White Oak Should Disclose Indirect Investor Names, as Requested by Interrogatory 2.**

Interrogatory No. 2 asks White Oak to disclose, *inter alia,* direct and indirect investor identities and ownership shares for the entities whose equity was included among the Transferred Plan Investments. Ex. A at 3. White Oak initially responded by producing, pursuant to FRCP 33(d), a spreadsheet from which it *redacted* the names of <u>every</u> investor but one. *See* Ex. E at 4. While it has since unredacted that spreadsheet, White Oak continues to withhold at least 416 indirect investor names unless the Plan agrees not to contact those investors for any reason.

White Oak's condition for disclosure is improper. In parallel with their discussions about White Oak's Interrogatory No. 2 response, the parties negotiated a Protective Order that does not

**COVINGTON**

contain any no-contact provision. *See* Dkt. 130. White Oak now seeks to add a no-contact

provision by claiming that "[t]here is no valid basis for Covington or its client to contact White

Oak's investors as part of judgment enforcement proceedings." Ex. F at 2. But the Plan cannot

foreclose the possibility of needing such contact in connection with judgment enforcement

proceedings.

To be clear, the identity of indirect investors bears on whether White Oak remains the

Plan's fiduciary and investment manager, in violation of the judgment. *First*, under ERISA, if

benefit-plan investors collectively own, directly or indirectly, 25% or more of a fund managed by

White Oak, White Oak may owe the Plan fiduciary duties. *See* 29 U.S.C. § 1002(42); 29 C.F.R.

§ 2510.3-101(a)(2); 29 U.S.C. § 1002(21). Here, White Oak manages the Transferred Plan

Investments, including via at least five "Financing Affiliates" that have "White Oak" in their

names, that are managed by those listed as "Management" on White Oak's website, and that

White Oak's SEC filings say are subject to White Oak's "oversight," including through their

"review [of] the material investment parameters," having "White Oak principals form a majority

of each Financing Affiliate's approval committee," and "retain[ing] authority to hire or dismiss

executive officers employed by, or associated with, each Financing Affiliate." *See* Ex. G at 6;

Dkt. 122-1; Ex. H at 45. Whether White Oak owes fiduciary duties under ERISA thus turns on

whether benefit-plan investors own, even indirectly, 25% or more of the fund's interests.

White Oak contends that an "operating company" exception to ERISA's fiduciary rule

applies, rendering the 25-percent inquiry moot. Ex. D at 2–3. Whether the "operating company"

exception applies is a disputed issue—not a reason to limit discovery. Indeed, while White Oak

contends the Financing Affiliates are operating companies, its own SEC filings described the

**COVINGTON**

Affiliates as mere investment vehicles[1] to which ERISA's "operating company" exception does not apply. 29 C.F.R. § 2510.3-101(c).

*Second*, White Oak can violate the judgment by retaining indirect investments, via White Oak-affiliated individuals and entities, in any Transferred Plan Investment. Controlling shareholders owe minority shareholders fiduciary obligations, and such duties can attach to those who invest indirectly.[2] The amount of indirect White Oak-affiliated equity ownership also bears on whether White Oak retains sufficient influence to be considered the Plan's investment manager, in violation of the judgment. *E.g.*, *In re Firestar Diamond, Inc.*, 634 B.R. 265, 301 (Bankr. S.D.N.Y. 2021) (controlling shareholder duties could exist via "web of corporations").

White Oak substituted code names for the 416 withheld investor names, and purported to separately identify the benefit plans. That is insufficient. "[N]o party is required to rely on the say-so of opposing counsel, even on the question of identification, to ascertain critical issues." *Jacob v. City of New York*, 2008 WL 2065706, at *1 (E.D.N.Y. May 13, 2008). This is especially true here where White Oak has disclaimed the accuracy of its benefit plan identifications because White Oak has not independently verified the information it received from investors. *See* Ex. F at 1. The Plan thus cannot verify whether an investor is a benefit plan without actual names.

Accordingly, the Court should order White Oak to respond to Interrogatory Nos. 2 and 3 in full, and pay the Plan's fees incurred with this motion pursuant to FRCP 37(a)(5)(A).

Respectfully submitted,

C. William Phillips

---

[1] *See* Ex. H at 44–45, 57 (describing Financing Affiliates as "portfolio investments of White Oak Clients" that are wholly- or majority-owned by White Oak Clients, overseen by "White Oak, as investment adviser to White Oak Clients that invest in the Financing Affiliates," and the residual equity interests in which provide "little to no expected return or value").

[2] *E.g.*, *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (noting that controlling shareholder duties can exist "when a stockholder owns, directly or indirectly, more than half of a corporation's voting power" or when a non-majority shareholder actually exercises control over the corporation's conduct).