# EXHIBIT H



# WHITE OAK GLOBAL ADVISORS, LLC

---

## Form ADV, Part 2A

("Brochure")

---

September 21, 2022

---

3 Embarcadero Center
Suite 550
San Francisco, CA 94111
www.whiteoaksf.com

This brochure provides information about the qualifications and business practices of White Oak Global Advisors, LLC ("WOGA"). If you have any questions about the contents of this brochure, please contact us at (415) 644–4100 or Compliance@whiteoaksf.com.

The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.

WOGA is registered with the SEC as an investment adviser, and additional information about WOGA is available on the SEC's website at adviserinfo.sec.gov. WOGA may refer to itself as a "registered investment adviser" or "RIA." You should be aware that registration with the SEC or a state securities authority does not imply a certain level of skill or training.

**WHITE OAK**
GLOBAL ADVISORS

## IMPORTANT NOTE ABOUT THIS BROCHURE

This Brochure is not:

- an offer or agreement to provide advisory services to any person;

- an offer to sell interests (or a solicitation of an offer to purchase interests) in any White Oak Fund;

- a complete discussion of the features, risks, or conflicts associated with any White Oak Fund or advisory service; or

- to be relied on in determining whether to invest.

As required by the Investment Advisers Act of 1940, as amended ("Advisers Act"), White Oak provides this Brochure to current and prospective clients and will provide this Brochure to current or prospective investors in a White Oak Fund (as defined in Item 4, below), together with other relevant offering materials (such as subscription agreements, offering memoranda, operating agreements or advisory contracts), prior to, or in connection with, such persons' establishment or consideration of an investment advisory relationship with WOGA or an investment in a White Oak Fund or Separate Account.  Additionally, this Brochure is available through the Securities and Exchange Commission's ("SEC's") Investment Adviser Public Disclosure website at adviserinfo.sec.gov.

Although this publicly available Brochure describes in a general manner the investment advisory services and products of WOGA, persons who receive this Brochure (whether or not from WOGA) should be aware that it is designed solely to provide information about WOGA as necessary to respond to certain disclosure obligations under the Advisers Act. More complete information about each White Oak Fund or Separate Account (together "Clients"), as well as WOGA's investment advisory services, is included in the relevant offering materials of the applicable Fund or in the investment management agreement governing the Separate Account, copies of which may be obtained upon request by eligible current and prospective clients or investors or an authorized Administrator or Placement Agent.

Capitalized terms are defined herein.  A Glossary at the end of this brochure is also provided for convenience.

WHITE OAK
GLOBAL ADVISORS

## ITEM 2:   MATERIAL CHANGES

The last annual update of this Brochure was filed by White Oak Global Advisors, LLC ("**WOGA**," "**Firm**," or "**White Oak**") with the SEC on March 31, 2022.

The following material changes have been made to this Brochure:

- An update related to the judgment described in *Item 9 – Disciplinary Information*

WHITE OAK
GLOBAL ADVISORS

## ITEM 3:   TABLE OF CONTENTS

Page

Item 2:  Material Changes ........................................................................................................... 3

Item 3:  Table of Contents ......................................................................................................... 4

Item 4:  Advisory Business ........................................................................................................ 5

Item 5:  Fees and Compensation ............................................................................................. 9

Item 6:  Performance-Based Compensation and Side-By-Side Management .................. 14

Item 7:  Types of Clients ............................................................................................................ 19

Item 8:  Methods of Analysis, Investment Strategies and Risk of Loss ......................... 19

Item 9:  Disciplinary Information .......................................................................................... 41

Item 10:  Other Financial Industry Activities and Affiliations ....................................... 42

Item 11:  Code of Ethics, Participation or Interest in Client Transactions and Personal Trading
................................................................................................................................................ 80

Item 12:  Brokerage Practices .................................................................................................. 82

Item 13:  Review of Accounts .................................................................................................. 86

Item 14:  Client Referrals and other Compensation ........................................................... 87

Item 15:  Custody ....................................................................................................................... 87

Item 16:  Investment Discretion ............................................................................................. 88

Item 17:  Voting Client Securities .......................................................................................... 88

Item 18:  Financial Information .............................................................................................. 90

Glossary ...................................................................................................................................... 91

Privacy Policy ........................................................................................................................... 95

WHITE OAK
GLOBAL ADVISORS

## ITEM 4:   ADVISORY BUSINESS

### A.   White Oak Global Advisors, LLC

White Oak Global Advisors, LLC (**"WOGA"** or **"White Oak"**), is a Delaware limited liability company that was formed in June of 2007 and is headquartered in San Francisco, with additional offices in New York, Chicago, Denver, and Atlanta, and is wholly owned by White Oak Financial, LLC.  White Oak Financial is owned by its managing members, Andre Hakkak and Barbara McKee, as well as other individuals who hold less than 25% ownership interests in it.  WOGA is a private debt advisory firm focused on direct lending and specialty finance that serves as an intermediary between companies that merit financing and investors seeking yield.

### B.   Advisory Services

WOGA provides investment advice and management to privately placed investment funds (**"White Oak Funds"** or **"Funds"**) and separately managed accounts (**"Separate Accounts"** and, together with the Funds, WOGA's "**Clients**").  As discussed below, WOGA also provides other types of investment advisory services, including cash management services for institutions (the **"Cash Management Strategy"**).  Additionally, WOGA manages White Oak Investment Partners, L.P. ("**WOIP**"), a proprietary account that invested in the White Oak Strategic Fund and whose investors include solely past and present WOGA personnel, their families, and the personnel of WOGA affiliates, and White Oak Partners Fund I, L.P. (**"WOPFI"**), a proprietary account that invests through different series in certain White Oak Funds and other non-fund investments and whose investors are limited to past and present WOGA personnel, their families, and certain personnel of WOGA affiliates.

Currently, in addition to the above-referenced Separate Accounts and proprietary accounts, WOGA advises a number of Funds, some of which are organized in a Master-Feeder Structure with each feeder fund investing substantially all of its assets in a dedicated master fund, including but not limited to:

- White Oak Yield Spectrum Fund V
- White Oak Impact Fund
- White Oak Yield Spectrum Fund
- White Oak Summit Fund
- White Oak Pinnacle Fund
- White Oak Fixed Income Fund
- White Oak Short Term ABL Fund

In the future, WOGA is expected to advise additional Funds not named above, some of which may use a Master-Feeder Structure.  To the extent that a master-feeder structure is employed, references to a particular Fund will mean collectively the associated master fund and feeder funds as well as any parallel funds as part of the same fund complex.

WHITE OAK
GLOBAL ADVISORS

From time to time, it may be necessary to separate an investment from a Fund or Separate Account in order to liquidate the investment.  Special purpose liquidation vehicles may be formed in order to hold such assets for liquidation.  For certain open-ended Funds that may offer periodic redemptions rights, redeeming investors' assets are placed in a side pocket and cash distributions are made in accordance with the governing documents and WOGA's internal policies, typically as their underlying illiquid investments are monetized.

In addition, and from time to time, WOGA identifies individuals and companies with industry connections, expertise, and capabilities, which companies are engaged in the business of providing financing and serve as diversified investment opportunities for White Oak Clients. Consistent with their business models, these companies lend their monies to their customers.  The portfolio companies described below in *Item 10 – Other Financial Industry Activities and Affiliations; Section C – Material Business Relationships with Certain Related Persons; Portfolio Companies Referred to as "Financing Affiliates"* are such entities.  The amount of any loan made to these portfolio companies or any similar vehicles formed or acquired in the future is determined by WOGA's Investment Committee, which also reviews the material investment parameters, including collateral, of the portfolio company itself.

The vast majority of WOGA's Clients pursue direct lending strategies ("Direct Lending Strategy").  Certain other strategies are also pursued as described below.

1. *Private Credit / Direct Lending Strategy*

The Private Credit / Direct Lending Strategy encompasses a comprehensive investment process to originate, underwrite, and monitor term loans, primarily to U.S.-based and Canada-based companies in the lower end of the middle market.  These companies are predominantly collateral-rich businesses with enterprise values of less than $1 billion and and/or EBITDA of less than $15 million.  ("EBITDA" is defined in the Glossary at the end of this Brochure.)  White Oak typically structures its investments as senior-secured term loans supported by a security interest in all of the company's assets, as well as a pledge of cash flows, with conservative loan-to-value ratios and short durations of fewer than five years at the time of issuance.  Such structures help to ensure a priority of return, as well as control if any restructuring process, asset sale, capital raise or receipt of insurance proceeds occurs. The investments may be originated with warrants, other forms of equity compensation, or embedded investment leverage.  The objective of this strategy is to generate fixed-income, excess returns that are not correlated to the broader public markets by capitalizing on the supply and demand imbalances in the private debt markets and by maintaining downside protection with strong asset coverage.  Loans to companies based outside the U.S. or Canada have been and may also be made if consistent with the Client's governing documents.  The Private Credit / Direct Lending Strategy is discussed, together with a description of its associated material risks, in more detail in Item 8 of this brochure and in the offering documents for the relevant Funds and in Client agreements, investment programs, investment policy statements, and/or investment guidelines (**"Investment Program"**) for Separate Accounts.

WHITE OAK
GLOBAL ADVISORS

Term Loan Strategy.  WOGA's general investment thesis for its term loan strategy is to underwrite loans to companies in which it holds a senior secured position in a capital structure in order to enhance its ability to protect Clients' investments.  Typically, this will involve lending against collateral, including but not limited to inventory, receivables, trade claims, intellectual property, and property, plant, and equipment, while taking into consideration a borrower's cash flows and its ability to reduce risk.  Each term loan will seek to make investments in order to generate an attractive net internal rate of return ("IRR") for investors on a portfolio basis.

Asset-Based Loan Strategy.  Asset-based loan transactions are similar to term loan financings, except that the amount of the advance is determined with reference to an advance rate on the receivables, inventory, or both of the borrower.  Each asset-based loan will seek to make investments in order to generate an attractive net IRR for investors on a portfolio basis.  Certain asset-based transaction may involve asset-backed securitizations.

Equipment Financing Strategy.  WOGA's investments in equipment financing transactions provide exposure to a variety of equipment financing solutions, including operating leases, capital leases, and other forms of equipment financing.  Each equipment financing loan will seek to make investments in order to generate an attractive net IRR for investors on a portfolio basis.

Opportunistic Strategy.  White Oak's investment in opportunistic transactions target the following type of opportunities: Debtor in possession financings and rescue financings; secondary opportunities and other special situations opportunities.  Each loan will seek to make investments in order to generate an attractive net IRR for investors.

Stand Alone Funds.  It is expected that certain of the strategies described above (such as asset-based loans, equipment financing transactions, opportunistic, etc.) will be offered by White Oak in the future as a stand-alone Fund.  Similarly, certain geographic (e.g., UK) or industry-focused (e.g., healthcare) term loan strategies also may be offered by White Oak in the future as a stand-alone Fund, and, as with the possible targeted strategies mentioned in the preceding sentence, if consistent with the Fund's investment mandate, would invest alongside other Clients as appropriate.

*2.   ESG Strategy*

Certain White Oak Clients have an investment mandate that specifically addresses Environmental, Social and Governance ("ESG") considerations in their governing documents. In such instances, WOGA, as investment manager to the ESG Client, invests in accordance with such Client's ESG mandate. For such Clients, investments will comply (at the time of investment) with the Investment Manager's Impact, Environmental, Social and Governance Policy ("ESG Policy"), which seeks to integrate environmental, social and governance factors, along with other criteria into the underwriting process at the time of the investment.

*3.   Cash Management*

WOGA also manages fixed income and cash portfolios on behalf of Clients that are institutions and portfolios of instruments that are not securities, such as bank-issued certificates of deposit and bank cash deposits, on behalf of Clients that are individuals.  Each such Separate Account is managed pursuant to parameters specified by each Client.  These parameters are set forth in each Client's Investment Program and include, among other things, the term structure of each Separate Account, instrument types eligible for (or restricted from) purchase, and required instrument attributes.  All Separate Accounts are managed on an individualized basis.

*   *   *

White Oak limits its discretionary advice to private debt investments, direct lending, and cash management instruments.  Further information about these strategies and investments, as well as a brief discussion of associated material risks, can be found in Item 8 of this Brochure.

## C.   Tailored Advice and Client-Imposed Restrictions

Each White Oak Client has its own investment objectives, strategies and restrictions.  Certain Clients focus on a narrow investment strategy while others pursue a broader investment strategy.  Many Clients have a similar private credit investment mandate, although some mandates are distinct with their own unique parameters, characteristics, and restrictions.  WOGA prepares offering materials with respect to each White Oak Fund that contain more detailed information, including a description of the investment objective and strategy or strategies employed and related restrictions.  These serve as a limitation on the discretionary authority of WOGA's management.  Separate Account Clients can also impose restrictions on the discretionary authority of WOGA's management through documents relating to the Investment Program for such Clients.

While Separate Accounts may be reasonably tailored based on the individual needs of a Client, as agreed to with WOGA, none of the White Oak Funds is tailored to meet the individualized investment needs of any particular investor ("Investor").  An investment in a White Oak Fund does not create a client-adviser relationship between WOGA and an Investor.  Further discussion of the strategies, investments, and risks associated with a White Oak Fund or Separate Account management is included in the relevant materials for each type of Client.

Clients and Investors must consider whether a particular White Oak Fund or advisory relationship is appropriate to their own circumstances based on all relevant factors including, but not limited to, the Client's or Investor's own investment objectives, liquidity requirements, tax situation and risk tolerance.  Prospective Clients and Investors are strongly encouraged to undertake appropriate due diligence, including but not limited to a careful review of relevant offering materials for the Funds or the documents relating to the proposed Investment Program for the Separate Account and the additional details about

WOGA's investment strategies, methods of analysis and related risks in Item 8, and possible conflicts set forth in Item 10, of this Brochure, before making an investment decision.

### D.  Assets Under Management

As of December 31, 2021, WOGA had regulatory assets under management of $7.04 billion. WOGA does not currently advise any assets on a non-discretionary basis.

## ITEM 5:   FEES AND COMPENSATION

WOGA is generally compensated for its services through the receipt of management and performance-based compensation.  WOGA's compensation, as well as other costs and expenses associated with the provision of investment advisory services by WOGA is discussed generally below and in more detail in relevant offering materials of a Fund or the applicable Separate Account investment advisory agreement.

### A.  Compensation

The investment advisory agreements entered into between WOGA and each White Oak Fund set forth the compensation to be paid to WOGA.  The White Oak Funds charge management fees based on the value of the Fund's assets under management or on the amount of the capital commitment of a Fund: generally between 1% and 2%.  Please refer to the appropriate Fund offering memorandum for exact fee rates.  Asset-based fees for Separate Accounts are negotiated on an individualized basis, but the management fees generally are between .95 and 1.75%.

White Oak Clients also are subject to performance-based compensation (which may be structured as an incentive fee, performance allocation, preferential dividend, or other form) of 10 - 20% of annual returns of the Client's portfolio.  Calculations are net of management fee and may include unrealized as well as realized gains and losses.  In some cases, performance-based compensation may be subject to loss carry forwards, hurdle rates, and/or high water marks, as described below in Item 6.  Please refer to the relevant offering materials of a Fund or the applicable Separate Account investment advisory agreement for further detail on performance-based compensation arrangements. WOGA receives performance fees directly from the Separate Accounts pursuant to the negotiated terms of investment advisory agreements.  Performance-based compensation paid or allocated by the White Oak Funds are received by WOGA or its affiliates, including but not limited to, White Oak Partners, LLC, White Oak Partners 2, LLC, White Oak Partners 3, LLC, White Oak Partners 4, SARL,  White Oak Partners Impact, SARL, White Oak Partners V, SARL, White Oak Partners V (Luxembourg), SARL, White Oak Partners V, LLC, White Oak Specialized ABL Partners, LLC, or White Oak Partners STABL, SARL, each of which serves as the general partner to one or more of the Funds (collectively, the "**General Partners**").  Performance-based compensation is discussed in more detail in Item 6 of this Brochure.  Other General partners may be formed in the future for additional Clients.

Fees for future White Oak Clients may vary.  Fees may be negotiable and WOGA may, in its discretion, waive or reduce management and performance fees charged to particular Clients or Investors.

With respect to the Cash Management Strategy, Clients are charged, typically in arrears, a fee rate based on the month-end or quarter-end market value (*i.e.*, the Separate Account's net asset value, including cash and accrued income) generally between 0.12% per annum and 0.25% per annum.  There is no performance-based compensation associated with this service.

With the exception of Management Fees charged on a committed capital basis, most Client Management and Performance Fees or Allocations (as applicable) are determined based upon the valuation of the underlying assets of such Client.  See generally "Valuation Risks" in Item 8.D below.  Certain clients pay internal administration and loan servicing fees based on gross commitment.

## B.  Different Fee Schedules

WOGA's (or the General Partner's, as applicable) Management Fees and Performance Fees or Allocations, as applicable, are waived with respect to WOIP and WOPFI, certain proprietary accounts that invest exclusively in the White Oak Funds, and certain large or strategic investors or accounts, or funds whose investors include WOGA personnel, their family, WOGA affiliates, and the personnel of WOGA affiliates.  In addition, WOGA may discount or waive its fees with respect to any investor for any particular period of time at the sole discretion of WOGA (or the General Partner, as applicable).  This discounted rate or waiver is not generally available to investors in the Funds.  Investments by an investor made through multiple White Oak Funds and/or Separately Managed Accounts may be aggregated in determining the management and performance-based fee applicable to such investor.   Likewise, investors investing through a common advisor or consultant may be aggregated in determining the management and performance-based fee applicable to such investors.

## C.  Side Letters

WOGA or the General Partner, as applicable, has, and likely will continue to do so in the future, waive or modify the terms of investment for certain large or strategic investors, in side letters or otherwise, in its sole discretion, including but not necessarily limited to, a waiver or lowering of the Management or Performance Fees or fee structure.  We may also agree to increased transparency or reporting though we would typically provide similar increased transparency and/or reporting to other investors upon their request.

## D.  Billing and Transaction Fees

Management Fees are automatically deducted from the accounts of Fund Investors.  Separate Account Clients are billed for fees incurred.  Management fees generally will be calculated and payable to WOGA quarterly in advance.  Clients of WOGA's Cash Management Strategy are also billed for fees incurred, but they have the option of having

management fees automatically deducted from their Separate Accounts. With respect to the Cash Management Strategy, Management Fees may be paid quarterly or monthly, in advance or in arrears, as agreed with the Client.

For some of the White Oak Funds, performance-based compensation is calculated at the end of the relevant one-year period and is payable in arrears. In addition, some White Oak Funds are structured as private equity-like term vehicles with carried interest or incentive fees payable upon realization of assets above a certain hurdle or preferred return rate. With respect to non-Cash-Management Separate Accounts, incentive fees are payable in arrears and calculated annually at individually-negotiated times as detailed in the investment management agreement for each such Client.

Transaction Fees Earned. WOGA or, as applicable, a General Partner, in certain cases has received and expects to continue to receive transaction fees, break-up fees, commitment fees, investment banking fees, directors' fees, asset management fees, consulting fees, termination fees, closing fees, origination fees, advisory fees, portfolio company monitoring and other similar fees from or in connection with a Fund's investments (collectively, "Transaction Fees"). With respect to White Oak Clients that pay management fees to WOGA or, as applicable, a General Partner, a percentage of the Transaction Fees allocable to such funds (net of certain expenses) is typically applied to reduce the management fees, if any, payable by such fund if in accordance with such fund's governing documents to the extent not already credited to such Fund. This reduction in fees is referred to as a management fee offset.

In certain instances, WOGA's investment committee may determine that it is appropriate for Clients to participate in a loan when the entire loan amount exceeds the current available capital of such Clients. In these instances, WOGA will syndicate out that portion not funded with the available capital of existing Clients. Syndication efforts are directed to existing Investors in WOGA Clients (for, e.g., potential co-investment opportunities) or to unaffiliated third-parties. Engaging in such syndication efforts affords WOGA Clients with the ability to participate in, and benefit from (e.g., receive interest payments, etc.), an investment that they otherwise would have been precluded from making. In other instances, a Financing Affiliate may seek capital from WOGA in excess of the amount determined appropriate for WOGA Clients, or the Financing Affiliate may be unwilling to provide the full amount of financing desired by its customers (see Item 10.C for a description of the Financing Affiliates). In these other instances, WOGA has in the past, and may in the future, syndicate out that portion not funded with the available capital of existing Clients. In other instances, certain Clients may be eligible to lend alongside a Financing Affiliate when a Financing Affiliate provides financing to its customers but when, among other potential scenarios, such Financing Affiliate lacks capacity to provide the entire amount of financing, if the opportunity fits the Client's investment mandate.

Origination fees earned on that portion of the loan funded by WOGA clients are often subject to management fee offset provisions for that portion of the loan funded by participating Clients and inure to their benefit. Origination fees earned on that portion not

funded by the participating Clients, however, have been earned and may be earned by WOGA or a WOGA affiliate, such as its affiliated broker-dealer, White Oak Merchant Partners, and typically are not subject to transaction fee offset.  While we believe that acting in this manner provides WOGA Clients with more attractive investments over time, any fees WOGA or an affiliate earn that are associated therewith (e.g., on that portion not funded by the participating Clients) could conflict with the interests of our Clients.  For example, given these conflicts, we could be incentivized to syndicate more of such loan to third parties than we would in the absence of such fees.  If that were to occur, our Clients would receive smaller allocations of a loan than otherwise would be desirable for them.  Nonetheless, we believe this conflict is mitigated through the use of WOGA's investment allocation policy which allocates to Clients, generally, in proportion to their available capital (see Item 16, *Investment Allocation,* for additional criteria governing the allocation of investment opportunities).

E.  Expenses and Fees Paid

Consistent with its governing documents, each White Oak Client bears various costs of its investment and trading activities.  Such expenses may include, but are not limited to, trading costs and fees (*e.g.*, commissions or spreads for securities traded through brokers or dealers, exchange fees, clearing costs, and regulatory charges), delivery, escrow and custody expenses, research costs and expenses, taxes, insurance costs, interest expenses, acquisition costs, due diligence costs (including travel expenses), finders' fees, legal and accounting fees and expenses.  (Please see Item 12 of this Brochure for further details on WOGA's brokerage practices.)  With respect to Separate Accounts and Cash Management, as noted in Item 12 of this Brochure, WOGA generally has authority to select broker-dealers to execute transactions for Separate Accounts and the Cash Management Strategy, but generally is not responsible for selecting custodians or other service providers for such Separate Accounts (including institutional cash management accounts).

In addition to the fees described above and if consistent with its governing documents, Clients bear all costs associated with investments, accounts, and maintaining their investments, including without limitation:  (1) custodial fees and charges, brokerage fees, commissions, and related costs; (2) borrowing costs including interest expenses; (3) taxes, duties, and other governmental charges; (4) transfer and registration fees or similar expenses; (5) costs associated with foreign exchange transactions; (6) other portfolio expenses, including but not limited to expenses related to the sourcing, due diligence, valuation, reasonable travel costs, and transaction expenses related to the potential acquisition of such investments, regardless of whether such acquisition is actually consummated, and the holding, monitoring and sale of such investments; (7) administrative and operating expenses, including, but not limited to, escrow, recordkeeping, administration, clerical, filing fees, and fees for specialized evaluation of borrowers, costs with respect to the use of third party valuation services and other similar expenses; (8) costs, expenses and fees associated with products or services that may be necessary or incidental to such investments or accounts, including costs of software; (9) fees related to legal, audit,

and administration services; (10) commissions and commission equivalents; (11) margin costs, if any; and (12) extraordinary expenses, if any.

In many instances, certain of these expenses are borne by the borrowers; however, in instances where the borrower was unable to pay, the Client would bear their allocable portion of such expenses to the extent permitted by its governing documents, even if the investment is not consummated.  In certain instances, WOGA or a General Partner, has in the past paid and may pay such expense and then be reimbursed by the applicable Client (*see* "Due Diligence Deposits" below for additional information).

Additionally, each White Oak Fund and Separate Account generally pays all of its ordinary organizational, offering, administrative, and operating expenses, including, but not limited to, ordinary and recurring legal, accounting, escrow, auditing, recordkeeping, administration, fund accounting, directors' fees, and certain clerical expenses including those incurred in preparing, printing and mailing reports and tax information to investors and regulatory authorities, expenses for specialized administrative services, filing fees, taxes, costs with respect to the use of third party valuation services and other similar expenses.  Additional fees (*e.g.*, wire transfer charges) may be imposed by service providers.

Consultants.  WOGA also engages and retains consultants or other third parties to create value for our Clients' portfolios.  These third parties generally have established industry expertise and can provide assistance with sourcing, structuring, consulting, and similar matters for the benefit of an investment in a Client's portfolio.  Such third parties have in the past served, and may in the future serve, on the boards of directors of borrower companies.  Compensation paid by a borrower to such third party does not offset the advisory fees payable by the Investors in WOGA's Clients.  Additionally, from time to time, consultants to or employees of WOGA or a portfolio company have in the past, and may in the future, become employed as an employee of, or consultant to, a borrower.  Engaging and retaining these consultants creates conflicts of interest, because in some cases WOGA could be deemed to influence the amount of compensation that would be paid to such individuals by the borrower.  We believe such conflicts are mitigated by requiring at times the appointment and engagement of such third parties by borrower representatives who are independent of WOGA; in addition, their work is generally subject to the review of management of such borrowers.

Due Diligence Advances/Deposits.  WOGA or an affiliate typically collects due diligence advances or deposits from potential borrowers, which are used to pay third party service providers that assist in the due diligence process, including but not necessarily limited to, appraisers, law firms and consultants, and for various expenses WOGA incurs in originating and underwriting any loan to such borrower, including travel expenses and overtime meals.  As noted above, in the event that the due diligence deposits do not cover such expenses, WOGA often attempts to collect the difference from the prospective borrower.  If WOGA is unsuccessful, Clients generally bear their allocable cost of the difference to the extent allowed pursuant to a Client's governing documents, even in instances when an investment is not consummated.

WHITE OAK
GLOBAL ADVISORS

Allocation of Fees, Costs, and Expenses among Multiple Clients. WOGA and its affiliates from time to time incur fees, costs, and expenses on behalf of one or more Clients.  To the extent that such fees, costs, and expenses are incurred for the account or for the benefit of one or more Clients, such Clients will typically bear an allocable portion of any such fees, costs, and expenses in proportion to the size of the investment made by each in the activity or entity to which the expense relates (subject to the terms of the applicable LPAs and other governing documents of the Clients) or in such other manner as WOGA considers fair and reasonable.  Although WOGA endeavors to allocate such fees, costs, and expenses on a fair and reasonable basis, there can be no assurance that such fees, costs, and expenses will in all cases be allocated appropriately.  In addition, and notwithstanding the foregoing, WOGA may in the future develop policies and procedures to address the allocation of expenses that differ from its current practice.

Payment of Fees and Expenses.  Given the investment strategy of many Clients, WOGA is generally able to pay fees and expenses out of profits generated from investments; however, when such capital is unavailable, WOGA may call capital for the payment of management fees and other expenses or pay such fees and expenses out of the assets of the Client, current income, or disposition proceeds from investments of the Client.

## F.   Sales-based Compensation

Not applicable.

## ITEM 6:   PERFORMANCE-BASED COMPENSATION AND SIDE-BY-SIDE MANAGEMENT

WOGA generally charges Clients (other than Cash Management Strategy Clients) an incentive fee based on the annual performance of the Client's portfolio.  Incentive fees are only charged to "qualified clients" in accordance with Rule 205-3 under the Advisers Act.  Not all compensation arrangements necessarily include a performance component, and the rate and nature of the calculation of performance compensation varies.  See Item 5.A – Compensation above for additional information about the range of performance compensation applicable to various Clients.

