```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK


THE TRUSTEES OF THE NEW YORK
STATE NURSES ASSOCIATION
PENSION PLAN,                      : Docket #21-cv-08330

                    Plaintiff,     :

     -against-                     :

WHITE OAK GLOBAL ADVISORS, LLC, : New York, New York
                                    April 11, 2023
                    Defendant.

-------------------------------:

                 PROCEEDINGS BEFORE
        THE HONORABLE ROBERT W. LEHRBURGER
           UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:      COVINGTON & BURLING, LLP
                    BY:  CHRISTOPHER Y. L. YEUNG, ESQ.
                    620 Eighth Avenue
                    New York, New York 10018


For Defendant:      SIDLEY AUSTIN, LLP
                    BY:  STEVEN E. SEXTON, ESQ.
                       REBECCA LEWIS, ESQ.
                    1 S. Dearborn Street
                    Chicago, Illinois 60603



Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1          THE COURT:  All right.  So we are here for

2    NYSNA Pension Plan versus White Oak Global Advisors,

3    LLC, 21-cv-8330, for a discovery application.

4          Counsel, please put in your appearances,

5    starting with plaintiffs.

6          MR. YEUNG:  Hi, Your Honor.  My name is

7    Chris Yeung from Covington & Burling.  I represent

8    the plaintiff, the Trustees of the New York State

9    Nurses Pension Plan.

10         THE COURT:  All right.  For defense?

11         MR. SEXTON:  Good afternoon, Judge.  Steve

12   Sexton and Rebecca Lewis on behalf of White Oak.

13         THE COURT:  Okay.  And I do see there are a

14   number of folks on the phone, but I think we have

15   the two parties that we need.  So I will ask, to the

16   extent anyone else is dialed in, to please put

17   yourself on mute if you are not already in that

18   position.

19         So, as you know, the matter was referred to

20   me by Judge Kaplan, and I have reviewed some of the

21   basic materials filed in the case, and I've,

22   obviously, read the letters that you've submitted.

23   We've got two issues, and I think we'll just take

24   them one by one.

25         So the first one is about the value, or the

```
 1    net asset value, as of a particular date.  As I
 2    understand it, the award, and Judge Kaplan agreed,
 3    is a NAV, net asset value, as of August 4, 2021.
 4    And as I also understand it, on September 3, 2021,
 5    the defendant transferred various interests in what
 6    I understand to be securities of some sort that are
 7    in a particular value.  I'm not sure what that value
 8    actually is, in the sense that I share the concern
 9    of the plaintiff, that if you transfer something on
10    September 3rd that is not cash and, therefore, the
11    equivalent of the NAV as it was on September -- you
12    know what the NAV was on August 4th.  Let's say it's
13    $100.
14            So if you transfer $100 on September 3rd,
15    you're good, but if you transfer something that the
16    value of which has a NAV that is to be valued
17    differently, how do you know that the NAV on
18    September 3rd is equal to what the NAV was on
19    September 4th?
20            And I guess that's a question for
21    Mr. Sexton.
22            MR. SEXTON:  Sure, Your Honor.  So I think
23    it's fairly simple.  So the award and Judge Kaplan's
24    decision confirming the award both recognize that
25    what could be transferred are the -- are assets.  So
```

```
 1   it's not an all-cash payment; it's an asset
 2   transfer.
 3            THE COURT:  Yep.
 4            MR. SEXTON:  And to take a simple example,
 5   if you had an investment fund that owned ten shares
 6   of IBM stock and investor -- call it the Plan --
 7   owned a 10 percent interest in that investment fund.
 8   If the investment fund transfers one share of IBM
 9   stock to the Plan, they got their NAV as of any
10   particular date.  It doesn't matter whether the
11   transfer is made on September 3rd or August 4th.
12   You know, the IBM shares may go up and down in
13   value, but if they have a 10 percent interest in a
14   fund and they recognize they got their pro rata
15   interest in their investment fund, they, by
16   definition, got their NAV.  You don't need to do an
17   NAV calculation because you're transferring assets.
18            It would be different if it was an all-cash
19   payment.  I would agree with you -- with them, that,
20   if we were ordered to pay all in cash, you'd have to
21   figure out the NAV, but this is an asset transfer,
22   so when we transfer their pro rata --
23            THE COURT:  Yeah.  I actually was looking
24   at it a little in the reverse, which is, if you're
25   transferring assets, those -- the value of those
```

1  assets can change between August 4th and

2  September 3rd, so don't I have to value those assets

3  on September 3rd to know whether they are still the

4  equivalent of what was supposed to be transferred on

5  August 4th?

6       MR. SEXTON:  No.  No, because it's --

7  you're transferring a pro rata interest in the

8  assets.  So if they were 10 percent of the fund and

9  they got 10 percent of their interest in the fund,

10  they, by definition, got their NAV as of any

11  particular date.  I mean, that's how the asset

12  transfer would work.

13       THE COURT:  I don't -- but I don't --

14  didn't the arbitrator and Judge Kaplan reject the

15  idea of pro rata share?  The whole point is there's

16  a $96 million award -- 96 plus -- and that has a

17  particular -- that is the net asset value as of

18  August 4, 2021, so it's -- the defendant is

19  obligated to transfer assets that have that value,

20  the $96 million value.  They can't transfer the same

21  assets if they happen to have gone down and have a

22  value of, say, 80 million.

23       MR. SEXTON:  Well, no.  I think that there

24  are two problems there.  One, although the

25  arbitration award referred to a $96 million number,

1    that was not as of August 4th.  It was -- and

2    Judge Kaplan recognized that.  He essentially said,

3    I see that $96 million number in the award.  I don't

4    know what it relates to.  It's not an August 4th NAV

5    calculation.  I think, as the arbitrator herself

6    says, that it's as of May 19, 2021.  So why that's

7    in there, nobody knows.  But it's certainly not an

8    August 4, 2021 NAV calculation.

9            And I think what Judge Kaplan recognized

10   is, you know, one of the -- one of the issues was,

11   you know, how does the pro rata distribution work?

12   And what he said on page 19 of his March opinion,

13   which is Docket 59, he said that -- he made

14   reference to an in-kind distribution of ownership

15   interest in the two underlying funds in which the

16   plan had invested in.  And he said, you know,

17   that -- he took issue with that.  If that was the

18   proposed pro rata distribution in the two funds, if

19   you just gave them, you know, their 10 percent

20   interest in the two investment funds, that may not

21   be good enough to satisfy the arbitration award.

22           But what we did -- I mean, White Oak is --

23   its business model is, essentially, it makes loans

24   to third parties.  And White Oak -- or the Plan had

25   been invested in two White Oak funds that had made

```
1    loans.  When we carved out their assets, we
2    essentially made them a co-lender.  So to the extent
3    a $100 loan had been issued and NYSNA was $10 of
4    that loan, they got their pro rata interest in that
5    loan, and they're -- they are now a co-lender
6    alongside of White Oak on the loans.
7           And so when they got their asset
8    distribution on September 3rd, they got all of their
9    pro rata interest in the underlying loans that
10   they're invested in.  And, of course, the loan value
11   may go up and down, right?  I mean, the principal
12   may be repaid.  And if a principal is repaid on a
13   loan, that -- the NAV is going to go down.  It --
14   between August and September, the Plan got money
15   back, principal payments back, from White Oak on
16   their investments, so, of course, the NA -- I mean,
17   they're complaining in their letter motion that it
18   looks like the NAV went down, but, of course, it
19   went down.  I mean, they got a -- they got a
20   principal distribution.  So, you know, to the extent
21   they're getting repaid on their loan investments,
22   their NAV is necessarily going to go down.
23          And we did give them -- just to be clear,
24   we gave them, a long time ago, the August 4, 2021
25   NAV calculation, which is not an ordinary-course
```