Incentive fees and differences in their calculation may result in certain conflicts of interest, such as motivating WOGA to allocate certain investment opportunities to Clients that pay higher performance-based fees and/or to invest Client funds in assets with heightened risk profiles that have the potential to produce relatively higher returns or causing WOGA to favor certain Clients over others.  Such risk is mitigated, however, through the use of White Oak's Investment Allocation policy, which typically allocates pro rata across Clients eligible to invest in the opportunity (see Item 16, *Investment Allocation,* for additional criteria governing the allocation of investment opportunities).

As noted in Item 5 of this Brochure, WOGA's compensation for each discretionary Fund and Separate Account (other than Cash Management Strategy Clients) generally includes a

WHITE OAK
GLOBAL ADVISORS

performance-based component.  In addition, WOGA has in the past and may in the future compensate or provide discretionary bonuses to portfolio managers that are based on, among other things, the performance of Client accounts they manage or for which they are otherwise responsible.  WOGA or its personnel or affiliates may have other pecuniary interests in the White Oak Funds.

## SPECIFIC CONFLICTS OF INTEREST AND WOGA'S PRACTICES DESIGNED TO MITIGATE THEM

Like all investment advisers who advise multiple accounts or funds having different fee structures, WOGA and its personnel face actual and potential conflicts of interest, including an incentive to favor those accounts in which WOGA or its personnel have greater pecuniary interests over other accounts.  Such conflicts of interest and WOGA's practices that are designed to mitigate such conflicts of interest are discussed below.  As a general matter, WOGA addresses such conflicts by following a thorough, detailed, and consistent investment decision-making process and by regular reviews of investments by the Firm's Investment Committee.

- **Allocation of Investments.**  WOGA has an incentive to allocate investment opportunities based on pecuniary interest or to further its own interests.  WOGA and its personnel will face a conflict of interest when considering how to allocate limited investment opportunities among Client accounts having different fee structures or pecuniary interests, including White Oak Funds in which WOIP or WOPFI is an investor.  In addition, to the extent that WOGA allocates an investment alongside a financing provided by a Financing Affiliate to its customer (see Item 10.C for a description of the Financing Affiliates), WOGA has an incentive to allocate investments to Clients that provide it with a greater pecuniary benefit.  Through its relevant policies and procedures, however, WOGA seeks to promote over time fair and equitable treatment of accounts (including the allocation of investment opportunities (see Item 16 – Investment Allocation)) based on considerations that are unrelated to pecuniary interests.  As a result of regulatory considerations and other investment limits, it is possible that different account types are not permitted to participate in an investment opportunity at the same time.  The decision as to which accounts that participate will take into account the suitability and the strategy of the applicable accounts. It is possible that an account with a diversified mandate is prevented from fully participating in an opportunity due to such investment opportunity being within the primary strategy of another similar-sized account.

- **Compensation of WOGA and its Personnel.**  WOGA and its personnel have an incentive to take on more risk when compensation is based on performance:  The receipt of performance-based compensation and the payment of bonuses relating to performance of Client accounts creates an incentive to make riskier investments than might be made in the absence of performance-based

compensation, as such compensation generally allows participation in gains in excess of exposure to losses.  Such risk could be heightened in instances involving Clients that do not pay a management fee to WOGA, and instead only pay a performance fee after a certain hurdle is met.  WOGA believes that performance-based compensation however, encourages an alignment of long-term investment interests between the Client and WOGA.  Moreover, performance-based compensation may be subject to mechanisms designed to ensure that prior losses are recouped and/or a certain level of gains is achieved before any performance-based compensation accrues, such as loss carry forwards, hurdle rates, and/or high water marks.  Furthermore, as discussed in more detail in Item 13.A, WOGA reviews the Client accounts that it advises on a regular basis to monitor risk levels.  In addition, engaging in high risk investment practices that cause adverse performance will have a negative and adverse impact on the receipt by WOGA of performance-based compensation, the receipt of discretionary bonuses paid to portfolio managers, WOGA's reputation, and WOGA's business.

- **Transaction-based Compensation to WOGA Affiliates and its Personnel.**  WOGA's affiliated broker-dealer, White Oak Merchant Partners (see Item 10.A for a description of this broker-dealer), has in the past been compensated, and may in the future be compensated, as a broker dealer for assisting in the syndication of investment transactions that exceed a Client's position limits (see Item 5.D, *Transaction Fees Earned*, above).  Such placement, investment banking, syndication, agency, or related fees or awards of equity securities that WOMP receives in respect of its syndication, private placement, or related efforts to third parties, including to borrowers of WOGA Clients, are generally not subject to management fee offset (see Item 5.D, *Transaction Fees Earned*, above). Accordingly, WOGA, which is owned by White Oak Financial, LLC and which is also the sole owner of White Oak Merchant Partners, may have an incentive to allocate less to particular Clients so that the broker-dealer can earn a placement fee, or a larger fee, from third-party co-investors; or WOGA may subsequently earn additional management and performance-based fees from new limited partners that co-invest alongside, for example, a Financing Affiliate.  Personnel affiliated with this broker-dealer are also employees of WOGA and some of them could influence which investments are made by WOGA's Clients.  This conflict is mitigated through the use by WOGA, among other mechanisms, of (i) formal approval of Client investment opportunities by WOGA's Investment Committee (a majority of which are not associated with WOGA's affiliated broker-dealer), (ii) the use of WOGA's Investment Allocation policy, which typically allocates pro rata across Clients eligible to invest in the opportunity (see Item 16, *Investment Allocation*), and (iii) the consideration of such transaction-based compensation when appropriate by WOGA's conflicts committee, which consists primarily of WOGA's legal and compliance personnel.  This conflict is further mitigated by the fact that WOGA does not earn ongoing management fees on the amount of any

-16-

opportunities syndicated to unaffiliated third parties.  In such instances, certain of the borrower's operating capital is and may be paid to White Oak Merchant Partners for its services and such amounts would therefore be unavailable to apply to existing loans to White Oak Clients.  In addition, existing or potential WOGA borrowers (including the Financing Affiliates), or customers of a Financing Affiliate (see Item 10.C for a description of these Financing Affiliates), have in the past contracted, and may in the future contract, with WOGA's affiliated broker-dealer, White Oak Merchant Partners, to engage in placement-agent, investment banking, advisory, or other services.

- **Competing Interests Between White Oak Clients and Finacity.**  WOGA's affiliated entity Finacity Corporation ("Finacity") is described in Item 10C. Given the nature of Finacity's business activities, there could be a perceived or actual conflict between Finacity and WOGA's funds and accounts and/or the Financing Affiliates, related to potential investment opportunities.  Any such conflicts, however, are mitigated because of the differing investment mandates and target returns of FInacity on the one hand, and WOGA's clients and the Financing Affiliates on the other. Because of the differences in target returns and investment mandates nearly all, if not all, of the potential investments that FInacity would consider, are expected to be outside the scope of the investment mandates of WOGA's clients.

- **Performance-based Fees for Adviser and Valuations.**  When WOGA's compensation is based on the value or performance of investments, WOGA has an incentive to value a position at a price higher than it might otherwise be valued or to accelerate or defer realizations.  To the extent that performance allocations are based on increases in the net assets of a White Oak Fund or Separate Account, WOGA's compensation is based upon unrealized appreciation as well as realized appreciation.  This means that WOGA may be compensated on performance that is ultimately not realized if positions decrease in value, are subsequently sold at a loss, or deemed realized as a result of some other event (e.g., such as management of a position being transferred to another adviser). The potential for inflated valuation of positions is increased when such positions are illiquid or otherwise lack a readily ascertainable market value.  WOGA seeks to mitigate this conflict by valuing assets in accordance with its written Valuation Policy, which is reasonably designed to assure that valuations are performed in a consistent and thorough manner that insulates the conflict.  In accordance with the Valuation Policy, WOGA considers the views of outside experts, including third-party valuation firms, in determining the value of illiquid or other hard to value assets.  Notwithstanding the foregoing, the Valuation Policy also states that any time a commingled White Oak Fund holds plan assets for purposes of the Plan Asset Regulation (Department of Labor Regulation Section 2510.3-101), the fair value of investments made by such Fund shall be determined by an independent third party valuation firm selected by limited partners owning at

least 51% of such Fund and not affiliated with the investment manager or its affiliates, to the extent necessary to comply with the provisions of the Employee Retirement Income Security Act of 1974.  To that end, the limited partners of certain of WOGA managed private funds have approved an independent third-party valuation firm with respect to determining the fair value of the investments in those Funds.

- **Principal and Cross-Transactions.**  While a rarity in practice, when WOGA engages in principal or cross-transactions, it has an incentive to favor accounts in which it has a greater pecuniary interest.  From time to time, various accounts advised by WOGA have in the past entered into, and may in the future enter into, principal and cross-transactions with other accounts advised by WOGA.

  WOGA will conduct such transactions in accordance with policies to promote fairness to all participating accounts (*e.g.*, by assuring that an appropriate price is assigned to the security being crossed).  Where required by law or the governing documents for a Client account, principal and cross transactions are subject to Client, or the Client's independent investor representative's, consent prior to settlement and information about the transaction, including the nature of the rebalancing transaction, the price at which it will be effected and WOGA's position as principal, if applicable, are provided to allow the Client to determine whether or not to consent.

  As a result of certain regulations governing the ability of Client accounts investing side-by-side, it is possible that different Client account types are not permitted to participate in an investment opportunity at the same time.  The decision as to which Client accounts may participate will take into account the suitability and the strategy of the applicable Clients.  (See Item 16 – Investment Allocation for additional discussion of various criteria applicable to which Client accounts may participate in a given investment.)  It is possible that a Client account may be prevented from participating due to such investment opportunity being more appropriate within the primary strategy of another Client account.

- **Other Conflict Mitigation Practices.**  Many of the conflicts resulting from allocation of investments, transaction based compensation, performance-based fees, side-by side management, etc. are mitigated by WOGA's relevant policies and procedures.  To mitigate potential and actual conflicts of interest, WOGA's policies and procedures stress that investment decisions are to be made in accordance with the fiduciary duties owed to each such Client and without consideration of WOGA's or its personnel's pecuniary, investment, or other financial interests.

  WOGA also has instituted trading policies to promote fair treatment of White Oak Clients based on considerations unrelated to pecuniary interests to ensure that,

WHITE OAK
GLOBAL ADVISORS

wherever possible and over time, opportunities are allocated in a fair and equitable manner.  See Item 12.B for a more detailed description of these policies.

## ITEM 7:   TYPES OF CLIENTS

WOGA provides investment advice to White Oak Clients, which consists predominantly of the Direct Lending Strategy, as discussed above in Item 4. WOGA also provides investment advice to Clients that are institutions using the Firm's Cash Management Strategy, and   to WOIP and WOPFI, as described in Item 4.  WOGA also manages portfolios of instruments that are not securities, such as bank-issued certificates of deposit and bank cash deposits, on behalf of Clients that are individuals.

Investors in the White Oak Funds may include pension funds, insurance companies, private banks, foundations, endowments, trusts, family offices, high net worth individuals, private investment funds, and other institutions.  As noted in Item 4, above, certain other investors include past and present WOGA personnel, their family, and the personnel of WOGA affiliates.  Except as otherwise agreed with WOGA, Investors are not clients of WOGA.

The minimum dollar amount of assets generally required for establishment of a Separate Account following the Direct Lending Strategy is $50,000,000.  The minimum investment required for the Cash Management Strategy is generally $3,000,000. Smaller amounts may be accepted in either instance if deemed appropriate by the Firm.

Smaller amounts than those listed above may be accepted for any product on an accommodation basis or when it is deemed likely that the minimum dollar size will be achieved within a reasonable period of time.

Clients should be aware that if a particular Separate Account is too small, it is possible that the Separate Account may be unable to participate in certain investments due to a lack of available investment capital.  For additional information about Investment Allocation for Clients, see Item 16 – Investment Discretion.

For restrictions on investments in the White Oak Funds, including minimum investments, please see the relevant Fund's offering materials.

Please also see the discussion in Item 4, Section C – Tailored Advice and Client-Imposed Restrictions concerning the White Oak Funds.

## ITEM 8:   METHODS OF ANALYSIS, INVESTMENT STRATEGIES AND RISK OF LOSS

### A.   Methods of Analysis and Investment Strategies

As noted in Item 4 of this Brochure, WOGA manages accounts in two primary investment strategies, each with related methods of analysis, which WOGA characterizes broadly as (1) Direct Lending; and (2) Cash Management.  As noted in Item 4 and discussed below, each

WHITE OAK
GLOBAL ADVISORS

strategy is credit-based.  Additionally, White Oak Funds or Separate Accounts may be focused or concentrated on particular types of instruments or issuers.  All investments anticipate a risk of loss and there is no guarantee that any particular strategy will be effective or yield particular results or levels of return.  As a result, WOGA's products and services are not intended to represent a complete investment solution, and it is expected that Clients and Investors maintain assets other than those advised by or invested through WOGA.  Clients and Investors are responsible for appropriately diversifying their assets to guard against any risk of loss.

## B.  Direct Lending Strategy

WOGA's Direct Lending Strategy is a comprehensive investment process that originates, underwrites, and services private debt investments.  It is designed to provide investors with stable returns with minimal correlation to the public markets.  This strategy seeks to allocate investments across a diversified portfolio of senior secured private credit investments with short maturities and low loan-to-value ratio; however, not all portfolios will be diversified.

The investment team applies fundamental credit analysis to the underwriting and placement of single credit opportunities.  The strategic objective of each of the Funds employing this strategy is to seek steady and consistent returns under any market environment while minimizing downside risk.  The Separate Accounts have separate investment guidelines for each Client, which are further detailed in the relevant Separate Account's Client agreements, investment policy statements, and/or investment guidelines.  Certain Separate Accounts pursue a direct lending strategy and invest alongside the Funds and/or may be eligible to lend alongside a Financing Affiliate when a Financing Affiliate provides financing to its customers.

The portfolio construction process is composed of multiple structural and diversity tests but, in general, consists of loans that share the following characteristics before being deemed an appropriate fit for the portfolio:

- **Senior secured loans**. White Oak generally obtains first lien security over a borrower's assets and in the event of a deteriorating credit circumstance this positioning may enhance downside risk protection.

- **Extensive covenants, low to moderate loan-to-value ("LTV") ratios and low leverage-to-EBITDA multiples**.  Such loan structures with appropriate covenant packages (e.g., requiring minimum revenue, minimum EBITDA, maximum senior leverage, maximum total leverage, minimum cash, minimum fixed charge, maximum capital expenditures, minimum interest coverage, and/or minimum asset coverage, etc.) may further enhance downside risk protection. "EBITDA" is defined in the Glossary at the end of this Brochure.

WHITE OAK
GLOBAL ADVISORS

- **Reduced loan tenors**.  White Oak's existing loan tenors currently average approximately three years at origination, although tenor for any particular loan may vary.  "Tenor" is defined in the Glossary at the end of this Brochure.

- **Control**.  White Oak is typically the sole lender to its borrowers as opposed to participating in broadly syndicated structures.  White Oak believes this senior position allows for a more efficient and effective response to borrower issues, and may enhance risk pricing

- **Early exit opportunities**. Use of cash sweeps and amortization schedules may further reduce loan tenor. Exit opportunities including refinancing, a liquidity event, or the sale of assets or the sale of the business as a going concern.

White Oak may deviate from these guidelines when deemed appropriate and consistent with the investment mandate of the Clients participating in particular investments.

## C.   Institutional Cash Management Strategy

WOGA also manages fixed income and cash portfolios in Separate Accounts only on behalf of institutions, and portfolios of instruments that are not securities, such as bank-issued certificates of deposit and bank cash deposits, on behalf of Clients that are individuals.  Each Separate Account is managed pursuant to parameters specified by each Client.  These parameters are set forth in each Client's investment program and include, among other things, the term structure of each Separate Account, instrument types eligible for (or restricted from) purchase, and required instrument attributes.  All cash management Separate Accounts are managed on an individualized basis.  The investment instruments included in this strategy are generally certificates of deposits, but may, on occasion, include money market funds, Yankee CDs, and U.S. Government paper.

## D.   Material Risks Associated with the Investment Strategies

Investing Involves a Risk of Loss.  While WOGA seeks to manage investments so that risks are appropriate to the return potential for the strategy, it is often not possible or desirable to fully mitigate risks. WOGA does not offer any products or services that guarantee rates of return on investments for any period to any Client or Investor.  All Clients and Investors assume the risk that investment returns may be negative or below the rates of return of other investment advisers or products.  Clients and Investors should understand that they could lose some or all of their investment and should be prepared to bear the risk of such potential losses.

There are risks inherent in the investment strategies pursued, and the financial instruments and trading methods used, by WOGA.  Key risks of loss which apply to the principal investment strategies employed by WOGA are listed below.  More detailed descriptions and explanations of the key risks of loss are included in the relevant documents governing the Client's or Investor's account.

WHITE OAK
G L O B A L   A D V I S O R S

Cybersecurity.  Although WOGA has implemented numerous measures designed to manage risks relating to possible cybersecurity breaches or other similar events, if its systems are somehow compromised, become inoperable for extended periods of time, or cease to function properly, it may be necessary for WOGA to make a significant investment in, or replace, such systems and to seek to remedy the effect of any breach.  The failure of these systems and/or of disaster recovery efforts for any reason could cause significant interruptions in the Firm's operations or to Client accounts and may result in a failure to maintain the security, confidentiality, or privacy of sensitive data, including personal information.

Business Disruptions.  Although WOGA has implemented measures designed to manage risks relating to possible business disruptions resulting from natural disasters, pandemics, and other events, if its systems or processes are somehow compromised or disrupted, become inoperable for extended periods of time, or cease to function properly, it may cause significant interruptions in the Firm's operations and have adverse impacts on Client accounts.  Any interruptions or disruptions may result in (i) a failure to maintain the security, confidentiality, or privacy of sensitive data, including personal information, (ii) adverse business impacts to White Oak, and/or (iii) financial losses for Clients.  WOGA seeks to mitigate such risks by having a current business continuity plan, testing the plan periodically, and maintaining a platform that allows most employees to work remotely to fulfill their duties.

Coronavirus Outbreak.  The outbreak of the 2019 novel coronavirus ("COVID-19") and the social and economic circumstances resulting from it, including business closures, limitations on public gatherings, travel restrictions and quarantines, have significantly impacted the global economy and markets.  COVID-19 may have a significant and lasting effect on White Oak, its clients and their portfolio companies.  For example, we anticipate the economic and market conditions resulting from the outbreak will materially and adversely affect the operations and financial position of many companies and industries, which would extend to certain investments held by our Clients.  In addition, COVID-19 and corresponding containment efforts have impaired and will continue to impair WOGA's ability to source and originate new investment opportunities, conduct due diligence, and manage and monitor portfolio investments, for example, through onsite visits and in-person communications.  Given the extraordinary nature of COVID-19 and its inherent unpredictability, it may take years to understand the full scope of its ramifications.

RISKS OF THE ESG STRATEGY:

For WOGA Clients with an ESG mandate, WOGA conducts an ESG analysis of borrowers before a loan commitment is made, in accordance with WOGA's ESG Policy.  The ESG Policy will not be measured during the life of a loan, compliance with WOGA's ESG Policy will not be covenanted by the borrower, and failure to comply with WOGA's ESG Policy will not give rise to an event of default on the loan.  Although WOGA will exercise commercially reasonable efforts to assure that borrowers intend to follow business models that align with

WOGA's ESG Policy, a Client may lend to a borrower that subsequently engages in activities that are inconsistent with WOGA's ESG Policy.

The use of ESG metrics in the investment process may be subjective and are not subject to uniform standards, and, as such, there is no guarantee that WOGA will be able to accurately assess and measure the ESG risks of any loan.  ESG-based exclusionary criteria may result in a Client foregoing opportunities to make certain investments when it might otherwise be advantageous to do so. The use of ESG criteria may affect a Client's investment performance and, as such, a Client may perform differently compared to other Clients that do not use such criteria.

Given the emerging nature of the ESG investment space and the high-demand for such opportunities, there may be limited investment opportunities, which could lead to a highly concentrated investment portfolio and affect investment returns. To the extent a Client concentrates investments in a particular sector, sub-sector, or geographic region, its investments will become more susceptible to risks related to the concentration of investments, as discussed below in the "Risks of the Direct Lending Strategy" section.

## RISKS OF THE DIRECT LENDING STRATEGY:

Acquisition of Loans from Other White Oak Funds.  While a rarity in practice, WOGA has from time to time caused and may in the future cause certain Clients (for purposes of this discussion, "Acquiring Clients") to acquire loans originated by other funds or accounts WOGA manages (for purposes of this discussion, collectively, "Other Clients").  Although WOGA will determine in good faith the prices at which those sales will occur, and will generally use third-party valuations, in light of the nature of loans and difficulties in valuing them, those prices may differ, possibly substantially, from the values an Acquiring Clients may ultimately be able to realize on them.  In addition, WOGA will have conflicts of interest in determining loan prices, to the extent WOGA receives higher compensation from Other Clients or otherwise has greater interests in the performance of such Other Client, as compared with the compensation WOGA receives from, or the interests it holds in, the Acquiring Client.  In determining loan sale prices, WOGA will use whatever criteria and techniques it, in its discretion, considers appropriate under the circumstances.

Bank Loans.  Firm Clients may invest directly in bank loans, either by buying a "participation" in a loan or by having a portion of the loan "assigned" to it.  There is often less readily available information about loans (and the borrowers) than there is about other debt instruments and their issuers.  Loans generally are not listed on any securities exchange or automated quotation system, and no active trading or secondary market exists for many loans.  As a result, many loans are illiquid.  Yet even where a secondary market does exist for a particular loan, such secondary market may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.  The market for loans could be disrupted in the event of an economic downturn or a substantial increase or decrease in interest rates.  Many loans are not rated by any credit rating agency and, where they are not, a Fund or Separate Account will be more completely dependent on WOGA's credit analysis

WHITE OAK
G L O B A L   A D V I S O R S

abilities than it is in the purchase of rated instruments.  Loan participations may give a Fund or Separate Account more limited rights as a creditor than loan assignments, because, among other things, the buyer of a participation typically has a contractual relationship with the lender who sold the participation but not with the borrower.  The owner of a participation assumes the credit risk of the seller who sold the participation, as well as the credit risk of the borrower.

Co-Investments with Third Parties.  A Fund or Separate Account may co-invest with unaffiliated third parties through joint ventures or other entities.  Those investments may involve risks in connection with such third party involvement, including the possibility that a third party co-venturer may have financial difficulties or economic or business interests or goals that are inconsistent with the Fund's or Separate Account's, or may be in a position to take (or block) action in a manner contrary to the Fund's or Separate Account's investment objectives.  In circumstances where co-investors involve a management group, the co-investors may enter into compensation arrangements relating to co-investments, including incentive compensation arrangements.  Those compensation arrangements would reduce the returns to participants in the investments, including the Fund or Separate Account.

Certain limited partners that have invested in WOGA clients have requested, or may request, to participate alongside WOGA clients as a co-investor in particular opportunities.  There can be no assurance that any co-investment opportunities will be provided to such limited partners, and one or more limited partners may, due to available capital, ability to execute in the timeframe provided, or for other reasons, participate in the majority or all of such co-investment opportunities.

Concentration of Investments.  Limits are typically placed on the amount of capital a Fund or Separate Account may commit to any single investment, issuer, industry, or sector.  While each Fund and Separate Account generally attempts to spread capital among a number of investments, at times a Fund or Separate Account may hold a relatively small number of positions, each representing a relatively large portion of the Fund's or Separate Account's capital.  The Fund or Separate Account may at times have a relatively large portion of its capital exposed to a particular industry or market sector.  Losses in one or more large positions, or a downturn in an industry or market sector in which the Fund or Separate Account is concentrated, could materially adversely affect the Fund's or Separate Account's performance in a particular period and could have a materially adverse effect on the Fund's or Separate Account's overall financial condition.

Counterparty Risk and Bridge Financing Program.  Prior to funding a new direct lending transaction, the Firm in the past has called capital from its Clients to whom it allocates such loan (unless its Clients maintain a cash balance sufficient to cover their respective allocation).  This capital call process can take as long as three weeks from the date WOGA notifies its Clients to the date of funding the borrower.  Given the length of time it may take to receive capital from a Client, WOGA has established a bridge financing program with a well-known third party bank to provide funding of loans to borrowers in an expedited fashion to take advantage of real-time borrower opportunities.  This bridge facility is used in

most instances.  Through this program, prior to funding the loan, WOGA, on behalf of its Clients, assigns or sells a participation interest in the loan to the bank and may provide guarantees in connection with the assignment or sale.  This financing provides the cash needed to fund the loan to the borrower.  Simultaneously, WOGA and the bank enter into a future transaction whereby WOGA, on behalf of its Clients, repurchases the participation interest or repurchases the assigned interest from the bank using the funds which have become available from the Client's capital call.  The bank typically charges an institutional margin rate and the Clients usually earn the interest accrued from the origination date through the settlement date.  The net result ranges from a modest loss to a slight gain on a case by case basis attributable to the participating Clients.  There is no capital call line of credit in place currently, although such a line may be put in place in the future if consistent with the Client's governing documents.  While the counterparty risk of our current bridge financing program is not the same as a traditional trading or prime brokerage relationship, one risk in this circumstance beyond the trade period described above is that the bank is no longer willing to provide this service in the future.  In that event, the Firm would revert to the prior practice of managing loan closings by simply calling capital earlier in the funding process and / or work with other banks.  In addition, while remote, in the event a Client or one or more investors failed to contribute the necessary capital to repay such facilities within the specified period, the lenders under these facilities could foreclose on their interests in the Client investments, which could adversely impact the investment, any related Investment Vehicle, and the Client.

Custody.  Firm Clients maintain accounts at certain banks, broker-dealers and other financial institutions where they will hold their assets in cash and certain cash equivalents pending use.  Clients participating in the Direct Lending Strategy, however, anticipate that their assets will consist primarily of interests in non-exchange traded debt in the forms of senior secured term loans, which generally are not considered "securities" nor are such instruments capable of being "custodied" in the traditional sense.  Accordingly, at any given time a Fund's or Separate Account's account with its custodians may only contain a relatively small portion of the Fund's or Separate Account's assets.  Notwithstanding the foregoing, all of the assets of the Clients consisting of cash or securities will be held by qualified custodians pursuant to Rule 206(4)-2 of the Advisers Act.  The Clients expect that any of their assets deposited with custodians will be clearly identified as being assets of the relevant Fund or Separate Account, and hence no Fund or Separate Account should be exposed to a credit risk with respect to such parties.

Debt Securities.  White Oak Clients may invest in debt or other fixed income securities.  These securities are generally bonds or other debt instruments issuers use as a means of borrowing money, such as senior secured corporate credit and similar debt instruments, consisting of term loans, asset based loans, asset backed loans, equipment financing, and other credit and credit-related instruments, including sale leaseback transactions and, in limited instances, assessment or revenue bonds whose underlying obligations have characteristics of a senior secured debt instrument, as well as warrants and equity co-investments received in conjunction with the debt financing, issued by small and middle-

market companies.  The issuer generally pays the investor a fixed, variable or floating rate of interest and, at the maturity of the instrument, must repay the amount borrowed.  Some debt securities (e.g., zero coupon bonds) do not pay current interest, but are sold at a discount to their face values.  Debt securities have varying levels of sensitivity to changes in interest rates and varying degrees of credit quality.  Assuming other factors remain constant (e.g., the creditworthiness of the issuer), bond values generally rise (increase in value) when interest rates fall and fall (decrease in value) when interest rates rise.