```
 1    calculation.  You know, ordinarily, White Oak does
 2    NAV calculations quarterly.  It hires Stout, which
 3    is an independent firm, to value all the loan
 4    investments.  And then it hires SEI, which is an
 5    independent administrator, to calculate NAV for its
 6    investors.  And so we did -- White Oak did a special
 7    NAV calculation for the plan as of August 4, 2021.
 8    We gave them the SEI paperwork relating to that
 9    calculation.  We gave them the Stout paperwork.  We
10    gave them the valuation number.
11          But we haven't -- you know, we -- to do a
12    September 3rd NAV calculation, that information
13    doesn't exist.  You'd have to value the investments
14    as of September 3rd, and then -- what they're
15    proposing is we then go out and hire SEI again out
16    of our own pocket to do another calculation for
17    them.  And I think that type of burden --
18          THE COURT:  How much does that cost?
19          MR. SEXTON:  I don't know how much it
20    would --
21          THE COURT:  Well, how much did it cost for
22    August 4th?
23          MR. SEXTON:  I think it was in the tens of
24    thousands of dollars.  I don't know the exact
25    figure, sitting here right now.
```

```
 1                THE COURT:  That's okay, but that helps me
 2     in terms of range.  Okay.  So let me --
 3                MR. SEXTON:  But it --
 4                THE COURT:  Go ahead.  Finish.  Go ahead.
 5                MR. SEXTON:  No, no.  I guess I -- but
 6     our -- I think our bigger issue conceptually is, is
 7     because this is an asset transfer, you just don't
 8     need to know the NAV number.  I mean, they got a pro
 9     rata distribution.
10                THE COURT:  Yeah.  So let me ask Mr. Yeung
11     to respond to that.  I see Mr. Sexton's point, I
12     think, which is that -- let's say they had
13     transferred on August 4th the -- whatever it is they
14     transferred on September 3rd.  It's still the same
15     thing as of September 3rd.  And if they're
16     correct -- if -- that the NAB has gone down because
17     principal has been returned and you've gotten the
18     benefit of holding that -- those securities, or
19     those interests, since August 4th, now -- and put it
20     differently:  If you had received it on August 4th,
21     you'd be in the same position as when they
22     transferred it on September 3rd because you would
23     have had whatever happened to the NAV happen during
24     that month; it's just that on September -- by
25     September 3rd, when it was in their hands, it just
```

1    happened to be on their watch.

2         So why should there be any different

3    valuation on September 3rd?  I mean, think of it; if

4    the market had gone up or somehow the loans became

5    more valuable by September 3rd, then would you

6    really be saying they would need to do evaluation to

7    make it equivalent to the value that should have

8    been transferred on August 4th?  Presumably not,

9    because then you'd be losing the numerical advantage

10   of having gone up during that time.

11        So help me understand why the fact that

12   you're getting -- or you're getting shares and --

13   well, shares, that it -- that itself isn't

14   sufficient.

15        MR. YEUNG:  Let me start, then, with the

16   language of the judgment, right?  This is the

17   judgment that was affirmed by -- that Judge Kaplan

18   issued confirming the arbitrator's award.  It says,

19   "disgorgement of the net asset value of the Plan's

20   assets as of August 4th."  That's the start and the

21   end of it.  It's the value that White Oak was

22   directed to transfer over, not the assets.  And

23   to -- you know, just to --

24        THE COURT:  Just -- hold on.  Just remind

25   me.  The value -- what was the value, what they

```
 1   have --
 2           MR. YEUNG:  They have disclosed, according
 3   to SEI, that August 4th SEI valuation that they
 4   procured, it was in the $86 million range.  I think
 5   it's 86 million -- 86.39 or 3 --
 6           THE COURT:  Okay.
 7           MR. YEUNG:  -- 86.4 million or so.  Yeah.
 8           THE COURT:  And are you contending that on
 9   August 4th you should have gotten the equivalent of
10   $96 million?
11           MR. YEUNG:  Of $96 million?
12           THE COURT:  Yeah.
13           MR. YEUNG:  No.  It would be -- well, look,
14   not the 96 million that's in the -- we don't take
15   that 96 million in that final award as the thing
16   that they were supposed to transfer to us for.
17           THE COURT:  Okay.  So what are you saying
18   you should have gotten on the 4th?  And what's the
19   difference in the value?
20           MR. YEUNG:  Yeah.  Well -- so at least this
21   $86.4 million value, right?  And White Oak chose to
22   try and -- to say, Well, we're going to satisfy that
23   aspect of the judgment by giving you paper, by
24   giving you something that's not cash, right, by
25   giving you securities.
```

1    THE COURT:  And Judge Kaplan explicitly

2   recognized that, of course, that was what was going

3   to happen.

4    MR. YEUNG:  That's a possibility.  But, you

5   know, he also acknowledged in his memo that -- and

6   he is parroting again -- he repeated what the

7   arbitrator said, that if -- White Oak may be forced

8   to find liquidity to satisfy its disgorgement

9   obligation.  So, in other words, if they choose to

10   provide us with some sort of in-kind distribution,

11   it still has to be worth what the net asset value of

12   our holdings were back in August 4th.

13    Right now, we're in the -- sort of in a

14   position where they've transferred these securities

15   and these things to us.  That's what they claim.

16   We're not -- there's another dispute over to what

17   extent that transfer is effective.  But they say,

18   You -- we've given you this -- these securities on

19   September 3rd, but we're not going to -- we don't

20   know how much they're worth on the date of transfer,

21   and we don't have to tell you.

22    All right, that's what their position is.

23   And the interrogatory at issue here, Rog 3, is

24   directed at requiring them to provide that valuation

25   because if they don't have that valuation, how can

1    they be in a position to argue, as they are arguing

2    now, that they're in compliance with the judgment?

3            The test also is availability.  We've

4    talked about SEI.  You've seen the Judge Kaplan case

5    that we cited in our paper.  They were able to

6    procure a valuation from SEI for August 4th.  You

7    know, they continue to have a relationship with SEI.

8    This is something that is certainly within their

9    power to obtain, and White Oak should be required to

10   provide it.  It's a valuation of what they claim to

11   have given us on September 3rd, as of that date.

12           THE COURT:  Well, a couple issues are

13   raised there.  So what about the point that what

14   they gave you had a valuation on August 4th?  And,

15   yes, whatever they gave you would have a different

16   value on September 3rd, but has been made up in a

17   different way, such as payment of principal.

18           MR. YEUNG:  Well, they haven't -- oh,

19   sorry.  Just to respond to that --

20           THE COURT:  No, no.  Go ahead.

21           MR. YEUNG:  I don't have a calculation.

22   I've seen no calculation that says that repayment of

23   principal makes up for the delta between what the

24   August 3rd value was and September 3rd value of the

25   securities are because I don't even have the value

1    of the securities.  They haven't given us that.  You

2    know, how do you make the argument that you've been

3    made whole via some type -- via some return of

4    capital -- sorry -- return of principal if you don't

5    even know what that difference is?

6            So I don't -- that's not -- you still need

7    to start with this, how much were the asset -- how

8    much were the things that you say you gave us on

9    September 3rd worth on September 3rd?

10           THE COURT:  And did they pay you any

11   portion in cash?

12           MR. YEUNG:  I think they were -- my

13   recollection is they returned some amount of

14   uninvested cash, but it was not -- I don't have that

15   number off the top of my head.

16           THE COURT:  Mr. Sexton, do you just recall

17   generally?

18           MR. SEXTON:  Yeah.  There was a return of

19   uninvested cash.  It was in the low million.

20           THE COURT:  Okay.  So there was still very

21   substantial portion that was in the form of

22   ownership of the loans; is that right?

23           MR. SEXTON:  Correct.

24           THE COURT:  Okay.  And when I say

25   "ownership of the loans," that's ownership in the

1  funds that hold the loans?

2          MR. SEXTON:  No, no.  They are now,

3  essentially, co-lenders on the loans they -- we took

4  them out of the two investment funds and gave them

5  their pro rata interest in the investments directly.

6          THE COURT:  And just --

7          MR. SEXTON:  They kind of sit alongside

8  White Oak.  Sorry.

9          THE COURT:  And just help me understand a

10 little more just what the -- you say there are loans

11 and they have an interest in the loans, so are these

12 buckets of loans that, you know, are thousands and

13 thousands of loans, or are we talking about

14 something else, or...

15          MR. SEXTON:  I don't think it's thousands

16 and thousands.  I think it's the order of magnitude

17 of 100 or so.  I could be off, but it's not --

18          THE COURT:  What kind of loans?

19          MR. SEXTON:  It's not thousands and -- I

20 think they're loans to small- and medium-sized

21 companies.  It's operating capital.  It's -- you

22 know, they're private credit loans where you loan

23 money to small- and medium-sized companies that may

24 not be able to get loans from a traditional bank so

25 they can fund and finance their operations.

1          THE COURT:  All right.  And the transfer of

2     those assets was made as of when?

3          MR. SEXTON:  As of September 3rd.  The

4     reason September 3rd -- the only reason it came up

5     is, when the arbitrator issued her award on the

6     4th of August, she said, make the -- disgorge the

7     August 4th NAV within 30 days.  September 3rd was in

8     30 days, so we made the transfer on that day, but it

9     could have been September 2nd or -- that was just

10    the end of the 30 day-period.

11         THE COURT:  And the assets and -- so help

12    me understand.  You hired the outside firms to do

13    the valuation.  Have you provided that to the

14    plaintiff?

15         MR. SEXTON:  Yes.  A long time ago.

16         THE COURT:  Okay.

17         MR. SEXTON:  We -- yeah, yeah.  Well --

18    long before any of these discovery issues came up.

19         THE COURT:  Okay.

20         MR. SEXTON:  We gave them the August 4th

21    NAV calculation.

22         THE COURT:  Okay.

23         MR. YEUNG:  Well, just to be clear, we had

24    to file a motion to compel in order to get the

25    August 4th SE valuation.