Default Risk; Credit Risk.  The performance of Client investments could be adversely affected if issuers of debt instruments in which a Client has an interest (or as to which it has entered into credit-related derivatives contracts) default on those instruments, or if events occur that reduce the creditworthiness of those issuers.  If a bond or other debt instrument were to become subject to such an event, the value of such instrument could be significantly reduced, conceivably to zero.

Derivative Financial Instruments and Techniques.  White Oak Clients have in the past, and may in the future, invest in derivative financial instruments as part of a hedging strategy. The risks posed by such instruments and techniques, which can be extremely complex, may include: (1) credit risks; (2) market risk; (3) legal risks; (4) operations risk; (5) documentation risk; (6) liquidity risk; (7) system risk; (8) concentration risk; and (9) settlement risk.  Use of derivatives and other techniques such as short sales involves certain additional risks, including: (i) dependence on the ability to predict movements in the price of the securities hedged; (ii) imperfect correlation between movements in the securities on which the derivative is based and movements in the assets of the underlying portfolio; and (iii) possible impediments to effective portfolio management or the ability to meet short-term obligations because of the percentage of a portfolio's assets segregated to cover its obligations.  In addition, by hedging a particular position, any potential gain from an increase in value of such position may be limited.

Difficulty of Locating Attractive Investments.  Identifying, completing, and realizing gain on attractive investments is a highly competitive activity and involves significant uncertainty. Firm Clients will compete for investments with other unrelated investment vehicles, as well as financial institutions and other institutional investors, which may have more resources than any particular Client.

Interest Rate Risk.  The value of debt securities (and related investments) in Client portfolios may fluctuate with changes in interest rates.  When interest rates rise, prices of debt securities generally fall, and when interest rates fall, debt securities generally increase in price.  Usually the prices of debt securities that must be repaid over longer time periods fluctuate more than the prices of shorter-term debt securities.  Interest rate changes will affect the value of a debt instrument indirectly (especially in the case of fixed rate securities) and directly (especially in the case of instruments whose rates are adjustable).  Additional factors that may affect market interest rates include, without limitation, inflation, slow or stagnant economic growth or recession, unemployment, international disorders, and instability in domestic and foreign financial markets. White Oak Clients have in the past, and

WHITE OAK
GLOBAL ADVISORS

may in the future, attempt to minimize the exposure of their respective portfolios to interest rate changes through the use of interest rate swaps, interest rate futures, interest rate options and/or other hedging strategies. However, there can be no guarantee that a Client will implement such hedges, or if it does so, that such hedges will be successful in fully mitigating the impact of interest rate changes on the portfolio.

Investments in Countries Other Than the United States.  White Oak Clients have in the past, and may in the future, make opportunistic investments in countries other than the United States. Investments outside of the United States may give rise to certain risks, which may include: (1) the seizure by foreign governments of company assets, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets; (2) enforcing legal rights in some foreign countries is difficult, costly and slow, and there can be special problems enforcing claims against foreign governments; and (3) non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and Clients may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts.  Changes in currency exchange rates will affect a Client's portfolio's net asset value, the value of dividends and interest earned, and gains and losses realized on the sale of investments.  An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of a Client's investments to decline. Some foreign currencies are particularly volatile.  Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of a Client's foreign currency holdings.  If a Client enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates.  On the other hand, if a Client enters forward contracts for the purpose of increasing return, it may sustain losses.

Investments in Undervalued Assets.  A Client may invest in undervalued assets.  The identification of investment opportunities in undervalued assets is a difficult task, and there is no assurance that such opportunities will be successfully recognized or acquired.  While investments in undervalued assets offer the opportunity for above-average capital appreciation, these investments involve a high degree of financial risk and can result in substantial losses.  Returns generated from a Client's investments may not adequately compensate investors for the business and financial risks assumed.  Clients should be aware that they may lose all or part of their investment.

A Client may be forced to sell, at a substantial loss, assets that are not, in fact, undervalued. In addition, a Client may be required to hold such assets for a substantial period of time before realizing their anticipated value.  During this period, a portion of the Client's assets would be committed to the investments purchased, possibly preventing the Client from investing in other opportunities.  In addition, a Client may finance such purchases with borrowed funds and thus will have to pay interest on such funds during such waiting period.

Lender Liability Considerations and Equitable Subordination.  In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lending institutions on the basis of various evolving legal theories (collectively termed "lender

WHITE OAK
GLOBAL ADVISORS

liability"). Generally, lender liability is founded upon the premise that an institutional lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower, or has assumed a degree of control over the borrower resulting in a creation of a fiduciary duty owed to the borrower or its other creditors or shareholders. While believed to be unlikely, because of the nature of certain Client investments, a Client could be subject to allegations of lender liability.

In addition, under common law principles that in some cases form the basis for lender liability claims, certain actions by a lending institution could persuade a court to elect to subordinate the claim of the offending lending institution to the claims of certain other creditors – a remedy called "equitable subordination." Because of the nature of certain Client investments, a Client could be subject to claims from creditors or shareholders of an obligor that the Client's investments issued by such obligor that are held by the Client should be equitably subordinated. In addition, certain Client investments may involve investments in which the Client would not be the lead creditor. Accordingly, it is possible that lender liability or equitable subordination claims affecting a Client's investments could arise without the direct involvement of the Client.

Litigation. In the ordinary course, borrowers and portfolio companies have been and are expected to be subject to routine litigation from time to time. The outcome of such proceedings may materially adversely affect the value of the Client and may continue without resolution for long periods of time. In certain instances, Clients, WOGA, or their affiliates could be named in the matter. Any litigation may consume substantial amounts of the relevant General Partner's and the principals' time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation. Although expenses incurred in defending against such litigation is typically paid by the borrower or portfolio company, in instances when the borrower or portfolio company lacks sufficient capital to pay defense costs or refuses to pay such costs, these expenses are generally borne by the Clients invested in such company.

Lending. WOGA may invest Client assets in certain loans, which are subject to a number of risks:

- **Conflicts among Clients Relating to Different Investments in the Capital Structure of Portfolio Companies, Issuers, and Borrowers.** Clients may invest in or, as a result of foreclosure upon defaulting borrowers, have interests in different layers of the capital structure of a portfolio company, issuer, or borrower, including Financing Affiliates. For example, a Client may own debt and/or equity of a portfolio company, issuer, or borrower while another Client owns equity and/or holds a debt position (e.g., different tranche or other class or issue of debt) in the same portfolio company, issuer, or borrower. Furthermore, a Client may participate in debt originated to finance the acquisition by other Clients of an equity or other interest in a portfolio company, issuer, or borrower. To the extent a reorganization or other major corporate event occurs with respect to such

WHITE OAK
GLOBAL ADVISORS

portfolio company, issuer, or borrower, conflicts may exist between such Client and other Clients.

Furthermore, a Client may also invest in portfolio companies or other assets in which other Clients already have an investment.  A Client may provide follow-on funding for a portfolio company, which may benefit both such Client and other Clients.  Such Client will not make such an investment unless WOGA or an Affiliate believes the investment fits within such Client's investment program and is approved by WOGA's investment committee.  Additionally, another Client may invest in a portfolio company in which a Client has a pre-existing investment.  There can be no assurance that a Client will wish to make such follow-on investment or have available capital to do so, and the inability to make such follow-on investment may result in dilution of such Client's investment in the portfolio company. In certain situations, Clients that provide follow-on fundings to existing borrowers may take priority in the payment waterfall over Clients who provided prior fundings to the same portfolio company.

Such activities present certain conflicts of interest, such as the risk of borrower bankruptcy, in which the interests of debt and equity holders are generally in opposition.  In such situations, WOGA will seek to resolve such conflicts of interest in a fair and equitable manner.  WOGA endeavors to mitigate this conflict through various mechanisms, including by having those original lenders to a particular borrower that have available capital participate in future lending opportunities (e.g., upsizes, add-ons, additional purchases of third-party debt, etc.) in roughly the same proportion as the original funding and by having the WOGA investment committee, in their fiduciary capacity, approve major investments.  Although WOGA will use its best efforts to represent the interests of each Client, managing such a conflict may result in one Client achieving a better return or outcome than another Client.

For Clients whose assets are considered "plan assets" under ERISA ("plan asset Clients"), the above risks are also mitigated by ERISA's requirements for plan fiduciaries to avoid prohibited transactions.  In the event of such a potential prohibited transaction involving a plan asset Client, WOGA will not act for such a Client in a potential conflict situation, but such investments or actions may be taken by a Fund if directed by the Independent Investor Representative of the Fund or by the Client itself if a Separate Account.

- **Differences with Traditional Lending.**  The companies in which WOGA may invest Client assets in the form of loans may present a higher risk of loss from non-payment of interest and principal than is typical among other borrowers.  Companies that seek debt financing from Firm Clients may be unable to obtain financing from traditional lenders, such as banks, because those lenders view these companies as presenting too great a risk of default.  The Firm may engage in different diligence practices and risk/benefit analyses, obtain fewer

WHITE OAK
GLOBAL ADVISORS

contractual protections in loan documents, and devote fewer resources to monitoring collateral as compared with a traditional lender's typical practices.  In addition, such loans will generally be subject to less regulatory scrutiny by state and federal authorities than loans extended by banks and other traditional lenders.

- **Risks Associated with Collateral.**  Although a loan made by a Client may be secured by collateral deemed by WOGA to be sufficient to cover principal and interest, as considered at the time of origination or acquisition, there can be no guarantee that the value of the collateral for a given loan will be sufficient to offset the principal and interest the debtor owes the lender over time.  In addition, the legal proceedings necessary to claim collateral in the event of a debtor's default, reduction in creditworthiness, or bankruptcy (each a "Credit Event") may be expensive and time consuming.

- **Secured Loans with Multiple Creditors.**  A single debtor may pledge the same collateral as security for loans from multiple lenders.  Although WOGA generally only invests when it is the most senior creditor, in the event the debtor has a Credit Event, the collateral remaining once any more-senior creditors have satisfied their claims may be insufficient to offset the principal and interest the debtor owes the relevant White Oak Client.

- **Secondary Market for Loans.**  The secondary market for certain loans may not be as well developed as the secondary markets for other types of securities.  Consequently, a Client holding a loan may not be able to find a buyer for such loan at a favorable price if the need for liquidity arises.

- **Syndicated Leveraged Loans.**  WOGA may invest Client assets in assignments or participations in syndicated leveraged loans.  Such investments entail general credit risks, risks associated with lower credit quality loans, the risk of equitable subordination, and the risk of fraud on the part of the borrower.  General credit risks arise from exposure to losses resulting from default and foreclosure.  Lower credit quality loans offer a higher return potential than better quality loans, but involve greater volatility of price and greater risk of loss of income and principal.  Additionally, the market values of certain lower credit quality loans may tend to be more sensitive to changes in economic conditions than better quality loans, and certain such loans may lack liquid markets.  Equitable subordination is a process by which lenders claims on debtor assets are subordinated or disallowed because of inappropriate exercise of control of the management and policies of a debtor; lenders to companies operating in workout modes or under Chapter 11 of the U.S. Bankruptcy Code are, in certain circumstances, subject to such risk.

- **Priority of Repayment.** The characterization of a Client's investments as senior debt or senior secured debt does not mean that such debt will necessarily be repaid in priority to all other obligations of the businesses in which such Client

WHITE OAK
GLOBAL ADVISORS

invests. Furthermore, debt and other liabilities incurred by non-guarantor subsidiaries of the borrowers of senior secured loans made by a Client may be structurally senior to the debt held by such Client. In the event of insolvency, liquidation, dissolution, reorganization, or bankruptcy of a portfolio company, the debt and other liabilities of such subsidiaries could be repaid in full before any distribution can be made to an obligor of the senior secured loans held by a Client. Finally, portfolio companies will typically incur trade credit and other liabilities or indebtedness, which by their terms may provide that their holders are entitled to receive principal payments on or before the dates payments are due in respect of the senior secured loans held by a Client. In addition, certain Client borrowers have in the past, and likely will in the future, taken out revolving or other forms of bank lines of credit; in such instances, these bank lines of credit by their terms may provide that they are repaid prior to any payment on Client's debt in the event of insolvency, liquidation, dissolution, reorganization, or bankruptcy.

- **Potential Early Payment.** The terms of loans acquired or originated by a Client may be subject to early prepayment options or similar provisions which, in each case, could result in a Client realizing such loans earlier than expected, sometimes with no or a nominal prepayment premium. This may happen when there is a decline in interest rates, when the portfolio company's improved credit or operating or financial performance allows the refinancing of certain classes of debt with lower cost debt or when the general credit market conditions improve. In the event that a Client receives proceeds from an investment earlier than it had anticipated, such Client may be permitted to reinvest such proceeds, but there is no assurance that such Client will be able to reinvest such proceeds even where they are received during an investment period. A Client's inability to reinvest such proceeds may material affect the performance of such Client. In the event that a given loan is structured with a prepayment premium, interest make whole, or the like, such prepayment typically results in a gain (sometimes a substantial gain) for the Client. In the event that a written agreement is reached with respect to such a prepayment and the closing takes place after the next relevant valuation date for the applicable Client, the Valuation Committee may mark such loan above the par or cost value to take into account the then present value of the expected prepayment premium (with some sort of adjustment or offset for the risk of the repayment not occurring as expected).

- **Interest Only/Bullet Repayment.** The terms of loans acquired or originated by a Client may provide for the entire loan amount to be paid at maturity or payments of interest only with a balloon payment of principal payable at the end of the term, rather than gradually repaying the loan in installments over a period of time. In some cases where bullet repayments are required, the bullet repayment is the only required principal repayment during the life of the loan; in others, the debt is also subject to amortization. In the latter case, the outstanding principal

WHITE OAK
GLOBAL ADVISORS

amount of the debt reduces over time as amortization payments are made in accordance with an agreed payment schedule.  However, a loan amortization schedule often leaves an outstanding principal balance at maturity that is significantly larger than the amount of any of the periodic amortization payments.  A low level of amortization of any debt, over the life of the investment, increases the risk that a portfolio company will not be able to repay or refinance the debt when it comes due at its final stated maturity. Fluctuations in interest rates and the unavailability of funds could adversely affect the ability of a borrower to refinance the loan at maturity.

- **Pay-In-Kind Interest/Original Issue Discount.** The loans made by the Firm's Clients may provide for original issue discount (OID), which are debt obligations issued at a discount from face value, and "pay-in-kind" interest (PIK).  In such case, the Clients would be required to include amounts in taxable income on a current basis even though receipt of such amounts will occur in a subsequent year.  Consequently, OID and PIK instruments may have unreliable valuations because their continuing accruals require ongoing judgments about the collectability of the deferred payments and the value of any associated collateral.  The deferred payment associated with OID and PIK increases the risk that a portfolio company will not be able to make the deferred payments when they come due at the loan's maturity.  Fluctuations in interest rates and the unavailability of funds could adversely affect the ability of a borrower to refinance the loan at maturity.

- **Tax Issues Affecting Investments.**  When making an investment, WOGA endeavors to structure the investment in a tax-efficient manner.  There can be no assurance, however, that optimal tax treatment will be achieved, and in instances when multiple clients participate in an investment, certain clients may achieve greater tax benefits than other clients.  In such circumstances, WOGA endeavors to structure the investment in a fair and equitable manner in order to, for example, achieve the greatest tax benefit for the clients or structure the investment to continue to protect the tax treatment of the clients and their investments.

- **Tax Issues Impacting Investment Allocations.**  Certain Clients may have tax considerations that limit the types of investments such Clients may make and that impact the method by which investments are structured, for example investing through a tax blocker.  As a result, these Clients may have different allocations of and net returns from investment opportunities than they might otherwise have in the absence of such tax considerations.  In addition, as a result of tax considerations, certain Clients may end up investing in different levels of the capital structure of a portfolio company.  (See *Conflicts among Clients Relating to Different Investments in the Capital Structure of Portfolio Companies, Issuers, and Borrowers* for a discussion of the risks associated with investments where Clients are in different layers of a borrower's, issuer's, or portfolio company's capital structure.)  For example, investments may be structured so

WHITE OAK
GLOBAL ADVISORS

that one Client receives third-party loans from, or transfers third-party loans to, another Client.  In structuring such investments, WOGA will weigh the conflicting interests of the different Clients in determining the amount to allocate to debt and equity and the terms of these loans.

- **Cash Flow Sweeps.**  The loans made to borrowers by Clients may provide for mandatory prepayments of the principal balance of the loan in an amount equal to a percentage (commonly ranging from 25% to 100%) of the borrower's excess cash flow for the previous fiscal year.  These mandatory prepayments result in accelerated repayment of the principal balance of the loan.  Accelerated payment reduces the loan to collateral value ratio, but also reduces the interest income that the Client would earn on the loan.

- **Warrants and Other Equity Positions.**  When Clients invest in certain debt instruments, they may also acquire warrants or other equity securities. The goal is ultimately to dispose of such warrants or other equity securities and realize gains upon the disposition.  However, such equity securities may not appreciate in value and, in fact, may decline in value.  Accordingly, the Client may not be able to realize gains from the equity securities.  In addition, any equity securities that the Clients receive in connection with a debt investment will generally be valued as part of the negotiation process with the borrowing company.  As a result, a portion of the aggregate purchase price for a debt investment and equity security will be allocated to the equity security.  This will generally result in original issue discount for tax purposes, which the Clients would be required to recognize as income although the equity security has not produced the cash representing such income.

Leverage.  From time to time, Clients have in the past utilized, and may in the future utilize, credit facilities in order to manage cash flows, bridge capital calls, support revolver facilities for borrowers, or through special purpose vehicles to finance loans, debt instruments, or other investments, which creates leverage.  The use of leverage has the potential to improve returns to investors if the borrowings are at interest rates that are less than the rates paid on the debt instruments themselves, but this may also have the effect of making returns on those debt instruments more volatile and subject to greater risks of loss, in the event of default.  In addition, many (if not most) of the issuers of debt instruments in which a Client may invest are leveraged themselves, which includes certain Financing Affiliates; see Item 10.C below for a description of these Financing Affiliates.  Such investments are inherently more sensitive than others to declines in revenues and to increases in expenses and interest rates.  Finally, in connection with a Client's investment in financial services companies, these financial services companies will routinely utilize bank debt in addition to borrowings from Firm Clients.  Examples include the Financing Affiliates as described in the section titled "Certain Risks related to Financing Affiliates" of Item 10.C.  Such leveraged capital structures may adversely impact investment performance as a result of credit deterioration, a default or in a general downturn of the economy.  Further, vehicles in which the Clients may invest, including, without limitation, the Financing Affiliates and any other

limited partnerships and limited liability companies, have in the past utilized, and such vehicles or any newly formed vehicles may in the future utilize, leverage, whether directly or indirectly, in connection with their business for the purpose of achieving a levered return. If such a vehicle in which a Client invests is structured as a pooled, commingled structure, whereby investments by a Client are combined with prior, concurrent or subsequent investments by other Clients, there may be the potential for additional risk.  (Please refer to the section titled "Counterparty Risk & Bridge Financing Program" in Item 8.D for additional information regarding the Clients' use of bridge facilities to fund the acquisition of loans, debt instruments and other Client investments.)

Limited Liquidity of Many Investments.  Most Clients pursuing the direct lending strategy will invest by making loans, whose ownership interest in such loan is relatively illiquid. Certain other Clients whose assets are invested using the Cash Management Strategy may invest in securities that, while not necessarily subject to resale restrictions, are relatively illiquid, possibly because a security is thinly traded, the Client's position in a security is large in relation to the overall market for the security, or for other reasons.  A Client may own securities that are relatively liquid when acquired but that become illiquid after the Client invests.  The Client may not be able to liquidate illiquid securities positions if the need were to arise; rapid sales of such securities could depress the market value of those securities, reducing such Client's profits, or increasing its losses, in the positions.  The value assigned to illiquid securities (including thinly traded securities) and large blocks of securities for purposes of determining net profit and net loss may differ from the value the Client is ultimately able to realize on those securities.  This may cause an inference of more liquidity than actually exists.  Furthermore, in circumstances whereby independent members of the board of a Fund or investors in Separate Accounts or open-ended Funds require a liquidation event, the values realized thereby may be below fair market values.

Material, Non-Public Information; Board Representation, and Inside Information.  Although a rarity in practice, WOGA or its personnel may come into possession of material, non-public information.  In such instances, the possession of such information could limit the ability of a Client to buy or sell a security or otherwise to participate in an investment opportunity. From time to time, WOGA also obtains representation on the boards of directors, governing groups, creditors' committees, or other committees of companies in which a Client invests. Representation on a board or committee of a company would increase the possibility that the Client will be deemed an affiliate of such company and in that instance could restrict the Client's trading of its investments in the company.  In addition, as a result of these positions, WOGA (through its representatives or otherwise) may receive or be deemed to receive inside information concerning certain companies.  WOGA's possession of inside information would restrict a Client's ability to buy or sell securities of the companies as to which the Firm has information, perhaps for substantial periods of time.  This may prevent such Client from realizing profit or avoiding loss or may otherwise adversely affect the Client's investment activities.  WOGA and/or one or more of its representatives may receive compensation or other benefits from companies for participating on certain committees.

WHITE OAK
GLOBAL ADVISORS

Such compensation, or transaction fees, or similar benefits may be subject to offset provisions for certain Funds pursuant to their respective governing documents.

<u>Non-Investment Grade/Low Quality Instruments/Distressed Debt.</u>  WOGA may invest Client assets in non-investment grade securities, Regulation D/Rule 144A bonds, and similar obligations and instruments.  Non-investment grade securities are debt securities that are not rated or are rated below investment grade (*e.g.,* below BBB by Standard & Poor's Rating Group or Baa by Moody's Investors Service, Inc.) by a nationally recognized statistical rating organization in the United States or other statistical rating organizations.  Investing and trading in debt instruments are subject to various risks, including issuer risk, credit risk, market risk, interest rate risk, prepayment risk, derivatives risk, and liquidity risk, as well as the risk of improper valuation.  Many of these risks are greater with respect to non-investment grade debt instruments than they are as to higher quality instruments.  Trading and investing in non-investment grade instruments can be highly speculative.

<u>Re-Balancing Risk.</u> WOGA may cause certain Clients to initially fully fund a particular loan, especially in the case of protective advances, which are later re-allocated to other Clients as the cash becomes available, usually within ninety days or less ("re-balancing").  Although WOGA will re-balance these positions with accrued interests, the risk will be initially borne disproportionately by Clients with more liquid assets that initially fully fund a particular loan.

<u>Proprietary Methods.</u>  Because specific elements of WOGA's strategies and their implementation are proprietary, Clients will not be able to determine the full details of WOGA's methods or evaluate how closely they are being followed.  Investment strategies may involve risks under some market conditions that differ from the risks that would be present under ordinary market conditions and which may not be anticipated by WOGA.  WOGA may seek to exploit arbitrage opportunities or market inefficiencies.  These opportunities may be limited as to time and capacity and become less profitable as WOGA and competing asset managers or investors seek to deploy a larger amount of assets in the same or similar manner (tending to reduce the profit opportunities) or when market conditions change.

<u>Risks Associated with Loans to Companies in Distressed Situations and/or Companies Struggling to Achieve Positive Cash Flow; Investments in Distressed Companies; Defaulted Securities; and Post-Reorganization Securities.</u>  Clients may acquire loans of companies that are experiencing significant financial or business difficulties, including companies involved in bankruptcy or other reorganization and liquidation proceedings, as well as loans to companies that are unrated or rated below investment grade.  Although the terms of such financing may result in significant financial returns to the Client, they involve a substantial degree of risk.  The level of analytical sophistication, both financial and legal, necessary for successful financing to companies experiencing significant business and financial difficulties is unusually high.  There is no assurance that the evaluation of the value of the assets collateralizing a Client's loans or the prospects for a successful reorganization or similar action will be correctly assessed.  In any reorganization or liquidation proceeding relating to a company that a Client funds, the Client may lose all or part of the amounts

WHITE OAK
G L O B A L   A D V I S O R S

advanced to the borrower or may be required to accept collateral with a value less than the amount of the loan advanced to the borrower.

Clients may invest in securities of issuers in weak financial condition, experiencing poor operating results, struggling to achieve positive cash flow, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, or that are involved in bankruptcy or reorganization proceedings, as discussed above.  Clients may invest in securities of distressed or troubled companies.  These investments involve substantial risks not normally associated with investments in other companies, including adverse business, financial, or economic conditions that may lead to defaulted principal and interest payments and insolvency proceedings.  The Client may lose its entire investment in a distressed company, may be required to accept cash or securities with a value less than the Client's investment, and may be prohibited from exercising certain rights with respect to the investment.  Distressed company investments may not show any returns for a considerable period of time.

It may be difficult for WOGA to obtain information as to the true condition of a distressed company.  Distressed company investments may also be adversely affected by U.S. state and federal laws related to, among other things, fraudulent conveyances, voidable preferences, lender liability, and the bankruptcy court's discretionary power to disallow, subordinate, or disenfranchise particular claims.  There may be little or no liquidity in the markets for distressed securities or instruments.  In particular, some of the Clients' investments may contain trading restrictions, or the marketability of these interests may be hindered for other reasons.  In addition, if publicly listed, the public market prices of distressed companies may experience periods of abrupt and erratic market movements and above-average price volatility, and the spread between "bid" and "ask" prices of these securities may be greater than normally expected.  There is no assurance that the securities of a Client's portfolio companies will resume trading in public markets or be acquired by other companies.  It may take a number of years for the market price of such securities to reflect their intrinsic value.  In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful, will be delayed, or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Client of the security in respect of which such distribution was made.

Distressed company investments require active monitoring, and Clients may seek representation on creditors' committees, from time to time, if WOGA determines that such representation is necessary or advisable to protect or further the Client's interests.  Representation on such a committee would increase the possibility that the Client will be deemed an affiliate of the company and may restrict the Client's trading of its investments in the company.

Clients may invest in the securities of companies involved in bankruptcy proceedings, reorganizations, and financial restructurings, and may have a more active participation in the affairs of the issuer than is typically the case of investors in companies not involved in such

proceedings.  This may subject a Client to litigation risks or prevent the Client from disposing of securities.  In a bankruptcy or other proceeding, the Client, as a creditor, may be unable to enforce its rights in any collateral or may have its security interest in any collateral challenged, disallowed, or subordinated to the claims of other creditors.  While the Client will attempt to avoid taking the types of actions that would lead to equitable subordination or creditor liability, there can be no assurance that such claims will not be asserted or that the Client will be able to successfully defend against them; see *Lender Liability Considerations and Equitable Subordination* in this Item 8.D above.

Post-reorganization securities typically entail a higher degree of risk than investments in securities of companies which have not undergone a reorganization or restructuring.  Moreover, post-reorganization securities can be subject to heavy selling or downward pricing pressure after the completion of a bankruptcy reorganization or restructuring.  If WOGA's evaluation of the anticipated outcome of an investment situation should prove incorrect, a Client could experience a loss.

Subordination.  From time to time, a Client may invest in securities that are contractually or structurally subordinate in right of payment and junior in rank to other securities that are secured by or represent an ownership interest in the same pool of assets, and thus, would be subordinated to the prior payment in full of such debt.  Such subordinated investments may be characterized by greater credit risks than those associated with the senior obligations of the same issuer.  Adverse changes in the financial condition of an issuer, general economic conditions, or both may impair the ability of such issuer to make payments on the subordinated securities and result in defaults on such securities more quickly than in the case of the senior obligations of such issuer.  An example of this circumstance is when a bank credit line is used to fund the revolver or working capital facility of a borrower (including, as appropriate, certain Financing Affiliates) and a Client investing in a term loan to such borrower is subordinate to the bank in the assets supporting the bank's revolver or working capital facility.