```
 1                    THE COURT:  Okay.
 2                    MR. YEUNG:  And we ultimately got it after
 3       that motion was granted.
 4                    THE COURT:  But, basically, Mr. Yeung,
 5       they're saying, We were required to pay you $100.
 6       We paid you assets:  $10 in cash and $90 in another
 7       non-liquid form that, as of August 4th, was worth
 8       the full amount of the $100 together, and then we
 9       transferred those assets to you 30 days later.
10                    And so, as Mr. Sexton is saying, they gave
11       you what had the net present value on August 4th.
12       Why do you need to know any more than that?
13                    MR. YEUNG:  Because they didn't give it to
14       us on August 4th.  So the stuff, the illiquid
15       portion of it, may not have been worth $0.90 anymore
16       on the dollar, you know, to the tenth.  I mean, that
17       split doesn't work anymore.  We don't --
18                    THE COURT:  Well, other than --
19                    MR. YEUNG:  Right now, we don't know --
20                    THE COURT:  Do you say that other than in
21       terms of payment in principal?  I mean, they're
22       loans, so there's a fixed amount that's going to be
23       due, right?
24                    MR. YEUNG:  Well, no.  So these are --
25       that's not the way that this works.  I think that
```

1     the way that these investments, as I understand it,

2     work, you know, you make -- the plan invested in

3     funds.  Those funds made loans to -- and pooled

4     at -- pooled other, pooled the White Oak, pooled the

5     Plans funds with other investors and then made loans

6     to, you know, private companies, you know, sometimes

7     obtained equity in various tranches; all, you know,

8     none of them publicly traded, right?  This is all

9     private -- you know, privately held businesses, as I

10    understand it, or mostly are.

11         Then what they purported to do on

12    August 4th is back out our share, our pro rata share

13    of that loan, that equity, and I think transferred

14    them over to some special-purpose vehicles.  You

15    know, while we're -- we have maybe a 0.4 percent

16    interest in a particular loan, other White Oak

17    assets have the other 96 -- you know, 99.6 percent

18    of the loans in equity, so there's a different

19    dispute about whether or not they've complied with

20    other aspects of the judgment in doing this.

21         But at the end of the day, we have this

22    sliver of interest in a variety of different loan

23    and equity investments that nobody has valued.  They

24    haven't valued as of the date of transfer.  And

25    they're saying that this stuff was all that they

1    needed to do to comply with the judgment.  They've

2    made the same argument before the arbitrator.  They

3    made the same argument before Judge Kaplan, a pure

4    in-kind transfer.  In both instances, the arbitrator

5    and Judge Kaplan said that's not enough.  The

6    judgment says disgorgement of net asset value of the

7    plan.  You know, if they made the transfer on

8    September 3rd, we need to know what the value is of

9    the stuff that they transferred to us on September

10   3rd to understand whether or not they're in

11   compliance with the judgment.

12        THE COURT:  But if, let's say for the

13   moment what they transferred you on September 3rd is

14   exactly what was the subject of their valuation on

15   August 4th, and so we're basically talking about a

16   difference of 30 days or so to get it moved.  And so

17   you're concerned that what you got on September 3rd

18   may be of lesser value than what you would have had

19   on August 4th.

20        But if they transferred -- I mean, what

21   would have been -- in the but-for world, what would

22   have been different?  They would have transferred

23   these assets to you.  Let's say they -- it all

24   happens on August 4th somehow.  In the next 30 days,

25   you're the owner of that interest, and so whatever

```
 1   happens between August 4th and September 3rd you're
 2   subject to anyway.  You're not in any worse a
 3   position or any different position than you would
 4   have been if they had pushed that to you 30 days
 5   before, are you?
 6             MR. YEUNG:  Well, I think the -- we can --
 7   if we actually own them on the 4th --
 8             THE COURT:  Hold on just a minute.
 9             Someone's chatting in the background, so
10   please put yourself on mute if you are.  Thank you.
11             Go ahead, Mr. Yeung.
12             MR. YEUNG:  If we, in fact, had owned the
13   assets in your hypothetical on August 4th, we would
14   have had 30 days worth of control over them in order
15   to do with them as we would.
16             THE COURT:  What kinds of things could you
17   have done with them?
18             MR. YEUNG:  Not -- I'll have to go talk --
19   I mean, I don't know what we could have done with
20   them, but the problem is, here, they're given --
21   White Oak was given various options on how to
22   satisfy the judgment.  They chose to satisfy this
23   judgment through a distribution of these illiquid
24   assets.  That's what they chose to do.
25             If they want to do that, you know,
```