Substantial Positions in Portfolio Companies.  A Client may, from time to time and in circumstances such as a bankruptcy or workout, acquire positions in particular companies that, by themselves or when combined with positions held in other investment funds and accounts WOGA manages, comprise a substantial percentage of those companies' outstanding securities.  WOGA and/or the relevant Client may be required to file with the SEC and/or other regulatory authorities reports of beneficial ownership of securities.  In these cases, it may be difficult to liquidate or reduce the Clients position, preventing the Client from readily realizing profit or avoiding loss.  In addition, there may be other circumstances under which the aggregate holdings in a company by a Client and other accounts WOGA manages, or WOGA's involvement with that company, limit the Client's ability to liquidate or reduce its position.  When WOGA obtains an equity position in a portfolio company, WOGA may at times attempt to influence management of a particular company or exercise control of a company.

WHITE OAK
GLOBAL ADVISORS

Target Market. Clients following the Direct Lending Strategy generally expect to invest primarily in privately held companies with enterprise or asset values below $1.5 billion. While WOGA believes these investments often provide significant potential for appreciation, investment in such companies involves higher risks in some respects than do investments in larger companies.  For example, prices of such investments are often more volatile than prices of investments in large-capitalization companies.  In addition, due to thin trading in some such investments, an investment in these companies may be more illiquid than investments in larger capitalization companies; see *Limited Liquidity of Many Investments* in this Item 8.D above.

Timing of Gains and Losses.  Some of a Client's investments will be in positions the Client must hold for significant periods before the success or failure of the investment becomes apparent or any gains can be realized.  It may take longer for successful investments to realize their potential than for unsuccessful ones to reveal their weaknesses.

Use of Alternative and Intermediate Investment Vehicles.  To address legal, tax, regulatory, accounting, or similar considerations, WOGA and their affiliates have the authority to structure particular investments through one or more alternative investment vehicles. While the economic and other substantive provisions governing any alternative investment vehicle are intended to be the same as those of the Clients, the rights of investors in, and the obligations and duties of WOGA and its affiliates as manager and/or general partner of, the alternative investment vehicle may differ from those applicable to the Client by virtue of the specific terms, jurisdiction of, or establishment of, the alternative investment vehicle.  In addition, the structural attributes of certain alternative investment vehicles may result in divergent return characteristics for certain Investors.

In addition, to address legal, tax, regulatory, accounting, or similar considerations, the Clients have made and may make investments (including investments into the Financing Affiliates and their related entities) directly or through one or more intermediate vehicles (each an "Investment Vehicle"), including through entities organized as limited partnerships, limited liability companies, corporations, trusts, etc., where WOGA considers it more beneficial to do so than to invest directly.  The Clients have made and may make investments by acquisition of debt or equity instruments in or of such Investment Vehicles. There may be more than one layer of subsidiary or intermediate vehicle used by the Clients in structuring such holdings.  These Investment Vehicles have in the past utilized, and may in the future utilize, leverage in connection with funding and making investments as part of a Client's investment strategy for the purpose of achieving a levered return.  In this context, the Client's investment in the Investment Vehicle does not always and may not have a senior secured position and may be junior to the bank financing, which typically will be secured by the assets of the Investment Vehicle.  As a result of such leverage, Clients face the risk of partial or complete loss of the Fund's investment in that Investment Vehicle under various scenarios, including as the result of a forced liquidation by the lenders to such Investment Vehicle.

Furthermore, for purposes of diversification or other benefits, Investment Vehicles have been and may be structured as a pooled, commingled structure, where investments by one Client are combined with prior, concurrent or subsequent investments by one or more other Clients.  For an Investment Vehicle with such a structure, the Client's investment may be subject to the performance of prior, concurrent or subsequent other financings made by the Investment Vehicle where such other financings were made by other Clients.  (For additional description of this pooled investment approach as it relates to the Financing Affiliates, see Item 10.C.12 *Certain Risks Related to Financing Affiliates, Potential Risks for Pooled, Commingled Loans.)*  WOGA seeks to mitigate this risk through its underwriting process, segregation of liabilities through tranching (although not in all instances), use of corporate liability blockers, and/or other risk mitigation strategies but there can no assurance that such measures will be successful or implemented in each instance.  As with other companies in which a Client makes investments, the organizational and operating expenses of each Investment Vehicle will be borne by such Investment Vehicle and therefore may affect the Client's returns.  Despite such expenses and risk, WOGA believes that investing in specialized sectors through Investment Vehicles can provide unique investment opportunities consistent with the Clients' investment objectives.

Valuation. Due to uncertainty inherent in the valuation process of many Client investments, estimates of fair value of such investments may differ significantly from the values that would have been used had a ready market for the investments existed, and the difference could be material.  It is generally more difficult to value non-investment grade securities than investment grade securities.  Many of the securities in which Clients may invest will be traded in markets that are not as active or deep as many equity markets or markets for investment grade debt securities.  For some there will be no established secondary market.  For others, the market may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods, resulting in unreliability of pricing information.  The markets for bank loans and over-the-counter derivative products (including credit default swaps) are even less developed and have no equivalent of established securities exchanges or composite tape systems to supply pricing information.  Because of market inefficiencies, there can be material variation of bid/offer pricing from different dealers.  Further, if an issuer's financial condition deteriorates, accurate financial and business information may become even more limited or entirely unavailable.  In some circumstances, prices for positions a Client holds may not be available from any source.  The lack of a regularized and readily ascertainable market valuation mechanism for Client loans could cause the net asset value on which various decisions are based (including investor percentages, withdrawal amounts, and incentive fees, etc.) to differ significantly from the value that the Client ultimately realizes on its investments.

WOGA utilizes third-party valuation firms to assist WOGA in making valuation determinations for certain private loans in which it invests Client assets.  Input from such third-party valuation firms is used to corroborate WOGA's valuation methodology, to provide additional valuation methodologies, and as a source of specialized expertise in assessing specific types of collateral.  Where third party pricing information is not available,

or where WOGA considers available pricing information not to be indicative of an investment's value, investments will be valued in accordance with WOGA's Valuation Policy. As noted above, there is often less readily available information about non-investment grade instruments (particularly loans) on which to base valuation judgments than there is about higher-quality instruments and their issuers. Further, if an issuer's financial condition deteriorates, accurate financial and business information may become even more limited or unavailable. WOGA may face conflicts of interest in making valuation decisions.

As a result of these and other factors, there can be no assurance that the valuation of a Client's investment positions will accurately reflect the amount the Client could obtain (or would be required to pay as to some types of derivatives positions) if it were to try to sell the security or close the position. Pricing inaccuracies could cause the net asset value on which the Client bases various decisions (including determining Limited Partner percentages and withdrawal amounts) to differ significantly from the value the Client can ultimately realize on its investments. In addition, inaccuracies in valuation could affect the Client's portfolio management activities and, as a result, cause the Client to experience significant losses.

Vendors, Consultants, and Third-Parties. Various vendors, consultants, and third-parties contract independently with existing borrowers, portfolio companies (e.g., borrowers that have been foreclosed upon or taken through bankruptcy), and/or the Financing Affiliates. At times, this same vendor, consultant, or third-party may also simultaneously contract with White Oak Global Advisors or other borrowers, portfolio companies, or Financing Affiliates. In such instances, WOGA seeks to mitigate any perceived or potential conflict by reviewing the rates at which such third-party contracts with WOGA and, separately, the borrower, portfolio company, or Financing Affiliate to consider whether any preferential treatment or discounted rates are provided by the vendor to WOGA and not to the borrower, portfolio company, or Financing Affiliates. In these instances, WOGA seeks to agree to such engagement only on terms WOGA believes are fair and equitable and does not provide preferential treatment to itself.

RISKS ASSOCIATED WITH THE INSTITUTIONAL CASH MANAGEMENT SERVICE:

Certain fixed income securities carry Federal Deposit Insurance Corporation ("FDIC") insurance, which is backed by the full faith and credit of the United States government. The full faith and credit backing is the strongest backing offered by the United States government and is traditionally considered to be the highest degree of safety with respect to payment of principal and interest. However, investment in any fixed income instrument, even those issued or secured by the United States government, carries some level of credit or default risk. Additionally, investing in fixed income instruments creates exposure to certain other risks. As discussed above, when interest rates rise, prices of fixed income instruments generally fall. This may result in a loss if a fixed income instrument is sold prior to maturity. Over time, the rate of inflation may exceed the returns on invested capital. This would result in a negative real return. In some cases, clients may not be able to sell instruments prior to maturity or may only be able to sell for a fraction of the original

purchase price.  WOGA encourages each Client to specify a term structure that matches its liquidity needs and does not rely on the ability to sell instruments prior to maturity.

## ITEM 9:   DISCIPLINARY INFORMATION

As previously disclosed, the plaintiff filed an action against White Oak in the United States District Court for the Southern District of New York (the "Court") to confirm an arbitration award dated August 4, 2021 following an arbitration proceeding between the parties.  The arbitration award found in favor of the plaintiff on certain ERISA and other claims. In an opinion dated March 17, 2022 (the "Opinion"), the Court confirmed in part and vacated in part the arbitration award. The Opinion and the arbitration award both recognized that White Oak had unsuccessfully attempted to return the plaintiff's assets in September 2018 and that White Oak should not be penalized for the plaintiff's failure to notify White Oak where to send those assets. The Court confirmed the arbitrator's order that the plaintiff is entitled to receive the net asset value of its investments with White Oak as of August 4, 2021, which was the date of the final arbitration award, and confirmed that White Oak could return assets to the plaintiff in accordance with the IMA and the arbitration award. Those assets have been distributed to the plaintiff as of August 4, 2021. However, the Court's Opinion questioned whether White Oak retains control over the assets that were distributed to the plaintiff. The Court also confirmed the arbitrator's award that White Oak is entitled to retain management fees it earned pursuant to the IMA, but White Oak must return an initial fee it collected at the inception of the plaintiff's investment (the "Day One" fee), plus interest, and must pay a portion of the plaintiff's attorneys' fees and costs from the arbitration proceeding. The Court also confirmed the arbitrator's award that found White Oak had violated ERISA. Following a motion by the plaintiff to correct the judgement, on July 14, 2022, the Court Clerk entered a corrected judgment identifying the specific amounts owed for attorneys' fees, the Day One fee, and prejudgment interest on that Day One fee.  The amended judgment also orders (a) White Oak to pay 9% prejudgment interest on the August 4, 2021 net asset value of plaintiff's investment starting in September 2018, (b) the disgorgement of unidentified profits and (c) the removal of White Oak as fiduciary and investment manager, which already occurred when White Oak returned the plaintiff's assets on September 3, 2021.  On July 25, 2022, White Oak filed a motion for reconsideration of the Court's order confirming (a) 9% prejudgment interest on the August 4, 2021 net asset value of the plaintiff's investments, and (b) disgorgement of profits.  On August 25, 2022, the Court denied White Oak's motion for reconsideration.

White Oak has appealed the Court's decisions.  On September 8, 2022, the plaintiff filed a motion with the Court to recover the attorneys' fees and costs the plaintiff incurred in the Court proceeding to confirm the arbitration award, which motion White Oak will oppose.

WHITE OAK
GLOBAL ADVISORS

## ITEM 10:  OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

### A.  Registered Broker-Dealer or Registered Representative

Andre Hakkak, a Managing Member of the Firm, is a Series 7, 24, and 63 licensed registered representative, investment banking representative, and General Securities Principal of White Oak Merchant Partners, LLC ("WOMP"), a registered broker-dealer that is affiliated with WOGA (see Section B directly below for a description of WOMP), and acts as WOMP's Chief Executive Officer.  (Additional description of WOMP's activities is set forth in Item 10.C below.)  John Jacobs is WOMP's CCO.  Mr. Jacobs holds a Series 24 license.  Other individuals employed by WOGA are also associated with WOMP.  WOMP may also employ its own professionals, who, if co-located with WOGA personnel or otherwise have access to Client information, are deemed Access Persons, and are subject to WOGA's compliance policies and procedures.  A complete list of individuals affiliated with WOMP, including current WOGA employees and consultants, as well as additional details concerning their registration with FINRA is available on FINRA's BrokerCheck website at brokercheck.finra.org.

### B.  Futures Commission Merchant, Commodity Pool Operator, Commodity Trading Adviser or Associated Person

Not applicable.

### C.  Material Business Relationships with Certain Related Persons

White Oak Merchant Partners, LLC:  WOGA is affiliated with White Oak Merchant Partners, LLC ("WOMP"), a registered broker-dealer.  WOMP places senior secured, second lien, mezzanine and other loans and debt, as well as, on occasion, equity and equity-related instruments, with institutional investors.  WOMP has in the past received, and may in the future receive, advisory, syndication, agency, placement and other fees or awards of equity from borrowers and other third parties in connection with transactions in which certain of the White Oak Clients participate (such as, e.g., syndication efforts as described in Item 5(D)), or in connection with investments made or disposed of by White Oak Clients.  Consistent with a Client's governing documents, WOMP does not participate in such fees attributable to the participating Clients.  Origination, syndication, and other fees earned that are not attributable to the participating Clients, however, are earned in these instances by WOMP, WOGA, or an affiliate.  In addition, as noted in Item 10.A above, certain employees and partners of WOGA that market interests in the White Oak Funds and Separate Accounts to external institutional investors are registered representatives of WOMP.  See also *Transaction-based Compensation to WOGA Affiliates and its Personnel* in Item 6 for how such conflicts are mitigated.

Having a related broker dealer can create certain conflicts or potential conflicts of interest when determining which broker dealer, investment bank, or counterparty to utilize when seeking borrowers on behalf of WOGA Clients.  As such, WOGA has implemented a process to ensure that any fee paid to WOMP by a prospective borrower or other third party in

connection with WOGA Clients is reviewed by certain WOGA Committees and WOGA's CCO.  WOMP is not a custodying broker.  Therefore, no WOGA client assets are maintained by WOMP.

Affiliated General Partners:  WOGA is also affiliated with each of the General Partners of its commingled funds  (see Item 5A, Compensation, for the names of some of these affiliated General Partners).  Each of these General Partners serves as the general partner of one or more of the Funds. Additional entities may also be organized that would serve as the general partner of Funds established in the future.

In addition, each of WOIP and WOPFI may be deemed a related person of WOGA due to service of WOGA or one of its affiliates as general partner, or by virtue of significant investments by such persons (see Item 4B for a more detailed description of each of WOIP and WOPFI).  WOGA's direct and indirect compensatory and pecuniary interests in WOIP and WOPFI, as described in Items 5 and 6, are material to WOGA.  Each of WOIP and WOPFI invests in the White Oak Funds alongside other Investors.  Investments by WOGA personnel in WOIP and WOPFI, therefore, have the potential to create a conflict of interest such as the incentive to grant WOIP and WOPFI preferential treatment in investment allocations or redemptions out of White Oak Funds.  To address such conflicts, WOIP and WOPFI invests on the same terms as all investors with respect to entering or exiting investment positions, the allocation of investment opportunities, and redeeming out of White Oak Funds.  The investors in WOIP and WOPFI do not, however, pay any management or incentive fees.

Finacity Corporation:  WOGA is also affiliated with Finacity Corporation ("Finacity"), which specializes in the structuring and provision of efficient capital markets receivables funding programs, supplier and payables finance, back-up servicing, and bond administration.

WHITE OAK
GLOBAL ADVISORS

Portfolio Companies Referred to as "Financing Affiliates":

1.  *Financing Affiliate Overview*

White Oak seeks to identify and capitalize on attractive risk-adjusted, return-opportunities in the private credit markets for its Clients.  Fully implementing and pursuing such strategies in certain market segments such as healthcare finance, trade finance, etc., requires both specialized business expertise, and customized loan servicing requirements. White Oak has proactively identified individuals and companies with industry expertise, existing pipelines and capabilities, which individuals or companies are engaged in the business of providing financing to these market segments and serve as diversified investment opportunities for White Oak Clients in these various strategic areas. In some instances, these individuals join companies formed for the purpose of receiving investments by White Oak Clients.  In other instances, the companies are pre-existing and are acquired by White Oak Clients.   These companies become portfolio investments of White Oak Clients, and White Oak refers to these companies  as 'Financing Affiliates,' which engage in the business of originating and servicing loans generally in respect of their own capital, and (as described in more detail below), on occasion, and to a limited degree, to customers of the Financing Affiliates.  The Firm refers to these entities as Financing Affiliates even though certain or all Financing Affiliates may not be "affiliates" of the Firm as such term is defined in Form ADV or under the Advisers Act and regulations thereunder. However, some persons employed by Financing Affiliates are treated as supervised persons of the Firm for purposes of the Firm's Code of Ethics.

Accordingly, certain White Oak Clients have invested, and in the future may invest, in special purpose entities and affiliates that White Oak establishes or identifies from time-to-time in order to capitalize on opportunistic and/or specialized sectors of lending in a specific industry (each a "Financing Affiliate") for the benefit of our Clients.  These Financing Affiliates are operating companies that originate and service loans to their customers.

Typically, White Oak Clients make loans to the Financing Affiliate in the form of senior debt and junior debt or preferred equity (the senior debt, junior debt and preferred equity, collectively, the "Debt") and receive, as additional consideration equity (the "Residual Equity") together with the Debt investment made to the Financing Affiliate.  In turn, the Financing Affiliate, in the regular course of its business, makes loans to, or enters into sale-lease back arrangements with, its customers.  This structure is intended to ensure that all of the net return, if any,  (i.e. interest income, capital gains, and any fees earned whatsoever by a Financing Affiliate net of operating expenses incurred by the Financing Affiliate, as described in more detail below) is returned to the White Oak Clients in the form of interest payments on their Debt investments and, to the extent excess cash profits are realized at the Financing Affiliate, a dividend paid annually on their Residual Equity investment in the Financing Affiliate, with little to no expected return or value on the Residual Equity upon maturity of the Debt.  Upon maturity of the Debt, it is expected that the Residual Equity would be retired for no value at the value of the investor's NAV in the Financing Affiliate,

Each Financing Affiliate is an operating company and is wholly owned by White Oak Clients, except for certain Financing Affiliates in which their respective management and senior personnel hold minority ownership interests.  As an operating company, the Financing Affiliate bears ordinary operating expenses, which include all normal administrative and operating business expenses, such as salary, rent, the cost of borrowed funds, consultants and advisors, etc., and including expenses relating to its loans to its customers (*see* "Factors Applicable to Each Financing Affiliate; Certain Risks related to Financing Affiliates; Expenses and Fees" below for additional information).  Income, servicing fees, and other revenue earned by each Financing Affiliate from its customers are used to pay these expenses.  The Financing Affiliates do not pay fees to WOGA, reimburse expenses incurred by WOGA, or otherwise remunerate WOGA.  Accordingly, White Oak Clients do not pay additional compensation to White Oak as a result of their investment in the Financing Affiliates beyond management and performance fees payable to White Oak. However, WOGA does not pay any of the expenses of the Financing Affiliates, which are paid for indirectly by White Oak Clients.   In addition, certain Financing Affiliates employ bank leverage to seek to enhance returns, and the costs of such financing will be borne by the Financing Affiliate (*see* "Factors Applicable to Each Financing Affiliate; Certain Risks related to Financing Affiliates; Financing Affiliate Leverage and Debt Financing" below for additional information).

White Oak, as investment adviser to White Oak Clients that invest in the Financing Affiliates, exercises oversight of the Financing Affiliates, including, as appropriate, by having the Firm's Investment Committee review the material investment parameters, including collateral, of the Financing Affiliate, e.g., in connection with receiving commitments from White Oak Clients in order for the Financing Affiliates to provide financing to their customers.  In addition, White Oak principals form a majority of each Financing Affiliate's approval committee that provides for appropriate governance on behalf of White Clients on matters such as budgets.  As such, White Oak retains authority to hire or dismiss executive officers employed by, or associated with, each Financing Affiliate.  White Oak's representatives on the approval committees receive no compensation from the Financing Affiliate for this service.  Some examples of actions that require the approval of a majority of the members of the approval committees are:

- Approval of or material modification to the Financing Affiliate's annual operating budget;

- Approval of the Financing Affiliate's annual financial statements;

- Any loans or advances to, guarantees for the benefit of, or investments in other entities;

- Any appointment or entering into any employment agreement with any "C-Level" executive officer that is not provided for in the Financing Affiliate's annual operating budget;

- Any liquidation, dissolution, winding up, voluntary commencement of bankruptcy, insolvency, liquidation, or similar proceedings with respect to the Financing Affiliate;

- Any entry into any new line of business by the Financing Affiliate or any of its subsidiaries; and

- Entering into agreements limiting distributions, redemptions of LLC Interests, or prepayments of debt.

New Financing Affiliates in the future may be established or acquired consistent with the foregoing description, which may or may not be similar in scope and structure to current Financing Affiliates and may focus on similar or different business sectors (*see* "Factors Applicable to Each Financing Affiliate; Certain Risks related to Financing Affiliates; Future Financing Affiliates" below for additional information). Over time, different White Oak Clients may end up with different equity and/or debt securities of the capital structure of a Financing Affiliate, may be diluted or may cease to be investors in any given current or future Financing Affiliate as new White Oak Clients are established and invest in such Financing Affiliate and as such Financing Affiliates' respective capital structures evolve (e.g., through capital raising to third parties, through public securities offerings, etc.).  At the end of the life of any given Financing Affiliate, the equity interests of such Financing Affiliate will be treated in accordance with applicable legal and regulatory requirements and the governing documents of the relevant White Oak Clients that have equity interests in such Financing Affiliate, taking into account any necessary advisory board or investor approvals that may be required.

## 2.   *Current Financing Affiliates*

As described in greater detail below, the following Financing Affiliates currently originate and service loans to their respective customers:

- **White Oak Asset Based Lending**, which focuses primarily on asset-based lending in the US, Australia and Europe.

- **White Oak Healthcare Finance**, a company focused on debt investment opportunities in the healthcare sector and including, through its related healthcare real estate business line, investing in healthcare related real estate loans and operating assets at times using tax-motivated structures such as Real Estate Investment Trusts (REITS).

- **White Oak Commercial Finance**, which provides asset-based lending, full-service factoring, invoice discounting, government contract financing, lender financing, supply chain financing, inventory financing, US import/export financing, trade credit risk management, account receivables management and credit and collections support.

- **White Oak Trade Finance**, a company that provides specialized lending and structured finance solutions.

- **White Oak Aviation,** which focuses on equity and debt financing in the commercial aviation market.

- **White Oak Europe**, which is the holding company for White Oak U.K, which operates in the U.K. White Oak U.K. is a finance company which provides asset finance, business loans, commercial mortgages and education leases to small and middle-market companies.

- **White Oak Commercial Finance Europe**, which provides a variety of finance solutions globally, such as the purchasing of receivables.

- **White Oak Equipment Finance,** which provides a number of equipment financing solutions, including operating leases, capital leases, and other forms of equipment financing.

- **White Oak Lender Finance,** which lends to specialty finance companies that focus on specific lending verticals.

- **White Oak Real Estate Capital,** which is a lender to the commercial real estate industry.

*3. Benefits of the Financing Affiliate Structure*

The Financing Affiliate structure offers White Oak Funds and Separate Accounts access to a pipeline in particular private credit areas, and each Financing Affiliate seeks to capitalize on its industry expertise, utilize its business processes, and source attractive underlying deals for the benefit, indirectly, of White Oak Funds and Separate Accounts.  The Financing Affiliate structure is intended to align interest between the professionals at the Financing Affiliate who bring their expertise to the table, whereby they are incented to meet or exceed certain performance goals targeted by White Oak Funds and Separate Accounts.

The Financing Affiliate structure gives rise to a number of potential benefits, including:

- Providing attractive risk-adjusted yield in private credit opportunities for the benefit, indirectly, of White Oak Clients by capitalizing on industry connections, expertise, and capabilities of individuals and companies operating in these strategic segments.

- Offering exposure to specialized expertise.  Absent such specialized expertise, White Oak Clients may be prevented from capitalizing on potential opportunities in certain strategic segments given the high start-up and going concern costs of generating and servicing opportunities in these areas.  As operating companies with specialized focus areas and sector knowledge, the Financing Affiliates are able to hire and retain talent in a particular sector;

- Aligning interests of the professionals at the Financing Affiliate, whereby they are incented to identify attractive risk-adjusted opportunities for White Oak Clients and operate effectively and efficiently to meet or exceed performance goals; and

- Capitalizing on substantial economies of scale and scope across platforms.

This structure also allows White Oak Clients to take advantage of 'revolver' facilities under a bankruptcy remote SPV with its own assets and liabilities. Such financing structure allows the Financing Affiliates to offer a competitive 'bank type' product to their customers, both in terms of the financing structure, i.e., offering revolvers, and rate, i.e., a lower blended cost of capital. In addition, by having the leverage facility of the Financing Affiliate away from the Funds and Separate Accounts, it provides an opportunity for investors to obtain the benefit of a revolver product without encumbering the rest of the portfolio assets pledged against it.

The Financing Affiliate structure gives rise to potential disadvantages, including the cost of operating the Financing Affiliates, as discussed in more detail below, and certain risks, including risks associated with the use of leverage by the Financing Affiliates may increase the risk of loss of the Financing Affiliates' capital and that lenders to the Financing Affiliates may withhold credit or require adverse terms, potentially adversely affecting the operations of the Financing Affiliates in the future. Further, the cost of operating each Financing Affiliate may substantially reduce the returns to investors relative to the gross return on the assets of the Financing Affiliates

### 4.   *White Oak Asset Based Lending*

White Oak ABL ("White Oak ABL" or "WO ABL") is the successor entity to White Oak Asset Finance, LP. White Oak ABL is a Financing Affiliate that makes stretch or non-conforming asset based loans in the United States, Australia, and Europe. The asset-based loans made by White Oak ABL to its customers differ from the typical term loans made by WOGA because asset-based loans or revolvers are typically focused on financing receivables and inventories of a given customer, and WO ABL requires cash controls on all customer receipts in order to manage risk and perfect their security interests in the collateral. In such ABL loans, customers can borrow, repay, and re-borrow the loan balance as needed over the life of a loan based on the quality and quantity of their receivables and inventories. The size of the available loan or borrowing base varies with changes, sometimes daily. With a term loan, by comparison, the outstanding balance is fixed for a period ranging from a month to several years with an agreed upon repayment schedule. White Oak ABL also sources, values, and services these asset based loans. At times WO ABL may enter into servicing arrangements with other entities, including as appropriate, other affiliates of White Oak.

White Oak ABL is led by Thomas Otte, a former WOGA employee and current owner of equity in White Oak Financial, and is a separate business from WOGA with its own employees that bears its own operating expenses, even though certain White Oak ABL

employees currently share office space with WOGA WO ABL therefore pays a portion of the cost of shared leased premises with WOGA.  In the future, White Oak ABL may license software, sub-lease, or obtain other services and resources from, or share office space with, WOGA or a WOGA affiliate to manage asset-based loans.