```
 1    that's -- they need to -- they -- we should be able
 2    to get the value that we're owed on the date of that
 3    transfer.  That's what the judgment says.  If they'd
 4    made the transfer on August 4th, I think we would
 5    be -- I don't know that we would be in front of you
 6    making this motion.
 7            THE COURT:  Well --
 8            MR. YEUNG:  They didn't.  They didn't,
 9    right?  They waited a month to do it.
10            THE COURT:  Well, they had to do a
11    valuation.  They couldn't -- how did they have a
12    valuation on the day of transfer?  Don't they need
13    some time to perform that valuation?
14            MR. YEUNG:  They had -- they have all the
15    information.  You know, they held on to the asset
16    for the 30 days.  They have the underlying
17    information.  We don't -- excuse me -- we don't have
18    the information.  They could have procured --
19            THE COURT:  That's not my question.  My
20    point is, if they're determining the net asset value
21    as of August 4th, don't they have to do that
22    valuation after August 4th?
23            MR. YEUNG:  And they've done -- that's the
24    same thing that they did with the August 4th
25    valuation, too, right?  The one that they provided
```

1    to us wasn't provided to us until several years

2    after the purported asset transfer.  So right now,

3    they haven't given us anything, saying that what we

4    transferred on -- what they say they transferred on

5    September 3rd is equal to the August 4th valuation.

6    They've given us one input, but not the other.

7         THE COURT:  Let me go back to Mr. Sexton.

8    So I was making a few assumptions in there.  I don't

9    know if they're correct.

10        Again, you're supposed to transfer as of

11   August 4th.  When was the valuation done of what you

12   actually ended up -- or to get at the August 4th

13   number?

14        MR. SEXTON:  I don't recall the exact point

15   in time, but it was some -- it wasn't -- obviously,

16   it wasn't the day we got the arbitration award,

17   which was August 4th.  It was done sometime after

18   that.

19        THE COURT:  Right.

20        MR. SEXTON:  But I continue to go back to

21   if, you know, Judge Kaplan's decision confirming the

22   award says on page 18 that the arbitrator properly

23   framed the award against the backdrop of the

24   investment management agreement, which provided that

25   White Oak would "transfer to the trustees all books,

```
1    records, accounts, cash, securities, and other
2    evidences of ownership" -- it goes on.  And that's
3    what we did.
4          So we -- you know, they call it a -- say
5    they had a 10 percent interest in the two funds.  We
6    gave them their pro rata distribution of their
7    assets.  And that, by definition, equals the
8    August 4th NAV.  It has to.  If you go back to the
9    IBM share example, I mean, IBM stock may go up and
10   down.  You get your share of IBM stock, and it is
11   your NAV as of any particular date.  It's by -- when
12   you get a pro rata distribution, it is your NAV as
13   of any date.  And they agree they got their pro rata
14   distribution.  They say it in their motion-to-compel
15   briefing.
16         MR. YEUNG:  We don't agree with that,
17   number one, but that's -- I mean, this is a --
18         THE COURT:  Well, Mr. Yeung, I
19   understand -- tell me if I'm wrong.  I understand
20   your position to be that, for payment of NAV based
21   on the arbitration order of Judge Kaplan, pro rata
22   asset is -- does not suffice, or does it?
23         MR. YEUNG:  The assets aren't a value.  I
24   mean, maybe that's the simplest way to put it,
25   right?  A value is a value; it's a number, right?
```

```
 1     And they've given us a value of approximately $86
 2     million of what -- that's what their own -- that's
 3     what their valuation company said the assets were
 4     worth at the day -- you know, on August 4th.  They
 5     need to give us 84 -- 86 -- right, $86 million worth
 6     of value.
 7               THE COURT:  But look --
 8               MR. YEUNG:  Yeah.
 9               THE COURT:  They're supposed to give you a
10     NAV value as of August 4th, right, that's worth a
11     certain amount?  They say, Here, we're giving you
12     these ten widgets.  We have valued them.  As of
13     August 4th, they were worth $86 million, and that's
14     what we owe you, period.  Then they give you those
15     assets because, as of August 4th, that's what they
16     were worth.  Why does it matter the 30 days
17     between -- you know, from the time it's actually
18     transferred, let's say -- you can't transfer
19     instantaneously.
20               How does -- the value is still based on
21     August 4th.  The assets themselves may have gone
22     down in value since then, but as of August 4th,
23     that's what they were worth and they gave them --
24     that's what they gave you.
25               MR. YEUNG:  So I guess I'll make two
```

```
 1    points.  Yeah, I think there you're equating --
 2    you're making -- you're making the -- you're -- you
 3    see no -- there's no daylight between what the
 4    assets are and what the value is, right?  That's the
 5    assumption you would have to make in order for that
 6    to be true, but that's not the case here.  They
 7    specifically made the argument that the value should
 8    be the assets to Judge Kaplan, to the arbitrator.
 9    And Judge Kaplan's memo, if you read further down
10    from where Mr. Sexton was reading, it actually says
11    the award establishes that White Oak cannot satisfy
12    its obligation through an in-kind distribution of
13    fractional interest and instruments that it controls
14    and flow through the prohibited ERISA
15    transactions --
16              THE COURT:  Right.
17              MR. YEUNG:  -- although in-kind
18    distribution is not precluded categorically.
19              THE COURT:  Right.
20              MR. YEUNG:  Now, what is the in-kind
21    distribution that they're talking about?  Is the
22    exact same thing they did here.  Judge Kaplan's
23    decision was issued in 2022, in March.  This was,
24    you know, six months after they had made this
25    purported transfer.  They said that this purported
```

```
 1    transfer was sufficient and Judge Kaplan disagreed.
 2              THE COURT:  Right.  But let me ask -- can I
 3    just --
 4              MR. YEUNG:  Yeah.
 5              THE COURT:  I just want to understand
 6    something because I read it the same way you do, but
 7    an in-kind transfer can be an in-kind of something
 8    other than these fractional interests.  There are
 9    other types of things they may have that might be in
10    kind.
11              MR. YEUNG:  Yeah.
12              THE COURT:  Of course, those would be
13    subject to the same potential issue, that their
14    value could go down between -- or their value would
15    change in some way in that 30-day period.  I don't
16    know how that the analysis would be any different.
17              You know, we're looking at this as a
18    discovery issue.  So, Mr. Yeung, how can, on a
19    discovery request a party be compelled to expend
20    funds to obtain information that doesn't exist under
21    their custody, control or possession?
22              MR. YEUNG:  So I think we would dispute
23    that it's not under their possession, custody or
24    control.  I mean, that's sort of the aspect here.
25              THE COURT:  Well, they can give you all the
```

1    data, but you'd have to go out and then hire your

2    people to figure out what the NAV is.  They don't

3    have the NAV as of September 3rd.

4           MR. YEUNG:  Well, it's an -- it's -- so I

5    think there -- if this were a document request --

6    give us your -- the NAV that you prepared for

7    September 3rd -- I think you would be correct on

8    that, Your Honor.

9           This is an interrogatory and the -- it's a

10   little bit different.  If you look at the case that

11   we cite, the Auction Houses Antitrust case, you

12   know, there, Judge Kaplan framed the issue as one as

13   availability and required the company in that

14   instance to procure information from a former CEO

15   who was apparently resisting, and at least resisted

16   initial overtures to provide the information.

17   Judge Kaplan said, No.  You have to go get that

18   information from the former CEO.

19          THE COURT:  Well, that's information that

20   exists --

21          MR. YEUNG:  Go ahead.

22          THE COURT:  -- in a form somewhere.  It's

23   not, in other words, in some embodiment.  Here,

24   your -- what you really want is a calculation that

25   hasn't been performed yet, and that's going to

1    require some expertise and some consulting.

2             MR. YEUNG:  Yeah.

3             THE COURT:  And you're basically asking the

4    defendant to do an expert analysis, essentially, and

5    to pay for it as a response to discovery.  And, you

6    know, I understand why, of course.  They, in some

7    sense, should have the burden of proving that what

8    they've provided you is the NAV value on August 4th,

9    and really what you're doing is disputing theories

10   about how you arrive at that.  They say it's already

11   been determined.  We provided you what we were

12   obligated to.

13            Do I have the power, in response to this

14   motion, to compel them to expend funds?  All -- of

15   course, in -- they always -- court can always cause

16   expenditure of funds to respond to discovery.  It

17   costs money and time to do that.  But to actually do

18   an analysis that hasn't been performed?

19            MR. YEUNG:  I think you do because they've

20   done the analysis as of August 4th, when it was

21   beneficial to them, right?  That's -- they've

22   already -- they've done that, right, from the same

23   company?

24            THE COURT:  They had to do it on -- I mean,

25   they had to do that valuation.  I mean --