Investments by White Oak Clients in White Oak ABL:   The Independent Investor Representatives of the White Oak Funds that have invested in White Oak ABL have approved certain policies and procedures in respect of White Oak ABL pertaining to the issuance of additional tranches of equity and debt in White Oak ABL, which may be issued from time to time without the need for specific approval by the Independent Investor Representatives in each instance.  Accordingly, it can be expected that as White Oak ABL has the opportunity to do so, White Oak ABL will issue new tranches of equity and debt in accordance with these pre-approved policies and procedures.  The policies and procedures generally provide that losses incurred by White Oak ABL in relation to its investments are allocated to the tranches outstanding at the time that the loss is incurred.  In the event of such a loss allocation, the tranches that suffer the loss will receive a priority in terms of the allocation of any recoveries on such losses until the loss is recaptured.  This is referred to as a "pooled, commingled loan" approach, see Paragraph 13 below, *Certain Risks related to Financing Affiliates – Potential Risks for Pooled, Commingled Loans*. This approach is different than the approach taken by White Oak ABL's predecessor entity, i.e., White Oak Asset Finance.  White Oak Asset Finance, as a Delaware series limited partnership, segregated for legal liability and tax purposes the loans it made to its customers in different series, whereas White Oak ABL pools the loans it makes to its customers, resulting in no segregation for tax or liability purposes. Some of the compensation of WOABL employees, including of Mr. Otte, may be allocated to other Financing Affiliates, including White Oak Commercial Finance.

5.   *White Oak Healthcare Finance*

White Oak Healthcare Finance ("WOHCF") was established in August 2016 in order to address the unmet need in the healthcare industry for a specialized non-bank healthcare lender with the domain expertise and flexible capital to finance small and middle market healthcare companies.  WOHCF seeks to capitalize on potential debt financing opportunities in the healthcare sector with attractive risk-adjusted returns.  It also services, performs, and manages the daily administrative functions of its portfolios.

WOHCF business activities focus on key segments of the healthcare industry, including but not limited to hospitals, skilled nursing facilities, healthcare services including homecare and behavioral health, specialty pharmacies, and medical devices, and seeks to provide flexible working capital financing and senior secured term financing for these healthcare providers.  WOHCF targets healthcare providers in all healthcare sub-segments with revenues of $50 to $3 billion, and financing needs of $10 to $400 million.  Led by Isaac Soleimani, the WOHCF team possesses a differentiated healthcare origination, credit, structuring and lending experience, which is essential to establishing a successful, market-leading lending platform within the healthcare industry.  Such resources and talent help

create strong business opportunities, from which certain White Oak Clients may benefit as a result of their investment in WOHCF.  Neither WOGA nor any of its officers, directors, or employees own any interest in WOHCF.  Certain employees of WOHCF, however, have ownership interests in WOHCF.

WOHCF is a separate business from WOGA with its own employees that bears its own operating expenses, but shares space, services and certain resources with WOGA and its affiliates, and WOHCF bears its costs in relation to those services.  WOHCF therefore pays a portion of cost for shared leased premises with WOGA. WOHCF may license software, sub-lease, or obtain other services and resources from, or share office space with WOGA, a WOGA affiliate, or White Oak Credit Services, LLC ("ServeCo").  Other operating expenses such as WOHCF employee salaries are also paid by WOHCF or are allocated to separate legal entities, referred to as "assetco's" that hold assets that WOHCF services, as described below. It should also be noted that although one of WOHCF's personnel was an employee of WOGA at the time of WOHCF's formation, such individual ceased to be an employee of WOGA prior to WOHCF's commencement of operations.  WOHCF has entered into bank facilities to finance its business activities, and/or investment pools operated by WOCHF, as described below, and may enter into additional financings, which will result in leverage for it and has the potential to enhance returns of White Oak Clients who have invested in WOHCF. (*see* "Factors Applicable to Each Financing Affiliate; Certain Risks related to Financing Affiliates; Financing Affiliate Leverage and Debt Financing" below for additional information).

Investments by White Oak Clients in White Oak Healthcare Finance:   The Independent Investor Representatives of the White Oak Funds that have invested in WOHCF have approved certain policies and procedures in respect of WOHCF pertaining to the issuance of additional tranches of equity and debt in WOHCF, which may be issued from time to time without the need for specific approval by the Independent Investor Representatives in each instance subject to the aforementioned policies and procedures.  Accordingly, it can be expected that as WOHCF has the opportunity to do so, WOHCF will issue new tranches of equity and debt in accordance with these pre-approved policies and procedures.  The policies and procedures generally provide that losses incurred by WOHCF in relation to its business operations are allocated to the tranches of its financings outstanding at the time that the loss is incurred.  In the event of such a loss allocation, the tranches that suffer the loss will receive a priority in terms of the allocation of any recoveries on such losses until the loss is recaptured.  This is referred to as a "pooled, commingled loan" approach, see Paragraph 13 below, *Certain Risks related to Financing Affiliates – Potential Risks for Pooled, Commingled Loans*.

White Oak Healthcare Real Estate (a business line of White Oak Healthcare Finance):

White Oak Healthcare Real Estate ("WOHC Real Estate") is a business line of White Oak Healthcare Finance that has been formed as one or more separate legal entities to provide tax-motivated structures through Real Estate Investment Trusts (REITS) in order to allow different investors to invest in (i) mortgage loans secured by skilled nursing facilities and

WHITE OAK
GLOBAL ADVISORS

other healthcare facilities (the "Debt REIT") and (ii) purchased buildings leased to the operators of such healthcare facilities (the "Equity REITs"). The Equity REITs primarily make investments in real estate that is leased to healthcare operators and seeks to receive monthly rental returns in excess of its cost of capital.

The use of REIT structures can give rise to a conflict of interest. REITs produce tax benefits and tax burdens, including withholding tax liabilities, to different categories of investors in the REIT, but has the effect of reducing the tax rate applicable to carried interest paid to WOHCF employees. The cost of establishing the REITs is born by the investors in the REITs.

WOHCF has hired an experienced team of professionals with an average of over 15 years of experience in each of the two REIT strategies in order to execute on its overall real estate investment strategy. However, the legal entities associated with the real estate strategy do not have any employees and have entered into servicing agreements with WOHCF whereby the WOHCF employees with the relevant experience originate, underwrite and service the portfolio of loans and buildings held by the real-estate related entities for a servicing fee paid to WOHCF. The servicing fee will be based on a cost-plus method, as determined by an independent third party accounting firm in accordance with a market transfer pricing study.

Given that WOHCF was previously a guarantor on existing banking facilities which are used for both real estate and non-real estate loans, once the real estate loans were separated into a new Debt REIT structure, the related banks required their debt facilities to be cross guaranteed by WOHCF and the Debt REIT. WOHCF and Debt REIT will pay an arms-length guaranty fee on market terms to the other for its guaranty.

In addition, WOHCF has obtained a HUD license and hired a team of professionals with experience in HUD-insured healthcare transactions. This team is employed by a subsidiary of WOHCF and originates fee income by underwriting and servicing debt transactions that will be insured by and held on the balance sheet of HUD. In addition, this team is expected to originate new transactions for the Debt REIT and will earn an origination fee for those activities, which fee will be shared with the Debt REIT, and receives ongoing loan servicing revenues once the loans are on HUD's balance sheet.

WOHC Real Estate is a separate business from WOGA with its own employees that bears its own operating expenses, even though certain WOHC Real Estate employees currently share office space with WOGA. WOHC Real Estate therefore pays a portion of the cost of share leased premises with WOGA. In the future, WOHC Real Estate may license software, sub-lease, or obtain other services and resources from, or share office space with WOGA or a WOGA affiliate to manage real estate-based loans and equity investments.

6.   *White Oak Commercial Finance*

In December 2016, White Oak Funds acquired Capital Business Credit, LLC (subsequently renamed White Oak Commercial Finance or "WOCF"), a leading commercial finance

company that provides asset-based loans, factoring, and trade finance products to small and middle-market companies.

Upon acquisition, White Oak Funds acquired WOCF's existing business portfolio, which was comprised of over $300 million of assets deployed, and the WOCF team along with its office locations, at that time in New York, Charlotte, Boca Raton and Los Angeles.  WOCF utilizes significant leverage in the form of bank financing to fund its lending operations.  White Oak Clients may make additional debt and equity investments in WOCF in the future.  The WOCF platform provides asset-based lending, full-service factoring, invoice discounting, government contract financing, lender financing, supply chain financing, inventory financing, US import/export financing, trade credit risk management, account receivables management and credit and collections support, with loans typically ranging from $1–$200 million to underserved middle-market companies.  The senior leadership team of WOCF includes Thomas Otte, Robert Grbic, Michael Fortino, and Andrew McGhee, along with the approximately 80 other members of the WOCF enterprise.

Mr. Otte is a former WOGA employee and current owner of equity in White Oak Financial.  WOCF is a separate business from WOGA with its own employees that bears its own operating expenses, even though certain WOCF employees currently share office space with WOGA.  WOCF therefore pays a portion of the cost of share leased premises with WOGA.  In the future, WOCF may license software, sub-lease, or obtain other services and resources from, or share office space with, WOGA or a WOGA affiliate to manage asset-based loans. During 2021, certain staff of White Oak Business Capital ("WOBC") were folded into WOCF.  As a result, WOCF now originates and services the existing WOBC portfolio.

*7.   White Oak Trade Finance and White Oak Trade Finance II*

White Oak Trade Finance ("WOTF") (previously doing business as White Oak Trade and Specialty Finance) was effectively launched on June 30, 2017 as a subsidiary of WOAF (the predecessor entity to WO ABL) to participate in the $9 trillion global trade finance sector to address the unmet need for specialized lending and structured finance solutions to companies operating domestically and internationally in select markets.  WOTF provides solutions for U.S.-based and international-based importers and exporters for both domestic and international flows.  White Oak Clients are able to participate indirectly in the offerings of this specialized lender through their indirect investments held through a separate series of WOAF.

Through key relationships located across the globe, WOTF is able to access and identify opportunities that serve to provide structured trade finance solutions and facilitate the flow of goods and commodities between producers and importers.  The strategy targets short duration, highly collateralized USD denominated transactions between established

counterparties and serves to fill the void that historically has been occupied by large global banks and supply chain managers.

White Oak Trade Finance, LLC is led by James Chan, Managing Director of WOTF with over 19 years of private and public credit, ABL, and commodities experience.  WOTF serves to expand and complement existing Client investments and provide for further diversification as a trade finance business operating in both the middle market and large corporate markets.  WOTF is an entity separate from WOGA with its own employees that bears its own operating expenses.

In November 2019, White Oak Trade Finance II, LLC ("WOTF II") was established to engage in business and activities similar in scope to WOTF.  It also is led by James Chan and certain employees working at WOTF also are employees of WOTF II.  The establishment of WOTF II enables Mr. Chan to be eligible to participate in profit share based on business that he and his team have originated, whereas business initially engaged in by WOTF was originated by the former CEO.  Together, WOTF and WOTF II conduct business as "White Oak Trade Finance."

WOTF and WOTF II each is a separate business from WOGA with its own employees that bears its own operating expenses, even though certain WOTF and WOTF II employees currently share office space with WOGA.  WOTF and WOTF II therefore pay a portion of the cost of share leased premises with WOGA.  In the future, WOTF and WOFT II may license software, sub-lease, or obtain other services and resources from, or share office space with WOGA or a WOGA affiliate to manage asset-based loans.

### 8.  White Oak Aviation

White Oak Aviation ("WOA") was established in December 2019.  WOA focuses on equity and debt financing in the commercial aviation market, which represents over $200 billion annually in new and pre-owned commercial aircraft transactions.  WOA's particular emphasis is on commercial aircraft, including freighters, as well as commercial engines. The WOA team is led by Robert Genise and Claude P. Franco, both of whom are career industry veterans who have previously successfully launched various undertakings focused on lending and leasing.  WOA is a separate business from WOGA with its own employees that bears its own operating expenses.  With the establishment of White Oak Credit Services ("ServeCo"), which provides certain back-office services to White Oak and certain Finance Affiliates, WOA will pay for its own office space.

### 9.  White Oak Europe

On behalf of White Oak Clients, White Oak acquired LDF Group in July 2018, now renamed White Oak Europe ("WOE").  WOE is the holding company for White Oak UK ("WOUK"), which operates in the U.K. WOUK is an FCA authorized and regulated origination, underwriting and servicing platform, and is one of the largest independent SME lending franchises within the UK, having over 35 years of experience in supporting small and medium sized businesses in the UK through its full suite of lending solutions, With a

management team, the business provides access to fast, simple, and transparent finance solutions across equipment and asset finance, tax loans to professions, SME business development loans, and specialist working capital facilities. Additional products in invoice finance and asset-based lending are recent additions to the product portfolio, and the company believes it presents a significant opportunity for further lending growth alongside developments of the existing product suite.

Through its team of approximately 170 professionals, operating from three (3) office locations across the UK, WOUK operates a hybrid approach to lending, i.e., on-balance sheet ("Own Book") and off-balance sheet syndicated through approximately 40 funding and broker relationships. In 2021, WOUK originated over £500 million of new loans through over 80 office and field based direct originators, underwriters, and relationship managers. With over 12,000 live customer relationships and a well-diversified portfolio of sectors and clients, WOUK is a strong platform for further lending growth in the UK market.

*10.  White Oak Commercial Finance Europe*

The White Oak Commercial Finance Europe entities, (collectively, "WOCFE") were created to provide a variety of finance solutions globally, such as the purchasing of receivables. Purchases can include those, on a true-sale basis, of eligible accounts receivable owed by eligible account debtors with a maximum tenor of 90 days. WOCFE has no employees, and is serviced by WOUK. WOUK provides administrative services to White Oak Commercial Finance Europe in exchange for a cost plus fee, where the "plus" factor is determined by means of a transfer pricing study pursuant to contractual agreements that are intended to approximate arm's length arrangements. The terms of these servicing arrangements have been reviewed and approved by the independent investor representatives of the funds/accounts that own WOUK and White Oak Commercial Finance Europe.

*11.  White Oak Equipment Finance*

White Oak Equipment Finance ("WOEF") was funded in February 2020. WOEF is a Financing Affiliate that provides a number of equipment financing solutions, including operating leases, capital leases, and other forms of equipment financing. WOEF's strategy includes funding equipment leases and software financing for highly leveraged, large corporations, while also pursuing opportunistic transactions, encompassing a broad spectrum of company profiles and types of security, with compelling risk/return parameters. White Oak believes that WOEF is well-positioned in the $1 trillion equipment finance market, where there are few independent platforms with the funding capacity to execute large transactions. The WOEF team is led by Richard Petrucci, who brings over twenty-five years of experience in credit and risk management for large, highly structured asset finance

WHITE OAK
GLOBAL ADVISORS

transactions.  WOEF is a separate business from WOGA with its own employees that bears its own operating expenses.

### 12. *White Oak Lender Finance*

White Oak Lender Finance ("WOLF")'s first transaction occurred in November 2020. WOLF lends to specialty finance companies which focus on specific lending verticals.  Specialty finance companies are subject to less regulation than traditional banks, and such companies' lending efforts frequently focus on under-served or specific market niches.  WOLF's strategy in the specialty finance space is to deploy capital to select specialty finance companies that possess strong management teams and a prudent credit culture.  WOLF will seek to lead transactions with commitment sizes up to $200MM, initially retaining $35MM - $50MM per transaction, working towards holding $100MM in well-structured facilities. WOLF is led by Andrew McGhee, who brings over 20 years of industry experience. Prior to joining White Oak, Mr. McGhee was the President and CEO of AloStar Capital Finance, and previously served as Senior Vice President at Sun Trust Banks Inc..  WOLF is a separate business from WOGA with its own employees that bears its own operating expenses.  Certain individuals associated with WOLF are employed by WOCF but provide services to and work for WOLF pursuant to a service-level agreement between the two entities (see Item 10C.23, *Specialized Services and Servicing Agreements*, for a more detailed description of such agreements).

### 13. *White Oak Real Estate Capital*

White Oak Real Estate Capital ("WOREC") is a lender to the commercial real estate industry specializing in originating bespoke financing solutions secured by transitional real estate assets.  WOREC offers loans across the capital structure, from first lien stretch senior loans to special situations bridge loans, and loan sizes will typically range from $25 million to $150 million. The company is led by Eric Tanjeloff, who brings over 20 years of experience, to the company.  Prior to joining White Oak, Mr. Tanjeloff served as a Managing Director and Head of Real Estate Investments at Melody Capital Partners, LP, and previously worked in the Real Estate and Lodging Investment Banking division at JP Morgan as an Executive Director and co-led CBRE's real estate capital and advisory division in the United States.  WOREC's first transaction occurred in June 2021.  WOREC is a separate business from WOGA with its own employees that bears its own operating expenses.

### FACTORS APPLICABLE TO EACH FINANCING AFFILIATE:

The description that follows addresses common themes applicable to each Financing Affiliate and identifies possible conflicts of interest that arise and that are mitigated and addressed by WOGA through various mechanisms.  WOGA Clients and, as applicable, their respective investors, should be aware of these conflicts and take them into account.  The discussion is as follows:

- Loans Made to Financing Affiliates by WOGA Clients

- Certain Risks related to Financing Affiliates

- Expenses and Fees

- White Oak Credit Services, LLC

- Ownership

- Management of the Financing Affiliate

- ABL and Specialty Products: Loan Origination and Servicing

- Securitization Opportunities

- Potential Conflicts Involving the Financing Affiliates and How Those Conflicts are Mitigated

- Future Financing Affiliates

- Specialized Services and Servicing Agreements

### 14. *Loans Made to Financing Affiliates by WOGA Clients*

Typically, White Oak Clients make a Debt investment and receive a Residual Equity investment directly or indirectly, through an intermediate blocker or one or more funding entities, in a particular Financing Affiliate, and the Financing Affiliate then makes loans to its customers.  Such Financing Affiliate would employ, or alternatively, enter into a Servicing, Operating, and Secondment agreement with a related entity that employs the individuals working for such Financing Affiliate.  In either event, the cost of employment and other operating expenses of the Financing Affiliate will reduce the return on Preferred Equity and amount attributable to the Residual Equity earned by the Financing Affiliate. Lending opportunities to each Financing Affiliate's underlying customers are typically identified, sourced, and serviced by its employees, although all or certain of these functions may be outsourced to another Financing Affiliate or third parties as appropriate.

The amount of any loan made to the Financing Affiliates, and/or the purchase of equity issued by the Financing Affiliates,  is determined by WOGA's Investment Committee, which also reviews the material investment parameters, including collateral, of the portfolio company itself, e.g., in connection with receiving commitments from White Oak Clients. From a governance perspective, White Oak Global Advisors remains accountable to the White Oak Clients for investments made by them in these Financing Affiliates.  For this purpose, White Oak Global Advisors exercises appropriate oversight as members of the governing body of each Financing Affiliate.  The Firm's potential conflicts of interest in deciding to invest in a Financing Affiliate on behalf of Clients are mitigated by the fact that WOGA and its employees, officers, and directors have no economic interest in, and receive no additional fees or other compensation from the Financing Affiliates.  WOGA receives, however, management and performance fees payable by White Oak Clients that have invested in the Financing Affiliates based on their investments in the Financing Affiliates.

When Clients of WOGA make a loan to, or invest in the Debt of, a Financing Affiliate and/or acquire equity of that Financing Affiliate, the proceeds are used by such Financing Affiliate, possibly in conjunction with other debt financing from a bank (i.e. leverage), in the ordinary course of its business to make a loan to the Financing Affiliate's ultimate underlying customers and, as necessary, to fund certain of its regular operating expenses.  A Financing Affiliate may also obtain debt financing from banks or other financial institutions, including revolver type facilities, in order to support the financing needs of its customers (*see* "Factors Applicable to Each Financing Affiliate; Certain Risks related to Financing Affiliates; Financing Affiliate Leverage and Debt Financing" below for additional information).

A Financing Affiliate typically makes loans to its respective customers directly.  For example WOGA, on behalf of a White Oak Client, makes a loan to a particular Financing Affiliate, and such Financing Affiliate, in turn, makes a back-to-back loan to its customer.  This Financing Affiliate then typically has one or more loans on its balance sheet, reflecting its business activities, at any given time.

The structure of the Financing Affiliates is intended to ensure that all or nearly all of the return (interest income, capital gains, and any fees earned whatsoever by such Financing Affiliate) is returned to the relevant White Oak Clients in the form of cash interest payments on their Debt investments and, to the extent excess cash profits (income less expenses) are realized at the Financing Affiliate, a dividend paid annually on their Residual Equity investment in the Financing Affiliate, with little to no expected return or value on the Residual Equity interests in the Financing Affiliate.  Upon maturity of the Debt, it is expected that the Residual Equity would be retired at the value of the investor's NAV in the Financing Affiliate.  Prior to maturity of the Client's Debt and retiring of its Residual Equity interest, other White Oak Clients may make loans to such Financing Affiliate and receive, in return, as additional consideration, Residual Equity for such loan that remains outstanding until such time as these other Clients' Debt matures and Residual Equity interests retire.

In certain instances, a Financing Affiliate may set up a special purpose vehicle, or "SPV," when making a loan to its underlying customers.  For example, in a typical financing transaction for WOHCF, WOHCF forms a special purpose vehicle ("SPV") to combine proceeds from the loans and other investments made by WOGA's Clients with or without additional financing and capital provided by WOHCF to make asset-based loans to healthcare related borrowers.  After repaying any such financing and paying expenses, the SPV's residual earnings would be distributed to WOHCF, potentially returning a profit.  Any profit would inure to WOHCF's owners which include its personnel as well as certain Clients of WOGA.

Any investment into a Financing Affiliate is intended to be structured in a tax-efficient manner for the White Oak Clients that have lent to and owns such Financing Affiliate.  In establishing a Financing Affiliate, WOGA relies on the advice of reputable outside tax firms and/or legal counsel.  However, there can be no guarantee or assurance that United States or foreign tax authorities will agree with the tax analysis underlying the Financing Affiliate structure.

WHITE OAK
GLOBAL ADVISORS

*15. Certain Risks related to Financing Affiliates*

No Assurance of Profitability.  While each Financing Affiliate seeks, and expects, to operate at a profit and to distribute its profits, there can be no assurance of profitability.  Accordingly, a Financing Affiliate's operations may prove unprofitable, rendering its equity worthless and, potentially, preventing it from repaying a loan to its lenders, which include certain White Oak Clients, in whole or in part when due.  WOGA's Clients who make loans to, or invest in the Debt of, a Financing Affiliate are entitled to receive interest and principal payments from such Financing Affiliate in accordance with the terms of the lending arrangement that governs White Oak Clients' investment in the Financing Affiliate.  However, such Client loan to the Financing Affiliate will not be a direct obligation of the Financing Affiliate's underlying customers.  Similarly, such Client loans may not be directly secured by any assets of the Financing Affiliate's underlying customers.  Accordingly, the risk and reward profile, as well as the lenders' rights and protections associated with loans by WOGA's Clients to the Financing Affiliates, may differ from those that a Financing Affiliate receives with respect to the loans the Financing Affiliate makes to its customers.

Expenses and Costs Borne by the Financing Affiliates.  As with the operating costs of other portfolio companies to which Clients make loans, the cost of operating the Financing Affiliates is borne by such Financing Affiliate and any of its subsidiaries, and therefore affects the White Oak Clients investing in it.  Each Financing Affiliate, as a type of portfolio company, incurs its own organizational and operating expenses and typically has its own employees.  A significant amount of the Financing Affiliates' expenses and costs may be incurred in return for services provided by White Oak Credit Services, LLC ("ServeCo"), as more fully described below.  The description of ServeCo in Item 10.C includes a discussion of potential conflicts related to this affiliated entity.

Structural Risks Linked to the Financing Affiliates.  By virtue of their investment and ownership interests in the Financing Affiliates, Clients will share in the profits and losses resulting from the business activities of the Financing Affiliates and will, as a result, participate, albeit indirectly, in the profit and losses of such customer financings.  An investment by an investor in a Fund or Separate Account does not constitute a direct participation in the financings originated by the Financing Affiliates as the Financing Affiliates are separate operating companies; Clients which hold ownership interests in the Financing Affiliates will have limited control over the Financing Affiliates, including the ability to exercise remedies with respect to the underlying financings of the Financing Affiliates, their use of leverage, and management of their operations.

Financing Opportunities for Financing Affiliates.  Depending on the equity and debt securities of the capital structure of a potential customer, a Financing Affiliate may be unable to participate in such customer financing while another Financing Affiliate may participate.  Similarly, as each Financing Affiliate is an individual, standalone operating company, depending on the need for additional resources, one Financing Affiliate may consider a customer financing while another Financing Affiliate would not consider providing financing to such customer.

Financing Affiliate Leverage and Debt Financing.  To the extent a Financing Affiliate obtains debt financing from banks or other financial institutions in order to provide financing to its underlying customers, investments by White Oak Clients in such Financing Affiliate could be deemed to be indirectly leveraged, which tends to increase the risk of loss as well as the magnitude of such loss, particularly in connection with economic downturns, changes in interest rates, and defaults by the customers of the Financing Affiliate, as is typically the case with any fund investment in a portfolio company that incurs debt.  If a Financing Affiliate borrows funds from a third party bank or other financial institution in order to more effectively meet the requirements of a given customer, such Financing Affiliate may need to borrow and repay funds at a higher dollar amount than is currently available under the existing structure.  In addition, a Client's investment in a Financing Affiliate would not be in a senior secured position and would be junior to the bank financing, which typically would be secured by the assets of the Financing Affiliate.  The use of leverage also typically imposes restrictive financial and operating covenants on a company, in addition to the burden of debt service, and may impair the ability of a Financing Affiliate to operate its business as desired and/or finance future operations and capital needs.  In such instance, a Client would also face the risk that the third-party lender to the Financing Affiliate may force a liquidation of collateral on terms or when the timing of the collateral sale may be adverse to the Financing Affiliate, and indirectly to the Client.  Other risks, including changes in interest rates, inability to refinance on favorable terms, and other risk factors that may not be readily foreseeable can arise in connection with the use of leverage.  When leverage is employed by a Financing Affiliate, WOGA would seek to ensure that such borrowing or leverage did not materially increase the risk of repayment on any loan made to the Financing Affiliates by the White Oak Clients.

Potential Risks for Pooled, Commingled Loans.  If a Financing Affiliate is structured as a pooled, commingled loan structure (such as White Oak ABL and White Oak Healthcare Finance, as described above), WOGA believes that diversification and other benefits of such a structure would outweigh the potential risks to Clients who have lent funds to such Financing Affiliate.  To the extent a Financing Affiliate employs such a structure, a Client's investment return may be subject to the performance of prior or subsequent financings made to the Financing Affiliate's customers, but which prior or subsequent financings were made with proceeds received from a Client loan.  In addition, a Client's investment would be subject to the cross collateralization risk of investments made before and after the Client invested into the Financing Affiliate.  For example, in the event an earlier customer financing resulted in less than the anticipated payments of interest and principal or are not repaid in full at maturity, a Client's investment returns could be materially impacted or the Client's investment may experience losses as a result of the earlier customer financing; similarly, if an earlier customer financing resulted in a significant liability, a later Client's investment may be used to satisfy such liability, thus impacting the later Client's investment.  WOGA will seek to mitigate this risk through its underwriting process, segregation of liabilities through tranching as appropriate, use of corporate liability blockers, oversight of the Financing Affiliate, and/or other risk mitigation strategies; however, there can no assurance that such measures will be successful.