```
 1                    MR. YEUNG:  Well, I would -- sorry.
 2                    THE COURT:  No, no.
 3                    MR. YEUNG:  Yeah, I would submit that they
 4         have to do this valuation, too, because it's two
 5         parts, right?
 6                    THE COURT:  Right.
 7                    MR. YEUNG:  One is what was it worth on
 8         August 4th, and what is it worth when you gave it to
 9         us, right?  So they gave us one, but not the other.
10         I would say that my -- you know, our position is
11         that both are necessary and both are obtainable.
12         They can't just give us one without the other.
13                    THE COURT:  Well, let's say they go ahead
14         and do this analysis --
15                    MR. YEUNG:  Yep.
16                    THE COURT:  -- and they come up with a
17         number that is materially different in your view
18         than the August 4th number.  Then there's going to
19         be a question:  Which is the correct valuation?  And
20         that seems to me a merits determination.
21                    MR. YEUNG:  I agree with that.  And then we
22         would -- you know, depending on what that number is,
23         we may be, you know, in front of -- it would not be
24         a discovery dispute; it would be a compliance issue.
25                    THE COURT:  But shouldn't -- which should
```

```
 1    come first; determination of the -- which is the
 2    correct way to do that valuation, or to do discovery
 3    and do an analysis that possibly in the end might be
 4    rejected as the appropriate way to look at it?
 5              MR. YEUNG:  So our -- the issue of what is
 6    the proper way of return this value, that's
 7    already -- in our view --
 8              THE COURT:  That's already been determined.
 9              MR. YEUNG:  -- it's already been
10    determined.  You know, Judge Kaplan heard all their
11    arguments before issuing the judgment, and he issued
12    this judgment.
13              THE COURT:  Yeah.  And, Mr. Sexton, you --
14    I mean, it is the case that Judge Kaplan, as I
15    understand, said, Look, in kind is one thing, but
16    providing fractional interest, that, you can't do.
17    That's not the equivalent.  How do you get around
18    that?
19              MR. SEXTON:  Well, I think, one, I mean, I
20    read his opinion slightly differently.  I mean, I
21    think -- I think if -- to harmonize the
22    arbitrator -- I think he's harmonizing the
23    arbitrator's award, which says you can transfer
24    assets.  I think what -- when I read the portion of
25    his opinion that talks about fractional interest,
```

1    he's saying you can't transfer fractional interest
2    in the investment funds that they owned.  And I
3    think the concern was, you know, if you give them
4    fractional interest in the two investment funds that
5    they were in before, then they're really in the same
6    spot they were in --
7              THE COURT:  Right.
8              MR. SEXTON:  -- before you gave them
9    something.  You really haven't put them in a
10   different footing.  I think that -- you know,
11   that -- I guess, maybe what didn't come through in
12   our briefing before Judge Kaplan, which wasn't
13   really an -- the issue before him, is that we made
14   them co-lenders, essentially, on the loans.
15             THE COURT:  Right.
16             MR. SEXTON:  And so they have an asset that
17   they can do with what they want.  And they have.
18   They have a new investment manager who's been making
19   investment decisions.  They can sell these assets,
20   so they have complete control over them.  So I think
21   that --
22             THE COURT:  Hold on.  Hold on a minute.
23   Hold on a minute.  Do they own the loans outright,
24   or they only own a percentage interest in the loans?
25             MR. SEXTON:  They own their percentage

```
 1   interest in the loan, but they --
 2            THE COURT:  Their percentage interest.
 3            MR. SEXTON:  -- can dispose of that
 4   interest.  There -- I mean, they can find third
 5   parties to sell them to.  They're making decisions.
 6   They're making decisions on the loans that are
 7   different than what White Oak is making for their
 8   investors.  So whenever there is a decision to be
 9   made, White Oak comes to their new investment
10   manager, it's called Comvest, and says, Comvest,
11   here's the decision.  How does your client want to
12   proceed?  And Comvest instructs White Oak how to
13   proceed.  And so they're in full control of their
14   loan.
15            THE COURT:  Okay.  So if they're in full
16   control of it, doesn't that cut against you?
17   Because let's say the 30-day period were a six-month
18   period, and let's say the value of those interests,
19   the -- of those interests in those loans had a value
20   on August 4th that has diminished by half.  They've
21   missed six months of their opportunity to dispose of
22   those interests as they had wished to -- you know,
23   they figured out -- they've projected:  This is not
24   going to be a good investment.  We don't want to
25   hold these, and so we're going to turn around and
```

1    sell them.

2            Now, that six-month period, could you come

3    back and say, Well, we gave them to you six months

4    later, but they had this value on August 4th?  I

5    don't -- how does that fly and why is that any

6    different?

7            MR. SEXTON:  Well, the arbitrator said, You

8    have to return their August 4th NAV, and you have 30

9    days to do it.

10           THE COURT:  Yeah.

11           MR. SEXTON:  And we returned it within 30

12   days.  And they got -- I think it -- they got their

13   August 4th NAV.

14           THE COURT:  Yeah.

15           MR. SEXTON:  It didn't say -- the award

16   doesn't say, Give them a September 3rd NAV if you

17   happen to return it on September 3rd.  It says, Give

18   them the August 4th NAV.

19           THE COURT:  No, but like I said -- well,

20   what if the award said give it in six months?  I

21   don't know that that -- or within six months.  If

22   you choose to wait that time, then you are depriving

23   them of the ability to dispose of the value that it

24   had on August 4th.  You're providing a different

25   value 30 days later or six months later or a year