For tax, business, and similar reasons, most Financing Affiliates have established, and are expected to continue to establish as necessary, various entities, including subsidiaries and affiliated companies, as well as intermediate companies and other structures to engage in their business activities and provide financings to their customers.  Although such investments, while subject to the risks, liabilities, as well as benefits of a pooled commingled approach, described above, may be accounted for using different accounting series in order to allow the reporting on an investment level of returns and similar information for particular Clients, such accounting series does not prevent the cross collateralization risks described directly above.  In addition, many of the Financing Affiliates have established separate side-by-side entities that borrow from White Oak Clients, which Clients are often different than the Clients that originally invested in the main Financing Affiliate entity, to provide financings to the customers of the side-by-side entity.  In certain instances, such side-by-side structures may participate alongside the main Financing Affiliate entity in a financing to a particular customer.  In other instances, certain side-by-side structures may be established to provide very specific types of financings to a Financing Affiliate's customers; in those instances, only the side-by-side structure will participate in that customer financing and not the main Financing Affiliate entity or other side-by-side structures.  The Financing Affiliates, in running their business, determine which entities are best suited to provide financing to a particular customer in accordance with their procedures and the rate that they will be paid by such side-by-side entities for the effort associated with the business activities of that side-by-side entity.  The rate charged by the main Financing Affiliate entity to its side-by-side entities can vary, even for the same expenditure of time and effort.

Potential Risks For Financing Affiliates and Clients Invested in the Same Portfolio Company. From time to time, Financing Affiliates may lend to a portfolio company that is also a borrower from another Financing Affiliate or White Oak Client (each an "Other White Oak Entity").   In these instances, each Financing Affiliate will generally have received different collateral from the portfolio company as to which the Financing Affiliate may have a first priority lien.  Similarly, the Other White Oak Entity will have a first priority lien over other collateral from the portfolio company as to which the Other White Oak Entity may have a first priority lien.  In these instances, the Financing Affiliate and the Other White Oak Entity may exchange (or "swap") second liens on each other's collateral.  By swapping second liens, the Financing Affiliate and the Other White Oak Entity may have the potential to secure their investment in the portfolio company.  However, the presence of an Other White Oak Entity, a lender to the same portfolio company, may introduce a potential conflict of interest because enforcing the rights of the Financing Affiliate against a portfolio company may be adverse to the Other White Oak Entity, and this may incline the Financing Affiliate to hesitate to foreclose on its debts when an Other White Oak Entity is also a lender to the same portfolio company as the Financing Affiliate.

*16. Expenses and Compensation*

As with the operating costs of other portfolio companies to which Clients make loans, the cost of operating the Financing Affiliates is borne by itself and any of its subsidiaries, and therefore affects the White Oak Clients investing in such Financing Affiliates.  Each Financing Affiliate (as a type of portfolio company) incurs its own organizational and operating expenses and typically has its own employees.  Despite such costs, White Oak believes that investing in specialized sectors through each Financing Affiliate provides White Oak Clients differentiated investment opportunities consistent with their respective investment mandates.

As operating companies, the Financing Affiliates bear all normal administrative and operating business expenses, including the following: Overhead costs, including rent, office supplies, utilities, and capital equipment;  External accounting expenses (including fees and disbursements and expenses related to the annual audit of the Financing Affiliate and the preparation of its tax information);  Organization costs relating to its legal formation and external advisory costs related to negotiating with and onboarding its executives;  Regulatory or other compliance costs related to its business activities (e.g., registering as a "finance lender" or similar in particular U.S. States or other jurisdictions);  Employee compensation, including salary, bonuses, and related benefits for Financing Affiliate staff (which such compensation is not reviewed or approved by any independent third party and may include, as noted in the description for certain Financing Affiliates above, ownership interests in such Financing Affiliate by its employees.);  Costs associated with calculating Financing Affiliate level and investor level NAV, including the cost of any independent third-party pricing or valuation services;  Expenses associated with sourcing and identifying investment opportunities; Expenses related to providing financing to its customers, whether or not such customer financings are consummated, including, as applicable, commissions, settlement charges, recordkeeping, interest expense, escrow fees, margin fees, business-related travel and lodging expenses, and research-related expenses;  Other customary business-related travel and lodging expenses;  Professional fees relating to originating, underwriting, and managing customer financings, including expenses of consultants, bankers, attorneys, accountants, and other advisors or experts;  Fees and expenses relating to software tools, programs, or other technology (including risk management software, fees to risk management services providers, third-party software licensing, implementation, data management and recovery services, and custom development costs);  Fidelity bonds, as applicable; Trustees and officers errors and omissions liability insurance, and other insurance premiums;  Direct costs such as preparing, printing, and mailing reports and other communications and long distance telephone charges;  Research and market data (including news and quotation equipment and services, and any computer hardware and connectivity hardware (e.g., telephone and fiber optic lines) incorporated into the cost of obtaining such research and market data);  Transfer agent and custodial fees, if applicable; Federal and any state registration or notification fees;  Federal, state, and local taxes;  Any expenses incurred outside of the ordinary course of business, including, without limitation, costs incurred in connection with any claim, litigation, arbitration, mediation, government

investigation, or similar proceeding and indemnification expenses as provided for in the Financing Affiliate's organizational documents.

The above list of expenses (the "Schedule of Financing Affiliate Expenses") are the type of expenses that are generally paid by each Financing Affiliate as an operating company.  As appropriate, certain of these costs are billed to side-by-side entities within the Financing Affiliate platform pursuant to Servicing, Operating, and Secondment agreements or similar agreements (see Item 10.C.22, below, *Specialized Services and Servicing Agreements* for a description of these agreements).  In addition, consistent with applicable legal requirements and the governing documents of the relevant White Oak Clients that have equity interests in such Financing Affiliate, the Financing Affiliates may license software, sub-lease, or obtain other services and resources from (including of the types of expenses identified in the paragraph above), or share office space with, WOGA or a WOGA affiliate, which may include another Financing Affiliate.  As more fully described in the "White Oak Credit Services, LLC" subsection below,  sourcing services from a single provider to multiple Financing Affiliates is expected to generate cost savings for the Financing Affiliates by capitalizing on economies of scale.

No Reduction in Management Fees.  WOGA Clients assets are invested in Financing Affiliates by WOGA, in the exercise of its investment discretion.  Each Financing Affiliate absorbs costs for loan origination, loan underwriting and loan services of assets held within the Financing Affiliate.  WOGA's management fee is not reduced by the operating costs of the Financing Affiliates.  As such, WOGA has an incentive to establish Financing Affiliates rather than adding employees to WOGA's own staff, as those employees would be an expense of WOGA and would reduce WOGA's profitability, and the ability of the Financing Affiliates to deploy capital more rapidly than WOGA could do on its own accelerates the earning of its management fees on invested capital..

Start-up Costs.  In addition, certain Financing Affiliates may be new entities with no operating history, will incur start-up expenses before they generate any revenue, and, for an indefinite period of time, may incur losses.  Other than the time and resources WOGA contributes to develop a Financing Affiliate, the start-up expenses and operating costs of a Financing Affiliate are typically borne by the White Oak Clients investing in the equity of such Financing Affiliates and not WOGA, including costs associated with employee salaries or consultants engaged by the Financing Affiliate as well as costs of outside advisers engaged to onboard such Financing Affiliate executives.  If the Financing Affiliate is a new entity, the payment of such expenses are typically advanced by WOGA on behalf of the Financing Affiliate, and then subsequently reimbursed by the Financing Affiliate to WOGA upon the Financing Affiliate's initial drawdown of capital.  As a result, expenses borne by a Financing Affiliate might preclude the need for WOGA to incur costs that WOGA might be deemed to have otherwise incurred; in such an instance, the costs would then be borne by the Financing Affiliate and, by extension, its equity investors, (i.e., WOGA's Clients).  However, the Financing Affiliates do not pay other fees to White Oak or otherwise remunerate White Oak.  Accordingly, White Oak Clients invested in a Financing Affiliate do

not pay additional compensation to White Oak as a result of their investment in the Financing Affiliates beyond management and performance fees payable by them to White Oak.

Exit Strategy for Illiquid Investments.  Each Financing Affiliate issues instruments that are illiquid, difficult to value, and that have no secondary market.  Accordingly, at the end of the life of a WOGA-advised fund or upon the termination of a separate account, interests in the Financing Affiliate may still be held by the fund or account.  From time to time, the term of the debt instruments and preferred equity of the Financing Affiliates may extend beyond the expected term of the funds or account that act as investors in that Financing Affiliate. This can have the consequence of producing a distribution in-kind in liquidation of the fund or account to its investors of interests issued by the Financing Affiliate, a sale of the interests issued by the Financing Affiliate to another White Oak advised fund or account, or, potentially, retirement of the residual equity interests for no value.  There can be no assurance therefore that interests in any Financing Affiliate will return the value ascribed to them by the fund's or account's valuation agent.

## 17.  White Oak Credit Services, LLC

Certain operational and business costs (e.g., rent, software/intellectual property, and other accounting, administrative, clerical and operations personnel, functions and services) of certain Financing Affiliates were previously paid by WOGA ("Subsidies").  The Subsidies were intended to be short-term to coincide with the launch of the Financing Affiliates, and, in WOGA's opinion, were not sustainable by WOGA for an extended period.  Effective January 1, 2019 (the "Effective Date"), the Subsidies were terminated, and these costs are now paid for by the participating Financing Affiliates, and therefore indirectly by White Oak Clients.

White Oak Credit Services, LLC ("ServeCo") acts as a consolidated back-office service company for WOGA and certain of the Financing Affiliates, with the aim to improve service quality, uniformity, and ultimately achieve cost savings for the Financing Affiliates and WOGA. During 2020, WOGA was the primary beneficiary of the cost savings.  However, at the end of 2020, ServeCo commenced operating on a basis that offers the potential for cost savings for the Financing Affiliates over a three year period.  It may also continue to result in cost savings for WOGA.  In short, ServeCo represents the consolidation of certain of the non-investment advisory services and infrastructure, including back-office personnel, physical assets, and certain intellectual property, from WOGA and certain U.S.-based Financing Affiliates.  In connection with the formation and operation of ServeCo, certain personnel who provide certain back-office services and other non-advisory services have been, and certain assets will be, transferred from the Financing Affiliates and from WOGA to ServeCo.  While the services that ServeCo will perform are expected to benefit the Financing Affiliates, it is not intended to provide all services that might be necessary to the operation of the Financing Affiliates and WOGA.  In particular, investment advisory personnel, services, and infrastructure at WOGA, and certain personnel, services, and infrastructure at the Financing Affiliates, will remain with their respective entities. Nonetheless, WOGA expects that the formation of ServeCo should enable the Financing

Affiliates to focus on their core activities through the consolidation of back-office services. The cost of establishing ServeCo is borne by the Financing Affiliates and not by WOGA.

While WOGA believes that ServeCo will benefit participating Financing Affiliates and the Clients that own interests in those Financing Affiliates over time, WOGA is in a position to benefit from the improved service quality, uniformity, and cost savings that ServeCo aims to provide and did so beginning in January 2020.  WOGA will also benefit from, among other things, reducing costs paid by WOGA and reallocating costs to the Financing Affiliates. WOGA expects that as the enterprise value of WOGA will be enhanced materially by the establishment and operation of ServeCo, WOGA's equity owners, comprised primarily of its management and employees, could enjoy a higher value for their interests from the formation and operation of ServeCo.

The formation and operation of ServeCo gives rise to a variety of conflicts of interest, many of which are described in more detail below.  However, WOGA seeks, and has sought, to mitigate these conflicts by, among other things, providing disclosure to, and obtaining the approval of, clients and of the independent investor representatives of the applicable White Oak Funds (the "Independent Investor Representatives") for those initial Financing Affiliates utilizing ServeCo's services, or, for those owner-Clients not represented by an IIR, the owner-Client directly.

Ownership, Costs and Benefits of ServeCo.  At the time of the formation of ServeCo, the participation in it by existing Financing Affiliates was subject to the approval of either the third-party Independent Investor Representative of the White Oak Funds that own the relevant Financing Affiliate or, for those owner-Clients not represented by an IIR, the owner-Client directly.  ServeCo will be owned by the participating Financing Affiliates, including any future Financing Affiliates that are established and utilize its services; WOGA does not have an ownership interest in ServeCo.  The Independent Investor Representatives reviewed and approved the launch of ServeCo during the course of 2019.  The process of fully implementing ServeCo was delayed.  In light of the delays associated with fully implementing ServeCo, the Independent Investor Representatives met repeatedly to review the cause of the delay, the prospects for resolving the delay and the financial implications to the Financing Affiliates.  The Independent Investor Representatives then reapproved the launch of ServeCo, in February of 2021.

ServeCo is not intended to operate on an "at cost" basis.  Rather, it will receive fees that include a profit component from each participating Financing Affiliate and WOGA for the services it provides.  Any profits will be allocable and distributed to ServeCo's equity owners (i.e., the participating Financing Affiliates) or applied to offset any fees due to ServeCo from a participating Financing Affiliate.  This, in turn, will benefit the Clients that own interests in the participating Financing Affiliates.

Similarly, any costs associated with the formation of ServeCo were borne pro rata by the participating Financing Affiliates and, therefore, indirectly by the White Oak Clients who own interests in the participating Financing Affiliates.  Such organizational and formation costs

WHITE OAK
GLOBAL ADVISORS

will be amortized over a five-period.  As WOGA will not be an owner of ServeCo and is not eligible to receive profits distributions or fee offsets, no organizational costs were or will be borne by WOGA, even though WOGA expects to also benefit as a consumer of ServeCo's services.  WOGA expects that ServeCo's profits (after tax) will repay organizational costs before the end of the amortization period, which should help to mitigate this conflict of interest among existing and future White Oak Clients.  However, even if ServeCo were to be profitable, there is no assurance that the value of the equity allocated to the initial Financing Affiliates that establish ServeCo will fully offset or recoup these organizational expenses.

Certain Conflicts of Interest.  WOGA has conflicts of interest in connection with the formation and operation of ServeCo. For example, because expenses that would otherwise have been borne by WOGA (or by the Financing Affiliates), will instead be borne by ServeCo, the formation and operation of ServeCo could materially increase profitability for WOGA or for any one or more of the Financing Affiliates at the expense of one or more of the other Financing Affiliates or White Oak Clients.  Because the Financing Affiliates are owned by White Oak Clients, WOGA or one or more of the White Oak Client could benefit from the efficiencies and enhanced profitability created by ServeCo while other White Oak Clients could enjoy lesser or no benefit, or even suffer losses.  Based on growth projections provided by each of the Financial Affiliates, including projects presented to the Independent Investor Representatives in February 2021, WOGA believes that these conflicts of interest are mitigated through projected operational efficiencies and cost reductions from ServeCo that are expected to benefit the White Oak Clients proportional to their use of ServeCo's services.

Affiliates' Roles in Negotiating ServeCo Agreements.  Because the agreements pursuant to which ServeCo is formed and operated (each, a "ServeCo Agreement," and collectively, the "ServeCo Agreements"), as may be amended from time-to-time, involve the participating Financing Affiliates, WOGA, and ServeCo, they are the product of negotiations between related parties.  Nevertheless, WOGA believes that the terms of the ServeCo Agreements reflect terms comparable to those found in agreements between unrelated parties, particularly as the Independent Investor Representatives of certain of the funds have approved or will approve (as the case may be) the ServeCo Agreements.

Nonetheless, there is a risk that the terms will not prove as favorable to the Financing Affiliates as terms that would have been negotiated with unaffiliated third parties.  To further mitigate this risk, the formation of ServeCo was reviewed by each relevant Fund's Independent Investor Representatives or the White Oak Client accounts directly, as the case may be, and each of then-existing Financing Affiliates had their participation so approved by the White Oak Clients that own the Financing Affiliates.  In doing so, such independent investor representatives were provided detailed information regarding the formation and operation of ServeCo, including the basis upon which expenses will be charged (and distributions will be made) pursuant to the ServeCo Agreements, and had the opportunity to discuss ServeCo with their own advisors and legal counsel and with WOGA.

WHITE OAK
GLOBAL ADVISORS

ServeCo Ownership.  The participating Financing Affiliates, and their underlying owners, i.e., White Oak Clients, have different ownership interests in ServeCo while WOGA does not have any ownership interest (but does generally control its Clients).  This ownership structure creates conflicts of interest in the allocation of (i) ServeCo's resources, and (ii) expenses in connection with the provision of ServeCo's services.  In addition, WOGA principals and employees are invested in certain of the White Oak Funds and will benefit from savings realized by the Financing Affiliates in which those White Oak Funds have invested, although such savings accrue to all investors proportionally.

As with existing Financing Affiliates, Financing Affiliates acquired or formed in the future are expected to utilize ServeCo's services and thus will become owners of ServeCo, which can be expected to dilute the profits interests of the initial and any subsequent participating Financing Affiliates who own ServeCo immediately prior to the inclusion of a new Financing Affiliate and, therefore, the indirect profits participation in ServeCo for White Oak Clients. Any profits dilution, however, would be mitigated by the fee-income earned by ServeCo from such new Financing Affiliate.  New Financing Affiliates which will participate in ServeCo will be granted equity interests in accordance with ServeCo's governing documents, the parameters of which have been approved by the Independent Investor Representatives of each White Oak Client that owns an interest in the participating Financing Affiliates. However, the admission of, and methodology for awarding equity interests in ServeCo to, new Financing Affiliates presents a conflict of interest because the new Financing Affiliates did not contribute any capital or property to ServeCo but will nonetheless be allocated profit interests in ServeCo.  Accordingly, the launch of new Financing Affiliates which utilize ServeCo's services could disadvantage those White Oak Clients that own the Financing Affiliates currently utilizing the services of ServeCo.  To mitigate this conflict, the ServeCo Agreements provide that initial Financing Affiliates are awarded equity interests in ServeCo based on their projected fees paid to ServeCo, and without regard to their contribution of capital to ServeCo.  WOGA believes that this approach is fair and equitable because (i) the fees paid to ServeCo are set at cost plus a profit factor (currently five percent and as determined by a transfer pricing study prepared by a reputable independent third party in order to approximate an arm's length transaction) and (ii) the profit factor is allocated to each participating Financing Affiliate in proportion to the fees it pays.  The ServeCo Agreements also provide for periodic reallocation of equity ownership among the Financing Affiliates in proportion to the fees each pays to ServeCo.

Potential Tax Consequences.  The scope of services to be provided by ServeCo could give rise to substantial adverse tax consequences to offshore White Oak Funds investing in the Financing Affiliates. WOGA has received professional tax advice that the scope of ServeCo's responsibilities must be limited to non-core functions, and WOGA expects that ServeCo will be so limited.  If ServeCo provides services outside of the non-core functions, or otherwise acts in a manner inconsistent with the factual premises on which such tax advice is based, the independent agent status of WOGA could be adversely affected and offshore White Oak Funds investing in the Financing Affiliates that rely on treaty structures could be materially adversely impacted, and become subject to paying US federal and state income

-66-

tax on ServeCo income. There is no assurance that the Internal Revenue Service will agree with the tax advice provided to WOGA.  In the event that the IRS were to disagree, adverse tax consequences arising from the implementation of ServeCo could exceed any potential savings to be achieved by ServeCo. WOGA believes that this potential for adverse tax consequences is mitigated by its receipt of professional tax advice concluding that the performance by ServeCo of the services contemplated by such tax advice should not affect the tax position of White Oak Clients that rely on US tax treaties or of other similar structures.

Conflicts Associated with Employee Compensation.  The employee compensation arrangements for ServeCo present a conflict of interest because the cost of paying certain employees will be borne by White Oak Clients through the participating Financing Affiliates, and not by WOGA.  However, all of the projected employee costs previously paid by WOGA will be allocated by ServeCo's Expense Allocation Policy back to WOGA on a cost plus basis, such that WOGA will not achieve any savings for the work ServeCo employees perform for WOGA due to the transfer of its employees from WOGA to ServeCo, and WOGA will, in fact, pay more than cost for such work and the excess will be allocable only to the participating Financing Affiliates. It is expected that a portion of time of such employees will be spent working on Financing-Affiliate related matters, which time will be billed to the relevant Financing Affiliate and not to WOGA, resulting in potential cost savings to WOGA. The participating Financing Affiliates' cost of employee compensation will increase by approximately 5%, on which corporate income taxes will be due, provided, however, that after-tax income will be allocable to each Financing Affiliate, which has the effect of offsetting the increased cost except for the tax burden on the profit paid.  WOGA believes that the allocation of employment compensation costs in the manner described above is beneficial to all WOGA entities utilizing ServeCo's services because sharing employees across the different entities can create cost efficiencies.  WOGA believes conflicts involving former WOGA personnel working at ServeCo are mitigated because sharing of the costs of certain employees anticipated to work for more than one WOGA entity will be pursuant to ServeCo's Expense Allocation Policy, described below, which is subject to review and approval by the independent members of the ServeCo Board to seek fairness for all parties over time and, as deemed prudent or necessary, by the Independent Investor Representatives of the applicable White Oak Funds.

Potential Future Activities.  Similar to, but separate from, ServeCo, White Oak Europe has established a company within the U.K. ("White Oak Credit Services Europe") to supply administrative services in respect of certain loans entered into by White Oak UK, White Oak Commercial Finance Europe and, potentially, other future Financing Affiliates in Europe and to clients of ServeCo in the United States. White Oak Credit Services Europe gives rise to many of the same conflicts noted above that exist for ServeCo. In addition, to the extent White Oak Credit Services Europe utilizes the services of ServeCo, the methodology for charging intercompany fees between ServeCo and White Oak Credit Services Europe presents conflicts of interest as the two entities have very different ownership structures among their respective investors.  Further, the fee to be charged by White Oak UK to

ServeCo will be influenced by regulatory and tax considerations unknown at this time, and that could cause either ServeCo or White Oak UK to earn a significant profit or loss or to incur significant tax liabilities, although such profit will inure to the benefit of each entity's owners, which owners do not include WOGA. The Independent Investor Representatives of the Funds that have invested in White Oak UK and White Oak Commercial Finance Europe have reviewed the cost allocation methodology, the terms of the intercompany services agreement, and a transfer pricing study fixing a cost plus fee arrangement and have approved the rates and methodology for payments to White Oak UK by White Oak Commercial Finance Europe for services provide by White Oak UK. Further, any client of ServeCo may pay fees to White Oak UK for services on the same terms as those approved in respect of White Oak Commercial Finance Europe.   .

WOGA's Policies and Procedures and ServeCo's Governance and Policies. WOGA's policies and procedures, including its Code of Ethics and ServeCo's governance structure and Expense Allocation Policy help mitigate the conflicts described above and other potential conflicts of interests.

ServeCo's Expense Allocation Policy will be reviewed, approved, and adopted by the board of managers of ServeCo. Under the current draft Expense Allocation Policy,  expense allocation relies on the following hierarchy:  First, the cost of any expense which is identified as being specific to a Financing Affiliate utilizing ServeCo's services is 100% allocated to that Financing Affiliate; Second, the cost of any expense that is identified as being specific to a sub-set or group of Financing Affiliate will be allocated solely to such Financing Affiliates in a manner intended to be fair and equitable and consistent with the approved Expense Allocation Policy; Finally, the cost of all other expenses will be allocated to the Financing Affiliates using allocation rules based on pre-determined methodologies, primarily based on relative fair value of deployed White Oak capital to each Financing Affiliate utilizing ServeCo's services.

Once constituted, the ServeCo Board, which includes at least two independent board members, as well as representatives of WOGA and the participating Financing Affiliates, will oversee ServeCo's business activities and the performance of the ServeCo Agreements.  To provide additional transparency and accountability, commencing in the second quarter of 2021, ServeCo will conduct quarterly meetings (the "ServeCo Meetings") at which it will provide reports to the board of managers of ServeCo, and, as deemed appropriate, to the Independent Investor Representatives of the relevant White Oak Funds and their respective limited partners advisory committees, as necessary.  These reports will, among things, document the services provided by ServeCo to WOGA and the participating Financing Affiliates, and the fees and expenses allocated to, and to be paid by, each of them.  Material conflicts of interests and disputes that arise out of the provision of services by ServeCo or costs allocated to any of the White Oak entities will be resolved at the ServeCo Meetings, with the approval of the independent members of the ServeCo Board.  WOGA believes that reliance on independent members of the ServeCo Board should mitigate various conflicts of interest, including those arising from allocation of expenses.

Customized IP and Third-Party Software Provided by IPCo.  In addition, White Oak owns IPCo, through which WOGA's internally developed, customized intellectual property assets, including, without limitation, code, applications, configuration, reporting, processes, procedures, and workflow (the "Customized IP") and certain third party software is held. IPCo will allow the Financing Affiliates and WOGA to use the Customized IP at no cost. While there will be charges associated with use of third party software, allocation of costs related to WOGA's and the participating Financing Affiliates' use of third party software will be determined pursuant to the ServeCo Expense Allocation Policy. WOGA believes that these conflicts associated with White Oak's ownership of IPCo can be mitigated through licensing Customized IP at no cost and applying the ServeCo Expense Allocation Policy to determine who bears the costs of the third-party software.

Provision of Services to Other Borrowers.  ServeCo may in the future provide services to existing third-party borrowers or portfolio companies owned by White Oak Clients.  In order to mitigate potential conflicts in the provision of such services, ServeCo is expected to provide such services at the cost that it typically charges for such services to the Financing Affiliates; further, it is expected that a preferential rate would not be charged to any third-party borrower as compared to the rate charged by ServeCo to the Financing Affiliates or a Client portfolio company.

*18. Ownership*

Each Financing Affiliate is wholly owned by one or more White Oak Clients.  Not every fund or account advised by WOGA may be an owner of a Financing Affiliate, and it is possible that some White Oak Clients will make loans to specific Financing Affiliates but may not take an equity economic interest in such Financing Affiliate.  White Oak Clients that are equity owners of the Financing Affiliates may bear additional expenses in order to gain exposure to specialized financing activity and to the potential enterprise value of such Financing Affiliate, which may increase the relative risk and return potential of the investment.  Equity owners of a Financing Affiliate may see their equity ownership diluted over time if the Financing Affiliate grows through additional capital raising from future investors that will invest in such Financing Affiliate's equity interests along with other current funds and accounts.  Upon maturity of an investor's Debt investment in a Financing Affiliate, it is expected that the related Residual Equity would be retired at the value of the investor's NAV in the Financing Affiliate.

As a result of the foregoing, White Oak Clients may end up in different equity and/or debt securities of the capital structure of a given Financing Affiliate, or may not participate in such investment.  For example, certain investment strategies pursued by WOCF, e.g., loan factoring, may not be appropriate for all White Oak Clients.  The Firm may potentially face conflicts with respect to, and Clients who hold equity interests in a Financing Affiliate may face additional risks in connection with, the disposition of such Financing Affiliate's equity. The decision of when and how to dispose of equity in a Financing Affiliate will be made by WOGA.  Each Financing Affiliate is a private company for which no liquid market is expected.

<u>Acquisition and Sale of Equity Issued by Financing Affiliates</u>.  White Oak Clients may purchase the equity of a Financing Affiliate from another existing White Oak Client.  This may arise by a transfer of securities issued by a Financing Affiliate among White Oak Clients.  Such transactions could be deemed to be cross trades and may give rise to a potential conflict of interest.  Other third parties and/or WOGA or a WOGA affiliate may purchase the equity of a Financing Affiliate in the future.  It is contemplated that material conflicts of interest, including cross or principal trades in interests issued by Financing Affiliates that may arise in connection with the foregoing transactions may be referred to the applicable Independent Investor Representatives or advisory committees of such funds or accounts, or to the underlying account holders, as appropriate.