```
 1    later for them to do what they want with.  It's just
 2    that they may be working with a much less value.
 3            As I said, I don't think they'd be coming
 4    back if there were an increase in the value, but
 5    that doesn't mean they should be taking the risk or
 6    the brunt of your providing them something with --
 7    arguably has less value on September 3rd than it did
 8    on August 4th because they don't have that value on
 9    September 3rd.
10            But I understand -- look, I understand the
11    arguments on both sides at this point.  And, really,
12    this determination, in part, as I said, sort of has
13    a merits aspect to it.  I guess we also don't know
14    how significant a difference the value is, the net
15    present value is, on September 3rd.
16            One thing I was going -- I did want to ask
17    about how much this costs.  And also, how long does
18    it take to do such a valuation, Mr. Sexton?
19            MR. SEXTON:  Well, I guess there -- I mean,
20    I -- there are, I guess, conceptually, two different
21    kinds of valuations, right?  There's valuing the
22    underlying loan investments.  And so on a quarterly
23    basis, that's what White Oak hires Stout to do.  And
24    that's very expensive because they're -- you know,
25    Stout is looking at the whole portfolio.  And then
```

1    you --

2              THE COURT:  Right.

3              MR. SEXTON:  And then --

4              THE COURT:  I'm just talking about

5    August 4th valuation, if it were to be done for

6    September 3rd, how long would that take?

7              MR. SEXTON:  I would guess a couple weeks.

8    I mean, I can't speak for SEI and how long it would

9    take them to do that, but I would guess at least a

10   couple weeks.

11             THE COURT:  I mean, in a sense, I could

12   order you-all to provide to the plaintiff all the

13   data that would be necessary to determine a

14   September 3rd NAV and then they go out and do it,

15   but I don't know that you would want to provide them

16   all that data.

17             I mean, look, I do think the September 3rd

18   NAV has to be determined because I do think that's

19   the right consideration, as has been argued by the

20   plaintiff.  In terms of the cost, you know, equity

21   might say the parties should split it.  On the other

22   hand, given the fact that the value is supposed to

23   be what it was on August 4th, we don't know if it

24   is, and so there's no way to verify whether it has

25   been complied with.  And in that sense, then it

1    would be on the defendant.

2          But if the defendant is saying, We have

3    supplied you with what we think the value is, and

4    plaintiff -- and, plaintiff, you disagree, then I do

5    think it is incumbent on both sides to be footing

6    the bill for this, so I'm going to -- my order is

7    that, yes, a September 3rd valuation has to be done,

8    but the parties have to share that cost equally.

9          MR. YEUNG:  Thank you, Your Honor.

10          THE COURT:  All right.  The second issue is

11    about individual investor names.  And this issue, I

12    would like a little more education on.  I think I

13    understand it and I think I know what a good

14    solution might be, but I would just like to

15    understand.

16          Mr. Yeung, explain it a little more, what

17    the restriction is that you're -- or threshold that

18    you're trying to guard against or you're concerned

19    about at this 25 percent threshold.  What's that

20    about?  And then why do you need to know investor

21    names rather than just their accounts anonymously?

22          MR. YEUNG:  So under ERISA, if White

23    Oak's -- if you have a fund that has monies that are

24    invested in -- into it by various investors that are

25    subject to ERISA and benefit plans, in other words,

1   and, you know, there are -- that money pooled

2   together directly or indirectly -- held directly

3   or -- through indirect or direct channels, if that

4   percentage equity is over 20 -- or it's 25 percent

5   or over, then the person managing the funds is

6   subject to ERISA duties.  That's sort of at the most

7   basic level.

8           There are certain exceptions to it.  And,

9   you know, one thing that White Oak has pointed to is

10  that the entities that are what they call the

11  "financing affiliates," which hold these -- which

12  have these funds, they call them "operating

13  companies."  We disagree with that characterization.

14  That's part of the discovery that we are taking and

15  we're looking at.  But, you know, that's -- if it's

16  not an operating company, if it's, in fact, an

17  investment vehicle -- and we contend these financing

18  affiliates are investment vehicles based on White

19  Oak's own public disclosures, among other things --

20  then they would owe us fiduciary obligations under

21  ERISA, which would be in direct violation of the

22  aspect of the judgment that says they have to remove

23  themselves as a fiduciary and investment manager.

24          Separately, there is a fact-intensive test

25  under ERISA where, even if you are not -- you know,

```
 1    you don't have this -- you don't hit this 25 percent
 2    threshold, if you are deemed in control, as a
 3    practical matter, through the various machinations
 4    of corporate ownership and other types of control,
 5    you are -- still can become -- you could -- still
 6    can be considered the ERISA fiduciary of somebody
 7    whose money that is under your control.
 8            And so there -- there's at least those two
 9    aspects where we think the investor identities are
10    relevant.  And specifically, you know, the actual
11    investor names are relevant for the 25 percent
12    threshold test because we don't have information --
13    even on the anonymized basis, we don't have
14    information that would be required to verify whether
15    or not these entities that White Oak has anonymized
16    are, in fact, ERISA plans or not.
17            What they've told us is, Here's a list.
18    It's anonymized.  We have a column that says whether
19    or not they're ERISA entities or not.  We're not
20    going to tell you the names of the investors.  And
21    the -- whether or not they're ERISA plans or not,
22    that's also information from the entities.  There --
23    it's not information from White Oak.  It's
24    information that the entities apparently gave to
25    White Oak.  So, you know, they can't -- you know, we
```

1    don't have information -- we don't -- we can't

2    verify that, and they're not necessarily even

3    standing behind it.  And, you know, the law -- the

4    legal test --

5              THE COURT:  So -- hold on.  So let me go

6    down that a little bit.

7              MR. YEUNG:  Yeah, sure.

8              THE COURT:  So for those who may hold over

9    25 percent, you want to understand whether it is an

10   ERISA plan that holds those funds in interest or

11   whether it is something else.  Do I have that right?

12             MR. YEUNG:  That's part of it.  And it's

13   not necessarily that one entity has to hold

14   25 percent, but as long as there's a 25 percent or

15   more of ERISA money in there directly or indirectly.

16   And, you know, if it's through a parent entity or

17   through some other fund that goes down, then there's

18   a math problem that has to be done, right, in

19   order --

20             THE COURT:  And for your purposes, in terms

21   of whatever it is you allege, if what -- what is it

22   that you're really looking for?  Are you looking to

23   find out if they have over 25 percent ERISA-type

24   funds being held by somebody who's not a plan.  I

25   mean, just explain to me.  I'm using the terminology

1    wrong, probably.

2         MR. YEUNG:  Yeah, sure.  If --

3    collectively, if what they -- if -- ultimately, you

4    know, the equity -- among the stuff that White Oak

5    purportedly gave us on September 3rd is our equity

6    interests in a variety of different companies.  What

7    we want to understand -- you know, we're a plan.  We

8    have plan funds.  If the other equity holders are

9    also plan funds and that is -- over the totality of

10   the equity holders, there's the -- there's over

11   25 percent of ERISA money in it, that would trigger,

12   in our view, fiduciary obligations that White Oak

13   owes to us on the basis of this ERISA rule.  That

14   would be in violation of the -- that would be in

15   violation of the judgment.  The judgment says White

16   Oak has to remove itself as fiduciary and investment

17   manager.

18        THE COURT:  So when you say that you need

19   to verify and White Oak doesn't necessarily have

20   that information, what is it you are seeking to do?

21   Are you seeking to go to all these investors and

22   seek discovery from them?

23        MR. YEUNG:  I -- sometimes if you can -- if

24   they reveal investor name and it's obviously a --

25   you know, a pension plan or some entity that's a --