<u>Economic Interests in the Financing Affiliates</u>.  Certain Financing Affiliates have different economic interests and voting interests.  The majority of the economic interests, with the exception of a minority interest and/or profit share that may be allocated to management and other key employees of such Financing Affiliate who are also unaffiliated with WOGA, will be held by White Oak Clients that make loans to such Financing Affiliate; the remainder of the economic interests, and certain voting interests, may be owned by other persons, including a particular Financing Affiliate's employees, officers, and managers.  If such employees share office space with WOGA or otherwise have access to nonpublic information regarding the purchase or sale of securities or portfolio holdings, then they may be deemed an Access Person of the Firm and subject to the Firm's compliance policies and procedures as a result.  In addition, to the extent White Oak and its affiliates have access to material, non-public information that may be relevant to an investment decision to be made by a Client, a Client may be restricted from initiating a transaction or selling an investment which, if such information had not been known to it, may have been undertaken on account of applicable securities laws.  Except as disclosed above with respect to Mr. Otte (*see "White Oak Asset Based Lending"*), neither WOGA nor any of WOGA's employees will own any equity interest in, be compensated by, or serve and receive compensation as an officer, director, or employee of a Financing Affiliate, nor will any Financing Affiliate employee also be an employee, officer, director, or equity owner of WOGA or of White Oak Financial, LLC (other than Mr. Otte as disclosed in Paragraph 4, *White Oak Asset Based Lending*, above).  The oversight of each Financing Affiliate by the approval committee (*see* "Portfolio Companies Referred to as "Financing Affiliates"; Financing Affiliates Overview" above for additional information about the approval committee) provides a governance mechanism to oversee minority economic interests allocated to Financing Affiliate management or other Financing Affiliate key employees.

## 19. *Management of the Financing Affiliate*

Management of each Financing Affiliate plays a key role in leading the respective company.  Successful management often requires differentiated origination, credit, structuring and lending experience, which is essential to establishing successful, market-leading lending platforms for each Financing Affiliate. As with any portfolio company, management turnover will occur at some point, and such turnover could impact the operational efficiency and

future growth of a Financing Affiliate.  In such instances, WOGA seeks to identify replacement management well in advance of any departure, in order to mitigate any possible detrimental effects on the Financing Affiliate.  Expenses associated with onboarding new management, as with any portfolio company, are borne by the Financing Affiliates. Additionally, WOGA seeks to ensure that the management teams of each Financing Affiliate are sufficiently experienced and appropriately incented to remain long-term and grow the business for the benefit of WOGA's funds and accounts.

*20. ABL and Specialty Products; Loan Origination and Servicing.*

Certain of the Financing Affiliates provide commercial loan sourcing and servicing to funds advised by WOGA with respect to certain asset backed loans ("ABL Loans") and specialty products (such as healthcare lending) that the Financing Affiliates identify as potential co-investment or direct investment opportunities for White Oak Clients (the **"Loan Opportunities"**).  WOGA believes these services will provide incremental revenue and reduced operating expense margins for the Financing Affiliates by referring potential investments at varying costs of capital to these White Oak Clients.  As a result of these commercial arrangements, WOGA anticipates that the incremental revenue and reduced expense margins should enhance returns to the investments held by White Oak Clients invested in the Financing Affiliates.  Additionally, these arrangements are anticipated to provide such White Oak Clients with the benefits of diversification by permitting them to spread their capital over a broader set of opportunities.

In sourcing Loan Opportunities, each Financing Affiliate's services are focused on offering White Oak Clients with the opportunity to invest in each Loan Opportunity and providing post-closing administrative services.  The Financing Affiliates do not intend to provide—and are contractually restricted from providing—any recommendation or advice to WOGA or White Oak Clients as to the advisability for the particular White Oak Client to invest in a given Loan Opportunity.

Co-Investments.  In the context of co-investments, the Financing Affiliate will offer to White Oak Clients a portion of a Loan Opportunity that the Financing Affiliate does not intend to finance entirely with its own capital. Co-investments will be negotiated by the Financing Affiliate(s), and any White Oak Client that elects to participate will co-invest alongside one another on the same or substantially the same terms.  Such co-investments may take the form of acting as a separate lender, participating in a loan of a Financing Affiliate via a participation agreement, or similar.

Direct Investments.  In the context of direct investments, the Financing Affiliate that identifies the Loan Opportunity will not invest in the Loan Opportunity, but one or more White Oak Clients may do so.  This may occur for various reasons, including where the Loan Opportunity is not expected to meet the return objectives or diversification requirements of the Financing Affiliate when investing its own capital or at times when the Financing Affiliate's capital is fully invested.

In both Co-Investment and Direct Investment situations:

- The determination of whether a Loan Opportunity is suitable for any particular White Oak Client will be made by WOGA, which will independently underwrite the Loan Opportunity; and

- The allocation of investment opportunities between and among the Financing Affiliate and White Oak Clients will be determined in accordance with WOGA's Allocation Policy.

In addition, WOGA anticipates that in some circumstances, one or more of the WOGA Clients may acquire a Financing Affiliate's existing interest in a Loan Opportunity through a secondary transaction, whether by way of assignment or participation.  In such circumstances, WOGA will endeavor to ensure that the transfer is conducted at arm's length based upon a third-party valuation.  Please refer to Item 10.C. Section 19 below, regarding potential conflicts of interests and mitigants related to transactions between the Financing Affiliates and White Oak Clients.

Loan Servicing. WOGA-advised funds and accounts are expected to contract with Financing Affiliates that source Loan Opportunities for post-investment administrative services, including services in the form of administrative agency, collateral management, monitoring, and reporting.  The compensation for such services is included in the Brokerage and Loan Servicing Fee described immediately below.

Financing Affiliate Fees. The White Oak Clients that participate in Loan Opportunities will pay the participating Financing Affiliates a brokerage and loan servicing fee (expressed as an percentage of the assets of the fund/account invested in Loan Opportunities) (the "Brokerage and Loan Servicing Fee").  The Brokerage and Loan Servicing Fee paid by a White Oak Client (in advance or arrears) is calculated in a manner similar to WOGA's management fee.

Further, such White Oak Clients are expected in certain circumstances to pay such Financing Affiliates performance-based compensation in respect of Loan Opportunities expressed as a participation in the White Oak Client's profits over a specified hurdle rate (the "Incentive Fee").  The Incentive Fee paid by a White Oak Client is calculated in a manner similar to WOGA's performance fee or its affiliates' carried interest.

In some instances, WOGA's management fee and/or performance fee will be reduced on a dollar-for-dollar basis by amounts paid to the Financing Affiliates as a Brokerage and Loan Servicing Fee and an Incentive Fee, respectively.  These offsets are not offered by WOGA to all of its Clients.

Separate Accounts.  Managed separate accounts may in the future participate in Loan Opportunities on substantially similar terms as those described above.  The terms of any fee offsets, if any, will be subject to negotiation on a case-by-case basis.

<u>Potential Conflicts of Interest.</u>  Each Financing Affiliate that sources Loan Opportunities is owned by White Oak Clients that – generally – will not be the same White Oak Clients that participate in Co-Investments or Direct Investments.   This raises certain potential conflicts of interest, which we describe below:

- White Oak believes that the economic benefits the Financing Affiliates will receive from the participation of the White Oak Clients in the Loan Opportunities—including the financial compensation, diversification, and economies of scale outlined above—are material and will redound to the benefit of the Financing Affiliates.  However, there is no guarantee that these benefits, some of which are performance based, will materialize, in which case the Financing Affiliates, and thus the White Oak Clients invested in them, might have been better off investing fully in certain Loan Opportunities rather than *pro rata* alongside the other White Oak Clients.  Additionally, even if the benefits materialize, they may not be in an amount that would result in the highest return on the existing White Oak Clients' investments in the Financing Affiliates (as those existing White Oak Clients indirectly bear the compensation and other operating costs of the Financing Affiliates).  While the Financing Affiliates will earn compensation for their activities involving Loan Opportunities, that compensation may not be the highest return potentially achieved by the Financing Affiliates' operations (either because additional investment opportunities generated for the existing White Oak Clients by the Financing Affiliates in the absence of these arrangements would have had higher returns, the Financing Affiliates need to incur more costs than anticipated to provide the services for the Funds, or existing investments held by the Financing Affiliates would have benefitted from greater resources devoted to those investments).  This could in theory mean the White Oak Clients invested in the Financing Affiliates would have generated higher returns in the absence of these commercial arrangements.

- The White Oak Clients that participate on a Co-Investment or Direct Investment basis are, as compared to the White Oak Clients invested in the Financing Affiliates, anticipated to pay less in overall investment expenses than if those expenses were allocated pro rata to all investors (including to the current White Oak Clients invested in the Financing Affiliates) based on invested capital.  While White Oak believes this arrangement is justified on a number of accounts, including as a result of shifting market demand for these specialty ABL and healthcare products, it raises a potential conflict of interest insofar as White Oak, the general partner or sponsor of these Funds, is an indirect beneficiary of these lower expense ratios and stands to benefit from them.  For example, White Oak might be unable to attract capital (or to the same degree) and earn management and performance fees from the Funds at higher expense ratios.  Likewise, all else equal, the lower the expense ratios for the Funds, the more profitable those funds will be and the more White Oak stands to generate from performance fees.

White Oak believes this potential conflict is mitigated in a number of ways.  First, as the General Partner to the White Oak Clients currently invested in the Financing Affiliates, White Oak benefits from the Financing Affiliates receiving the additional economics, lower cost margins, and diversification benefits noted above.  If realized, these potential benefits would enhance the Financing Affiliates' cash flows, permitting them to satisfy their obligations to the White Oak Clients invested therein and generating higher residual returns.  This would inure to the benefit of White Oak Clients and WOGA.  Accordingly, there is an alignment of WOGA's incentives that mitigates the potential conflict.

Second, WOGA believes the additional capital from the Funds is in the best interests of the current White Oak Clients invested in the Financing Affiliates.  Although the overall expense ratios for these new products are lower on a net basis—in many cases due to the lower overall yield on the product—the ability to lower cost margins and generate incremental income for the Financing Affiliates is, in White Oak's view, materially better than the alternative of not raising the additional capital to spread out risk and costs.

Third, because the Financing Affiliates participate in the upside via the profit sharing component of the commercial arrangements, any incremental profit (i.e., higher performance fee) that White Oak might generate from negotiating lower origination and servicing fees for the White Oak Clients co-investing alongside the Financing Affiliates is offset in part by this profit-sharing arrangement.  Moreover, these arrangements with the Financing Affiliates have been determined by a reputable, Big Four accounting firm to be at arm's-length terms.

- To the extent the referral of Loan Opportunities to the Funds will require the Financing Affiliates to provide services in respect of Loan Opportunities that are beyond the scope of current investment parameters of the Financing Affiliates and the White Oak Clients currently invested therein, each Financing Affiliate may have fewer resources to dedicate to its existing loan portfolio. This could affect a Financing Affiliate's ability to repay interest, dividends, or principal on the White Oak Clients' investments in the Financing Affiliates and thus those Clients' returns.

  In most cases, the Loan Opportunities already require the Financing Affiliates' sourcing resources.  However, today the Financing Affiliates would in many cases pass on those Loan Opportunities, particularly for the Direct Investments that are not sufficiently attractive for the Financing Affiliates to invest given the overall yield.  These commercial arrangements allow the Financing Affiliates to generate additional income that they otherwise would not receive, thus enhancing the returns of the White Oak Clients invested in those Financing Affiliates.  That additional income could further support the hiring of additional employees to source Loan Opportunities to the extent existing resources were insufficient to meet the demand.

WHITE OAK
GLOBAL ADVISORS

- WOGA, through the Approval Committees, exercises a degree of control over the Financing Affiliates and the agreements between the Financing Affiliates, the White Oak Clients that intend to co-invest, and WOGA will therefore not be negotiated at arm's length.  As a result, the compensation paid to the Financing Affiliates may be lower (or higher) than that seen between third parties in the market.

This risk is mitigated by the fact that the commercial arrangements between the parties are benchmarked against a transfer pricing study provided by a reputable, Big Four accounting firm.  In addition, the Financing Affiliates personnel who have negotiated the commercial terms have fiduciary duties to their own Financing Affiliates and are also invested in those Financing Affiliates and therefore are incentivized to maximize the income received by the Financing Affiliates.

- As with any new fund, new White Oak Clients formed to invest alongside the Financing Affiliates will require WOGA to dedicate resources and time to allocation of capital among the White Oak Clients in addition to its ongoing business.  In the absence of additional resources or expertise, this could reduce WOGA's focus on its existing business with respect to the White Oak Clients currently invested in the Financing Affiliates.

This risk is mitigated by the fact that WOGA believes its existing complement of underwriting and portfolio management professionals are well positioned to handle the additional work required by the White Oak Clients.

- The allocation of Loan Opportunities between the Financing Affiliates and one or more of the Funds presents potential conflicts of interest, particularly in the event that a potential Loan Opportunity would be over-subscribed for by all of the White Oak Clients currently invested in the Financing Affiliates and those formed to invest alongside them.

To mitigate this potential conflict of interest, WOGA intends to apply in good faith its existing, robust investment allocation policies and procedures to the allocation of investment opportunities that may be appropriate for more than one White Oak Client.

To address these potential conflicts of interest, WOGA has sought and obtained the consent of the independent investor representatives of the White Oak Clients that own the Financing Affiliates for the arrangements described above, including the fee amounts to be paid to the Financing Affiliates.

*21.  Securitization Opportunities*

Certain loans backed by receivables, including ABL and specialty products, lend themselves to monetization via securitization, with the aim to create value and earn additional return for the Clients invested in those receivables.  To this end, a Financing Affiliate may seek to pool such receivables into a securitization vehicle for the benefit of

WHITE OAK
GLOBAL ADVISORS

itself and its investors and/or act as collateral agent or similar to such securitization vehicles to earn additional fee income.

22. *Potential Conflicts Involving the Financing Affiliates and How Those Conflicts are Mitigated*

Differing Allocations over Time.  A potential conflict of interest exists in that the benefits of the business activities of the Financing Affiliate accrue to different White Oak Clients over time.  For example, the White Oak Clients that make initial loans to a Financing Affiliate, the proceeds of which are then provided to its underlying customers, are typically the same initial equity owners of such Financing Affiliate; subsequent loans made over time to that Financing Affiliate, or to a related entity operated by such Financing Affiliate, however, will not necessarily have the same allocation as occurred initially or as occurred with any preceding loan.  This is due to circumstances such as one Separate Account being fully funded at the time of the second loan, a fund being past its investment period, etc.  This potential conflict is mitigated by the fact that White Oak Clients who make a loan to a Financing Affiliate earn all of the income, fees, capital gains, associated with such loan minus such loan's pro rata costs of the Financial Affiliate's expenses consistent with the procedures disclosed above.  The equity in each Financing Affiliate is not expected to have any residual income or value.  Except as required by the relevant governing documents, White Oak is not obligated to recommend or allocate any investment to any particular Client.

Financing Affiliate Performance.  Another potential conflict of interest could arise if the Financing Affiliate fails to perform its responsibilities adequately in servicing its customers, resulting in harm or damages to the White Oak Clients that have lent money and funds to such Financing Affiliate.  Given that the Financing Affiliates receive loans from certain White Oak Clients, which may not be the same White Oak Clients that have equity interests in such Financing Affiliate, WOGA would have a potential conflict in determining what action to take against the Financing Affiliate if it fails to perform its responsibilities adequately.  In such an instance, the Firm would seek to resolve this potential conflict using its best judgment considering all factors it deems relevant including the best interests of each of the affected Clients.

Accordingly, in deciding whether to invest Client assets in debt or equity of a particular Financing Affiliate, WOGA has considered, and will consider, among other things: (i) whether such an investment is consistent with the investment objectives and policies, including risk and return requirements as well as timing, of each such Client; (ii) the stated rate of interest on any loans the Client may make to such Financing Affiliate; (iii) the potential profits from any equity investment a Client may make in such Financing Affiliate; and (iv) the anticipated risks and returns of the investment, including the use of leverage by the Financing Affiliate in its business activities.  The results of such an analysis may differ from Client to Client.  As a result, and due to the timing of investments, not all Clients will invest in each Financing Affiliate; moreover, over time, not all Clients who do invest may invest in the same mix of debt and equity, although the initial investments by White Oak Clients are expected always

to be on a pari passu basis, and it is generally expected that this arrangement will continue in the foreseeable future.  This may result in a divergence of interest for Clients and may create potential conflicts for WOGA in determining actions to take with respect to purchasing or selling, or making other determinations, such as exercising rights on behalf of Clients as debt and/or equity holders in connection with, interests in any particular Financing Affiliate.

Future Financing Affiliate Support.  WOGA may face a conflict of interest in determining whether or not to continue to cause the White Oak Funds and/or Separate Accounts to make loans to or acquire the equity of particular Financing Affiliates, and a failure to provide continued financing to such Financing Affiliate or financing that is inconsistent with such Financing Affiliate's business and expanse outlay, would be adverse to the Financing Affiliate's existing equity owners and could adversely affect WOGA's strategy of developing the Financing Affiliates to support a diversified portfolio for the benefit of White Oak Clients. It is anticipated that, when necessary, future material conflicts may be referred to the Independent Investor Representatives and/or advisory committees of the affected White Oak Funds as appropriate, and that participation by Separate Accounts (if any) in the Financing Affiliates will be on the basis of their respective investment objectives and others provisions of their respective investment advisory agreement and related documentation, and if required, consent of the account holders.  WOGA may determine at any time, and in its sole discretion, to cease to continue to support any or all of the Financing Affiliates.

Financing Affiliate Side-by-Side Lending.  From time to time, Financing Affiliates have in the past co-lent, and may in the future co-lend, to the same borrower alongside another Financing Affiliate and/or Clients advised by WOGA. This has in the past taken, and may in the future take, the form of co-lending under a common credit facility and credit agreement or pursuant to separate credit facilities and separate agreements.  In these situation, it is common for the respective lenders to enter into intercreditor agreements or other similar arrangements that govern each lender's rights in the event of a default, bankruptcy, or insolvency scenario.  In this situations, it is also common for the Financing Affiliates to grant second liens to one another (so-called, "swapping seconds") to minimize losses in the event the borrower becomes troubled.   If lending alongside a WOGA Client, the Financing Affiliate typically acts as the agent on the financing and receives fee income for such activity.  Potential conflicts of interest can arise in such scenarios, for example where such loans are backed by different pools of collateral or are senior or junior in preference to one another.  Additionally, the Financing Affiliates and/or WOGA can be adverse to one another with respect to the negotiation and execution of intercreditor agreements. Potential conflicts in these instances are mitigated by generally using segregated pools of borrower collateral, where each co-lender typically would have rights against separate pools of borrower collateral and by ensuring that intercreditor agreements reflect arm's-length terms prevailing in the market.   In addition, if the co-lenders were to find themselves in a conflicted position, such conflict would be resolved by an arm's length transaction at market terms and, where appropriate, by presenting the conflict to the Independent

Investor Representatives of the White Oak Clients who own such borrower and/or Financing Affiliate(s).

Transactions With or Between Financing Affiliates.  A potential conflict of interest could arise when a Financing Affiliate is a party to a transaction with WOGA, a WOGA-affiliated entity, including another Financing Affiliate, or a White Oak Client.  Financing Affiliates are authorized to purchase property or obtain services from, sell property to or provide services to, borrow funds or otherwise deal with WOGA, one of its affiliated entities, or a White Oak Client, provided that such dealing shall be on terms no less favorable than would be obtained at an arm's length basis.  Transactions between Financing Affiliates, including transfers of assets, provision of services, and other dealings, are also considered to be transactions with WOGA affiliated entities.  Any conflicts that may arise from transactions between Financing Affiliates are mitigated by the fact that the Financing Affiliates are free to negotiate between and among themselves as to the terms of any transaction and that such terms must be no less favorable than would be obtained at arm's length.

Competing Interests Between Financing Affiliates and Finacity.  Finacity is described in Item 10C.  Given the nature of Finacity's business activities, there could be a deemed a perceived or actual conflict between Finacity and the Financing Affiliates, related to potential investment opportunities. Any such conflicts, however, are mitigated because of the differing investment mandates and target returns of Finacity on the one hand, and the Financing Affiliates on the other. Because of the differences in target returns and business activities, nearly all, if not all, of the potential investments that Finacity would consider are expected to be outside of the scope of the business activities of the Financing Affiliates.

Other Risks Associated with Investments in each Financing Affiliate.  There are other risks associated with investments in each Financing Affiliate, including the possibility that a Client may lose its entire investment in any particular Financing Affiliate.  As a general matter, investments in each Financing Affiliate will be subject to many of the applicable investment risks described elsewhere in this brochure, including Item 8; there are, however, certain particular risks associated with Clients' investments in the Financing Affiliates that should be considered, as described above.  In addition, in the event that certain key personnel of a respective Financing Affiliate depart, such Financing Affiliate may be shut down at any time, including if the Financing Affiliate is unable to undertake additional, new financings, if such Financing Affiliate's existing customer financings have yet to mature, and/or for any other reason, prior to meeting the Client's objectives in investing in the Financing Affiliate.

Equity Interests in Underlying Customers.  As a result of providing a loan or other forms of financing to its underlying customer, a Financing Affiliate may also acquire warrants or other equity interests in such customer.  The goal is ultimately to dispose of such warrants or other equity securities and realize gains upon the disposition for the indirect benefit of White Oak Clients; nevertheless, such equity securities may not appreciate in value and, in fact, may decline in value.  Accordingly, the Financing Affiliate may not be able to realize

gains from the equity securities. In addition, such equity positions may impose tax or other obligations on the Financing Affiliate, and, indirectly, its owners, which are White Oak Clients. A growth in retained earnings and value more generally of the equity interests, however, would benefit the Financing Affiliate and would provide, e.g., additional revenue for operations and increase the possibility of a distribution to the Financing Affiliates owners (i.e., White Oak Clients). Such growth, however, would also benefit such Financing Affiliate's other minority owners and/or Financing Affiliate executives who earn profit share, which could include certain of its officers and employees.

### 23. *Future Financing Affiliates*

The Firm may consider in the future the formation or acquisition of additional Financing Affiliates for the benefit of White Oak Clients. In such an event, the Firm anticipates that certain White Oak Clients would provide most or all of the capital associated with any new formation of such additional entities or the acquisition of any additional businesses. It is anticipated that White Oak Clients will create, or finance, or will participate in the financing of the acquisition of, any additional Financing Affiliates. Such new Financing Affiliates may or may not be similar in scope and structure to current Financing Affiliates, and may focus on similar or different business sectors. Potential future Financing Affiliates may be acquired by the White Oak Clients in transactions that may be structured as loans made by such parties, as loans together with equity, in the format of acquisition opportunities where such parties (acting together or separately) would effectively acquire, e.g., a factoring company or loan originator, or in some other manner deemed appropriate by WOGA.

In the future, certain front-office employees from existing Financing Affiliates, including WO ABL, WOCF, WOTF, WOEF and WOLF, may move into a consolidated entity named White Oak Commercial Capital, whose purpose would be to provide certain front-office services, including identification, origination and sourcing of financing opportunities, underwriting, performing due diligence, risk management, asset management, and reporting.

### 24. *Specialized Services and Servicing Agreements*

Some Financing Affiliates have in the past structured and may continue to structure their businesses in two or more special purpose vehicles or entities, so as to provide specialized services for the Financing Affiliate. If and when implemented, such segmentation may benefit the Financing Affiliate and, indirectly, the White Oak Funds and Separate Accounts that own the Financing Affiliate, by improving efficiencies, reducing costs, and/or allowing segregation of investment types into SPVs that hold assets aligned to the funds/accounts that invest in those SPVs.

Where a Financing Affiliate holds its assets in one or more investment vehicles, the SPV may be wholly-owned by the Financing Affiliate or may be owned in part by the Financing Affiliate and certain WOGA Funds and Accounts. For example, certain WOGA-advised funds and accounts may limit their investments to those that meet certain environmental, social and governance criteria ("ESG Criteria"). To date White Oak ABL has launched one or

more SPVs designed to accommodate certain investors' investment criteria.  Other Financing Affiliates may do so in the future.

Each Financing Affiliate may utilize SPVs to hold ESG compatible investments so that funds/accounts subject to ESG Criteria may participate in investing in the Financing Affiliate in a manner that only exposes that fund or account to ESG Criteria-compliant assets.  Each SPV will pay a portion of the operating expenses of the Financing Affiliate under a cost allocation  procedure that has been reviewed and approved by the independent investor representatives of the funds and accounts that own that Financing Affiliate.

White Oak Health Care Finance has launched SPVs to hold real estate related assets, including SPVs that qualify as "real estate investment trusts" for tax purposes ("REITs").  The REITs consist of debt REITs that hold loans secured by real estate and "equity REITs" that hold improved real estate that is leased.

The SPVs bear a portion of the operating expenses of the Financing Affiliate to which the SPV is associated, pursuant to cost allocation procedures and services agreements whose terms have been approved by the independent investor representatives whose funds and accounts invest in those SPVs or as otherwise disclosed in those Client's governing documents.  Generally, costs are allocated on a cost plus basis, where the plus factor is determined by an independent party's transfer pricing study.  The allocation of cost is frequently determined by operation of cost allocation policies and procedures that use a mixture of specific cost identification and time based cost allocations. Certain employees of a Financing Affiliate that devote all of their time to a single SPV may be seconded to that SPV, which will bear all of that employee's allocable costs.

Additionally, where appropriate, it is anticipated that ServeCo may provide services to one or more of these SPVs in addition to or in lieu of the services provided by the associated Financing Affiliate.  If and when this structure is employed, the various entities typically enter into one or more bilateral or multilateral agreements ("Servicing Agreements") that describe the respective assets and responsibilities of each entity and is designed to fairly allocate costs and expenses to each entity pursuant to an allocation methodology, which methodology addresses difference in ownership of the various entities, as applicable.

## D.  Recommendation and Selection of Other Investment Advisers

Not applicable.

## ITEM 11:  CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

## A.  Code of Ethics

WOGA has adopted a Code of Ethics (the "**Code**") pursuant to Rule 204A-1 under the Advisers Act that sets forth the Firm's ethical standards and governs the business conduct of the Firm and certain persons associated with the Firm.  The Code describes WOGA's

policies regarding, among other policies, the oversight and monitoring of personal trading activity by the Firm, its owners, principals, and employees. Securities holdings and transactions of access persons (which includes "**Covered Persons,**" as such term is defined in the Code and includes Supervised Persons meeting further criteria), including their immediate family members sharing the same household, are reviewed periodically to determine compliance with the requirements of the Code. The Code also contains other restrictions and reporting requirements designed to limit personal conflicts of interest. These provisions apply to all employees of the Firm. All personnel are also required to comply with applicable federal securities laws. In addition, the employees of certain Financing Affiliates are treated as Covered Persons, either by virtue of their level of access to White Oak information or by application out of an abundance of caution of the Code's provisions to them (even though such employees may not be, in fact, Supervised Persons or Covered Persons).

You may obtain a copy of our Code upon request. Our contact information appears on the cover page of this Brochure.

## B.  Participation or Interest in Client Transactions

None of WOGA's Supervised Persons (as defined in the Code) may knowingly sell to or buy any security from a Client without prior written permission from the Chief Compliance Officer ("**CCO**"), the CCO's designee, or the Compliance Committee. Additionally, all Covered Persons must submit annual holdings and quarterly transaction reports detailing personal securities transactions. Such reports are periodically reviewed by the CCO or the CCO's designee to ensure ongoing compliance with the Code.

WOGA has adopted specific policies and procedures reasonably designed to monitor the level of proprietary ownership in each White Oak-managed Fund, and for obtaining the requisite consent before engaging in a transaction that would be considered a principal transaction under applicable SEC interpretations.

In addition, and as noted above, WOGA is associated with certain portfolio companies referred to as "Financing Affiliates," which are owned by various White Oak Clients, that create certain conflicts given the ownership interests in those entities by other White Oak Funds, which may impact Client transactions (see Item 10.C above for a description of these conflicts and how such conflicts are mitigated).