```
 1    that is subject to ERISA, I don't think we would
 2    need to do that, necessarily.  And in -- but, you
 3    know, there may be instances, and that's really
 4    the -- this -- the issue here.  They said they'll
 5    give us these investor names if we agree never to --
 6    don't contact the investors at all, right?  That's
 7    what they've told us they'd do -- that they were
 8    willing to do.
 9         We can't promise that because there may be
10    instances where we have to go out, and for this
11    purpose, to enforce the judgment, for legitimate
12    judgment-enforcement purposes, to obtain discovery
13    necessary for this action, to contact those
14    investors.  And, you know, we understand all of our
15    obligations with respect to the protective order and
16    all the -- those things, but we can't agree not to
17    go, right now, without even knowing what their names
18    are, that we can't do it.  And that's really the
19    dispute on the discovery front.
20         THE COURT:  And, in turn, can -- based on
21    the information that White Oak has provided you, the
22    anonymous information, can you tell which entities,
23    percentage-wise, create an issue for you that you
24    would want their names?
25         MR. YEUNG:  We can't because we don't have
```

1    the names.

2                THE COURT:  No, no, no.  But what I'm

3    saying is, if there's an issue about -- in the data

4    they provided you, do they provide you with the

5    extent of the holdings that those entities have,

6    regardless of their name?

7                MR. YEUNG:  They give us commitment

8    numbers, which they've told us aligns with a

9    percentage amount.  Yeah.

10                THE COURT:  Okay.  And so if you see a

11    number that says, let's say, 3 percent, and then

12    something else says 28 percent, you're only

13    interested in the 28 percent number, or am I looking

14    at this way too simplistically?

15                MR. YEUNG:  I think you -- it's not just

16    one entity.  You have -- it's a collective, right?

17    So let's say if there are ten entities, ten

18    investors that hold, collectively, 28 -- 25 or

19    more --

20                THE COURT:  Got it.

21                MR. YEUNG:  -- then that could trigger

22    the -- that could trigger the percentage, so yeah.

23                THE COURT:  And do you -- so you need to --

24    you're wanting to assess, then, any entity name that

25    suggests or indicates it is an ERISA plan?

```
 1              MR. YEUNG:  That, and -- yeah, that's --
 2   that would be one of the things we would look at,
 3   correct.  Yes.
 4              THE COURT:  Well, what else?
 5              MR. YEUNG:  Well, it's -- you know, I think
 6   if there are -- I mean, that may be all.  That may
 7   be the end of it, right?  That may be the end of the
 8   analysis because it'd be very apparent, based on the
 9   names of the entities, that they're ERISA funds and,
10   therefore, you're above the 25 percent threshold.
11              THE COURT:  And how many customers are we
12   talking about that they gave you?
13              MR. YEUNG:  Looks like -- I'm just looking
14   at the sheet they gave us.  416.
15              MR. SEXTON:  I think it's 416.
16              MR. YEUNG:  Yeah, 416.
17              THE COURT:  416, Mr. Sexton?
18              MR. SEXTON:  Yes.
19              THE COURT:  Okay.  And what -- I don't know
20   what those, obviously, are composed of, whether
21   they're all ERISA-type plans, whether none are,
22   whether some may be.
23              Do you have a way -- well, I mean, who --
24   are you in a position where you could and you would
25   agree to provide them the names of any that are --
```

```
 1    appear to be plans, ERISA plans?
 2              MR. SEXTON:  Judge, could I just back up
 3    and explain --
 4              THE COURT:  Yeah, absolutely --
 5              MR. SEXTON:  -- what we actually did?
 6              THE COURT:  Sure.
 7              MR. SEXTON:  And we have a graphic if it
 8    would be helpful.  We had circulated it.  We could
 9    put it up on the screen.
10              THE COURT:  I have it.
11              MR. SEXTON:  I don't know if it's
12    necessary.
13              THE COURT:  I have it.
14              MR. SEXTON:  So we won't put it on the
15    screen.  But the graphic is meant to show -- so you
16    have, you know, two White Oak funds, then you have
17    NYSNA, and they're transferring money to what's
18    called a "financing affiliate," which, in turn, you
19    know, makes loans to other people.
20              Their argument is say, you know, 25 percent
21    or more of the eight investors in White Oak Fund 1
22    are ERISA investors, then that -- and that money is
23    going to the financing affiliate.  Then the
24    financing affiliate could have -- whoever is
25    managing the financing affiliate could have ERISA
```

1    fiduciary duties to the plan.  So if 25 percent or

2    more of total investor money is ERISA money, then

3    you could have, you know, ERISA obligations.

4         THE COURT:  Right.

5         MR. SEXTON:  And what we said to them -- we

6    said, you know, Look, we disagree, but we're going

7    to give you the information you need to do your

8    25 percent test.  And so what we did is we took all

9    of the investors.  White Oak has a database.  And so

10   each time an investor invests, they sign a

11   subscription agreement.  And the investor indicates

12   in the subscription agreement whether or not they

13   are subject to ERISA.  And so if the investor, when

14   they sign their subscription agreement, says, Yes,

15   White Oak, we're subject to ERISA, White Oak puts it

16   in their database in the normal course of business.

17   So every time they have a new investor, they are

18   continually updating their database to identify

19   who's subject to ERISA, who's not.

20        We generated a list on an anonymized basis

21   of all the investors.  We put their investment

22   amount, and we indicated whether or not they are

23   subject to ERISA based on what the investor

24   represented in the subscription agreement, and

25   that's from a database maintained in the ordinary

1    course of business.  And we sent it to them.  And

2    they can look at that and they can see Investor 1, 2

3    and 3, and whether they're subject to ERISA and

4    their investment amounts and determine for

5    themselves whether this 25 ERISA -- percent ERISA

6    test is met or not.  They have all of the

7    information to do that.  They have everything they

8    need.

9         They don't need to know the names because

10   we've given them the ERISA status based on what the

11   investor told White Oak.  So they -- and the idea of

12   contacting some 400 White Oak investors in a

13   judgment-enforcement proceeding is really hard to

14   swallow because these are confidential investor

15   names.  We've given them the ERISA status.  And we

16   previously said, We will give you the names, but you

17   got to promise not to contact our investors because

18   that could be very disruptive to White Oak's

19   business to have a plaintiff contacting 400-some

20   White Oak investors.  And they refused, and that's

21   why we gave them the information on an anonymized

22   basis.

23        THE COURT:  And the 416 names, only some of

24   those represented themselves to be ERISA, or those

25   are all --

1          MR. SEXTON:  Correct.

2          THE COURT:  -- ones?

3          MR. SEXTON:  No, no.  That's all of the

4    investors.  And the ones that said, We are subject

5    to ERISA, we indicated that in the Excel spreadsheet

6    we gave to them.

7          THE COURT:  And --

8          MR. SEXTON:  We indicated their investment

9    amounts.

10          THE COURT:  And about what number or

11   percentage of the 416 are ones that fall under the

12   ERISA umbrella based on their representations?

13          MR. SEXTON:  It's a fairly small number.

14   We have the spreadsheet up, but I'm not sure we

15   could quickly tell you the precise number, but it's

16   a relatively small number.

17          THE COURT:  What -- would it be -- you

18   know, what about the prospect of Mr. Yeung's client,

19   or at least Mr. Yeung, you know, in the legal

20   capacity -- would it -- is there so much harm to

21   White Oak in -- with the prospect that they might be

22   contacting that handful of your investors or

23   customers, but not the others?

24          MR. SEXTON:  No.  I think that would -- I

25   mean, that would spook investors to get a call from

1   a lawyer of a former investor that has sued them and

2   been involved in contentious proceedings, and then

3   they're calling them to say, Are you subject to

4   ERISA or not?

5           One, I don't -- I don't know that the

6   investor -- if I were the investors' counsel, I'd

7   say, Don't even talk to them.  I --

8           THE COURT:  Yeah.

9           MR. SEXTON:  -- because I don't know why

10  they're asking you this.  But I think that'd be very

11  disruptive to the investor relationship and it's

12  unnecessary.  They have the information.  I don't --

13  I mean, we've told them, based on what the investor

14  told us, whether they're subject to ERISA.

15          THE COURT:  Okay.  So, Mr. Yeung, I am sort

16  of puzzled what you really -- that's why I was

17  asking about why do you really need to -- the name?

18  And you say to verify.  To verify what?

19          MR. YEUNG:  Verify ERISA -- to verify

20  the -- whether or not they're subject to ERISA or

21  not if we need to, right?  If it --

22          THE COURT:  Well, if they -- if on this, on

23  their -- the number -- the spreadsheet that has been

24  provided, the 416, and there are ones that are

25  indicated to have represented that they are covered