## C.  Investment in Securities Recommended to Clients

WOGA's Supervised Persons may not use knowledge about pending transactions or investments currently being considered on behalf of any White Oak Client for personal profit. To facilitate compliance with this policy, the CCO or the CCO's designee maintains a Restricted List containing all securities the Firm or certain affiliates of the Firm is analyzing or considering for a Client. As noted above, all Covered Persons must submit quarterly transactions reports detailing personal securities transactions. While WOGA's Supervised Persons may not invest directly in the same portfolio securities held by Clients, WOGA

WHITE OAK
GLOBAL ADVISORS

personnel may invest in White Oak Funds either directly or through a co-investment vehicle. Please refer to the discussion in Items 6 and 11 regarding pecuniary interests in White Oak Funds by White Oak employees, the potential conflicts of interests arising from such pecuniary interests, and descriptive summary of the policies and procedures adopted by WOGA that it believes are reasonably designed to mitigate these conflicts.

### D.   Investment in Securities at or about the Same Time Recommended to Clients

See Part 11.C above.

## ITEM 12:  BROKERAGE PRACTICES

### A.   Selecting or Recommending Broker-Dealers

With respect to the Direct Lending Strategy, WOGA's typical acquisition or disposition of an asset will involve a privately negotiated transaction and will not involve the services of a broker or dealer.  In those instances, WOGA seeks to negotiate and execute transactions in an efficient manner and consistent with its fiduciary duties to its Clients.  In limited circumstances, however, WOGA may dispose of an asset through a broker or dealer.  When it is appropriate to execute portfolio transactions through brokers or dealers, WOGA seeks the best overall terms available consistent with the factors identified directly below.  In assessing the best overall terms available for any transaction, WOGA considers the full range and quality of a broker or dealer's services and other considerations, including cost, expertise, and reputation.  If a Client asset can only be obtained from one broker or dealer, that broker dealer is then used.

WOGA is responsible for the placement of Client portfolio transactions and the negotiation of any commissions paid on such transactions.  Purchases of portfolio instruments through brokers typically involve a commission to the broker.  Purchases of portfolio securities from dealers serving as market makers include the spread between the "bid" and the "ask" price. WOGA may utilize the services of one or more introducing brokers who will execute the Clients' brokerage transactions through a broker or custodian who will clear the Clients' transactions.

When securities transactions for a Client are executed through brokers, such brokers will be selected by WOGA in its sole discretion and without the consent of any Client.  When effecting securities transactions for any Client, WOGA shall seek "best execution" for each trade.  "Best execution" does not necessarily mean obtaining the lowest possible price for any particular transaction.  Instead, WOGA considers a number of factors in order to determine which broker-dealer offers the best terms and conditions for the execution of trades.  The following factors are typically considered:

- The price sought to be obtained;

- The level of commissions or mark ups to be paid;

- Risks taken in positioning a block of securities;

- Broad market coverage resulting in a continuous flow of information regarding bids and offers the full range of brokerage services provided by the broker;

- The broker's capital strength;

- The broker's creditworthiness, stability, and reputation;

- The quality of the investment research, if applicable, and the investment strategies provided;

- Special execution capabilities;

- Clearance;

- Settlement;

- Custody;

- Recordkeeping; and

- Other services provided by the broker-dealer.

Placing Private Debt with Third Party Co-Lenders:  WOGA's affiliated broker-dealer, WOMP (see Item 10.A above for a description of WOMP and Item 10.C for a description of potential conflicts that such affiliation may create) provides debt syndication capabilities, debt capital markets solutions, and ancillary advisory services to corporate borrowers and institutional investors, including, at times, by placing private debt or equity when co-investors are involved or in deals that are deemed unsuitable for WOGA's capital.  See also *Transaction-based Compensation to WOGA Affiliates and its Personnel* in Item 6 for how such conflicts are mitigated.

Use of Qualified Brokers:  Firm Clients generally authorize WOGA to select brokers to effect transactions on their behalf.  WOGA has established general criteria to determine which brokers are qualified to provide brokerage services to such Clients, and considers, among others, the following relevant factors:

- financial stability of the broker;

- the actual executed price of the security and the broker's commission rates;

- research (including economic forecasts, investment strategy advice, fundamental and technical advice on individual securities, valuation advice and market analysis), as well as custodial and other services provided by such brokers and/or dealers that are expected to enhance WOGA's general portfolio management capabilities;

- the size and type of the transaction;

- the difficulty of execution and the ability to handle difficult trades;

- the operational facilities of the brokers and/or dealers involved (including  back office efficiency); and

- the ability to handle a block order for securities and distribution capabilities.

Best Execution Committee:  At least quarterly, selected employees of WOGA (the "**Best Execution Committee**") will meet to evaluate systematically the execution performance of its brokers.  The review of brokers will consist of a review of the prior quarter's commissions for executing brokers and may also include a review of balances held at ISDA and prime brokerage counterparties in respect of Client transactions in addition to any qualitative feedback received from WOGA's employees.  If deemed appropriate, the Best Execution Committee will also evaluate and / or engage a third party service provider to provide best execution metrics.  The review may consist of various factors, including, as applicable, the factors set forth below, and any other factors that the reviewers think necessary for WOGA to make a reasonable decision about its best execution determinations:

- names of brokers reviewed;

- volume of trades transacted by each broker by asset class or security type;

- average commission rate charged by each broker;

- the services provided by the broker other than execution (*i.e.*, research or other services used in the management of Client assets);

- whether the execution and other services provided by the broker were satisfactory (taking into account such factors as the speed of execution, the certainty of execution, and the ability to handle large orders or orders requiring special handling);

- reason for using that broker (*i.e.*, research, execution only, etc.);

- unusual trends (such as higher than usual commission rates or a large volume of business directed to an unknown broker); and

- potential conflicts of interest (such as directing brokerage to a broker who makes client referrals to WOGA).

1.  *Soft Dollar Arrangements*

Certain broker-dealers selected by WOGA may provide unsolicited, proprietary research at no stated cost or requirement of executing a particular amount of transactions.  Such provision of research to WOGA is consistent with the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended ("Exchange Act").  Any other soft dollar arrangements WOGA may enter in the future will also be consistent with the Exchange Act Section 28(e) safe harbor.

*2.   Brokerage for Referrals*

WOGA may use a variety of broker-dealers to execute Client transactions, some of which may also refer clients or investors to WOGA, other affiliate, or Client.  Such referrals can create a conflict of interest because they benefit WOGA without benefitting Clients.  As a matter of policy, WOGA does not allocate brokerage to compensate any broker for, or in recognition of, Client or Investor referrals; however, WOGA may select a broker-dealer that has referred, or may refer, business when doing so is consistent with WOGA's duty to seek best execution.  To prevent brokerage commissions from being used to compensate brokers for past or expected referrals, WOGA will not allocate brokerage business to a broker that has referred or may intend to refer Clients or Investors unless WOGA determines in good faith that the commissions payable to such broker are reasonable in relation to those available from non-referring brokers offering services of substantially equal value to the Client.

*3.   Directed Brokerage*

Not applicable.

## B.   Aggregation of Trades

Securities transactions in investment advisory accounts are normally implemented on a consistent basis across accounts.  In order to accomplish this, orders are aggregated and allocated pro-rata to the nearest round lot.  In addition to considerations of equity, such aggregation avoids placing competing orders, improves order management, and may, because of larger order size, permit some degree of price improvement relative to a series of individually placed orders.  WOGA may aggregate Client orders for execution where it believes it is in the best interests of clients to do so.  WOGA has an allocation policy designed to ensure fair and equitable treatment of clients over time.

With respect to the Direct Lending Strategy, when investment opportunities become available, WOGA will first determine the Client or Clients for which the investment is appropriate taking into account multiple factors including position limits, sector limitations, collateral exposures, and client-specific constraints.  If the investment is appropriate for more than one client, WOGA will allocate the investment among eligible clients pro rata based on the committed capital of each client, giving appropriate consideration to the current capital available for investment by each Client at the time the opportunity becomes available.  For more detailed information concerning WOGA's Investment Allocation process, see Item 16.

WOIP and WOPFI, each as an investor in White Oak Funds, may be included in aggregated orders or investment allocations, subject to the Code and the policies discussed above.

WOGA may cause a Client to effect "cross" transactions – transactions in which securities or other portfolio holdings are bought and sold among and/or between two or more Clients. Such a transaction will only be carried out if WOGA believes that the transaction will be

beneficial to both parties and if done in accordance with applicable law and WOGA's cross transactions policies and procedures, which are designed to ensure compliance with all applicable laws.

Certain Clients, as a result of applicable law (*e.g.*, ERISA) or as agreed with the client, may be unable to participate in cross-trades.  Such clients should understand that prohibitions on cross-trades may result in Clients receiving poorer quality of execution, bearing costs in excess of what might have been the case were cross-trades permitted, or being unable to participate in a cross transaction due to statutory (*e.g.*, ERISA) or other legal constraints, resulting in potentially adverse consequences to the client.

With respect to the Cash Management Strategy, trades are bound by the investment guidelines detailed in the investment management agreement with each Client.  Client trades are executed in accordance with the cash management allocation policy, which generally provides that trades are first executed for those Clients with the greatest daily total amount of cash available for investment.  In determining the daily total amount of cash available for investment, where the investment guidelines of two or more Clients have identical investment guidelines, the available cash is aggregated for the purpose of determining the cash levels, and trades are then executed consistent with the policy.

### C.   Affiliated Broker-Dealer

Please see Item 10.C. regarding White Oak Merchant Partners, LLC ("WOMP"), an affiliate of WOGA.  WOMP places, as appropriate, senior secured, second lien, mezzanine and other debt in transactions in which WOGA Clients may also participate.

## ITEM 13:  REVIEW OF ACCOUNTS

### A.   Periodic Account Review

With respect to the Direct Lending Strategy, the Investment Committee performs account reviews on a regular basis.

With respect to the institutional Cash Management Strategy, the operations manager performs account reconciliation at least monthly, which is then reviewed by the portfolio manager.

### B.   Client Reports

Generally, Separate Accounts will receive monthly or quarterly written reports from their custodians.  Investors in White Oak Funds generally receive written annual audited financial reports and may receive unaudited reports and updates from WOGA on a monthly or quarterly basis.  Depending on the contractual details of the engagement, WOGA may provide performance reports, holding reports, and/or market commentary on a regular basis.

## ITEM 14:  CLIENT REFERRALS AND OTHER COMPENSATION

WOGA has entered into and in the future may enter into additional written solicitation arrangements with in-house and third parties (each a "Solicitor").  Under a solicitation arrangement, the Firm may pay a referral fee to a Solicitor when the Solicitor successfully introduces a Client or Fund Investor to the Firm.  The amount of compensation is based on a negotiated percentage of the management and incentive fees received by WOGA from each Client.  Unless otherwise indicated in the governing documents for each client, the solicitation arrangement does not affect the amount of fees paid by each Client.

Although common, such referral arrangements do create a potential conflict of interest because, in theory, the referrer may be motivated, at least partially, by financial gain and not because WOGA's advisory services are necessarily the most suitable to the prospective client's/investor's needs.  Any prospective Client should consider carefully its investment objectives and take into account the description and risks identified with WOGA's investment strategies, including those identified in Item 8, which is only appropriate for certain types of investors.

## ITEM 15:  CUSTODY

White Oak Funds.  Due to certain arrangements, WOGA may be deemed to have custody of Client accounts, including the White Oak Funds, because WOGA or an affiliate serves as general partner or managing member of each of the White Oak Funds.  Fund investors do not receive account statements from the custodian; rather, the Funds are subject to an annual audit, and WOGA provides (or causes to be provided) to each Investor in the Fund a copy of the Fund's audited financial statements within 120 days following the relevant Fund's fiscal year end.  Investors who do not receive audited financial statements within such time period should contact WOGA immediately.

Separate Accounts.  Where WOGA is deemed to have custody of the assets of a Separate Account, the custodian(s) for such account will send to the Client periodic account statements (generally on a quarterly basis) indicating the amounts of any funds or securities in the custodial account as of the end of the statement period and any transactions in the account during the statement period.  Clients should review these statements carefully and should immediately contact WOGA if account statements are not received from the custodian on at least a quarterly basis.  To the extent WOGA, pursuant to the relevant advisory contract or otherwise, separately provides reports or account statements, Clients should compare WOGA's statements carefully to the account statements received from the custodian.  If there are any discrepancies between the account statements, please contact WOGA immediately.  In addition, WOGA undergoes a "surprise audit" by an independent public accountant with respect to the assets of the Separate Accounts where WOGA is deemed to have custody (other than situations in which the Firm is deemed to have custody solely due to its authority to directly debit its advisory fees).

## ITEM 16:  INVESTMENT DISCRETION

WOGA generally manages Client assets on a discretionary basis with the authority to determine for each Client what investments are made, as well as when and how they are made, consistent with and pursuant to limited powers of attorney granted for trading purposes through the relevant governing documents (*e.g.*, a Separate Account Client agreement, investment policy statement and/or investment guidelines, or the governing documents for White Oak Funds).  Clients may impose restrictions, limitations, or other requirements with respect to their individual accounts.  WOGA also has discretion over WOIP and WOPFI.

Investment Allocation.  WOGA maintains policies relating to allocations of investment opportunities between or among Clients.  WOGA uses its best judgment and acts in a manner that it considers fair and reasonable in allocating investment opportunities among the Clients.  Each Client has its own investment mandate (e.g., investment objective, type of investments, expected timing of exit, etc.) that may preclude it from participating in certain investments.  Additionally, each Client has different groups of investors, or an investor, with unique tax, legal, regulatory, and/or other requirements, including possible capital and liquidity constraints, that may prevent any one Client from participating in certain investments.  When it is determined that an opportunity is suitable for more than one Client, WOGA allocates such opportunity among Clients consistent with its investment allocation policy and seeks to do so on a fair and, over time, equitable basis.

Although such allocations are generally *pro rata*, they will not necessarily be so, where WOGA's allocation policies dictate a different result.  For example, WOGA, in allocating such investment opportunities, will consider, among other things, the proposed investment's size, liquidity, and time horizon, each such Client's diversification guidelines and objectives (including, e.g., position, geographic, or sector limitations), the likelihood of current income, and each such Client's investment period and available capital.  Allocations may also differ for tax, legal, regulatory, or other reasons as deemed appropriate by WOGA.  There can be no assurance that a particular investment opportunity will be allocated in a particular manner, and it is possible that a particular Client may not be given the opportunity to participate in certain investments made by other Clients that meet such Client's investment objectives, including, possibly, in instances of follow-on investments when such Client may have participated in the same or similar investment previously and/or provided protective advances previously.  Where conflicts arise in the allocation of investment opportunities, WOGA seeks to resolve such conflicts fairly and equitably for all effected Clients.

## ITEM 17:  VOTING CLIENT SECURITIES

### A.  WOGA Proxy Voting Authority

WOGA typically has authority to vote Client securities with respect to those accounts where WOGA has investment discretion.  While an extreme rarity in practice given WOGA's investment strategies, when WOGA has voting authority and is asked to vote, it will vote in

accordance with its written proxy voting policies and procedures, which are summarized below and available to Clients and Investors upon request. WOGA will also provide, to a Client or Investor, information about how that client's securities or securities held by the relevant White Oak Fund, as applicable, were voted.  Clients and Investors in White Oak Funds can request copies of WOGA's proxy voting policies and relevant voting records by contacting their White Oak investor relations representative.  WOGA will not disclose how it voted for a Client to third-parties, unless specifically requested, in writing by the Client.

Proxy voting is an important right of shareholders and reasonable care and diligence must be undertaken to ensure that such rights are properly and timely exercised.  When WOGA has discretion to vote the proxies of its Clients, it will vote those proxies in the best interest of its Clients and in accordance with its policies and procedures.

When proxies are received by WOGA, the Firm determines which accounts managed by WOGA hold the security to which the proxy relates and provides it to the relevant portfolio manager.  Absent material conflicts, the portfolio manager will determine how WOGA should vote the proxy consistent with the policy, as summarized in the guidelines below.  A proxy is typically voted electronically and is stored in the Firm's Books and Records.

If appropriate, WOGA will retain a third party to assist it in coordinating and voting proxies with respect to client securities.  If such instances, the CCO will monitor the third party to assure that all proxies are being properly voted and appropriate records are being retained.

## VOTING GUIDELINES

In the absence of specific voting guidelines from the Client, WOGA will vote proxies in the best interests of each particular Client.  WOGA believes that voting proxies in accordance with the following guidelines is in the best interests of its Clients.

- Generally, WOGA will vote in favor of routine corporate housekeeping proposals, including election of directors (where no corporate governance issues are implicated), selection of auditors, and increases in or reclassification of common stock.

- Generally, WOGA will vote against proposals that make it more difficult to replace members of the issuer's board of directors, including proposals to stagger the board, cause management to be overrepresented on the board, introduce cumulative voting, introduce unequal voting rights, and create supermajority voting.

For other proposals, WOGA shall determine whether a proposal is in the best interests of its Clients and may take into account the following factors, among others:

- whether the proposal was recommended by management and WOGA's opinion of management;

- whether the proposal acts to entrench existing management; and

WHITE OAK
GLOBAL ADVISORS

- whether the proposal fairly compensates management for past and future performance.

## CONFLICTS OF INTEREST

In voting proxies, the Firm seeks to identify conflicts that may exist between the interests of WOGA and its Clients, including by reviewing the relationship of WOGA and its affiliates with the issuer of each security and any of the issuer's affiliates to determine if the issuer is a Client of WOGA or an affiliate of WOGA or has some other relationship with WOGA or a Client of WOGA. If a material conflict exists, WOGA will determine whether voting in accordance with the voting guidelines and factors described above is in the best interests of the Client. WOGA will also determine whether it is appropriate to disclose the conflict to the affected Client(s) and as appropriate, except in the case of Clients that are subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), give the Clients the opportunity to vote their proxies themselves. In the case of ERISA Clients, if the applicable investment management agreement reserves to the ERISA Client the authority to vote proxies when WOGA determines it has a material conflict that affects its best judgment as an ERISA fiduciary, WOGA will give the ERISA Client the opportunity to vote the proxies themselves. Absent the Client reserving voting rights, WOGA will vote the proxies solely in accordance with its policies.

WOGA does not accept or exercise proxy voting authority with respect to its institutional cash management service.

### B. Client Proxy Voting Authority

Clients who do not grant WOGA discretion to vote proxies on their behalf are responsible for voting their own proxies and, if they desire to do so, must arrange to receive proxy materials from the relevant custodians or transfer agents. WOGA does not provide any proxy related information, or advice as to how to vote proxies, to such Clients.

## ITEM 18: FINANCIAL INFORMATION

### A. Financial Disclosures

Not Applicable.

### B. Material Financial Impairment

Not Applicable.

### C. Bankruptcy Petitions

Not Applicable.

WHITE OAK
GLOBAL ADVISORS

## GLOSSARY

| | |
|---|---|
| **Access Person** | Employees or other personnel of the Firm and certain of its affiliates who are deemed Access Persons as such term is defined under the rules promulgated under the Investment Advisers Act of 1940, as amended. |
| **Administrator** | A third party hired by WOGA to carry out certain functions with respect to the White Oak Funds or Separate Accounts, such as calculation of the net asset value, maintenance of books and records, facilitating payment of the pool's expenses, and other functions. |
| **Advisers Act** | The Investment Advisers Act of 1940, as amended from time to time. |
| **Brochure** | This Form ADV, Part 2A, as it may be updated from time to time. |
| **CCO** | WOGA's Chief Compliance Officer |
| **Clients** | White Oak Funds and Separate Accounts. |
| **Code** | WOGA's Code of Ethics. |
| **Compliance Committee** | WOGA's committee that is responsible for, among other things, assisting the Operating Committee and WOGA in its oversight with respect to compliance matters under the Advisers Act, Exchange Act, FINRA rules, and other regulatory frameworks to which WOGA becomes subject, and acts as a resource to WOGA's CCO. |
| **Credit Event** | A debtor's default, reduction in creditworthiness, or bankruptcy. |
| **EBITDA** | Earnings before interest, taxes, depreciation, and amortization. This metric is used as one measurement of a company's value. |
| **ERISA** | Employee Retirement Income Security Act of 1974. |
| **Exchange Act** | The Securities Exchange Act of 1934, as amended from time to time. |
| **Financing Affiliate** | A portfolio company in which certain White Oak Clients have invested and/or may invest in the future that are engaged in the business of providing financing, typically in a targeted industry or economic sector, including WOABL, WOA, WOCF, WOHCF, WOTF, WOEF and WOUK. |
| **Finacity** | Finacity Corporation |
| **FINRA** | The Financial Industry Regulatory Authority. |

WHITE OAK
GLOBAL ADVISORS

| | |
|---|---|
| **Firm** | White Oak Global Advisors, LLC. |
| **Funds** | Privately placed investment funds to which WOGA provides investment advice. |
| **General Partner** | Including but not limited to, White Oak Partners, LLC, White Oak Partners 2, LLC, White Oak Partners 3, LLC,  White Oak Partners 4, SARL, White Oak Partners Impact, SARL, White Oak Partners V, SARL, White Oak Partners V (Luxembourg), SARL, White Oak Partners V, LLC,  White Oak Specialized ABL Partners, LLC, and White Oak Partners STABL, SARL, as applicable. |
| **Independent Investor Representative** | An individual or entity appointed by investors in a Fund to act on each investor's behalf in such Fund and on behalf of such Fund. |
| **IRR** | Internal rate of return. |
| **Investment Committee** | WOGA's committee that is responsible for, among other things, approving and monitoring investments made by White Oak Clients. |
| **Investors** | Persons other than Clients holding beneficial ownership interests in a White Oak Fund.  Except as otherwise agreed with WOGA, Investors are not clients of WOGA. |
| **Master-Feeder Structure** | An arrangement pursuant to which investment activities are generally engaged in by a "master fund" while Investors participate, indirectly, in those investment activities through ownership interests in one or more "feeder funds."  Certain White Oak Funds employ a master-feeder fund structure.  In such cases, references to the White Oak Fund include the master fund and all related feeder funds. |
| **Offering Materials** | As applicable and without limitation, subscription agreements, offering memoranda, operating agreements or advisory contracts with respect to the White Oak Funds or Separate Accounts. |
| **Operating Committee** | WOGA's committee that is responsible for, among other things, overseeing other White Oak Committees. |
| **Placement Agent** | A third party with whom WOGA contracts to locate potential investors in White Oak Funds or Separate Accounts. |

| | |
|---|---|
| **Separate Account** | An account advised by WOGA on behalf of a third party, typically with one beneficial owner entity or entities and includes funds of one. |
| **ServeCo** | White Oak Credit Services, LLC, an affiliated entity of WOGA |
| **Tenor** | Tenor refers to the time left for repayment on a loan. |
| **Valuation Committee** | WOGA's committee that is responsible for, among other things, maintaining, updating, and identifying possible modifications to the Valuation Policy. |
| **Valuation Policy** | The policy, as amended from time to time, which provides guidance on portfolio valuation and includes details on valuing illiquid or other hard to value assets. |
| **White Oak** | White Oak Global Advisors, LLC. |
| **White Oak Funds** | Privately placed investment funds to which WOGA provides investment advice. |
| **WOABL** | White Oak Asset Based Lending, LP (the successor entity to White Oak Asset Finance, LLC), is a business focused primarily on providing asset based financing to its customers in the US, Australia and Europe. |
| **WOA** | White Oak Aviation is a company that focuses on equity and debt financing in the commercial aviation market. |
| **WOCF** | White Oak Commercial Finance (previously doing business as Capital Business Credit) is a company which provides provides asset-based lending, full-service factoring, invoice discounting, government contract financing, lender financing, supply chain financing, inventory financing, US import/export financing, trade credit risk management, account receivables management and credit and collections support. |
| **WOCFE** | White Oak Commercial Finance Europe is a company which provides a variety of finance solutions globally, such as the purchasing of receivables. |
| **WOE** | White Oak Europe is the holding company for White Oak UK, which operates in the U.K and provides asset finance, business loans, commercial mortgages and education leases to small and middle-market companies. |
| **WOEF** | White Oak Equipment Finance is a company which provides a number of equipment financing solutions, including operating leases, capital leases, and other forms of equipment financing. |

WHITE OAK
GLOBAL ADVISORS

| | |
|---|---|
| WOGA | White Oak Global Advisors, LLC |
| WOHCF | White Oak Healthcare Finance, LLC, is a company focused on debt investment opportunities in the healthcare sector. |
| WOIP | White Oak Investment Partners, L.P., a proprietary account that invested in the White Oak Strategic Fund and whose investors include solely past and present WOGA personnel, their family and the personnel of WOGA affiliates. |
| WOLF | White Oak Lender Finance is a company that lends to specialty finance companies which focus on specific lending verticals. |
| WOMP | White Oak Merchant Partners, LLC. |
| WOPFI | White Oak Partners Fund I, L.P., a proprietary account that invests in certain of the White Oak Funds and other non-Fund investments and whose investors include solely past and present WOGA personnel, their family, and the personnel of WOGA affiliates. |
| WOREC | White Oak Real Estate Capital is a lender to the commercial real estate industry. |
| WOTF | White Oak Trade Finance, LLC, a company focused on structured trade finance solutions. |
| Yankee CD | A certificate of deposit issued by a U.S. branch of a non-U.S. bank. |

**WHITE OAK**
G L O B A L   A D V I S O R S

# WHITE OAK GLOBAL ADVISORS, LLC

## PRIVACY POLICY

*This is for your information only.  No action is required on your part.*

| FACTS | WHAT DOES WHITE OAK GLOBAL ADVISORS, LLC ("WOGA") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|

| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>▪ Address and Other Contact Information<br>▪ Social Security Number, Account Numbers and Income<br>▪ Transaction History and Account Balances<br>▪ Credit Scores and Income Tax Information<br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
|---|---|

| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons WOGA chooses to share such information; and whether you can limit this sharing. |
|---|---|

| Reasons we can share your personal information | Does WOGA share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes —** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes —** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |

**WHITE OAK**
GLOBAL ADVISORS

| | | |
|---|---|---|
| For our affiliates' everyday business purposes — information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes — information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| Questions? | Call 1-855-WHT-EOAK (1-855-948-3625)  or email compliance@whiteoaksf.com |
|---|---|

| Who we are | |
|---|---|
| Who is providing this notice? | WOGA |

| What we do | |
|---|---|
| How does WOGA protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does WOGA collect my personal information? | We collect your personal information, for example, when you:<br>• subscribe to our services or otherwise communicate to us<br>• inquire as to our services or otherwise provide information to us<br>• provide us with your contact information<br>We also collect your personal information from others, such as affiliates and nonaffiliated third parties such as custodians and consumer reporting agencies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only:<br>• sharing for affiliates' everyday business purposes — information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing.  See below for more on your rights under state law. |

| Definitions | |
| --- | --- |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *Our affiliates include (i) the general partners to the funds managed by WOGA, (ii) White Oak Credit Services, LLC, an entity organized under the laws of Delaware and (iii) White Oak Merchant Partners, LLC, an entity organized under the laws of Delaware.* |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ *WOGA does not share your information with nonaffiliates to market to you.* |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>▪ *WOGA does not share your information with nonaffiliated financial companies to market to you.* |

| Other important information |
| --- |
| Special notice for residents of California: We will not share information we collect about you with nonaffiliates, except as permitted by California law, including, for example, to process your transactions or to maintain your account(s).<br><br>Special notice for residents of Vermont: We do not share your information with nonaffiliates except as otherwise permitted or required by law. We do not share your information with our affiliates, other than information relating to your account transactions and our experiences with you except as otherwise permitted or required by law. |