```
 1    by ERISA, what would prompt you to call or get in
 2    touch with one of them or more of them?  Are you
 3    going to be asking, Well, we want to confirm that?
 4              MR. YEUNG:  If it's a -- well, I'd be
 5    more -- it would be, really, the ones that indicate
 6    that they are not, right?
 7              THE COURT:  Ah, okay.
 8              MR. YEUNG:  You know, the noes.
 9              THE COURT:  So you think it may be
10    underrepresented on the list of 416.
11              MR. YEUNG:  I don't know one way or the
12    other because I don't have the names.  I have a
13    list, right, that they provided.  I have no way of
14    doing one thing or the other right now.
15              THE COURT:  Okay.
16              MR. YEUNG:  And the -- may I also mention
17    one other thing?  I don't know if there are any
18    White Oak, you know, principals, members,
19    individuals, employees, directors, anybody
20    affiliated with White Oak that are on this investor
21    list and, you know, maybe -- may create situations
22    where they owe us fiduciary obligations as a more
23    general matter of corporate law, putting ERISA
24    aside, which, again, would also, I think, be in
25    violation of the judgment, but I'll leave that to
```

1    the side for now.

2            MR. SEXTON:  Could I address that point?

3            THE COURT:  Sure.

4            MR. SEXTON:  So I don't understand that

5    point because, to the extent that there are

6    White Oak principals that invested in these

7    investment funds, like the ones we put on our

8    graphic, these are passive investment funds.

9    They're not managed by any individual investor in

10   the fund.  But White Oak is an investment manager.

11   White Oak, the entity, manages the funds.  There's

12   no -- this is not a situation where you have, like,

13   a joint venture where a majority share --

14   controlling majority shareholder in a joint venture

15   with a minority shareholder had fiduciary duty.

16           These are passive investment funds.  And so

17   we've identified all of the persons who are subject

18   to ERISA based on our records.  And they don't need

19   to know whether any of the principals of White Oak

20   are investors in these investment funds because

21   that -- it doesn't give rise to a fiduciary

22   relationship in the fund itself.

23           THE COURT:  Okay.  This is what we're going

24   to do:  We're going to take this in steps.  So I'm

25   going to order that the names be produced, but that

```
1    the plaintiff not be permitted to contact any of
2    those entities without first seeking and obtaining
3    Court approval to do so.
4           MR. YEUNG:  Okay.
5           THE COURT:  And that way, you'll be able to
6    have a more focused discussion, if we need to, about
7    particular potential investors and customers and
8    what the real reasons are for wanting to contact
9    those entities.
10          MR. SEXTON:  Could we also request that
11   that be attorneys' eyes only, so just Covington's
12   counsel?
13          THE COURT:  Mr. Yeung, do you have a
14   position on that?
15          MR. YEUNG:  What is the -- I guess my
16   question -- I mean, we can talk -- I can talk to
17   Mr. Sexton about this offline.  I would be
18   interested in understanding what their concern is
19   because these are -- my clients are trustees in a
20   pension plan; they're not -- this is not -- this
21   is -- they're not -- you know, they're not
22   investment managers.  They're in the same industry.
23   There are no concerns of that sort here, so I'm
24   just --
25          MR. SEXTON:  But --
```

1           MR. YEUNG:  Yeah.

2           MR. SEXTON:  But your client does have --

3     your client did retain an independent investment

4     manager to manage this investment, which is a

5     competitor to White Oak.

6           MR. YEUNG:  If you want to -- if you want

7     the -- if that's the entity that you want to carve

8     out of seeing this, I think -- subject to my

9     client's views.  I might be more -- that's a

10    different conversation, yeah.  But I'd be more open

11    to that, but I don't know how I can have a -- it's

12    hard for me to have a conversation with the trustees

13    where it's just -- they're managing a pension fund,

14    right?  They're not in -- yeah.

15          THE COURT:  Right.  So, Mr. Sexton, what

16    about that?  If they were able to -- they weren't --

17    they were able to share with their client, but not

18    with that particular entity, is that sufficient, or

19    no?

20          MR. SEXTON:  Their client representative

21    only and lawyers, and neither can contact the

22    investors without Court approval.

23          THE COURT:  Without me -- without Court

24    approval?

25          MR. SEXTON:  Yes, I think that'd be fine.

```
 1                  THE COURT:  Okay.  And so it's -- I just
 2       want to understand.  It's the client reps.
 3                  And I just want to make -- Mr. Yeung, what
 4       was that particular entity?  It was an investment
 5       manager.
 6                  MR. YEUNG:  Comvest.
 7                  THE COURT:  Yeah, but -- and what do they
 8       do?  They are --
 9                  MR. YEUNG:  It's C-O-M-V-E-S-T.  I think
10       they're in -- they perform investment-management
11       services for --
12                  THE COURT:  Got it.  Okay.  Great.  Okay.
13                  MR. YEUNG:  They're a third party.
14                  THE COURT:  All right.
15                  MR. YEUNG:  Yeah.
16                  THE COURT:  So I think that resolves our
17       issues.  I'm going to issue a short order that
18       embodies them so you have a written order.
19                  Is there anything else we need to discuss,
20       Mr. Yeung?
21                  MR. YEUNG:  No.  I think that's it.  Thank
22       you, Your Honor.
23                  THE COURT:  Mr. Sexton?
24                  MR. SEXTON:  No, nothing more for me.
25       Thank you.
```

```
1                THE COURT:  All right.  Well, thank you,
2     all.  I wish you well.  And we're adjourned.
3                MR. YEUNG:  Thank you.
4                MR. SEXTON:  Thank you.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1            C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4    transcript of proceedings in the case of

5    THE TRUSTEES OF THE NEW YORK STATE NURSES ASSOCIATION

6    PENSION PLAN v. WHITE OAK GLOBAL ADVISORS, LLC,

7    Docket #1:21-cv-08330-LAK-RWL, was

8    prepared using digital transcription software and is

9    a true and accurate record of the proceedings.

10

11

12    Signature   _Marissa Mignano_____

13              Marissa Mignano

14

15    Date:    May 9, 2023

16

17

18

19

20

21

22

23

24

25